UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                 :

BITVESTMENT PARTNERS LLC,          :

                       Plaintiffs,   :

               -against-          :    13 CV 7632 (RWS)

                                 :

COINLAB, INC., CLI HOLDINGS, INC., ALYDIAN :
INC., PETER VESSENES and JOHN DOE,     :    **COMPLAINT**

                                 :

                 Defendants.   :

                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

       Plaintiff Bitvestment Partners LLC f/k/a Dalsa Barbour LLC ("Bitvestment" or

"Plaintiff"), by and through its attorneys, Reyhani Nemirovsky LLP, as and for its Complaint

against CoinLab, Inc. ("CoinLab"), CLI Holdings, Inc. ("CLI Holdings"), Alydian Inc.

("Alydian"), and Peter Vessenes ("Vessenes") (collectively, "CoinLab") and John Doe, (a yet

unknown investor entity or individual) (CoinLab and John Doe are collectively referred to herein

as "Defendants") hereby alleges as follows:

**THE NATURE OF THE ACTION**

       1.    Plaintiff pursues this action for injunctive relief, breach of contract, breach

of covenant of good faith and fair dealing, unjust enrichment, an accounting, indemnification and

specific performance against CoinLab, and tortious interference with contractual relations

against Vessenes and John Doe.

       2.    CoinLab is among the world's largest providers of technology and

services for the digital currency Bitcoin.

3.     In or about August 2013, Bitvestment and CoinLab entered into the Amended and Restated Bitcoin Services Agreement ("the Amended Agreement").  *See* Exhibit A, a true and correct copy of the August 14, 2013 Amended Agreement.

4.     Under the express terms of the Amended Agreement, CoinLab agreed "to dedicate 100% of its mining output" from August 14, 2013 (the date of the Amended Agreement), "to producing Bitcoin for [Bitvestment] until such time as [Bitvestment] receives 7,984.006735 Bitcoins from CoinLab."  *See* Ex. A at 1.

5.     CoinLab further contracted under the Amended Agreement to use its best efforts to mine Plaintiff's Bitcoins, and to deliver such coins to Plaintiff on a weekly basis as they are mined by CoinLab.

6.     CoinLab has willfully and intentionally failed to perform its obligations under this contract.

7.     It is publicly documented that CoinLab has successfully mined at least 922.88703245 Bitcoins since the date of the Amended Agreement and those Bitcoins have not been delivered to Plaintiff, in violation of the Amended Agreement.

8.     CoinLab represented that it is using its mining output for operating expenses and capital expenditures, in violation of express contractual provisions of the Amended Agreement, which require Bitvestment's approval for such actions.  Bitvestment did not provide such approval.

9.     CoinLab also represented that it has entered into an agreement with a third-party investor, John Doe, by which it committed to provide at least 10,000 Bitcoins to John Doe third-party investor before any other parties.  Such an agreement is in direct contravention of the Amended Agreement.

10. Any modicum of due diligence would have notified John Doe that CoinLab could not enter into such an agreement because it had a competing obligation to Bitvestment, through the Amended Agreement, wherein CoinLab agreed to provide 100% of its mining output to producing Bitcoin for Bitvestment until such time as Bitvestment receives 7,984.006735 Bitcoins.

11. These acts and breaches by Defendants have injured Plaintiff by preventing it from receiving the benefit of its bargain.

12. As a result, Plaintiff brings this action seeking injunctive relief, breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, an accounting, indemnification and specific performance against CoinLab, and tortious interference with contractual relations against John Doe.

## JURISDICTION AND VENUE

13. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction as the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.

14. On or about August 14, 2013, CoinLab and Plaintiff entered into the Amended Agreement by which the parties agreed that "any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District of New York" or, if subject matter jurisdiction was lacking, in any state court located in the city and county of New York. *See* Ex. A at 5, ¶ 11 b.

15. By the terms of the Amended Agreement, CoinLab consented to personal and subject matter jurisdiction.

16.     Vessenes, as an officer and chairman of CoinLab, was the signatory to the Amended Agreement and, as such, is subject to jurisdiction per the terms of the Agreement.

17.     John Doe, an investor, is subject to jurisdiction in New York, under the long arm jurisdiction statute C.P.L.R. § 302(a).

18.     The Amended Agreement provides that it will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

## THE PARTIES

19.     Plaintiff Bitvestment is a New York limited liability company with its principal place of business at 315 West 36th Street, New York, New York 10018.

20.     Defendant Vessenes is a citizen of Washington State and resides at 7561 NE Emerald Way Bainbridge Island, Washington 98110.  He is the Chairman of CLI Holdings and Alydian, and the Chief Executive Officer of CoinLab.

21.     Defendant CoinLab, Inc. is a Delaware corporation with its principal place of business at 900 Winslow Way East, Suite 100, Bainbridge Island, Washington 98110.

22.     Defendant CLI Holdings is a Seychelles corporation with its principal place of business at 900 Winslow Way East, Suite 100 Bainbridge Island, Washington 98110.

23.     Defendant Alydian is a Seychelles corporation with its principal place of business at 900 Winslow Way East, Suite 100 Bainbridge Island, Washington 98110, and also conducts business at 5320 SW Macadam Ave., Portland, Oregon 97239.

## FACTUAL ALLEGATIONS

24.     CoinLab is a venture capital-backed company engaged in the operation and development of Bitcoin software and technology platforms, products and services.

4

25.    CoinLab, on its website, represents itself to be a Bitcoin business incubator.

26.    Bitcoins are a digital, Internet-based currency, managed by an Internet-based peer-to-peer network.

27.    Bitcoins were introduced to the public market in early 2009.

28.    Bitcoins are volatile in value and speculative in nature.  Within the past year, the U.S. dollar value per Bitcoin ranged from approximately $10 to $260.  The current U.S. Dollar value is approximately $196 per Bitcoin (when averaging Bitcoin values across a variety of Bitcoin exchanges).  *See http://www.bitcoinexchangerate.org/* (last accessed on October 28, 2013).

29.    The process by which Bitcoins are created is known as "mining."

30.    Bitcoin mining involves adding transaction records to Bitcoin's blockchain, which is a public ledger of past transactions.

31.    Mining also involves using computer hardware and software to determine specific sets of numbers that constitute a valid block of Bitcoins.

32.    Mined Bitcoins are verified by nodes on the Bitcoin peer-to-peer network.

33.    CoinLab, *vis a vis* Alydian, developed a Bitcoin mining system and engages in Bitcoin mining.  According to Alydian's website:

> Bitcoins are algorithm-based mathematical constructs aggregated into blocks and traded on open global markets.  In order to successfully mine a block, which contains 25 bitcoins, one needs specialized computer setups constantly running the mining algorithm, a protocol designed to protect and secure the Bitcoin network.  Currently, there are roughly 11.5 million bitcoins in circulation, 25 more are mined every 10 minutes, and there will be a total of 21 million bitcoins issued.

Available at: http://alydian.co/news/CoinLab-Announces-First-Incubator-Company (last accessed on October 23, 2013).

34.     On December 13, 2012, Gallancy entered into a contract with CLI Holdings (the "First Services Agreement").  *See* Ex. B, a true and correct copy of the First Services Agreement.

35.     Under the terms of the First Services Agreement, Gallancy agreed to pay and did in fact pay CoinLab $50,000 in consideration for CoinLab mining 6734.00673499673 Bitcoins on his behalf and promptly delivering to him such Bitcoins.

36.     The parties entered into a second agreement on March 8, 2013 (the "Second Services Agreement").  The Second Services Agreement was between CoinLab and Gallancy.  *See* Ex. C, a true and correct copy of the Second Services Agreements.

37.     Under the terms of the Second Services Agreement, Gallancy agreed to pay, and did in fact pay, CoinLab $25,000 in consideration for CoinLab mining 1,250.00000000 Bitcoins on his behalf and promptly delivering to him such Bitcoins.

38.     On or about August 14, 2013, by virtue of two Assignment and Assumption Agreements, Gallancy assigned both the First and Second Services Agreement to Dalsa Barbour LLC n/k/a Bitvestment.  Bitvestment assumed, among other things, all of Gallancy's rights related to the First and Second Services Agreement.  *See* Ex. D and E, true and correct copies of the August 14, 2013 Assignment and Assumption Agreements.

39.     Through its signature on the Assignment and Assumption Agreement, CoinLab expressly agreed to its terms.

40.     CoinLab and Bitvestment entered into a third agreement on August 14,

2013, the aforementioned Amended Agreement.  By its terms, the Amended Agreement

superseded both the First and Second Services Agreements.

41.     The Amended Agreement expressly states that CoinLab would provide the

following services to Plaintiff:

> CoinLab will use best efforts to mine 7,984.006735 Bitcoins on [Bitvestment's]
> behalf, which, for the avoidance of doubt, will mean that <u>CoinLab shall dedicate
> 100% of its mining output</u> (other than the mining output that is required to meet
> CoinLab's appropriate mining operating expenses and capital expenditures
> subject as approved by all parties) <u>from the date of this Agreement to producing
> Bitcoin for Bitvestment until such time as Bitvestment receives 7.984.006735
> Bitcoins from CoinLab pursuant to this Agreement</u>.  On a weekly basis, CoinLab
> will promptly deliver to [Bitvestment] the Bitcoins ordered as they are mined by
> CoinLab.  CoinLab will deliver to [Bitvestment] a weekly account of Mined
> Bitcoins compared with Bitcoins delivered to [Bitvestment].  CoinLab will deliver
> to [Bitvestment] Mined Bitcoins via the CoinLab Storage or other methods of
> delivery requested by [Bitvestment].  [Bitvestment] may retain Mined Bitcoins in
> this CoinLab Storage through the Wind Down Period.  [Bitvestment] may
> perform one or more audits, at CoinLab's expense, of CoinLab's Bitcoin output to
> confirm that [Bitvestment] is receiving the mining output as agreed in section 2.

*See* Ex. A, Amended Agreement at 2-3, ¶ 2 [Emphasis added].

42.     In connection with the Amended Agreement, and with express authority of

CoinLab, Gallancy undertook due diligence of CoinLab's Bitcoin mining operations on behalf of

a potential third-party capital partner related to an expansion of CoinLab's Bitcoin mining

project.

43.     In connection with that due diligence, during which Gallancy was

provided access to CoinLab's operations (via both in-person inspection and extensive

conversations with CoinLab's executives and employees), mining project cost structure, financial

status (corporate structure, balance sheets, cash flows and capital) and operational plans,

Gallancy determined that: (a) CoinLab had fully and adequately functional Bitcoin mining

equipment; (b) CoinLab would be able to execute on the contemplated Bitcoin mining project with the third party investor; (c) CoinLab's mining equipment could be deployed at reasonable cost; and (d) CoinLab had the financial wherewithal to devote additional internal capital to the project.

44.     Gallancy advised the prospective third-party capital partner of his due diligence findings.  That prospective third-party capital partner was prepared to proceed with an investment into CoinLab in or about late August 2013.

45.     On or about August 29, 2013, Gallancy received an email from Vessenes wherein Vessenes informed him that CoinLab had located a different capital partner and was not moving forward with the prospective third-party capital partner on whose behalf Gallancy performed due diligence.

46.     In that same email, Vessenes requested to renegotiate the terms of the Amended Agreement, so that his newfound capital partner could jump to the front of the line regarding CoinLab's Bitcoin mining output despite the clear and unambiguous terms of the Amended Agreement.

47.     On or about August 29, 2013, Gallancy and Vessenes spoke by telephone. In that call, Vessenes informed Gallancy that: (1) he had already finalized the deal with CoinLab's new capital partner (John Doe) and (2) the new capital partner would be provided with an initial return of 10,000 Bitcoins, prior to any other parties, and in direct contravention of the Amended Agreement.  Vessenes again requested that Gallancy renegotiate the terms of the Amended Agreement, and Gallancy declined.

48.     Upon information and belief, the new capital partner (John Doe) knew or should have known of the existence of the Amended Agreement with Plaintiff and the fact that

8

its agreement would interfere with, and was in direct contravention of, CoinLab's Amended Agreement with Plaintiff.

49.     On September 12, 2013, Gallancy informed Vessenes by email that the first batch of Bitcoins due to Bitvestment was contractually due on Friday, September 13, 2013.

50.     Vessenes did not respond to the September 12, 2013 email and Bitvestment never received such Bitcoins.

51.     On September 27, 2013, Vessenes advised Gallancy by email in sum or substance that, among other things, CoinLab was utilizing mined Bitcoin output for capital expenses and operating expenditures, in direct contravention of the Amended Agreement.

52.     The project to mine Bitvestment's Bitcoins was already fully capitalized, and there was no reason for CoinLab to utilize Bitcoin output for capital expenses and operating expenditures.

53.     Gallancy advised Vessenes by email dated September 27, 2013 that Bitvestment did not approve of CoinLab using mined Bitcoin output for the purported expenses of capital and operating expenditures and demanded that Bitvestment receive 100% of mined Bitcoin output as required by the express terms of the Amended Agreement.

54.     Pursuant to the Amended Agreement, Bitvestment was provided with full audit rights regarding CoinLab's mining output.  In fact, Vessenes provided Bitvestment with two addresses at which CoinLab mined Bitcoins.

55.     On or about October 2, 2013, Bitvesment learned that CoinLab had violated the Amended Agreement by impairing its audit rights and changing the addresses at which it was mining Bitcoins, in an effort to hide Bitcoins or mask its mining output.  One such address that was provided to Bitvestment by Vessenes, showed a last-use date of October 2,

2013, with a cumulative final balance of 803.56015414 Bitcoins, and the last received 3.26

Bitcoins having a timestamp at 6:17:19 pm.  *See*

https://blockchain.info/address/18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC

        56.    The cessation of Bitcoins being received at this address after October 2,

2013 demonstrates that CoinLab has indeed has changed the address at which it is mining

Bitcoins in an apparent attempt to hide Bitcoins, as there would be no other reason for this

address to no longer receive Bitcoins on a regular basis (*i.e.,* every few hours).

        57.    Bitvestment neither received the 3.26 Bitcoins mined on October 2, 2013

time-stamped at 6:17:19 pm, nor any of the other Bitcoins of the 803.56015414 total at that

address, nor any of the 119.32687842 Bitcoins at the other address provided by CoinLab

(https://blockchain.info/address/1G3Csro9jsrGssJmdgpezj6cbKyu64sfua), nor any other Bitcoins

from CoinLab, in violation of the Amended Agreement.

        58.    Vessenes even had had the temerity to publicly boast that Alydian has

recently mined Bitcoins, none of which were delivered to Bitvestment.

        59.    On the Bitcoin Internet discussion forum bitcointalk.org, Vessenes

(utilizing the moniker Vess) admitted on October 2, 2013 that he has been mining Bitcoins.

While he discusses mining Bitcoins through BTC Guild (which is a Bitcoin mining pool), he also

discusses Coinlab's (Alydian's) solo mining and his decision to "come out of the closet" by

specifically embedding Alydian's name in the actual Bitcoin blockchain.  At the bottom of page

is text that shows:

*03e9fc0318416c796469616e3533333353036333532313130334392e2f2f0429c70100086ed13da0b9*

*377875 (decoded) Alydian53350635211049)*, to demonstrate to the Bitcoin community (and

likely in an effort to attract customers, since a miner is not required to embed one's name in the

blockchain and many miners would prefer anonymity) that he is in fact mining Bitcoins.  *See* Exhibit F, a printout from bitcointalk.org in which Vessenes admits to mining Bitcoins and a screenshot of: http://blockchain.info/tx/a screenshot of: https://bitcointalk.org/index.php?topic=306672.msg3289385#msg3289385 (last accessed on October 28, 2013).

60.     CoinLab has already brought online significant Bitcoin mining capacity and, per its represented plans with its new capital partner, should be bringing online at least 400 TH of Bitcoin mining capacity.  This mining capacity demonstrates that CoinLab has, and will have, plenty of output to perform its obligations under the Amended Agreement.

61.     As discussed above, computer power dedicated to Bitcoin mining is measured in hashes per second.  As of October 28, 2013, the aggregate computing power devoted by all miners to the task is approximately 3459 trillion hashes per second (one trillion hashes per second is known as a terrahash or 1 TH).  CoinLab's 400 TH constitutes (or will constitute) 400/3459 of computing power devoted to mining, which is 12% of the worldwide total.  By utilizing its 400 TH of computer power, CoinLab can generate 12% of the 3600 Bitcoins generated daily, or 416 Bitcoins per day.  Thus, just one day of mining output provides CoinLab with sufficient Bitcoins to fulfill 416/7984 of the Bitcoins required by the agreement, or 5% of the total agreement.  In just the next few weeks, however, based on recent history, mining capacity (*i.e.* computing power) in competition with CoinLab will undoubtedly grow.

62.     During the due diligence process of Gallancy set forth above, CoinLab represented that it possessed approximately $5 million cash and that its cost per TH is less than $6,000.  With such cash resources, among others, CoinLab can easily add at least 800 TH of incremental mining capacity, an amount far in excess of the amount required for CoinLab to

produce the necessary mining output to meet its obligations pursuant to the Amended Agreement.

63.     CoinLab also has the ability to raise more capital for additional mining capacity if necessary.  For example, during the due diligence process, CoinLab represented that its minority partner in Alydian, X Ray Holdings LLC, would be prepared to provide additional capital for mining capacity.

64.     CoinLab has breached the terms of the Amended Agreement that it use its best efforts and dedicate 100% of its mining output to producing Bitcoins for Bitvestment until Bitvestment receives 7,984.006735 Bitcoins.

65.     To date, Plaintiff has not received any of the Bitcoins owed under the Amended Agreement.

## FIRST CLAIM FOR RELIEF
(Breach of Contract against CoinLab)

66.     Plaintiff repeats and realleges paragraphs 1 through 65 above with the same force and effect as if fully set forth herein.

67.     Plaintiff and Defendants entered into a valid and binding Amended Agreement.

68.     Plaintiff has performed all of its obligations under the Amended Agreement, except as excused or prevented by Defendants.

69.     Defendants have materially breached the Amended Agreement by, among other things: (1) failing to mine 7984 Bitcoins and provide those Bitcoins to Plaintiff; (2) failing to provide Bitcoins mined thus far to Plaintiff, (3) failing to use its best efforts and devote 100% of its mining output for this purpose; (4) failing to provide accurate and timely information regarding the amount of Bitcoins mined in response to Plaintiff's request for an audit; and (5)

failing to seek approval from Plaintiff before using any mining output for operating expenses and/or capital expenditures.

70.    As a result of Defendants' numerous material breaches of the Amended Agreement, Plaintiff has been damaged, which damages are the natural and proximate consequence of CoinLab's breach of the Amended Agreement, in an amount to be determined at trial, but no less than 7984.006735 Bitcoins.

## SECOND CLAIM FOR RELIEF
(Breach of the Covenant of Good Faith and Fair Dealing against CoinLab)

71.    Plaintiff repeats and realleges paragraphs 1 through 70 above with the same force and effect as if fully set forth herein.

72.    Defendants agreed to abide by the terms of the Amended Agreement between Plaintiff and CoinLab.  Implied in this contractual relationship was Defendants' covenant of good faith and fair dealing.

73.    Defendants' actions as set forth above breached this implied covenant of good faith and fair dealing.

74.    Defendants' breaches are causing substantial and imminent harm and damage to Plaintiffs.

75.    As a result of Defendants' numerous material breaches of the Amended Agreement, Plaintiff has suffered significant damage, in an amount to be determined at trial, but no less than 7984.006735 Bitcoins.

## THIRD CLAIM FOR RELIEF
(Accounting against CoinLab)

76.    Plaintiff repeats and realleges paragraphs 1 through 75 above with the same force and effect as if fully set forth herein.

77.     Plaintiff seeks a formal accounting of all Bitcoins mined, any transactions related to mined Bitcoins, all revenue received from mining, and all claimed mining operating expenses and capital expenditures by CoinLab beginning from the date of the Amended Agreement to determine whether and if CoinLab is in actual breach of the Amended Agreement.

### FOURTH CLAIM FOR RELIEF
(Indemnification for Legal Fees and Related Costs against CoinLab)

78.     Plaintiff repeats and realleges paragraphs 1 through 77 above with the same force and effect as if fully set forth herein.

79.     Pursuant to Section 9 of the Amended Agreement, Indemnification, CoinLab agreed to indemnify Plaintiff "from and against any and all loss, damage or liability due to or arising out of any inaccuracy or breach of any representation or warranty of CoinLab or failure of CoinLab to comply with any covenant or agreement set forth herein.  CoinLab shall reimburse [Plaintiff] for its legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection with any such claim, action, proceeding or investigation."

80.     Defendants have breached the Amended Agreement, causing Plaintiff to suffer the damages for which Defendants owe it indemnity.

81.     CoinLab is therefore liable to Plaintiff for all of Plaintiff's legal fees and related costs, and all other costs fees and expenses that Plaintiff has incurred, is incurring and will incur in connection with CoinLab's failure to observe and perform its obligations under the Amended Agreement.

**FIFTH CLAIM FOR RELIEF**
(Specific Performance against CoinLab)

82.    Plaintiff repeats and realleges paragraphs 1 through 81 above with the same force and effect as if fully set forth herein.

83.    The Amended Agreement is a valid and enforceable contract between CoinLab and Plaintiff.

84.    Under the terms of the Amended Agreement, Plaintiff and Defendant made several valid and enforceable mutual agreements.

85.    Plaintiff substantially performed its obligations under the Amended Agreement by, *inter alia*, paying $75,000 to CoinLab and conducting due diligence.

86.    Upon information and belief, Defendant is able to continue to perform under the Amended Agreement by dedicating 100% of its mining output to producing Bitcoins for Plaintiff until such a time as Plaintiff receives 7,984.006735 Bitcoins from CoinLab.

87.    Plaintiff has suffered harm resulting from CoinLab's refusal to adhere to the terms of the Amended Agreement, for which there is no adequate remedy at law.

88.    Plaintiff has demanded, and is entitled to, specific performance of CoinLab's mining obligations under the Amended Agreement.

**SIXTH CLAIM FOR RELIEF**
(Unjust Enrichment against CoinLab)

89.    Plaintiff repeats and realleges paragraphs 1 through 88 above with the same force and effect as if fully set forth herein.

90.    In consideration for the Amended Agreement, CoinLab received payment from Plaintiff.

15

91.     CoinLab has wrongfully refused to abide by the terms of the Amended Agreement with regard to dedicating 100% of its mining output to providing 7,984.006735 Bitcoins to Plaintiff, in violation of the Amended Agreement.  It would be unjust and inequitable to allow CoinLab to benefit in this manner without remuneration to Plaintiff.

92.     By reason of the foregoing, CoinLab has been unjustly enriched at the expense of Plaintiff, and Plaintiff has suffered damages in an amount to be established at trial.

### SEVENTH CLAIM FOR RELIEF
(Tortious Interference with Contract and Business Relationships
Against Vessenes and John Doe)

93.     Plaintiff repeats and realleges paragraphs 1 through 92 above with the same force and effect as if fully set forth herein

94.     Plaintiff had a reasonable expectation of economic advantage from its Amended Agreement with CoinLab, in which CoinLab contracted to dedicate 100% of its mining output to providing 7,984.006735 Bitcoins to Plaintiff.

95.     Defendants John Doe and Vessenes intentionally and maliciously, without justification, interfered with Plaintiff's anticipated economic benefits by orchestrating and entering into a separate agreement by which CoinLab committed to provide at least 10,000 Bitcoins of CoinLab's mining equipment to John Doe before any other parties.  Such an agreement is in direct contravention of the Amended Agreement with Plaintiff, wherein CoinLab agreed to provide 100% of its mining output to producing Bitcoin for Bitvestment until such time as Bitvestment receives 7,984.006735 Bitcoins.

96.     As a direct result of John Doe's and Vessenes's interference with the Amended Agreement, Plaintiff was deprived of its prospective economic benefit from the Amended Agreement.  But-for John Doe's and Vessenes's interference, Plaintiff would already

16

have received Bitcoins mined by CoinLab and, as such, would already have received the anticipated economic benefits of the Amended Agreement.

97.     By reason of the foregoing, Plaintiff has been damaged, which damages are the natural and proximate consequence of John Doe's and Vessenes's tortious interference with Plaintiff's business relationships, in an amount to be proven at trial.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Bitvestment Partners LLC pray that this court:

a.     Enter judgment in its favor for injunctive relief, enjoining Defendants and their owners, officers, employees, agents and those in privity or acting in concert with them from: (1) transferring Bitcoins between and among themselves and to any third-parties; (2) transferring any other CoinLab assets to any third party, including cash on hand; (3) using Bitcoin mining output for operating expenses and capital expenditures; and (4) utilize best efforts and begin to mine and deliver Bitcoins to Bitvestment until Plaintiff receives 7,984.006735 Bitcoins from CoinLab.

b.     Order an Accounting of all claimed mining operating expenses and capital expenditures of CoinLab;

c.     Award the full costs of this action, including attorney's fees, costs and disbursements incurred by Plaintiffs as required by the indemnification clause in the Amended Agreement, at 4 ¶ 9;

d.     Award compensatory and punitive damages in an amount to be determined at trial;

e.     Order Specific Performance of the Agreement; and

f.     Such other and further relief as the Court may deem just and proper.

Dated: October 29, 2013
New York, New York

Respectfully submitted,

REYHANI NEMIROVSKY LLP

By: _____
Bryan Reyhani, Esq. (BR-9147)
Danielle Kiwak, Esq. (DK-1212)
200 Park Ave., 17th FL
New York, NY 10166
(212) 897-4022
bryan@rnlawfirm.com
danielle@rnlawfirm.com

*Attorneys for Plaintiff*
*Bitvestment Partners LLC*

# EXHIBIT A

**Amended and Restated Bitcoin Services Agreement**

This Amended and Restated Bitcoin Services Agreement ("**Agreement**") is entered into as of August 14, 2013 by and among CLI Holdings Inc., with its principal place of business at 900 WINSLOW WAY EAST, SUITE 100, BAINBRIDGE ISLAND, WA 98110 ("**CLI Holdings**"), CoinLab Inc., with its principal place of business at 900 WINSLOW WAY EAST, SUITE 100, BAINBRIDGE ISLAND, WA 98110 ("**CoinLab Inc.**"), and Alydian Inc. ("**Alydian**" and collectively with CLI Holdings, CoinLab Inc. and Vessenes, and each of their respective affiliates, "**CoinLab**"), and Dalsa Barbour LLC, with its principal place of business at 315 West 36th Street #18B New York, NY 10018 ("**Customer**").

**RECITALS**

Whereas, CoinLab Inc. and Customer are parties to that certain Bitcoin Services Agreement dated as of December 13, 2012 (the "**First Services Agreement**").

Whereas, CLI Holdings and Customer are parties to that certain Bitcoin Services Agreement dated as of March 8, 2013 (the "**Second Services Agreement**" and together with the First Services Agreement, each a "**Services Agreement**" and together the "**Services Agreements**").

Whereas, Vessenes, or one or more of his affiliates, is an equity holder of CLI Holdings, CoinLab Inc., and Alydian, and will benefit from this Agreement and the Services Agreement.

Whereas, Customer anticipates acting as an agent for ███████████████████████████ █████████████████ ) by providing diligence services for ███████████ in connection with a potential transaction between ████████████ and CoinLab (the "**Diligence Services**").

Whereas, in order to eliminate any and all potential conflicts of interest of Customer in its performance of the Diligence Services, the parties hereto desire to amend and restate each of the Services Agreements on the terms and conditions set forth herein, and for this Agreement to supersede each of the Services Agreements in its entirety, including without limitation by: (a) CoinLab releasing Customer from any confidentiality obligations imposed by the Services Agreements and (b) CoinLab agreeing to dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to Crystal Island and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab pursuant to this Agreement.

Whereas, CoinLab acknowledges that without the agreements set forth in the preceding Recital, a conflict of interest inherently arises between ( ███████████ and Customer because Customer would be put in a position of advocating on behalf of CoinLab to enter into a financing

1

REDACTED

transaction with ███████ regardless of the outcome of the Diligence Services, and CoinLab and Customer acknowledge that such a conflict of interest must be prevented.

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby amend and restate each of the Services Agreements in its entirety and further agree as follows:

1. **Definitions.**

   a. **"Bitcoin"** means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

   b. **"CoinLab Storage"** means the online storage system developed and hosted by or for CoinLab.

   c. **"Confidential Information"** means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure. "Confidential Information" includes the terms and conditions of this Agreement.

   d. **"Fees"** has the definition set forth in Section 3.

   e. **"Mined Bitcoins"** means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

   f. **"Services"** means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

   g. **"Term"** means the period of time necessary for CoinLab to deliver all Bitcoins to Customer under this Agreement.

   h. **"Wind Down Period"** means the period of time extending 12 months after the Term of the Agreement.

2. **Services.** CoinLab will use best efforts to mine 7,984.006735 Bitcoins on Customer's behalf, which, for the avoidance of doubt, will mean that CoinLab shall dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to ███████ and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab pursuant to this Agreement. On a weekly basis, CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab. CoinLab will deliver to Customer a

REDACTED

weekly account of Mined Bitcoins compared with Bitcoins delivered to Customer. CoinLab will deliver to Customer Mined Bitcoins via the CoinLab Storage or other methods of delivery requested by Customer.  Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.  Customer may perform one or more audits, at CoinLab's expense, of CoinLab's Bitcoin output to confirm that Customer is receiving the mining output as agreed in section 2.

3.   **Fees.**  In exchange for performing the Services, Customer has paid CoinLab a total of $75,000.00 USD ("**Fees**").  Each party will bear its own taxes as levied under applicable law.

4.   **Termination.**  Customer may suspend its performance or terminate this Agreement:

    **a.**  If CoinLab materially breaches this Agreement and fails to cure that breach within 30 days after receiving notice;

    **b.**  Immediately upon notice if CoinLab is Insolvent. "***Insolvent***" means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

5.   **Effects of Termination or Expiration**.  Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive.  Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down Period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab.  In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, at Customer's option, CoinLab will promptly refund all Fees to Customer.

6.   **Confidentiality.**  CoinLab will not use Customer's Confidential Information except as reasonably required for the performance of this Agreement.  CoinLab will hold in confidence Customer's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than reasonable care.  CoinLab agrees not to disclose Customer's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

7.   **Warranties.**  CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not

REDACTED

exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws. Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

8. **CoinLab Representations.** CoinLab represents and warrants that (a) all action required to be taken by CoinLab's respective directors, shareholders, managers and members in order to authorize CoinLab to enter into this Agreement has been taken, (b) CoinLab is not in violation of any term of its organizational documents, or, to CoinLab's knowledge, in any material respect of any term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound, (c) CoinLab is not in violation of any material federal or state statute, rule or regulation applicable to CoinLab, (d) the execution and delivery of this Agreement by CoinLab and the performance by CoinLab of its obligations pursuant to this Agreement will not violate, or conflict with, or constitute a default under, any contract, agreement, instrument, judgment, order or decree to which it is party or by which CoinLab is bound, nor, to CoinLab's knowledge, result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of CoinLab, and (e) CoinLab has made available to Customer all material information reasonably available to CoinLab and no information provided to Customer contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

9. **Indemnification**. CoinLab hereby agrees to indemnify and hold harmless Customer and each member, partner, principal, manager, director, officer, advisor or employee thereof (each, an "**Indemnified Party**") from and against any and all loss, damage or liability due to or arising out of any inaccuracy or breach of any representation or warranty of CoinLab or failure of CoinLab to comply with any covenant or agreement set forth herein. CoinLab shall reimburse each Indemnified Party for its legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection with any such claim, action, proceeding or investigation. The reimbursement and indemnification obligations of the Investor under this Section shall survive the termination of this Agreement and shall be in addition to any liability which CoinLab may otherwise have, and shall be binding and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Indemnified Party.

10. **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY

REDACTED

SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS. COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

## 11. Miscellaneous.

a. **Assignment.** This Agreement may not be assigned by either party without the prior written approval of the other party. Any purported assignment in violation of this Section will be void.

b. **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. The parties hereto irrevocably and unconditionally agree that any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York. The parties consent to personal and subject matter jurisdiction in the State of New York.

c. **Remedies Upon Breach.** CoinLab agrees that any breach, or threatened breach, of this Agreement by CoinLab could cause irreparable damage to Customer and that in the event of such breach Customer shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations under this Agreement, without the necessity of proving irreparable damage or posting a bond.

d. **Force Majeure.** Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes best efforts to promptly notify the other. In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

e. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

f. **Entire Agreement.** This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter, including

5

REDACTED

without limitation each of the Services Agreements.  No amendment or modification of this Agreement will be made except by a writing signed by both parties.  This Agreement is effective and survives regardless of whether a transaction is consummated between ▮▮▮▮▮▮▮▮ and CoinLab.

g.  **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

h.  **Recitals.**  The recitals hereof are hereby incorporated into this Agreement by this reference.

**[SIGNATURE PAGE FOLLOWS]**

6

REDACTED

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Bitcoin Services Agreement to be signed as of the date first above written.

**CUSTOMER**

Dalsa Barbour LLC

By: _____

Name:  Daniel H. Gallancy
Its: Member

**COINLAB INC.**

CoinLab Inc.

By: _____
Name: _____ Peter Vessenes _____
Its: _____ CEO _____

**CLI HOLDINGS**

CLI Holdings Inc.

By: _____
Name: _____ Peter Vessenes _____
Its: _____ chairman _____

**ALYDIAN**

Alydian Inc.

By: _____
Name: _____ Peter Vessenes _____
Its: _____ chairman _____

# EXHIBIT B

### Bitcoin Services Agreement

This Bitcoin Services Agreement ("**Agreement**") is entered into as of the last signature below by and between CLI Holdings Inc., with its principal place of business at 71 Columbia St, Suite 300, Seattle, WA 98104 ("**CoinLab**") and Daniel H. Gallancy with residence at 315 West 36th Street Apt 18B New York, NY 10018 ("**Customer**").  For good and valuable consideration the parties agree to the terms and conditions of this Agreement.

1. **Definitions.**

   a. "**Bitcoin**" means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

   b. "**CoinLab Storage**" means the online storage system developed and hosted by or for CoinLab.

   c. "**Confidential Information**" means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure.  "Confidential Information" includes the terms and conditions of this Agreement.

   d. "**Fees**" has the definition set forth in Section 3.

   e. "**Mined Bitcoins**" means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

   f. "**Services**" means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

   g. "**Term**" means 1 years unless the Agreement earlier terminated pursuant to the terms and conditions herein.

   h. "**Wind  Down Period**" means the period of time extending 12 months after the Term of the Agreement

2. **Services.** CoinLab will make commercially reasonable efforts to mine 6734.00673499673 Bitcoins on Customer's behalf during the Term.  CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab on the condition that Customer acknowledges and agrees that no delivery of Mined Bitcoins is expected to occur before July 1, 2013.  After July 1, 2013, CoinLab will deliver to Customer a monthly account of Mined Bitcoins compared with Bitcoins ordered.

CoinLab will deliver to Customer Mined Bitcoins via the CoinLab Storage. Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.

3.  **Fees.** In exchange for performing the Services, Customer will pay CoinLab a total of $7.425 USD per Bitcoin, for a total of $50,000.00 USD (**"Fees"**). Customer will pay CoinLab the Fees within 10 days of the effective date. Each party will bear its own taxes as levied under applicable law.

4.  **Termination.** Either party may suspend its performance or terminate this Agreement:

    a.  If the other party materially breaches this Agreement (other than the confidentiality obligations in Section 6) and fails to cure that breach within 30 days after receiving notice;

    b.  Immediately upon notice if the other party materially breaches the confidentiality obligations in Section 6;

    c.  Immediately upon notice if the other party is Insolvent. **"*Insolvent*"** means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

    d.  Immediately upon notice in the event that performing the Services becomes impracticable or impossible including, without limitation, in the event that applicable laws or regulations have changed in a way that materially affects the provision of Services under this Agreement in either party's reasonable discretion.

5.  **Effects of Termination or Expiration.** Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive. Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab. In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, CoinLab will refund to Customer US Dollars by the following formula:

    USD Fee Paid - (Bitcoins Delivered / Bitcoins Ordered) * (USD Fee Paid)

6.  **Confidentiality.** Neither party will use the other's Confidential Information except as reasonably required for the performance of this Agreement. Each party will hold in confidence the other's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than

reasonable care.  Each party agrees not to disclose the other party's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

7. **Warranties.**  CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws.  Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins.  Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

8. **Disclaimer of Warranties.**  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE.  CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS.  COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

9. **Limitation of Liabilities.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR THAT RELATE IN ANY WAY TO THIS AGREEMENT OR ITS PERFORMANCE. THIS EXCLUSION WILL APPLY REGARDLESS OF THE LEGAL THEORY UPON WHICH ANY CLAIM FOR SUCH DAMAGES IS BASED, WHETHER THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER SUCH DAMAGES WERE REASONABLY FORESEEABLE, OR WHETHER APPLICATION OF THE EXCLUSION CAUSES ANY REMEDY TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES WILL NOT BE LIABLE FOR ANY DIRECT DAMAGES THAT EXCEED THE AMOUNT OF FEES PAID UNDER THIS AGREEMENT.  THIS SECTION WILL NOT APPLY TO ANY INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.

10. **Miscellaneous.**

    a. **Assignment.**  This Agreement may not be assigned by either party without the prior written approval of the other party.  Notwithstanding the foregoing, CoinLab may assign this Agreement to: (i) a parent or subsidiary; (ii) an acquirer

of all or substantially all of CoinLab assets (or all or substantially all of the CoinLab assets relating to this Agreement); or (iii) a successor by merger or other combination. Any purported assignment in violation of this Section will be void.

b. **Governing Law.** This Agreement will be governed and interpreted in accordance with Washington State law. Any dispute relating to the terms, interpretation, or performance of this Agreement or the dealing of the parties under this Agreement will be resolved at the request of either party through binding arbitration. Arbitration will be conducted in the city of Seattle Washington under the rules and procedures of the American Arbitration Association ("**AAA**").

c. **Force Majeure.** Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes commercially reasonable efforts to promptly notify the other. In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

d. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

e. **Entire Agreement.** This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter. No amendment or modification of this Agreement will be made except by a writing signed by both parties.

f. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

So agreed by the parties:

| CoinLab | [Customer] |
|---|---|
| By: | By: |
| Printed Name: Peter Vessenes | Printed Name:  Daniel H. Gallancy |
| Title: CEO | |
| Date:   12-13-2012 | Date: December 13, 2012 |

# EXHIBIT C

**Bitcoin Services Agreement**

This Bitcoin Services Agreement ("**Agreement**") is entered into as of the last signature below by and between CoinLab Inc., with its principal place of business at 71 Columbia St, Suite 300, Seattle, WA 98104 ("**CoinLab**") and <u>Daniel H. Gallancy</u> with its principal place of business or residence at <u>315 West 36th Street 18B, New York, NY 10018</u> ("**Customer**").  For good and valuable consideration the parties agree to the terms and conditions of this Agreement.

1. **Definitions.**

    a. "**Bitcoin**" means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

    b. "**CoinLab Storage**" means the online storage system developed and hosted by or for CoinLab.

    c. "**Confidential Information**" means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure.  "Confidential Information" includes the terms and conditions of this Agreement.

    d. "**Fees**" has the definition set forth in Section 3.

    e. "**Mined Bitcoins**" means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

    f. "**Services**" means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

    g. "**Term**" means 1 years unless the Agreement earlier terminated pursuant to the terms and conditions herein.

    h. "**Wind Down Period**" means the period of time extending 12 months after the Term of the Agreement

**Services.**  CoinLab will make commercially reasonable efforts to mine 1,250.00000000 Bitcoins on Customer's behalf during the Term.  CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab on the condition that Customer acknowledges and agrees that no delivery of Mined Bitcoins is expected to occur before August 1, 2013.  After August 1, 2013, CoinLab will deliver to Customer a monthly account of Mined Bitcoins compared with Bitcoins ordered.  CoinLab will

deliver to Customer Mined Bitcoins via the CoinLab Storage. Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.

2. **Fees.** In exchange for performing the Services, Customer will pay CoinLab a total of $20.00 USD per Bitcoin, for a total of $25,000 USD (**"Fees"**). Customer will pay CoinLab the Fees within 10 days of the effective date. Each party will bear its own taxes as levied under applicable law.

3. **Termination.** Either party may suspend its performance or terminate this Agreement:

   a. If the other party materially breaches this Agreement (other than the confidentiality obligations in Section 6) and fails to cure that breach within 30 days after receiving notice;

   b. Immediately upon notice if the other party materially breaches the confidentiality obligations in Section 6;

   c. Immediately upon notice if the other party is Insolvent. **"Insolvent"** means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

   d. Immediately upon notice in the event that performing the Services becomes impracticable or impossible including, without limitation, in the event that applicable laws or regulations have changed in a way that materially affects the provision of Services under this Agreement in either party's reasonable discretion.

4. **Effects of Termination or Expiration**. Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive. Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab. In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, CoinLab will refund to Customer US Dollars by the following formula:

   USD Fee Paid - (Bitcoins Delivered / Bitcoins Ordered)  * (USD Fee Paid)

5. **Confidentiality.** Neither party will use the other's Confidential Information except as reasonably required for the performance of this Agreement. Each party will hold in confidence the other's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than

reasonable care.  Each party agrees not to disclose the other party's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

6. **Warranties.**  CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws.  Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

7. **Disclaimer of Warranties.**  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE.  CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS.  COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

8. **Limitation of Liabilities.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR THAT RELATE IN ANY WAY TO THIS AGREEMENT OR ITS PERFORMANCE. THIS EXCLUSION WILL APPLY REGARDLESS OF THE LEGAL THEORY UPON WHICH ANY CLAIM FOR SUCH DAMAGES IS BASED, WHETHER THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER SUCH DAMAGES WERE REASONABLY FORESEEABLE, OR WHETHER APPLICATION OF THE EXCLUSION CAUSES ANY REMEDY TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES WILL NOT BE LIABLE FOR ANY DIRECT DAMAGES THAT EXCEED THE AMOUNT OF FEES PAID UNDER THIS AGREEMENT.  THIS SECTION WILL NOT APPLY TO ANY INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.

9. **Miscellaneous.**

   a. **Assignment.**  This Agreement may not be assigned by either party without the prior written approval of the other party.  Notwithstanding the foregoing, CoinLab may assign this Agreement to: (i) a parent or subsidiary; (ii) an acquirer

of all or substantially all of CoinLab assets (or all or substantially all of the CoinLab assets relating to this Agreement); or (iii) a successor by merger or other combination.  Any purported assignment in violation of this Section will be void.

b. **Governing Law.**  This Agreement will be governed and interpreted in accordance with Washington State law.  Any dispute relating to the terms, interpretation, or performance of this Agreement or the dealing of the parties under this Agreement will be resolved at the request of either party through binding arbitration.  Arbitration will be conducted in the city of Seattle Washington under the rules and procedures of the American Arbitration Association ("AAA").

c. **Force Majeure.**  Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes commercially reasonable efforts to promptly notify the other.  In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

d. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

e. **Entire Agreement.**  This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter.  No amendment or modification of this Agreement will be made except by a writing signed by both parties.

f. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

So agreed by the parties:

| CoinLab | [Customer] Daniel H. Gallancy |
|---|---|
| By: *(signature)* | By: *(signature)* |
| Printed Name: *Jodie Brady* | Printed Name: Daniel H. Gallancy |
| Title: *CFO* | |
| Date: *3.8.13* | Date: March 7, 2013 |

# EXHIBIT D

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of August 14, 2013, between Daniel H. Gallancy ("Assignor"), and Dalsa Barbour LLC, a New York limited liability company ("Assignee").

### *Recitals*

A.    Assignor is a party to that certain Bitcoin Services Agreement, dated as of March 8, 2013 between Assignor and CoinLab Inc. (the "Services Agreement").

B.    Assignor desires to assign, and Assignor desires to assume, all of Assignor's rights and responsibilities pursuant to the Services Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Assignor hereby sells, transfers, conveys, assigns and delivers to Assignee all of Assignor's privileges, right, title, interest and obligations under the Services Agreement.

2.    Assignee hereby assumes all of the obligations of Assignor from and after the date of this Agreement under the Services Agreement.

3.    Except as otherwise set forth in this Agreement, Assignee is not assuming any further liability or obligation of Assignor.

4.    This Agreement will not affect Assignee's right to assert any defense with respect to the Services Agreement, at law, in equity or otherwise, against the validity or enforceability of any liability or obligation with respect to the Services Agreement.

5.    This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6.    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

**ASSIGNOR:**

Daniel H. Gallancy

**ASSIGNEE:**

Dalsa Barbour LLC

By:

Name:  Daniel H. Gallancy
Its: Member

ACKNOWLEDGED AND AGREED:

CoinLab Inc.

By:
Name:  Peter Vessenes
Its:  CEO

2

# EXHIBIT E

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of August 14, 2013, between Daniel H. Gallancy ("Assignor"), and Dalsa Barbour LLC, a New York limited liability company ("Assignee").

### *Recitals*

A.     Assignor is a party to that certain Bitcoin Services Agreement, dated as of December 13, 2012 between Assignor and CLI Holdings Inc. (the "Services Agreement").

B.     Assignor desires to assign, and Assignor desires to assume, all of Assignor's rights and responsibilities pursuant to the Services Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     Assignor hereby sells, transfers, conveys, assigns and delivers to Assignee all of Assignor's privileges, right, title, interest and obligations under the Services Agreement.

2.     Assignee hereby assumes all of the obligations of Assignor from and after the date of this Agreement under the Services Agreement.

3.     Except as otherwise set forth in this Agreement, Assignee is not assuming any further liability or obligation of Assignor.

4.     This Agreement will not affect Assignee's right to assert any defense with respect to the Services Agreement, at law, in equity or otherwise, against the validity or enforceability of any liability or obligation with respect to the Services Agreement.

5.     This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6.     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

**ASSIGNOR:**

Daniel H. Gallancy

**ASSIGNEE:**

Dalsa Barbour LLC

By: 
Name: Daniel H. Gallancy
Its: Member

ACKNOWLEDGED AND AGREED:

CLI Holdings Inc.

By: 
Name: Peter Vessenes
Its: Chairman

2

# EXHIBIT F



