UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

BITVESTMENT PARTNERS LLC,

                        Plaintiff,

      v.

COINLAB, INC., CLI HOLDINGS, INC.,
ALYDIAN INC., PETER VESSENES and
JOHN DOE,

                      Defendants.

13 CV 7632 (RWS)

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS'
<u>CROSS-MOTION FOR A STAY</u>**

# **TABLE OF CONTENTS**

I. INTRODUCTION…………………………………………………………….…….…...1

II. STATEMENT OF FACTS…………………………………………………………….4

      A.      Bitcoin Mining Background……………………………………………….4

      B.      Defendant's Corporate Structure and Alydian Bankruptcy………………………5

      C.      The Agreements between Dalsa Barbour/Dan Gallancy and Defendants………...5

III. AUTHORITY AND ARGUMENT………………………………………………...9

      A.      Defendants Respectfully Request a Stay of Proceedings Against All Defendants

              Pursuant to Chapter 11 of Bankruptcy Code……………………………………..10

      B.      Plaintiff Cannot Satisfy its Burden to Award a Preliminary Injunction…………..11

      C.      Plaintiff's Claims are for Money Damages which are not Appropriate for

              Injunctive Relief ……………………………………………………………12

      D.      Plaintiff Cannot Demonstrate that CoinLab Breached the Agreement…………..13

      E.      CoinLab has complied with the Best Efforts Standard to Mine Bitcoin…………14

      F.      Plaintiff has not Demonstrated Standing to Assert Claims Under

              the Agreement…………………………………………………………………17

      G.      The Balance of Hardship Do Not Tip in Plaintiff's Favor…………………….....18

      H.      CoinLab Requests a Bond Equal to the Cost of Entering the Bitcoin Mining

              Business………………………………………………………………………...19

IV. CONCLUSION…………………………………………………….......................19

## I.    INTRODUCTION

Defendants respectfully request that the court deny Plaintiff's Motion for a Preliminary Injunction.  Under the Federal Rules of Civil Procedure, preliminary injunctions are disfavored and should be denied absent a clear (1) showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant.  Plaintiff's motion fails in both respects.

First, Plaintiff cannot show irreparable injury.  Plaintiff alleges breach of a contract that seeks bitcoins, which are tantamount to money damages.  It is well established that money damages do not warrant preliminary injunctive relief and Plaintiff has shown no exception to that rule.  For this reason alone, Plaintiff's motion should be denied.

Second, Plaintiff does not come close to meeting its burden of showing a clear likelihood of success on the merits.  Plaintiff's breach of contract claim fails in multiple respects.

Plaintiff grossly overreaches in its demands under the contract; under clear New York law, the contract and the best efforts standard do not require Defendants to engage in business models or enterprises that are unprofitable or that are otherwise inconsistent with their good faith business judgment.  The subject contract provides that Plaintiff, the "Customer", is entitled to receipt of bitcoins that defendants mine, minus the overhead and costs necessary to mine those bitcoins.  The evidence is undisputed that the costs incurred by Defendant CLI Holdings, Inc. dba Alydian, Inc. (hereinafter "Alydian") to design, manufacture and maintain its bitcoin mining activities have exceeded the value of the bitcoins mined.  The shortfall is due, *inter alia*, to the dramatic and unexpected increase in the speed of the bitcoin mining network rendering manufacturing and deploying bitcoin mining rigs – Alydian's sole means for mining bitcoins – an unsustainable business enterprise.  As a result, the bitcoin mining rigs have not produced bitcoins in excess of their costs and no bitcoins are due to Plaintiff under the contract.

The contract expressly provides that the bitcoin industry is a volatile and risky investment and that the Customer incurred the risk from technology and other market "forces" outside of Defendants' control. Indeed, the contract *emphasizes* that the Customer accepted the risks of nonperformance. The agreement states, in capital letters, that

> CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM...ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

Changes in technology not within Defendants' control in fact rendered performance under the agreement "impracticable." Plaintiff, having accepted the risk, cannot now seek to shift the risk back to Defendants. The exponential increase in the speed of the bitcoin mining network and increase in the expense of deploying the mining rigs rendered Alydian's bitcoin mining operations impracticable. As proof of this reality, Alydian – the only entity in this case that has any assets or capacity to mine bitcoins – has sought Chapter 11 bankruptcy protection because unanticipated market forces rendered it insolvent. Plaintiff cannot demonstrate success on the merits because Plaintiff cannot demonstrate that Defendants breached the Agreement.

Plaintiff's request for preliminary injunction further fails because Bitvestment has not demonstrated standing to bring the present lawsuit. Bitvestment seeks relief based upon a contract between Dalsa Barbour LLC and Alydian and CoinLab, Inc. ("CoinLab"). The contract is unassignable. Plaintiff has made no evidentiary showing why or how it can assert the claims of Dalsa Barbour and, accordingly, Plaintiff has failed to demonstrate that it has standing to assert the present claims.

Despite the fact that Alydian is the only entity with assets related to bitcoin mining, Plaintiff's motion for preliminary injunction pertains only to defendant CoinLab, Inc.[1] Pursuant to the automatic bankruptcy stay, 11 U.S.C. § 362(a), this case is stayed with respect to Alydian and Defendants request that the stay be extended to all defendants.  It is undisputed that all of the bitcoin mining capacity and assets at issue in this case are owned by Alydian. Accordingly, the case should be stayed against all defendants under current Second Circuit "identity of interest" precedent.  This circumstance is precisely the scenario where a stay against all defendants should apply.

The Court entered a TRO on November 5 which required CoinLab, Inc. "begin to mine and deliver bitcoins to Bitvestment" subject to the terms of the Agreement.  The obligation to begin to mine suffers the same deficiencies asserted above; namely, Plaintiff has no contractual right that requires CoinLab to engage in a new business enterprise that is unprofitable or otherwise "impracticable."  Nor does the contract entitle Plaintiff to payment without consideration of the costs of mining bitcoins.  Bitvestment, as an alleged customer of CoinLab, did not acquire a controlling interest in CoinLab and cannot dictate its business operations. CoinLab did not waive the business judgment rule under the Agreement.

Regardless, in the week since being on notice of the TRO, CoinLab has undertaken its best efforts to mine bitcoins by engaging industry professionals to evaluate whether engaging in bitcoin mining is practicable under current market forces.  CoinLab has consulted with

---

[1] In its motion for a preliminary injunction, Plaintiff does not make any argument whatsoever with respect to the individual named defendant, Peter Vessenes.  No relief should be granted with respect to Mr. Vessenes, the CEO of CoinLab and Board Member of Alydian.  The only claim against Mr. Vessenes is in the Complaint, and it is a vague claim for tortious interference, which is subject to a Fed. R. Civ. P. 12(b)(6) motion to dismiss as actions in his corporate capacity or.  In the event this case is not stayed, Mr. Vessenes will move to dismiss the case against him individually as there is not a single fact alleged in the Complaint that he was acting in his personal capacity.

multiple third parties regarding the viability of launching a bitcoin mining operation consistent with the best efforts standard under New York law and the contractual disclaimer of warranties due to impracticability. CoinLab's efforts are ongoing, but the preliminary analysis is that entering into the bitcoin mining business would not be a viable business. (Vessenes Decl) In the event that the Court does issue a preliminary injunction against CoinLab – which it should not – CoinLab requests that Plaintiff post a bond equivalent to the cost of launching a bitcoin mining operation; namely, $6,000,000. (Olsen Decl)

In sum, Plaintiff cannot show irreparable harm in this breach of contract case nor can it demonstrate a likelihood of success on the merits. Plaintiff's argument implies that CoinLab has somehow profited substantially from bitcoin mining when, in fact, the only entity that has the capacity or experience to engage in bitcoin mining, Alydian, is in bankruptcy and the proceeds of its mining efforts are subject to the jurisdiction of the bankruptcy court. Plaintiff respectfully requests that the Court deny the motion for preliminary injunction and enter a stay of this litigation pending the resolution of the Alydian bankruptcy.

## II    STATEMENT OF FACTS

### A. Bitcoin Mining Background

Bitcoin mining uses highly-specialized hardware, known as Application-specific Integrated Circuits ("ASICs") to verify transactions on the Bitcoin computer network. Specifically, Bitcoin miners connect ASICs to the Internet to verify the time stamp of Bitcoin transactions, ensuring that no person may spend a bitcoin twice and no person can spend a bitcoin he does not already have. In exchange for this work, the Bitcoin network awards the miner with bitcoins. Bitcoin mining was once a very profitable exercise. However, as more and more miners have joined the Bitcoin network, it has become more and more difficult for any particular miner to perform the complex mathematical operations required to verify Bitcoin transactions. The Bitcoin network itself automatically increases the difficulty to ensure that only 3,600 bitcoins may be mined in any one day. It is a force entirely outside of Defendants' control. As this difficulty has increased, more complex and expensive ASICs have been

required to perform those operations.

Literally thousands of bitcoins (approximately 3,600) become available for mining every day, and will continue to become available until the year 2140. Bitcoins are fungible, non-unique units of digital currency. In March 2013, the Department of the Treasury issued the seminal guideline identifying bitcoins as a "decentralized, convertible virtual currency."[2] A bitcoin is readily exchangeable for dollars, euros or any other traditional currency on any number of digital currency exchanges. Just like any other currency, one bitcoin is indistinguishable from any other. To say that one bitcoin is unique from any other is like saying one dollar is unique from another dollar. It is simply false. That the value of a bitcoin relative to the dollar fluctuates is irrelevant, since that value can still be readily measured in dollars. There is no magic to this, and no harm could possibly befall Plaintiff that could not be compensated by money.

As Plaintiff's counsel has conceded, mining difficulty has increased stratospherically, well beyond expectations. A graph charting this increase is included in the Vessenes Declaration. Thus, mining now requires exponentially more expensive hardware than it did when Plaintiff became a customer. This increase, which is completely out of the control of any Defendant, has made the contract impracticable. Plaintiff was warned of and assumed this risk at the time of contracting. The speed of the bitcoin mining network has increased so dramatically, it is no longer cost-effective for Alydian to deploy and operate its ASICs to make any profit. The chip technology designed by Alydian has been surpassed and is no longer the state of the art. (Olsen Declaration)

**B. Defendants' Corporate Structure and Alydian Bankruptcy**

Defendant CoinLab, Inc. ("CoinLab") is a Delaware Corporation based in Washington

---

[2] http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html

State.  CoinLab is a bitcoin incubator that invests in and operates bitcoin-related ventures. CoinLab, Inc. owns a 65% interest in CLI Holdings, Inc., which operates under the dba Alydian Inc. or "Alydian."  Defendant Peter Vessenes is the CEO of CoinLab and a board member of Alydian.  Hans Olsen, an experienced chip manufacturer, manages the engineering and operational aspects of Alydian. (Olsen Decl)

Alydian is in the business of designing, manufacturing and mining bitcoins using bitcoin mining "rigs" on the bitcoin mining network.  CoinLab provided Alydian with its technical know-how and systems experience to allow Alydian to mine. Alydian's business model is described in greater detail in the Declaration of Hans Olsen.  Of all of the defendants in this case, the only defendant with any capacity to engage in the business of bitcoin mining is Alydian.  On November 1, 2013, Alydian filed for Chapter 11 bankruptcy protection. Accordingly, all bitcoin mining activities are subject to the bankruptcy proceeding and Plaintiff's claims to those bitcoins are properly adjudicated before the bankruptcy court. (Olsen Decl)

### C.  The Agreements between Dalsa Barbour/Dan Gallancy and Defendants

Alydian had a number of "prebuyer" Customers of bitcoins which had entered into agreements with Alydian to pay in advance for bitcoins to be mined by Alydian in the future. The contracts provided that, if bitcoins were not mined, then Alydian had the right to refund the money paid.  Dan Gallancy was one of the prebuyers and had paid $75,000 toward future delivery of bitcoins by two separate agreements, dated December 13, 2013 ($50,000) and March 7, 2013 ($25,000).  (Exhibit 1 to Vessenes Decl) (Prebuyer agreements with Dan Gallancy).

In August 2013, Alydian became aware of the need for increased financial capital.  The bitcoin mining network was increasing exponentially and Alydian needed to manufacture and deploy its bitcoin mining rigs online or they would be obsolete.  (Olsen Decl) Mr. Vessenes had a relationship with investors, Cedar Hill Capital ("Cedar Hill"), who were evaluating whether to invest in Alydian in exchange for receiving the first 10,000 bitcoins mined above the capital

and operational expenses. Cedar Hill sought the assistance of a third party to perform due diligence on Alydian and engaged Dan Gallancy to serve that function. Gallancy, in turn, agreed to perform due diligence on behalf of Cedar Hill but asserted that he had a conflict of interest and could not perform due diligence unless his agreement with Defendants was modified such that:

> CoinLab agree[d] to dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to Crystal Island and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab.

See August 13, 2013 Amended and Restated Bitcoin Services Agreement ("Agreement") at ¶ 2 (Exhibit 2 to Vessenes Decl). The plain language of the Agreement is clear that Gallancy was to receive funds net of "appropriate mining operating expenses and capital expenditures" and the bitcoins paid to Cedar Hill under the discussed Cedar Hill investment. Mr. Gallancy was fully aware of the financial difficulties facing Alydian in its bitcoin mining operations and the speculative nature of bitcoin investing. Mr. Gallancy has steadfastly refused to approve any mining operating expenses and capital expenditures. The possibility of market difficulties were disclosed to and acknowledged by Gallancy[3] from the outset. (Exhibit 4 to Vessenes Decl)[4]

_____

[3] At the time of the Agreement, the parties executed an assignment of the Agreement from Mr. Gallancy to his company, Dalsa Barbour, LLC. The agreement is otherwise unassignable. (Agreement at 11(a)). Plaintiff Bitvestment Partners LLC purports to hold the rights of Dalsa Barbour, LLC under the Agreement but provides no evidence of assignment or otherwise that it has standing to assert the claims of Dalsa Barbour.

[4] The record is clear that the parties discussed the financial challenges facing Alydian. See, CoinLab at 373 (email from Vessenes to Gallancy, et al, dated August 18, 2013 stating "some of the list just isn't going to be knowable right now, for instance, there are going to be probably 30+ suppliers all with different parts availability and terms…A team with better experience and relationships and capital will win those supply chain battles, but we don't know what all of them are today, for sure. And even if we thought we did, someone will screw us between here

Indeed, the very purpose of the August 2013 amendment to the parties agreement was to enable due diligence so that Alydian could raise funds to deploy its bitcoin mining rigs.  (Olsen Decl)

The Agreement is further clear that the "Customer" bears the risk of loss under the contract.  The Parties agreed that:

> SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM…ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

Agreement at ¶10 (emphasis in original).  The plain language of the "Disclaimer of Warranties" in the Agreement is broad.  Customer bears "all associated risks" from "changes in technology and other forces, not within CoinLab's control" that would render the agreement "impracticable."  Miriam Webster's Dictionary defines "impracticable" only as "incapable of being performed or accomplished by the means employed or at command; difficult or impossible to do or use; *an impracticable proposal.*"[5]  Impracticability due to changes in "forces" outside of CoinLab's control (including increases in expense from vendors and

---

and there, for sure."); CoinLab at 378 (email from Vessenes to Gallancy, et al, dated August 19, 2013 stating "I just don't believe that capacity is going to come online at that pace. But, we can only really speculate about how doable that is."); CoinLab at 410-411 (email between Gallancy, Olson, and Vessenes dated August 21, 2013 regarding hosting expense as "biggest operating expense category by far and away" but acknowledging inability to provide comprehensive modeling at present); CoinLab at 430-431 (email from Gallancy to Batten, Vessenes, et al seeking to "explore alternative hosting options that would reduce your costs as much as possible" and asking for additional information).

[5] <http://www.merriam-webster.com/dictionary/impracticable>.  Where contractual terms are not fully defined in the agreement, a court "employs the ordinary meaning of the phrases." *Media AB v. 3M Co.*, 2013 U.S. Dist. LEXIS 125699, *48 (S.D.N.Y. Sep. 3, 2013) *citing Federal Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2nd Cir. 2011).

increases in the speed of the bitcoin mining network) affords CoinLab considerable discretion to exercise its valid business judgment.

In fact, the disclaimer contemplated in the contract came to fruition, as changes in market conditions outside of Defendants' control rendered performance under the agreement impracticable.  The change in market factors was twofold.  First, there was a dramatic increase in the speed of the bitcoin mining network making bitcoin mining rigs less effective and, therefore, less profitable.  Moreover, there was a corresponding increase in the cost of manufacturing bitcoin mining rigs.   (Olsen Decl)  As a result of the impracticability of the bitcoin mining business, Alydian has gone bankrupt.

### III      AUTHORITY AND ARGUMENT

### A.  Defendants Respectfully Request a Stay of Proceedings Against All Defendants Pursuant to Chapter 11 of Bankruptcy Code

There is no dispute that this action is stayed against Alydian pursuant to 11 U.S.C. § 362(a), which automatically imposes a stay of "the commencement or continuation...of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).  It is "axiomatic" that when a Chapter 11 case was filed, the automatic stay went into effect and enjoins the continuation of any litigation against the debtor. *In re Gold & Honey, Ltd.*, 410 B.R. 357, (Bankr. E.D.N.Y. 2009); *Nevada Power Co. v. Calpine Corp.*, 365 B.R. 401 (Bankr. S.D.N.Y. 2007).

The only dispute is whether the stay should extend to the other Defendants in this case. A stay may be imposed against a non-bankrupt party when such an <u>identity of interest</u> exists between the debtor and third party non-debtor that a judgment against the third party will directly affect the debtor. *In re North Star Contracting Corp*, 125 B.R. 368, 371 (S.D.N.Y. Mar. 17, 1991) (imposing stay against non-debtor based on identity of interest where non-debtor entitled to indemnity and action against non-debtor affects "both reorganization efforts and assets of [debtor]"); *In re Lomas Financial Corp.*, 117 B.R. 64, 68 (S.D.N.Y. Aug. 2, 1990)

(imposing stay against non-debtor based on identity of interest where non-debtor entitled to indemnity by debtor); *In re Johns-Manville Corp.*, 33 Bankr. 254, 263-64 (Bankr. S.D.N.Y. 1983) (enjoining proceeding where such action would adversely affect debtors' assets or estate); *see also*, *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153-54 (5th Cir. 1987) (imposing stay against non-debtor in suit alleging alter ego theory against non-debtor).

*North Star* involved allegations against an officer of a company that had filed for protection under Chapter 11 of the Bankruptcy Code. Although the plaintiff brought suit against the officer, a bankruptcy court found that the stay provisions of §362(a) applied to the officer because of the identity of interest between the non-debtor and debtor: 1) the debtor's reorganization efforts would be harmed if the suit proceeded against the officer because the officer is a principal player in the reorganization process; 2) the officer has a right of indemnification with respect to the debtor and any recovery by the plaintiff against the officer would affect the debtor's assets; and 3) there is no bona fide separate cause of action against the officer. 125 B.R. at 371.

Plaintiff seeks "bitcoins mined."   Alydian is in the business of mining bitcoins. CoinLab is not. CoinLab is the majority shareholder of Alydian, and Alydian – the debtor in possession in bankruptcy – is the only corporate entity that has any existing ability to mine bitcoins. CoinLab has, over the last year, provided its technical know-how and systems experience to allow Alydian to mine. Neither CoinLab nor Mr. Vessenes personally is in the business of mining bitcoins, neither owns ASICs and neither have any ability to mine bitcoins themselves. Thus, any relief – especially injunctive relief – granted against CoinLab would unavoidably impinge upon Alydian's ability to reorganize itself in Chapter 11 and continue to mine for the benefit of its creditors. Plaintiff's requested preliminary injunction, and this entire case, would affect the property of the debtor's estate. Specifically, if the relief requested was granted, it would preclude Alydian from generating value for its creditors – precisely the outcome the automatic stay seeks to avoid. Accordingly, extending the stay to all defendants in this case is appropriate.

**B. Plaintiff Cannot Satisfy its Burden to Award a Preliminary Injunction**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1998) (emphasis in original) *quoting* 11A C. Wright, et al., Federal Practice and Procedure §2948 at 129-130 (2d. ed. 1995). A party moving for a preliminary injunction must demonstrate: (1) a showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant. *MONY Group, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 143 (2nd Cir. 2004) *citing Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2nd Cir. 1999).

The showing of irreparable injury is "the most important perquisite for the issuance of a preliminary injunction." *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2nd Cir. 1990) (internal citations omitted). Irreparable harm must be shown by the moving party to be "imminent, not remote or speculative[.]" *Id.* A court may not simply presume irreparable injury, but must actually consider the injury the plaintiff will suffer if he or she loses on the on the preliminary injunction but ultimately prevails on the merits. *G.R. v. New York City Dep't of Educ.*, 2012 U.S. Dist. LEXIS 11582, *10-11 (S.D.N.Y. Jan. 31, 2012) *citing Salinger v. Colting*, 607 F.3d 68, 79-80 (2nd Cir. 2010). An irreparable injury is one that "cannot be redressed through a monetary award." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2nd Cir. 1995) (internal citation omitted); *G.R. v. New York City Dep't of Educ.*, 2012 U.S. Dist. LEXIS 11582 at *10; *Sea Carriers Corporation v. Empire Programs, Inc.*, 2006 U.S. Dist. LEXIS 83843, *12 (S.D.N.Y. Nov. 21, 2006). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Jayaraj*, 66 F.3d at 39 *quoting Sampson v. Murray*, 415 U.S. 61, 90 (1974). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.*

A party seeking preliminary injunctive relief must also demonstrate a likelihood of success on the merits or at least "sufficiently serious questions going to the merits to make them a fair ground for litigation" and the balance of hardships tipping decidedly in the movant's favor. *Salinger*, 607 F.3d at 80. Courts also consider the impact to the public's interest. *Id.* at 83.

## C. Plaintiff's claims are for money damages which are not appropriate for injunctive relief.

Plaintiff demands bitcoins. That is, Plaintiff simply demands money. An irreparable injury is one that "cannot be redressed through a monetary award." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2nd Cir. 1995) (internal citation omitted); *G.R. v. New York City Dep't of Educ.*, 2012 U.S. Dist. LEXIS 11582 at *10; *Sea Carriers Corporation v. Empire Programs, Inc.*, 2006 U.S. Dist. LEXIS 83843, *12 (S.D.N.Y. Nov. 21, 2006). This Court has affirmed the well-established rule that where monetary damages are adequate compensation, "a preliminary injunction generally will not issue." *Sea Carriers Corp.*, 2006 U.S. Dist. LEXIS 83843 at *15 (denying injunction because restriction on disbursement of funds is one that may clearly be addressed by a monetary award); *see also*, *Wolk v. Kodak Imaging Network, Inc.*, 2011 U.S. Dist. LEXIS 27541 (S.D.N.Y. Mar. 17, 2011) (plaintiff failed to identify why damages cannot be remedied after a final adjudication); *Goldblatt v. Englander Communications, LLC*, 431 F.Supp.2d 420 (S.D.N.Y. 2006) (denying injunction because if defendant's best efforts not successful obtaining trademark registration, plaintiffs may recovery any amount due under contract as monetary damages).

This is a breach of contract case. Plaintiff in the present matter is a mere customer that seeks bitcoins mined pursuant to an alleged breach of contract. There is no irreparable harm there. Indeed, Plaintiff even alleges that CoinLab has assets and could, therefore, satisfy any money damages judgment in the unlikely event Plaintiff prevailed at trial. (Gallancy Decl at 36-45)

It is indisputable that Plaintiff's claims are compensable with money damages. It is

further indisputable – and Plaintiff has not disputed – that bitcoins are currency.  The first federal court to answer the question "Is Bitcoin money?" found in the affirmative: "Bitcoin is an electronic form of currency unbacked by any real asset and without specie, such as coin or precious metal.... Bitcoin can be used to purchase items online, and some retail establishments have begun accepting Bitcoin in exchange for gift cards or other purchases." *SEC v. Shavers*, 2013 U.S. Dist. LEXIS 110018, *2 (E.D.Tex. Aug. 6, 2013).  The Shavers Court continued:

> It can be used to purchase goods or services, and as Shavers stated, used to pay for individual living expenses. The only limitation of Bitcoin is that it is limited to those places that accept it as currency. However, it can also be exchanged for conventional currencies, such as the U.S. dollar, Euro, Yen, and Yuan. Therefore, Bitcoin is a currency or form of money,

*Id.* bitcoins are indisputably a currency.  As the Financial Crimes Enforcement Network famously stated on March 18, 2013, bitcoins are a "decentralized convertible virtual currency," precisely because it "either has an equivalent value in real currency, or acts as a substitute for real currency."[6]

Moreover, if Plaintiff does prevail in this case, and Defendants have no bitcoins to give to Plaintiff to satisfy a judgment, Defendants could just buy bitcoins and give them to Plaintiff. Alternatively, if Plaintiff was awarded money damages, he could simply use the money to purchase bitcoins on any number of public bitcoin exchanges, including: www.campbx.com www.btc-e.com; www.coinx.com; and www.coinmkt.com. Indeed, the list could continue. This case does not present an irreparable injury that "cannot be redressed through a monetary award" and for this reason alone the preliminary injunction should not issue. It is the opposite – Plaintiff is just demanding money.

**D.  Plaintiff Cannot Demonstrate that CoinLab breached the Agreement.**

---

[6] http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html

Plaintiff cannot demonstrate success on the merits because it cannot demonstrate that Defendants breached any agreement with Plaintiff. The contract provides that Dalsa Barbour LLC was to receive bitcoins mined <u>net</u> of mining and operational expenses and the bitcoins paid to Cedar Hill under the discussed Cedar Hill investment. Mr. Gallancy was fully aware of the financial difficulties that Alydian was facing in its bitcoin mining operations and the speculative nature of bitcoin investing. Dalsa Barbour LLC, as the customer under the agreement, bears the risk of loss under the contract. The contract specified, in all capital letters, that:

> SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM...ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

Agreement at ¶10 (emphasis in original). The plain language of the "Disclaimer of Warranties" in the Agreement is broad and nullifies Plaintiff's contractual claims. *Gunn v. Hytrol Conveyor Co.*, 2013 U.S. Dist. LEXIS 72650 (E.D.N.Y. May 22, 2013) (A warranty which expressly disclaims the implied warranties and is conspicuously set forth in all capital letters effectively excludes any implied warranties for purposes of the New York U.C.C.).

To the extent that the contract is construed to be ambiguous, any ambiguity must be construed against Plaintiff, as the drafter of the agreement. "New York law provides that ambiguities in a contract must be construed against the drafter." *Aircraft Servs. Resales LLC v. Oceanic Capital Co.*, 2013 U.S. Dist LEXIS 114956, *10 (S.D.N.Y. Aug. 14, 2013) *citing McCostis v. Home Ins. Co. of Indiana*, 31 F.3d 110, 113 (2nd Cir. 1994). *See* Vessenes Decl (providing that Mr. Gallancy drafted the Agreement and required immediate signature).

### E. CoinLab has complied with the Best Efforts Standard to Mine Bitcoin

Plaintiff's argument ignores the clear capitalized disclaimer of warranties and myopically relies on the requirement that CoinLab use "best efforts" to mine bitcoins.

Plaintiff's argument is unavailing.  Plaintiff seeks to exaggerate the best efforts standard beyond the bounds of New York law.  A "best efforts clause imposes an obligation to act with good faith in light of one's own capabilities." *Serdarevic v. Centex Homes, LLC*, 2012 U.S. Dist. LEXIS 134349, *42 (S.D.N.Y. Sep. 5, 2012) *citing Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n.7 (2nd Cir. 1979).  A party has the right to give "reasonable consideration to its own interests" and need not bankrupt itself to satisfy a best efforts provision. *Id.* at 614.  A best efforts clause "permits parties a degree of discretion in the selection of a plan of action and allows them to rely on their good faith business judgment as to the 'best way' to achieve the desired result." *Id. citing in re Chateaugay Corp.*, 186 B.R. 561, 594 (S.D.N.Y. 1995) and *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.*, 584 F.2d 1164, 1171 (2nd Cir. 1978); *see also, Sedona Corp. v. Ladenburg Thalmann & Co.*, 2011 U.S. Dist. LEXIS 105320, *5 (S.D.N.Y. Sep. 15, 2011) ("best efforts clauses requires plaintiff to show that the nature and extent of the opposing party's efforts did not reflect good faith business judgments") (internal citations omitted).

Courts generally construe 'best efforts' clauses to require only that a party act with good faith based on the party's capabilities.  Where it is determined that a party did not perform with its best efforts, there were clear actions that could be taken within the party's capabilities but were not done so.  For instance, in *Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258 (S.D.N.Y. 1978), the court found that a buyer had failed to use its best efforts to promote and maintain a high volume of the plaintiff-seller's beer because failed to use even its own "temporarily circumscribed abilities and resources to promote the sale of [plaintiff's] products." 454 F.Supp. at 267.  Bitcoin ventures, however, are not well established or well-tread grounds where profitability is foreseeable.  Operating a bitcoin mining operation is inherently risky and speculative and, in fact, CoinLab had direct visibility into the difficulties that faced Alydian, which resulted in filing for bankruptcy protection. CoinLab is not required to disregard the business judgment rule and enter into a business that it has no capacity to execute or that will bankrupt the company.   The business judgment rule "bars judicial inquiry into actions of

corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Fox v. Koplik (In re Perry H. Koplik & Sons, Inc.)*, 2013 U.S. Dist. LEXIS 123254, *25 (S.D.N.Y. Aug. 14, 2013) *citing Auerbach v. Bennett*, 47 N.Y.2d 619, 629 (1979); *citing* N.Y. Bus. Corp. Law §§ 715(h), 717(a). There is no bad faith here. If bitcoin mining were a viable business enterprise, then CoinLab would be equally incentivized as Plaintiff to launch a bitcoin mining operation and receive the benefit of the enterprise. CoinLab, like Plaintiff, has an interest in receiving the value from mined bitcoins. CoinLab knows, however, from the experience of Alydian, that it is not a practicable business due to market forces outside of its control and nothing in the contract or applicable New York law requires CoinLab to engage in a business enterprise that is not practicable.

Courts do <u>not</u> hold parties responsible for changing circumstances which are not the result of the conduct of the allegedly breaching party and render the defendant incapable of performing, particularly in a case such as the present matter where the parties expressly disclaimed warranties due to forces outside of CoinLab's control. In *Mofet Etzion, Ltd. v. Gen. Dynamics Land Sys.*, 2008 U.S. Dist. LEXIS 11362 (S.D.N.Y. Feb. 4, 2008), the court refused to overturn an arbitrator's decision finding that a party used its best effort to expand and maximize the U.S. market for a ceramic armor manufacturer. The arbitrator looked to the defendant's capabilities and found that the underwhelming demand for the plaintiff's product was "a result of market conditions, not the efforts of Defendant." *Mofet*, supra at *9. The court properly refused to vacate the arbitrator's decision. *Id.* Similarly, in *Farey-Jones v. Buckingham*, 2004 U.S. Dist. LEXIS 12480 (E.D.N.Y. July 7, 2004), a court refused to find that a defendant failed to use best efforts to obtain an opinion regarding the tax status of a proposed transaction because the obligated party simply "declined to opine." *Farey-Jones* supra at *35.

As in *Mofet* and *Farey-Jones*, supra, the court in *Serdarevic v. Centex Homes, LLC*, 2012 U.S. Dist. LEXIS 134349, *42 (S.D.N.Y. Sep. 5, 2012) refused to find that a development company breached a 'best efforts' clause despite the development company's admission that it

anticipatorily repudiated the contract.  Conditions beyond the control of the development company and arising out of a revision to the local jurisdiction's zoning code rendered performance impossible by the time it was due.  *Serdarevic*, 2012 U.S. Dist. LEXIS 134349 at *44-45.  The court concluded that the development company – in the face of such a challenge – "made a good faith business judgment to terminate the contracts."  *Id.* at *49 *citing in re Chateaugay Corp.*, 186 B.R. 561, 594 (S.D.N.Y. 1995) and *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.*, 584 F.2d 1164, 1171 (2nd Cir. 1978).  Like in *Serdarevic*, CoinLab has made a good faith business judgment not to engage in a business enterprise that is not viable.

In addition to a party's capabilities, courts also look to whether the there is any evidence or demonstration of bad faith.  In *McDonald's Corp v. Hinksman*, 1999 U.S. Dist. LEXIS 9587, *38-39 (E.D.N.Y. May 28, 1999), a case involving allegations of delay in construction of a McDonald's restaurant, the court dismissed the claim that McDonald's failed to use its best efforts in construction because there was no "concrete evidence of misfeasance or nonfeasance."  Other courts in this jurisdiction have ruled similarly.  *Farey-Jones*, supra at *37 ("plaintiff failed to prove bad faith or negligence in the defendants' obligation to use their best efforts...").

Plaintiff cannot demonstrate either that, (1) CoinLab or Vessenes are capable of mining Bitcoins under the Agreement without Alydian or (2) that CoinLab or Vessenes have performed the contract with any bad faith. In fact, CoinLab has worked diligently since the TRO to begin to use best efforts to launch a bitcoin mining operation.  (Vessenes Decl)

### F. Plaintiff has not demonstrated standing to assert claims under the Agreement

The agreement in question was initially between Dan Gallancy, the individual, and the corporate defendants in this lawsuit.  At the time of the August 13, 2013 amendment, an assignment was executed providing that Mr. Gallancy assigned the agreement to his single member corporate entity, Dalsa Barbour, LLC.  (Exh F & G to Gallancy Decl).  The contract, on its face, is unassignable.  Agreement at ¶ 11(a) (stating that "This Agreement may not be

17

assigned by either party without the prior written approval of the other party.  Any purported

assignment in violation of this Section will be void.")  Despite the clear language that the

contract cannot be assigned, a new entity – with whom Defendants have no relationship –

"Bitvestment Partners LLC" is the plaintiff purporting to assert claims under the Agreement.

Bitvestment makes no attempt to demonstrate how or why it has standing to assert claims under

a contract to which it is not a party and, for this reason, Plaintiff cannot demonstrate success on

the merits.

### G.  The Balance of Hardships Do Not Tip in Plaintiff's Favor.

In order for a preliminary injunction to be issued, Plaintiff must demonstrate (a) a

likelihood of success on the merits or (b) sufficiently serious questions going to the merits to

make them a fair ground for litigation and the balance of hardships tipping in favor of the

movant.  As asserted above, Plaintiff cannot demonstrate a likelihood of success on the merits

or even serious questions going to the merit.  Even if it could establish a serious question,

Plaintiff cannot demonstrate that the balance of hardships tips in its favor.  Gallancy was a

customer of Alydian's bitcoin mining operations that paid $75,000 toward future bitcoins

mined and performed due diligence on an unsuccessful effort that was not consummated.

Gallancy now seeks 7,984.006735 bitcoins which have a present market value of $3,300,000

USD.  Gallancy was fully aware of the risks associated with launching a bitcoin mining

operation and it was necessary in Alydian's business judgment, to seek Chapter 11 bankruptcy

protection.  The costs of engaging in bitcoin mining exceed the benefits and the creditors of

Alydian, including Plaintiff, none of whom may receive the full value of their contracts with

Alydian.  Plaintiff, like the other creditors, will have their claims adjudicated in the bankruptcy

court.  The hardship to CoinLab in recreating Alydian's business and investing millions of

dollars and years in creating and launching bitcoin mining rigs only to relive Alydian's

unprofitability and eventual bankruptcy is greatly outweighed by the hardship to Plaintiff in

exercising a contractual claim that is unlikely to prevail at trial.

### H.  CoinLab requests a bond equal to the cost of entering the bitcoin mining business.

Pursuant to the Federal Rules of Civil Procedure 65(c),

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

(emphasis added).  Accordingly, in order for a bond to issue Plaintiff must post a bond. CoinLab is not in the business of operating bitcoin mining rigs or operations.  It does not possess the intellectual property to design ASIC chips.  It does not possess the bitcoin mining rigs necessary to mine bitcoins.  It has, since entry of the TRO, consulted with multiple experts in the bitcoin mining industry and confirmed the direct experience of Alydian and, in its business judgment, determined that it does not want to enter into the bitcoin mining business. (Vessenes Decl)  The contract does not grant Plaintiff control over CoinLab and it cannot dictate CoinLab's business operations.  In the event that the Court issues a preliminary injunction against CoinLab – which it should not – requiring CoinLab to launch a bitcoin mining business, CoinLab requests that Plaintiff post a bond equivalent to the cost that Alydian experienced in a bitcoin mining operation, which range from $4,000,000 to $6,000,000 for a 28nm node platform. (Olsen Decl) If, as projected, the costs of launching a bitcoin mining operation exceeds the revenue from doing so, the cost should be incurred by Plaintiff that compelled CoinLab into a business that it anticipated would not be profitable.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court stay this litigation pending resolution and disposition of Alydian's bitcoin mining assets.  In the alternative, Defendants request that the Court deny Plaintiff Motion for a Preliminary Injunction or, set a bond in the amount equal to Alydian's costs in launching a bitcoin mining operation.

**Dated: November 14, 2013**

**NESENOFF & MILTENBERG, LLP**

**By:**       _____/s/_____

**Marco A. Santori, Esq.  (MS 7422)**
**Andrew T. Miltenberg, Esq. (AM 7006)**

**363 Seventh Avenue - 5th Floor**
**New York, New York 10001**
**Tel: (212) 736-4500**
**Fax: (212) 736-2260**