UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| BITVESTMENT PARTNERS LLC,<br><br>                        Plaintiff,<br><br>        v.<br><br>COINLAB, INC., CLI HOLDINGS, INC.,<br>ALYDIAN INC., PETER VESSENES and<br>JOHN DOE,<br><br>                        Defendants. | 13 CV 7632 (RWS) |

<u>DECLARATION OF PETER VESSENES</u>

1.      My name is Peter Vessenes.

2.      I am the Chief Executive Officer of Defendant Coinlab, Inc. ("Coinlab").  I am also the managing director of CLI Holdings, Inc., doing business as Alydian ("Alydian"), and a defendant in this action.  I have been actively involved in Alydian business operations from the outset.  Additionally, Hans Olsen, an experienced computer chip manufacturer, is currently managing the engineering and operational aspects of Alydian.

Bitcoin.

3.      Bitcoins are units of digital currency, just like dollars are units of government currency.  The Bitcoin protocol itself is an agreed-upon way for two computers to communicate so as to enable Bitcoin users to transmit value over the Internet.  Just as SMTP is a computer protocol that enable email over the internet, the Bitcoin protocol enables users to send bitcoins back and forth over the Bitcoin network in exchange for goods and services, or simply store value.

4.      Just like the average email user does not know or even care about SMTP, the average bitcoin user does not need to know much at all about the Bitcoin protocol to use bitcoins.  In practice, sending and receiving bitcoins is as easy as sending and receiving email.

5.      One of the revolutionary aspects of bitcoins is their ability to be exchanged reliably without the use of a trusted intermediary. Historically, a bank or some kind of neutral reserve organization has always stood between two parties to a transaction to settle monetary transactions between the parties and issue new money.  For example, a bank might settle a wire transaction.  Visa or Mastercard might settle a credit card transaction. With Bitcoin, there is no such settling intermediary.  Instead, transactions on the network are verified and secured by participants called Bitcoin "miners".

## Bitcoin Mining

6.      All money systems must answer questions of issuance – who gets to decide how much money there is, and who should have this money. The Bitcoin protocol's solution to this question is to incentivize other parties, called miners, to help secure the network. Securing the network is done by 1) checking that transactions are validly time-stamped so that no users can spend bitcoins they do not have and 2) performing certain highly-specialized cryptographic mathematical work.

7.      In exchange for miners doing this security work, the Bitcoin network issues bitcoins in a sort of lottery system. By analogy, the more securing work is done, the more lottery tickets the miner gets.  The more tickets, the greater the chance of getting a "lucky ticket", winning the lottery and receiving a bitcoin.

8.      By design, this lottery occurs every ten minutes.  That is, the Bitcoin network

automatically generates and distributes to miners approximately twenty-five Bitcoins about every ten minutes. This will continue until approximately the year 2140.

9.     Recently, more and more miners have been dedicating more and more work to secure the network. To compensate, the network automatically adjusts upward the amount of mathematical work required to receive a lottery ticket.

10.     Thus, miners are effectively forced to fight harder for those lottery tickets. One miner will always win the lottery about every ten minutes, but the probability of any particular miner receiving a lucky ticket (and therefore bitcoins) is proportionate to the amount of securing work – or number of tickets – the miner performs for the network.

11.     The name for this security work in the industry is 'hashing.' At the launch of the Bitcoin protocol, approximately one in 4.3 billion hashes found a lucky ticket. As of this writing, approximately one in 250 quadrillion hashes finds a lucky ticket.

12.     This phenomenon is known colloquially as "increasing difficulty." This is something of a misnomer because bitcoins are always generated every ten minutes, and miners always receive those bitcoins. Indeed, while lucky tickets are harder to find, Bitcoins themselves are not becoming rarer, nor will they be impossible to mine at any point in the next hundred and twenty seven years. In order to perform hashing, miners require custom computer chips. In the past, standard consumer processors and graphics cards were used to perform Bitcoin mining. Because more and more processing power is required find a lucky ticket, these consumer devices now cost more in energy to run than they return in bitcoins. Thus, the industry has moved to creating custom silicon purpose-made for Bitcoin mining, known as Application-Specific Integrated Circuits, or "ASICs."

### ASIC Mining

13.     When creating an ASIC, the miner must make cost-benefit tradeoffs. The smaller the 'geometry' of a computer chip, the faster the chip will run, and the less energy it will use.

14.     On the other hand, the smaller the geometry of the chip, the more expensive the upfront costs are, including extremely expensive 'masks' and more and more experienced design teams. A chip design project takes approximately 12 to 18 months from start to deployment; the smaller the geometry, the longer the deployment schedule.

15.     Current market leaders use 28 and 55 nanometer ("nm") chips to mine Bitcoins. Some of those miners invested directly the money to do a project (between $4 and $10mm per project), while others announced their intentions and sold mining systems ahead of time to customers who wished to speculate. Alydian's chips are 65nm Bitcoin chips, two to four times less energy efficient than current market leaders.

16.     The nature of Bitcoin mining means there is a race to deploy mining capacity; the earlier one can deploy, the greater a portion of total earnings can be captured. Each successive entrant must invest more capital, either through a smaller geometry process, or through building more chips than competitors.

17.     There are currently no known repeatable business methodologies in the Bitcoin industry – the market leaders as recently as February 2013 -- Avalon and Asic Miner -- are now largely out of business, and new ones have arisen. While some may demonstrate sustainable business models over the next few years, no company has yet shown a credible plan to do so.

## **Alydian is a Mining Company, and Coinlab is its Incubator**

18.     Like many companies (such as 500 Startups, Rocket Internet, AngelPad and others), CoinLab is an incubator – it aims to create and foster high value businesses which can participate in the Bitcoin ecosystem. The company's business plans have been fluid since launch in November 2011, as the Bitcoin industry itself is fluid and rapidly changing.

19.     To date, Coinlab has put significant efforts into incubating two larger businesses – a Bitcoin exchange (similar to a retail Foreign-Exchange market), and a Bitcoin mining company, Alydian. CoinLab has had smaller efforts in a number of ancillary businesses.

20.     CoinLab recruited chip industry experts to work on the chip design and creation of the mining systems for Alydian. (A system includes hundreds of Bitcoin mining chips and the associated computer hardware, wiring, power supplies and controllers necessary to do the mining work). Alydian engaged Hans Olsen, who has 30 years experience in the computer chip industry, to consult on the progress of the project. Alydian then brought on Hans full-time to manage the project to completion.  Since that time, Hans has managed day-to-day operations for Alydian.

21.     Alydian's systems are manufactured at a variety of locations worldwide: Taiwan and the United States in large part. The systems are assembled in Portland, Oregon, and deployed at data centers in the United States.  Deploying the systems is extremely technically challenging; fires are a possibility, and incredible amounts of energy are consumed mining. Alydian's hosting and energy bills are estimated to exceed $150,000 a month in December. Deploying mining systems also requires specialized know-how and labor.

22.     CoinLab's team has, over the last year provided this technical know-how and

systems experience to allow Alydian to mine.  This is a typical incubator business arrangement: as an example, one of the largest incubators in the world, Rocket Internet, provides knowledge and labor at a cost-plus basis for its incubated companies until they are ready to bring certain operations in-house.  The incubated company itself often provides distinct knowledge and labor. Together with the incubator, the incubated company can achieve its business goals.  In this case, all work and work product was paid for by Alydian and is owned by Alydian.

23.     As to equipment, Coinlab acted as a purchasing agent, like most incubators do, for Alydian's supplies and raw materials, including mining equipment.  For example, Coinlab purchased equipment from vendors such as Bright Semiconductor, and then invoiced Alydian (CLI) for the cost.  True and correct copies of these purchase orders and invoices are annexed hereto as **Exhibit 3**.

24.     As such, Coinlab does not own any Bitcoin mining equipment.  Coinlab is not a Bitcoin mining company and presently has no capacity to mine bitcoins.  In order to mine at scale, Coinlab would be required to invest significant capital expenditures to secure mining equipment, supporting hardware, hosting locations, and pay for enormous amounts of electricity. It would have to hire support staff, lease office space and all attendant frictional costs. It would, quite literally, have to enter an entirely new line of business.

### Alydian's Fundraising and the Amended Restated Agreement

25.     As the chip project took shape, Alydian pursued a retail strategy, offering its best efforts at Bitcoin mining in exchange for early payment from customers.  This raised another approximately $950,000 through the spring of 2013. The contracts offered a full refund for the dollars paid to customers if Alydian was unable to deliver the purchased Bitcoins.  Dan

Gallancy, allegedly the principal of Plaintiff Bitvestment LLC, was one of these customers. A true and correct copy of his agreement is annexed hereto as **Exhibit 1**.

26.     As the project hit mid-summer of 2013, it became clear that Alydian would require another large capital infusion. Alydian's capital needs were urgent and large – roughly $1 million was needed immediately, and more would be required to finish the project. Accordingly, I went about looking for debt or equity placements that could finance the project.

27.     Alydian found a willing finance partner, Crystal Island, in New York City who was willing to loan money to Alydian. Crystal Island had a trusted relationship with Dan Gallancy, who also lived in New York City, and requested that he be permitted to do due diligence to determine the viability of the project.  The Alydian team agreed.

28.     Alydian had roughly one or two weeks left of operating capital when due diligence was to begin, and stress levels were high. Just before due diligence was to begin, Gallancy delivered to Alydian and CoinLab an amended and restated contract to sign, and gave us a deadline: he stated he was on his way to the airport, and would not do due diligence unless both CoinLab and Alydian signed the agreement. He claimed he had a conflict of interest that the amendments would cure.  A true and correct copy of the Amended and Restated Agreement (the "Agreement") is annexed hereto as **Exhibit 2**.

29.     CoinLab and Alydian did their best to review the new Agreement, but could not possibly get quality legal representation with an hour's notice.  While Dan stayed on the phone at the gate pressuring us to sign, I executed the Agreement on behalf of both parties  On later review, the contract cannot be stated to remotely cure Dan's conflict of interest, it seems designed solely to create a vehicle allowing Dan to sue at his whim, and in fact it did create a

conflict of interest for him shortly after he signed it.

30.     Dan's contract upgraded most of his rights; in particular it gave him rights to the

first approximately 7,984 Bitcoins mined after all capital and operating expenses had been paid,

and after any coins mined to satisfy Crystal Island, LLC, the funding partner that Alydian had

sourced.  The agreement also provided for significant qualifiers that could result in no net

payment of bitcoins to Dan.  In particular, the contract expressly contemplates that the bitcoin

investment is volatile and risky and Dan incurred the risk from technology and other market

"forces" outside of Defendants' control.  Indeed, the contract emphasizes that the Customer

accepted the risks of non-performance.  The agreement states, in capital letters, that

> CUSTOMER UNDERSTANDS AND AGREES THAT THE
> SERVICES AND BITCOINS ARE THE RESULT OF
> RELATIVELY NEW TECHNOLOGIES AND MARKET
> EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS,
> REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER
> FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT
> SUCH CHANGES COULD RENDER THIS AGREEMENT
> IMPRACTICABLE OR IMPOSSIBLE TO PERFORM...ALL
> ASSOCIATED RISKS RESIDE WITH CUSTOMER.

31.     As demonstrated by my declaration and the declaration of Hans Olsen, who

managed day to day operations, changes in technology in fact rendered performance under the

agreement "impracticable."  Furthermore, the agreement expressly contemplates that Dan

received bitcoins mined net of obligations to Crystal Island and "mining output that is required

to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as

approved by all parties."  (Agreement at par. 2).  Dan has steadfastly declined to approve any

mining operating expenses and capital expenditures.  Nonetheless, the contract is clear that --

like any business -- Alydian's bitcoin mining has overhead costs that cannot simply be ignored.

32.     In August, 2013, Dan assigned his contracts to Dalsa Barbour, LLC, explaining

that it was a single-owner LLC and the parties agreed in writing to that assignment. Neither CoinLab nor Alydian have knowledge as to who Bitvestment Partners, LLC is, and neither has ever signed an agreement with that entity. In fact, the amended and restated contract is not assignable (Agreement at par. 11.(a)), and I believe he may have brought on a partner for the sole purpose of litigating this case.

### Alydian Used its Best Efforts to Mine Bitcoins, but the Increase in Difficulty made Performance Impracticable, if not Impossible

33.     As time progressed, mining difficulty was increasing at an incredible rate, as much as 3% per day. This was much quicker than anybody at Alydian had expected, and indeed quicker than most people in the Bitcoin industry had expected.  A true and correct chart of bitcoin "difficulty" is included below. Note that incredible rise of difficulty since July, 2013.



34.     This meant that Alydian's Bitcoin mining returns were dropping at a 3% per day compound rate.  However, the cost of mining equipment, personnel, hosting and electricity was not dropping at all.  Between July 1 and October 31, mining difficulty went from 21 million to 390 million, making it 18.5 times harder to find Bitcoins, and lowering Alydian's Bitcoin generation capabilities by 94.6%.

35.     In an effort to generate as much value as possible for its customers, Alydian decided to pay additional fees to its suppliers to speed up delivery and deployment. This increased capital requirements by as much as double for some early Bitcoin mining equipment; approximate additional costs were in the realm of $500,000.

36.     As of Nov. 1 when Alydian filed for Chapter 11, CoinLab had loaned Alydian an additional $600,000 to finish its Bitcoin mining deployment and contributed over $500,000 in additional equity; CoinLab is now the second-largest creditor of Alydian in the bankruptcy proceedings.

37.     This increase in difficulty made the Agreement impracticable. While systems that Alydian has paid for will generate positive cashflow for a few more weeks, I do not believe there is a reasonable and high-certainty way for a company that does not currently own mining systems to profitably purchase, wait and deploy.

38.     Ongoing monthly expenses for the entire Alydian project are currently being estimated for the bankruptcy court, but will likely be at $200-$350k per month during the next few months.

39.     At this time, Alydian is mining between 50 and 60 coins per day, making approximately $20-24k per day, (although note that the extreme volatility of the Bitcoin price

and Bitcoin difficulty will certainly change these numbers).

40.     Coinlab is not mining and has no ability to mine.  Sometime during November it seems likely that Alydian will be able to begin to repay creditors, as part of any bankruptcy court proceedings.

## CoinLab's "Best Efforts"

41.     The November 5 TRO provides that CoinLab must begin to use best efforts to mine Bitcoins subject to the terms of the Agreement.  CoinLab does not own any Bitcoin mining hardware and so at minimum needs to assess the current mining market and understand how a company could best do this.  CoinLab has significant mining expertise in-house.  In order to begin to use best efforts to mine Bitcoins, CoinLab must look to the future of the bitcoin mining network to try to determine the state of the network at such time when new rigs could be deployed,  whether there are any practical methods that could be employed to obtain rigs and the estimated timeframe to receive them.

42.     To demonstrate impartiality to the court, while working internally to comply with the order, CoinLab has also tried to recruit an independent technical expert to do this assessment for us. On November 8, Plaintiff sent us the letter detailing the variety of possibilities that Plaintiff feels could be used to satisfy best efforts.

43.     For the same reasons they were never practicable before this litigation, each and every one of these possibilities is impracticable now.  Due to the short timespan between TRO and this filing, CoinLab does not have a full analysis ready for submission to the court, but I believe the findings will demonstrate that none of the Plaintiff's suggestions would return capital and operating expenditures, much less provide net income sufficient to return any coins

to Plaintiff in excess of "operating expenses and capital expenditures."

44.     In the event that capital and operating expenditures can't be recouped through the Bitcoin mining network, then a court order would both impoverish CoinLab, a company that is not in the business of mining, and would not yield any financial benefits for Dalsa Barbour.

45.     CoinLab is currently working to find an expert who can provide their own unbiased report; there are only a few worldwide I would consider sophisticated enough to do this analysis. To date CoinLab has contacted five of them and offered $400/hour for consulting on this matter, one had a family tragedy, two couldn't appear in New York City on November 20, one declined, and one did not respond.

46.     In summary, Alydian was hit by market forces well beyond its control, leaving it with less than 6% of its hoped for earnings generation in four months, and has struggled to raise capital during a market free-fall for Bitcoin generation, eventually heading to bankruptcy. CoinLab staff is working right now to maintain Alydian's asset base in an attempt to maximize Alydian's creditor value.

47.     Given its intimate knowledge of the Bitcoin mining industry, CoinLab does not believe that, at present, there are ways to invest in Bitcoin mining that have a reasonable likelihood of returning capital, much less generating the extra earnings that the contract with Dalsa Barbour would require. The contract with Dalsa Barbour contemplated precisely this scenario, and any sophisticated customer in the Bitcoin mining space understands that bitcoins are speculative and volatile. CoinLab has not acted in bad faith. To the contrary, CoinLab is a 65% owner of Alydian and is fully incentivized to generate a profit.

I declare under the penalty of perjury that the foregoing is true and correct.

**Dated: Bainbridge Island, WA**
**November 14, 2013**

**PETER VESSENES**

EXHIBIT 1

### Bitcoin Services Agreement

This Bitcoin Services Agreement ("**Agreement**") is entered into as of the last signature below by and between CLI Holdings Inc., with its principal place of business at 71 Columbia St, Suite 300, Seattle, WA 98104 ("**CoinLab**") and Daniel H. Gallancy with residence at 315 West 36th Street Apt 18B New York, NY 10018 ("**Customer**").  For good and valuable consideration the parties agree to the terms and conditions of this Agreement.

1. **Definitions.**

    a. "**Bitcoin**" means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

    b. "**CoinLab Storage**" means the online storage system developed and hosted by or for CoinLab.

    c. "**Confidential Information**" means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure.  "Confidential Information" includes the terms and conditions of this Agreement.

    d. "**Fees**" has the definition set forth in Section 3.

    e. "**Mined Bitcoins**" means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

    f. "**Services**" means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

    g. "**Term**" means 1 years unless the Agreement earlier terminated pursuant to the terms and conditions herein.

    h. "**Wind  Down Period**" means the period of time extending 12 months after the Term of the Agreement

2. **Services.**  CoinLab will make commercially reasonable efforts to mine 6734.00673499673 Bitcoins on Customer's behalf during the Term.  CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab on the condition that Customer acknowledges and agrees that no delivery of Mined Bitcoins is expected to occur before July 1, 2013.  After July 1, 2013, CoinLab will deliver to Customer a monthly account of Mined Bitcoins compared with Bitcoins ordered.

CoinLab will deliver to Customer Mined Bitcoins via the CoinLab Storage.  Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.

3.  **Fees.**  In exchange for performing the Services, Customer will pay CoinLab a total of $7.425 USD per Bitcoin, for a total of $50,000.00 USD ("Fees").  Customer will pay CoinLab the Fees within 10 days of the effective date.  Each party will bear its own taxes as levied under applicable law.

4.  **Termination.**  Either party may suspend its performance or terminate this Agreement:

    a.  if the other party materially breaches this Agreement (other than the confidentiality obligations in Section 6) and fails to cure that breach within 30 days after receiving notice;

    b.  immediately upon notice if the other party materially breaches the confidentiality obligations in Section 6;

    c.  immediately upon notice if the other party is insolvent.  *"Insolvent"* means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

    d.  immediately upon notice in the event that performing the Services becomes impracticable or impossible including, without limitation, in the event that applicable laws or regulations have changed in a way that materially affects the provision of Services under this Agreement in either party's reasonable discretion.

5.  **Effects of Termination or Expiration.**  Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive.  Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab.  In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, CoinLab will refund to Customer US Dollars by the following formula:

    USD Fee Paid - (Bitcoins Delivered / Bitcoins Ordered)  * (USD Fee Paid)

6.  **Confidentiality.**  Neither party will use the other's Confidential Information except as reasonably required for the performance of this Agreement.  Each party will hold in confidence the other's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than

CoinLab000533

reasonable care. Each party agrees not to disclose the other party's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

7. **Warranties.** CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws. Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

8. **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS. COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

9. **Limitation of Liabilities.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR THAT RELATE IN ANY WAY TO THIS AGREEMENT OR ITS PERFORMANCE. THIS EXCLUSION WILL APPLY REGARDLESS OF THE LEGAL THEORY UPON WHICH ANY CLAIM FOR SUCH DAMAGES IS BASED, WHETHER THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER SUCH DAMAGES WERE REASONABLY FORESEEABLE, OR WHETHER APPLICATION OF THE EXCLUSION CAUSES ANY REMEDY TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES WILL NOT BE LIABLE FOR ANY DIRECT DAMAGES THAT EXCEED THE AMOUNT OF FEES PAID UNDER THIS AGREEMENT. THIS SECTION WILL NOT APPLY TO ANY INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.

10. **Miscellaneous.**

    a. **Assignment.** This Agreement may not be assigned by either party without the prior written approval of the other party. Notwithstanding the foregoing, CoinLab may assign this Agreement to: (i) a parent or subsidiary; (ii) an acquirer

of all or substantially all of CoinLab assets (or all or substantially all of the CoinLab assets relating to this Agreement); or (iii) a successor by merger or other combination.  Any purported assignment in violation of this Section will be void.

b. **Governing Law.**  This Agreement will be governed and interpreted in accordance with Washington State law.  Any dispute relating to the terms, interpretation, or performance of this Agreement or the dealing of the parties under this Agreement will be resolved at the request of either party through binding arbitration.  Arbitration will be conducted in the city of Seattle Washington under the rules and procedures of the American Arbitration Association ("AAA").

c. **Force Majeure.**  Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("Force Majeure") provided that such party makes commercially reasonable efforts to promptly notify the other.  In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

d. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

e. **Entire Agreement.**  This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter.  No amendment or modification of this Agreement will be made except by a writing signed by both parties.

f. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

So agreed by the parties:

| CoinLab | [Customer] |
|---|---|
| By: | By: |
| Printed Name: Peter Vessenes | Printed Name:  Daniel H. Gallancy |
| Title: CEO | |
| Date:  12-13-2012 | Date: December 13, 2012 |

**Bitcoin Services Agreement**

This Bitcoin Services Agreement ("**Agreement**") is entered into as of the last signature below by and between CoinLab Inc., with its principal place of business at 71 Columbia St, Suite 300, Seattle, WA 98104 ("**CoinLab**") and <u>Daniel H. Gallancy</u> with its principal place of business or residence at <u>315 West 36th Street 18B, New York, NY 10018</u> ("**Customer**"). For good and valuable consideration the parties agree to the terms and conditions of this Agreement.

1. **Definitions.**

    a. "**Bitcoin**" means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

    b. "**CoinLab Storage**" means the online storage system developed and hosted by or for CoinLab.

    c. "**Confidential Information**" means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure. "Confidential Information" includes the terms and conditions of this Agreement.

    d. "**Fees**" has the definition set forth in Section 3.

    e. "**Mined Bitcoins**" means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

    f. "**Services**" means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

    g. "**Term**" means 1 years unless the Agreement earlier terminated pursuant to the terms and conditions herein.

    h. "**Wind Down Period**" means the period of time extending 12 months after the Term of the Agreement

**Services.** CoinLab will make commercially reasonable efforts to mine 1,250.00000000 Bitcoins on Customer's behalf during the Term. CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab on the condition that Customer acknowledges and agrees that no delivery of Mined Bitcoins is expected to occur before August 1, 2013. After August 1, 2013, CoinLab will deliver to Customer a monthly account of Mined Bitcoins compared with Bitcoins ordered. CoinLab will

CoinLab000543

deliver to Customer Mined Bitcoins via the CoinLab Storage.  Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.

2.   **Fees.**  In exchange for performing the Services, Customer will pay CoinLab a total of $20.00 USD  per Bitcoin, for a total of $25,000 USD ("Fees").  Customer will pay CoinLab the Fees within 10 days of the effective date.  Each party will bear its own taxes as levied under applicable law.

3.   **Termination.**  Either party may suspend its performance or terminate this Agreement:

   a.   If the other party materially breaches this Agreement (other than the confidentiality obligations in Section 6) and fails to cure that breach within 30 days after receiving notice;

   b.   Immediately upon notice if the other party materially breaches the confidentiality obligations in Section 6;

   c.   Immediately upon notice if the other party is insolvent. *"Insolvent"* means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

   d.   Immediately upon notice in the event that performing the Services becomes impracticable or impossible including, without limitation, in the event that applicable laws or regulations have changed in a way that materially affects the provision of Services under this Agreement in either party's reasonable discretion.

4.   **Effects of Termination or Expiration.**  Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive.  Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab.  In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, CoinLab will refund to Customer US Dollars by the following formula:
   USD Fee Paid - (Bitcoins Delivered / Bitcoins Ordered)  * (USD Fee Paid)

5.   **Confidentiality.**  Neither party will use the other's Confidential Information except as reasonably required for the performance of this Agreement.  Each party will hold in confidence the other's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than

CoinLab000544

reasonable care. Each party agrees not to disclose the other party's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

6. **Warranties.** CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws. Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

7. **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS. COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

8. **Limitation of Liabilities.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR THAT RELATE IN ANY WAY TO THIS AGREEMENT OR ITS PERFORMANCE. THIS EXCLUSION WILL APPLY REGARDLESS OF THE LEGAL THEORY UPON WHICH ANY CLAIM FOR SUCH DAMAGES IS BASED, WHETHER THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER SUCH DAMAGES WERE REASONABLY FORESEEABLE, OR WHETHER APPLICATION OF THE EXCLUSION CAUSES ANY REMEDY TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES WILL NOT BE LIABLE FOR ANY DIRECT DAMAGES THAT EXCEED THE AMOUNT OF FEES PAID UNDER THIS AGREEMENT. THIS SECTION WILL NOT APPLY TO ANY INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.

9. **Miscellaneous.**

   a. **Assignment.** This Agreement may not be assigned by either party without the prior written approval of the other party. Notwithstanding the foregoing, CoinLab may assign this Agreement to: (i) a parent or subsidiary; (ii) an acquirer

of all or substantially all of CoinLab assets (or all or substantially all of the CoinLab assets relating to this Agreement); or (iii) a successor by merger or other combination.  Any purported assignment in violation of this Section will be void.

b.  **Governing Law.**  This Agreement will be governed and interpreted in accordance with Washington State law.   Any dispute relating to the terms, interpretation, or performance of this Agreement or the dealing of the parties under this Agreement will be resolved at the request of either party through binding arbitration.  Arbitration will be conducted in the city of Seattle Washington under the rules and procedures of the American Arbitration Association ("AAA").

c.  **Force Majeure.**  Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes commercially reasonable efforts to promptly notify the other.  In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

d.  **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

e.  **Entire Agreement.** This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter.  No amendment or modification of this Agreement will be made except by a writing signed by both parties.

f.  **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

So agreed by the parties:

| CoinLab | [Customer] Daniel H. Gallancy |
|---|---|
| By: *(signature)* | By: *(signature)* |
| Printed Name:  *Jodie Brady* | Printed Name: Daniel H. Gallancy |
| Title:  *CFO* | |
| Date:  *3.8.13* | Date: March 7, 2013 |

CoinLab000546

EXHIBIT 2

**Amended and Restated Bitcoin Services Agreement**

This Amended and Restated Bitcoin Services Agreement ("**Agreement**") is entered into as of August 14, 2013 by and among CLI Holdings Inc., with its principal place of business at 900 WINSLOW WAY EAST, SUITE 100, BAINBRIDGE ISLAND, WA 98110 ("**CLI Holdings**"), CoinLab Inc., with its principal place of business at 900 WINSLOW WAY EAST, SUITE 100, BAINBRIDGE ISLAND, WA 98110 ("**CoinLab Inc.**"), and Alydian Inc. ("**Alydian**" and collectively with CLI Holdings, CoinLab Inc. and Vessenes, and each of their respective affiliates, "**CoinLab**"), and Dalsa Barbour LLC, with its principal place of business at 315 West 36th Street #18B New York, NY 10018 ("**Customer**").

## RECITALS

Whereas, CoinLab Inc. and Customer are parties to that certain Bitcoin Services Agreement dated as of December 13, 2012 (the "**First Services Agreement**").

Whereas, CLI Holdings and Customer are parties to that certain Bitcoin Services Agreement dated as of March 8, 2013 (the "**Second Services Agreement**" and together with the First Services Agreement, each a "**Services Agreement**" and together the "**Services Agreements**").

Whereas, Vessenes, or one or more of his affiliates, is an equity holder of CLI Holdings, CoinLab Inc., and Alydian, and will benefit from this Agreement and the Services Agreement.

Whereas, Customer anticipates acting as an agent for Crystal Island, LLC (together with its affiliates, including without limitation Cedar Hill Capital, Emil Woods and Chad Cascarilla "**Crystal Island**") by providing diligence services for Crystal Island in connection with a potential transaction between Crystal Island and CoinLab (the "**Diligence Services**").

Whereas, in order to eliminate any and all potential conflicts of interest of Customer in its performance of the Diligence Services, the parties hereto desire to amend and restate each of the Services Agreements on the terms and conditions set forth herein, and for this Agreement to supersede each of the Services Agreements in its entirety, including without limitation by: (a) CoinLab releasing Customer from any confidentiality obligations imposed by the Services Agreements and (b) CoinLab agreeing to dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to Crystal Island and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab pursuant to this Agreement.

Whereas, CoinLab acknowledges that without the agreements set forth in the preceding Recital, a conflict of interest inherently arises between Crystal Island and Customer because Customer would be put in a position of advocating on behalf of CoinLab to enter into a financing

1

transaction with Crystal Island regardless of the outcome of the Diligence Services, and CoinLab and Customer acknowledge that such a conflict of interest must be prevented.

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby amend and restate each of the Services Agreements in its entirety and further agree as follows:

1. **Definitions.**

   a. **"Bitcoin"** means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

   b. **"CoinLab Storage"** means the online storage system developed and hosted by or for CoinLab.

   c. **"Confidential Information"** means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure. "Confidential Information" includes the terms and conditions of this Agreement.

   d. **"Fees"** has the definition set forth in Section 3.

   e. **"Mined Bitcoins"** means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

   f. **"Services"** means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

   g. **"Term"** means the period of time necessary for CoinLab to deliver all Bitcoins to Customer under this Agreement.

   h. **"Wind Down Period"** means the period of time extending 12 months after the Term of the Agreement.

2. **Services.** CoinLab will use best efforts to mine 7,984.006735 Bitcoins on Customer's behalf, which, for the avoidance of doubt, will mean that CoinLab shall dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to Crystal Island and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab pursuant to this Agreement. On a weekly basis, CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab. CoinLab will deliver to Customer a

2

weekly account of Mined Bitcoins compared with Bitcoins delivered to Customer. CoinLab will deliver to Customer Mined Bitcoins via the CoinLab Storage or other methods of delivery requested by Customer.  Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.  Customer may perform one or more audits, at CoinLab's expense, of CoinLab's Bitcoin output to confirm that Customer is receiving the mining output as agreed in section 2.

3. **Fees.**  In exchange for performing the Services, Customer has paid CoinLab a total of $75,000.00 USD ("**Fees**").  Each party will bear its own taxes as levied under applicable law.

4. **Termination.**  Customer may suspend its performance or terminate this Agreement:

    a. If CoinLab materially breaches this Agreement and fails to cure that breach within 30 days after receiving notice;

    b. Immediately upon notice if CoinLab is Insolvent. "*Insolvent*" means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

5. **Effects of Termination or Expiration.**  Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive.  Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down Period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab.  In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, at Customer's option, CoinLab will promptly refund all Fees to Customer.

6. **Confidentiality.**  CoinLab will not use Customer's Confidential Information except as reasonably required for the performance of this Agreement.  CoinLab will hold in confidence Customer's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than reasonable care.  CoinLab agrees not to disclose Customer's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

7. **Warranties.**  CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not

exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws.  Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins.  Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

8. **CoinLab Representations.**  CoinLab represents and warrants that (a) all action required to be taken by CoinLab's respective directors, shareholders, managers and members in order to authorize CoinLab to enter into this Agreement has been taken, (b) CoinLab is not in violation of any term of its organizational documents, or, to CoinLab's knowledge, in any material respect of any term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound, (c) CoinLab is not in violation of any material federal or state statute, rule or regulation applicable to CoinLab, (d) the execution and delivery of this Agreement by CoinLab and the performance by CoinLab of its obligations pursuant to this Agreement will not violate, or conflict with, or constitute a default under, any contract, agreement, instrument, judgment, order or decree to which it is party or by which CoinLab is bound, nor, to CoinLab's knowledge, result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of CoinLab, and (e) CoinLab has made available to Customer all material information reasonably available to CoinLab and no information provided to Customer contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

9. **Indemnification.**  CoinLab hereby agrees to indemnify and hold harmless Customer and each member, partner, principal, manager, director, officer, advisor or employee thereof (each, an "**Indemnified Party**") from and against any and all loss, damage or liability due to or arising out of any inaccuracy or breach of any representation or warranty of CoinLab or failure of CoinLab to comply with any covenant or agreement set forth herein.  CoinLab shall reimburse each Indemnified Party for its legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection with any such claim, action, proceeding or investigation.  The reimbursement and indemnification obligations of the Investor under this Section shall survive the termination of this Agreement and shall be in addition to any liability which CoinLab may otherwise have, and shall be binding and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Indemnified Party.

10. **Disclaimer of Warranties.**  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE.  CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY

4

SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS.  COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

11. **Miscellaneous.**

    a. **Assignment.**  This Agreement may not be assigned by either party without the prior written approval of the other party.  Any purported assignment in violation of this Section will be void.

    b. **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.  The parties hereto irrevocably and unconditionally agree that any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York.  The parties consent to personal and subject matter jurisdiction in the State of New York.

    c. **Remedies Upon Breach.** CoinLab agrees that any breach, or threatened breach, of this Agreement by CoinLab could cause irreparable damage to Customer and that in the event of such breach Customer shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations under this Agreement, without the necessity of proving irreparable damage or posting a bond.

    d. **Force Majeure.**  Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes best efforts to promptly notify the other.  In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

    e. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

    f. **Entire Agreement.**  This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter, including

without limitation each of the Services Agreements.  No amendment or modification of this Agreement will be made except by a writing signed by both parties.  This Agreement is effective and survives regardless of whether a transaction is consummated between Crystal Island and CoinLab.

g.   **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

h.   **Recitals.**  The recitals hereof are hereby incorporated into this Agreement by this reference.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Bitcoin Services Agreement to be signed as of the date first above written.

**CUSTOMER**

Dalsa Barbour LLC

By: _____
Name:  Daniel H. Gallancy
Its: Member

**COINLAB INC.**

CoinLab Inc.

By: _____
Name: _____
Its: _____

**CLI HOLDINGS**

CLI Holdings Inc.

By: _____
Name: _____
Its: _____

**ALYDIAN**

Alydian Inc.

By: _____
Name: _____
Its: _____

7

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of August 14, 2013, between Daniel H. Gallancy ("Assignor"), and Dalsa Barbour LLC, a New York limited liability company ("Assignee").

### Recitals

A.     Assignor is a party to that certain Bitcoin Services Agreement, dated as of December 13, 2012 between Assignor and CLI Holdings Inc. (the "Services Agreement").

B.     Assignor desires to assign, and Assignor desires to assume, all of Assignor's rights and responsibilities pursuant to the Services Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     Assignor hereby sells, transfers, conveys, assigns and delivers to Assignee all of Assignor's privileges, right, title, interest and obligations under the Services Agreement.

2.     Assignee hereby assumes all of the obligations of Assignor from and after the date of this Agreement under the Services Agreement.

3.     Except as otherwise set forth in this Agreement, Assignee is not assuming any further liability or obligation of Assignor.

4.     This Agreement will not affect Assignee's right to assert any defense with respect to the Services Agreement, at law, in equity or otherwise, against the validity or enforceability of any liability or obligation with respect to the Services Agreement.

5.     This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6.     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

**ASSIGNOR:**

Daniel H. Gallancy

**ASSIGNEE:**

Dalsa Barbour LLC

By:
Name:  Daniel H. Gallancy
Its: Member

ACKNOWLEDGED AND AGREED:

CoinLab Inc.

By:
Name:  Peter Vessenes
Its:  CEO

2

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of August 14, 2013, between Daniel H. Gallancy ("Assignor"), and Dalsa Barbour LLC, a New York limited liability company ("Assignee").

*Recitals*

A.      Assignor is a party to that certain Bitcoin Services Agreement, dated as of March 8, 2013 between Assignor and CoinLab Inc. (the "Services Agreement").

B.      Assignor desires to assign, and Assignor desires to assume, all of Assignor's rights and responsibilities pursuant to the Services Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.      Assignor hereby sells, transfers, conveys, assigns and delivers to Assignee all of Assignor's privileges, right, title, interest and obligations under the Services Agreement.

2.      Assignee hereby assumes all of the obligations of Assignor from and after the date of this Agreement under the Services Agreement.

3.      Except as otherwise set forth in this Agreement, Assignee is not assuming any further liability or obligation of Assignor.

4.      This Agreement will not affect Assignee's right to assert any defense with respect to the Services Agreement, at law, in equity or otherwise, against the validity or enforceability of any liability or obligation with respect to the Services Agreement.

5.      This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6.      This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

**ASSIGNOR:**

Daniel H. Gallancy

**ASSIGNEE:**

Dalsa Barbour LLC

By:
Name: Daniel H. Gallancy
Its: Member

ACKNOWLEDGED AND AGREED:

CLI Holdings Inc.

By:
Name: Peter Vessenes
Its: Chairman

EXHIBIT 3

# CoinLab

CoinLab
71 Columbia
Suite 300
SEATTLE WA 98104

(855)522-2646

## Purchase Order

| Date | P.O. # |
|------|--------|
| 03/14/2013 | 1002 |

| Vendor |
|--------|
| Brite Semiconductor<br>Flat C, 15th Floor<br>Unionway Commercial Centre<br>283 Queens Rd Central<br>Hong Kong |

| Ship To |
|---------|
| CoinLab<br>71 Columbia<br>Suite 300<br>SEATTLE, WA 98104 |

| Ship Via |
|----------|
|          |

| Item | Description | Amount |
|------|-------------|--------|
| NRE | Leaf NRE design service - Quotation #Q20130307c - due upon PO | 36,600.00 |
| NRE | Leaf NRE design service - Quotation #Q20130307c - due upon final GDS database delivery | 36,600.00 |
| | **Total** | **$73,200.00** |

Approved By _____

Date _____

Confidential - Attorney's Eyes Only -- Subject to Protective Order  CoinLab000001

# CoinLab

CoinLab
900 Winslow Way East
Suite 100
Bainbridge Island, WA  98110

accounts@coinlab.com

## Invoice

| Date | Invoice No. |
|------|-------------|
| 05/08/2013 | 1047 |

| Terms | Due Date |
|-------|----------|
| Due on receipt | 05/08/2013 |

| Bill To |
|---------|
| CLI Holdings, Inc |



| Balance Due | Enclosed |
|-------------|----------|
| $0.00 | |

> ✂ Please detach top portion and return with your payment. ✂

| Activity | Amount |
|----------|--------|
| • Arrow Electronics (PO 1004) Prepd | 45,125.00 |
| • Brite Semiconductor Invoice 064 (2013-5-6) NRE | 36,600.00 |
| • Digikey (P.O. 1003) sales order 36051566 | 11,871.48 |
| • Brad Martin Seattle & Shanghai - Airfare | 2,478.20 |
| • Brad Martin 5/6 ER Austin to Seattle - Travel ground trans | 10.45 |
| • Brad Martin 5/3 & 5/6 Shanghai and Seattle - Hotel | 1,007.98 |
| • Brad Martin passport express & courier service Shanghai - Travel misc | 315.00 |
| • Brad Martin 5/3 & 5/6 Shanghai and Seattle - Travel meals | 152.90 |
| • Brad Martin 5/6 parking Seattle - Travel ground trans | 52.96 |
| • Brad Martin 5/6 Leaf Project development - Postage & shipping | 91.72 |
| • Brad Martin 5/6 Leaf Project development - Office supplies | 15.67 |
| • Brad Martin 5/6 Leaf Project development - NRE | 3,043.09 |
| • Admin Fee 10% (cap at $5K) | 5,000.00 |

| | |
|---|---|
| Total | $105,764.45 |
| Payment | $105,764.45 |
| Balance Due | $0.00 |

Confidential - Attorney's Eyes Only -- Subject to Protective Order

EXHIBIT 4

| | |
|---|---|
| **From:** | Peter Vessenes <peter@coinlab.com> |
| **Sent:** | Sunday, August 18, 2013 9:09 PM |
| **To:** | Chad Cascarilla |
| **Cc:** | Emil Woods; Daniel H. Gallancy; Hans Olsen |
| **Subject:** | Re: questions and call tmrw |

P.s. some of the list just isnt going to be knowable right now, for instance, there are going to be probably 30+ suppliers all with different parts availability and terms. Precisely one of the hard parts about doing this fast is that a bunch of shit will happen realtime in the supply chain. A team with better experience and relationships and capital will win those supply chain battles, but we dont know what all of them are today, for sure. And even if we thought we did, somone will screw us between here and there, for sure.

Peter Vessenes
Sent from my smartphone/tablet.
http://about.me/peterv

On Aug 18, 2013, at 8:16 PM, Chad Cascarilla <Chad.Cascarilla@cedarhillcapital.com> wrote:

> peter,
> are you available to do a call tmrw at noon EST?  also, below is a list of questions which we
> need to understand.
> thx,
> chad
>
>
> **Inquiry items for Peter:**
>
> Organization:
> ·     Full org chart with all entities
> ·     List of employees (and by which entities they are employed)
>       o  Employee salaries
>       o  Employees include contractors (whether part-time or full-time)
>
> Old capital:
> ·     Copies of all pre-buy contracts
>       o  Which pre-buyers have you spoken with about taking a haircut, what have you
>       told them and how have they reacted?
> ·     Copies of the convertible notes docs (want to make sure there aren't any
> unexpected items embedded in the indenture)
> ·     Regarding the pre-buy contracts, convertible notes and equity:  there are several
> LLCs ("BTC Holdings, LLC") - who are these people?
> ·     Delineate assets, liabilities and capital by entity (and people)
>
> Assets and liabilities:
> ·     Balance sheet
>       o  All A/P items (there was some ambiguity from Jodie about this – we need this
>       to be 100% clear on this), both amount and purpose
>       o  Besides the equity, convertible notes, pre-buy contracts are there any other
>       liabilities whatsoever?

CoinLab000373

      § Anything off-balance sheet? Perhaps related to the mtgox dispute?
- Balance sheets should be shown on a sub-entity basis and consolidated
- Outstanding POs: amount and purpose
- Confirm cash balance: 550,000 USD and 2,500 BTC

Expenses:
- Cash burn rate for current operations
  - Best if we can see this broken down by category

Operational issues:
- Why is the build staff expense so high?
  - Break this down by assembly expense per card cage
  - Assembly yield?
  - Number of techs anticipated to be hired and cost per tech
  - Where will the assembly be done?
    - § Cost of facility
  - Shipping expense to the hosting facility

- Why is hosting expense so high?
  - Data center uptime
  - SLA? Who will be on site to fix things that break?

- Need to nail down expenses and timing
  - Timing on ordering all parts and payment terms from suppliers

The information contained in this message and any attachments may be confidential, privileged, proprietary or otherwise protected from disclosure and is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited and may be unlawful. You should not copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any person. If you have received this message in error, please notify us immediately by replying to this email and permanently delete this message, any attachments and all copies thereof. Nothing contained in this message and/or any attachments constitutes a solicitation or an offer to buy or sell any securities.

CoinLab000374

**From:**       Hans Olsen <hans@coinlab.com>
**ent:**        Wednesday, August 21, 2013 10:56 PM
**To:**         Daniel H. Gallancy; 'Peter Vessenes'
**Subject:**    Re: Also

Dan,

Appreciate the info.

We were working with TiTan and Sabey late into the  evening to explore various technical and deployment options to reduce cost.
I'm hopeful that we will have final numbers and deployment schedules clarified tomorrow.

Thank you for your patience.

Hans


**From:** Dan Gallancy <dhg@gallancy.com>
**Date:** Wednesday, August 21, 2013 10:18 PM
**To:** Peter Vessenes <peter@coinlab.com>
**Cc:** Hans Olsen <hans@coinlab.com>
**Subject:** RE: Also

You should seriously consider this option (i.e. your email below or some variation on the idea you've expressed).  The fact of the matter is that hosting expense is the biggest operating expense category by far and away.  Hopefully I'll be able to share with you a more comprehensive model in the future.  But for now, just consider this:

CoinLab000410

| | Total thru 6/28/2014 | as % of revenue |
|---|---|---|
| BTC mined | 128,016 | |
| BTCUSD | 110 | |
| | | |
| USD revenue (thousands) | 14,082 | 100% |
| | | |
| Maintenance expenses | (190) | -1% |
| Assembly / ramp expense | (697) | -5% |
| Hosting exepenses | (3,953) | -28% |
| Total Cash Expenses | (4,839) | -34% |
| | | |
| Operating Income | 9,243 | 66% |
| | | |
| | | |
| Hosting expense breakdown: | | |
| Setup cost | (260) | -2% |
| Electricity cost | (643) | -5% |
| Co-location charges | (3,050) | -22% |
| Total hosting charges | (3,953) | -28% |

**From:** Peter Vessenes [mailto:peter@coinlab.com]
**Sent:** Monday, August 19, 2013 5:35 PM
**To:** Daniel H. Gallancy
**ubject:** Also

Pricing out some power plants. Looks like we could buy 3 megawatts for $300k. Then you've got a bunch of other questions, of course.

Peter

--

PETER **VESSENES**
CEO

**peter@coinlab.com** / 206.486.6856 / SKYPE: vessenes
900 WINSLOW WAY EAST / SUITE 100 / BAINBRIDGE ISLAND, WA 98110

2

CoinLab000411

| | |
|---|---|
| **From:** | Peter Vessenes <peter@coinlab.com> |
| **Sent:** | Monday, August 19, 2013 5:27 PM |
| **To:** | Chad Cascarilla; Emil Woods; Daniel H. Gallancy; Hans Olsen |
| **Subject:** | Numbers coming at you in about an hour |

Hey guys,

We've gotten much better granularity on payment terms, timing and have some significantly better hosting numbers from Titan, plus a few backups if for some reason they don't pan out.

We also squeezed out some opex when Hans and I talked it over.

I've so far run the bootstrap scenario, e.g. you guys pass, and it definitely is better than before. I am updating the 550+ scenario now and will get it passed back around to you in the next hour.

One note; I think 1.5% on 500TH is tough. I just don't believe that capacity is going to come online at that pace. But, we can only really speculate about how doable that is.

Are you guys going to want to talk tonight? If so, we're both available. I know it's late there already, so let me know what you're thinking.

Peter

--

**PETER VESSENES**
CEO

**peter@coinlab.com** / 206.486.6856 / SKYPE: vessenes
900 WINSLOW WAY EAST / SUITE 100 / BAINBRIDGE ISLAND, WA 98110

1

CoinLab000378

I'm glad you enjoyed the tour. We enjoyed showing you around and helping answer questions.

To answer your questions:
1. A slightly larger rack than 42U is better as there is a 1U network switch per rack and a 1U server per every 4-5 racks
2. Your power estimations are approximately correct.
3. I am not a cooling expert but from what I have read and been told  is approximately 10 tons of AC per rack. Also my understanding is that datacenters spend approximately the same amount of power cooling a system as the system consumes.
The air entering the front of the rack should be between 70 and 75F. The hot exhaust air shouldn't mix with the cold inlet air. The system moves about 5000 CFM of air. Air is sucked into the front of the rack and is exhausted out the back.
4. I think those are the major issues. Floor issues - these systems are heavy, about 400-500lbs per rack, so there may be loading concerns. Fire - the system consume significant amounts of electricity. In the event of a connection failure, there could be a electrical fire. Wooden structures are probably a bad idea.

To give you an idea of the power requirements, a standard house might have a 200A/240V service. Each rack and associated AC would require approximately 300+ A service. One of the limiting time and cost issues is directly related to having the utility provision the required power.

I hope this helps a little. If you have more questions, please don't hesitate to ask.

-R

On Thu, Aug 22, 2013 at 12:38 PM, Daniel H. Gallancy <daniel@dalsabarbour.com> wrote:

Hey Robert,

I spoke with Peter about some hosting options and he indicated that I should email you. We would like to help you explore alternative hosting options that would reduce your costs as much as possible. In order for me to do so, I need a little bit of information from you. Here is what I understand to be the situation – you'll need:

1.  Approximately 90 42U racks (this assumes 6 card cages per rack), yes?

2.  Each rack (which would provide about 6.5 TH) will require 36kW of power, correct?

    a.  So, in total, you need about 3.3 MW of power at full deployment, yes?

3.  You need some cooling – but I'm not sure how much nor how it is measured. Can you provide some insight?

    a.  If the racks were to be in a non-traditional space, what would the ambient room temperature need to be?

    b.  If there are additional cooling nuances / complexities, please let me know

2

CoinLab000430

4.   How far apart do the racks need to be spaced / how much floor space in the aggregate do you require?

5.   Any other issues that I need to be aware of?

I have some buddies who used to work in the data center industry and some others from the real estate industry (who have some data center experience).  Plus we have some other contacts to whom we can reach out.  We just need to know the specific requirements so we know what to ask for.

Would warehouse space be acceptable?  If so, we need to know cooling requirements.  This could be a much cheaper alternative to a conventional data center.  Perhaps assembly can also take place in such a space.

What about rental trailers with cooling?  Sounds like a good possibility, particularly during winter months.  Would this be acceptable?  If so, how many racks would fit into a standard sized trailer?  Any thoughts on this?  Potential location options:  Oregon, Washington, Alaska, etc.

I'll be in meetings until about 3 PM pacific time but available to talk after that.  646-580-2324 / 917-370-5158

Regards,

Dan

P.S.  I had meant to email you to thank you again for taking the time to give us the tour last week.  It was very helpful and we sincerely appreciated it!!

3

CoinLab000431