UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
BITVESTMENT PARTNERS LLC,                                            :
:
                Plaintiff,                        :
:
:
       -against-                                                    :     13 Civ.7632 (RWS)
:
COINLAB, INC., CLI HOLDINGS, INC., ALYDIAN :
INC., PETER VESSENES and JOHN DOE,                                   :
:
                Defendants.                       :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**AFFFIDAVIT OF DANIEL H. GALLANCY IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

      DANIEL H. GALLANCY, being duly sworn, deposes and says:

      1.      I submit this Affidavit in further support of Plaintiff's motion for a preliminary injunction.

      2.      At the outset, regarding the name Bitvestment Partners LLC, it is simply a new name for Dalsa Barbour LLC.  The name change occurred in October 2013.  No other changes have occurred to the LLC's ownership or its capital structure, and the LLC's contract with Defendants, including CoinLab, Inc. and Peter Vessenes, has not been reassigned in any manner.

      3.      Certain statements by Vessenes in his affidavit dated November 14, 2013 (the "Vessenes Aff.") in opposition to the preliminary injunction, as well as statements in Defendants' Memorandum of Law in opposition to the preliminary injunction, require attention. While there are numerous misstatements, I have only addressed below those misstatements that are most noteworthy and are of most relevance for the Court's determination of a preliminary

injunction. In that regard, I also have addressed Defendants' failure to utilize best efforts to mine and deliver Bitcoins to Bitvestment in accordance with the Court-ordered Temporary Restraining Order ("TRO") and provide a further explanation herein as to why money damages are not a sufficient remedy for Defendants' actions.

4. Vessenes contends in his affidavit at ¶ 12 that "Bitcoins themselves are not becoming rarer, nor will they be impossible to mine at any point in the next hundred and twenty seven years." This statement is false. Vessenes has openly acknowledged that the Bitcoin network is subject to cyber-attack. Such an attack would render it impossible to mine Bitcoins in the future. *See* http://youtu.be/si-2niFDgtI?t=37m30s, last accessed on November 18, 2013 (video of Vessenes speaking on a Bitcoin panel regarding Bitcoin security). It is this issue, among others, that create the risk of imminent and irreparable harm to Bitvestment. A recently published computer science whitepaper from Cornell University also highlights the imminent risk of cyber-attack on the bitcoin network. *See* http://arxiv.org/pdf/1311.0243v5.pdf, last accessed on November 18, 2013.

5. Certainly, nobody can predict with clarity what will happen 127 years from now. The whole purpose – and indeed the only purpose – of the impracticability clause in the contract was to address the issue of what happens if the Bitcoin network is rendered useless as a consequence of either (a) a crippling cyber-attack, (b) changes in the fundamental architecture of the internet, or (c) changes in regulation. Any of these items could easily render Bitcoin useless at any moment in the future.

6. To be clearer still about the impracticability clause in the Agreement, it refers to "changes in technology." This is the heart of the issue. Nothing of substance has changed with regards to the core technology defining the workings of the Bitcoin network. Any assertion by

Vessenes to the contrary is a blatant untruth. The algorithm that enables the Bitcoin network to run was defined in a whitepaper released in 2008 (*see* http://bitcoin.org/bitcoin.pdf) by Satoshi Nakamoto (likely a pseudonym). That algorithm is based on cryptographic techniques – including running the SHA256 hashing algorithm for mining. The Bitcoin network was specifically designed to handle a scale-up in the running of the SHA256 algorithm (*i.e.* an increase in miners and an increase in *difficulty*), and all Bitcoin miners know this, including Vessenes. The algorithm has not changed. All that has changed is CoinLab's willingness to participate in the mining process, as Vessenes seems intent on devoting CoinLab's capital to other endeavors.

7. Vessenes asserts that the increases in *difficulty* constitute a change in technology and make the agreement impracticable, but this certainly cannot be true. These increases in *difficulty* were occurring at the time of the signing of the original contracts, in December 2012 and March 2013, and also at the time of the signing of the Amended Agreement, in August 2013. The increases in *difficulty* are not a new phenomenon. Such increases have occurred continuously since the creation of Bitcoin in early 2009. If increases in *difficulty* constituted a change in technology, the contracts would have lacked any economic value in the first place. Indeed, a main reason for a customer to engage in a contract to receive Bitcoins from a miner is for the miner to assume the deal's increases in *difficulty* in exchange for compensation from the customer. An increase in *difficulty* is really akin to nothing more than an increase competition.

8. An increase in competition also does not lead to impracticability, in spite of Vessenes's assertions to the contrary. The nature of the agreement is very much akin to a customer of a gold miner paying the gold miner to dig for gold in a mountain. Both parties know in advance that gold mining will become increasingly competitive as other miners dig in a

particular mountain, but the miner agrees to do the work in exchange for a cash payment from the customer. The contract would have no value if an increase in competition were to enable the miner to cease mining operations at will, keeping the customer's funds and leaving the customer without his product. Impracticability would only occur if, for example, an earthquake were to destroy the mountain entirely. In this case, no earthquake has occurred, and the ability to mine remains very much intact.

9. A "change in technology" (an analogy to the earthquake as described above) would be something far more profound than a change in *difficulty*. A change in technology could be a change in the hashing algorithm from SHA256 to some other algorithm, or it could be a cyber-attack or a change in the architecture of the Internet. All of these would be profound events, and would indeed render the contract impracticable, and the biggest risk right now is one of a cyber-attack. Such an attack has not yet happened, but it could happen at any moment.

10. So, in this instance, CoinLab's tactic is to falsely claim impracticability now (*i.e.*, falsely claiming that increases in difficulty constitute a change in technology – a false earthquake, of sorts) leaving Bitvestment empty-handed and facing the imminent risk of actual impracticability: a real cyber-attack, which is an imminent danger.

11. As mentioned above, Vessenes also asserts in his affidavit at ¶ 12 that Bitcoins do not become rarer as time progresses, but he knows this statement not to be true. Right now, newly mined blocks provide 25 Bitcoins per block, but in approximately three years from now, if the Bitcoin network survives, the number of Bitcoins per mined block will be cut in half, to 12.5 Bitcoins per block. Subsequent network halvings – to 6.25, 3.125, etc. – are scheduled to occur approximately once every 4 years. Thus, Bitcoins mined will indeed become rarer as time goes on.

12. Vessenes contends in his affidavit at ¶ 14 that a "chip design project takes approximately 12 to 18 months from start to deployment." KnC Miner, however, a well-known provider of Bitcoin mining equipment, implemented and completed its project in approximately 6 months (*see* http://www.coindesk.com/kncminer-begins-shipping-jupiter-bitcoin-mining-rigs/ and https://bitcointalk.org/index.php?topic=170332.0 ).

13. Vessenes contends in his affidavit at ¶ 15 that current mining market leaders use 28 and 55 nanometer ("nm") chips to mine Bitcoins and Alydian's chips are 65nm Bitcoin chips, two to four times less energy-efficient than current market leaders. *First*, Vessenes focuses his misplaced attention on Alydian and not CoinLab. *Second*, while Vessenes' statement is accurate insofar as 65 nm chips are less energy efficient than newer chips, the statement appears designed to mislead the Court. The fact that Alydian's chips are less energy efficient does not mean that they do not work. An analogous statement is "my computer is one year old so I don't feel like using it because there are better computers." The referenced Alydian equipment is fully functional and the input costs from electricity are dwarfed by the revenue CoinLab and Alydian would make from mining. The fact that Alydian's equipment is technologically viable is demonstrated beyond any doubt by the fact that Alydian continues to operate the equipment and mine Bitcoins as debtor in possession.

14. Moreover, Vessenes asserts that the two market leaders as of February 2013, ASIC Miner and Avalon, are "largely out of business." This assertion, perhaps designed to deceive the Court into believing that obsolescence in Bitcoin mining occurs in a matter of months, is a distortion of the truth. Avalon continues to sell mining-related equipment to this day. *See* http://avalon-asics.com/product/a3255-55nm-chip-500-count-reel/, last accessed on November 18, 2013. ASIC Miner has produced a substantial amount of easy-to-install mining

5

equipment that is readily available for next-day delivery on Amazon.com. *See* http://www.amazon.com/ASICMiner-Block-Erupter-USB-Sapphire/dp/B00CUJT7TO, last accessed on November 18, 2013.

15. Vessenes contends in his affidavit at ¶ 19 that Coinlab has put significant efforts into both incubating a Bitcoin exchange and Alydian, and smaller efforts in a number of ancillary businesses. What Vessenes fails to mention is that CoinLab's original business was a mining pool. In fact, when Vessenes and I first met in late 2012, his initial business pitch was that his mining pool was growing at an impressive rate. Annexed hereto as Exhibit A are true and correct copies of various references on the Internet that demonstrate CoinLab's mining pool, including screenshots taken from CoinLab's own website.

16. Vessenes contends in his affidavit at ¶ 24 that "CoinLab is not a Bitcoin mining company and presently has no capacity to mine bitcoins. In order to mine at scale, Coinlab would be required to invest significant capital expenditures to secure mining equipment, supporting hardware, hosting locations, and pay for enormous amounts of electricity." These statements are false. There is plenty of mining capacity from small, medium and large-scale miners that can be aggregated (for example, across geographies) and there are plenty of ways to outsource mining efforts, find brokers to do the mining, etc. *See, e.g.*, https://cloudhashing.com/ and https://cex.io/, last accessed on November 18, 2013. CoinLab undeniably has the ability to engage in Bitcoin mining if it chooses to do so, and could outsource the mining if it desired.

17. Vessenes states that in order to comply with the Court's TRO requiring CoinLab to mine Bitcoins, CoinLab "at a minimum needs to assess the current mining market and understand how a company could best do this." Given that Vessenes is the founder and former Chairman of the Bitcoin Foundation as well as the CEO of CoinLab, a company that has engaged

directly in the Bitcoin mining industry, such an assessment is merely continued delay and non-compliance with the TRO by Vessenes since he is well versed in Bitcoin mining.

18. Indeed, there are a number of methodologies that CoinLab could implement to comply with the Court's best efforts requirement. Annexed hereto as Exhibit B is a true and correct copy of correspondence by and between Bitvestment's counsel and Defendants' counsel outlining such methodologies. While Vessenes contends at ¶ 43 of his affidavit that the suggested methodologies are purportedly "impracticable" and that he did not have sufficient time to provide the Court with an analysis of such purported impracticability, I can explain how each of the proposed methodologies would have CoinLab to comply with the TRO.

19. To be precise, and for the sake of argument, it makes sense to use Defendants' definition of that which is "impracticable": "incapable of being performed or accomplished by the means employed or at command; difficult or impossible to do or use[.]" Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defendants' Opposition") at 8.

20. *First*, CoinLab can reach out to well-known miners and engage their services privately or contract with third-parties to engage the services of miners. Again, these activities do not qualify as activities that Defendants cannot accomplish. They are neither impossible nor difficult.

21. *Second*, CoinLab can purchase a hosted mining contract from multiple vendors including: https://cloudhashing.com/, https://products.butterflylabs.com/1-gh-cloud-hosted-bitcoin-hashing-power.html, or any number of other suppliers. Using the Internet to purchase hosted mining from a third-party supplier does not qualify as an act that Defendants cannot accomplish. It is neither impossible nor difficult.

22. *Third*, CoinLab can make a public announcement that it wishes to contract with individual miners for their services. Such an announcement can be made via a press release, on CoinLab's website, on bitcointalk.org or elsewhere. Making public announcements or solicitations does not qualify as an act that Defendants cannot accomplish. It is neither impossible nor difficult. In CoinLab's case, it is, in fact, particularly easy, given Vessenes's status in the Bitcoin community (as the founder of the Bitcoin Foundation) and given how well known CoinLab is within the Bitcoin community.

23. *Fourth*, CoinLab can purchase on the open market Bitcoin mining equipment. Such equipment is available for immediate purchase via the Internet. For example, please see http://bit.ly/1azMiJ7, http://bit.ly/17E7Shq and http://amzn.to/1hnfrxg. Making purchases of computing equipment on ebay.com or amazon.com certainly does not qualify as an act that Defendants cannot accomplish. It is neither impossible nor difficult.

24. *Fifth*, CoinLab can purchase equipment for future delivery from any of the suppliers listed at http://mining.thegenesisblock.com/. On the bottom of that URL page, there are ten such suppliers listed. Given that the delivery date for such equipment may not be known, CoinLab can contact any of these vendors to make special arrangements for the immediate delivery of such equipment or for hosted mining services. As the founder and former chairman of the Bitcoin Foundation, Vessenes is quite familiar with certain of these vendors and knows their executives and staff personally. For example, I personally witnessed Vessenes have conversations with the founder of Avalon Asics (a/k/a BitSyncom) at the Bitcoin Foundation's conference in May 2013. Vessenes contacting via telephone individuals with whom he already has a relationship does not qualify as an act that Defendants cannot accomplish. It is neither impossible nor difficult.

8

25. *Sixth*, CoinLab can contact TradeHill.com. Vessenes has the contact information for TradeHill's CEO, as they are on at least one mutual email list. TradeHill has run an auction for Bitcoin mining equipment and can broker purchases. Participating in an auction for equipment does not qualify as an act that the defendant cannot accomplish. It is neither impossible nor difficult.

26. *Seventh*, CoinLab also could revive its mining pool (http://pool.coinlab.com/partners) and provide appropriate incentives for miners to join. Given that CoinLab's original business was as a mining pool, this certainly cannot qualify as an act that the Defendants cannot accomplish. It is neither impossible nor difficult.

27. *Eighth*, CoinLab can reach out to mining pool operators and engage their services. As with reviving CoinLab's original mining pool, engaging the services of mining pool operators does not qualify as an act that that Defendants cannot accomplish. It is neither impossible nor difficult.

28. Furthermore, and what should be the most obvious for CoinLab in both this proceeding and Alydian's bankruptcy proceeding, is that CoinLab could simply contract with Alydian (as debtor in possession) to do the mining on CoinLab's behalf. Alydian's creditors and any bankruptcy trustee would welcome the cash infusion. Such an arrangement could be structured in any number of ways, many of which could actually *increase* the recovery for Alydian's creditors.

29. For example, CoinLab could purchase equipment from Alydian at a modest markup, enabling Alydian to earn a profit on equipment sold to CoinLab. Vessenes even stated in support Alydian's Motion to Reject Executory Contracts in connection with the Chapter 11 proceeding (at ¶ 16 of his declaration) that "Alydian anticipates filing a motion under 11 U.S.C.

§ 363 for sale of its assets. Alydian believes such a sale is the best prospect for maximizing the return to all creditors." Annexed hereto as Exhibit C is a true and correct copy of the Declaration of Peter Vessenes in Support of Motion to Reject Executory Contracts dated November 15, 2013.

30. The above list is not exhaustive. There are an abundance of mechanisms by which CoinLab can fulfill its obligations to Bitvestment, including but not limited to the above.

31. Moreover, Vessenes complains in his affidavit that CoinLab's mining returns were decreasing at 3% per day while CoinLab's electricity costs were not decreasing. Again, by omission, Vessenes attempts to distort the facts. Between the time the TRO was issued by the Court and the date of the PI hearing, the growth in *difficulty* has actually subsided, going down below 1% (as measured using precisely the same statistical estimates as Vessenes – see http://bitcoin.sipa.be/).



Nonetheless, in spite of this window of opportunity for CoinLab, not a single Bitcoin was delivered to Bitvestment.

32. Furthermore, during this period of a slowing increase in *difficulty*, the traded value of a Bitcoin increased by more than 100% in U.S. Dollar terms, thus enabling CoinLab to use its mining output with far greater efficiency in paying its costs of new equipment, personnel, electricity, hosting and other expenses.

33. The very fact that Alydian filed for Chapter 11 bankruptcy protection and that it continues to operate as debtor in possession underscores the fact that mining is practicable. Alydian did not file for Chapter 7 liquidation – it is in Chapter 11 reorganization and it continues to mine Bitcoins as it did before filing for bankruptcy. Even if Alydian's finances are in disarray, its operations continue unaffected.

34. Vessenes contends in his affidavit at ¶ 31 that "changes in technology in fact rendered performance under the agreement 'impracticable.'" Not only is it not a fact, but it is untrue, as demonstrated above. It is not impracticable to comply with the terms of the Amended Agreement or the TRO (as explained above with various methodologies), it is just undesirable to CoinLab, as CoinLab likely sees bigger profits for itself in incubating other businesses.

35. Over 50,000 Bitcoins were mined since the issuance of the TRO, yet despite multiple demands, Plaintiff has yet to receive a single Bitcoin from Defendants.

36. Despite Defendants' assertions to the contrary, they could quickly meet their contractual obligations to deliver 7,984.006735 Bitcoins to Bitvestment by delivering such Bitcoins from its stash of 15,101.29024042 mined Bitcoins at address 12zZM5LQeC4xdtRMNw7DdJVcCRBQQ8Vb1t.

37. As Defendants know, Bitcoins are fully traceable through the Bitcoin network. Defendants informed Bitvestment that "CoinLab [, Inc.] mines Bitcoin" at addresses 18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC and 1G3Csro9jsrGssJmdgpezj6cbKyu64sfua and that it controls such addresses. Annexed hereto as Exhibit D is a true and correct copy of Defendants' counsel's September 24, 2013 letter specifying such addresses. As an aside, while such letter specifies that the information contained therein is subject to a non-disclosure agreement, neither me nor Bitvestment are subject to any purported confidentiality restriction.

38. On October 29, 2013, during the precise time that the parties were in the courtroom before the Honorable Robert W. Sweet arguing the TRO the first time, CoinLab, Inc. moved its Bitcoins from those two addresses to 12zZM5LQeC4xdtRMNw7DdJVcCRBQQ8Vb1t. This fact is irrefutable. Annexed hereto as Exhibit E is a true and correct copy of various online data demonstrating the transfer of Bitcoins, including the time and date of such transfers.
Address 12zZM5LQeC4xdtRMNw7DdJVcCRBQQ8Vb1t currently holds 15,101.29024042 Bitcoins.

39. Defendants contend "Plaintiff demands bitcoins. That is, Plaintiff simply demands money" (Defendants' Opposition at 12) and "It is indisputable that Plaintiffs claims are compensable with money damages. Defendants' argument fails to address the fact that although Bitcoin can be used as a form of currency: (a) Bitcoin is actually software running on a network of computer and is by no means guaranteed to exist in the future, (b) the functions of the software run far beyond that of a common currency (*i.e.*, Bitcoin is definitely not "just like dollars" as described on page 1 of the Vessenes Aff.); and (c) the magnitude of damages to Bitvestment cannot necessarily in the future be measured in dollars and cents.

40. *First*, as with any emerging technology, Bitcoin is anything but guaranteed to exist in the future. Bitcoin is the subject to the constant threat of cyber-attack. Numerous computer science papers have been written about this issue (*see, e.g.*, http://arxiv.org/pdf/1311.0243v2.pdf) and Vessenes himself, in his capacity as a member of the board of directors of the Bitcoin Foundation, reiterated that point. *See* http://youtube/si-2niFDgtI?t=37m30s (where Vessenes, in a speaking engagement in May 2013, described such an attack as "totally doable.").

41. The risk of attack is not just hypothetical. Such attacks have occurred against several "alt-coins," which are competing technologies to the Bitcoin network. For example, earlier in 2013, Terracoin was hit by a cyber-attack causing tremendous disruptions to the Terracoin network (*see* https://bitcointalk.org/index.php?topic=263953.0). As Bitcoin becomes increasingly popular, the impetus to attack it grows. Thus far, the Bitcoin network has not suffered from a significant cyber-attack, but an "accident" in March 2013 created the risk of annihilation of the Bitcoin network. The accident occurred during a software upgrade, which caused the Bitcoin blockchain to "fork." Luckily, human intervention was able to correct the situation (*see* https://en.bitcoin.it/wiki/BIP_50). But the events of March 2013 are an overt example of the inherent fragility of the Bitcoin network.

42. *Second* – and related to the first point above – Bitcoins are not guaranteed by any central authority, thus it is inherently unlike any government-issued currency. The ability to use a U.S. Dollar is backed by the full faith and credit of the U.S. Government. The ability to use a Bitcoin – either as currency or otherwise – is available today but not guaranteed to be available in the future.

43. The uncertain future and nature of Bitcoin was made abundantly clear by one of Defendants' own attorneys, Marco Santori, Esq., who, in his capacity as chairman of the regulatory affairs committee for the Bitcoin Foundation, recently described Bitcoin in a Washington Post article dated November 14, 2013 (quite notably the same date as the Vessenes Aff. contending otherwise) as "a new asset class." Mr. Santori further stated about Bitcoin that "[i]t's a baby in a crib, and we still don't know what it's going to grow up to be." Annexed hereto as Exhibit F is a true and correct copy of the November 14, 2013 Washington Post article. The point clearly being that Bitcoin's future – in many respects – is simply unknowable. Mr. Santori's quote underscores the point that, by failing to comply with the Amended Agreement and TRO, Bitvestment is put at significant risk of imminent harm.

44. *Third*, unlike the U.S. Dollar, which is fully fungible, Bitcoins are not necessarily fungible. Bitcoin is a new technology, and, as such, it possesses special characteristics that separate it from traditional money. For example, certain Bitcoins can be assigned as proof of ownership of specific objects. A specific Bitcoin can be deemed to represent ownership of a piece of artwork, for example (with that piece of artwork having a value that cannot readily be measured in dollars). Several projects, integrated directly with the Bitcoin network, are underway in precisely this regard. Two such projects are Mastercoin (http://www.mastercoin.org/) and BitcoinX (http://www.bitcoinx.org/). If Dollars were used in this manner, it would be as if a specific U.S. Dollar represented the full ownership of a deed of property, and the act of one individual handing that specific U.S. Dollar to another individual would constitute the transfer of ownership of a house. U.S. Dollars explicitly cannot be used in this manner, but Bitcoins can. To demonstrate further this point, Mastercoins, for example, were recently trading at twice the value of Bitcoins.

45. *Fourth*, unlike the U.S. Dollar, the value of Bitcoin fluctuates tremendously on a day-to-day basis and across the various exchanges. Over the past year, the value of a Bitcoin (depending on the exchange) has fluctuated between $11.57 (on November 19, 2012) and $900.98 (on November 18, 2013 -- Bitcoin actually traded as high as $1,147 in China, but it is not exactly an apples-to-apples comparison given the unique capital controls in that country), with sharp movements in value on a regular basis. Indeed, today, Bitcoins are trading at $606.74 on mtgox.com and $564.00 on bitstamp, a decline in one day of approximately 33%. So, although one could exchange a Bitcoin for goods and services, the value received in any such deal varies dramatically minute to minute. Also, even among the exchanges there are wide variations in price -- on November 18, 2013, Bitcoin traded as high as $900.98 on mtgox.com, whereas they reached a peak of $755.00 on bitstamp.net.

46. *Fifth*, although the technology and usage of Bitcoin is legal, there are ongoing debates about the future legal status of Bitcoin in the United States, and, unlike the U.S. Dollar, Bitcoin runs the risk of having its legal status changed drastically in the future. Indeed, congressional hearings on the legal status of virtual currency, including Bitcoin, began yesterday, November 18, 2013 (*see* http://www.hsgac.senate.gov/hearings/beyond-silk-road-potential-risks-threats-and-promises-of-virtual-currencies).

47. In fact, at those hearings, the director of Financial Crimes Enforcement Network (FinCEN), U.S. Dept. of Treasury, Jennifer Shasky Cavelry, testified: "[v]irtual currency is a medium of exchange that operates like a currency in some environments but does not have all the attributes of real currency… And since a convertible virtual currency either has an equivalent value in real currency, or acts as a substitute for real currency, it qualifies as 'other value that substitutes for currency' under the definition of 'money transmission services.'" Annexed hereto

as Exhibit G is a true and correct copy of the November 18, 2013 Panel I, Witness Testimony, of Jennifer Shasky Cavelry.

48. Furthermore, state regulatory authorities, including the New York State Department of Financial Services, are in the midst of debating the future legal status of Bitcoin. On November 14, 2013 the NYS DFS issued a "Notice of Intent to Hold Hearing on Virtual Currencies, Including Potential NYDFS Issuance of a 'BitLicense' " (*see* http://www.dfs.ny.gov/about/press2013/virtual-currency-131114.pdf). If Defendants do not perform in a timely manner, Bitvestment could be permanently harmed by changes in the legal status of Bitcoin.

49. *Sixth*, unlike U.S. Dollars, which can be printed by the Federal Reserve Bank at its discretion and without limit, Bitcoins are a finite quantity resource. There are approximately 12 million Bitcoins in existence today but, even if Bitcoin survives into the future, Bitcoin's design inherently prevents the creation of more than 21 million Bitcoin units.

50. For all the foregoing reasons, Bitvestment is at risk of imminent and irreparable harm, and money damages in this action will not suffice. Thus, CoinLab should be ordered to immediately deliver 7,984.006735 Bitcoins to Bitvestment.

Dated: November 19, 2013
New York, New York

_____
Daniel H. Gallancy

Sworn to before me this
19th day of November 2013

_____
Notary Public

DIMITRI NEMIROVSKY
Notary Public, State of New York
Registration #02NE6261832
Qualified In New York County
Commission Expires May 14, 2016

16