# EXHIBIT A

11/6/13                                                       CoinLab | All your gamers are gold

Protected Earnings Pool    Stats   Leaderboard                                        Sign in

For every difficulty 1 share (from here, called a credit) you submit above break even (equal to our price floor factoring in our cut - $2.50/ 1 GH/s day / 0.95 = ~$2.63 / GH day), you earn 95% PPS for that credit and one Loyalty Point which lets you sell one credit at the price floor ($2.5 / 1 GH/s day).

For the next couple months, you can earn credits with the miner of your choice. Once we release it, we will only accept credits submitted by our custom mining client (co-developed with Con Kolivas, the creator of cgminer), as it will allow us to perform other, more valuable compute jobs when available.

Loyalty Point credits can only be redeemed through our custom mining client.

We may perform other types of computation with your GPU besides Bitcoin mining. We will calculate your earnings based on the equivalent number of credits your card would have produced for the same amount of work.

Payments for computation will be in Bitcoin, and occur once per week. This system will be manually administered at first, so please be patient. We'll have a self-service system in the next few months which will automate payouts and sign-ups.

Payouts will only occur when your balance is at least 1 BTC. If you wish to withdraw a smaller increment, contact us.

If you earn more than $500 worth of BTC in one calendar year and are in the US, we may need to send you a Form-1099 to report our payments to you to the IRS (we will need your name, address, and US tax id). Miners in this group also get the option of receiving US dollar payouts, or a mixture of USD and BTC (you can take your electricity costs in USD and keep your profits in BTC). We're evaluating a means of waiving this requirement, so we'll keep you posted.

Loyalty Points are redeemed automatically whenever you mine and the market rate for Bitcoin mining is below $2.50 per GH/s-day.

Loyalty Points are not transferable.

Loyalty Points expire 2 years after the earnings from Bitcoin mining crosses below the price floor of $2.50 / 1 GH/s-day. If the price swings above the price floor and back down, the expiration date is reset.

ccount inactivity. Account inactivity is defined as not
nicating with us.

Loyalty Points have no cash value.

Bitcoin payouts will only be sent to you. If you want to send them on to someone else, you need to tke possession of them from us first.

Users who submit at least 1,125,000 shares in one week will be paid at the increased rate of 97% PPS. 1,125,000 shares is equivalent to 100% uptime with 10GH/s for one week. Double the hashrate will earn this many shares in half the time. (Ex If you have 15 GH/s, you will reach 1,125,000 shares 66% of the way through the week.) The new week begins each Monday.

Early on-request payouts will be credited at 95% PPS unless you have already earned 1,125,000 shares that week.

CoinLab's services and offerings including this program and the Loyalty Points are subject to Terms and Conditions posted by CoinLab from time-to-time. Terms related to this offer will be made public available in the next week.

Users who violate these terms are subject to account termination. In the event of account termination, we will be sending all remaining funds in the closed account to the BTC payout

Protected Earnings Pool     Stats    Leaderboard                                    Sign in

By joining our service, you agree to our privacy policy.

In order to provide the best service, CoinLab will collect and store the following information from you:

- An email address, to communicate information about the service, provide support, etc.

- Email correspondence between you and our company, and all information therein.

- Your hardware specifications: particularly your GPU model(s) and operating system, but this list may be expanded if relevant to performance of our client.

- Information required to measure your performance while using our client, including but not limited to: solutions to computational problems, client log files, errors, etc.

This list is subject to change over time.

We may use this information to contact you, improve our services, analyze past performance, etc. We may share this information with our affliliates, as relevant to our business. We will not sell any of your personally identifiable information.

1-855-LAB-COIN  /  Seattle, WA  /  © 2012 CoinLab

.
There are millions of computers sitting idle every day - turned on, yet not accomplishing anything. By runing the CoinLab Compute Client we transform that otherwise idle computing resource into valuable items.

Just choose a partner from the list below, download the client, and start earning!

We partner with online game companies to deliver valuable in-game items that you would otherwise have to purchase. You simply download the client for your chosen game, type in your in-game username, and start running. As your computer solves problems, you earn more stuff.

Behind the scenes, the Compute Client is searching for Bitcoins. We convert the value of your computing into units of your in-game currency or special items, and purchase them on your behalf.

**Coinlab Partners**

your game in real-time.

Note: The CoinLab Compute Client uses the power of your graphics card. If you're actively using your computer, it stops computing so we don't interfere with your work or gaming (although you can override this behavior in the program settings). So you'll generally be earning in-game credits while you away from your computer, not while you're actively playing a game.

We also have a charity version of the client; if you don't play any of the games listed below, you can run this version to send your computing earnings to a good cause. We send 100% of the proceeds to charity.

## Give-A-Goat Charity Client

CoinLab's Give a Goat program lets you donate your idle Graphics Card's computational power to raise money to be donated a charitable organization.

## Uber Compute Client

Uber Entertainment's Super Monday Night Combat is a quirky, fast-paced, free-to-play third-person-shooter MOBA.  The Uber Compute For Keys client gives Keys that let you open Treasure Balls for random rare items.

## Wurm Mining Client

Wurm Online is a free-to-play fantasy MMORPG with a twist: players can terraform the landscape and build structures to change the in-game world.  The Wurm Mining Client lets you earn in-game Iron, which you can use to buy Premium game-time or to purchase in-game items.

## Protected Pool

The CoinLab Protected pool is a 95% PPS Bitcoin Mining Pool, for experienced Bitcoin Miners.

## Redeem Pool

The CoinLab Redeem pool is for Protected Pool users who are looking to redeem loyalty points.

## Protected Earnings Pool

Stats    Leaderboard

Sign in

The CoinLab Protected Pool is a 95% PPS Pool.

Miners who submit over 1,125,000 shares in given week get a bonus 2% PPS. This means that miners with 8GH/s of perfect uptime or more can earn 97% PPS on our pool.

We are no longer giving out Loyalty Points. If you earned some Loyalty Points previously and would like to redeem them, head over to the Redeem Pool.

You can join the discussion about this pool on the Bitcointalk forums here.

Use the navigator bar at the top of the page to view your stats.

1-855-LAB-COIN  /  Seattle, WA  /  © 2012 CoinLab

Case 1:13-cv-07632-RWS    Document 18-1    Filed 11/19/13    Page 6 of 50

Loyalty Redeem    Stats    Leaderboard    Sign in

The CoinLab Redeem Pool

The Redeem Pool is for miners who previously earned Loyalty Points through the Protected Pool.

You can use your same username as password from the Protected Pool to log in and view your Redeem Pool stats.

Use the navigator bar at the top of the page to view your stats.

1-855-LAB-COIN  /  Seattle, WA  /  © 2012 CoinLab



## Bitcoin Forum

Welcome, **Guest**. Please login or register.

| | | Forever ▼ | Login |

Login with username, password and session length

**News**: **Change your forum password**

🔍 | | Search |

HOME    HELP    SEARCH    DONATE    LOGIN    REGISTER

Bitcoin Forum > Bitcoin > Mining > Pools (Moderators: gmaxwell, MiningBuddy) > **[ANN] CoinLab Protected Pool**

« previous topic
next topic »

Pages: [**1**] 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 43 44 45 46 47 48 49 50 51 ... 53

print

   Author      Topic: [ANN] CoinLab Protected Pool  (Read 49780 times)

**CoinLab**
Sr. Member
🟡🟡🟡🟡

Activity: 270



1CoinLabF5Avpp5kor4



Ignore

 **[ANN] CoinLab Protected Pool**
<u>August 09, 2012, 11:08:19 PM</u>

#1

# What is CoinLab Offering?

**UPDATE: We have stopped giving out new Loyalty Points as of midnight UTC Sunday 11/25/12. You may continue to mine on Protected as long as you'd like and continue earning 95/97%. Redeem pool is being set up now.**

The text below will be preserved as-is for archival purposes.

=====================================

**CoinLab Protected Pool – 95-97% PPS Pool with Protected Earnings**
~~Earn 95% PPS plus Loyalty Points.  When ASICs make GPU mining unprofitable, you can redeem your Loyalty Points to get $2.5 per GH/s per day on submitted shares. Protect the future of your GPU!~~

97% PPS for users who mine at least 1,125,000 shares in a week (the equivalent of 1 week at 10GH/s with perfect uptime, or 3.5 days with perfect uptime at 20GH/s...).

~~98% PPS Pool~~
~~This is just a simple 98% PPS pool.  No earnings protection is offered.~~

PPS Pool's rate is now 95%

## Worried about GPU Bitcoin Mining becoming Unprofitable?

Many Bitcoin miners are worried about the day when their graphics cards will no longer be able to earn as much as they do now.  When GPUs replaced CPUs for mining, the value of mining on a CPU dropped dramatically, and eventually became completely uneconomical.



We are on the cusp of a new generation of technological improvement as custom chips are being designed for Bitcoin mining (FPGAs and ASICs).  While these new chips are not general purpose computing devices, they are designed to mine Bitcoins at rates 10 to 100 times more efficiently than even GPUs can today.

If Bitcoin prices drop to the marginal cost of mining using specialized hardware, current GPUs could become useless for Bitcoin mining (since you'll earn less than your electricity costs).

## Protect Yourself from a Price Drop

To help protect against a possible price drop, CoinLab is now offering a Bitcoin mining pool, that comes with a minimum price guarantee!  For every share that you mine at today's prices, we'll guarantee to pay you the equivalent of $2.50 per GH/s-day ($0.00012427 PPS) in case the current market rate for mining drops below that level.



This is a "loyalty program"; we want to you start mining with us today, and in return we'll guarantee your income in the future if you stay with us.  We pay a competitive market-rate of 95% pay-per-share (PPS), delivered to you in Bitcoins.  But for each share you earn, you'll also be able to bank a "Loyalty Point".

**Example**

If you mine with us for 6 months before the price drops below $2.50, you'll have enough shares to earn the minimum price of $2.50 for the next 6 months (assuming equivalent hash rates during both periods). Or, you could sell half of your rig, and those loyalty points will last 1/2 the hashing power twice as long: 12 months. Or, double your hashing power and use all of your Loyalty Points up in 3 months.

The current expected earnings from a 1GH/s for 24 hours is $5.37 (using price of $11.7 and difficulty 2190865.9701). On our 95%PPS pool, you'll be earning $5.10 per 1GH/s per day.

**This program gives you protection against three risk factors:**

1. Difficulty goes up dramatically - so that earned shares get much fewer Bitcoins per block.
2. The Bitcoin cliff cuts the number of Bitcoins earned per solved block in half (now 50 BTC, new blocks will only pay out 25 BTC) - expected in December 2012.
3. The price of Bitcoins themselves drop to match the marginal cost of mining with custom hardware.

# How can CoinLab make this Offer?

We are in the business of building a a world-wide distributed computing service. While today, you can earn money from mining Bitcoins, we want to be able to bring you other scientific computing jobs that will pay as much or higher than the rate of Bitcoin mining.

So, if you'll help us build out our network, we'll commit to providing you with profitable work for your idle GPU cycles. We're willing to take the risk that we won't be able to find higher-value replacement work, in return for your agreeing to join our network.

We've identified a number of opportunities to monetize our growing GPU cluster at a higher rate than Bitcoin mining, particularly for NVIDIA cards: Protein Folding, Computational Finance, and Big Data Analysis, just to name a few. We believe we will be able to monetize computation at a higher rate than Bitcoins before mining profitability takes a serious drop. However, you probably don't want to take on our sales risk. If mining earnings drop before our other computation jobs come online then we are willing to eat the difference until then.

We are looking for GPU miners who can give us lots of hashing power with high uptime who are willing to run our custom mining client. We have structured this program to reward these miners most: the more shares you submit before earnings drop under the price floor, the more Loyalty Point shares you will be able to mine when it would otherwise not be profitable.

# The Fine Print

- For every difficulty 1 share (from here, called a credit) you submit above break even (equal to our

ANN CoinLab - Protected Post

price floor factoring in our cut - $2.50 / 1GH/s day / 0.95 = ~$2.63 / GH day), you earn 95% PPS for that credit and one Loyalty Point which lets you sell one credit at the price floor ($2.5 / 1GH/s day = $0.00012427 PPS).

- For the next couple months, you can earn credits with the miner of your choice.  Once we release it, we will only accept credits submitted by our custom mining client (co-developed with Con Kolivas, the creator of cgminer), as it will allow us to perform other, more valuable compute jobs when available.
- Loyalty Point credits can only be redeemed through our custom mining client.
- We may perform other types of computation with your GPU besides Bitcoin mining.  We will calculate your earnings based on the equivalent number of credits your card would have produced for the same amount of work.
- Payments for computation will be in Bitcoin, and occur once per week.  This system will be manually administered at first, so please be patient.  We'll have a self-service system in the next few months which will automate payouts and sign-ups.
- Payouts will only occur when your balance is at least 1 BTC.  If you wish to withdraw a smaller increment, contact us.
- If you earn more than $600 worth of BTC in one calendar year and are in the US, we may need to send you a form 1099 to report our payments to you to the IRS (we will need your name, address, and US tax id). Miners in this group also get the option of  receiving US dollar payouts, or a mixture of USD and BTC (you can take your electricity costs in USD and keep your profits in BTC). We're evaluating a means of waiving this requirement, so we'll keep you posted.
- You can redeem your Loyalty Points by mining on the redeem pool.  See the instructions here: https://bitcointalk.org/index.php?topic=99643.msg1350491#msg1350491 ~~Loyalty Points are redeemed automatically whenever you mine and the market rate for Bitcoin mining is below $2.50 per GH/s day.~~
- Loyalty Points are not transferable.
- Loyalty Points expire 2 years after the earnings from Bitcoin mining crosses below the price floor of $2.50 / 1GH/s-day.  If the price swings above the price floor and back down, the expiration date is reset.
- Loyalty Points expire after 90 days of account inactivity.  Account inactivity is defined as not submitting any shares and not communicating with us.
- Loyalty Points have no cash value.
- Bitcoin payouts will only be sent to you.  If you want to send them on to someone else, you need to take possession of them from us first.
- Users who submit at least 1,125,000 shares in one week will be paid at the increased rate of 97% PPS.  1,125,000 shares is equivalent to 100% uptime with 10GH/s for one week.  Double the hash rate will earn this many shares in half the time.  (Ex. If you have 15 GH/s, you will reach 1,125,000 shares 66% of the way through the week.) The new week begins each Monday.  Early on-request payouts will be credited at 95% PPS unless you have already earned 1,125,000 shares that week.
- CoinLab's services and offerings including this program and the Loyalty Points are subject to Terms and Conditions posted by CoinLab from time-to-time.  Terms related to this offer will made publicly available in the next week.

# How do I join?

To sign up for our 95% Protected Pool, go here:
http://pool.coinlab.com/partners/protected/sign-up

To sign up for our ~~98%~~ 95% PPS pool (no Loyalty Points), go here:
http://pool.coinlab.com/partners/ppspool/sign-up

We'll email you instructions to get started.

Advertisement: **Your ad here.**



**CoinLab**
Sr. Member
🌕🌕🌕🌕

Activity: 270



1CoinLabF5Avpp5kor4

👤 🌐

Ignore

**Re: [ANN] Protect your future GPU mining earnings with CoinLab's 95% PPS Pool**
August 09, 2012, 11:09:26 PM

#2

**Announcements**

8/13/12 - Loyalty points now expire 2 years after the price drop, extended from 6 months.

8/20/12 - Users who contribute an average hashrate of 10GH/s over the week (submit a total of at least 1,125,000 shares) will now earn 97% PPS

8/20/12 - Web Interface for checking your mining performance is now live at
http://pool.coinlab.com/partners/protected/

9/17/12 - Email idle notifications now available:
https://bitcointalk.org/index.php?topic=99643.msg1199339#msg1199339

9/17/12 - Changed payout period from Sunday at 12:00 AM UTC (Saturday night's midnight) to the following Sunday at 12:00AM.  From next week, the payout amount you receive will match the values seen in the web interface.

10/1/12 - Automated sign-up process now online!

10/2/12 - First version of the custom client is planned to ship 11/1

10/5/12 - Worker Update!  You can now mine with multiple workers, and create workers on the fly:
https://bitcointalk.org/index.php?topic=99643.msg1248241#msg1248241

11/5/12 - Miner PPS Rate Elasticity Experiment begins - we're now intermittently paying rates up to 200% PPS to learn how miners respond to changing PPS rates. https://bitcointalk.org/index.php?topic=99643.msg1318535#msg1318535

# EXHIBIT B



Reyhani
Nemirovsky LLP

Bryan I. Reyhani
212.897.4022
bryan@rnlawfirm.com

<u>Via Email</u>
msantori@nmllplaw.com

November 8, 2013

Marco A. Santori, Esq.
Nesenoff & Miltenberg, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001

Re:   Bitvestment Partners LLC v. CoinLab Inc., CLI Holdings, Inc., Alydian Inc.,
      Peter Vessenes and John Doe
      Southern District of New York, 13 Civ. 7632 (RWS)

Dear Mr. Santori:

This letter concerns the November 5, 2013 Temporary Restraining Order
executed by the Honorable Robert W. Sweet (the "TRO") in this matter.

As Judge Sweet made clear in the TRO, Defendant CoinLab "shall utilize best
efforts to begin to mine and deliver bitcoins to Bitvestment."

Since the TRO was executed, approximately 10,000 Bitcoins have been mined.
Bitvestment has not yet received any such Bitcoins.  Please advise what number
of those 10,000 Bitcoins CoinLab mined and is prepared to deliver to Bitvestment
on a rolling basis.

While it is not our responsibility to advise CoinLab as to how to comply with the
TRO, there are multiple ways for CoinLab to comply with the best efforts
requirement, any number of which are set forth below.  To be clear, CoinLab
should not take Judge Sweet's order lightly.  Bitvestment will fully protect its
rights in the event we believe CoinLab is shirking its Court-ordered obligation to
use best efforts to mine and deliver Bitcoins to Bitvestment.

*First*, CoinLab can purchase on the open market Bitcoin mining equipment.  Such
equipment is available for immediate purchase via the Internet.  For example,
please see http://amzn.to/1hnfrxg, http://bit.ly/1cGMxpR, http://bit.ly/HARcLM,
http://bit.ly/1hndIYO, among others.

*Second*, CoinLab can purchase equipment for future delivery from any of the
suppliers listed at http://mining.thegenesisblock.com/.  On the bottom of that URL



page, there are ten such suppliers listed.  Given that the delivery date for such equipment may not be known, CoinLab can contact any of these vendors to make special arrangements for the immediate delivery of such equipment or for hosted mining services.  As you are likely aware, Mr. Vessenes is intimately familiar with certain of these vendors and knows their executives and staff personally.

*Third,* CoinLab can purchase a hosted mining contract from multiple vendors including: https://cloudhashing.com/, http://bit.ly/18uAAza, http://bit.ly/1fmMCN6 or any number of other suppliers.

*Fourth*, CoinLab can make a public announcement that it wishes to contract with individual miners for their services.  Such an announcement can be made via a press release, on CoinLab's website, on bitcointalk.org or elsewhere.

*Fifth*, CoinLab can reach out to well-known miners and engage their services privately or contract with third parties to engage the services of miners.

*Sixth*, CoinLab can reach out to TradeHill (Mr. Vessenes has their contact information).  TradeHill runs periodic auctions for Bitcoin mining equipment and can broker purchases.

*Lastly*, CoinLab also could enhance it mining output generated by the aforementioned six options by: (1) reviving its mining pool (http://pool.coinlab.com/partners) and provide appropriate incentives for miners to join and generate Bitvestment's Bitcoins; (2) reaching out to mining pool operators and engage their services; and (3) purchasing older hardware – FPGAs or GPUs for Bitcoin mining.  This equipment is widely available.

These are just a few methods for CoinLab to mine Bitcoins.  As you are likely aware, between the time the TRO was issued and the date of the preliminary injunction hearing on November 20, 2013, more than 50,000 Bitcoins will have been mined.  Thus, if CoinLab utilizes its best efforts as it is mandated to so do by Judge Sweet, there is no conceivable reason that CoinLab cannot fulfill its contractual obligations prior to the preliminary injunction hearing.

Of course, as an alternative, and to conserve CoinLab's efforts and resources, CoinLab can deliver to Bitvestment the 7,984.006735 Bitcoins that it has already mined from the 15,101.29024042 Bitcoin stash it holds at Bitcoin address 12zZM5LQeC4xdtRMNw7DdJVcCRBQQ8Vb1t.

Also, as a reminder, Defendants' production of documents pursuant to the expedited discovery order are due this morning.



This letter is provided without waiver of or prejudice to Bitvestment's rights and remedies, all of which are expressly reserved.

If you have any questions, please do not hesitate to call me.

Sincerely,

*/s/ Bryan I. Reyhani*

Bryan I. Reyhani

cc:    Andrew Miltenberg, Esq.
       Danielle Kiwak, Esq.

# EXHIBIT C

The Honorable Karen A. Overstreet
Chapter: 11
Hearing Date:  December 6, 2013
Hearing Time:  9:30 am
Response Date:  November 29, 2013

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | | |
|---|---|---|
| In Re: | ) | NO. 13-19746 |
| | ) | |
| CLI HOLDINGS, INC. dba ALYDIAN, | ) | DECLARATION OF PETER VESSENES |
| | ) | IN SUPPORT OF MOTION TO REJECT |
| Debtor. | ) | EXECUTORY CONTRACTS |
| | ) | |

I, Peter J. Vessenes, make this declaration in support of the Debtor's Motion to Reject Executory Contracts.

1.      I am the managing director of the debtor, CLI Holdings, Inc. dba Alydian ("Alydian").  I have personal knowledge of these facts stated herein.

2.      Alydian, a corporation organized and existing under the laws of the Republic of Seychelles under the International Business Companies Act, was formed in August 2012. Alydian does business in the United States and has an office at 900 Winslow Way East, Suite 100, Bainbridge Island, WA.

3.      A basic explanation of Alydian's business, and the background to its Chapter 11 filing, is appropriate at this juncture.

4.      Alydian owns and operates certain inventory and system designs necessary to implement a large scale Bitcoin mining operation (the "System").  A list of Alydian's assets is set forth on Schedule B on file with this court.

DECLARATION OF PETER VESSENES IN SUPPORT OF MOTION
TO REJECT EXECUTORY CONTRACTS (13-19746) Page - 1

N:\CLIENTS\29744\1\PLEADINGS\EXECUTORYCONTRACTS\VESSENES.DECL.DOC

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

5.      Bitcoins are units of digital currency.  The Bitcoin protocol is an agreed-upon way for two computers to communicate to as to enable Bitcoin users to transmit value over the Internet.  The protocol enables users to send Bitcoins back and forth over the Bitcoin network in exchange for goods and services, or store value.  They may be exchanged without the use of a settling intermediary (such as a bank settling a wire transaction or Visa or Mastercard settling a credit card transaction).  Rather, transactions on the network are verified and secured by participants called Bitcoin "miners".

6.      Since approximately October 2012, Alydian has been a Bitcoin miner.  A Bitcoin miner is incentivized to help secure the Bitcoin network by checking that transactions are validly time-stamped so that users cannot spend Bitcoins which they do not have, and by performing highly specialized cryptographic mathematical work.  In exchange for providing this security, the Bitcoin network issues Bitcoins to miners in a sort of lottery system.  The more securing work that is done, the more "lottery tickets" the miner receives.  The more lottery tickets, the greater the chance of receiving a "lucky ticket", that is, winning the lottery and receiving a Bitcoin.  The System automatically generates a fixed number of Bitcoin daily, a process which will continue until approximately the year 2140.

7.      Because Bitcoins have appreciated in value, an increasing number of miners are dedicated to securing the network.  Consequently, it is more difficult for each one to obtain a "lottery ticket".  This is because the probability of receiving a lucky ticket, thereby earning Bitcoins, is proportionate to the amount of securing work which the miner performs for the network.

8.      CoinLab, Inc. ("CoinLab") is a Delaware corporation which owns 65% of the common stock of Alydian.  CoinLab has served as a Bitcoin business incubator, meaning it aims

---

DECLARATION OF PETER VESSENES IN SUPPORT OF MOTION
TO REJECT EXECUTORY CONTRACTS (13-19746) Page - 2

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   to create and foster high value businesses which can participate in the Bitcoin ecosystem.

2   CoinLab has built an infrastructure to allow Alydian to construct and work toward

3   implementation of the System.  Deployment of the System is very challenging, complex, and

4   requires specialized experience and labor.  To implement the System, Alydian provides Bitcoin

5   mining hardware and chips and other servers and equipment necessary for mining.  Alydian

6   requires the use of CoinLab's hosting contracts, offices, management, administration,

7   deployment specialists, manufacturing support, and services of CoinLab's engineers.  The

8   System is manufactured primarily in Taiwan and the United States, then assembled in Portland,

9   Oregon and deployed at data centers in the United States.  Deployment of the System is very

10  costly, and consumes significant energy.  Alydian's approximate costs to date are $2M in

11  development and operating, and $2M for inventory and built costs.

12          9.      Pursuant to the terms of an Operations Agreement, CoinLab invoices Alydian and

13  Alydian reimburses CoinLab for its work and work product.  CoinLab charges Alydian for its

14  invoiced Direct Costs, plus an administrative fee of ten percent subject to a maximum of $5000

15  per invoice.  *See* Alydian's Statement of Financial Affairs, Question 3b, reflecting invoices

16  Alydian paid during the 90-day period prepetition.

17          10.     During 2012 and 2013, Alydian entered into several prepay contracts with these

18  customers:  Christopher Koss, Robert F. Seidensticker III, Brian Cartmell, Barry Silbert, Soule

19  Investments LLC, Dalsa Barbour LLC, Joel Yarmon, Sunshine Network Limited, the Timothy

20  Draper Living Trust, Jon Chin, and myself (collectively, the "Customers").  These contracts are

21  attached hereto and marked Exhibits A-K (the "Bitcoin Services Agreements").

22          11.     For purposes of this motion, the operative term in each of the Bitcoin Services

23  Agreements is found in section 2.  In each (except the Dalsa Barbour Agreement, Exhibit F)

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Alydian is required to use commercially reasonable efforts to mine a specified number of Bitcoins on the customer's behalf.  Alydian is then required to deliver to Customers the Bitcoins ordered as they are mined, on the condition that Customers acknowledge and agree that no delivery of mined Bitcoins is expected to occur before July 1, 2013.  At some point, after that date, Alydian is required to deliver to the customer a monthly account of mined Bitcoins consistent with Bitcoins ordered.

12.     Alydian has not delivered any Bitcoins under any of the Bitcoin Services Agreements.  In each of the Bitcoin Services Agreements, with the exception of the one with Dalsa Barbour, Customers are entitled to receive a full refund of the dollars it has prepaid if Alydian is unable to deliver the purchased Bitcoins.

13.     Alydian originally entered an agreement with Daniel Gallancy, but Dalsa Barbour assigned and assumed that agreement on August 14, 2013.  *See* Exhibit F, pages 8-9.  Although there is lengthy history which is not pertinent for purposes of this motion, this agreement differs from the other Bitcoin Services Agreements.  For example, the Dalsa Barbour agreement provides for significant qualifiers that could result in no net payment of Bitcoin to Dalsa Barbour. Also, it invokes a "best efforts" standard.  Exhibit F, ¶ 2.  It expressly contemplates that Bitcoin investment is volatile and risky and that Dalsa Barbour incurred that risk.  It entitles Dalsa Barbour to no refund.  Alydian disputes that any Bitcoins are due under the Bitcoin Services Agreement with Dalsa Barbour.

14.     Alydian has used its best efforts to mine Bitcoin.  The increase in difficulty made performance under the Bitcoin Services Agreements impracticable, if not impossible.  At least three main factors impacted Alydian.  First, it faced business challenges, as there were market forces beyond its control, which left Alydian with a fraction of the earnings it anticipated.

DECLARATION OF PETER VESSENES IN SUPPORT OF MOTION
TO REJECT EXECUTORY CONTRACTS (13-19746) Page - 4

N:\CLIENTS\29744\1\PLEADINGS\EXECUTORYCONTRACTS\VESSENES.DECL.DOC

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Second, by mid-summer of 2013, it became clear to Alydian that it would require another infusion of capital; however, Alydian was unable to raise new capital.  Third, in October 2013, Bitvestment LLC filed a Complaint in the U.S. District Court, Southern District of New York, (13-civ-7632) against Alydian and CoinLab, et al, seeking certain injunctive relief.  Shortly after, Alydian sought Chapter 11 bankruptcy protection in this court.

15.     Alydian has analyzed its obligations associated with each of the Bitcoin Services Agreements exhibited hereto, and its ability to perform.  The cost of deploying the System has exceeded the value of the Bitcoins mined.  Due the increase in the Bitcoin mining network, under the current business model, Alydian cannot generate a positive cash flow from the mining operation.  In the exercise of its business judgment, Alydian has determined that rejecting the Bitcoin Services Agreements is in the best interests of its estate.

16.     Alydian continues to operate in order to maximize the value to be returned to the Customers.  It anticipates the System to be fully deployed in the next eight to twelve weeks.  Alydian anticipates filing a motion under 11 U.S.C. § 363 for sale of its assets.  Alydian believes such a sale is the best prospect for maximizing the return to all creditors.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed in Bainbridge Island, Washington this 15th day of November 2013.


*/s/Peter J. Vessenes*
Peter J. Vessenes

DECLARATION OF PETER VESSENES IN SUPPORT OF MOTION
TO REJECT EXECUTORY CONTRACTS (13-19746) Page - 5

N:\CLIENTS\29744\1\PLEADINGS\EXECUTORYCONTRACTS\VESSENES.DECL.DOC

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

# EXHIBIT D

**BRESKIN | JOHNSON | TOWNSEND** PLLC

**CONFIDENTIAL INFORMATION SUBJECT TO NON-DISCLOSURE AGREEMENT**

September 24, 2013

**VIA EMAIL AND US MAIL**

Richard Zecchino
Honigman Miller Schwartz and Cohn LLP
222 North Washington Square, Suite 400
Lansing, Michigan 48933-1800
Email: rzecchino@honigman.com

Re:     *Dalsa Barbour LLC –CoinLab, Inc.*

Dear Richard:

        This law firm represents CoinLab, Inc. ("CoinLab").  We are in receipt of your letter dated September 20, 2013. We have reviewed the allegations contained therein and are confident that there has not been, nor is there likely to be, a breach of the Agreement between Dalsa Barbour LLC ("Dalsa") and CoinLab (the "Agreement").

        The Agreement provides that Dalsa is entitled to receive Bitcoins other than Bitcoins "required to meet CoinLab's appropriate mining operating expenses and capital expenditures." Agreement at ¶ 2.   At this time, CoinLab's mining output has not exceeded the capital expenditures necessary to launch and maintain Bitcoin mining activities.

        The Agreement authorizes Dalsa to conduct an audit "of CoinLab's Bitcoin output."  To that end, please be advised that CoinLab mines Bitcoin to the following Bitcoin addresses:

- 18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC (the "18a address")
- 1G3Csro9jsrGssJmdgpezj6cbKyu64sfua (the "1G3 address")

Dalsa can, at any time, ascertain the number of Bitcoins mined to these addresses.  As of September 23, 2013, there are 405.29617911 BTC associated with the 18a address and 119.32687842 BTC associated with the 1G3 address.  Please be advised that <u>CoinLab's Bitcoin addresses are confidential information</u> subject to the nondisclosure agreement between the parties.

        As of September 23, 2013, the Bitcoin price was equal to approximately $133.31 USD. Accordingly, the total present value produced from CoinLab's Bitcoin mining output is approximately $70,070 USD.  Unfortunately for all concerned, the current expenditures for

*Richard Zecchino, Esq.*
*Page 2 of 3*

mining operating expenses exceeds $100,000 per month, and capital expenses to mine at peak speed may exceed $500,000.

This level of expenditure and effort is necessary to compete in the increasingly competitive Bitcoin mining industry. As you note, the Agreement states that CoinLab will use best efforts to mine Bitcoins. CoinLab is presently running three racks of servers and, subject to capital constraints, hopes to greatly increase the number of racks dedicated to Bitcoin mining activities. Regardless of any contractual obligation to Dalsa, CoinLab is fully incentivized to mine as many Bitcoins it can as fast as it can. Should he have any questions about the vigor with which CoinLab is pursuing its mining efforts, Mr. Gallancy is invited to visit CoinLab's headquarters and learn more about how seriously CoinLab takes its obligation to use best efforts to mine Bitcoins. Similarly, Mr. Gallancy is invited to visit CoinLab's headquarters to learn, subject to nondisclosure, more about the operating expenses and capital expenditures devoted to mining Bitcoins.

As you are aware, the Agreement contains the following Disclaimer of Warranties:

CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM

Agreement at ¶ 10 (emphasis in original). The speed of the Bitcoin processing network is accelerating at a much greater rate than anticipated even a month ago. This change in processing speed constitutes a "change in technology" and "other forces" outside of CoinLab's control that could render the Agreement "impracticable or impossible to perform." Similarly, the availability of external capital is an external force that may render the Agreement impracticable to perform. Indeed, the Agreement expressly contemplates that Crystal Island would invest significant capital that would enable CoinLab to devote the necessary resources to build out its network to mine Bitcoins at a faster rate.

Regardless of the external forces outside of its control, CoinLab is vigorously engaging in Bitcoin mining activities and is cautiously optimistic that it will be have a positive cash flow in the foreseeable future. At this time, the present technology, access to capital and state of the market causes CoinLab to be operating at a loss and there are no Bitcoins to be delivered to Dalsa or any third party. All Bitcoins are necessary to meet CoinLab's appropriate mining operating expenses and capital expenditures. Accordingly, there has been no breach of the Agreement as there is no obligation to deliver Bitcoins at this time.

*Richard Zecchino, Esq.*
*Page 3 of 3*


       CoinLab has no interest in engaging in costly and protracted litigation in the United States District Court for the Southern District of New York.  Such litigation would only serve to undermine the profitability of CoinLab's Bitcoin mining venture.  Such litigation would be futile as CoinLab is confident that there is no breach of the Agreement.  Nonetheless, we share your desire for a meeting between the parties and their representatives to discuss the issues between the parties and a possible negotiated resolution thereof.

       Should you have any questions or comments, please do not hesitate to contact me directly at (206) 518-6200.

                 Sincerely,

                 BRESKIN JOHNSON & TOWNSEND PLLC

                 Roger M. Townsend

Cc:    CoinLab, Inc.

# EXHIBIT E







# EXHIBIT F

Case 1:13-cv-07632-RWS  Document 18-1  Filed 11/19/13  Page 32 of 50

# The Washington Post

Back to previous page

# Got bitcoin? FEC may let candidates, PACs accept the digital currency.

## By Matea Gold, Published: November 14

Digital currency called bitcoins can be used to pay for OKCupid subscriptions, WordPress blog features and even sandwiches at some Subway franchises.

Could donations to federal political candidates be next?

The Federal Election Commission debated a proposal Thursday to let candidates and committees accept bitcoins as in-kind contributions, in the same way computer equipment or shares of stock are sometimes given as donations.

The six-member panel appeared to be leaning toward sanctioning them, as long as it can resolve concerns about whether the Internet cash could be used to mask the identities of donors.

"There's a balancing act here," Commissioner Matthew Petersen, a Republican appointee, said at the end of an hour-long discussion. "There's this new technology that no one wants to strangle in its infancy," but the panel also is "trying to make sure that there are adequate protections so that it couldn't serve as a vehicle for illegal or prohibited contributions to flood into the system."

The FEC is one of the first federal agencies moving to issue guidance on the use of bitcoins, a significant step toward mainstream acceptance of the four-year-old online currency.

The experimental money is increasingly attracting the attention of technology investors and government regulators. The price of bitcoins hit a record high this week, topping $400 per coin — a surge driven in part by the decision last month of a major Chinese Web site to accept the currency.

FEC approval would be "yet more recognition from the federal government that bitcoin is a serious new technology that is here to stay and that people want to use in their everyday lives," said Jerry Brito, senior research fellow at the Mercatus Center at George Mason University and director of its technology policy program. "Current regulation does not take into account anything like bitcoin, and so regulators are having to figure out how to apply existing rules and laws."

Created by a still-unknown developer in 2009, the bitcoin network allows people to make nearly instantaneous online payments without going through a bank or a third party. The transactions are public, although the parties involved are identified only by their bitcoin addresses.

Case 1:13-cv-07632-RWS Document 18-1 Filed 11/19/13 Page 33 of 50

The freedom of the system has captured the imagination of entrepreneurs such as Cameron and Tyler Winklevoss, the investor twins who claim to have scooped up 1 percent of all bitcoins in circulation. But the currency also has garnered an unsavory reputation because of its use in illegal transactions on black-market Web sites.

FEC commissioners stressed Thursday that any political committees that accept bitcoins must be able to collect a contributor's name and address, as with any other donation.

"Knowing how many ones and zeros are in the chain isn't really helpful to us or to the public," said commission Chairman Ellen Weintraub, a Democratic appointee.

The commission took up the issue in response to a request by the Conservative Action Fund, a super PAC financed largely by Alabama businessman Shaun McCutcheon, who is also pursuing a challenge to campaign contribution limits now before the Supreme Court.

Dan Backer, an attorney for the group, said obtaining the names and addresses of bitcoin donors should not be any more difficult than in cases when people donate through prepaid gift cards or credit cards.

"I don't think it presents any greater potential for fraud, misconduct, misuse or abuse than current mechanisms," Backer said. "There are probably better ways to track it down than folks showing up with anonymous bags of cash at campaigns."

Although bitcoins function as cash online, the election commission appeared unlikely to categorize it as money for campaign finance purposes because it is not the currency of any nation. Some bitcoin backers have urged the FEC to allow political committees to accept the currency as either cash or in-kind contributions to avoid getting ahead of other federal agencies in classifying it.

"Bitcoin is a new asset class," said Marco Santori, chairman of the regulatory affairs committee for the Bitcoin Foundation, a nonprofit trade organization representing bitcoin users and businesses. "It's a baby in a crib, and we still don't know what it's going to grow up to be."

The FEC also is wrestling with whether a political committee should be able to transfer bitcoins to other PACs or use its bitcoins to purchase goods and services directly from merchants. In addition, commissioners raised questions about the volatility of the currency, noting that the value of a bitcoin donation could change drastically between when it is given and when it is converted into dollars.

After requests from its members, the Libertarian Party began accepting bitcoins earlier this year, using a service called BitPay that instantly converts the currency into dollars.

The party has received several thousand dollars worth of bitcoin donations, according to Executive Director Wes Benedict, who said the party would welcome the ability to be able to collect bitcoin contributions directly.

The first congressional hearing on virtual currency is to be held Monday by the Senate Committee on Homeland Security and Governmental Affairs, featuring law enforcement officials, academics and bitcoin entrepreneurs.

One of the most urgent concerns for law enforcement is the challenge in tracking bitcoin users, as well as the role the currency has played in funding illicit transactions online. Last month, the Department of Justice shut down Silk Road, an online drug bazaar, seizing millions of dollars worth of bitcoins in the process.

The value of a bitcoin is determined solely by supply and demand; there is no equivalent to a Federal

Case 1:13-cv-07632-RWS Document 18-1 Filed 11/19/13 Page 34 of 50

Reserve. On Wednesday, bitcoins were selling for more than $400 on public exchanges, an all-time high. That marks a huge climb from early October, when the value of bitcoins plunged to about $90 after the Silk Road bust.

The number of bitcoins that can be introduced into the system is capped at 21 million. New bitcoins are introduced through a process called mining, in which users devote computer processing power to helping reconcile the ledger that tracks all bitcoin transactions.

**Sponsored Links**



**Do THIS before eating carbs (every time)**
1 EASY tip to increase fat-burning, lower blood sugar & decrease fat storage
http://info.fixyourbloodsugar.com



**Dell Student Laptop Deals**
Shop Dell & Get a $200 Promo eGift Card on Select PCs w/ Intel® Core™
www.Dell.com/BacktoSchool

**Breast Cancer Trial**
Clinical trial needs post menopausal women w/ breast cancer. Do you qualify?
www.falconstudy.com

                                                                    **Buy a link here**

© The Washington Post Company

# EXHIBIT G



# Statement of Jennifer Shasky Calvery, Director
# Financial Crimes Enforcement Network
# United States Department of the Treasury

# Before the United States Senate
# Committee on Homeland Security and Government Affairs

**November 18, 2013**

Chairman Carper, Ranking Member Coburn, and distinguished Members of the Committee, I am

Jennifer Shasky Calvery, Director of the Financial Crimes Enforcement Network (FinCEN), and

I appreciate the opportunity to appear before you today to discuss FinCEN's ongoing role in the

Administration's efforts to establish a meaningful regulatory framework for virtual currencies

that intersect with the U.S. financial system.  We appreciate the Committee's interest in this

important issue, and your continued support of our efforts to prevent illicit financial activity from

exploiting potential gaps in our regulatory structure as technological advances create new and

innovative ways to move money.  I am also pleased to be testifying with my colleagues from the

Departments of Justice and Homeland Security.  Both play an important role in the global fight

against money laundering and terrorist financing, and our collaboration on these issues greatly

enhances the effectiveness of our efforts.

FinCEN's mission is to safeguard the financial system from illicit use, combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.  FinCEN works to achieve its mission through a broad range of interrelated strategies, including:

- Administering the Bank Secrecy Act (BSA) - the United States' primary anti-money laundering (AML)/counter-terrorist financing (CFT) regulatory regime;

- Sharing the rich financial intelligence we collect, as well as our analysis and expertise, with law enforcement, intelligence, and regulatory partners; and,

- Building global cooperation and technical expertise among financial intelligence units throughout the world.

To accomplish these activities, FinCEN employs a team comprised of approximately 340 dedicated employees with a broad range of expertise in illicit finance, financial intelligence, the financial industry, the AML/CFT regulatory regime, technology, and enforcement.  We also leverage our close relationships with regulatory, law enforcement, international, and industry partners to increase our collective insight and better protect the U.S. financial system.

## **What is Virtual Currency?**

Before moving into a discussion of FinCEN's role in ensuring we have smart regulation for virtual currency that is not too burdensome but also protects the U.S. financial system from illicit use, let me set the stage with some of the definitions we are using at FinCEN to understand virtual currency and the various types present in the market today.  Virtual currency is a medium of exchange that operates like a currency in some environments but does not have all the

attributes of real currency.  In particular, virtual currency does not have legal tender status in any

jurisdiction.  A *convertible* virtual currency either has an equivalent value in real currency, or

acts as a substitute for real currency.  In other words, it is a virtual currency that can be

exchanged for real currency.  At FinCEN, we have focused on two types of convertible virtual

currencies: centralized and decentralized.

Centralized virtual currencies have a centralized repository and a single administrator.  Liberty

Reserve, which FinCEN identified earlier this year as being of primary money laundering

concern pursuant to Section 311 of the USA PATRIOT Act, is an example of a centralized

virtual currency.  Decentralized virtual currencies, on the other hand, and as the name suggests,

have no central repository and no single administrator.  Instead, value is electronically

transmitted between parties without an intermediary.  Bitcoin is an example of a decentralized

virtual currency.  Bitcoin is also known as cryptocurrency, meaning that it relies on

cryptographic software protocols to generate the currency and validate transactions

There are a variety of methods an individual user might employ to obtain, spend, and then "cash

out" either a centralized or decentralized virtual currency.  The following illustration shows a

typical series of transactions in a centralized virtual currency, such as Liberty Reserve:



By way of comparison, the next illustration shows a very similar series of transactions in a decentralized virtual currency such as Bitcoin:



From a "follow the money" standpoint, the main difference between these two series of transactions is the absence of an "administrator" serving as intermediary in the case of Bitcoin.

This difference does have significance in FinCEN's regulatory approach to virtual currency, and that approach will be addressed further during the course of my testimony today.

## Money Laundering Vulnerabilities in Virtual Currencies

Any financial institution, payment system, or medium of exchange has the potential to be exploited for money laundering or terrorist financing.  Virtual currency is not different in this regard.  As with all parts of the financial system, though, FinCEN seeks to understand the specific attributes that make virtual currency vulnerable to illicit use, so that we can both employ a smart regulatory approach and encourage industry to develop mitigating features in its products.

Some of the following reasons an illicit actor might decide to use a virtual currency to store and transfer value are the same reasons that legitimate users have, while other reasons are more nefarious.  Specifically, an illicit actor may choose to use virtually currency because it:

- Enables the user to remain relatively anonymous;

- Is relatively simple for the user to navigate;

- May have low fees;

- Is accessible across the globe with a simple Internet connection;

- Can be used both to store value and make international transfers of value;

- Does not typically have transaction limits;

- Is generally secure;

- Features irrevocable transactions;

- Depending on the system, may have been created with the intent (and added features) to facilitate money laundering;
- If it is decentralized, has no administrator to maintain information on users and report suspicious activity to governmental authorities;
- Can exploit weaknesses in the anti-money laundering/counter terrorist financing (AML/CFT) regimes of various jurisdictions, including international disparities in, and a general lack of, regulations needed to effectively support the prevention and detection of money laundering and terrorist financing.

Because any financial institution, payment system, or medium of exchange has the potential to be exploited for money laundering, fighting such illicit use requires consistent regulation across the financial system.  Virtual currency is not different from other financial products and services in this regard.  What is important is that financial institutions that deal in virtual currency put effective AML/CFT controls in place to harden themselves from becoming the targets of illicit actors that would exploit any identified vulnerabilities.

Indeed, the idea that illicit actors might exploit the vulnerabilities of virtual currency to launder money is not merely theoretical.  We have seen both centralized and decentralized virtual currencies exploited by illicit actors.  Liberty Reserve used its centralized virtual currency as part of an alleged $6 billion money laundering operation purportedly used by criminal organizations engaged in credit card fraud, identity theft, investment fraud, computer hacking, narcotics trafficking, and child pornography.  One Liberty Reserve co-founder has already pleaded guilty to money laundering in the scheme.  And just recently, the Department of Justice has alleged that

customers of Silk Road, the largest narcotic and contraband marketplace on the Internet to date, were required to pay in bitcoins to enable both the operator of Silk Road and its sellers to evade detection and launder hundreds of millions of dollars.  With money laundering activity already valued in the billions of dollars, virtual currency is certainly worthy of FinCEN's attention.

That being said, it is also important to put virtual currency in perspective as a payment system. The U.S. government indictment and proposed special measures against Liberty Reserve allege it was involved in laundering more than $6 billion.  Administrators of other major centralized virtual currencies report processing similar transaction volumes to what Liberty Reserve did.  In the case of Bitcoin, it has been publicly reported that its users processed transactions worth approximately $8 billion over the twelve-month period preceding October 2013; however, this measure may be artificially high due to the extensive use of automated layering in many Bitcoin transactions.  By way of comparison, according to information reported publicly, in 2012 Bank of America processed $244.4 trillion in wire transfers, PayPal processed approximately $145 billion in online payments, Western Union made remittances totaling approximately $81 billion, the Automated Clearing House (ACH) Network processed more than 21 billion transactions with a total dollar value of $36.9 trillion, and Fedwire, which handles large-scale wholesale transfers, processed 132 million transactions for a total of $599 trillion. This relative volume of transactions becomes important when you consider that, according to the United Nations Office on Drugs and Crime (UNODC), the best estimate for the amount of all global criminal proceeds available for laundering through the financial system in 2009 was $1.6 trillion. While of growing concern, to date, virtual currencies have yet to overtake more traditional methods to move funds internationally, whether for legitimate or criminal purposes.

## **Mitigating Money Laundering Vulnerabilities in Virtual Currencies**

FinCEN's main goal in administering the BSA is to ensure the integrity and transparency of the U.S. financial system so that money laundering and terrorist financing can be prevented and, where it does occur, be detected for follow on action.  One of our biggest challenges is striking the right balance between the costs and benefits of regulation.  One strategy we use to address this challenge is to promote consistency, where possible, in our regulatory framework across different parts of the financial services industry.  It ensures a level playing field for industry and minimizes gaps in our AML/CFT coverage.

Recognizing the emergence of new payment methods and the potential for abuse by illicit actors, FinCEN began working with our law enforcement and regulatory partners several years ago to study the issue.  We understood that AML protections must keep pace with the emergence of new payment systems, such as virtual currency and prepaid cards, lest those innovations become a favored tool of illicit actors.  In July 2011, after a public comment period designed to receive feedback from industry, FinCEN released two rules that update several definitions and provide the needed flexibility to accommodate innovation in the payment systems space under our preexisting regulatory framework.  Those rules are: (1) Definitions and Other Regulations Relating to Money Services Businesses; and (2) Definitions and Other Regulations Relating to Prepaid Access.

The updated definitions reflect FinCEN's earlier guidance and rulings, as well as current business operations in the industry.  As such, they have been able to accommodate the

8

development of new payment systems, including virtual currency.  Specifically, the new rule on money services businesses added the phrase "other value that substitutes for currency" to the definition of "money transmission services."  And since a convertible virtual currency either has an equivalent value in real currency, or acts a substitute for real currency, it qualifies as "other value that substitutes for currency" under the definition of "money transmission services."  A person that provides money transmission services is a "money transmitter," a type of money services business already covered by the AML/CFT protections in the BSA.

As a follow-up to the regulations and in an effort to provide additional clarity on the compliance expectations for those actors involved in virtual currency transactions subject to FinCEN oversight, on March 18, 2013, FinCEN supplemented its money services business regulations with interpretive guidance designed to clarify the applicability of the regulations implementing the BSA to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies.  In the simplest of terms, FinCEN's guidance explains that administrators or exchangers of virtual currencies must register with FinCEN, and institute certain recordkeeping, reporting and AML program control measures, unless an exception to these requirements applies. The guidance also explains that those who use virtual currencies exclusively for common personal transactions like buying goods or services online are users, not subject to regulatory requirements under the BSA.  In all cases, FinCEN employs an activity-based test to determine when someone dealing with virtual currency qualifies as a money transmitter.  The guidance clarifies definitions and expectations to ensure that businesses engaged in such activities are aware of their regulatory responsibilities, including registering appropriately.  Furthermore, FinCEN closely coordinates with its state regulatory counterparts to encourage appropriate

application of FinCEN guidance as part of the states' separate AML compliance oversight of financial institutions.

It is in the best interest of virtual currency providers to comply with these regulations for a number of reasons.  First is the idea of corporate responsibility.  Legitimate financial institutions, including virtual currency providers, do not go into business with the aim of laundering money on behalf of criminals.  Virtual currencies are a financial service, and virtual currency administrators and exchangers are financial institutions.  As I stated earlier, any financial institution could be exploited for money laundering purposes.  What is important is for institutions to put controls in place to deal with those money laundering threats, and to meet their AML reporting obligations.

At the same time, being a good corporate citizen and complying with regulatory responsibilities is good for a company's bottom line.  Every financial institution needs to be concerned about its reputation and show that it is operating with transparency and integrity within the bounds of the law.  Legitimate customers will be drawn to a virtual currency or administrator or exchanger where they know their money is safe and where they know the company has a reputation for integrity.  And banks will want to provide services to administrators or exchangers that show not only great innovation, but also great integrity and transparency.

The decision to bring virtual currency within the scope of our regulatory framework should be viewed by those who respect and obey the basic rule of law as a positive development for this sector.  It recognizes the innovation virtual currencies provide, and the benefits they might offer

society.  Several new payment methods in the financial sector have proven their capacity to

empower customers, encourage the development of innovative financial products, and expand

access to financial services. We want these advances to continue.  However, those institutions

that choose to act outside of their AML obligations and outside of the law have and will continue

to be held accountable.  FinCEN will do everything in its regulatory power to stop such abuses of

the U.S. financial system.


As previously mentioned, earlier this year, FinCEN identified Liberty Reserve as a financial

institution of primary money laundering concern under Section 311 of the USA PATRIOT Act.

Liberty Reserve operated as an online, virtual currency, money transfer system conceived and

operated specifically to allow – and encourage – illicit use because of the anonymity it offered.

It was deliberately designed to avoid regulatory scrutiny and tailored its services to illicit actors

looking to launder their ill-gotten gains.  According to the allegations contained in a related

criminal action brought by the U.S. Department of Justice, those illicit actors included criminal

organizations engaged in credit card fraud, identity theft, investment fraud, computer hacking,

narcotics trafficking, and child pornography, just to name a few.  The 311 action taken by

FinCEN was designed to restrict the ability of Liberty Reserve to access the U.S. financial

system, publicly notify the international financial community of the risks posed by Liberty

Reserve, and to send a resounding message to other offshore money launderers that such abuse

of the U.S. financial system will not be tolerated and their activity can be reached through our

targeted financial measures.

## <u>Sharing Our Knowledge and Expertise on Virtual Currency</u>

As the financial intelligence unit for the United States, FinCEN must stay current on how money is being laundered in the United States, including through new and emerging payment systems, so that we can share this expertise with our many law enforcement, regulatory, industry, and foreign financial intelligence unit partners, and effectively serve as the cornerstone of this country's AML/CFT regime.  FinCEN has certainly sought to meet this responsibility with regard to virtual currency and its exploitation by illicit actors.  In doing so, we have drawn and continue to draw from the knowledge we have gained through our regulatory efforts, use of targeted financial measures, analysis of the financial intelligence we collect, independent study of virtual currency, outreach to industry, and collaboration with our many partners in law enforcement.

In the same month we issued our guidance on virtual currency, March 2013, FinCEN also issued a Networking Bulletin on crypto-currencies to provide a more granular explanation of this highly complex industry to law enforcement and assist it in following the money as it funnels between virtual currency channels and the U.S. financial system.  Among other things, the bulletin addresses the role of traditional banks, money transmitters, and exchangers that come into play as intermediaries by enabling users to fund the purchase of virtual currencies and exchange virtual currencies for other types of currency.  It also highlights known records processes associated with virtual currencies and the potential value these records may offer to investigative officials.  The bulletin has been in high demand since its publication and the feedback regarding its tremendous value has come from the entire spectrum of our law enforcement partners.  In

12

fact, demand for more detailed information on crypto-currencies has been so high that we have also shared it with several of our regulatory and foreign financial intelligence unit partners.

One feature of a FinCEN Networking Bulletin is that it asks the readers to provide ongoing feedback on what they are learning through their investigations so that we can create a forum to quickly learn of new developments, something particularly important with a new payment method.  Based on what we are learning through this forum and other means, FinCEN has issued several analytical products of a tactical nature to inform law enforcement operations.

Equally important to our ongoing efforts to deliver expertise to our law enforcement partners is FinCEN's engagement with our regulatory counterparts to ensure they are kept apprised of the latest trends in virtual currencies and the potential vulnerabilities they pose to traditional financial institutions under their supervision.  FinCEN uses its collaboration with the Federal Financial Institutions Examination Council (FFIEC) BSA Working Group as a platform to review and discuss FinCEN's regulations and guidance, and the most recent and relevant trends in virtual currencies.  One such example occurred just recently, when several FinCEN virtual currency experts gave a comprehensive presentation on the topic to an audience of Federal and state bank examiners at an FFIEC Payment Systems Risk Conference.  The presentation covered an overview of virtual currency operations, FinCEN's guidance on the application of FinCEN regulations to virtual currency, enforcement actions, and ongoing industry outreach efforts.

FinCEN also participates in the FBI-led Virtual Currency Emerging Threats Working Group, the FDIC-led Cyber Fraud Working Group, the Terrorist Financing & Financial Crimes-led Treasury Cyber Working Group, and with a community of other financial intelligence units.  We host

speakers, discuss current trends, and provide information on FinCEN resources and authorities as we work with our partners in an effort to foster an open line of communication across the government regarding bad actors involved in virtual currency and cyber-related crime.

Finally, FinCEN has shared its strategic analysis on money laundering through virtual currency with executives at many of our partner law enforcement and regulatory agencies, and foreign financial intelligence units, as well as with U.S. government policy makers.

### **Outreach to the Virtual Currency Industry**

Recognizing that the new, expanded definition of money transmission would bring new financial entities under the purview of FinCEN's regulatory framework, shortly after the publication of the interpretive guidance and as part of FinCEN's ongoing commitment to engage in dialogue with the financial industry and continually learn more about the industries that we regulate, FinCEN announced its interest in holding outreach meetings with representatives from the virtual currency industry.  The meetings are designed to hear feedback on the implications of recent regulatory responsibilities imposed on this industry, and to receive industry's input on where additional guidance would be helpful to facilitate compliance.

We held the first such meeting with representatives of the Bitcoin Foundation on August 26, 2013 at FinCEN's Washington, DC offices and included attendees from a cross-section of the law enforcement and regulatory communities.  This outreach was part of FinCEN's overall efforts to increase knowledge and understanding of the regulated industry and how its members are impacted by regulations, and thereby help FinCEN most efficiently and effectively work with

14

regulated entities to further the common goals of the detection and deterrence of financial crime. To further capitalize on this important dialogue and exchange of ideas, FinCEN has invited the Bitcoin Foundation to provide a similar presentation at the next plenary of the Bank Secrecy Act Advisory Group (BSAAG) scheduled for mid-December.  The BSAAG is a Congressionally-chartered forum that brings together representatives from the financial industry, law enforcement, and the regulatory community to advise FinCEN on the functioning of our AML/CFT regime.

### Conclusion

The Administration has made appropriate oversight of the virtual currency industry a priority, and as a result, FinCEN's efforts in this regard have increased significantly over recent years through targeted regulatory measures, outreach to regulatory and law enforcement counterparts and our partners in the private sector, and the development of expertise.  We are very encouraged by the progress we have made thus far.  We are dedicated to continuing to build on these accomplishments by remaining focused on future trends in the virtual currency industry and how they may inform potential changes to our regulatory framework for the future.  Thank you for inviting me to testify before you today.  I would be happy to answer any questions you may have.