DBKBBITH                    Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BITVESTMENT PARTNERS LLC,

4              Plaintiff,

5        v.                          13 CV 7632 (RWS)

6   COINLAB, INC., CLI HOLDINGS,
    INC., ALYDIAN INC., PETER
7   VESSENES and JOHN DOE,

8              Defendants.

9   ------------------------------x
                                    New York, N.Y.
10                                  November 20, 2013
                                    3:06 p.m.
11
    Before:
12
                    HON. ROBERT W. SWEET,
13
                                    District Judge
14
                         APPEARANCES
15
    REYHANI NEMIROVSKY LLP
16       Attorneys for Plaintiff
    BRYAN ISAAC REYHANI
17
    LOEB & LOEB LLP
18       Attorneys for Plaintiff
    DANIELLE JANINE KIWAK
19
    NESENOFF & MILTENBERG, LLP
20       Attorneys for Defendants
    MARCO AURELIO SANTORI
21
    BRESKIN JOHNSON TOWNSEND PLLC
22       Attorneys for Defendants
    ROGER M. TOWNSEND
23

24

25

DBKBBITH                     Hearing

```
 1              (In open court)
 2              THE COURT:  Please be seated.  Yes.
 3              MR. SANTORI:  I think we're waiting for plaintiff's
 4    counsel.
 5              THE COURT:  No, I'm not waiting.
 6              MR. TOWNSEND:  Thank you, your Honor.
 7              THE DEPUTY CLERK:  I'll go find them.
 8              MR. TOWNSEND:  May it please the Court, my name is
 9    Roger Townsend.  I represent defendants CoinLab and Peter
10    Vessenes.
11              I want to correct at the outset one of the
12    implications of your Honor's question.  There are more issues
13    here than just the out clause in the contract.  At the
14    outset the most significant issue, I believe, is whether this
15    is a money damages case and whether or not any ultimate
16    judgment that could be proven at trial can be satisfied by
17    dollars.
18              And I think --
19              THE COURT:  Well, that I don't care about today, the
20    ultimate trial.  What I'm dealing with is this application for
21    a preliminary injunction.
22              MR. TOWNSEND:  Right, your Honor.
23              THE COURT:  And if you're correct that there can't be
24    money damages, then that's irreparable harm.
25              MR. TOWNSEND:  It can be money damages is my
```

DBKBBITH                        Hearing

1    contention.

2              THE COURT:  Oh, you're saying it can't.

3              MR. TOWNSEND:  Your Honor, even Mr. Gallancy

4    concedes --

5              THE COURT:  Fellows, it's been a lovely day.  I've

6    enjoyed every minute of it.  We have until 4 o'clock.  If you

7    want to put on any testimony, put the testimony on.  As far as

8    the argument is concerned, we'll worry about that when the time

9    comes.

10             MR. TOWNSEND:  Okay.  Well, let me just rush through

11   it in three minutes then, your Honor.

12             I think that it is undisputable that bitcoins are

13   currency.  It's the testimony of the Department of Treasury.

14   It's the clear precedent that other courts have done this.  It

15   is equivalent, if anything, to a stock, and the precedent of

16   this Court is clear that a case for stock damages can be

17   determined by money damages.

18             Importantly -- and the testimony will come to this --

19   will show that the stay must apply in order for the creditors

20   in the Alydian bankruptcy to get valid, because the individuals

21   that are in this courtroom, as well as three others, are the

22   individuals who are employees or contractors of CoinLab, are

23   those that are managing the Alydian project.  So if they are

24   pulled out from this case and brought in --

25             THE COURT:  Well, look, forgive me, but I don't think

DBKBBITH                     Hearing

1     I have anything to do with Alydian.

2               MR. TOWNSEND:  You're right, your Honor, but these

3     witnesses do.  These witnesses manage the Alydian project.  So

4     if your Honor enters an order that says these individuals need

5     to jump off of Alydian and use best efforts to --

6               THE COURT:  Whatever happens to Alydian, it's not my

7     affairs.

8               MR. TOWNSEND:  Right, your Honor, but under the Second

9     Circuit precedent, if there's a commonality of interest and if

10    these individuals -- if you enter an order that says these

11    individuals need to come out and use best efforts the mine

12    bitcoins --

13              THE COURT:  Well, I've already ordered that.  I've

14    already ordered bitcoins to make best efforts, I believe.

15              MR. TOWNSEND:  You have ordered CoinLab to make best

16    efforts and they have commenced that process.

17              THE COURT:  Okay.

18              MR. TOWNSEND:  Let me tell you what that entails and

19    what that would entail on a preliminary injunction because it

20    is not, as plaintiff's counsel represents, a matter of going on

21    Amazon and ordering like you're going to Best Buy.  There are

22    very few -- and they acknowledge this -- there are very few

23    people in the world who can accomplish this project.  Two of

24    them are in this room and two of them are managing it for

25    Alydian.  If they're pulled away from Alydian, the creditors of

DBKBBITH                       Hearing

1     Alydian will lose value.  And that is exactly the instance

2     where a stay is appropriate.

3            Your Honor, what's significant in the contract is the

4     contract provides that CoinLab has to use best efforts to mind

5     bitcoins.

6            THE COURT:  Yes.

7            MR. TOWNSEND:  CoinLab has never mined bitcoins; has

8     no bitcoins mined.  So under the contract, there are no

9     bitcoins due.  That is an undisputable fact, your Honor, and

10    the evidence will show that.

11           CoinLab may possess bitcoins, but it's no different--

12    it's a currency.  It's no different than CoinLab possessing

13    dollars or a company that is due dollars possessing dollars.

14    In fact, it's evidence that a preliminary injunction should not

15    issue because if they can satisfy a judgment at the end of the

16    day, after a trial, then it's a reason why there's no

17    irreparable harm and any damage that they could establish could

18    be satisfied.

19           So the fact that CoinLab may or may not have

20    bitcoins -- and they do -- in fact supports denial of a motion

21    for preliminary injunction.  Moreover, your Honor, plaintiff

22    concedes that these bitcoins are fungible.  They said, hey,

23    we'll take the bitcoins you've got, we'll take the bitcoins

24    you've mined, we'll take bitcoins from anywhere.  Is that not a

25    concession, your Honor, that the bitcoins are fungible?  They

DBKBBITH                    Hearing

1    are like a dollar.  We could have a $20 bill here, a $20 bill

2    there.  They're both worth $20.  In fact, that's exactly what

3    plaintiff wants.  I'll take the bitcoins you've got now, I'll

4    take the bitcoins that are mined.

5            And keep in mind, your Honor, that the obligation is

6    not to deliver bitcoins at a certain date.  The obligation is

7    to mine bitcoins.

8            THE COURT:  Well, I'm trying to put my finger on the

9    contract.  Where is it?  The contract that's the source of all

10   this.

11           MR. TOWNSEND:  Your Honor, we've brought some

12   evidentiary binders that have the contract.

13           THE COURT:  That's fine.

14           MR. TOWNSEND:  So Tab 1 is the contract.

15           THE COURT:  Oh, okay.

16           MR. TOWNSEND:  No, I'm sorry, your Honor.  That is

17   not-- yes, that's the contract.

18           So the obligation --

19           THE COURT:  By the way, by any chance do you have

20   another one?  Because I think in duplicate.

21           MR. TOWNSEND:  We have one extra.

22           THE COURT:  Thanks.  Okay.

23           MR. TOWNSEND:  The contract provides, at Section 2,

24   that CoinLab will use best efforts to mine the bitcoins.  And

25   then to deliver the bitcoins mined to the Dalsa Barbour, which

DBKBBITH                     Hearing

1    is allegedly renamed into Bitvestment, the plaintiff.

2         A couple of other significant clauses under paragraph

3    2.  One is it's not just a matter of, say, once November 1,

4    comes you're going to deliver bitcoins.  No, you've got to mine

5    them first.  Again, they haven't mined any.  There are no

6    bitcoins due.

7         Secondly -- and the parenthetical here is

8    significant -- it's clear under the contract that bitcoins

9    mined and bitcoins to be delivered are net of capital and

10   operational expenses.  We will show you today, your Honor, and

11   the testimony of Mr. Olsen and Mr. Vessenes will show you, that

12   it is not possible under the best effort standards or otherwise

13   to mine bitcoins at a positive rate.  The cost to mining

14   bitcoins exceeds the revenue from mining bitcoins.  We know

15   this because we've done it.  We did it with Alydian and these

16   very people who plaintiff asks to be ordered to pull away from

17   the Alydian projects and to the CoinLab projects to the

18   detriment of the Alydian creditors --

19        THE COURT:  Forgive me.  I heard you, but where in the

20   contract do you get to offset the expenses?

21        MR. TOWNSEND:  If you look under paragraph 2, there's

22   a parenthetical and it says "CoinLab will use best efforts to

23   mine" 7,900-some-odd bitcoins "which, for the avoidance of

24   doubt, will mean" it will "dedicate 100 percent of its mining

25   output (other than mining output that is required to satisfy

DBKBBITH                     Hearing

1   CoinLab's obligations to Crystal Island and mining output that

2   is required to meet CoinLab's appropriate mining operating

3   expenses and capital expenditures subject as approved by all

4   parties)..."

5          Now, plaintiffs contend they don't approve any

6   expenses, so therefore apparently it's one of those businesses

7   that has no overhead and can be just done for free.  Well,

8   that's not the case.  And we can testify that not only is--

9   it's a money loser, your Honor.

10          THE COURT:  I understand that point.  Okay.

11          MR. TOWNSEND:  Okay?  So that is evidence of failure

12   to establish likelihood of success on the merit.

13          And, in fact, you'll see in Tab 5 this language was

14   included per an e-mail from Mr. Gallancy on Wednesday, August

15   14th, the date of signature, which includes that parenthetical

16   to be added to the contract to make clear that delivery was net

17   of the operational and capital expenditures.  Okay?

18          And, your Honor, it really shouldn't be a valid

19   dispute that operational and capital expenditures exceed the

20   revenue when the only entity that has ever engaged in bitcoin

21   mining is in bankruptcy because the operational and capital

22   expenditures exceeded the revenue.  So I don't think that's a

23   very difficult call.

24          And then, finally, as your Honor identified, the

25   disclaimer of warranties is broad.  It is not, as plaintiff's

DBKBBITH                    Hearing

counsel represented, merely a matter of new technologies,

although there are new technologies in play, and the

declaration of Mr. Olsen will establish that.  The chip size

necessary to mine bitcoins has changed dramatically over the

course of the bitcoin mining projects.  They went from a-- and

Mr. Olsen can explain this at length-- 110 nanometer, or

nanometer, speed to a 65 nanometer.  Now the state of the art

is 28.  So the current chips that Alydian did are at 65.

Your Honor, I want to dispel this claim that somehow

CoinLab has done nothing in compliance with the best efforts

standards.  We know from experience, again as plaintiff

testifies-- plaintiff argues, these guys are the guys that know

what they're doing about bitcoin mining; that it takes nine

months.  It takes nine months to launch and operate a bitcoin

mining expenditure.  But the speed of the bitcoin mining

network is expanding exponentially, so you really can't know

when you get into the project whether you're going to make

money on it.  And under the best efforts standard, that is not

a requirement, that they launch into that business that's going

to lose money.

Your Honor, as you could tell, I'm rapidly rushing

through these points because I know we are short on time.  But

I don't think you need to address the issues of likelihood of

success on the merit because I don't think there's any dispute.

And Mr. Gallancy's testimony, Mr. Vessenes's testimony and

DBKBBITH                        Hearing

1   Mr. Olsen's testimony, the District Court in Texas, the

2   Department of Treasury, they all state that bitcoins are

3   currency.  At worst, they would be equivalent to stock.  These

4   are all things that are measurable in dollars.

5            The burden of having to-- I mean, the preliminary

6   injunction, proposed preliminary injunction, is outrageous.

7   It's managing a high-technology business in a way that makes no

8   sense.  So if you are to order that these people are going to

9   get into a business that they know is going to lose money, they

10  know is going to require $6 million at least of capital

11  expenditures if they only go to the current state of the art --

12  if they go ahead into the future state of the art, nine months

13  from now, it will probably cost $20 million.  We're going to go

14  spend the $20 million, we're going to spend the $6 million, and

15  we're going to lose money.  We know that.  We have that

16  experience.  We're going to lose money.  That should be bonded.

17  Because we could tell you today that it will cost more than it

18  will make.  So that needs to be bonded at least at $6 million

19  because we're going to lose that money.  And I don't know that

20  Bitvestment is going to be able to pay that at the end of the

21  day as we get into it for improperly issued preliminary

22  injunction.

23            And, finally, I don't think there is any dispute --

24  and the proposed preliminary injunction, for reasons

25  unbeknownst to me, includes Mr. Vessenes personally under the

DBKBBITH                    Hearing

preliminary injunction.  It's totally inappropriate.  He is the

CEO of CoinLab.  He is not a bitcoin miner in his individual

capacity.

So, your Honor, I actually do not think this is a very

difficult case for preliminary injunction.  I think a trial --

it's a complicated case.  I think we need to have depositions.

I think we need to see experts.  I think we need to flesh this

out through the benefit of discovery as to whether or not you

can make money on bitcoin mining.  I can present to you today

two people who have lived this intimately for over a year and

who will testify under oath that you can't make money doing it.

And Mr. Gallancy's surfing the internet and finding

things on Amazon, we know-- and we refute each of these points

and we can do it.  It would take hours to refute each of them,

but we can do each of them.  None of them will net a positive

cash flow.  Okay?  So Mr. Gallancy thinks that this is about a

business that has no overhead.  It is not the contract that he

entered into and he can not stubbornly refuse to approve

capital and operational expenditures and simply rely on that

fact.

Unless your Honor has any questions, I'd like to start

with Mr. Gallancy to testify.

THE COURT:  With whom?

MR. TOWNSEND:  Mr. Gallancy himself.

THE COURT:  Okay.

DBKBBITH                    Hearing

1          MR. TOWNSEND:  Thank you.

2     DANIEL H. GALLANCY,

3          called as a witness by the Defendants,

4          having been duly sworn, testified as follows:

5          THE DEPUTY CLERK:  Please state your full name and

6     spell your first name and last name slowly for the record.

7          THE WITNESS:  Daniel H. Gallancy.  D-a-n-i-e-l middle

8     initial H, G-a-l-l-a-n-c-y.

9          THE DEPUTY CLERK:  Thank you, Mr. Gallancy.  Please be

10    seated.

11    DIRECT EXAMINATION

12    BY MR. TOWNSEND:

13    Q.  Good afternoon, Mr. Gallancy.  I'm sorry, it sounds like

14    I'm mispronouncing your name.  It's Gallancy.  Is that

15    correct?

16    A.  Yes, that's correct.

17    Q.  And you're a chartered financial analyst.  Is that right?

18    A.  That's correct.

19    Q.  And what training did you receive to become a CFA?

20    A.  I passed a series of exams and satisfied a series of work

21    requirements.

22    Q.  And that's how long a process?

23    A.  The exams take approximately three years.  There are ways

24    to do it a little bit faster, but approximately three years.

25    Q.  And you took three years to do it?

DBKBBITH                          Gallancy - direct

1    A.  Yes, sir.

2    Q.  And in your capacity as a CFA, you have knowledge of

3    complex financial models.  Is that right?

4    A.  I have knowledge of financial models.

5    Q.  Okay.

6    A.  Complexity is a matter of subjectivity.

7    Q.  Sure.  But you regularly construct financial models.  Is

8    that right?

9    A.  I have in the past regularly constructed financial models,

10   yes, sir.

11   Q.  And usually, in your experience in constructing financial

12   models, most businesses have overhead.  Is that right?

13   A.  Yes, sir.

14   Q.  And in the contract that you entered into with CoinLab and

15   Alydian, that contemplated that you would be paid bitcoins

16   mined by CoinLab.  Is that right?

17   A.  I'm sorry?

18   Q.  In the contract that you entered into with CoinLab and

19   Alydian, that contemplated that you would be delivered bitcoins

20   that were mined by CoinLab or Alydian.  Is that right?

21   A.  The contract said I was to receive 100 percent of CoinLab

22   and Alydian and CLI Holdings' mining output, with the exception

23   of that which is to go to Crystal Island were they to

24   participate in the deal, and operating and capital expenditures

25   as approved by all parties.

DBKBBITH                        Gallancy - direct

1    Q.   Correct.

2            And so it was contemplated at that time that the net

3    of bitcoins would be less payments to Crystal Island.  Right?

4    A.   That's correct.

5    Q.   And net payments for capital and operational expenditures.

6    Correct?

7    A.   Not necessarily.

8    Q.   Okay.  Why not necessarily?

9    A.   The project, if fully capitalized, needn't use mining

10   output for capital expenditures but, rather, would use the

11   input capital for capital expenditures and operating expenses.

12   Q.   And upon what basis do you believe that outside money would

13   fund capital and operational expenditures?

14   A.   On the basis of discussions with the defendant.

15   Q.   Who specifically?

16   A.   Peter Vessenes and the rest of the CoinLab team.

17   Q.   And they told you that they would just absorb all of the

18   operational and capital expenditures?

19   A.   We had discussed various different scenarios, amongst them

20   the usage of input capital for operating and capital

21   expenditures.  And also amongst them the usage of mining output

22   for capital and operating expenditures.  The primary source of

23   capital expenditures was to be the input capital.

24   Q.   Okay.  But certainly it was contemplated that at least a

25   portion, you'll acknowledge --

DBKBBITH                    Gallancy – direct

1   A.  I will not acknowledge.  That's not the case.

2   Q.  Well, isn't that what you just said?

3   A.  I said under certain circumstances.  We had contemplated

4   several different deal structures.

5   Q.  And you believed you had a veto right for any capital and

6   operational expenditures.  Correct?

7   A.  I have a veto right for any capital and operational

8   expenditures which I did not intend to use unless the defendant

9   made it such that I had to.

10  Q.  And you did use it.  Correct?

11  A.  I attempted to use it.

12  Q.  Okay.

13  A.  Although without any real success.

14  Q.  Okay.  And you would acknowledge that the veto right for

15  capital and operational expenditures was also a right that all

16  parties had.  Right?

17  A.  Yes.

18  Q.  All right.

19  A.  That's true.  For mining output, that is correct.

20  Q.  So CoinLab could elect not to spend capital and operational

21  expenditures for mining output.  Correct?

22  A.  CoinLab could elect not to use the funds from its mining

23  output to fund capital or operating expenditures as long as it

24  fulfilled its requirements to -- if Crystal Island were to

25  invest -- Crystal Island and as long as it were to fulfill its

DBKBBITH                          Gallancy - direct

1   operations to Bitvestment.

2   Q.  Well, it doesn't say that, does it?

3   A.  It does say that.

4   Q.  It says that they only have a veto right provided they paid

5   you first?

6   A.  The language in the contract says that CoinLab will provide

7   100 percent of mining output until such time that Bitvestment

8   receives 7,984-some-odd bitcoins with the exception of mining

9   output that would go to Crystal Island or capital and operating

10  expenditures as approved by all parties.

11  Q.  Okay.

12  A.  To be clear.

13  Q.  And so, therefore, if CoinLab doesn't approve the capital

14  and operational expenditures, it won't get spent.  Correct?

15  A.  Well, the first part of the sentence says "CoinLab is to

16  provide 100 percent of mining output until Bitvestment receives

17  7,984 bitcoins."

18  Q.  So when it says the veto right applies to all parties,

19  what you're really saying it is only applies to you.  Is that

20  right?

21  A.  No, I'm saying that the veto right would only be-- that's

22  incorrect.

23  Q.  Okay.

24  A.  To be clear --

25  Q.  They have the right to the same under the contract.

1    Correct?

2    A.  Fair enough.

3    Q.  It applies to all parties equally.  Correct?

4           MR. REYHANI:  Objection.  Asked and answered like

5    three times already.

6           THE COURT:  Overruled.

7           MR. TOWNSEND:  Well, the answer keeps changing, so I

8    just want to make clear.

9    Q.  Each party has a right not to spend the capital and

10   operational expenditures.  Correct?

11   A.  I suppose.

12   Q.  Thank you.

13          And if they don't expend capital and operational

14   expenditures, then necessarily they're not going to mine

15   bitcoins.  Right?

16   A.  No, absolutely not correct.

17   Q.  And why is that?

18   A.  Because if the project is capitalized in the first place as

19   contemplated, and as it was, the input capital would be

20   sufficient to cover capital and operating expenditures.  That's

21   the whole point.

22   Q.  In your capacity as a CFA, do you recommend that people

23   engage in businesses that lose money?

24   A.  I don't make recommendations that people engage in

25   businesses one way or the other in my capacity as a CFA.  I

1    analyze companies.

2    Q.   Okay.  And you analyzed this company, Alydian.  Correct?

3    A.   Correct.

4    Q.   You did a detailed financial model of Alydian, did you

5    not?

6    A.   I did a detailed financial model that would be for this--

7    that would be for a mining project for Alydian and/or CoinLab

8    and/or CLI Holdings.

9    Q.   Okay.  So that's a yes.  Right?

10   A.   I just answered your question, sir.

11   Q.   So you did a detailed financial analysis of the proposed

12   mining operation that was being run by Hans Olsen and Peter

13   Vessenes and the companies that they work for.  Is that

14   right?

15   A.   Among other participants, yes.

16   Q.   Okay.  And you didn't produce that financial analysis, did

17   you?

18   A.   Produce it?

19   Q.   In this litigation.

20   A.   I didn't present a copy of it, no.  I presented it to

21   Crystal Island, to Cedar Hill.

22   Q.   But you haven't provided it to the Court or in this

23   litigation?

24   A.   It was not requested.

25   Q.   Okay.  But you didn't use it-- you have the burden of proof

DBKBBITH                          Gallancy - direct

1   in this litigation.  Right?  Okay.

2            You would agree that bitcoins are an inherently risky

3   and speculative investment, would you not?

4   A.  I would agree that bitcoins possess significant risks,

5   yes.

6   Q.  And you would further agree that bitcoin mining is a risky

7   and unproven investment.  Is that right?

8   A.  I would agree that bitcoin mining has its risks.  It's not

9   unproven insofar as whether or not it is achievable.  It is

10  certainly achievable.

11  Q.  Is it achievable with a positive cash flow?

12  A.  Depending on its execution, yes.

13  Q.  Okay.  And you didn't provide any evidence of any positive

14  financial models that shows any bitcoin operation that

15  generates a positive cash flow, did you?

16  A.  I did, indeed, provide that sort of model to Crystal

17  Island, Cedar Hill, and they, indeed, upon that model were

18  willing to invest.

19  Q.  Okay.  But you didn't provide it in support of your motion

20  for preliminary injunction, did you?

21  A.  I didn't provide it in this particular case, no.  I

22  provided it in the past to those who were interested in the

23  investment.

24  Q.  So you don't have any evidence to present now or in any way

25  in this proceeding that supports that --

DBKBBITH                    Gallancy - direct

1   A.  I don't have my laptop computer with me, no, sir.

2   Q.  And you recommended to Cedar Hill-- first of all, who is

3   Cedar Hill?

4   A.  It's an investment fund.

5   Q.  Okay.  And what's your relationship with Cedar Hill?

6   A.  Its principals are people with whom I'm friendly.

7   Q.  Okay.  And who is Crystal Island?

8   A.  Crystal Island is a subsidiary of Cedar Hill.

9   Q.  Okay.  And then at some point they engaged you to do

10  financial planning.  Is that right?

11  A.  They did not engage me to do financial planning.  They

12  engaged me to assist them with the diligence of this deal.

13  Q.  Okay.  And did they pay you for that?

14  A.  No, they did not.

15  Q.  And why did you do --

16  A.  There was an offer of compensation subsequent to the deal

17  if it were-- if they were to go through with it.

18  Q.  Okay.  And what was that compensation?

19  A.  We were actually still in the middle of negotiating it.  So

20  there was not a final specific amount, but it was likely to be

21  5 percent of the profits from the deal.

22  Q.  Okay.  So that was a profit-based deal?

23  A.  Correct.  So obviously I thought it would be profitable.

24  Q.  Right.

25          You also testified in your declaration that you

DBKBBITH                    Gallancy - direct

1   thought that the project was grossly mismanaged.  Is that

2   right?

3   A.   The project, prior to the arrival of Hans, I believe was in

4   the past grossly mismanaged.

5   Q.   Okay.  But you put in your declaration that the project was

6   grossly mismanaged, right?

7              MR. REYHANI:  Objection.  Asked and answered.

8              THE COURT:  Overruled.

9   Q.   You can answer.

10  A.   Yes, I believe that the project was in the past grossly

11  mismanaged.  That's correct.

12  Q.   Okay.  And despite the gross mismanagement, you recommended

13  to Crystal Island and Cedar Hill that they invest money.  Is

14  that right?

15  A.   Because it was essentially under new management.

16  Q.   Right.  But you specifically stated in your declaration

17  that it was Mr. Vessenes that was responsible for the gross

18  mismanagement.  Right?

19  A.   Yes.  And, thankfully, Mr. Olsen came along and did his

20  best to save the day.

21  Q.   Right.  But they went into bankruptcy, didn't they?

22             MR. REYHANI:  Who's "they"?

23  Q.   Alydian went into bankruptcy.  Correct?

24             MR. TOWNSEND:  Thank you.

25  A.   So, yes, Alydian did indeed go into bankruptcy, but I don't

DBKBBITH                    Gallancy - direct

1   believe that's because it had negative cash flow.

2   Q.  And upon what basis do you allege that?

3   A.  Well, I don't have all of the data from Alydian.

4   Q.  Thank you.  That's --

5   A.  But your --

6   Q.  That's enough.

7   A.  But your colleague made it clear to me he was going to file

8   for bankruptcy if I pursued this litigation.

9   Q.  Well, you don't know the financial model of Alydian, do

10  you?

11  A.  I created one several months ago for Cedar Hill.

12  Q.  Right.

13  A.  I don't have their internal-- I do not have CoinLab's

14  internal model, no.  I have an older version of it.  I do not

15  have a current version of it.

16  Q.  So you have no idea what happened between August of 2013

17  and the time they filed for bankruptcy.  Is that right?

18  A.  I don't have a full and complete picture of that, no.  I do

19  know that the price of bitcoin has increased.

20  Q.  You also know that the speed of the bitcoin network has

21  increased exponentially as well.  Is that right?

22  A.  As was contemplated in the original model.

23  Q.  But it's increased at a much faster rate that was

24  contemplated in the original model.  Right?

25  A.  No, we had various different-- well, hold on.  Whose model?

DBKBBITH                    Gallancy - direct

```
 1   Vessenes's model or my model?
 2   Q.  No one's seen your model, so we don't know about your
 3   model.  So we have to talk about Alydian's model
 4   A.  So I don't remember the details of Alydian's model
 5   specifically.  I do know that in my model, and in my model in
 6   discussions with Cedar Hill, we had contemplated various rates
 7   of increase in speed, as high as and, in fact, in crazy cases,
 8   far higher than that which has actually occurred.
 9   Q.  Okay.  Well, Mr. Vessenes and Mr. Olsen can talk about what
10   actually occurred based on the reality of the situation.
11          You agree in the agreement to bear all the risk from
12   any changes in future laws, regulations, changes in technology
13   and other forces not within CoinLab's control.  Is that
14   right?
15   A.  That, indeed, I believe is the text of the agreement, but I
16   don't have it in front of me.  If you say it is, then I believe
17   so.
18   Q.  And would a change in the state of the art of chip
19   technology be a change in technology?
20   A.  Definitely not.
21   Q.  Definitely not?
22   A.  Definitely not.
23   Q.  And why is that?  Is a chip a technology?
24   A.  A chip is a piece of silicon which has a purpose in terms
25   of its input and output.
```

DBKBBITH                          Gallancy - direct

1    Q.  Okay.  And how is that different from a technology?

2    A.  I'm not really sure how to answer that question.

3    Q.  I think you did.

4    A.  It's not, though.  The answer is no.

5    Q.  Okay.  Chips are not technology.  I understand --

6    A.  No, chips are chips.  Technology -- actually, if you want

7    to look at it from a semantic basis, technology refers to a

8    broader category of items.

9    Q.  Okay.  Would a semiconductor be a technology?

10   A.  Technology-- I don't have a dictionary definition of

11   technology in front of me.

12   Q.  Would a computer be a technology?

13   A.  These are examples of technological innovations.

14   Q.  Okay.  So the chip is a technological innovation.  Is that

15   right?

16   A.  A chip is one example of a technological innovation.

17   Q.  Okay.  And a new chip would be a new example of a new

18   technological innovation.  Is that right?

19   A.  That's a fair statement, yes.

20   Q.  And then, also, you agreed in the same disclaimer of

21   warranties that you understand and agree that services and

22   bitcoins are the result of relatively new technologies and

23   market exchanges.  Is that right?

24   A.  The technologies in that paragraph don't refer to --

25   Q.  Well, I'm actually going to change your focus to the

DBKBBITH                     Gallancy - direct

1   "market exchanges" language.  So moving on --

2   A.  So I don't know exactly what the words "market exchanges"

3   in that context means.  If he's referring to-- if the

4   contract-- if that means are there new bitcoin exchanges,

5   there are new exchanges that will trade fiat currency for

6   bitcoins.

7              MR. TOWNSEND:  May I approach, your Honor?

8              THE COURT:  Sure.

9   Q.  I'm going to hand you that and I'll ask you to look at it.

10  I'd draw your attention to Tab 2.

11  A.  Yes, sir.

12  Q.  Do you recognize this document?

13  A.  I do, indeed.

14  Q.  What is this?

15  A.  This is the contract that I signed --

16  Q.  You're on Tab 1, I think.

17  A.  My apologies.  Tab 2 is not a contract.

18  Q.  No, it's not, your Honor-- I mean, no, it's not,

19  Mr. Gallancy.  It's an e-mail from you.  Is that right?

20  A.  Indeed, it is.

21  Q.  It's an e-mail that you sent on November 12th.  Is that

22  right?

23  A.  Yes, it is.

24  Q.  And in it you're lauding a bitcoin exchange.  Is that

25  right?

DBKBBITH                         Gallancy - direct

1   A.  I am, indeed.

2   Q.  And that bitcoin is called-- exchange is called ItBit.  Is

3   that right?

4   A.  It is, correct.

5   Q.  And there are other coin exchanges, aren't there?

6   A.  There are, indeed.

7   Q.  Bitstamp.net is a bitcoin exchange?

8   A.  Correct.

9   Q.  BTC-e.com is a bitcoin exchange?

10  A.  I believe so, yes.  I haven't used that one.

11  Q.  And Mt.Gox.com is a bitcoin exchange.  Is that right?

12  A.  Yes.

13  Q.  Which bitcoin exchange do you use?

14  A.  I've used several bitcoin exchanges.

15  Q.  Okay.  And how do they work?

16  A.  I don't understand.

17  Q.  How does a bitcoin exchange work?  How do you get a

18  bitcoin?

19  A.  The bitcoin exchange, it usually involves going to a

20  website, and the underpinnings of that website are a matching

21  engine that matches buy orders and sell orders.

22  Q.  Okay.

23  A.  Sort of like a-- I don't know what it's like.  It's a

24  matching one.

25  Q.  Is it like a stock exchange?

DBKBBITH                    Gallancy – direct

1   A.  It's not really the same as a stock exchange.  A stock

2   exchange-- a bitcoin exchange tends to be an amalgamation of

3   several different items that all get compressed into one thing.

4   A stock exchange is a discrete entity, like the New York Stock

5   Exchange, and then you'd have brokers going to that entity and

6   various intermediaries.  So it's not quite analogous to a stock

7   exchange although it bears some similarities to it.

8   Q.  But as a consumer you would pay dollars or other

9   traditional fiat-based currency and in exchange you would

10  receive bitcoins.  Right?

11  A.  That's one way you would do it.

12  Q.  Okay.  And, also, if you sold bitcoins, on those exchanges

13  you could sell a bitcoin and receive a dollar or a euro or a

14  yen or another foreign currency.  Is that right?

15  A.  Yes.  All of this presupposes that the technology that

16  underlies bitcoins doesn't crash in the midst of this.

17  Q.  Correct.

18  A.  Which has happened.

19  Q.  But you've used them before successfully and turned them

20  into dollars.  Right?

21  A.  I've used them before both successfully and unsuccessfully.

22  Q.  But today if you had eight thousand bitcoins, you could

23  sell them for dollars.  Is that right?

24  A.  I don't know that.  I probably could, but it's not certain.

25  But, yes, I probably could.

DBKBBITH                        Gallancy - direct

1    Q.  Okay.  And, in fact, in your declaration, you identify

2    bitcoins as a currency.  Correct?

3    A.  I don't have a copy of my declaration in front of me.

4    Q.  In fact, you do.

5    A.  Okay.  Tell me what tab to look at, please.

6    Q.  Turn yourself to the next tab, Tab 3.

7    A.  I do.

8    Q.  Okay.  If you look at paragraph 5, you testify that

9    bitcoins are a virtual currency.  Is that right?

10   A.  "Maintained through internet pier-to-pier network."  The

11   tail half of that sentence is essential.

12   Q.  Okay.  But you also --

13   A.  Without the tail half of the sentence, the first half

14   wouldn't be correct.

15   Q.  Okay.  But it's a medium of exchange in which you can turn

16   dollars into bitcoins.  That's how the exchange --

17   A.  Wait.  An exchange is or a bitcoin is?

18   Q.  Well, a bitcoin can be turned into dollars.  Right?  We've

19   already established that.  But a bitcoin is a virtual currency.

20   Right?

21   A.  We haven't established that.  You can at times exchange

22   bitcoins for dollars.  That is not necessarily the case at all

23   times and is not necessarily the case in the future.

24   Q.  It's probably the case today.  Right?

25   A.  It's probably the case today, yes.

DBKBBITH                    Gallancy - direct

1    Q.  And, in fact, you testified or you provided testimony from

2    the director of FinCEN-- first of all, what is FinCEN?

3    A.  FinCEN is an arm of the treasury department.

4    Q.  And FinCEN has engaged in regulation of bitcoins.  Correct?

5    A.  So FinCEN -- from what I understand, I'm not a lawyer --

6    has provided guidance regarding the way bitcoin is to be

7    treated.  I'm not intimately familiar with everything that

8    FinCEN has done in the bitcoin ecosystem.  I have read the

9    March 2013 guidance.  I don't have it with me.

10   Q.  And you've also read the November 18th, 2013 testimony from

11   FinCEN as well.  Correct?

12   A.  I've read portions of it, yes.

13   Q.  Okay.  And you cite to it in your second declaration you

14   filed yesterday.  Is that right?

15   A.  That's correct.

16   Q.  Okay.  And if I draw your attention to the next tab, Tab 4,

17   paragraph 47, on page 15.

18   A.  Yes, sir.

19   Q.  And in that you say that the director of FinCEN testified

20   that "virtual currency is a medium of exchange that operates

21   like a currency in some environments but does not have all the

22   attributes of real currency.... And since a convertible virtual

23   currency either has an equivalent value in real currency, or

24   acts as a substitute for real currency, it qualifies as 'other

25   value that substitutes for currency' under the definition of

DBKBBITH                    Gallancy - direct

1   'money transmission services.'"  Is that right?

2   A.  That is, indeed, in the declaration, yes, sir.

3   Q.  Okay.  And so it's your understanding the Department of

4   Treasury treats the exchange of bitcoins as a money transition

5   service.  Is that right?

6   A.  That's, indeed, what the director of the-- what the FinCEN

7   person speaking has said, yes.

8   Q.  Okay.  Under the time circumstances, I'm going to say thank

9   you for your testimony.

10          MR. TOWNSEND:  And unless there's a cross, we have

11   other witnesses we'd like the Court to hear.

12          MR. REYHANI:  We'd like to reserve our right to recall

13   Mr. Gallancy at the conclusion of their examination.

14          THE COURT:  Okay.

15          MR. REYHANI:  Thank you.

16          THE COURT:  That's fine.  Thank you.

17          MR. SANTORI:  Your Honor, I call-- by the way, this is

18   Marco Santori for the stenographer.

19          Your Honor, we call Mr. Peter Vessenes.

20          MR. SANTORI:  Your Honor, what I'd like to do is give

21   Mr. Vessenes the same binder of exhibits.

22          THE COURT:  Sure.

23    PETER JOSEPH VESSENES,

24       called as a witness by the Defendants,

25       having been duly sworn, testified as follows:

DBKBBITH

```
 1              THE DEPUTY CLERK:  Please state your full name and

 2    spell your first name and last name slowly for the record.

 3              THE WITNESS:  My name is Peter Vessenes.  Peter Joseph

 4    Vessenes.  P-e-t-e-r J-o-s-e-p-h V-e-s-s-e-n-e-s.

 5              THE DEPUTY CLERK:  Thank you, sir.

 6              MR. SANTORI:  May I approach, your Honor?

 7              THE COURT:  Yes.

 8              MR. REYHANI:  Your Honor, if I may, is it a 4 p.m.

 9    hard stop?

10              THE COURT:  Pardon me?

11              MR. REYHANI:  Is this proceeding a 4 p.m. hard stop?

12              THE COURT:  Well, probably.

13              THE DEPUTY CLERK:  We have three conferences.

14              MR. REYHANI:  No, I understand.

15              MR. SANTORI:  In that event, your Honor, we will hit

16    the high points of our testimony.

17              THE COURT:  Okay.

18    DIRECT EXAMINATION

19    BY MR. SANTORI:

20    Q.  By way of introduction, Mr. Vessenes, what is your

21    educational background?

22    A.  I attended Brown University.  I have a Bachelor of Science

23    degree in theoretical math and cryptography.

24    Q.  And what is your business experience?

25    A.  I am a serial entrepreneur largely.  I've started 10 to 12
```

DBKBBITH                     Vessenes – direct

1   businesses.  About five or six of them are still operating.

2   Q.  Do you have any experience outside of those businesses?

3   A.  Yes, as a management consultant.  I also am chairman and

4   founder of the Bitcoin Foundation, which is the global trade

5   organization for bitcoins.

6   Q.  And what is your relationship to the defendant, Alydian?

7   A.  I am the managing director of Alydian.

8   Q.  What about CoinLab?  What is your relationship to CoinLab?

9   A.  I'm the CEO of CoinLab.

10  Q.  And so to put the puzzle pieces together, what is CoinLab's

11  relationship to Alydian?

12  A.  CoinLab owns 65 percent of the common stock of Alydian and

13  is a creditor of approximately a half million to six hundred

14  thousand dollars to Alydian.

15  Q.  So what does CoinLab mean, the name?

16  A.  Well, CoinLab is-- the idea of a lab is just making --

17  making something, making something interesting.  CoinLab is a

18  bitcoin incubator.  We want to incubate new businesses and

19  make them.  It was inspired by another incubator called

20  IdeaLab.

21  Q.  So are there other incubators out there?

22  A.  There are many, yeah.  Betaworks is one.  I think in New

23  York, five hundred start-ups.  There's a German one that the

24  brothers made a couple billion dollars doing it, Rocket

25  Internet in Germany.

DBKBBITH                        Vessenes – direct

1          THE COURT:  When you say "incubator," what do you

2     mean?

3          THE WITNESS:  It's a term of art, your Honor, which I

4     suppose denotes a business model and that model is to create

5     and launch new businesses.  So you incubate them.  A little bit

6     like farming, I suppose.

7     Q.  Has CoinLab always been in this line of business,

8     incubation?

9     A.  Yeah, it was always the plan to be an incubator.  You start

10    with one.  So we didn't always present to the public that

11    brand, but internally we had that idea from the beginning.

12    Q.  And so then has CoinLab ever run a mining pool?

13    A.  Yes, we've run a mining pool.

14    Q.  Can you just explain to me, then, is a mining pool the same

15    thing as mining?

16    A.  No.  We've thrown around some technical terms.  Bitcoin

17    mining is the act of securing the bitcoin network.  You do some

18    hard cryptographic problems and math problems, and you help

19    provide overall security for this open financial network.

20         A pool, on the other hand-- now, you don't always

21    make enough money doing that mining to have some certainty of

22    your financial results.  And so often those who do a little bit

23    of bitcoin mining will pool up together and a service will

24    provide them with some financial certainty and that's called a

25    mining pool.

DBKBBITH                          Vessenes - direct

1    Q.  And so we've talked about bitcoin mining.

2            What is Alydian's business?

3    A.  Alydian is in the business of bitcoin mining.

4    Q.  What is bitcoin mining?

5    A.  Well, I said a little bit about it just now, but what you

6    should think about it is it's a pool of people who want to help

7    secure the bitcoin network.  They do that through, currently,

8    custom chips, custom chip design.  And in exchange they get

9    paid, paid for doing that.

10   Q.  And how are new bitcoins created?

11   A.  They are issued to miners in exchange for doing the

12   securing work.

13   Q.  And what kind of hardware is required for bitcoin mining?

14   A.  Well, there are a lot of options, but if you want to mine

15   right now in such a way that it will return more money than

16   your energy costs, you need to have a fairly sophisticated

17   piece of custom silicon or custom chip that's been built.

18   Q.  Is there a specialized staffing required in addition to

19   that specialized hardware?

20           THE COURT:  Let me try a definition in lay terms.

21   Bitcoin mining is using a product which generates internet

22   algorithms which enables people to make connections.  Is that a

23   fair statement?

24           THE WITNESS:  I think that's broadly true, your Honor.

25   What the miners really do is they take the role that the bank

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBKBBITH                         Vessenes - direct

1   fraud department would take at the bank or someone watching the

2   transactions that the Fed would take.  But they kind of --

3   everyone does it together so they look over the transactions

4   and secure them.

5          THE COURT:  Well, first of all, they have to locate a

6   transaction?

7          THE WITNESS:  Yes.  People will send them a

8   transaction and say, "Secure this for me, please."

9          THE COURT:  And then they-- what do they do once they

10  get people who want to have a transaction?

11         THE WITNESS:  Well, I would assume you want me to be

12  not too technical.  Is that correct?

13         THE COURT:  You got it.

14         THE WITNESS:  What they do, they get a list of

15  transactions.  If you think of any money system --

16         THE COURT:  Forgive me.  They've got to do-- you

17  should pardon the expression-- mining.  They have to locate

18  those transactions.

19         THE WITNESS:  Those are sent to them.  People kind of

20  call them up and send them.  They say, Hey, if you could, if

21  you mine my transaction for me, I'll give you a little money.

22  Miners make money that way.  In exchange they time-stamp them.

23  And the time-stamping is the thing that keeps the network

24  secure.  And it's very hard to do this.  There's some clever

25  math that makes it hard, and that difficulty of finding the

1    time stamp is how the network sort of moderates its security

2    and money issuance.

3          THE COURT:  And then, once they have the

4    identification of the transaction, what do they do?

5          THE WITNESS:  As soon as it's time-stamped, the whole

6    world knows about it.  And whoever was lucky enough to find

7    that time stamp gets, right now, 25 bitcoins.  And they say,

8    Hey, good job, thank you for securing the network.  We'll get

9    another time-stamped set of transactions in about ten minutes.

10         THE COURT:  So what do you have to do to get the time

11   stamp?

12         THE WITNESS:  Well, you have to do a lot of

13   computational work.  Trillions and trillions of math problems.

14   So it's very, very hard to do that.  And that's the bitcoin

15   mining, is those hard math problems.

16         THE COURT:  And the problem that's being solved is?

17         THE WITNESS:  It's impossible to describe in a

18   nontechnical way, but it's a clever problem that proves-- well,

19   I could explain it this way.  You want to-- if I gave you a

20   job -- but it's just to prove you worked.  Here's a job.  Flip

21   coins.  Videotape yourself flipping coins.  And as soon as you

22   have a video of flipping 32 heads in a row, call me and show me

23   that video.

24         Now, if you called me, I would know you had done a lot

25   of coin flipping, but I'd only need to see that one video.  I

DBKBBITH                    Vessenes - direct

1    would know you-- it's a 50/50 chance for every tail, so it's

2    billions of coin flips you would need to make.

3          So the bitcoin problem, the mining problem, is

4    designed to let someone review the video later without doing

5    all the work.  And they know, okay, you've worked really hard

6    at securing and I can see that right now.

7          THE COURT:  Excuse the interruption.

8          MR. SANTORI:  Not at all.

9    BY MR. SANTORI:

10   Q.  So we've heard a little bit today, and in Mr. Gallancy's

11   affidavit, about the concept of a cyber attack.

12         Is the bitcoin network vulnerable to a cyber attack?

13   A.  Yes, of course.

14   Q.  Is the Visa network vulnerable to a cyber attack?

15   A.  Yes, certainly.

16   Q.  Is it any more likely that the bitcoin network will be

17   taken down by a cyber attack than the Visa network?

18   A.  I don't think so.

19   Q.  Is it any more likely than the banking network being taken

20   down by a cyber attack?

21   A.  I don't think so.

22   Q.  Do bitcoins exist physically?

23   A.  No, they're just data.

24   Q.  Is there a limit to the number of new bitcoins that will be

25   created?

DBKBBITH                    Vessenes – direct

1    A.   Yeah.  The bitcoin network promises to only issue 21

2    million or so bitcoins.

3    Q.   And when will the bitcoin network stop issuing bitcoins?

4    A.   The current promise is around the year 2140.

5    Q.   So in 100 years?

6    A.   127 years maybe.

7    Q.   What happens then?

8    A.   Well, bitcoins will continue on.  And I mentioned to Judge

9    Sweet that people who want transactions time-stamped pay a

10   little bit.  Miners will keep getting paid to do that

11   time-stamping and transaction acting.  They're paid now and

12   they'll be paid then.

13   Q.   Even a hundred years from now --

14   A.   Of course we speculate, you understand, because we'll be

15   dead.  Yeah.

16   Q.   Well, speak for yourself.

17   A.   There we go.

18   Q.   So even in a hundred years from now, when new bitcoins

19   cease to be created, would it be correct to say that miners

20   will still make money even after--

21   A.   Yes, they will certainly receive bitcoins in exchange for

22   mining.

23   Q.   If you wanted to get bitcoins right now, what would you

24   do?

25   A.   I would buy them on an exchange.

DBKBBITH                        Vessenes – direct

1          THE COURT:  I'm sorry?

2          THE WITNESS:  I would buy them on a bitcoin exchange.

3   Q.  Could you do anything else to get bitcoins?

4   A.  You could mine them as well.

5   Q.  Anything else?

6   A.  Not that I'm aware of.  You buy them or you make them.

7   Q.  Could you buy them from somebody in person?

8   A.  Oh, that's true, of course.  Yeah.

9   Q.  Have you personally traded bitcoins for dollars on an

10  exchange?

11  A.  Yes.

12  Q.  Is it difficult to do?

13  A.  No, it's very easy.

14  Q.  What does it take?

15  A.  You send your money to an exchange with a wire transfer,

16  you load a web page and you click a button.

17  Q.  If you wanted to get bitcoins a year ago, what would you

18  have done?

19  A.  I would have bought them on an exchange.

20  Q.  If you want to get bitcoins a year from now, what would you

21  do?

22  A.  I will buy them on an exchange.

23  Q.  Would you be able to buy them from somebody in person?

24  A.  Yes, of course.

25  Q.  Do you have any reason to believe today that you wouldn't

1    be able to do that?

2    A.  No.

3    Q.  How are prices established on these exchanges that you've

4    discussed?

5    A.  It's like Mr. Gallancy said.  It's an open market, which

6    I'm sure the district here knows a lot about.  Bids and asks.

7    Q.  On those markets, is one bitcoin worth more than any other

8    bitcoin?

9    A.  No.

10   Q.  Is there any reason why a merchant would accept one bitcoin

11   but not another bitcoin?

12   A.  No.

13   Q.  Is there any reason why a creditor would accept one bitcoin

14   but not another bitcoin?

15   A.  No.  In fact, even in Mr. Gallancy's complaints, he's

16   willing to accept bitcoins from multiple sources.  He doesn't

17   care where they come from.

18   Q.  Is a bitcoin mined today any more valuable than a bitcoin

19   mined tomorrow if in a week you sell them at the same time?

20   A.  No.

21   Q.  When people sell on the market, do those sellers charge a

22   premium for one bitcoin over another bitcoin?

23   A.  No.

24   Q.  Is a mined bitcoin worth any more than a bitcoin purchased

25   on exchange?

DBKBBITH                          Vessenes - direct

1    A.  No.

2    Q.  So are bitcoins fungible?

3    A.  Yes.

4    Q.  Dan Gallancy said that one bitcoin can be different from

5    another.  Is that true?

6    A.  Yeah, that's true.  Maybe like $20 bills can be different

7    from each other, but they're still fungible.

8    Q.  Can one bitcoin be made to be different than another

9    bitcoin?

10   A.  Yes.  You could write on your $20 bill.  You could attach

11   data to anything, including a bitcoin.

12   Q.  So can you, as Mr. Gallancy said --

13   A.  But, I mean-- do I have a $20?  If I write on my $20, it's

14   still, you know-- like, I can write on it, but it's still a

15   $20.  It doesn't change its moneyness to attach some data to

16   it.

17   Q.  So you could take a $20 bill and write-- could you write a

18   deed on a $20 bill --

19   A.  Yeah, you could write a contract on a $20 bill and it would

20   still be a $20 bill.

21   Q.  Could you do the same with a bitcoin?

22   A.  I suppose so.

23   Q.  Would any of that have been done to the bitcoins that

24   Alydian or CoinLab could have mined?

25   A.  No.  No, that was never conceived of.

DBKBBITH                       Vessenes - direct

1   Q.  So back to Alydian.  How did Alydian come into existence?

2   A.  I'm just worried about time.

3   Q.  I'm sure that the Court will hurry us along if that's

4   required.

5            THE WITNESS:  How are we doing?

6   Q.  If we go back to Alydian, can you just tell us, very

7   briefly, how did Alydian come into existence?

8   A.  It was incubated by CoinLab in the fall of 2012.  That

9   means that we sourced a business model, we recruited a team,

10  and we found a capital partner to launch the business.

11  Q.  And what happened in the fall of 2012?

12  A.  So we raised $500,000 and began a chip project.  It went

13  okay, not great.  And through the spring of 2013 we realized we

14  would need more money.  We knew we needed at least a million

15  dollars at the time.  Final budget for Alydian was four

16  million, so we were wrong, very wrong, about how much we

17  needed.  But we sold some contracts to what we call prebuyers,

18  which counsel mentioned here.  They prepurchased bitcoins from

19  us.  It was a way to finance the project.  And that raised as a

20  total about $1.4 million at that time.

21  Q.  And what were Alydian's obligations under those prebuyer

22  contracts?

23  A.  So those contracts-- those contracts were pretty simple.

24  We would deliver bitcoins to people.  If we couldn't deliver

25  them, we would refund all their money.  It's actually

1   something-- there are a few contracts CoinLab, Inc. has with

2   these prebuyers.  I've been wanting to refund them since

3   Alydian went into bankruptcy, but I wasn't sure if I could

4   based on the restraining order because it's not in the ordinary

5   course of business.  So we have a few of those.  We'll refund

6   their money as soon as we can.  And if we're able to deliver,

7   great, we would deliver the coins.

8   Q.  I'd like you to turn to Tab 6 in the binder that you've

9   been provided.

10  A.  Okay.

11  Q.  Do you know what this is?

12  A.  Yes.

13  Q.  What is it?

14  A.  This is the initial contract with Dan Gallancy that Alydian

15  signed.

16  Q.  And who prepared it?

17  A.  My lawyers prepared it.

18  Q.  And how do you maintain these kinds of documents?

19  A.  These are stored in paper form and then also scanned and

20  pdf'd.

21  Q.  Do you maintain this in the normal course of your

22  business?

23  A.  Yes.

24  Q.  And is it the normal course of your business to maintain

25  these documents?

DBKBBITH                         Vessenes - direct

1  A.  Yes.

2          MR. SANTORI:  I'd like to introduce this document as--

3  are we anywhere yet on exhibits?  I believe this would be

4  Exhibit Number 1.

5          THE COURT:  Okay.  Defendants' 1 is admitted.

6          (Defendants' Exhibit 1 received)

7  Q.  With whom was this agreement?

8  A.  This was with Daniel Gallancy.

9  Q.  Is this one of those prebuy contracts that you mentioned?

10 A.  It is.

11 Q.  Did these prebuy contracts raise all of the money that

12 Alydian needed?

13 A.  No, absolutely not.  As I said, the final cost of the

14 Alydian project were roughly $4 million, and these prebuy

15 contracts got us up to about 1.4 million.

16 Q.  So why did Alydian need more capital?

17 A.  Well, it's very expensive to do a chip company and, at the

18 same time, there were market forces outside our control.  So

19 there were -- the bitcoin network was growing more and more

20 quickly and competitors were bringing new chip technology on.

21 So at the start of the project, everyone had 110 nanometer

22 chips.  When we launched, we thought the 65-nanometer chips

23 were better than the 110; would be enough.  As the project went

24 on, it became clear other people had went to 28-nanometer

25 chips.  Each of these jumps requires more technology, a more

1    sophisticated engineering team to play with them, you have to

2    purchase more equipment.

3          Additionally, the network sped up so quickly.  It was

4    originally ten trillion hashes a second, 10 terahashes a

5    second.  By the time we were about to deploy, it was hundreds

6    of terahashes a second.  One to two hundred.  It was increasing

7    1 to 2 percent a day.  And we had budgeted for 1 percent a day

8    growth, but it was as much as 3 percent a day at times.  That

9    meant not only did we have to buy more equipment, but every day

10   you waited, you lost 3 percent of all your future earnings.  So

11   it was urgent, so we had to pay rush fees.  Buy more equipment

12   and pay rush fees on top of it.

13   Q.  So you said equipment, hardware, rigs.  What we are talking

14   about?

15   A.  It's like a computer server that only makes bitcoins.  It's

16   your custom chips in it and then all the other technologies

17   around it that let you do the mining.

18   Q.  Did everybody at Alydian agree that Alydian should continue

19   mining in the face of this speed increase?

20   A.  No.  No, in the summer there was significant debate

21   internally.  Hans, who was managing day-to-day operations, was

22   not sure we should continue.  The CFO at CoinLab and I

23   actually-- as Alydian ran out of money, CoinLab was putting

24   more in.  Like I said, the second largest creditor now to

25   Alydian.  The CFO and I had quite a discussion about it and she

1    essentially resigned over this issue.  Like it's not wise to

2    continue, but I wanted to continue doing it.

3    Q.  So how did you ultimately deal with this?

4    A.  Well, we tried to raise money.  We had a relationship with

5    Crystal Island.  They made us an offer that we couldn't accept.

6    We found another offer that we did accept to invest money into

7    Alydian.  We took that.  CoinLab put in more money.  Actually,

8    right up until the end of the bankruptcy claims, I was pouring

9    in cash.

10   Q.  Why didn't you accept Crystal Island's offer?

11   A.  Two things.  One is we knew we needed $2 to $3 million to

12   do the whole project.  Crystal Island only wanted to offer like

13   one-million-something.  They wanted extremely onerous terms,

14   kind of New York hard money lender terms.  And they also

15   wanted -- and Dan referred to this.  They wanted some, like,

16   unbounded liabilities for CoinLab that we just thought, on the

17   CoinLab side, we couldn't possibly sign up for.

18   Q.  Was Crystal Island a bitcoin mining expert?

19   A.  No, not particularly.

20   Q.  Were they financial experts?

21   A.  I would think so.

22   Q.  So how did they evaluate the investment?

23   A.  Well, essentially they looked at, you know, is the project

24   real?  Can we actually do what we say we can do?  And then they

25   looked at how hard will it be to make the bitcoins?  They used

1    the bitcoin difficulty metric to do that.  We had significant

2    debate over how many terahashes a second would be coming

3    on-line or through the end of the year.

4    Q.  Did they put anybody in charge of due diligence for the

5    investment?

6    A.  They did.

7    Q.  Who was that?

8    A.  Daniel Gallancy.

9    Q.  Was he satisfied with the investment after doing this due

10   diligence?

11   A.  I believe so.  He told me that he would recommend they go

12   ahead.

13   Q.  How did you determine whether, even with an investment, the

14   business would have a chance of success?

15   A.  So we built a fairly sophisticated financial model.

16   Q.  I'm sorry, continue.

17   A.  But, again, the salient-- well, you can-- I'll tell you

18   about the salient points when you're ready.  We built a model.

19   Q.  Okay.  I'd like you to turn to Tab 7, please.

20   A.  Okay.

21   Q.  Do you know what this is?

22   A.  Yes.

23   Q.  What is it?

24   A.  This is the summary page for one of the financial models we

25   built to assess Alydian.

DBKBBITH                        Vessenes – direct

1   Q.  Is this the financial model you were referring to in your

2   testimony?

3   A.  Yes.

4   Q.  Were there others?

5   A.  Yes.

6   Q.  But this is just one of them?

7   A.  This is one of them.

8         THE COURT:  Excuse the interruption.  What we will do

9   is we will have a short recess.  Maybe 10, 15 minutes.

10  Something like that.  It might be a little longer.  Then we

11  will resume.  We will stop at 5:30 and, if we're not finished,

12  we will resume tomorrow morning.

13        (Recess)

14        MR. SANTORI:  Mr. Vessenes.

15        THE COURT:  You're still under oath.

16        THE WITNESS:  Okay.  That changes everything.

17        THE COURT:  Yes, I know.

18  BY MR. SANTORI:

19  Q.  Mr. Vessenes, when we left off, we were discussing your

20  financial model.

21  A.  Yes, on Tab 7.  Is that correct?

22  Q.  Right.

23        Is this the financial model you were referring to in

24  your testimony?

25  A.  Yes.

DBKBBITH                          Vessenes - direct

1    Q.  And who prepared it?

2    A.  CoinLab and Alydian employees and contractors.  So me,

3    Jodie Brady, Hans Olsen.

4    Q.  And how did you prepare it?

5    A.  With Excel.

6    Q.  And how did you retain it?

7    A.  It's kept in your standard file servers.

8    Q.  Was it maintained in the normal course of your business?

9    A.  Yes.

10   Q.  Is it the normal course of your business to maintain such

11   documents?

12   A.  Yes.

13          MR. SANTORI:  I'd like to introduce this as the

14   financial model, Alydian's financial model, the document on Tab

15   7.

16          THE COURT:  It's admitted.  Defendants' 2, I take it.

17          MR. SANTORI:  Yes, thank you, your Honor.

18          (Defendants' Exhibit 2 received)

19   Q.  What does the financial model show?  Actually, withdrawn.

20          Is this the entire Excel spreadsheet?

21   A.  No, it's not.

22   Q.  How long would the entire Excel spreadsheet have been had

23   we printed it out today?

24   A.  It would have been, I think, hundreds of pages.

25   Q.  Okay.  And so what is this that we're looking at here?

1   A.   This is a summary at a point when we were trying to decide

2   how many terahashes of mining capacity to deliver.  We had

3   three estimates:  The column 230 terahashes at the top, 550 or

4   870.  We had hoped to have this model so your Honor could see

5   some of the things we were thinking about.  But, in summary, we

6   were projecting a 1 percent growth rate per day for the bitcoin

7   mining network.  And that was, we were estimating, going to

8   yield 1,897 terahashes on the rest of the network by the end of

9   the year.  In that model all of our business plans looked like

10  they made some money.

11  Q.   So you said "terahashes."  What are terahashes?

12  A.   So, again, a hash is like a try.  It's like that coin

13  flipping for bitcoin mining.  A terahash, t-e-r-a-h-a-s-h, is a

14  trillion of them.  And so it's a lot.  It's a lot of those

15  hashes.

16  Q.   What would happen had the network speed increased beyond 1

17  percent?

18  A.   Well, we did some analysis on that and it seemed like at

19  1.25 percent, Alydian was marginal per day.  It was very, very

20  sensitive to this growth rate.  Anything over that and we

21  thought that it was unlikely to make money.

22  Q.   Did Dan Gallancy see this model?

23  A.   Yes.

24  Q.   Have you seen any of Dan's models?

25  A.   No.

DBKBBITH                          Vessenes - direct

1   Q.  Not one?

2   A.  No.

3   Q.  How did Dan see this model?

4   A.  So in the course of explaining the Alydian business, we

5   reviewed this model.  And the model has-- it shows that we were

6   going to reinvest capital and operating-- mining into capital

7   and operating expenses and it has returns estimates.  So we

8   e-mailed this to Dan, and then he reviewed it with me on the

9   phone multiple times and also, I believe, with Jodie Brady.

10  Q.  You said you e-mailed it to Dan.  I'd like you to turn to

11  Tab 8.

12  A.  Okay.

13  Q.  Do you know what this is?

14  A.  Yes.

15  Q.  What is it?

16  A.  This is an e-mail sent to, among other people, Dan with the

17  model attached to it.

18  Q.  And who prepared it?

19  A.  I did.

20  Q.  Did you maintain this document in the normal course of your

21  business?

22  A.  Yes.

23  Q.  Is it the normal course of your business to maintain such

24  documents?

25  A.  Yes.

DBKBBITH                    Vessenes - direct

1              MR. SANTORI:  I'd like to introduce this exhibit as

2    Exhibit 3.

3              THE COURT:  It's admitted.

4              (Defendants' Exhibit 3 received)

5    Q.  In the course of his due diligence, did Mr. Gallancy

6    develop his own estimate of the network speed?

7    A.  I believe so.

8    Q.  How do you know that?

9    A.  He told me on the phone.

10   Q.  Oh, and what was his estimate of the network speed?

11   A.  Well, we were using end of the year as a kind of date to

12   estimate how much mining capacity there would be.  And he told

13   me that Cedar Hill was estimating four thousand terahashes, but

14   that I think he said, "You and I both agree that it's going to

15   be more like two thousand."  So he told me his own internal

16   estimates were about two thousand terahashes.

17   Q.  What kind of a growth rate would that be?

18   A.  That was a little over 1 percent.  It was 1 to 1.05 per

19   day.

20   Q.  So at that rate would Alydian still have been arguably

21   profitable?

22   A.  I believe so.  I think it could have repaid any capital

23   that it needed and its customers at that growth rate.  I think

24   so.

25   Q.  So now the year hasn't ended yet, but what's the total

DBKBBITH                        Vessenes - direct

1   network speed right now?

2   A.   Today it's five thousand terahashes.

3   Q.   And you thought-- how much did you think it was going to

4   be?

5   A.   Two thousand but in some time, and it grows geometrically.

6   I think Mr. Gallancy estimates in his declaration it might be

7   as much as 20,000 by the end of the year.  That seems very

8   possible to me.

9   Q.   Did anyone at Alydian or CoinLab believe that it would be a

10  viable company at this growth rate?

11  A.   No.  That gets into the 2 to 3 percent a day growth rate

12  range and no one thought that it was viable at that rate.

13          THE COURT:  Why not?  I think I know the answer, but

14  why not?

15          THE WITNESS:  Well, your Honor, the reason is that

16  you have to share proceeds with everyone else who's mining.  If

17  there's a hundred of you and you got one, you get 1 percent.

18  If there's a thousand and you got one, you get a tenth of a

19  percent.

20          So we had purchased -- you know, we were deciding how

21  much to purchase, but in the event we purchased 220 terahashes.

22  Now, if there's only going to be two thousand terahashes other

23  than us, we would get about 10 percent of all the bitcoins

24  mined.  If there's five thousand or 10 or 20, we get less and

25  less bitcoins.

1          So, you know, and the difference, it sounds like not a

2     lot, but we calculated out the annual percentage rates for 1

3     percent a day versus 3 percent a day.  One percent a day is

4     about 3,700 percent a year in annual growth and we were ready

5     for that, I believe.  Three percent a day is 4.8 million

6     percent a year annual growth and we just couldn't-- we couldn't

7     compete with that.  That was way out of our control.

8     Q.  So you just testified that the network speed changed.  But

9     did anything change about the hardware required to keep up with

10    that network?

11    A.  Yeah.  As it gets harder and harder -- if you have older

12    technology chips, they're not as effective.  They require more

13    energy.  They require more data center space.  So all your

14    operating costs go up if you have old technology.

15    Q.  Can you explain that, the difference in that technology?

16    A.  Yeah.  I mean, we refer to them by nanometer range.  So a

17    65-- Hans could explain much more about this.  I'm not really

18    an expert.  But a 65-nanometer chip like ours might cost

19    three to four times as much as a 28-nanometer chip.  And

20    those, we can see some are out now and more are coming.  You

21    just see this incredible growth rate where other companies have

22    very, very different operational and capital dynamics than

23    Alydian.

24    Q.  So given the network speed increase that nobody expected

25    and the change in chip technology required to keep up with

DBKBBITH                         Vessenes – direct

```
 1   that, did anybody at Alydian believe that it would be-- or
 2   CoinLab-- believe that it would be a viable company at this
 3   growth rate?
 4   A.   No, no one would have ever thought at a 2 to 3 percent a
 5   day growth rate that it was viable.
 6   Q.   I'd like you to turn to Tab 9, please.
 7   A.   Okay.
 8   Q.   Do you know what this is?
 9   A.   Yes.
10   Q.   What is it?
11   A.   This is an e-mail chain between Hans Olsen and myself and
12   some others.
13   Q.   How do you retain e-mails?
14   A.   They're kept by Gmail.  We don't have to do anything to
15   retain them.
16   Q.   Do you maintain these kinds of documents in the normal
17   course of your business?
18   A.   Yes.
19   Q.   Is it the normal course of your business to maintain such
20   documents?
21   A.   Yes.
22           MR. SANTORI:  I'd like to introduce this as
23   Defendants' Exhibit 3.
24           THE WITNESS:  I think it's four.
25           THE COURT:  It's admitted.
```

DBKBBITH                          Vessenes - direct

1              MR. SANTORI:  Four.  Thank you.

2              (Defendants' Exhibit 4 received)

3              THE WITNESS:  So we were discussing that we had chips

4    to build more bitcoin systems on the dates these e-mails were

5    sent, in mid-October.  So we had already paid for those.  And

6    we were trying to decide if it was worth paying to assemble

7    them and deploy them at all.  And you could read Hans's e-mail,

8    which is really on the next page, the second page:  "The rate

9    of network deployments continues to increase at a surprising

10   pace.  It seems deployments in late November have a lot of

11   risk, but minimal or no return."

12             In general, we all agreed in the course of these

13   e-mails that we should not even reinvest in building out all

14   the chips we had.  We didn't think we could make any money

15   doing that.

16   Q.  So turning back to the financial model, what would the

17   financial model predict for this 2 to 3 percent increase that

18   we were seeing?

19   A.  Just doom, basically.  I think that's the technical term.

20   I mean massive losses.

21   Q.  And what if you had already purchased all of your chips and

22   all you had to do was assemble them and install them and plug

23   them into the data center?

24   A.  Well, that's what happened here.  We have the chips --

25   there's a lot more to get those chips working.  There's

DBKBBITH                        Vessenes - direct

1   engineers and there's assembly and costs.  Even in that event

2   we didn't want to do that.

3              Now, if you have a fully assembled bitcoin mining

4   system ready to go, you may or may not want to run that.

5   That's a little bit of a different situation.

6   Q.  So you testified earlier that you were looking for

7   capital.

8   A.  Yeah.

9   Q.  What if you weren't able to find capital for Alydian on

10  workable terms?  What would have happened?

11  A.  We would have had to shut it down.

12  Q.  Would it have been able to mine bitcoins?

13  A.  No.

14  Q.  Would it have been able to mine bitcoins for Dalsa Barbour,

15  Dan Gallancy or Bitvestment?

16  A.  No.

17  Q.  Did you discuss the possibility of shutting down with

18  anybody?

19  A.  Yeah, we talked it over with the board.  And then, as Dan

20  became more aggressive, we also told him it was a possibility.

21  Q.  I'd like to turn to Tab 10.

22  A.  Yes.

23  Q.  Do you know what this is?

24  A.  Yes.

25  Q.  What is it?

1   A.  This is a printout of a board PowerPoint.

2   Q.  Is it, though, part of a discussion that you were referring

3   to about shutting down Alydian?

4   A.  Absolutely.  One of many.

5   Q.  Did you maintain this document in the normal course of your

6   business?

7   A.  Yes.

8   Q.  Is it the normal course of your business to maintain such

9   documents?

10  A.  Yes.

11          MR. SANTORI:  I'd like to introduce this as

12  Defendants' Exhibit 5.

13          THE COURT:  It's admitted.

14          (Defendants' Exhibit 5 received)

15  Q.  Does it say anywhere in this presentation that you're

16  considering shutting down?

17  A.  Yes, it does.

18  Q.  Where?

19  A.  Well, on the "What's next?" page, which is-- it's kind of

20  in the middle of the document.  It's after two that say

21  "Challenges."  Then it says "Go forward options."  The last

22  slide is an order-- these are different possibilities we're

23  discussing now.

24  Q.  Can you refer to a number in the bottom right --

25  A.  I'm sorry, the Bates number is 637.  I'm sorry.  So you can

DBKBBITH                    Vessenes - direct

1    see here we're talking, well, maybe we keep deploying, but

2    we'll have to get additional capital to do that.  Maybe we can

3    get these into retail configurations.  As it happened, we

4    decided that would not be helpful.  Maybe we should go to a

5    smaller geometry.  Should we keep trying to find hosting or

6    maybe we should shut down.

7    Q.  When you say "go to a smaller geometry," does that mean--

8    is this third-- I'll withdraw that.

9              What does that mean?

10   A.  It means, you know, as I told you, we have these

11   65-nanometer chips, but they were not likely to be

12   competitive.  So we were saying perhaps we should figure out

13   how to get 28-nanometer chips if we like the business and it's

14   viable.

15   Q.  Did you think you had to change your technology to keep up

16   with this?

17   A.  It was certain.

18   Q.  Would switching to a 28-nanometer device be a change in

19   technology?

20   A.  I believe so, yeah.  I mean, it's a totally new technology.

21   Different machines make them.  It's much harder to do.  I would

22   call it a change in technology.

23   Q.  Did Alydian ultimately find financing?

24   A.  It did.  It received financing from its seed investor,

25   X-ray Holdings, PLC.

DBKBBITH                    Vessenes - direct

1   Q.  And what were the terms of that arrangement?

2   A.  X-ray Holdings put in 12,500 bitcoins in exchange for

3   15,000 bitcoins back essentially.  I'm simplifying, but that's

4   the rough.

5   Q.  Did you offer those terms to Crystal Island?

6   A.  Yeah, we did.  We offered terms similar to them in a

7   counteroffer.

8   Q.  What was their response?

9   A.  They were not interested.

10  Q.  Did X-ray Holdings ever receive any bitcoins that Alydian

11  mined?

12  A.  No, X-ray Holdings has received no bitcoins mined from

13  Alydian.  They are the largest creditor to Alydian.

14  Q.  So has Alydian mined the bitcoins?

15  A.  It has, yes.

16  Q.  Since December of 2012, has CoinLab mined any bitcoins?

17  A.  Not to my knowledge.  It's possible maybe a little bit in

18  development for Alydian, but not-- no, essentially.

19  Q.  And how many would you say --

20  A.  If it had, it would be like a tenth of a bitcoin or

21  something.

22  Q.  I see.

23  A.  De minimis.

24  Q.  In early October, what was the status of Alydian?

25  A.  Well, bitcoin mining speeds around the network are

DBKBBITH                        Vessenes - direct

1    increasing far more rapidly than we thought.  We need another

2    $500,000 or so of parts to finish our deployment.  I have

3    unhappy staff who have been working for a year and are going to

4    make no money.  And then we've got a possible lawsuit with

5    Dalsa Barbour.

6    Q.  How fast was the network increasing at that time?

7    A.  It was increasing between 2 to 3 percent a day.  Something

8    like that.

9    Q.  And remind us, what growth rate had Alydian projected

10   around that time?

11   A.  We had projected 1, maybe 1.1.

12   Q.  So am I right to say that the network speed increased three

13   times as fast as what Alydian's projections planned for?

14   A.  No.

15   Q.  Well, then, how fast was the network speed increase?

16   A.  As I was telling Judge Sweet, I mean, it's more in this,

17   like, 4 million percent a year range, you know, as an

18   annualized number.  Just incredibly fast.

19   Q.  And then what annualized number were you prepared for?

20   A.  More like 3,700 percent or something.  So it was like-- I

21   don't know.  It was 150 times faster, or something, than we

22   thought it would be growing.

23   Q.  Did Alydian's personnel believe that given this, Alydian

24   should continue?

25   A.  No.  But I will say that we thought there was a chance

1    some money could be returned to creditors and we wanted to do

2    that.  And so CoinLab put in some money just for a bankruptcy,

3    which it's now a creditor on, just in an effort to make sure

4    that like creditors to Alydian got something out of it.

5    Q.  How much did CoinLab ultimately invest in Alydian?

6    A.  CoinLab invested approximately a million dollars.  So about

7    550 in equity and then another 500-ish.  We're still kind of

8    sorting everything out in the bankruptcy in debt.

9    Q.  Did that investment make Alydian competitive?

10   A.  No.  And somewhat obviously.

11   Q.  Why not?

12   A.  Again, we had this incredible, like, outside force of the

13   bitcoin network speed.  Our chips aren't competitive anymore.

14   It's nine months to do another project and we would need to go

15   raise -- after that wonderful success, we would need to go

16   raise 6 to 15 million dollars and start immediately.  Like, it

17   just didn't seem possible.  With the debt stack, that left us

18   substantially insolvent.

19   Q.  So what did Alydian do?

20   A.  Went bankrupt.

21   Q.  Why?

22   A.  I think I just explained it.  It was insolvent.  Its

23   liabilities seemed to significantly exceed its earning

24   potential or assets.

25   Q.  In the weeks preceding the bankruptcy, did CoinLab invest

1   any more money into Alydian?

2   A.  Yeah.  As I said, it put in about another $500,000 just to

3   make sure that the parts and so on would get paid for.

4   Q.  Is that in addition to the one million it put in earlier?

5   A.  No, it's a total of about a million.

6   Q.  Okay.  So please direct your attention to the next tab in

7   the exhibit.

8   A.  This is 11, Marco?

9   Q.  Right, 11.

10  A.  Okay, thanks.

11  Q.  Actually-- yeah.

12  A.  I like 11.  I'm down with 11.

13  Q.  Just one second.

14          What's your understanding of CoinLab's obligations

15  under its agreement with Dalsa Barbour?

16  A.  Well, I believe that CoinLab is required to make best

17  efforts to mine bitcoins for Dalsa Barbour.  And I also believe

18  that once any mining operations that has commenced on ever

19  turned capital and operating expenses, then it is due the first

20  7,900 coins, give or take.

21          However, there's an out, which I believe is triggered

22  here, and the out is quite simple.  It says if there are

23  changes in technology or market forces outside of CoinLab's

24  control, then Dalsa Barbour takes all risks.  And so to my

25  mind, I don't think-- I don't believe, aside from Judge

DBKBBITH                    Vessenes - direct

1   Sweet's restraining order, that we owe Dalsa Barbour

2   anything.  I think it's almost incontrovertible that market

3   forces have made this an impossible business to pay back

4   capital and operating expenses.  That's my belief.

5   Q.  Now, today, and in their papers and in their exhibits, the

6   plaintiffs argued that CoinLab has not made best efforts to

7   mine bitcoins.

8           Would you agree with that?

9   A.  No.

10  Q.  I'd like you to take a look at what's behind Tab 11.

11  A.  Yeah.

12  Q.  Do you know what this is?

13  A.  Yes, I do.

14  Q.  What is it?

15  A.  This is some documents we prepared in response to the TRO

16  from Judge Sweet assessing some of the suggestions that Dan

17  Gallancy made in one of his many letters as to how we might

18  mine bitcoins.

19  Q.  Is it the normal course of your business to keep such

20  documents?

21  A.  Yes.

22  Q.  And do you maintain such documents in the normal course of

23  your business?

24  A.  Yes.

25          MR. SANTORI:  I'd like to introduce this as

DBKBBITH                    Vessenes - direct

1   Defendants' Exhibit 5.

2            THE COURT:  You're talking--

3            THE DEPUTY CLERK:  Six, I think.

4            MR. SANTORI:  Is it six now?

5            THE COURT:  Okay.  It's admitted.

6            MR. SANTORI:  Tab 11.

7            (Defendants' Exhibit 6 received)

8   Q.  Can you walk us through this chart, please?

9   A.  Yeah, absolutely.  So CoinLab has no mining equipment.  It

10  needs to somehow obtain mining equipment or otherwise purchase

11  bitcoin mining in some way.

12  Q.  But isn't Alydian a mining company?

13  A.  I said CoinLab.

14  Q.  But isn't Alydian a mining company?

15  A.  Yes, but CoinLab is not.  It's an incubator.  It just

16  starts businesses.

17  Q.  Does CoinLab have bitcoin mining hardware?

18  A.  No, it doesn't.

19  Q.  Could CoinLab right now begin to mine if it wanted to?

20  A.  No, it has no mining equipment right now.

21  Q.  Okay.  So please take us through what this chart means.

22  A.  So to my mind -- and I think that Dan Gallancy said

23  exactly this in his letter -- you could go buy some bitcoin

24  mining equipment and start; or, you know, there are fairly

25  sophisticated derivative-type things that lets you bitcoin mine

DBKBBITH                          Vessenes - direct

1    without hardware, and he listed some.

2          So we're not done with this.  I apologize that this is

3    not-- what I wanted was an expert, an independent expert, to

4    provide this testimony for us because I was very annoyed to

5    hear these intimations that, like, I'm a bad guy and I'm lying.

6    I thought, let's try and get an expert.  And I said in my

7    declaration that we tried five different people, each of whom

8    we offered $400 an hour to do this and we couldn't find anyone

9    in time.  So we were a little time crunched.  I worked through

10   some of the options given and then we picked the ones that we

11   thought most likely to return capital.

12         Now, Dan had suggested that we purchase eight hundred

13   terahashes of equipment, and so we used that number.  Now, when

14   you purchase bitcoin mining equipment, you worry about the

15   price and also the network growth rate.  In the last week, the

16   price has been between $350 and $900.  I mean, it probably

17   changed hundreds of dollars up and down while we're talking

18   here.

19         So I wanted to assess some different prices for the

20   returns because you have to think about that as well.  So if

21   you'd like, I can explain what each of these are.

22   Q.  Please do.

23   A.  Okay.

24   Q.  To start at the top, CEX.io sells realtime bitcoin mining.

25   You buy it and they provide hashes to you.  It's kind of like

DBKBBITH                        Vessenes - direct

1  purchasing an energy contract.  To buy eight hundred terahashes

2  there today would be $36.6 million.  Or I guess like yesterday,

3  is when I last updated these numbers, but it may be different

4  today.

5        The minimum growth rate we've seen in any two-week

6  period since the summer is 1.6 percent daily growth rate.  And

7  obviously the average is between 2 and 3.  So at those growth

8  rates, purchasing this raw hashing power managed by someone

9  else would have a negative return on capital, minus $16 million

10  to minus $25 million.  And that would be at-- again, I updated

11  the bitcoin price yesterday for that.  That's a $580 price.

12        CoinTerra is what, I would say, is the most likely

13  high-technology chip provider.  You can't actually buy their

14  mining rigs yet, not till March.  However, they're run by a

15  very sophisticated chip design team from Samsung and they quote

16  a price that you can purchase these mining rigs.  And so it

17  would be about $2.5 million to purchase these for March

18  delivery.

19        You could look at the sea of negative numbers, but we

20  didn't find any world in which running these for two years

21  would return capital.  They're all money losers.

22        Finally, one that I thought was particularly annoying,

23  it was suggested we purchase these really small USB sticks on

24  Amazon called ASICMiner.  And Mr. Gallancy claims this business

25  is a market leader.  They're actually out of business, so this

DBKBBITH                          Vessenes - direct

1    is old stock.  But were we to buy the ones he suggested and if

2    we had bitcoins at $900, which is the peak price we've ever had

3    for five minutes ever, it would cost you $96 million to buy

4    them and they would return, you know, hugely negative

5    numbers.

6          So to me mind -- and I think this is why I believe the

7    contract's impracticable -- I do not see-- no one has

8    suggested-- these are all suggestions from the plaintiff as to

9    how to do this, but no one has suggested a way that comes even

10   close to returning capital and operating expenses.  So I don't

11   know what we do.  I think the contract conceived of this exact

12   situation.  Market forces outside our control make it

13   impossible to make money bitcoin mining.

14   Q.  To wrap this up, I have to ask, did Alydian exercise its

15   best efforts to mine bitcoins?

16   A.  Yes.

17   Q.  How did it do that?

18   A.  It purchased bitcoin mining chips.  It had a chip design

19   project that purchased all the hardware that would be used to

20   create the bitcoin mining rigs.  It went out and recruited

21   engineers and hosting companies and so on and deployed them.

22   Q.  Did CoinLab exercise its best efforts to mine bitcoins?

23   A.  Yes, I believe so.  First by funding Alydian, when that was

24   the way we mined, and then, postbankruptcy and postrestraining

25   order, by attempting to assess the market and figure out if

DBKBBITH                    Vessenes - direct

1   there's a way to do this.

2   Q.  Did you ever rent warehouse space?  I'm sorry, did CoinLab

3   ever rent warehouse space on Alydian's behalf?

4   A.  Yeah, we've got office and warehouse space in Portland.

5   Q.  What does it mean to rent this space on Alydian's behalf?

6   A.  So we would enter into contracts and then we bill Alydian

7   for the net costs of the space.

8   Q.  Is that standard in the incubator industry?

9   A.  Yeah, it's very common to do that.

10  Q.  And can you give us an example?

11  A.  Yeah, like Rocket Internet does exactly that.  They'll put

12  staff and-- very similar to what we've done.  Staff, resources,

13  technology, all those things, and they'll charge it cost plus.

14  Q.  What ability did CoinLab have to mine bitcoins itself since

15  December 2012?

16  A.  We haven't had that ability.

17  Q.  And why not?

18  A.  We're a business incubator.  So to the extent we wanted to

19  mine, we launched a company and that's the company that does

20  the mining.

21  Q.  What ability does CoinLab have to mine bitcoins now?

22  A.  We don't have the ability to mine bitcoins right now.

23  Q.  What would it take if you did want to mine-- if you wanted

24  to deploy and manage bitcoin hardware?

25  A.  One thing, we'd have to recruit a new team because our

DBKBBITH                    Vessenes - direct

1   current team is working on Alydian.  We would have to-- or I

2   suppose if one of these things look like they made money that

3   didn't require a team, you could just -- you could buy it.

4   But, I mean, to do the kind of scale imagined to pay back these

5   9,000 bitcoins, you'd have probably a team of five or six

6   people, significant hosting arrangements.  Hundreds of

7   thousands of dollars a month in hosting costs and staff.

8   Q.  And how much would all that cost, roughly?

9   A.  I mean, I gave some estimates just here in this Exhibit 11

10  for a few different things.  It will vary depending on what you

11  do.

12  Q.  How much would it cost in electricity alone?

13  A.  Well, Alydian's electricity costs are like $200,000 a month

14  maybe right now just for the 220 terahashes.  That technology

15  could cost as much as a million dollars a month in electricity

16  if you were to scale it out to the amount that Dan Gallancy

17  wants.

18  Q.  Can't you just purchase a premade bitcoin mining rig?

19  A.  We assessed that here.  Yeah, you can go buy them.  They

20  just don't make money.  They won't pay you back.  So there's no

21  market assessment we've done or seen that says-- in fact,

22  actually we used-- we also use as a backup the calculator

23  Mr. Gallancy suggested to us, TheGenesisBlock.com.  None of

24  those show any return of capital either.

25  Q.  Mr. Reyhani said earlier that this preliminary injunction

DBKBBITH                        Vessenes - direct

1    would be in the public interest.

2              Do you agree?

3    A.  No, I don't.  He claimed that I had-- CoinLab had creditors

4    that I suppose the judge could force us to pay back.  We want

5    to pay them back.  We're actually barred from doing that now

6    because they mostly want bitcoins for their refunds and I think

7    that's outside the ordinary course of our business right now.

8    Q.  Is this action hurting Alydian's ability to repay its

9    creditors?

10   A.  Yeah.  We've got Hans sitting here all day.  He's sitting

11   here rather than working on the Alydian bankruptcy and

12   operations.

13   Q.  Can Alydian continue to mine and repay its creditors

14   without CoinLab's personnel?

15   A.  No.

16   Q.  Will existing employees with mining expertise stay if

17   CoinLab is continued to be subject to this lawsuit for however

18   many millions of dollars?

19   A.  It's speculative, but I don't think so.  I mean, they're

20   helping out Alydian for personal reasons now.  It's not

21   lucrative for them.  I don't imagine you do that forever, it's

22   very stressful, but I don't know.

23             MR. SANTORI:  Thank you, Mr. Vessenes.

24   CROSS-EXAMINATION

25   BY MR. REYHANI:

DBKBBITH                        Vessenes - cross

1   Q.  Good afternoon, Mr. Vessenes.

2   A.  Good afternoon.

3   Q.  My name is Bryan Reyhani.

4           Isn't it true that on October 29th, 2013, around the

5   time the parties were sitting here in court, that CoinLab

6   transferred bitcoins out of its bitcoin addresses?

7   A.  No.

8   Q.  It's not true?

9   A.  No.

10  Q.  Okay.  It's not true-- isn't it true that-- and I'm going

11  to use shorthand version -- that two addresses, 18AQ and 1G3C

12  are CoinLab addresses?

13  A.  No, they're not.

14  Q.  Whose addresses are they?

15  A.  I believe those are Alydian addresses.

16  Q.  Those are Alydian addresses?

17  A.  I believe so.

18  Q.  You understand that your counsel in a letter-- your

19  counsel, Mr. Townsend, represented on September 24th, 2013,

20  that CoinLab mined bitcoin to the following bitcoin addresses:

21  18AQ and 1G3C.

22          Was Mr. Townsend incorrect?

23          MR. SANTORI:  Objection, your Honor.  I believe what

24  Mr. Reyhani is referring to was settlement-- were letters sent

25  back and forth during settlement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBKBBITH                          Vessenes - cross

          MR. REYHANI:  We didn't settle anything on this

document.

          MR. SANTORI:  "CoinLab has no interest in engaging in

costly and protracted litigation in the United States District

Court for the Southern District of New York, but only" --

          THE COURT:  Sustained.

          MR. SANTORI:  Thank you, your Honor.

          MR. REYHANI:  Your Honor, there was no settlement

offer or anything like that in the document.

          THE COURT:  Sustained.

Q.  Are those not-- those are Alydian's addresses?

A.  I believe so.  I mean, you're kind of throwing this at me

here and I don't have all the books, but I believe so.

Q.  You reviewed Mr. Gallancy's affidavit.  Right?

A.  Yes.

Q.  Okay.  So two days before Alydian filed for bankruptcy,

Alydian was transferring out a thousand bitcoins to another

address?

A.  Yes, that's correct.

Q.  That address, the 12zZ address, isn't it true that that

address holds 15,000-plus bitcoins?

A.  I believe so.

Q.  Your counsel stated that the bitcoin mining process,

generally it's a money loser.  I quoted that.  You stated that

running a bitcoin mining pool won't make you enough money.

DBKBBITH                        Vessenes - cross

1              But you can generate bitcoins.  Is that not correct?

2    A.  Who do you mean by "you"?

3    Q.  Anyone who engages in mining could generate bitcoins.  Is

4    that right?

5    A.  Any party who engages in mining can generate bitcoins, that

6    is correct.

7    Q.  You testified before that CoinLab did, in fact, mine a

8    bitcoin or a part of a bitcoin during the course of this past

9    year.  Is that not correct?

10   A.  I said that it was possible.

11   Q.  How would that be possible?

12   A.  Well, perhaps some software, some hardware is being used in

13   tests.  Again, I speculate.  I have no knowledge of this, but

14   perhaps it was being used in a test environment and went to an

15   address controlled by CoinLab.  Perhaps.  But, again, I have no

16   knowledge that that happened.

17   Q.  So that would be some third party with software or hardware

18   that would be mining that bitcoin for CoinLab?

19   A.  It's totally speculative.  I'm not even sure I understand

20   what you're asking.

21   Q.  Can a third party mine-- can a third party be contracted to

22   mine bitcoins for CoinLab?

23   A.  Of course.

24   Q.  Okay.

25   A.  And, in fact, I've shown you some on the sheet we just gave

DBKBBITH                          Vessenes - cross

1   you.

2   Q.   Okay.   You stated that you're a serial entrepreneur?

3   A.   That's correct.

4   Q.   You signed contracts?

5   A.   Often.

6   Q.   Hundreds?   Thousands in your lifetime?

7   A.   I couldn't speculate.

8   Q.   Do you believe you're bound to what you sign?

9   A.   Of course.

10  Q.   Okay.   You testified earlier that the first bitcoin

11  contract or the bitcoin contract referred to as Defendants'

12  Exhibit 1 --

13  A.   This is the Daniel Gallancy contract.

14  Q.   I'm sorry.

15          Isn't it true, Mr. Vessenes, that the second contract

16  that Mr. Gallancy entered into with CoinLab was with the

17  CoinLab entity itself?

18  A.   CoinLab, Inc. you're referring to, I guess?

19  Q.   Yes.

20  A.   Yes.   We had two contracts with Dan Gallancy and the second

21  one was with CoinLab, Inc.

22  Q.   And isn't it true that monies were paid to CoinLab, Inc. in

23  consideration for those contracts?

24  A.   Yes.

25  Q.   Okay.   And isn't it true that the third contract, the

DBKBBITH                         Vessenes - cross

1   amended agreement, that CoinLab, Inc. was a party to that

2   agreement?

3   A.  Yes.

4   Q.  And isn't it true as an affiliate you are a party to that

5   contract as well?

6   A.  Me personally?

7   Q.  Yes.

8   A.  I don't think so.  I never signed it.

9   Q.  You are listed as an affiliate of CoinLab and Alydian and

10  CLI.  Right?

11  A.  I don't know what to say.  I'm not a lawyer, but I didn't

12  ever sign a personal contract with Dan.

13  Q.  Okay.  On behalf of CoinLab, Inc. or in general, you

14  believe you're bound to what you sign.  Correct?

15  A.  Yeah.  If I sign on behalf of a corporation, I'm binding

16  the corporation.  If I sign on behalf of myself, I believe I'm

17  binding myself.  Again, I'm not a lawyer, but that's what I

18  understand.

19  Q.  But CoinLab itself, if I'm understanding your testimony,

20  never had any intent to do any mining itself whatsoever?

21  A.  CoinLab, Inc. certainly intended to mine in the way that it

22  normally did business, through its subsidiary, Alydian.

23  Q.  But there's no reference to how CoinLab was intending to

24  mine other than the fact that CoinLab was going to mine.

25  Correct?

DBKBBITH                     Vessenes - cross

1   A.   I don't understand.  Which agreement are you referring

2   to?

3   Q.   Any of the agreements.

4   A.   We didn't talk methodologies, no.

5   Q.   Right.  So CoinLab is obligated to mine.  Correct?

6   A.   I believe given the provisos we discussed, that CoinLab,

7   Inc. is obligated to use best efforts for Dalsa Barbour.  But

8   there are significant provisos that are obviously a key.  I

9   mean, they're a key --

10  Q.   That's your opinion.  I respect that.  That's fine.

11          And best efforts is a step up from commercially

12  reasonable efforts.  Correct?

13  A.   So I'm told.

14  Q.   You're really, really obligated to do something.  Correct?

15  A.   Please, you're the lawyer.

16  Q.   And the TRO that Judge Sweet executed ordered that CoinLab

17  use best efforts to mine and deliver about eight thousand

18  bitcoins to Bitvestment.  Is that correct?

19  A.   That's correct, yes.

20  Q.   And you placed before the Court lots of analyses regarding

21  the costs of purchasing equipment and starting a whole new

22  venture that were going to cost tens of millions of dollars.

23  Is that correct?

24  A.   Some of the estimates were in that range; some were less.

25  Q.   Did you reach out to any third-party miners to contract

1    with them to mine for you?

2    A.  We got quotes from third-party miners.  For instance, on

3    that sheet is CEX.io.  That's a third-party miner.

4    Q.  You elected not to hire them to mine Bitvestment's

5    bitcoins?

6    A.  Because I don't have $36 million and I don't believe I'm

7    bound to that when it looks like it will lose $26 million.  I

8    did not contract with them.

9    Q.  There are no miners you could go to right this second and

10   say, I'm going to give you "X" dollars for you to mine

11   bitcoins?

12   A.  One could do that, for sure.

13   Q.  You did not do that.  Correct?

14   A.  That is correct.

15   Q.  You differentiated earlier between CoinLab mining and

16   CoinLab running a mining pool.

17   A.  Yes.

18   Q.  Mining pools generate bitcoins.  Is that correct?

19   A.  I guess it's a matter of semantics.  I think the miners in

20   the pools generate the bitcoins, not the pool itself.

21   Q.  Okay.  And you can incentivize those miners to mine

22   bitcoins for CoinLab.  Correct?

23   A.  Again, we have some speculation.  One could start a mining

24   pool and incentivize miners, yeah.

25   Q.  You did not on behalf of CoinLab incentivize miners to

DBKBBITH                         Vessenes - cross

1   operate a mining pool to produce bitcoins for Bitvestment.  Is

2   that correct?

3   A.  That's correct.

4   Q.  Did you make an announcement on your website, on any

5   website, or anywhere for that matter, saying that you needed

6   miners to begin to mine bitcoins for CoinLab immediately?

7   A.  No.

8   Q.  Because it would cost money?

9   A.  No, that's not why.

10  Q.  But third-party miners could have in the last three weeks

11  mined bitcoins for Bitvestment.  Is that correct?

12  A.  No, I don't believe they could have.

13  Q.  How many bitcoins have been mined-- 50,000-plus bitcoins

14  have been mined since the TRO was executed.  Is that correct?

15  A.  I don't know.

16  Q.  You don't know?

17  A.  No, I don't know.  It's changing all the time.

18  Q.  It's going up, right, the amount of bitcoins that are being

19  mined?

20  A.  Yes.

21  Q.  It's not going down.

22  A.  That's correct.

23  Q.  So if you contracted with any of those miners that were

24  fortunate enough to mine bitcoins, then CoinLab would have

25  bitcoins to deliver to Bitvestment.  Is that correct?

DBKBBITH                    Vessenes - cross

1   A.  That's not correct.  Aren't you curious why?

2   Q.  No.

3        So you indicated before that Cedar Hill is willing to

4   give you some financing.  Correct?

5   A.  That's correct.

6   Q.  And they were willing to give you what I believe to be

7   about a million dollars at the time or what I really believe to

8   be 10,000 bitcoins.  Correct?

9   A.  I believe that's the offer we discussed, yeah.

10  Q.  Okay.  And you turned down that offer?

11  A.  That's correct.

12  Q.  And you turned that offer down because you claim the terms

13  were too onerous?

14  A.  That's correct.

15  Q.  Okay.

16  A.  Well, not just-- there are other reasons.  For instance, it

17  was about a third of the capital we thought would be needed to

18  finish the Alydian deployment.  And it had requirements for

19  CoinLab that required, like, unbounded investment for CoinLab.

20  Neither of those were appealing to us.  We didn't think they

21  were workable.

22  Q.  So you chose not to accept Cedar Hill's money?

23  A.  Of course.

24  Q.  So you went to a third party to get financing.  Correct?

25  A.  That's correct.

DBKBBITH                         Vessenes - cross

1   Q.  And that's John Doe in this matter?

2   A.  I don't know.  You've named John Doe.  That party's X-ray

3   Holdings, PLC.

4   Q.  That's Brian Cartmell?

5   A.  Brian Cartmell owns X-Ray Holdings, PLC.

6   Q.  And what did Brian Cartmell do?

7   A.  He offered us a better deal.

8   Q.  What was that deal?

9   A.  I told Marco about it already.  The rough is 12,500

10  bitcoins in on a loan in exchange for 15,000 coins returned.

11  Q.  And what were Cedar Hill's offer?

12  A.  They wanted to put in only 10,000.  They required 20,000

13  bitcoins back and they required possible unlimited investment

14  from CoinLab, Inc.

15  Q.  Okay.  But you were having various discussions with Dan and

16  whomever else as to how to structure that deal.  Is that not

17  correct?

18  A.  Yeah.  I don't believe we got a signed term sheet from

19  them.

20  Q.  But there were ongoing discussions?

21  A.  Sure.

22  Q.  So if you would have taken the Cedar Hill money and Brian

23  Cartmell's money, wouldn't that have put CoinLab in a much

24  better position to mine bitcoins?

25  A.  I don't think so.  If you're going to lose money in an

DBKBBITH                    Vessenes - cross

1    investment, doubling your debt stack doesn't help you.  It just

2    makes things works.

3    Q.  But those 10,000 bitcoins that Cedar Hill would have given

4    you would have been worth anywhere between $5 and $10 million

5    today.  Correct?

6    A.  It's immaterial.  You would have had to spend them on

7    parts.  Isn't that what we're talking about?

8    Q.  You don't always have to pay for delivery up front.  Isn't

9    that correct?

10   A.  In our business you do.

11   Q.  There are terms with every vendor where you can negotiate.

12   Isn't that true?

13   A.  That is not true in our business.  Ask Hans about it.  We

14   have to pay cash up front for almost everything.

15   Q.  So Brian Cartmell or X-ray Holdings, whichever entity it

16   was, gave CoinLab the 12,5 and --

17   A.  No.

18   Q.  No?

19   A.  No.

20   Q.  What did they do?

21   A.  He gave it to Alydian.

22   Q.  He gave it to Alydian.

23   A.  He invested it in Alydian.

24   Q.  Okay.  And he's the 35 percent owner of Alydian?

25   A.  He's also the 35 percent owner of Alydian.

DBKBBITH                          Vessenes - cross

1    Q.  Okay.  But had you taken Cedar Hill's money, irrespective

2    of the terms, worked it out, you would have been in a better

3    position to either buy the rigs, outsource it, do whatever it

4    was to generate bitcoins?

5    A.  I disagree.  I mean, you imagine a scenario that doesn't

6    exist.  We never had terms from Cedar Hill that were anywhere

7    near as favorable as these terms.  How can you speculate?

8    Q.  Had you taken Cedar Hill's money, you would have had at

9    least another million dollars with which to play to facilitate

10   the production of bitcoins.  Is that not correct?

11   A.  Perhaps, but we would have had many other commitments as

12   well.

13   Q.  And had you taken that money, you would have actually put

14   all the prebuyers -- it would have been in the best interests

15   of all the prebuyers, because then the bitcoins would have been

16   made a little faster--

17   A.  No, that's incorrect.

18   Q.  That's incorrect?

19   A.  Yeah.

20   Q.  Isn't it true you didn't take Cedar Hill's money because it

21   would have pushed you down in the stack of bitcoins?

22   A.  No.  Who's "you" by the way?

23   Q.  You personally.

24   A.  No.  I'm a creditor to Alydian now personally, but it was

25   immaterial.

1    Q.  Isn't it true that best efforts would have required you to

2    take in Cedar Hill's money and put it to use?

3    A.  No, I don't think so.

4    Q.  You indicated that CoinLab and Alydian are two separate

5    companies.  Correct?

6    A.  That's correct.

7    Q.  Different corporate structure?

8    A.  Yes.

9    Q.  Completely different?

10   A.  Yes.

11   Q.  Different tax I.D. numbers?

12   A.  Yes.

13   Q.  Okay.  You claim in among the papers that CoinLab would

14   purchase equipment and then bill it to Alydian.

15   A.  That's correct.

16   Q.  Is that correct?

17   A.  Yes.

18   Q.  And how much were those expenses that Alydian had to pay

19   CoinLab for that equipment?

20   A.  Millions of dollars, I think.  I believe.  I'm not the CFO.

21   In that range.

22   Q.  So essentially it was CoinLab's billing to Alydian for

23   these purchases that put Alydian into bankruptcy?

24   A.  If you imagine parts are free and inventory is free.  I

25   mean, what do you mean?  No.  It's the purchasing of parts that

DBKBBITH                         Vessenes – cross

1  did not generate enough money to finance the debt stack that

2  drove it into bankruptcy.

3  Q.  Alydian's equipment to this day can generate bitcoins.

4  Correct?

5  A.  That is correct.

6  Q.  At the time you and Mr. Gallancy first discussed

7  business opportunities, isn't it true that you represented to

8  him that it was CoinLab's goal to take over 90 percent of the

9  network?

10  A.  No.

11  Q.  You never said that?

12  A.  No.

13  Q.  You are intimately aware of the changes in chip size?

14  A.  Probably more than you.

15  Q.  I would suspect.

16       So you've been aware over the course of the past year

17  of the change from 110 to 65 to 28.  Is that correct?

18  A.  Yes.

19  Q.  Even prior to the August amended agreement with Dalsa

20  Barbour/Bitvestment.  Correct?

21  A.  I don't know about Bitvestment, but we certainly new

22  28-nanometer chips were coming.

23  Q.  And you knew that before the amended agreement?

24  A.  Yes.

25  Q.  Okay.  How many bitcoins do you have personally?

DBKBBITH                         Vessenes – cross

1        MR. SANTORI:  Objection.  Relevance, your Honor.

2        THE COURT:  Sustained.

3   Q.  Have you mined bitcoins personally?

4        MR. SANTORI:  Objection.  Relevance, your Honor.

5        THE COURT:  Overruled.

6   A.  Yes.

7   Q.  How have you done that?

8   A.  The last time I mined it, you could use a graphics card, a

9   3D card.  It would maybe cost $150 at Best Buy.  This was

10  sometime ago.  2011 probably.  2012?  I don't know.  Early 2012

11  maybe.  Something like that.  You run it in your office and it

12  makes, you know, like .024 bitcoins a day.  It varies every

13  day.

14  Q.  Okay.  If I could turn your attention back to Exhibit 5

15  that your counsel previously showed you before.  D-5.

16  A.  Exhibit 5?

17  Q.  Yes.

18  A.  Tab 5?

19  Q.  Tab 10.

20  A.  Tab 10.  Okay.  Yes, the board meeting.  Is that what

21  you're referring to?

22  Q.  If I could turn your attention to the page Bates stamped

23  641.

24  A.  Sure.

25  Q.  You see the middle section which says "Debt Summary"?

DBKBBITH                          Vessenes – cross

1   A.  Yes.

2              MR. SANTORI:  Which page are we on?

3              MR. REYHANI:  641.

4              MR. SANTORI:  Thank you.

5   Q.  And there's three lists-- there's three entities or

6   individuals listed:  Cartmell, Dan Gallancy, and prebuyers.

7   A.  Yes.

8   Q.  You see the last column, bitcoins to be returned to

9   Cartmell were about 1.8 million and bitcoins to other prebuyers

10  were $950,000?

11  A.  Uh-huh.

12  Q.  And Dan's is specifically omitted?

13  A.  Uh-huh.

14  Q.  Isn't it true you never intended to return the bitcoins to

15  Bitvestment?

16  A.  Bitvestment I don't know anything about.

17  Q.  To Dan.

18  A.  To Dan Gallancy?  Now, in fact, the column right next to it

19  has some numbers for him.

20  Q.  But you ran a scenario where you explicitly were going to

21  exclude Dan from receiving those bitcoins.

22  A.  Yeah.  I believe that the business was impracticable.  He

23  wouldn't be owed anything.  And that's unlike the contract he

24  got out of, which allowed him rescission rights basically.  But

25  he changed his contract.  You can see there we're upholding all

DBKBBITH                          Vessenes - cross

1  those other contracts.

2  Q.  Okay.

3          MR. REYHANI:  Your Honor, if I could have one minute,

4  please.

5          THE COURT:  Sure.

6          (Pause)

7          MR. REYHANI:  Just one or two more questions.

8  Q.  Isn't it true, Mr. Vessenes, that you could put on your

9  website or start another website or whatever's most practical,

10  you could put an advertisement out there to say I'm seeking

11  miners to mine bitcoins for me and that probability-wise,

12  depending on their computing power, bitcoins would be produced

13  in a matter of days?

14  A.  Bitcoins would be produced.  Yes, I think I would agree

15  with that statement.

16  Q.  And if CoinLab collected those bitcoins from those miners,

17  those bitcoins could be transferred rather immediately to

18  Bitvestment.  Is that not correct?

19  A.  No.  Only after any expenses had been paid would coins go

20  to Dalsa Barbour per our agreement.

21  Q.  That's your interpretation of it.  I'm just saying --

22  A.  That's a pretty plain language of the contract.  Dan read

23  exactly that.

24  Q.  Again, irrespective of that --

25  A.  Okay.  All right.  So you grant me that there may have been

1   some expenses associated with doing this mining?

2   Q.  I'm not granting you anything.  I'm asking you a simple

3   question:  If CoinLab puts out a little advertisement that says

4   seeking miners, pays them something, bitcoins can be produced

5   rather immediately and turned over to Bitvestment?

6   A.  No.  We've got-- I mean, what do you mean "can"?  Under our

7   contract?  I don't understand.

8   Q.  I'm just asking you in general.  If you took-- forget about

9   the contract.

10  A.  Do you --

11  Q.  Forget about the contract.

12  A.  So in a world with no contract.  Yes, one can absolutely --

13  Q.  Let me ask the question.  Assuming arguendo --

14  A.  I don't know what "arguendo" means.  I'm sorry.

15  Q.  For the sake of argument.

16          If you put out a website or advertisement that said

17  I'm seeking miners to mine for me--

18  A.  I'm with you so far.

19  Q.  -- and they mined bitcoins for you--

20  A.  Yes.

21  Q.  -- you would be able to turn them over to any other third

22  party if you were ordered to.

23  A.  I agree, it's a money.  You can move it to anyone you

24  wanted.

25  Q.  You agree that it could get transferred?

DBKBBITH                    Vessenes - cross

1   A.  I agree.

2           MR. REYHANI:  Nothing further at this time.

3           MR. SANTORI:  I have only a couple of questions on

4   redirect, your Honor.

5   REDIRECT EXAMINATION

6   BY MR. SANTORI:

7   Q.  Mr. Reyhani mentioned two bitcoin addresses -- I believe

8   they were 12zZ and one other one -- that were holding 15,000

9   bitcoins.

10          Where do those bitcoins come from?

11  A.  Well, they're mostly-- they're purchased.  Actually they're

12  from-- CoinLab purchased all those bitcoins, is probably the

13  best way to say it.

14  Q.  Did CoinLab mine those bitcoins?

15  A.  No, it did not.

16  Q.  Did Alydian mine those bitcoins?

17  A.  Alydian mined some of them, yes, and used them to pay for

18  parts, but the vast majority of them were from Brian Cartmell's

19  investment.

20  Q.  Does the contract obligate you to pay Dalsa Barbour your

21  bitcoins?

22  A.  No.

23  Q.  Does it obligate you to use best efforts to mine bitcoins

24  and then send them to Dalsa Barbour?

25  A.  Once capital and operating expenses are paid, yes, provided

1    that there are not market forces outside our control that make

2    it impracticable.

3    Q.  Mr. Reyhani put to you a hypothetical:  Why don't you just

4    make an announcement to all the bitcoin miners in the world to

5    come mine for you.

6            Why didn't you do that?

7    A.  Well, any business activity like that, especially when it

8    looks like it might take millions of dollars, it might lose you

9    millions of dollars, needs some analysis, I think, to just do

10   your fiduciary duty for a corporation.  So we need to know if

11   that's a good idea before we do that.

12   Q.  But do you know if that would be profitable or not?

13   A.  I don't believe it would be from the knowledge we have

14   right now.

15   Q.  Why don't you believe it would be profitable?

16   A.  Just from the analysis we have done, bitcoin mining costs

17   more to procure than it looks like it will return.

18   Q.  Mr. Reyhani put to you another hypothetical:  Why don't you

19   just seek out contracts with other miners to mine for you and

20   pay those miners to do it.

21           Why didn't you do that?

22   A.  Same thing.  There's a market price for bitcoin mining

23   right now and it did not look that the results of that mining

24   will return capital.

25   Q.  Mr. Reyhani also talked about a change in chip size.  I

DBKBBITH                        Vessenes - redirect

1   shouldn't say chip size.  I'll withdraw that.

2           Mr. Reyhani talked about a change in chip

3   architecture, and then he asked you if you knew about that

4   change in chip architecture.

5           Was that change within your control?

6   A.  No.

7   Q.  Was it within CoinLab's control?

8   A.  No.

9   Q.  Was it within Alydian's control?

10  A.  No.

11  Q.  Mr. Reyhani also talked about you mining individually

12  today and the way that you mined in 2011.  How did you mine in

13  2011?

14  A.  I purchased a graphics card from Best Buy.

15  Q.  And how much did that cost you?

16  A.  It was $150.  It was fun.

17  Q.  Would it be profitable if you did that today?

18  A.  No.

19  Q.  Would it have been profitable in August?

20  A.  No.

21  Q.  Mr. Reyhani also pointed out that there was a missing entry

22  for Dan Gallancy in the CoinLab board presentation.

23          Why was there a missing entry in the board

24  presentation?

25  A.  Well, as I was saying, it looked that the business might be

DBKBBITH                       Vessenes - redirect

1   impracticable.  You know, I had a fiduciary duty to the

2   corporation.  We've got to figure out how to do the best thing

3   for the corporation.  So if there's a contract that looks like

4   there's nothing due, then we need to estimate results of that.

5   Q.  Did Dan ever threaten to sue you?

6   A.  Yes.

7   Q.  Did he threaten to sue you before that presentation?

8   A.  I don't remember the dates.  I think it's quite likely,

9   though.

10          MR. SANTORI:  Thank you.  No more questions.

11          THE WITNESS:  Can I get down?

12          THE COURT:  Just a minute.

13          THE WITNESS:  Okay.

14   RECROSS EXAMINATION

15   BY MR. REYHANI:

16   Q.  Just so we're abundantly clear, when you assessed the

17   situation of going to third-party miners, you didn't do it

18   because the returns to CoinLab would not be there.  Correct?

19   A.  That's not correct.

20   Q.  That's not correct.

21          But they would still be mining bitcoins for CoinLab.

22   Correct?

23   A.  One could pay bitcoin miners to mine coins for CoinLab,

24   yes.

25   Q.  But you did not see the return on capital for CoinLab.

DBKBBITH                    Vessenes - recross

1   Correct?

2   A.  I'm not sure I understand.  I think no model we saw showed

3   that the amount that that cost would ever be paid back.

4   Q.  All right.  So CoinLab would be out-of-pocket money.

5   A.  I would presume so.

6           MR. REYHANI:  Okay.  Nothing further, your Honor.

7           MR. SANTORI:  Nothing further, your Honor.

8           THE COURT:  Thank you, sir.  You're excused.

9           THE WITNESS:  Thank you, your Honor.

10          (Witness excused)

11          MR. TOWNSEND:  Your Honor, defendants call Hans Olsen

12   to the stand.

13    HANS OLSEN,

14       called as a witness by the Defendants,

15       having been duly sworn, testified as follows:

16          THE DEPUTY CLERK:  Please state your full name and

17   spell your first name and last name slowly for the record.

18          THE WITNESS:  Name is Hans Olsen.  First name H-a-n-s,

19   last name O-l-s-e-n.

20          THE DEPUTY CLERK:  Thank you, Mr. Olsen.  Please be

21   seated.

22          MR. TOWNSEND:  Your Honor, may I approach with the

23   binder?

24          THE COURT:  Yes.

25   DIRECT EXAMINATION

DBKBBITH                          Olsen - direct

1    BY MR. TOWNSEND:

2    Q.  Good afternoon, Mr. Olsen.  Can I draw your attention to

3    the Tab 12 of the binder?

4    A.  Okay.

5    Q.  Do you recognize this document?

6    A.  I do.

7    Q.  What is this?

8    A.  It is the summary of returns for contemplated --

9    Q.  No, I'm sorry.  You're on Tab 11, I think.  Tab 12 should

10   be your CV.

11   A.  Oh, sorry.  Yes, that's my CV.

12           MR. TOWNSEND:  Barring any objection, move to admit

13   Mr. Olsen's CV as Defendants' Exhibit 6.

14           THE COURT:  Seven.

15           MR. REYHANI:  Seven.

16           THE COURT:  It's admitted.

17           (Defendants' Exhibit 7 received)

18   Q.  Mr. Olsen, can you describe your educational background?

19           THE COURT:  Maybe we can speed this up just a little

20   bit.

21           MR. TOWNSEND:  Sure.

22           THE COURT:  You've given me a declaration, Mr. Olsen.

23           Do you affirm all of the statements in that

24   declaration?

25           THE WITNESS:  I do.

DBKBBITH                    Olsen - direct

1          THE COURT:  Thank you.

2          Anything you want to tell us in addition to that?

3          THE WITNESS:  Well--

4          THE COURT:  No, no.  Any questions with respect to

5     additions?

6          MR. TOWNSEND:  I would just stay at the high level.

7     BY MR. TOWNSEND:

8     Q.  Mr. Olsen, in your experience, how long does it take to

9     launch a bitcoin mining operation?

10    A.  With today's requirements for the technology, to do a

11    reasonably effective mining operation, you would take anywhere

12    from nine to 18 months, depending on how you approach it.

13    Q.  And how would you suggest that it be approached given

14    today's technology?

15    A.  Well, if you have design teams, if you have technology

16    access, you may be able to do it in a nine-month period to get

17    to the ASIC device.  After that, then you have to put it in

18    your hosting environment and start your mining operation.

19         For most conventional models, would take you like 12

20    to 15 months, but in the best case you might be able to do it

21    in nine months.

22         THE REPORTER:  Did you say ASIC?

23         THE WITNESS:  ASIC, A-S-I-C.

24         THE COURT:  What does that stand for?

25         THE WITNESS:  It stands for application-specific

DBKBBITH                    Olsen – direct

1   integrated circuit.  And it's really used today in the bitcoin

2   community wrongfully.  It's not really an ASIC.  An ASIC is a

3   term that was used in the late '80s and the '90s for custom

4   devices.  Today an ASIC, as it's referred to in the bitcoin

5   community, is really a customizing.

6   BY MR. TOWNSEND:

7   Q.  And have you observed in your experience in the bitcoin

8   mining industry changes in technology that have affected the

9   practicability and viability of bitcoin mining?

10  A.  Yes, I have.  When I first became involved with bitcoins,

11  the technology was at 110-nanometer technology.  It's rapidly

12  progressed over the last 12 months to a 28-nanometer

13  technology, which is hydrofast.  Even in the technology

14  communities that we're in today with semiconductors, technology

15  progressions typically do not happen that quickly.  There's

16  been a lot of developments, a lot of mining efforts going into

17  bitcoin mining and the technology accelerations have been

18  unprecedented.

19  Q.  And in addition to the technology acceleration in the

20  chips, are there other technology accelerations that were

21  unanticipated?

22  A.  Well, I think the capital required for hosting these

23  advanced technologies is, again, happening faster than typical

24  and certainly faster than anticipated.

25  Q.  And in your experience, can you buy mining equipment, other

DBKBBITH                    Olsen – direct

1   capital and operational expenditures, on credit for a bitcoin

2   mining operation?

3   A.  Well, in our case we're not able to do that.  We have been

4   able -- with one exception.  We are required to pay for all our

5   material up front.  In part due to concerns about the bitcoin

6   business, bitcoin community; in part due to the lack of capital

7   that CoinLab/Alydian has had available to it.

8   Q.  And can you describe to me, to the Court, briefly the

9   complications associated with cooling bitcoin mining rates?

10  A.  Yeah.  The operation or the intricate circuits in a bitcoin

11  mining application is unusual in the way that it is operating

12  24 hours a day, constantly.  It is on all the time.  Most

13  semiconductor devices are not operating at its peak performance

14  constantly.  In a mining application, it operates at 100

15  percent constantly.  It requires levels of cooling, again, that

16  are unprecedented.  They only see similar in other server

17  applications.  But even in server applications, the power

18  requirement is less than half, sometimes a third, of what is

19  required for a mining operation.  And that places really,

20  really stringent requirements for cooling which can only be

21  attained in a data center environment, which brings additional

22  cost and complexity into operating a mining business.

23  Q.  And, in fact, you have to have a special section of the

24  data center that has additional cooling.  Is that right?

25  A.  That's how we've been able to work it out with our data

DBKBBITH                    Olsen - direct

1   centers, is that we have special sections of the data center

2   that has additional cooling over and above what's normally

3   provided.

4   Q.  And despite the additional cooling, you've had fires.  Is

5   that right?

6   A.  Yes.

7   Q.  Can you describe those fires?  Or maybe it's just one fire?

8   A.  One fire.

9   Q.  Okay.

10  A.  In spite of the cooling, some of the cooling design in the

11  initial stages was not adequate to sufficiently cool the

12  equipment.  And, in fact, it caused some of the insulation on a

13  wiring harness to catch on fire.

14  Q.  And did that destroy some of the mining rigs?

15  A.  It did.

16  Q.  And is there a relationship between the cooling obligation

17  and the cooling requirements and the chip size?

18  A.  There is.  The older the technology-- and here, when you

19  say "older," it's 110 nanometer and 65 nanometer.  The older

20  the technology, the more power is required.  The advanced

21  technology, 28 nanometer, requires less cooling.

22  Q.  But it requires more electricity.  Right?

23  A.  But it requires-- it requires -- to get the same amount of

24  mining capacity, it does require more, yeah.

25  Q.  And the Court asked the question earlier about whether or

DBKBBITH                    Olsen - direct

1   not mining machines were connected to the internet.

2           Are they connected to the internet?

3   A.   They are, yes.

4   Q.   But they're not connected to the internet in the same way

5   that a normal server would be.  Is that correct?

6   A.   The physical connection is similar.

7   Q.   Is similar.  Okay.

8   A.   Right.

9   Q.   Did you meet with Mr. Gallancy in the course of his due

10  diligence on behalf of Cedar Hill, Crystal Island?

11  A.   I did.

12  Q.   And can you describe those meetings?

13  A.   We met in mid-August as part of the due diligence efforts

14  on behalf of Cedar Hill.  And I participated, together with

15  others of staff members, in a session over a period of two,

16  three days.

17  Q.   And did you discuss financial models with him at that

18  time?

19  A.   We did.

20  Q.   And to your recollection, did those financial models

21  contemplate that the proceeds from bitcoin mining would pay for

22  capital and operational expenditures?

23  A.   Correct.

24  Q.   And do your vendors generally accept bitcoins for

25  equipment and hosting and other operational and capital

DBKBBITH                    Olsen - direct

1   expenditures?

2   A.   None that I'm aware of.

3   Q.   So you're required to convert bitcoins to cash in order to

4   pay your vendors.  Is that right?

5   A.   Correct.

6           THE COURT:  Tomorrow, 10:00.  Thank you.

7           MR. TOWNSEND:  Thank you, your Honor.

8           MR. REYHANI:  Thank you, your Honor.

9           (Adjourned to November 21, 2013, at 10:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3     DANIEL H. GALLANCY

4     Direct By Mr. Townsend . . . . . . . . . . . .12

5     PETER JOSEPH VESSENES

6     Direct By Mr. Santori  . . . . . . . . . . . .31

7     Cross By Mr. Reyhani . . . . . . . . . . . . .71

8     Redirect By Mr. Santori  . . . . . . . . . . .90

9     Recross By Mr. Reyhani . . . . . . . . . . . .93

10    HANS OLSEN

11    Direct By Mr. Townsend . . . . . . . . . . . .95

12                        DEFENDANT EXHIBITS

13    Exhibit No.                               Received

14     1    . . . . . . . . . . . . . . . . . . . .44

15     2    . . . . . . . . . . . . . . . . . . . .49

16     3    . . . . . . . . . . . . . . . . . . . .52

17     4    . . . . . . . . . . . . . . . . . . . .56

18     5    . . . . . . . . . . . . . . . . . . . .58

19     6    . . . . . . . . . . . . . . . . . . . .65

20     7    . . . . . . . . . . . . . . . . . . . .95

21

22

23

24

25