UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| BITVESTMENT PARTNERS LLC,       : | |
|                 Plaintiffs,   : | 13 CV 7632 (RWS) |
|                             : | |

**PLAINTIFF BITVESTMENT**
**PARTNERS LLC'S PROPOSED**
**FINDINGS OF FACTS AND**
**CONCLUSIONS OF LAW**

-against-

COINLAB, INC., CLI HOLDINGS, INC., ALYDIAN
INC., PETER VESSENES and JOHN DOE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFF BITVESTMENT PARTNERS LLC'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This preliminary injunction motion having been heard before the Honorable Robert W. Sweet, United States District Judge, beginning on November 20, 2013 and continuing until November 21, 2013, and this Court having received and considered the testimony of the witnesses at the hearing (Daniel H. Gallancy, Peter Vessenes, and Hans Olsen) and the documents and things received in evidence:

NOW, THEREFORE, this Court does hereby set forth its finding and conclusions of law:

**PROPOSED FINDINGS OF FACT**

1. **The Parties**

    1.    Plaintiff Bitvesment Partners LLC ("Bitvestment") is a New York corporation. Dkt No. 1, Complaint ¶ 19.

    2.    Defendant CoinLab Inc. ("CoinLab") is a Delaware corporation with its principal place of business in Washington.  Dkt No. 30, Answer ¶ 21.

3.      Defendant CLI Holdings d/b/a Alydian ("Alydian") is a Seychelles corporation with operations in Oregon and Washington. Dkt No. 30, Answer ¶ 22-23.

4.      Defendant Peter Vessenes ("Vessenes") is an individual residing in Washington state, and he is the Chairman of Alydian and the Chief Executive Officer of CoinLab.  Dkt No. 30, Answer ¶ 20; Dkt. No. 24 Transcript of 11/21/2013 Preliminary Injunction Hearing ("Dkt 24") at 32:7-9 Vessenes Direct; Dkt 24 at 32:3-5 Vessenes Direct (noting that Vessenes also is the chairman and founder of the Bitcoin Foundation, which is the global trade organization for Bitcoin); *see* also Declaration of Bryan Reyhani dated January 9, 2014 ("Reyhani Decl.") at Exhibit A, U.S. Bankruptcy Court, Washington State, *In re CLI HOLDINGS, INC. dba ALYDIAN*, No. 13-19746-KAO ("Bankruptcy Proceeding"), Dec. 3, 2013 341 Meeting of Creditors Tr. ("Bankruptcy Tr.") 65:16-24 (Vessenes is the only board member of CoinLab and the only board member of Alydian)).

5.      Alydian is in the business of Bitcoin mining.  Dkt 24 at 34:2-3 Vessenes Direct.

6.      Alydian was incubated by CoinLab in the second half of 2012, by which CoinLab sourced a business model, recruited a team, and found a capital partner to launch the business. Dkt 24 at 42:7-10 Vessenes Direct.

7.      CoinLab owns 65 percent of the common stock of Alydian. Dkt. 24 at 32:12-14 Vessenes Direct.

**2.  Bitcoin**

8.      Bitcoin is an algorithm-based mathematical construct that is used as a form of digital, Internet-based currency.  See Aff. of Daniel H. Gallancy dated October 28, 2013 ("Gallancy TRO Aff."), ¶¶ 5, 7, Ex. A Summary of the Bitcoin Mining Process.

9.      The same algorithm has been in place, SHA-256, the entire time for the Bitcoin

protocol – it has been used in Bitcoin mining since its inception in 2009. Dkt. No. 26 Transcript

of 11/22/2013 Preliminary Injunction Hearing ("Dkt 26") at 143:4-17 Gallancy Direct; Dkt 26 at

122:1-24 Olsen Cross.

10.     All of the chips used in Bitcoin mining -- whether 28 nanometer, 65 nanometer, or

110 nanometer -- all run the same SHA-256 algorithm.  Dkt 26 at 143:4-17 Gallancy Direct; Dkt

26 at 122:1-24 Olsen Cross.

11.     Although Bitcoin is referred to as an Internet-based currency, it is not recognized

as a currency by the government.  Dkt 24 at 28:21-23 Gallancy Direct (noting that, although at

times bitcoins can be exchanged for dollars, "[t]hat is not necessarily the case at all times and is

not necessarily the case in the future); Dkt 24 at 30:3-7 Gallancy Direct (the Department of

Treasury treats Bitcoin as a money transmission service); Dkt 24 at 33:16-17 Vessenes Direct

(acknowledging Bitcoin is an open financial network which requires the assistance of miners to

secure it).

12.     The mechanism by which a bitcoin is issued is known as mining.  Gallancy TRO

Aff. ¶ 5; Dkt 24 at 33:16-17 Vessenes Direct ("Bitcoin mining is the act of securing the Bitcoin

network.  You do some hard cryptographic problems and math problems, and you help provide

overall security for this open financial network.")

13.     Due to the inherent difficulty of unlocking new bitcoins, mining has always been

a costly activity because of the computer platform required to mine for bitcoins.  Gallancy TRO

Aff. ¶ 7, Ex. A.

14.     There are a finite amount of bitcoins to be mined.  Gallancy TRO Aff., ¶ 6.  There

are approximately 11.91 million bitcoins currently in circulation.  *Id.*  There can be no more than

a total of 21 million Bitcoins issued.  *Id.*; Dkt 24 at 37:24-38:2 Vessenes direct (the Bitcoin network promises to only issue 21 million or so bitcoins).

15.     Bitcoins are wildly speculative.  *See* Aff. of Daniel H. Gallancy dated Nov. 19, 2013 ("Gallancy PI Aff.), ¶¶ 40-47; Dkt 24 at 66:15-18 Vessenes Direct ("In the last week, the price has been between $350 and $900.  I mean, it probably changed hundreds of dollars up and down while we're talking here.).  In fact, the value of Bitcoin over one year [generally, the year 2013] has ranged from a low of $11.57 to $900.98.  Gallancy PI Aff. ¶ 45.

16.     Bitcoins trade on a number of exchanges and the prices vary greatly across the board, with pricing across different exchanges varying by a significant.  Moreover, since Bitcoin is based on a software protocol, certain bitcoins can have traits that differ from other bitcoins, such as being attachable to specific objects and real properties rendering them to be of greater value than an ordinary bitcoin.  *Id.* ¶ 44.  Mastercoin and BitcoinX.org are examples of projects that specifically use the Bitcoin protocol and network for such purposes.  So-called "Mastercoins" were recently trading at twice the value of bitcoins.  *Id.*  j

17.     In addition, Bitcoin is vulnerable to a cyber-attack, and its existence in the future is unknown.  Dkt 24 at 37:12-13 Vessenes direct (the Bitcoin network is vulnerable to a cyber attack); Dkt 26 at 154:2-13 Gallancy Direct (a cyber attack on the Bitcoin network is not akin to a cyber attack on a credit card company because credit cards are businesses, dealing in U.S. dollars "which are backed ultimately by the U.S. government.  If Bitcoin were cyber attacked, there's no way necessarily to recover.  That's the end.  It's good-bye."); Dkt 26 at 154:24-155:6 Gallancy Direct (Mr. Vessenes has made public statements regarding this at the Bitcoin Foundation conference in May.  "He was on a security panel and he discussed precisely this

issue of the potential for a 51 percent attack to happen.  I think he described it as — he described it as totally doable.").

3. **The Parties And Their First Two Agreements**

18.     CoinLab operates in the Bitcoin industry.  To fund its Bitcoin mining, CoinLab entered into contracts with individuals and entities by which such individuals and entities paid CoinLab to mine a certain number of bitcoins.

19.     Alydian also entered into such Bitcoin mining contracts.  Dkt 24 at 42:11-20 Vessenes direct ("through the spring of 2013 Alydian knew it needed more money so it sold some contracts to what we call prebuyers, they prepurchased bitcoins from us to finance the project raising about $1.4 million at that time.")

20.     CoinLab and Alydian entered into mining agreements with Daniel H. Gallancy ("Gallancy") dated December 2012 and March 2013 for the production of bitcoins.  *See* Gallancy TRO Aff. ¶¶ 8-12; Dkt 24 75:20-76:3 Vessenes Cross (stating there were two contracts and money was paid in consideration for those contracts.); Dkt 26 156: 8-23 Gallancy Direct (stating that he entered into such contracts "[b]ecause Mr. Vessenes represented to me on multiple occasions that he would be 90 -- nine-zero -- percent of network capacity.").

21.     On December 13, 2012, Gallancy entered into a contract with Alydian (the "First Services Agreement").  *See* Ex. B to Gallancy TRO Aff., a true and correct copy of the First Services Agreement.

22.     Under the terms of the First Services Agreement, Gallancy agreed to pay and did in fact pay Alydian $50,000 in consideration for Alydian agreeing "to make commercially reasonable efforts to mine 6734.00673499673 Bitcoins" on behalf of Gallancy, with the first

delivery of bitcoins occurring on a monthly basis after July 1, 2013.  Gallancy TRO Aff. ¶¶ 8-9, Ex. B.

23.     The parties entered into a second agreement on March 8, 2013 (the "Second Services Agreement").  The Second Services Agreement was between CoinLab and Gallancy. *See* Ex. C to Gallancy TRO Aff., a true and correct copy of the Second Services Agreements.

24.     Under the terms of the Second Services Agreement, Gallancy agreed to pay, and did in fact pay, CoinLab $25,000 in consideration for CoinLab agreeing to "make commercially reasonable efforts to mine 1,250.00000000 Bitcoins" on behalf of Gallancy with the first delivery occurring on a monthly basis after August 1, 2013.  Gallancy TRO Aff. at ¶¶ 10-11, Ex. D, Ex. E.

25.     On or about August 14, 2013, by virtue of two Assignment and Assumption Agreements, Gallancy assigned both the First and Second Services Agreement to Dalsa Barbour LLC n/k/a Bitvestment.  Bitvestment assumed, among other things, all of Gallancy's rights related to the First and Second Services Agreement.  *See* Ex. D and E to Gallancy TRO Aff., true and correct copies of the August 14, 2013 Assignment and Assumption Agreements.

26.     Through Peter Vessenes's signatures on the Assignment and Assumption Agreements, CoinLab and Alydian expressly agreed to the terms of the assignments.  Gallancy TRO Aff., Ex D-E.

**4.  <u>The Parties Enter Into The Amended Agreement</u>**

27.     In August 2013, CoinLab and Alydian sought an additional, substantial amount of financing for a new investor in Alydian.  Gallancy TRO Aff. at ¶ 16; Dkt 24 at 45:18-46:9;  Dkt 24 at 80:3-82:23 Vessenes Cross.

28.     Gallancy had a relationship with an entity, Crystal Island, that was considering providing capital to CoinLab and/or Alydian.   Gallancy TRO Aff. ¶¶ 16-17.

29.     In consideration for Gallancy's efforts in conducting in-depth due diligence of CoinLab and Alydian over the course of two weeks in an effort to procure capital for such entities, CoinLab and Alydian entered into a third agreement with Bitvestment on August 14, 2013, the Amended Agreement.  Gallancy TRO Aff., Ex. H; Dkt 24 75:20-76:3 Vessenes Cross.

### A. CoinLab And Alydian Knew Of Alydian's Precarious Finances Prior To Entering Into The Amended Agreement

30.     Prior to entering into the Amended Agreement, CoinLab and Alydian were aware that Alydian was in a tenuous financial condition.  Dkt 26 at 123:8-124:1 Olsen Cross (noting that prior to entering into the Amended Agreement in August 2013, management at CoinLab and Alydian were aware that, absent a cash infusion, bankruptcy for Alydian was a real possibility. In fact, they were considering to wind down the Bitcoin mining effort prior to entering into the Amended Agreement); Dkt 26 at 118:22-119:11 Olsen Cross (admitting that start-ups generally carry losses for quite a long time before they are profitable and that it's reasonable for a business to have growing pains as its growing); Dkt 24 at 45:18-46:9 Vessenes direct (noting that in the summer of 2013, when CoinLab and Alydian were pursuing a relationship with Crystal Island, there was significant debate whether Alydian should continue mining, and Alydian chose to continue mining after finding another investor).

### B. CoinLab Knew That Alydian's Chips Were Not "Cutting Edge" Prior To Entering Into The Amended Agreement

31.     CoinLab and Alydian, despite being well aware of 28-nanometer chipsets months in advance of the Amended Agreement, elected to pursue a mining strategy with 65-nanometer

chipsets. Dkt 24 at 85:19-24 Vessenes Cross; Dkt 26 at 140:10-141:9 Gallancy Direct; Dkt 26 at 122:16-123:7 Olsen Cross.

32.     At the time prior to entering into the Amended Agreement, CoinLab and Alydian were both aware that the Bitcoin industry was shifting from 65-nanometer chips, which Alydian intended to use, towards 28-nanometer chipsets.  Dkt 24 at 85:19-24 Vessenes Cross (prior to the August amended agreement with Bitvestment "we certainly knew 28-nanometer chips were coming."); Dkt 26 at 140:10-141:9 Gallancy Direct (the fact that Bitcoin mining equipment is now utilizing, or shortly in the future utilizing, 28-nanometer technology was wholly expected. The International Technology Roadmap for semiconductors (ITRS) roadmap goes all the way out to 2022, because there's a ton of advanced planning and people know many, many years in advance what the technology node for semiconductors will be).

33.     The chief chipset engineer of CoinLab and Alydian, Hans Olsen, testified to this fact in detail:

Q.  So prior to the August amended agreement, you're abundantly aware that the industry was shifting down to 28-nanometer chipsets?

A.  Correct.

Q.  And you and Peter [Vessenes] had discussed this prior to the August amended agreement?

A.  Correct.

Q.  And you were aware prior to the August Amended Agreement that Alydian and/or Coinlab would need a cash infusion to keep up with the other miners?

A.  We were aware we needed cash infusion to deploy what we had for existing technology and we needed to deploy it quickly; otherwise, we would not be providing any return.

Q.  And --

A.  We realized that we could not -- we did not raise money to develop a 28-nanometer

technology.  We raised money to do a very fast-track 65-nanometer project.

Dkt 26 at 122:16-123:7 Olsen Cross.

33.     By its express terms, the Amended Agreement superseded both the First and

Second Services Agreements.

34.     The Amended Agreement expressly states that CoinLab (as defined therein

includes Alydian) would provide the following services to Plaintiff:

> CoinLab will use best efforts to mine 7,984.006735 Bitcoins on [Bitvestment's]
> behalf, which, for the avoidance of doubt, will mean that CoinLab shall dedicate
> 100% of its mining output (other than the mining output that is required to meet
> CoinLab's appropriate mining operating expenses and capital expenditures
> subject as approved by all parties) from the date of this Agreement to producing
> Bitcoin for Bitvestment until such time as Bitvestment receives 7.984.006735
> Bitcoins from CoinLab pursuant to this Agreement.  On a weekly basis, CoinLab
> will promptly deliver to [Bitvestment] the Bitcoins ordered as they are mined by
> CoinLab.  CoinLab will deliver to [Bitvestment] a weekly account of Mined
> Bitcoins compared with Bitcoins delivered to [Bitvestment].  CoinLab will deliver
> to [Bitvestment] Mined Bitcoins via the CoinLab Storage or other methods of
> delivery requested by [Bitvesment].  [Bitvestment] may retain Mined Bitcoins in
> this CoinLab Storage through the Wind Down Period.  [Bitvestment] may
> perform one or more audits, at CoinLab's expense, of CoinLab's Bitcoin output to
> confirm that [Bitvestment] is receiving the mining output as agreed in section 2.

> *See* Gallancy TRO Aff. ¶¶ 13-19, Ex. H, Amended Agreement at 2-3, ¶ 2
> [Emphasis added].

35.     Pursuant to the Amended Agreement, CoinLab and Alydian: (1) committed to use

their best efforts, rather than commercially reasonable efforts (as the prior Services Agreements

contained); and (2) agreed that Bitvestment would receive 100% of CoinLab's (which includes

Alydian by definition) mining output to fill the 7,984.006735 bitcoins owed, regardless of

whether the third party was to proceed with the transaction. Gallancy TRO Aff., Ex. H; Dkt 24

77:11-13 Vessenes Cross (CoinLab agreed to use best efforts to mine for Bitvestment, a step up from commercially reasonable efforts).

36.     In consideration for the Amended Agreement, and with the express authority of both CoinLab and Alydian, Gallancy undertook due diligence of CoinLab's and Alydian's Bitcoin mining operations on behalf of a potential third-party capital partner related to an expansion of CoinLab's and Alydian's Bitcoin mining project.  Gallancy TRO Aff. ¶ 16.

37.     In connection with that due diligence, during which Gallancy was provided access to CoinLab's and Alydian's operations (via both in-person inspection and extensive conversations with CoinLab's and Alydian's executives and employees), mining project cost structure, financial status (corporate structure, balance sheets, cash flows and capital) and operational plans, Gallancy determined that: (a) CoinLab and Alydian had fully and adequately functional Bitcoin mining equipment; (b) CoinLab and Alydian would be able to execute on the contemplated Bitcoin mining project with the third party investor; (c) CoinLab's and Alydian's mining equipment could be deployed at reasonable cost; and (d) CoinLab had the financial wherewithal to devote additional internal capital to the project.  Gallancy TRO Aff. ¶¶ 17-19.

38.     Gallancy advised the prospective third-party capital partner of his due diligence findings.  That prospective third-party capital partner was prepared to proceed with a capital infusion into CoinLab and Alydian in or about late August 2013. Gallancy TRO Aff. at ¶¶ 17-19. The third-party investor was poised to complete the transaction at the end of August.  *Id*. at ¶ 19.

**5.   CoinLab and Alydian Indicate Their Intent To Breach The Amended Agreement**

39.     On or about August 29, 2013, however, Vessenes informed Gallancy via email that CoinLab located a different capital partner that would provide the necessary funding with lower returns than those offered by Crystal Island on whose behalf Gallancy had performed

diligence, and that CoinLab was not moving forward with Crystal Island as a capital partner.
Gallancy TRO Aff. at ¶ 20, Ex. I; Dkt 24 at 80:16-19 (CoinLab declined Crystal Island's
investment because, in addition to finding certain terms unfavorable, it "was about a third of the
capital we thought would be needed to finish the Alydian deployment.").

40.    The investor that CoinLab located was X-Ray Holdings, PLC owned by Brian
Cartmell.  Dkt 24 at 59:23-60:1-4 Vessenes direct (Alydian ultimately found financing from its
seed investor, X-Ray Holdings, PLC by which X-Ray Holdings essentially put in 12,500 bitcoins
in exchange for 15,000 bitcoins in return); Dkt 24 at 80:24-81:5; *see also* Bankruptcy Tr. 13:6-12
Vessenes (stating that X-Ray Holdings Limited was the seed investor of Alydian, putting in
$500,000).

41.    X-Ray Holdings made both an initial investment, and then a short time later, a
purported loan, to Alydian in the form of Bitcoin.  Bankruptcy Tr. 13:22-14:7 (X-Ray loaned $3
million to Alydian); Bankruptcy Tr. 58:17-18 (X-Ray Holdings loan and initial investment were
both done with bitcoins); Bankruptcy Tr. 61:20-62:4, 91:11-17; 93:15-20 (stating that the loan
from X-Ray Holdings (which was memorialized in a written contract) was 10,000 bitcoins
loaned, with 15,000 bitcoins to be returned, and that the return of the 15,000 bitcoins does not
have a date associated with it by which it will become due).

42.    Prior to X-Ray Holdings making its investment, the Bitvestment contract with
CoinLab and Alydian was disclosed to it.  Bankruptcy Tr. 105:22-106:1; 107:3-9 (pre-buy
contracts were disclosed to X-Ray Holdings prior to it making its investment).

43.    Vessenes requested that Gallancy renegotiate the terms of the Amended
Agreement with CoinLab and Alydian, so that CoinLab's new capital partner investor, Cartmell

and his X-Ray Holdings, would receive, among other things, the initial 10,000 bitcoins that CoinLab mines.  Gallancy TRO Aff. at ¶¶ 20-21.  Gallancy refused that proposal. *Id.* ¶ 22.

44.     On or about that same day, Gallancy and Vessenes spoke by telephone and Vessenes again asked that Gallancy renegotiate the terms of the Amended Agreement.  Gallancy TRO Aff. at ¶ 22.  Gallancy again declined to renegotiate the Agreement.  *Id.* ¶¶ 22-23. Gallancy learned during that telephone conversation with Vessenes that CoinLab and Alydian did in fact enter into an agreement with CoinLab and Alydian's newfound third-party investor wherein CoinLab and Alydian committed to provide that investor the first 10,000 Bitcoins that CoinLab and Alydian mined.  *Id.* at ¶ 22, Ex. J.  This commitment was in direct contravention of the express terms of the Amended Agreement, which provides that Bitvestment receives 100% of CoinLab's and Alydian's mining of Bitcoins until approximately 7,984 Bitcoins have been provided to it.  *Id.* at Ex. H.

45.     Bitvestment also learned that CoinLab and Alydian were violating the Amended Agreement by using bitcoins they had mined for capital and operating expenses output for the expenses without Bitvestment's authorization.  Gallancy TRO Aff. at ¶ 26-27, Ex. M.   CoinLab and/or Alydian also surreptitiously changed the addresses at which they were mining Bitcoins, in an effort to hide bitcoins or mask their mining output.  *Id.* at ¶ 28-30, Ex. N.  CoinLab and Alydian further advised Plaintiff that they were considering distributing their mining equipment to third parties and/or contracting with other parties to fulfill any other mining obligations.  *Id.* ¶ 33, Ex. P.

**6.  This Court Enters Two TROs To Protect Bitvestment**

46.     This Court entered a temporary restraining order dated November 5, 2013 (the "TRO")  which provided that CoinLab *vis a vis* its CEO Vessenes was ordered to utilize best

efforts to mine and deliver Bitcoins to Bitvestment.  Dkt. No. 6, Nov. 5, 2013 TRO.  A bond was not required.  Dkt. No. 9, Nov. 11, 2013 Order.

47.     Despite the order in the TRO that Defendant CoinLab adhere to the Amended Agreement and that it "shall utilize best efforts and begin to mine and deliver bitcoins to Bitvestment," Defendants made no efforts whatsoever to procure the services of miners or equipment to deliver the Court-ordered Bitcoins to Bitvestment.  *See* Vessenes Declaration dated November 14, 2013 ("Vessenes Decl.") at ¶ 41 (stating CoinLab "needs to assess the current mining market and understand how a company could best do this."), ¶¶ 42, 44-45; Dkt 24 at 77:16-19 Vessenes Cross (admitting that Judge Sweet ordered CoinLab to use best efforts to mine and deliver about eight thousand bitcoins to Bitvestment).

48.     The amount of bitcoins that were mined by Bitcoin miners around the world between the date of the issuance of the TRO on November 5, 2013 and the first day of the PI hearing on November 20, 2013 was 62,925 bitcoins.  Dkt. 26 at 149:22-150:3 Gallancy Direct.

49.     Despite the express terms of the Court's TRO, Defendants failed to deliver a single bitcoin to Plaintiff.  *See* Aff. of Daniel H. Gallancy dated Nov. 19, 2013 ("Gallancy PI Aff.") at ¶ 35.

50.      Because potential profits to CoinLab are not as high as they once might have been, CoinLab has no desire to mine Bitcoins.  Dkt 24 at 94 Vessenes re-cross (complying with the TRO would mean CoinLab would be out-of-pocket money).

51.     CoinLab could have contracted with an outsourced mining provider, a miner directly, or Alydian could be a subcontractor to CoinLab to comply with the Amended Agreement.  Dkt. 24 at 150:14-151:10 Gallancy Direct; Dkt 24 at 74:20-25 Vessenes Cross (a third party can be contracted to mine bitcoins for CoinLab); Dkt 24 at 66:24-25 Vessenes Direct

(assessing Defendant's Exhibit 6 and noting that CEX.io sells realtime bitcoin mining. "You buy it and they provide hashes to you."); Dkt 24 at 78:9-14 Vessenes Cross (admitting he could contact miners and pay them to mine bitcoins, but CoinLab did not); Dkt 93:16-24 Vessenes re-cross ("[o]ne could pay bitcoin miners to mine coins for CoinLab, yes"); Dkt 26 at 133:19-134:12 Olsen Cross (acknowledging that to his knowledge, CoinLab didn't reach out to any third parties to mine bitcoins on Bitvestment's behalf.).

52.     CoinLab could put an advertisement on a website to seek miners to mine bitcoins for CoinLab and bitcoins would be produced in a matter of days and could be transferred to Bitvestment. Dkt 24 at 88:8-90:1 Vessenes Cross.

53.     In fact, it is possible to buy mining equipment, other capital and operational expenditures, on credit for a bitcoin.  Dkt 82:4-10 Vessenes Cross (for vendors, material does not always need to be paid up front); Dkt 97:25-98:4 (same).

54.     Smaller (or any) profit, however, does not absolve CoinLab from mining and complying with the Court's express TRO.

55.     After CoinLab disregarded the first TRO, Judge Sweet entered a second temporary restraining order on November 21, 2013 ("TRO 2") mandating that CoinLab retain and maintain 7,984.006735 bitcoins pending the Court's determination of the Preliminary Injunction.  Dkt 26 192:8-11.

**VII.     Alydian Continues To Mine Bitcoins And Is Profitable**

56.     Subsequent to the filing of this action, Alydian filed a Chapter 11 bankruptcy petition (the "Bankruptcy Proceeding"), and this action was stayed as against that entity.

57.     During the pendency of the Bankruptcy Proceeding, and since Alydian's initial Chapter 11 petition, Alydian has mined approximately 4,500 bitcoins.  Reyhani Decl., Ex. B

Vessenes Bankruptcy Court January 7, 2014 Rule 2004 Deposition ("Vessenes Bankruptcy Dep. Tr.") 140:7-25, 145:21-24; 146:1-4 (listing bitcoin mining totals for December-January 7, 2014 at over 4,500 with a value between $800-900 per coin); Dkt 24 at 117:22-118:7 Olsen direct (as of November, Alydian is operating, producing about 40 bitcoins a day "[c]all it business as usual.");   While the U.S. Dollar value of Bitcoin fluctuates wildly, such bitcoins have a current U.S. dollar value of $3.6 million.

58.     Alydian's Bitcoin mining operation has been practicable and profitable with mined bitcoins exceeding expenses by over $1 million per month.  Vessenes Bankruptcy Dep. 213:21-214:18 (based on Alydian's December operating expenses of $442,000, Alydian's December mined bitcoin of 2,573, and giving bitcoin a value between $800-900 (its rate on January 7, 2014), Alydian would generate revenue of 1.8 million); 214:19-215:6, 216:1-12 (based on Alydian's projected January operating expenses of less than $440,000, Alydian's projects 1,600 mined bitcoins in Janaury and, at its current value of $800-900 (its rate on January 7, 2014), Alydian would generate revenue of 1.3 million).

59.     Alydian continues to mine bitcoins and its mining rigs will continue to mine bitcoins.  Vessenes Bankruptcy Dep. 140:7-25 (Alydian mined about 2,500 bitcoins in December); Vessenes Bankruptcy Dep. 145:21-24 (Alydian will mine between 1,500 to 2,000 bitcoins in January); Vessenes Bankruptcy Dep. 146:1-4 (Alydian will mine between 800 to 1,100 bitcoins in February).

60.     Alydian also transferred bitcoins to CoinLab on December 13, 2013, *see* Vessenes Bankruptcy Dep. 174:6-178:19; 177:23-179-18 (stating that Alydian made two transfers of Bitcoin to CoinLab on December 13, 2013, totaling 492 bitcoins), which is during the pendency of the TRO 2 and the Bankruptcy Proceeding of Alydian.

<u>**PROPOSED CONCLUSIONS OF LAW**</u>

**I.    Jurisdiction and Venue**

61.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

62.    By the express terms of the Amended Agreement, this Court has personal jurisdiction over Defendants and venue is proper in this judicial district.  Compl. Ex. A at 5, ¶ 11. b. ("any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District of New York" or, if subject matter jurisdiction was lacking, "in any state court located in the City and County of New York.").

**II.    Applicable Law**

63.    Paragraph 11. b. of the Amended Agreement dictates that New York law applies.

**III.    Bitvestment Has Standing to Pursue its Claims**

64.    Pursuant to N.Y. BOL § 801, a corporation may amend its certificate of incorporation, from time to time, such as to change its corporate name.  Thus, the lawful amendment of Dalsa Barbour LLC's corporate name to Bitvestment Partners LLC in no way constituted an assignment of the Amended Agreement, and Bitvestment has standing.  *See In re Salzman*, 61 B.R. 878, 886, 1986 Bankr. LEXIS 5908 (Bankr. S.D.N.Y. 1986) (rejecting debtors' argument that a name change creates a new corporation).

**IV.    CoinLab Is Not Entitled to a Stay Because of Alydian's Bankruptcy Filing**

65.    Defendant Alydian (defendants CLI Holdings and Alydian are the same entity) filed for bankruptcy protection, and there is no identity in interest between and/or among the parties to entitle defendants CoinLab and Vessenes to a stay.  *Queenie, Ltd. v. Nygard Int'l*, 321

F.3d 282, 287 (2d Cir. 2003) (a suit against a co-defendant is not automatically stayed by the debtor's bankruptcy filing) (citing 3 Collier on Bankruptcy § 362.03[3][d] (16th ed. 2011)). CoinLab is not an officer of CLI Holdings and Plaintiff is pursuing a separate cause of action against the officer, Vessenes, than it is pursuing against Alydian.  *See Acker v. Wilger*, 2012 U.S. Dist. LEXIS 161628, *2-5 (S.D.N.Y. Oct. 25, 2012) (citing various cases where a stay was denied under the identity exception; "the automatic stay does not extend to a nondebtor where a claim of indemnity is conditional or otherwise uncertain or where the nondebtor's own conduct gives rise to its liability.").

66.    Unusual circumstances do not exist here to support the extension of the stay imposed by the Bankruptcy Code, 11 U.S.C § 362, to the non-debtor co-defendants.  *See Houndog Prods., LLC v. Empire Film Grp., Inc*., 767 F. Supp. 2d 480, 485-86 (S.D.N.Y. 2011) (concluding that a litigation stay may only be supported where an unusual circumstance exists, such as when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate); *Queenie, Ltd.,* 321 F.3d at 287-88 (an identity between the debtor and co-defendant, such that the debtor may be said to be the real party defendant, is an unusual circumstance); *see e.g. Velasquez v. Metro Fuel Oil Corp*., 2012 U.S. Dist. LEXIS 166486 (E.D.N.Y. 2012) ("a 'stay clearly cannot be extended to the non-debtor' under the unusual-circumstances test 'where the debtor and non-debtor co-defendant 'are joint tortfeasors…'") (citing *DeSouza v. PlusFunds Grp., Inc*., 2006 U.S. Dist. LEXIS 53392 (S.D.N.Y. 2006) (without evidence which demonstrates a material impact upon the debtor's reorganization effort, the stay cannot be extended to a solvent co-defendant).

## V.      Bitvestment Is Entitled To A Preliminary Injunction

67.      Under Rule 65(a)(1) of the Federal Rules of Civil Procedure, the Court "may issue a preliminary injunction only on notice to the adverse party."  Fed. R. Civ. P. 65(a)(1). This motion for a preliminary injunction is on notice to CoinLab, the adverse party.

68.      To obtain a preliminary injunction in the Second Circuit, the movant must demonstrate: (1) irreparable harm and (2) either a likelihood of success on the merits, or a sufficiently serious question as to the merits of the case to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.  *Green Party v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004) (granting request for preliminary injunction); *see AIM Int'l Trading, LLC v. Valcuine SpA, IBI LLC*, 188 F. Supp. 2d 384, 386-87, 388 (S.D.N.Y. 2002).

69.      As a final consideration, a court may take into account the public interest. *Rodriguez v. Debuono*, 175 F.3d 227, 233 (2d Cir. 1999) (per curiam); *Hizam v. Clinton*, 2012 U.S. Dist. LEXIS 135104, n. 2, **20, 21 (S.D.N.Y. Sept. 20, 2012).

70.      Plaintiff satisfies all three prongs of the preliminary injunction standard and each of these factors tips decidedly in favor of granting Bitvestment's motion.

### A.      Likelihood or Probability of Success:
### Breach of Amended Agreement (Count One)

71.      Plaintiff has demonstrated that it will likely succeed on its breach of the Amended Agreement claim.

72.      Under New York law, to prevail in an action for breach of contract, a plaintiff must prove (1) the formation of a contract; (2) performance by one party; (3) its breach by the other; and (4) damages resulting from the breach.  *Rexnord Holdings v. Bidermann*, 21 F.3d 522 (2d Cir. N.Y. 1994); *Readick v. Avis Budget Group, Inc.,* 2013 U.S. Dist. LEXIS 94611

(S.D.N.Y. 2013).  Nominal damages are always available for a breach of contract, proof of actual damages is not necessary.  *T & N PLC v. Fred James & Co. of New York, Inc.*, 29 F.3d 57, 60 (2d Cir. 1994).

73.   Bitvestment has demonstrated that CoinLab owed it contractual obligations under the Amended Agreement, and that CoinLab has breached those obligations.

74.   Bitvestment and CoinLab and Alydian entered into the Amended Agreement in August 2013.

75.   Plaintiff provided consideration to CoinLab and Alydian for the Amended Agreement in the form of $75,000 and, beyond that, the due diligence services performed by Daniel Gallancy as work to help CoinLab and Alydian raise capital from Crystal Island.

76.   In exchange, the Amended Agreement provided that beginning on August 14, 2013, CoinLab and Alydian would dedicate 100% of their mining output (with limited exceptions) to produce Bitcoin for Bitvestment until Bitvestment received 7,984.006735 bitcoins from CoinLab and Alydian.

77.   CoinLab admits that it is not producing bitcoins pursuant to its contractual agreement with Plaintiff.  Vessenes Declaration dated November 14, 2013 ("Vessenes Decl.") ¶ 24 ("Coinlab does not own any Bitcoin mining equipment.  Coinlab . . . presently has no capacity to mine bitcoins."); s*ee* Vessenes Decl. at ¶ 41 (stating CoinLab "needs to assess the current mining market and understand how a company could best do this."), ¶¶ 42, 44-45.

78.    CoinLab breached the Amended Agreement by: (1) failing to utilize its best efforts to mine bitcoins; (2) refusing to provide Plaintiff with bitcoins that it mined; (3) changing the addresses at which it mined bitcoins (in an effort to hide bitcoins or mask its mining output); (4) using Bitcoin output for the expenses of capital and operating expenditures that were

unauthorized; (5) entering into a competing contract with a third-party; and (6) refusing to

indemnify Plaintiff for its legal expenses as they are incurred in connection with its Complaint.

79.     Accordingly, Bitvestment has affirmatively established that CoinLab has

breached the Amended Agreement and that it is therefore nearly certain to prevail on the merits.

## B.     Likelihood or Probability of Success: Specific Performance (Count Five)

80.     Plaintiff has demonstrated that it will likely succeed on its specific performance of

the Amended Agreement claim.

81.     Under New York law, to satisfy the legal standard for specific performance, a

party must show that he was "ready, willing, and able" to perform his duties under the contract.

*Binder v. SE Opportunity Fund LP (In re 553 W. 174th LLC)*, 2013 Bankr. LEXIS 3656, 26

(Bankr. S.D.N.Y. 2013); *see also Petrello v. White*, 412 F. Supp. 2d 215, 2006 U.S. Dist. LEXIS

6128 (E.D.N.Y. 2006), *overturned on other grounds*, *Petrello v. White*, 507 Fed. Appx. 76 (2d

Cir. N.Y. 2013) ("To obtain specific performance, the requesting party must show: (1) the

making of the contract and its terms, including a description of the subject matter; (2) that the

party is ready, willing, and able to perform the contract and has fulfilled all of his duties to date;

(3) that it is within the opposing party's power to perform; and (4) that there is no adequate

remedy at law (an element that need not be pled where the contract is for the sale of real

property).") (citing 96 N.Y. Jur 2d, 'Specific Performance,' § 69)).

82.     As set forth above, the Amended Agreement is a valid and enforceable contract

between CoinLab and Plaintiff.

83.     Under the terms of the Amended Agreement, Plaintiff and Defendants made

several valid and enforceable mutual agreements.

84.     Plaintiff wholly performed its obligations under the Amended Agreement by, *inter alia*, paying $75,000 to CoinLab and Alydian and conducting due diligence.

85.     Defendant CoinLab, independently from Alydian, is able to continue to perform under the Amended Agreement until such a time as Plaintiff receives 7,984.006735 Bitcoins from CoinLab and, in any event, CoinLab continues to receive bitcoins from Alydian.

86.     CoinLab and Vessenes have the wherewithal, capacity and knowledge to mine and have, in fact, previously mined.  *See* Gallancy PI Aff. at ¶¶ 7-10, 12-18, 36-38; Dkt 24 at 33:12-13 Vessenes direct (CoinLab has run a mining pool); Dkt 24 at 60:14-15 Vessenes direct (Alydian has mined bitcoins); Vessenes Decl. ¶ 24 (CoinLab "*presently* has no capacity to mine bitcoins") (emphasis added.); Dkt 24 at 74:3-6 Vessenes Cross (any party who engages in mining can generate bitcoins); Dkt 78:19-79:7 Vessenes Cross (admitting that CoinLab could start a mining pool and incentivize miners to produce Bitcoin for Bitvestment, or could make an announcement on its website asking miners to begin to mine bitcoins for CoinLab).

87.     Bitcoin mining is not impracticable, as is demonstrated by the mining that contemporaneously continues around the world, including that by Alydian.  Dkt 24 at 85:3-5 Vessenes Cross (Alydian's equipment to this day can generate bitcoins); Dkt 26 at 117:22-118:7 Olsen direct (Alydian is operating, producing about 40 bitcoins a day "[c]all it business as usual."); Vessenes Bankruptcy Dep. 140:7-25 (Alydian mined about 2,500 bitcoins in December); Vessenes Bankruptcy Dep. 145:21-24 (Alydian will mine between 1,500 to 2,000 bitcoins in January); Vessenes Bankruptcy Dep. 146:1-4 (Alydian will mine between 800 to 1,100 bitcoins in February).

88.     CoinLab could contract with an outsourced mining provider, a miner directly, or Alydian could be a subcontractor to CoinLab.  Dkt. 24 at 150:14-151:10 Gallancy Direct; Dkt 24

at 74:20-25 Vessenes Cross; Dkt 24 at 66:24-25 Vessenes Direct; Dkt 24 at 78:9-14 Vessenes

Cross; Dkt 93:16-24 Vessenes re-cross; Dkt 26 at 133:19-134:12 Olsen Cross.

89.     CoinLab could put an advertisement on a website to seek miners to mine bitcoins

for CoinLab and bitcoins would be produced in a matter of days and could be transferred to

Bitvestment. Dkt 24 at 88:8-90:1 Vessenes Cross.

90.     In fact, it is possible to buy mining equipment, other capital and operational

expenditures, on credit for a bitcoin.  Dkt 82:4-10 Vessenes Cross; Dkt 97:25-98:4.

91.     Complying with the TRO and the terms of the Amended Agreement through

actions as set forth above would involve only phone calls, or internet contact, requiring little

monitoring or effort and would not require Mr. Vessenes or Mr. Olsen to be out of the office, not

being able to tend to Alydian's matters.  Dkt 26 at 148:9-149:21 Gallancy Direct (noting various

ways that CoinLab could go about complying with the terms of the contract).

92.     Alternatively, Defendants' can meet their contractual obligations to deliver

7,984.006735 Bitcoins to Bitvestment by delivering such Bitcoins from the 15,101.29024042

mined Bitcoins that exist at 12zZM5LQeC4xdtRMNw7DdJVcCRBQQ8Vb1t.[1] *See* Gallancy PI

Aff. at ¶ 36; Dkt 24 at 73:16-22 Vessenes Cross (two days before Alydian filed for bankruptcy, it

was transferring out thousands of bitcoins to another address, the 12zZ address, that held 15,000-

plus bitcoins); Dkt 24 at 90:16-19 Re-Direct Vessenes (the coins in the account are Alydian's

and Brian Cartmell's investment); Bankruptcy Tr. 55:1-5 (stating that the 12z address is a

CoinLab address); Bankruptcy Tr. 57:21-58:2 (the 12z address with the 10,000 bitcoins are the

X-Ray loan coins); Vessenes Bankruptcy Dep.. 174:6-178:19; 177:23-179-18 (stating that

Alydian made two transfers of Bitcoin to CoinLab on December 13, 2013, totaling 492 bitcoins).

---

[1] *See* Gallancy January 9, 2014 Decl., ¶¶ 5-8 (noting that the more than 15,000 bitcoins contained in the 12zZ account as of November 21, 2014 have since been transferred to a variety of other accounts).

93.    Plaintiff has suffered harm resulting from CoinLab's refusal to adhere to the terms of the Amended Agreement, for which there is no adequate remedy at law.

94.    When "the subject matter of a particular contract is unique and has no established market value," specific performance is appropriate. *Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*, 69 A.D.3d 212, 217, 889 N.Y.S.2d 793 (N.Y. App. Div. 4th Dep't 2009); *see also Edge Group Waiccs LLC v. Sapir Group LLC*, 705 F. Supp. 2d 304, 313-317 (S.D.N.Y. 2010) (awarding specific performance because legal damages could not compensate plaintiff fully).  Bitcoin falls squarely into this exception because its unique character renders it difficult to calculate any damages sustained by Bitvestment, and providing money damages would impose an unacceptably high risk of under-compensation on Plaintiff.  *See* Gallancy PI Aff. at ¶¶ 39-49.

95.    Just as the court noted in *Edge Group Waiccs LLC*, 705 F. Supp. 2d at 313-14, where a property value is uncertain, there is a risk that the damages to the aggrieved party cannot be reliably determined:

> What matters, in measuring money damages, is the volume, refinement, and reliability of the available information about substitutes for the subject matter of the breached contract.  <u>When the relevant information is thin and unreliable, there is a substantial risk that an award of money damages will either exceed or fall short of the promisee's actual loss.</u>  Of course this risk can always be reduced -- but only at great cost when reliable information is difficult to obtain.  Conversely, when there is a great deal of consumer behavior generating abundant and highly dependable information about substitutes, the risk of error in measuring the promisee's loss may be reduced at much smaller cost.  <u>In asserting that the subject matter of a particular contract is unique and has no established market value, a court is really saying that it cannot obtain, at reasonable cost, enough information about substitutes to permit it to calculate an award of money damages without imposing an unacceptably high risk of undercompensation on the injured promisee.</u>

*Edge Group Waiccs LLC*, 705 F. Supp. 2d at 313-14 ("courts look to the specific circumstances of the case to determine whether there is a sufficiently reliable means of measuring value for

purposes of awarding contract damages.") (emphasis added); *see also LA MIRADA PRODS. CO. v. WASSALL PLC*, 823 F. Supp. 138, 141, 1993 U.S. Dist. LEXIS 7045 (S.D.N.Y. 1993) ("when a court cannot arrive at a legal measure of damages with a sufficient degree of certainty, no adequate remedy at law exists and specific performance may be granted.  Put another way, the legal remedy is inadequate, so that specific performance may be ordered, if the assessment of monetary damages is impractical or too speculative.") (internal citations omitted).

96.     That plaintiff has an available remedy at law does not bar specific performance. *Id.* citing 96 N.Y. Jur. 2d § 9 at 279 (1992).  "Rather, a court will order specific performance when the remedy at law is not as 'certain, prompt, complete and efficient to attain the ends of justice and its prompt administration as the remedy in equity.'"  *Id.* (internal quotations omitted).

97.     Plaintiff has demanded, and is entitled to, the immediate specific performance of CoinLab's mining obligations under the Amended Agreement.

**C.     Likelihood or Probability of Success:**
**Performance Of The Contract Is Not Excused By A**
**"Change in Technology" Or By Lack Of Profitability**

98.     Defendants are not excused from performance pursuant to the "Disclaimer of Warranties" language, as defined by the Amended Agreement at paragraph 10.

99.     Under New York law, to be excused from a contract due to impossibility, performance must be rendered impracticable because of circumstances that were <u>not foreseeable at the time the contract was entered into,</u> or stated differently, without the "assumption of the risk" by the party seeking relief.  *See 407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338, 343-345 (1968); *see also Capital World Trading, LLC v. Next Up Funding, Inc.*, 2012 U.S. Dist. LEXIS 24246, 7-8, 2012 WL 601073 (S.D.N.Y. Feb. 23, 2012) ("[I]mpossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract.").

100.     "'[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused.'"  *Bank of America Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 267, 1990 U.S. Dist. LEXIS 7568 (S.D.N.Y. 1990) (discussing frustration of purpose and quoting *407 East 61st Garage*, 23 N.Y.2d at 281).  "The applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts." *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*, 23 N.Y.2d at 282; *see e.g. General Elec. Co. v Metals Resources Group Ltd*., 293 AD2d 417, 741 N.Y.S.2d 218 (1st Dept 2002)(parties to a contract have not been permitted to avoid contractual obligations on the ground of impossibility where a commodity swap agreement was rendered extremely disadvantageous due to an increase in the price of cobalt); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. N.Y. 1990)(decline in stock price after October 1987 market crash that would force party to pay other party $10 million adjustment does not excuse performance; fact that performance is "more onerous does not establish a basis for a defense of frustration of purpose or commercial impracticability"); *Bank of New York v Tri Polyta Finance B.V.*, 2003 U.S. Dist. LEXIS 6981, 2003 WL 1960587 (S.D.NY 2003)(party was unable to generate sufficient cash flow due to the catastrophic economic collapse of the Asian market; contract not excused because of impossibility).

101.     Here, just as in *Chase Manhattan Bank v. Traffic Stream Infrastructure*, 52 Fed. Appx. 528, 530, 2002 U.S. App. LEXIS 24034 (2d Cir. N.Y. 2002), Defendant's "alleged impossibility or difficulty of performance is occasioned by hardship that is purely financial, and… arguably foreseeable, and therefore insufficient to establish impossibility of performance

under New York law." Lack of funds, "even to the extent of insolvency or bankruptcy," can never excuse contractual performance. *Bank of America Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 267, 1990 U.S. Dist. LEXIS 7568 (S.D.N.Y. 1990) (internal quotations omitted) (rejecting defendants argument that performance was impossible, even though compliance would "now cost them five times the amount" that they had anticipated at the time of entering in to the contract, would create substantial financial hardship, and may in fact lead to bankruptcy).

102.    Defendants failed to perform their contract due to forces precisely within their control.  Defendants testified that they were aware at the time of entering into the Amended Agreement that Alydian had financial difficulty and that the Bitcoin market was changing.  Dkt 26 at 123:8-124:1 Olsen Cross; Dkt 26 at 118:22-119:11 Olsen Cross; Dkt 24 at 45:18-46:9 Vessenes direct.

103.    As its engineer testified, CoinLab was fully aware prior to entering into the Amended Agreement that there was a change in chipsets used to mine bitcoin.

Q.  So it's been planned for at least since December of 2012 that 28-nanometer chipsets would come onto the market.  Correct?

A.  Correct.

Q.  And, likely, if I go out and find the prior years' versions of these [the Internatonal Technology Roadmap for Semiconductors] it's going to forecast 28 nanometer will come onto the market.  Correct?

A.  Absolutely.

Q.  A 28-nanometer chip is smaller than a 65-nanometer chip.  Correct?

A.  Implementing the same circuitry, yes.  Yes.

Q.  A 28-nanometer chip is more energy efficient than a 65-nanometer chip.  Correct?

A.  Correct.

. . .

Q.  But you can generate the same type of processing power by just stacking additional 65 nanometers?

A.  Within certain limits.

Dkt 26 at 126:7-127:15 Olsen Cross.

104.     Because the change in the size of the chip was foreseeable at the time the Amended Agreement was entered into, it cannot qualify as a change in technology.  *See 407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338, 343-345 (1968).

105.     Indeed, CoinLab acknowledges that, while both cumbersome and expensive, mining is in fact possible. Dkt 24 at 54:8-14 Vessenes direct (noting that the older technology chips are "not as effective.  They require more energy.  They require more data center space.  So all your operating costs go up if you have old technology."); Dkt 24 at 68:6-13 Vessenes Direct ("this is why I believe the contract's impracticable -- I do not see-- no one has suggested-- these are all suggestions from the plaintiff as to how to do this, but no one has suggested a way that comes even close to returning capital and operating expenses.  So I don't know what we do.  I think the contract conceived of this exact situation.  Market forces outside our control make it impossible to make money bitcoin mining."); Dkt 24 at 56:12-15 Vessenes direct ("we all agreed in the course of these e-mails that we should not even reinvest in building out all the chips we had.  We didn't think we could make any money doing that.").

106.     CoinLab in fact acknowledges that mining is not only possible, but profitable. Vessenes Bankruptcy Dep.  140:7-25, 145:21-24; 146:1-4 (listing bitcoin mining totals for

November 2013 through January 7, 2014 at over 4,500 with a value between $800-900 per coin);

Vessenes Bankruptcy Dep. 213:21-214:18 (based on Alydian's December operating expenses of

$442,000, Alydian's December mined bitcoin of 2,573, and giving bitcoin a value between $800-

900 (its rate on January 7, 2014), Alydian would generate revenue of 1.8 million); 214:19-215:6,

216:1-12 (based on Alydian's projected January operating expenses of less than $440,000 and its

projection to mine 1,600 bitcoins with a current U.S. dollar value between $800-900 per coin (its

rate on January 7, 2014), Alydian would generate revenue of 1.3 million).

107.     CoinLab is financially capable of mining and delivering Bitvestment's Bitcoins --

Alydian filed for bankruptcy protection, not CoinLab.  Dkt 24 at 46:7-9 Vessenes direct (noting

that CoinLab has ample finances and that CoinLab invested in Alydian in summer 2013 up until

the end of the bankruptcy claims); Dkt 24 at 62 Vessenes direct ("CoinLab put in some money

just for a bankruptcy, which it's now a creditor on, just in an effort to make sure that like

creditors to Alydian got something out of it."); Dkt 24 at 62:22-63:3 Vessenes direct (Alydian

declared bankruptcy because it was insolvent.  Its liabilities seemed to significantly exceed its

earning potential or assets. In the weeks preceding the bankruptcy, CoinLab invested about

another $500,000 just to make sure that the parts and so on would get paid for.); Dkt 84:4-16

Vessenes Cross (CoinLab and Alydian are two separate companies.  But CoinLab would

purchase equipment and then bill it to Alydian).

108.     CoinLab possesses ample bitcoins that could fulfill this mining contract.

Bankruptcy Tr. 59:6-60:9 (stating that CoinLab paid for Bitcoin mining parts in cash, then billed

Alydian, who in turn paid CoinLab with Bitcoin that it had received via a 10,000 bitcoin loan

from X-Ray Holdings); Bankruptcy Tr. 80:1-81:17, 84:20-85:12 (stating that when CoinLab

buys an item, such as a mining system, in cash, and bills Alydian, Alydian transfers bitcoins to

CoinLab, and the valuations put in the amount paid, or the amount transferred, is not a value that is marked to the market as of the day of the transfer, but it is valued as to the day that the purchase was made; so Alydian paid CoinLab the 10,000 bitcoin loaned by X-Ray Holdings as a partial payment of certain bills owed to CoinLab by Alydian); Bankruptcy Tr. 83:17-84:10 (the operating agreement between CoinLab and Alydian post-dates August 2013); Vessenes Bankruptcy Dep.. 174:6-178:19; 177:23-179-18 (Alydian made two transfers of Bitcoin to CoinLab on December 13, 2013, totaling 2,492 bitcoin).

109.    In fact, it is possible that the rise in Bitcoin could make Alydian profitable.  Dkt 26 at 129:14-130:6 Olsen Cross  (acknowledging that if Bitcoin value rises, Alydian will be profitable "you could create a scenario where that would be the case, yes.  You could create such assumption," and agreeing that even though Alydian's or Coinlab's costs have gone up over the last few months, the revenue has also gone up, given the price of Bitcoin, and that Alydian's return on the bitcoins has gone up, dramatically); Dkt 26 at 128:15-22 Olsen Cross (if bitcoin value rises, company has additional purchasing power to use for other resources).  And, in fact, Alydian is profitable.  Vessenes Bankruptcy Dep. 213:21-214:18; 214:19-215:6, 216:1-12.

110.    Alydian is currently mining bitcoins, about 100 a day, providing revenue well in excess of its operating costs.  Bankruptcy Tr. 14:17-18; Bankruptcy Tr. 15:1-11; Bankruptcy Tr. 16:2-7 (net of bills to CoinLab, as of December 3, 2013 Alydian was holding 1,100 to 1,200 bitcoins today, maybe more); Bankruptcy Tr. 24:7-9 (there are about 144 bitcoin blocks mined a day, and Alydian mines 4 of those blocks; Vessenes Bankruptcy Dep. 213:21-214:18; 214:19-215:6, 216:1-12 (Alydian stands to generate millions in profit for December and January).

111.    In fact, as of November, Alydian had deployed half of its inventory of already purchased systems - 16 systems have been deployed, with 30-32 being the goal for December 2013. Bankruptcy Tr. 32:6-25; Bankruptcy Tr. 33:2-11.

112.    Alydian is expected to mine 5,421 bitcoins by the end of February, which has a market value as of December 2013 of around 5.4 million.  Bankruptcy Tr. 69:4-15; Bankruptcy Tr. 71:4-11 (Alydian's cost for having all the 32 mining systems up and running each month will be $441,860); Bankruptcy Tr. 71:22-72:3 (Alydian, for the month of December, expects to mine 2573 bitcoins, generating $2.5 million in revenue, with expenses of only $441,000 for that same month); Bankruptcy Tr. 26:1-9.   Although operating under bankruptcy protection as debtor-in-possession, Alydian is a highly profitable business.  Vessenes Bankruptcy Dep. 213:21-214:18; 214:19-215:6, 216:1-12.

113.    Moreover, Defendants are able to satisfy the contractual Bitcoin requirement, given their holding and/or control of 15,101.29024042 bitcoins (formerly) at address 12zZM5LQeC4xdtRMNw7DdJVcCRBQQ8Vb1t.

114.    In sum, performance by CoinLab was at all times possible, although less profitable, since it could mine, or hire a company to mine, and the legal excuse of impossibility of performance is not be available to it.  *See* Gallancy PI Aff. ¶¶ 5-18.

115.    This case does not involve frustration of the purpose of the contract.  "In order to invoke the doctrine of frustration of purpose, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense." *Warner v Kaplan*, 71 A.D.3d 1, 5-6, 892 N.Y.S.2d 311 (N.Y. App. Div. 1st Dep't 2009) (citing 22A NY Jur 2d, Contracts § 375)).  Here, the purpose of mining Bitcoin was frustrated only when CoinLab itself made a business decision to delay deployment of its mining

capabilities, and did not result from unanticipated circumstances.   *See 407 East 61st Garage,*

*Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338, 343-345 (1968) (citing 6

Williston, Contracts [Rev. ed.], §§ 1951, 1959; Restatement, Contracts, § 288)).

116.    Bitvestment has demonstrated a likelihood of success on the merits of its

underlying claims.  Thus, whether a preliminary injunction should issue turns on whether there

would be irreparable harm in the absence of an injunction, a showing that Bitvestment has

established.

**D.    Absent a Preliminary Injunction,
Bitvestment Will Suffer Irreparable Harm**

117.    "To establish irreparable harm, a party seeking preliminary

injunctive relief must show that 'there is a continuing harm which cannot be

adequately redressed by final relief on the merits' and for which 'money damages

cannot provide adequate compensation.'"  *Kamerling v. Massanari*, 295 F.3d 206,

214 (2d Cir. 2002) (quotation omitted).  "And, irreparable harm must be shown to

be actual and imminent, not remote or speculative."  *Id.*

118.    As Bitvestment has demonstrated, CoinLab has wrongfully breached the

Amended Agreement and placed it at significant risk by, among other things distributing, in

violation of the Agreement with Plaintiff, the very same Bitcoins that were the subject of the

Agreement with Bitvestment to a third-party; using Bitcoins to fund capital expenditures and

operating expenses of CoinLab; and considering distributing mining equipment to third parties,

which will directly impact Plaintiff's ability to receive Bitcoins.

119.    CoinLab has continued to commit these wrongful acts even after Bitvestment told

it to stop and even after this Court ordered CoinLab to adhere to the Amended Agreement

pursuant to the TRO.

120.    The irreparable harm here is the actual and imminent threat of Plaintiff losing its rights to its bitcoins -- being held hostage by CoinLab -- which are notorious difficult to mine and exist in a limited amount, and the difficulty in assessing the value of Plaintiff's Bitcoins, as the market has wide fluctuations.

121.    Time is of the essence - Alydian apparently plans on ceasing its mining activities and selling off its mining rigs in January 2014.  Bryan Reyhani Decl., Ex. D Bankruptcy Proceeding, Alydian's *Ex Parte* Motion to Shorten Time.  In the Bankruptcy Proceeding, Alydian is seeking an order to sell its assets on an expedited basis, which consist of Bitcoin mining rigs, because the market price for Bitcoin mining rigs is volatile, and it appears to be trending downwards.  *Id.* at 1.  Alydian wants to sell its rigs before competitors deliver newer rigs, as doing so will afford a better market and a higher price for its assets.  *Id.* at 1-2.  Also, Alydian has stated in the Bankruptcy Proceeding that its employees are only committed to providing services to Alydian until the end of January 2014.  *Id.*

122.    In the Amended Agreement, CoinLab acknowledged that a breach could cause irreparable harm and would entitle Plaintiff to injunctive relief:

> [A]ny breach, or threatened breach, of this Agreement by CoinLab could cause irreparable damage to [Plaintiffs] and that in the event of such breach [Plaintiff] shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations under this Agreement, <u>without the necessity of proving irreparable damage or posting a bond</u>. *See* Gallancy Aff., Ex. H [Emphasis Added].

123.    This clause constitutes evidence of the parties' intent when entering into the Amended Agreement - CoinLab was aware of the consequences of a breach when it entered into the Amended Agreement and expected a breach likely would be enjoined.  *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. N.Y. 1999) (affirming the issuance of a preliminary injunction and noting that the defendant acknowledged in his Employment

Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to North Atlantic) (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (relying on a similar clause in determining irreparable injury for purposes of upholding a grant of injunctive relief)); *Int'l Creative Mgmt. v. Abate*, 2007 U.S. Dist. LEXIS 22964, *19-21 (S.D.N.Y. 2007) (noting that an injunction provision specially negotiated by the parties (rather than one that is a standard term or condition in a contract) carries significance in determining irreparable harm).

### E.    The Balance of Hardships Favors Bitvestment

124.    The balance of hardships weighs heavily in favor of Plaintiff.  If an injunction is granted (and unless the Court orders that CoinLab immediately deliver to Bitvestment its bitcoins), CoinLab would only be prevented from distributing or utilizing Bitcoin that it has no claim of right to, and would only require CoinLab to produce Bitcoin that it has the capability and finances to produce.  The parties' contract demonstrates that it was contemplated and intended that an injunction would be granted if CoinLab breached the Agreement with Bitvestment.

125.    On the other hand, absent the injunction, Bitvestment will face the continuing threat of being unable to obtain its bitcoins, as bitcoins are increasingly difficult to mine and CoinLab will at some point in the reasonably near future be unable to perform on its contract with Bitvestment.  The balance of hardships therefore tips decidedly in Bitvestment's favor.

### F.    The Public Interest Favors an Injunction

126.    Far from harming the public interest, an injunction would serve it best.  An injunction would serve the public interest because it would prevent CoinLab customers from possibly being deceived, misled or misinformed about the availability of bitcoins through CoinLab.  In addition, it is in the public's interest for companies to honor their contracts, rather than breaching them when profits are not as high as anticipated.  In light of the irreparable public

harm that will result in the absence of injunctive relief, this Court should grant a preliminary injunction against the Defendants.

127.    Because Bitvestment has shown irreparable harm and a likelihood of success on the merits, pursuant to Rule 65 of the Federal Rules of Civil Procedure, this Court should conclude that a preliminary injunction is necessary to prohibit CoinLab from converting the 7,984.006735 bitcoins in its possession, that Bitvestment is likely to prevail on claims of breach of contract and specific performance and for the turnover of such bitcoins to Bitvestment following a full adjudication on this issue.

## CONCLUSION

For the foregoing reasons, Plaintiff Bitvestment Partners LLC respectfully requests that the Court enter judgment in its favor for injunctive relief, continuing the restraints set forth in the TRO 2 by requiring CoinLab to turn over to Bitvestment's counsel 7,984.006735 bitcoins to be held in escrow pending the conclusion of this matter, and employ best efforts as set forth in the proposed accompanying order or, alternatively, requiring the immediate delivery of the 7,984.006735 Bitcoins in Defendants' control to Plaintiff.

Dated: January 9, 2014
       New York, New York

                              Respectfully submitted,

                              REYHANI NEMIROVSKY LLP


                              By: */s/ Bryan I. Reyhani*
                                   Bryan Reyhani, Esq. (BR-9147)
                                   Danielle Kiwak, Esq. (DK-1212)
                                   200 Park Ave., 17th FL
                                   New York, NY 10166
                                   (212) 897-4022
                                   bryan@rnlawfirm.com
                                   danielle@rnlawfirm.com

                                   *Attorneys for Plaintiff*
                                   *Bitvestment Partners LLC*