UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
BITVESTMENT PARTNERS LLC,                                   :
:
                                        Plaintiff,          :
:
                  -against-                                 :
:                    13 Civ. 7632 (RWS)
:
COINLAB, INC., CLI HOLDINGS, INC., ALYDIAN :
INC., PETER VESSENES, and JOHN DOE,                         :
:
:
                                        Defendants.         :
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF BRYAN REYHANI IN SUPPORT OF
## PLAINTIFF'S PRELIMINARY INJUNCTION

BRYAN REYHANI declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am an attorney duly admitted to practice before the Bar of this Court and am a

partner at the law firm Reyhani Nemirovsky LLP, attorneys for Plaintiff in this action.

2.      I make this declaration pursuant to Local Rule 6.1(d) and in support of Plaintiff's

preliminary injunction continuing the restraints set forth in the second Temporary Restraining

Order and requiring Defendant CoinLab Inc. to turn over to Bitvestment's counsel 7,984.006735

bitcoins to be held in escrow pending the conclusion of this matter, and employ best efforts as set

forth in the proposed accompanying order or, alternatively, requiring the immediate delivery of

the 7,984.006735 bitcoins in Defendants' control to Plaintiff.

3.      In support of Plaintiff's Supplemental Memorandum, I attach the following

documents:

(a)     Exhibit A: a true and correct copy of the U.S. Bankruptcy Court, Washington State, *In re CLI HOLDINGS, INC. dba ALYDIAN*, No. 13-19746-KAO ("Bankruptcy Proceeding") Dec. 3, 2013 341 Meeting of Creditors Transcript;

(b)     Exhibit B: a true and correct copy of the Bankruptcy Proceeding January 7, 2014 Rough Transcript of the Deposition of Peter Vessenes;

(c)     Exhibit C: a true and correct copy of the Bankruptcy Proceeding Amended SOFA 3(b) and (c), submitted on January 8, 2014; and

(d)     Exhibit D: a true and correct copy of the Bankruptcy Proceeding *Ex Parte* Motion to Shorten Time, submitted on December 23, 2013.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of January 2014, New York, New York.


                                        */s/ Bryan I. Reyhani*
                                        Bryan I. Reyhani

# EXHIBIT A

1

2                    UNITED STATES BANKRUPTCY COURT

3            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

4     ----------------------------------------------------
                                            )
5      In Re:                               ) No. 13-19746-KAO
                                            )
6      CLI HOLDINGS, Inc. d/b/a ALYDIAN,    )
                                            )
7               Debtor.                     )
                                            )
8     ----------------------------------------------------

9                    341 MEETING OF CREDITORS

10                     December 3, 2013

11               Digitally Recorded Proceedings

12    ----------------------------------------------------

13

14

15

16

17

18

19

20

21

22    Transcribed by:     Marjie Jackson, CETD

23                        Reed Jackson Watkins

24                        Court Approved Transcription

25                        206.624.3005

```
 1                      A P P E A R A N C E S

 2

 3          For the Trustee:

 4                  MARTIN LESTER SMITH

 5                  Department of Justice/Office of U.S. Trustee

 6                  700 Stewart Street, Suite 5103

 7                  Seattle, Washington 98101

 8

 9          For CLI Holdings Inc.:

10                  DEIRDRE GLYNN LEVIN

11                  Keller Rohrback LLP

12                  1201 Third Avenue, Suite 3200

13                  Seattle, Washington 98101

14

15          For Bitvestment Partners LLC f/k/a Dalsa Barbour LLC:

16                   TEREZA SIMONYAN

17                   Lane Powell PC

18                   1420 Fifth Avenue, Suite 4200

19                   Seattle, Washington 98101

20
                     BRYAN REYHANI (telephonically)
21
                     Reyhani Nemirovsky, LLC
22
                     200 Park Avenue, 17th Floor
23
                     New York, New York 10166
24

25
```

1

2                 A P P E A R A N C E S (continued)

3

4     For Soule Investments, LLC:

5              DANIEL S. FRIEDBERG

6              Riddell Williams PS

7              1001 Fourth Avenue, Suite 4500

8              Seattle, Washington 98154

9

10    ALSO PRESENT:

11    Daniel Gallancy, Principal of Bitvestment Partners, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     December 3, 2013

 2                       --ooOoo--

 3

 4          MR. SMITH:  Good morning.  It's approximately

 5   11 a.m. on Tuesday, December 3rd, 2013.  This is the

 6   meeting of creditors being held in the Chapter 11 case of

 7   CLI Holdings, Inc., Case No. 13-19746.  The purpose of

 8   today's meeting is to allow the Office of the United

 9   States Trustee and any creditors or their representatives

10   who are present to ask questions of the Debtor's

11   representative about the Debtor's prospects for

12   reorganization and their assets and their liabilities.

13          My name is Martin Smith.  I'm a trial attorney

14   with the Office of the United States Trustee.  I'll be

15   conducting today's meeting, which is also being

16   electronically recorded, hopefully.

17          I'll let everybody know that on the telephone

18   listening today is Bryan Reyhani.  He will not be

19   otherwise participating, but he will be listening today.

20   I believe that representing the Debtor today is Peter

21   Vessenes.

22          Mr. Vessenes, would you please stand and raise

23   your right hand?  Do you swear the testimony you're about

24   to give is the truth, the whole truth and nothing but the

25   truth?
```

1          MR. VESSENES:  Yes.

2          MR. SMITH:  Thank you.  Please be seated.

3          (Witness sworn.)

4          MR. SMITH:  Mr. Vessenes, did CLI Holdings, Inc.

5    file for Chapter 11?

6          MR. VESSENES:  Yes.

7          MR. SMITH:  With the assistance of counsel, did

8    you prepare schedules of assets and liabilities and a

9    Statement of Financial Affairs?

10         MR. VESSENES:  Yes.

11         MR. SMITH:  Did you review the schedules and the

12   statements prior to their being filed with the court?

13         MR. VESSENES:  Yes.

14         MR. SMITH:  Did you sign them?

15         MR. VESSENES:  Yes.

16         MR. SMITH:  Were they true and correct to the best

17   of your knowledge at the time that they were filed.

18         MR. VESSENES:  Yes.

19         MR. SMITH:  Did they list all the Debtor's assets?

20         MR. VESSENES:  I believe so, yes.

21         MR. SMITH:  And did they list all the Debtor's

22   creditors and liabilities?

23         MR. VESSENES:  Yes.

24         MR. SMITH:  Are there any amendments or omissions

25   that you need to bring to my attention this morning?

1          MR. VESSENES:  Not that I know of.

2          MR. SMITH:  Okay.  This is a Chapter 11 case, so

3     just so that you know, if there's sufficient interest of

4     unsecured creditors, there may be a committee of

5     unsecured creditors appointed.  As of now, we have not

6     appointed one.  That can always change.

7          If everybody has not signed up on the list, I'd

8     appreciate it if you'd be sure to sign up before you

9     leave today.

10         MR. SMITH:  Mr. Vessenes, I usually like to start

11    these with a synopsis or summary by the Debtor's

12    principal as to what the Debtor does and why they filed

13    for Chapter 11.  I understand with the bitcoin -- I'd say

14    phenomenon, but it seems much more than a phenomenon --

15    but with the bitcoin industry being where it is, that

16    that could be a two-hour lecture, so let's avoid that.  I

17    think probably everybody in the room has some

18    underpinnings for what bitcoins are at this point, but if

19    you could summarize what the Debtor does and why it filed

20    for Chapter 11.

21         MR. VESSENES:  Sure.  So CLI Holdings is a bitcoin

22    mining company.  Mining is the process of looking for

23    bitcoins, essentially.  Bitcoins are a new -- I would

24    consider them a new asset class, but for purposes of our

25    consideration, you might think of it like a gold mining

1    company or an oil drilling company or something like

2    that.

3              MR. SMITH:  So virtual currency.

4              MR. VESSENES:  Bitcoins are virtual currency;

5    that's right.  And CLI Holdings job is to do the bitcoin

6    mining, particularly by -- you buy -- you create computer

7    chips, and the computer chips can look for these

8    bitcoins.  So that's the business model, is you go create

9    the bitcoin mining equipment.  There's chips and there's

10   computer servers and other things.  And then you put them

11   all together and you put them in hosting, somewhere where

12   they can be kept cool because they run very hot, and then

13   you look for bitcoins with them.

14             MR. SMITH:  And why did the Debtor file for

15   Chapter 11 protection?

16             MR. VESSENES:  So, we, at the time we filed,

17   looking at our assets, the liabilities under our

18   contracts and what we thought the future earnings would

19   be, we felt that there was no way we could come close to

20   paying them off, and so we wanted to make sure that all

21   of our creditors got a fair shake, depending on what

22   happened.

23             MR. SMITH:  And when you say "contracts," are

24   those the prepaid contracts that there's a motion to

25   reject those contracts pending?

1          MR. VESSENES:  Mm-hmm, yes.

2          MR. SMITH:  Okay.

3          MR. SMITH:  And, Counsel, is that still set for

4     the 6th?

5          MS. GLYNN LEVIN:  It is.

6          MR. SMITH:  And what's the -- and your attorney

7     can help -- what's the plan going forward for the Chapter

8     11?  What's the intention or the goal of the Chapter 11.

9          MR. VESSENES:  So, I don't know precisely.  The

10    market changes very rapidly, as you may know if you have

11    gotten interested in bitcoins yourself.

12         MR. SMITH:  I heard that it's up to 1200-or-so

13    dollars per bitcoin.

14         MR. VESSENES:  It's quite volatile, so yesterday

15    it was between 735 and a thousand, just in a single day.

16    So I have no idea what it is right now, but, yeah.  In

17    bitcoin mining returns, there are two markets.  There's

18    the publicized one, which is the dollar value of

19    bitcoins.  And then there's also a less publicized one,

20    which is how hard it is to find bitcoins themselves, and

21    that's when bitcoin miners compete against each other.

22    So there's two sort of areas of uncertainty.

23         Right now, given that we don't know -- well, there

24    are two possible plans.  One is to continue mining while

25    we work out a plan with our creditors.  The other would

1    be if -- the other possibility would be to sell or

2    auction off the bitcoin mining equipment.  And then, of

3    course, we would I suppose also need to work out a plan

4    with our creditors at that point.

5          MR. SMITH:  How many employees does the Debtor

6    actually have.

7          MR. VESSENES:  Just one, just me.

8          MR. SMITH:  And what's your relationship with

9    CoinLab Inc.?

10          MR. VESSENES:  So CoinLab Inc owns 65 percent of

11    the common stock of CLI Holdings, and it also provides

12    technology services.

13          MR. SMITH:  I think you referred to it as an

14    incubator in some pleadings.

15          MR. VESSENES:  That's right.  CoinLab functions as

16    an incubator, so if there's a business model that looks

17    interesting, CoinLab will find capital partners, put

18    talent, management, operational talent and kind of get

19    things rolling.  If the new company -- the strategy is if

20    the new company then takes off, it will take over more

21    and more responsibility.

22          MR. SMITH:  The company or CoinLab?  The company?

23          MR. VESSENES:  When I say "company" in that case,

24    I mean if CoinLab has incubated a new company.

25          MR. SMITH:  Okay.

```
 1            MR. VESSENES:  Yeah.

 2            MR. SMITH:  It kind of brings to mind one other

 3     question.  In looking at your operations agreement that

 4     appears to have been consummated post-petition --

 5            MR. VESSENES:  Mm-hmm.

 6            MR. SMITH:  -- it looks likes CoinLab is doing

 7     everything but flipping the switches, so what does the

 8     Debtor do?  What do you do as the employee for the

 9     Debtor?

10            MR. VESSENES:  Right now I'm mostly negotiating, I

11     guess, talking to creditors and talking to people like

12     you.  I'm also -- I'm making decisions along the lines

13     of:  Do we deploy more of these mining systems or not?

14            MR. SMITH:  But are you making those decisions --

15     what's your title with the Debtor?

16            MR. VESSENES:  Managing director.

17            MR. SMITH:  And you're also -- what's your title

18     with CoinLab?

19            MR. VESSENES:  CEO.

20            MR. SMITH:  All right.  So when you say "making

21     those decisions," are you making those decisions on

22     behalf of CoinLab or are you making those decisions on

23     behalf of the Debtor, or how do you make a distinction

24     there or do you?

25            MR. VESSENES:  Yeah, I do, absolutely.  The
```

1    decisions that I'm making are on behalf -- any -- all my

2    decisions around Alydian would be for Alydian's benefit

3    or the benefit of the estate.  So that's how I think

4    about it, is how to maximize the value for CLI Holdings,

5    which is doing business as Alydian.

6         MR. SMITH:  Don't you also maximize the value of

7    CoinLab since you're up-straining 10 percent all the

8    time?  It seems like a conflict to me in terms of trying

9    to make that distinction, because every time you do

10   anything at the CoinLab level --

11        MR. VESSENES:  Yeah.

12        MR. SMITH:  -- if I understand the business model

13   correctly, you turn around and you bill that to the

14   Debtor plus 10 percent.

15        MR. VESSENES:  Yeah.  So that 10 percent is not a

16   significant revenue stream for CoinLab.  Alydian -- it's

17   also a common business practice with incubators.  For

18   instance, Rocket Internet is a very large one in Germany.

19   They bill their subsidiaries 30 percent for similar

20   services.  I don't -- you know, CoinLab Inc.'s interests

21   are much greater as a creditor, I would say than --

22        MR. SMITH:  Okay.

23        MR. VESSENES:  Does that make sense?

24        MR. SMITH:  Which is about $600,000.

25        MR. VESSENES:  That's correct, yeah.

1          MR. SMITH:  When you bill the Debtor as part of

2     the management of the contract, are you billing --

3     because if I understand, again, CoinLab goes out and I'll

4     use a term I know because I don't know what the proper

5     term would be -- let's say CoinLab goes out and buys some

6     additional servers.

7          MR. VESSENES:  Okay.

8          MR. SMITH:  To then sell those to the Debtor for

9     mining.

10         MR. VESSENES:  Mm-hmm.

11         MR. SMITH:  And they invoice the debtor for their

12    servers plus 10 percent.

13         MR. VESSENES:  With a cap.

14         MR. SMITH:  With a $5,000 per invoice.

15         MR. VESSENES:  Yeah.

16         MR. SMITH:  Is the amount billed for the equipment

17    at cost or is there also a markup between CoinLab and the

18    Debtor in terms of the equipment?

19         MR. VESSENES:  No, there's no markup at all.

20         MR. SMITH:  That's a pure pass-through?

21         MR. VESSENES:  Absolutely, yeah.

22         MR. SMITH:  Is that true on all the types of

23    things that CoinLab purchases?

24         MR. VESSENES:  Yeah, that's correct.  That's

25    correct.  And as a matter of practice, it's much less

1   than 10 percent.  So in July or August, a few million

2   dollars, or a million and a half dollars of parts were

3   purchased, and those were billed in I think two or three

4   invoices.  So it's, like I said, it's not a profit stream

5   for CoinLab; it's an administrative fee.

6        MR. SMITH:  And then the other equity partner of

7   the Debtor is XRay Holdings Limited; is that right?

8        MR. VESSENES:  Mm-hmm.

9        MR. SMITH:  And how did they end up with 35

10  percent?  Were they there at the beginning?

11       MR. VESSENES:  Yeah, they were the seed investor

12  so they put in $500,000.

13       MR. SMITH:  And it looks like in the schedules,

14  anyway, they're 3 million now, approximately 3 million?

15       MR. VESSENES:  Yes.

16       MR. SMITH:  So is that additional investment

17  capital that was put in?

18       MR. VESSENES:  That's correct.

19       MR. SMITH:  Did their shares increase?  Was that a

20  loan or -- I use the term "investment capital," but was

21  the rest of that a loan?

22       MR. VESSENES:  There were -- when we -- so CoinLab

23  and XRay put more money in in July or August,

24  approximately.  CoinLab and XRay, there was a capital

25  call, so CoinLab put in 550,000-or-so dollars and XRay

1    put in its pro rata, I think $250,000 or so worth.  And

2    that went -- that's capital, that's not debt.  And then

3    XRay loaned money as well, and that part shows up on the

4    Creditors' Schedule, but not the equity investment.

5         MR. SMITH:  So the 3 million is pure loan; that's

6    not any part of the equity?

7         MR. VESSENES:  That's correct.  That's correct.

8         MR. SMITH:  And the same with the 600,000 for

9    CoinLab?

10        MR. VESSENES:  That's correct, yeah.  Those are

11   all parts that CoinLab had paid for but not been

12   reimbursed at the time of the filing.

13        MR. SMITH:  At this point in time, if I understand

14   it correctly, the debtor has not generated any income, is

15   that fair to say?  In looking at your Statement of

16   Financial Affairs, it has zero.

17        MR. VESSENES:  We discussed this in our last

18   meeting.  The Debtor is making bitcoins.

19        MS. GLYNN LEVIN:  Do you want to refer -- to

20   explain what meeting you're talking about.

21        MR. SMITH:  The meeting with the U.S. Trustee

22   analyst?

23        MR. VESSENES:  With the U.S. Trustee analyst.

24   Thank you.  Sorry about that.

25        MR. SMITH:  It's all right.

1          MR. VESSENES:  The Debtor is making bitcoin.  I

2     think it's --

3          MR. SMITH:  How many per day is the Debtor

4     generating?

5          MR. VESSENES:  Right now about a hundred.  It

6     changes every day, and it goes down over time, but that's

7     certainly in excess of operating costs right now.  We

8     weren't sure if you call that income or not.  It's not

9     necessarily converted to dollars, so what we agreed at

10    the analyst's meeting was to just keep track of and

11    report the bitcoins generated on the separate schedule.

12         MR. SMITH:  And how is the Debtor paying CoinLab

13    on the invoices?

14         MR. VESSENES:  CoinLab takes bitcoins.  It's

15    willing to take bitcoins.

16         MR. SMITH:  And have all those transactions, at

17    least to date, been bitcoin transactions or has cash --

18         MR. VESSENES:  For some time -- not for quite some

19    time.  The initial $500,000 equity investment that XRay

20    Holdings made, Alydian settled -- or CLI Holdings/Alydian

21    settled originally with dollars for that, but since then

22    it's been all bitcoins.

23         MR. SMITH:  And so how many bitcoins is the Debtor

24    actually holding at this point in time?

25         MR. VESSENES:  I don't have a precise number.

1          MR. SMITH:  Not counting today's mining --

2          MR. VESSENES:  Yeah.  Probably net of bills:  11-

3     to 1200, maybe more.

4          MR. SMITH:  When you say "net of bills," what

5     bills does the Debtor have other than CoinLab's

6     invoicing?

7          MR. VESSENES:  Just CoinLab, yeah.

8          MR. SMITH:  And so those are the -- when you say

9     "net of bills," the already previously invoiced bills?

10         MR. VESSENES:  So there are post-petition bills

11    for the month of November.  They haven't been reconciled

12    or put into a report yet, so I don't know what those are

13    precisely, but there's nothing other than that.

14         MR. SMITH:  And is your bankruptcy counsel

15    accepting bitcoins for payment?

16         MR. VESSENES:  She wants to.

17         MR. SMITH:  I'm wondering how the Debtor is paying

18    its legal bills.

19         MS. GLYNN LEVIN:  We have not accepted bitcoin,

20    no.

21         MR. SMITH:  Okay.

22         MS. GLYNN LEVIN:  Yeah.

23         MR. SMITH:  Okay.  So is the Debtor going to use

24    the -- is it the Mt. Gox?

25         MR. VESSENES:  We wouldn't use Mt. Gox because I

1     don't believe they're solvent.

2          MR. SMITH:  Okay.  So how --

3          MR. VESSENES:  But there are other bitcoin

4     exchanges.

5          MR. SMITH:  So what is the Debtor's intention in

6     order to get cash out of the bitcoins to pay things like

7     legal fees?

8          MR. VESSENES:  Yeah, there's a very liquid market

9     and so to the extent we need dollars, we could sell them.

10    We could sell the bitcoins.

11         MR. SMITH:  Other than legal fees, because it

12    sounds likes you will need cash for that, are there other

13    expenses the Debtor is incurring that it would need cash

14    for?

15         MR. VESSENES:  The analyst told me you guys

16    wouldn't take bitcoins.

17         MR. SMITH:  We will not take -- so far.

18         MR. VESSENES:  So far, so far.

19         MR. SMITH:  Being the progressive organization

20    that the U.S. Federal Government is, as I've heard the

21    treasury secretary discussing bitcoins on C-Span not too

22    long ago, who knows?

23         MR. VESSENES:  Yeah, you never know.  So I think

24    other than our fees here, I'm not aware of any others.

25         MR. SMITH:  So just the quarterly fees and the

1     legal fees at this point?

2          MR. VESSENES:  I believe so, yeah.

3          MR. SMITH:  In terms of generating revenue at the

4     Debtor's level, how does it do that?  So you have the

5     mining activity, so the magic bitcoins pop up.  How else

6     does the Debtor, if at all, how does it generate revenue?

7          MR. VESSENES:  I think the only other way we

8     could, presuming that that's revenue, again my CPAs --

9          MR. SMITH:  Right.

10          MR. VESSENES:  -- argue over that.

11          MR. SMITH:  Right, as opposed to asset

12     accumulation or something else.

13          MR. VESSENES:  Exactly, exactly.  I think it would

14     be just to sell the hardware.  The bitcoin mining

15     hardware itself could be sold or auctioned.  And those

16     are the only two ways I can think of.

17          MR. SMITH:  I've read in the literature that you

18     also generate or "you," generically in the industry

19     generate revenue through the transactions.  So if you go

20     out and you modify the block chain, does that generate

21     income?

22          MR. VESSENES:  So when one -- can I have two

23     minutes to explain?

24          MR. SMITH:  Yeah.  I just get confused when I'm

25     trying to distinguish, if I should distinguish, between

1    the actual mining activity that generates the bitcoins

2    versus the mining activity transactional side.

3              MR. VESSENES:  It's a great.  It's --

4              MR. SMITH:  So if you could help me understand

5    that.

6              MR. VESSENES:  I can.  It's an astute question.

7    Let's reframe mining for a second as time stamping, and

8    then to take two more sentences on it, if you're going to

9    have a money system, you need secure time stamping

10   because you need to know when someone had something,

11   right?  And cash, we know because we all, like, live in

12   time.  At a bank, we know because the bank keeps track of

13   when your checks are presented for settlement or the wire

14   came in.

15             The way the bitcoin network keeps track is by

16   mining.  And when a miner finds a block about every ten

17   minutes, they time stamp it.  Now, what's in a block is

18   all the transactions that are approved for that time

19   period.  And those transactions can pay fees.  They can

20   offer up fees for being included, so there's a little

21   transactional market.

22             The bitcoin network itself pays miners something

23   for security; right now 25 bitcoins.  And then it adds

24   in, kind of underneath that, all the transactional fees

25   the miner has chosen to include.  So when we say, "You

1    get 25 bitcoins per block you mine," that's kind of a --

2    it's a summary for simplistic conversation.  In reality

3    it varies.

4         MR. SMITH:  Depending on the transactional fees on

5    both sides?

6         MR. VESSENES:  Precisely.  You know, right now on

7    average that's another .05, .1 bitcoins per block.  So I

8    might have mined a block yesterday that got 25.124, and

9    today I won that as 25.023 or something, but we round

10   them when we talk.  And it's not a different activity for

11   the bitcoin miner to take those fees; it's just part of

12   their process of securing and time stamping the network.

13        MR. SMITH:  So if you look at the bitcoins as

14   asset accumulation, then that's just an additional --

15        MR. VESSENES:  It's additional assets accumulated.

16        MR. SMITH:  -- assets that you're accumulating?

17        MR. VESSENES:  It, in fact, comes in the same --

18   there's a sort of a "Here are your bitcoins" transaction

19   for miners, and it's all melded together.  It's not even

20   like there's a 25 in transactional fees.  It's "Here's

21   25.024, it's all yours."  It's all one thing.

22        MR. SMITH:  Okay.  So there aren't additional

23   revenue streams or bitcoin streams if, for example, you

24   were fulfilling your prepaid contracts, which we know is

25   a big issue in this case, but let's just take one of

1    them.  And you went and you fulfilled that, and so you

2    were transferring the bitcoins pursuant to that contract.

3          MR. VESSENES:  Sure.

4          MR. SMITH:  So that block -- portion of the block

5    needs to be modified.  Would you get paid for going out

6    as the miner and putting a different address in there or

7    whatever technically happens to show the change in

8    ownership?

9          MR. VESSENES:  Yeah, we might be using some

10   different language.

11         MR. SMITH:  Oh, I'm sure we are.

12         MR. VESSENES:  So if I'm the owner of some

13   bitcoins and I want to send them to someone, I will

14   author a transaction.  It's a little computer program.

15   Your phone could do it or some other computer could do

16   it.  The transaction says -- it's a lot like a check but

17   with some extra rules.  You say:  I, the owner of these

18   bitcoin addresses, do hereby instruct the bitcoin network

19   to send so many here; and if there's any left over, here;

20   and if there's any left over from that, give it to the

21   miner as a fee for this transaction.

22         MR. SMITH:  Okay.

23         MR. VESSENES:  That's, you know, a couple hundred

24   characters.  It's very small.  You don't need to mine to

25   author that transaction.

1          MR. SMITH:  So there is a revenue stream, a fee

2     potentially involved in completing that transaction, when

3     you said "the fee to the miner."

4          MR. VESSENES:  Yeah.  Whoever includes that one

5     transaction into a bitcoin block will be paid the

6     transactional fee.

7          MR. SMITH:  Okay.

8          MR. VESSENES:  If you happen to be the miner who

9     puts it in, you'll get that fee back, but it could be

10    another party.

11         MR. SMITH:  But it would apply to any bitcoins

12    that the debtor is transferring ownership to.

13         MR. VESSENES:  It would not be revenue.  It would

14    actually be an expense.  So if I were to send you --

15         MR. SMITH:  Well, let's put it in pragmatic terms.

16    When you -- I have to be careful because you're on both

17    sides of these transactions when I describe them.  When

18    the Debtor pays CoinLab for one of the invoices and does

19    it using bitcoin, is there a transactional payment to the

20    Debtor for securing the block, making the changes?

21         MR. VESSENES:  Good question.  So the Debtor --

22         MR. SMITH:  Or does it just reduce the amount of

23    the bitcoin that go across the table?

24         MR. VESSENES:  So, first, that's a good question.

25    The Debtor will pay a tiny bit.  And by "tiny," I mean

1    currently .0001 bitcoins or so to have the transaction

2    included in a block.

3              MR. SMITH:  Okay.  So the sender --

4              MR. VESSENES:  That's an expense the sender pays.

5              MR. SMITH:  -- the sender pays, not the receiver.

6              MR. VESSENES:  That's correct.

7              MR. SMITH:  Okay.

8              MR. VESSENES:  So what is that currently, 10 cents

9    or something?  That ten cents is an expense kind of like

10   a bank fee that goes to the sender.  The person who

11   receives that does not receive that 10 cents necessarily.

12   And CoinLab does not mine.  It doesn't have any mining.

13   So someone out there mining will get that 10 cents.  It

14   might be Holdings --

15             MR. SMITH:  But the Debtor would have mined that

16   bitcoin, so as the miner, wouldn't the Debtor get that?

17             MR. VESSENES:  No, the miner -- no.  So the miner

18   would have mined, say, let's say I'm -- let's say Alydian

19   is going to pay someone 25 bitcoins.  It mines --

20             MR. SMITH:  That it mined?

21             MR. VESSENES:  That's all it has, yeah.

22             MR. SMITH:  Okay.

23             MR. VESSENES:  Yeah.  So it mines a block with

24   25.2 bitcoins in it.  It sends 25 to whomever it owes the

25   25 bitcoins to.  It's got .2 left over.  It will use

1    .00 -- let's call it .001 of that for a fee.  It will

2    then have .199 bitcoins left over.  And that's it.  So

3    the money -- .001 went to a fee.  If the Debtor happened

4    to mine the next block that had that fee in it, it would

5    get it back.

6         MR. SMITH:  Okay.

7         MR. VESSENES:  But it's not guaranteed.  There are

8    about 144 blocks a day that are mined, and the Debtor is

9    mining about 4, give or take.

10        MR. SMITH:  So it doesn't sound like there's any

11   scenario where it's going to be material.

12        MR. VESSENES:  I don't think it's material.

13        MR. SMITH:  Material for the Debtor.

14        MR. VESSENES:  I don't think so.

15        MR. SMITH:  All right.  And are there any other

16   activities or potential revenue sources other than what

17   we've talked about and the selling of the equipment

18   ultimately?

19        MR. VESSENES:  No.

20        MR. SMITH:  On your bankruptcy schedules on

21   Schedule B, you have current value of parts of

22   manufacturing as approximately 1.3 million, and then you

23   have the six deployed systems at approximately $379,000.

24   How did you arrive at those values?  Is that cost or

25   something else?

1          MR. VESSENES:  It's cost.

2          MR. SMITH:  Okay.  And all the equipment has been

3    purchased or otherwise received by the Debtor in the last

4    year and a half or so?

5          MR. VESSENES:  That's correct.

6          MR. SMITH:  What do you think it would actually

7    sell for if you had to liquidate it?  Do you have any

8    sense of that?

9          MR. VESSENES:  It's hard to say.  There are

10   real-time -- I was just looking at this over the

11   weekend -- there are real-time markets for this equipment

12   or the output of this equipment.  Over the weekend, each

13   system -- so I should preface this and say these markets

14   are not liquid and you cannot sell a lot into them, so we

15   have a lot more than we could easily analyze what the

16   market could move.  But if one were able to sell at the

17   market rates, one system would be worth approximately

18   $420,000.

19          Now, I do not believe a system will ever generate

20   anything like that, and that's one reason that selling

21   them seems appealing because I think it would inure more

22   benefit to the estate.  However, it's not -- you know,

23   there's not a -- I think the only way, really, to know

24   what they're worth would be to auction them off.

25          MR. SMITH:  I guess I was a little confused by the

1     answer in the sense that, if I heard you right, you said

2     one system could sell for over $400,000.

3              MR. VESSENES:  Mm-hmm, yeah.

4              MR. SMITH:  You've got six systems and the value

5     for all six is 379,000.

6              MR. VESSENES:  Right.  So that was our parts cost

7     for those systems, and the market is valuing them at more

8     right now.

9              MR. SMITH:  All right.  So that's not the market

10    value of the systems; that's just the broken-down parts.

11             MR. VESSENES:  It's like the cost base, yeah.  And

12    I really -- there's not a good market for this equipment

13    where we could get a simple assessment, but the most

14    recent ones I have I gave you.

15             MR. SMITH:  Okay.  And I wanted to confirm there

16    are no security interests in any of that equipment; is

17    that right?

18             MR. VESSENES:  Is that true?  What does that mean?

19             MS. GLYNN LEVIN:  That's --

20             MR.  VESSENES:  No one has preferred that --

21             MS. GLYNN LEVIN:  Not preferred, but secured.

22             MR. VESSENES:  Yeah.  No, that's correct.

23             MR. SMITH:  Okay.  So CoinLab went out and bought

24    all the stuff?

25             MR. VESSENES:  Yes.

1          MR. SMITH:  And then sold it to the Debtor --

2          MR. VESSENES:  Yes.

3          MR. SMITH:  -- with the invoicing system.

4          MR. VESSENES:  Yes.

5          MR. SMITH:  And CoinLab did not take a security

6     interest or anything in it?

7          MR. VESSENES:  No.

8          MR. SMITH:  All of these, all of the presale

9     services agreements, I haven't looked at them, but are

10    they -- is the Debtor the party to those or is CoinLab

11    that's the party to those?

12         MR. VESSENES:  There is one with Dalsa Barbour,

13    LLC where both the Debtor and CoinLab are parties.  The

14    rest are all the Debtor.

15         MR. SMITH:  When I looked at the Statement of

16    Financial Affairs No. 3, I just want to confirm, it's got

17    all these relatively large payments that have occurred

18    between the Debtor and CoinLab.  And I think you

19    testified that while these are dollar equivalents, those

20    are mark-to-market the day of the transaction for

21    bitcoins, so those were all bitcoin transactions?  Is

22    that right?  So, for example, October 30th, $580,809?

23         MR. VESSENES:  I believe that those -- I'm not

24    prepared to, you know, I'd have to go back and look

25    through our accounting but I believe those were all --

1      could have been remitted in bitcoin on that list.

2             MR. SMITH:  It shows a $10,000 payment to Keller

3      Rohrbach.

4             MS. GLYNN LEVIN:  Where are you looking at,

5      Martin?

6             MR. SMITH:  I'm on Statement of Financial Affairs

7      No. 9, so the $10,000, it says payer was CoinLab.  So how

8      do you characterize that transaction?  Is that a loan to

9      the Debtor or is that something else?

10            MR. VESSENES:  I don't know.  I think I would --

11     I'm not sure.  I would wait for her to opine.  I don't

12     fully understand if it's pre- or post-petition or...

13            MR. SMITH:  Well, it's not about being pre- or

14     post-petition to me.  It's what CoinLab's expectations

15     are.  Is that a capital contribution?  Is that a loan?

16     Is that something that CoinLab --

17            MR. VESSENES:  Good question.

18            MR. SMITH:  -- is there a promissory note between

19     the Debtor and CoinLab?

20            MR. VESSENES:  There isn't.  Again, I just

21     don't -- CoinLab would love to have that money back.  I'm

22     not sure I understand --

23            MR. SMITH:  Okay.

24            MR. VESSENES:  -- what the right characterization

25     would be.

1          MR. SMITH:  And then in the file, there's this

2     operating budget.  I'm not sure, did you generate this?

3          MR. VESSENES:  No.

4          MR. SMITH:  Who generated this?

5          MR. VESSENES:  Jodie Brady generated it.

6          MR. SMITH:  Okay.

7          MS. GLYNN LEVIN:  Well, yeah --

8          MR. VESSENES:  I'm sorry.  Go ahead.

9          MS. GLYNN LEVIN:  I think when he asked, did you

10    generate this, did you mean Peter personally or did you

11    mean --

12         MR. SMITH:  Actually, I did, but --

13         MS. GLYNN LEVIN:  Did you?  Okay.

14         MR. VESSENES:  I was intuiting the question.

15         MS. GLYNN LEVIN:  Just give me a chance to find

16    that in my notebook here.

17         MR. SMITH:  Okay.  I'm not sure what it was

18    attached to.  I just found it in our file separately.

19         MR. VESSENES:  It was a separate filing.

20         MS. GLYNN LEVIN:  So --

21         MR. SMITH:  So this was in place of Schedule I and

22    J.

23         MS. GLYNN LEVIN:  That's correct.  Schedule I and

24    J, while the operating expenses were a little easier to

25    come up with, the first line I think is the substitute,

1       if you will, for the income forecast, which is

2       Schedule I, I believe.

3               MR. SMITH:  Okay.  Just not without evaluation

4       since it's fluctuating so much.

5               MR. VESSENES:  Yeah.

6               MR. SMITH:  All right.  So I wanted to be -- I

7       assume it is a typo, that I'll cross out the first line.

8       It says January and February, 2013?

9               MR. VESSENES:  That is a typo.

10              MR. SMITH:  Okay.  So that should be 2014.  And

11      then when I come down for project management, and you

12      have the note, "assumes all employees supporting Alydian

13      are terminated with the exception of two engineers to

14      maintain systems."

15              Can you explain that?

16              MR. VESSENES:  Sure.  So right now, there are a

17      lot of people working on the Alydian project.  There are

18      parts to assemble and test and ship around the country to

19      data centers.

20              MR. SMITH:  But they're all CoinLab employees,

21      correct?

22              MR. VESSENES:  That's right, but they're

23      contracted specifically for Alydian.

24              MR. SMITH:  So are they contracting with, and I'm

25      going to use the term "Debtor" because I understand

1      Alydian is a dba.

2           MR. VESSENES:  I'm sorry.  I use that as a dba for

3      Holdings, I'm sorry.

4           MR. SMITH:  But it's not the Debtor CLI Holdings,

5      so let's just stick with the Debtor.  So those are

6      subcontractors or independent contractors?

7           MR. VESSENES:  They've contracted not with the

8      Debtor, but with CoinLab.

9           MR. SMITH:  Okay.  So all those are contracted

10     with CoinLab?

11          MR. VESSENES:  That's correct.

12          MR. SMITH:  Okay.

13          MR. VESSENES:  And once all of the systems are

14     running, it takes far fewer people to manage them than it

15     did to assemble and test and do all of those things.

16          MR. SMITH:  So that would be, in addition to the

17     six operating systems currently, that would be once all

18     those other parts that you list in Schedule B, once those

19     become systems --

20          MR. VESSENES:  That's correct.

21          MR. SMITH:  -- you would anticipate that most

22     everybody, except two of the CoinLab workers associated

23     with the systems, would be let go?

24          MR. VESSENES:  Yes, provided Alydian decides not

25     to keep building the coin mining equipment, which is

1    certainly the plan right now, is to stop building more.

2    In that world, you need maintenance employees but you

3    don't need more.

4         MR. SMITH:  And when do you anticipate that the

5    new systems will be deployed?

6         MR. VESSENES:  So they have been deployed

7    throughout November.

8         MR. SMITH:  So what are we up to now, instead of

9    six?

10        MR. VESSENES:  Roughly 16, something like that.

11        MR. SMITH:  And what's the goal?  How many will

12   you be deploying?

13        MR. VESSENES:  Probably 30, 32, something like

14   that, depending on how many parts we have.

15        MR. SMITH:  Okay.  Without the purchase of

16   additional parts, correct?

17        MR. VESSENES:  That is correct.  There may be some

18   very small parts needed to be purchased, like screws or

19   steel casings, but that's just -- that's deploying the

20   inventory that's already been purchased.

21        MR. SMITH:  So you're halfway there in terms of

22   deployment --

23        MR. VESSENES:  That's correct.

24        MR. SMITH:  -- of what you have already purchased

25   or what the Debtor has already purchased?

1          MR. VESSENES:  That's correct, yeah.

2          MR. SMITH:  And when are you going to hit that 30

3     or 32, do you think?

4          MR. VESSENES:  I ask all the time.  I don't know.

5     I mean, they're deploying, for instance, three systems

6     today.  The next large tranche of systems will go into a

7     new data center, like the one that we're in now doesn't

8     have more space, so that tends to be slower.  Their

9     engineers will have to get up to speed on what's

10    happening.  I think here we're assuming by end of

11    December that will be done.

12         MR. SMITH:  All right.  And my only other question

13    for right now is, again, it's a theoretical kind of thing

14    to help me a little bit as the case goes forward, and

15    help Thomas, is you use a description in some of your

16    writings that this is like a lottery.

17         MR. VESSENES:  Mm-hmm.

18         MR. SMITH:  When I first started reading about

19    this, I was more under the impression that if you had the

20    computer power and the computers were doing their job,

21    you would end up with bitcoin.

22         MR. VESSENES:  Mm-hmm.

23         MR. SMITH:  Your description makes it sound like

24    you could do all the work in the world and never end up

25    with any bitcoin because you aren't the one with the

1      lottery ticket.

2              MR. VESSENES:  Mm-hmm.

3              MR. SMITH:  So can you clarify?

4              MR. VESSENES:  I can.  It is like getting lucky,

5      rolling dice or getting very lucky flipping coins.

6      However, you do a lot of flips, so --

7              MR. SMITH:  But so does everybody else.

8              MR. VESSENES:  So does everyone else.  So if you

9      have -- so the way I think of it is, what percent chance

10     you have to find a given block compared to everyone else?

11     And to do that, you divide your own mining capacity by

12     everyone else's mining capacity, or by everyone's

13     capacity.  CoinLab has about -- or I'm sorry, Alydian

14     or --

15             MR. SMITH:  The Debtor.

16             MR. VESSENES:  -- CoinLab Inc./Holdings, the

17     Debtor, has about a hundred terra-hashes, and the rest of

18     the network has about, call it 6,000 total terra-hashes.

19     So you can say that you have a 1 in 60 chance of finding

20     a block.

21             MR. SMITH:  All else being equal.

22             MR. VESSENES:  Yeah.  And it essentially is I

23     think for this calculation.  So every ten minutes you

24     flip your 1-in-60 coin or die.  If it comes up heads,

25     you're good.  If it's not, you do it again the next time.

1    And so on average over a course of a day, that means you

2    get about four blocks, but it's not that unlikely you'd

3    get zero.  And it's not that unlikely you'd get six or

4    seven or eight.  And so an average over time, you'll see,

5    you know, that you've about got what you expected.

6         MR. SMITH:  So it is a probability theorem.  So

7    eventually the idea is that it should equal out to your

8    percentage --

9         MR. VESSENES:  Just like if you flipped --

10        MR. SMITH:  -- of the hashes, but --

11        MR. VESSENES:  Exactly.

12        MR. SMITH:  -- that depends on the time frame that

13   you're talking about.  So if you're in a shorter time

14   frame like, for example, if the Debtor were going to sell

15   all its equipment in six months, it may have

16   significantly less or more than what its probability says

17   it should have.

18        MR. VESSENES:  I think over that time frame you'll

19   be very close.

20        MR. SMITH:  That's a long enough time frame that

21   it evens out.

22        MR. VESSENES:  Even a few weeks is plenty for

23   evenness.  That said, right now, the Debtor is mining

24   with what's called a bitcoin mining pool.  And there are

25   companies that provide the financial product of getting

1    rid of that risk for you in exchange for a small fee.

2    And so it's mining with a pool that charges, I don't

3    know, it's a 1 or 2 percent fee, and in exchange it

4    completely, basically, almost totally evens out your

5    earnings.  And so we have sometimes mined on our own and

6    taken that risk as the Debtor and sometimes we have gone

7    with a pool.

8         And so, but that said, I mean, the kind of

9    luckiness, how lucky you got is going to be measured over

10   a period of a week or two.  It will tend to be fairly

11   even.

12        MR. SMITH:  And the process of participating in

13   the pool to minimize the risk, is that pursuant to a

14   written agreement?

15        MR. VESSENES:  It's not.  There's no contract.

16   You just turn on your account and go.

17        MR. SMITH:  Okay.  And there are costs associated

18   with that?

19        MR. VESSENES:  There are; although the way they

20   look you just accumulate less assets.  They don't even

21   have a fee they show you; they just tell you you made

22   this.

23        MR. SMITH:  All right.  At this point, those are

24   all my questions, so I will open up the floor if you have

25   questions.  You can stay where you are or you can come up

1    to the front desk.  I just ask that you identify who you

2    are and who you represent, and then speak up so that

3    hopefully the recording will capture your questions and

4    the answers.

5         I will say, as an overarching comment, that I

6    understand there is litigation ongoing in the case, and

7    this 341 will not be a substitute for a deposition or a

8    2004 exam, so in that context if you could frame your

9    questions.

10        MS. SIMONYAN:  We understand that.  Thank you.

11        MR. SMITH:  Thank you.

12        MR. GALLANCY:  Yes, sir.

13        MS. SIMONYAN:  For the record, Tereza Simonyan on

14   behalf of Bitvestment Partners, LLC.

15        MR. GALLANCY:  And I'm Daniel Gallancy.  I'm the

16   principal of Bitvestment Partners.

17        MR. SMITH:  All right.  And you have a deep voice.

18   I'm afraid it's not going to get captured great, so if

19   you could speak up because the only microphone is over

20   here.

21        MR. GALLANCY:  Yes, sir.  Yes, sir.

22        MR. SMITH:  Thank you.

23        MR. GALLANCY:  Okay.  So thank for taking the time

24   to answer these questions.  I just wanted to clarify some

25   of the things that were discussed already.  I think you

1    mentioned that there are 16 systems deployed currently.

2    When you say a system, are you referring to a six

3    terra-hash system, is that approximately correct?

4            MR. VESSENES:  I have a question for the trustee.

5            MR. SMITH:  Actually, I'm an attorney for the U.S.

6    Trustee.

7            MR. VESSENES:  Oh, I'm sorry.

8            MR. SMITH:  I need to make a distinction.  I'm not

9    a trustee.

10           MR. VESSENES:  Do you wish me to just answer

11   technical questions directly or --

12           MR. SMITH:  You should answer all of his questions

13   directly unless you guys get in a dispute or I think it's

14   crossing the line in terms of deposition testimony --

15           MR. GALLANCY:  I don't think we're going --

16           MR. SMITH:  -- then I'll jump in.

17           MR. GALLANCY:  I don't think we're going to --

18           MR. SMITH:  I'm just saying, other than that --

19           MR. VESSENES:  Okay, that's fine.

20           MR. SMITH:  -- he's free to ask you questions,

21   anything about assets and liabilities or operations of

22   the Debtor or its relationships with other parties.

23           MR. VESSENES:  And we can talk nerd, is my

24   question.

25           MR. SMITH:  And you answer him directly.

1          MR. VESSENES:  Okay, all right.

2          MS. GLYNN LEVIN:  Just one thing.  Make sure that

3     he finishes his question before you answer so that the

4     recording system can get --

5          MR. VESSENES:  No problem at all.

6          MR. SMITH:  That will help if anybody wants to end

7     up getting the transcript.

8          MR. VESSENES:  A system is six cages.  Each cage

9     is approximately a terra-hash.  They may, if they're

10    better cooled, run a little more quickly.

11         MR. GALLANCY:  Sure.

12         MR. VESSENES:  If they have boards that are out,

13    may run more slowly.

14         MR. GALLANCY:  Okay, got it.  Makes sense.  And

15    the cost per terra-hash at this point for those systems

16    deployed is -- or if you want to do it on a cost-per-cage

17    basis, can you provide that value?

18         MR. VESSENES:  It really varies, so I can't

19    without some preparation.  The early ones cost a lot

20    because there were rushed parts.

21         MR. GALLANCY:  Right.  The later ones cost less.

22    So, yeah, I don't know.  I really don't know exactly what

23    they cost.

24         MR. GALLANCY:  Okay, got it.  But you had -- just

25    to make sure, the number that you'd provided before was

1     marked at cost, so one way to think about it would be for

2     me to just divide that number by the number of systems,

3     that would give me a cost per system for the earlier

4     systems, right?

5          MR. VESSENES:  I think so, yeah.

6          MR. GALLANCY:  Okay, very good.  So just a couple

7     of questions about mining addresses here.  I understand

8     that there are a couple addresses at which Alydian is

9     mining.  Can you tell me what those addresses are?  I

10    have some printouts, but I don't know if you -- if there

11    are other addresses, maybe it's best if you just list

12    them.

13         MR. VESSENES:  I can't tell you what mining

14    addresses --

15         MR. GALLANCY:  Okay.  I can show you the addresses

16    that I have, and it's one that starts with 18aQ.

17         MS. SIMONYAN:  I can give you a copy.

18         MR. GALLANCY:  I'm happy to give you a copy.

19         MS. SIMONYAN:  Is this it?

20         MR. GALLANCY:  Yeah, the 18aQ address.

21         MS. SIMONYAN:  I have a copy for you.

22         MR. GALLANCY:  Right.  And then there's another

23    one that is 1g3c.

24         MR. VESSENES:  I'm just not prepared to talk to

25    these.  They look familiar, but I'm not -- I'm under oath

1      so if you -- if for some reason we need a list of

2      addresses that the Debtor is mining to, that's okay.  I'm

3      happy to provide those, but I don't want to rep to it

4      here in the meeting.

5              MR. SMITH:  You should testify from personal

6      knowledge, so if you recognize those addresses as the

7      Debtor's, you should say so.  And if you don't recognize

8      them, then you should say so.

9              MR. VESSENES:  And for your reference, these are

10     the addresses.  They look familiar but I can't promise

11     that those are correct.  There's a very long string of

12     numbers.

13             MR. GALLANCY:  There's one more.  There is 1eGh.

14     If you can --

15             MS. SIMONYAN:  So this is the second one.

16             MR. GALLANCY:  There are three in total.

17             MR. SMITH:  If you want to just look at those to

18     see whether you happen to remember those strings.

19             MS. SIMONYAN:  And this is the third.

20             MR. VESSENES:  Yeah, I don't know.  They might be.

21             MS. SIMONYAN:  If I may interject, I spoke with

22     Mr. Buford and I understand that he had instructed that

23     the Debtor come prepared because these are sort of

24     equivalent of bank accounts where the bitcoins are

25     stored, bitcoins owned by the estate, so if you are

1    unable to testify today, would Counsel be able to provide

2    this information by the end of the week?

3          MS. GLYNN LEVIN:  Which information, specifically?

4    If you send me a letter, I'm happy to --

5          MS. SIMONYAN:  The information where --

6          MS. GLYNN LEVIN:  Let me finish so it's on the

7    record.

8          MS. SIMONYAN:  Okay.

9          MS. GLYNN LEVIN:  First of all, I don't know what

10   conversation you had with Mr. Buford.  I don't know.  I

11   didn't have any specific conversations with him about

12   preparing my client for today other than for the standard

13   341 questions.  We weren't asked to produce anything

14   additionally for today, but if you have specific

15   questions, I'm certainly happy to provide that with some

16   informal discovery.  I cannot promise it's going to be by

17   the end of the week but I will certainly make the best

18   effort to get it out to you in a reasonable time.

19         MR. SMITH:  Well, let me jump in because this is

20   an important issue here.  If I understand the concept

21   that the addresses are, in fact, like checking accounts,

22   essentially, and obviously Schedule B, which would

23   normally capture checking accounts and financial

24   accounts, wouldn't capture this type of information.  So

25   what I would request is that the Debtor provide a list of

1    all addresses that it has mined under or that it has been

2    associated with in the last -- that it currently has and

3    that it has used in the last year, if that's different.

4          MR. VESSENES:  Okay.  And that's no problem.

5    It's --

6          MR. SMITH:  I mean, I would think you would have

7    that at your fingertips back at the office, as it were.

8          MR. VESSENES:  One of the complexities is that

9    it's common practice to associate, unlike a checking

10   account, associate a single address with a single

11   transaction, so Alydian has, call it maybe 100,000

12   addresses, that it's generated and might use.  Now --

13         MR. SMITH:  I don't want a list of 100,000.

14         MR. VESSENES:  I'm sure you don't and I didn't

15   want to --

16         MR. SMITH:  So are they grouped into an

17   overarching address and then you have sub-addresses?

18         MR. VESSENES:  No, they're each separate.  And one

19   of the reasons is for financial privacy.  Once this is

20   known, anyone can audit and that's one reason they're

21   interested in these.  They want to --

22         MR. SMITH:  Of course.  They want to know if the

23   Debtor is hiding bitcoins in other addresses --

24         MR. VESSENES:  Precisely.

25         MR. SMITH:  -- which is a very fair question in

1     Chapter 11.

2          MR. VESSENES:  I totally agree.  What I can easily

3     do is provide all the bitcoins that the Debtor has used

4     to transact so far, or mined to.  There's a matter of,

5     often when you transact, you kind of pull one off the

6     stack and then use it and then you're done with it.

7          MR. GALLANCY:  So would each bitcoin be associated

8     with a different address?

9          MR. VESSENES:  No, not precisely.  So there would

10    be maybe, it could be a fraction of a bitcoin or quite a

11    lot of them in one address.  So I guess what I would

12    suggest is that we provide a list of addresses that the

13    Debtor is in control of, maybe, that we could start with

14    those that have current balances at all so that --

15         MR. SMITH:  What are you looking for?  And I can

16    help a little here because I think it is kind of critical

17    to what assets the Debtor has or should have, but are you

18    looking for a list of 100,000 addresses?

19         MS. SIMONYAN:  Well, if the Debtor has used

20    100,000 addresses to store and transfer bitcoins in and

21    out of, then, yes, we need to have that information.

22    That's all property of the estate.  We don't know what

23    those transfers are.  You know, there are concerns about

24    preferential or fraudulent transfers.  If the Debtor has

25    been in control of 100,000 addresses, then we need to

1     have that information, yes.

2          MR. GALLANCY:  And, sir, if I may interject, just

3     to get back to the nerd speak for a minute here, from my

4     understanding, you know, of course, in pooled mining,

5     there can be many inputs, so many sort of input

6     addresses, but generally you're mining to one specific

7     output address, so this printout that I brought over with

8     this 18a address is, from my understanding, an address at

9     which Alydian is mining and that's where they're

10    receiving the coins.  So if there are indeed 100,000 such

11    addresses, then, yes, we would indeed request them, but I

12    would be surprised if the request ended up being so

13    onerous as to require that many.

14         MR. VESSENES:  Well, I'm not saying it's onerous.

15    And the mining pool we mine at right now delivers to one

16    address, and so that's merely trivial to confirm.

17         MR. GALLANCY:  That's really, I think, what we're

18    trying to get at here, is the addresses at which the

19    bitcoins are being delivered to the Debtor.

20         MR. VESSENES:  And I understand we need a list

21    of --

22         MR. SMITH:  Okay.

23         MR. VESSENES:  -- the locations of all of them.

24    That's fine.  I just, you know, want to make sure you

25    understand what you're asking for.

1          MR. SMITH:  So how about you provide that list to

2     my office and to counsel and then -- as you understand

3     it.  And if that's not satisfactory and you need

4     something additional, you'll have to get it through your

5     normal processes.

6          MR. GALLANCY:  Right.  So there was a follow-on

7     question that I think is relevant here, just to be clear.

8     Does the Debtor and the parent company CoinLab, is there

9     any commingling of bitcoins or are they segregated by

10    address so anything that was --

11         MR. VESSENES:  No, they're not commingled.

12         MS. GLYNN LEVIN:  Just a second.  First of all,

13    can you clarify what you mean by "parent company"?

14         MS. SIMONYAN:  CoinLab.

15         MS. GLYNN LEVIN:  What parent company?

16         MR. GALLANCY:  CoinLab Incorporated, the majority

17    owner and the majority equity holder in Alydian.

18         MS. GLYNN LEVIN:  Okay.  I don't want to split

19    hairs and you're not an attorney, but that doesn't make

20    it a parent company so maybe you could just talk about

21    the names of the company --

22         MR. GALLANCY:  Sure, absolutely.  I'd be glad to.

23         MS. SIMONYAN:  Just use the names of the --

24         MR. GALLANCY:  I would be glad to.  I think you

25    were about to answer -- you were about to answer the

1     question.  I was going to ask if there was any

2     commingling of bitcoins between Alydian and CoinLab at

3     any addresses.

4              MR. VESSENES:  No.

5              MR. GALLANCY:  There's not, so they are

6     segregated?

7              MR. VESSENES:  They're totally segregated.

8              MR. GALLANCY:  Got it.

9              MR. SMITH:  And the only other thing I would

10    interject is, if there are confidentiality or propriety

11    confidential information issues, those need to be

12    addressed.  You know, you're litigants at this point.  I

13    don't know.  Are there any issues with --

14             MR. VESSENES:  There are some.

15             MR. SMITH:  -- providing addresses that --

16             MR. VESSENES:  So there are physical threats.

17    Some of the addresses in the investments lawsuit in New

18    York that they mention have enough coins that there is a

19    worry that I am a kidnap or ransom risk.  And they have

20    tried to ask how much I own personally under testimony

21    and so on.  So I think those are things that I think

22    should be confidential, not from a bankruptcy proceeding

23    but in general, I think that --

24             MR. SMITH:  Okay.

25             MR. VESSENES:  Those are real worries that --

  1          MR. SMITH:  I just want to raise it so that if

  2     those issues are underneath this, you don't hit a log jam

  3     in terms of, once you think about it, saying, well,

  4     you're going to have to sign a confidentiality agreement

  5     or some other document before we will provide those and

  6     just raising it now to think about.

  7          MR. GALLANCY:  If I may, I certainly don't think

  8     any of the parties involved in any of the lawsuits have

  9     threatened to kidnap anybody, and this is sort of the

 10     same thing as any debtor disclosing assets, so if there

 11     were any particular debtor that had a --

 12          MR. SMITH:  As somebody who doesn't understand the

 13     system very well --

 14          MR. GALLANCY:  Right.

 15          MR. SMITH:  -- I just wanted to be sure that there

 16     wasn't a --

 17          MR. GALLANCY:  Sure.

 18          MR. SMITH:  -- risk to the chain or something else

 19     by making public all the actual addresses.

 20          MR. GALLANCY:  As a creditor, I don't believe

 21     there is any risk to the chain.

 22          MR. SMITH:  Okay.

 23          MR. GALLANCY:  I do want to ask about some of the

 24     transfers that have occurred, whether or not we can

 25     discuss the addresses in particular.

1          MR. SMITH:  And before you go there, the documents

2     that I passed over there, do you need those back?

3          MR. GALLANCY:  No, you can keep --

4          MS. SIMONYAN:  No, we don't.

5          MR. SMITH:  Because I passed all of those --

6          MR. GALLANCY:  No, no.  Please do keep those.  So

7     you said you have some familiarity with these; not really

8     sure.  Did Alydian transfer any bitcoins from the

9     addresses at which it's mining to any other addresses in

10    October or November?

11         MR. VESSENES:  I don't know.

12         MR. GALLANCY:  You don't know, okay.  So one of

13    the addresses that we had discussed in the past --

14         MS. SIMONYAN:  I'm sorry.  Can I just interrupt?

15    You don't know if there were any transfers out of Alydian

16    addresses to other addresses?

17         MR. VESSENES:  You know, I'm just not prepared

18    with a full financial audit here, so I'm not willing to

19    perjure myself by saying yes or no.  If you guys have

20    information you need that the Court wants, I'm very happy

21    to give it, but I don't think you should complain as to

22    whether or not I know intricate, you know, details.

23    That's like saying "Did cash move from one drawer to

24    another in November?"  I don't know.

25         MS. SIMONYAN:  So, you know, we're not complain --

1      we are sort of complaining, I suppose, because this is

2      very basic information that pertains to the schedules.

3            MR. SMITH:  Let me just cut you off and say,

4      there's no point to be gained by complaining.  Either you

5      need to rephrase your question to something that he will

6      answer from personal knowledge or you have him now saying

7      he doesn't know.  And you know, if, in fact, he receives

8      a daily report of transfers, you know, whether there was

9      a transfer, then he just perjured himself.  So, I mean

10     it's a normal question and answer.

11           MS. SIMONYAN:  Okay.

12           MR. SMITH:  But complaining about it isn't going

13     to get you anywhere.

14           MS. SIMONYAN:  Okay, yes.  We can --

15           MS. GLYNN LEVIN:  We'd be happy to have a 2004

16     exam and have an opportunity, so he's prepared to answer

17     your specific questions about these accounts and

18     transfers.

19           MR. SMITH:  Well, and that's all true, but they're

20     not asking about a specific transfer at this point.  I

21     mean, it was --

22           MS. SIMONYAN:  Exactly.

23           MR. SMITH:  -- have there been any transfers

24     during that time period.  That's a pretty broad, generic

25     question that I would expect you to be able to answer.

1   The fact that you say you don't know if there was a

2   single transfer, that's strains credibility.

3         MR. VESSENES:  I disagree, because they asked have

4   we moved any between accounts we control.  And that to me

5   is -- I don't know that.  It's like asking, "Has any

6   hardware moved between your warehouses in November?"  I

7   don't know --

8         MR. SMITH:  Okay, fair enough.  You're putting a

9   different interpretation than I did on it.

10         MS. SIMONYAN:  Who would be in charge?  I

11   understand you are the only employee at Alydian; is that

12   correct?

13         MR. VESSENES:  That's correct, yeah.

14         MS. SIMONYAN:  Who would make the decision to

15   transfer bitcoins in and out of bitcoin addresses?

16         MR. VESSENES:  It could be -- well, the people

17   that are capable of doing it would be me, possibly the

18   finance director and possibly an engineer.

19         MR. GALLANCY:  So who's the finance director?

20         MR. VESSENES:  It has been Jodie Brady.  We're

21   currently evaluating bringing someone new on.

22         MR. GALLANCY:  Jodie Brady has left the company.

23         MR. VESSENES:  She's still contracting

24   occasionally, but she's not full time.

25         MS. SIMONYAN:  And Jodie Brady, is she a CoinLab

1    employee?

2         MR. VESSENES:  She was.

3         MS. SIMONYAN:  She was never an Alydian employee?

4         MR. VESSENES:  No.

5         MR. GALLANCY:  She was the CFO of CoinLab?

6         MR. VESSENES:  That's correct.

7         MR. GALLANCY:  Just so I understand, why did she

8    depart?

9         MR. VESSENES:  I gave testimony about that in New

10   York.

11        MS. GLYNN LEVIN:  Yeah, I think that's outside the

12   scope of today's 341 meeting.

13        MR. GALLANCY:  Okay, very good.

14        MS. SIMONYAN:  An the third person that had

15   authority to make transfers on Alydian's behalf?

16        MR. VESSENES:  Well, by authority, do you mean

17   corporate authority or do you mean technical ability?

18        MR. GALLANCY:  Both.

19        MR. VESSENES:  Corporate authority, to move money

20   between Alydian-owned contracts, I mean, there's no

21   document specifying it.  I would think as far as

22   technical ability it would be the engineers or anyone who

23   has got access to the accounts.

24        MS. SIMONYAN:  Actually, I am interested in who

25   had the authority to make the decision that money is

1      going to -- or bitcoins are going to be transferred out

2      of an address.

3              MR. VESSENES:  So there's no document specifying

4      who would have that authority, but as a practical matter

5      moving the coins from one Alydian-owned address to

6      another Alydian-owned address is not considered, you

7      know, a big policy concern.  If they're -- it's also --

8      it's unlikely such a thing happened, by the way.  I mean,

9      it's not something we would tend to do.

10             However, if there were concerns about the security

11     of the account, they might have been moved.  That could

12     be one reason someone might do it.

13             MR. GALLANCY:  So maybe I didn't phrase my

14     question sufficiently clear earlier.  What I had also

15     meant was, were there any transfers between Alydian

16     accounts into CoinLab accounts?

17             MR. VESSENES:  So there have been post-petition --

18             MS. GLYNN LEVIN:  Just a second.  What time frame

19     are you referring to?

20             MR. GALLANCY:  In October and November, as I'd

21     mentioned before.

22             MS. GLYNN LEVIN:  October 1st through November

23     30th?

24             MR. GALLANCY:  Yes.

25             MS. GLYNN LEVIN:  Okay.  So you're talking about a

1    pre-petition and a post-petition time period?

2         MR. GALLANCY:  Yes, ma'am.

3         MR. VESSENES:  So, yes, certainly, is the answer.

4         MR. GALLANCY:  And what were those transfers for.

5         MR. VESSENES:  Those are, you know, they would be

6    in payment for bills, so invoices are delivered to

7    Alydian; Alydian would remit.

8         MR. GALLANCY:  Got it.  One more address and I

9    think that this will certainly be familiar to you because

10   we did discuss it in New York.  Do you want to pass this

11   over?

12        MR. SMITH:  And just to let me in on it, when you

13   say "discuss it in New York," was there a deposition in

14   the state court action in New York or something?

15        MS. GLYNN LEVIN:  I'm not counsel in that case so

16   I can't say.

17        MR. VESSENES:  We haven't taken depositions.

18   There was testimony, live testimony.

19        MR. SMITH:  At a hearing?

20        MR. VESSENES:  In the Southern District of New

21   York at a hearing, evidentiary hearing.

22        MR. SMITH:  All right.

23        MR. GALLANCY:  So I think that's my -- that might

24   be my copy of it, unfortunately.  I want to make sure

25   we're looking at the same thing for accuracy sake.  This

1    12z address, this is the address we had discussed in New

2    York at the time.  We had discussed it.  First of all,

3    since this is an address that you would be familiar with,

4    is this a CoinLab address or an Alydian address?

5             MR. VESSENES:  This is a CoinLab Inc address.

6             MR. SMITH:  And could somebody put some portion of

7    the -- on the record so that people will know what

8    address you're talking about?

9             MR. VESSENES:  It starts with 1-2-z-z-m-5.

10            MR. SMITH:  Okay.

11            MR. GALLANCY:  I was calling it a 12zz address for

12   simplicity.  So the 12zz address is a CoinLab address.

13   So just to understand, I'm going to lump a couple of

14   questions in here just for simplicity here.  You can see

15   that there are a bunch of input transactions to that

16   address and, you know, again back to this sort of nerd

17   speak a little bit, what I'm referring to is bitcoins

18   that were sent to that address, either from -- could be

19   from anywhere, and some of them seemed to be from random

20   places.  It's impossible to say.

21            MR. VESSENES:  Sure, there's spam.

22            MR. GALLANCY:  Right, there's some spam.  We both

23   agree, right.  There is one on October -- on, sorry, on

24   October 29th for, I think it's on the last page, it's for

25   9,999 bitcoins.

1             MR. VESSENES:  Mm-hmm.

2             MR. GALLANCY:  Right?  What was the source of

3      funds for that?  That's a very large -- that's a very,

4      very large transaction.

5             MR. SMITH:  Well, to the degree, if you want to

6      ask whether that was from the Debtor, I think that's a

7      good question, but to the degree --

8             MR. GALLANCY:  Right.  Or I guess I should --

9             MR. SMITH:  -- it was from some unrelated --

10             MR. GALLANCY:  I guess I should rephrase it.

11             Is that from the Debtor to the Debtor or does that

12      relate to XRay Holdings in any way?

13             MS. GLYNN LEVIN:  So are you asking him to respond

14      in his capacity with CoinLab or as a principal of the

15      Debtor company?  Because you just established that this

16      account, 12zzm5 doesn't belong to the Debtor.

17             MS. SIMONYAN:  Well, it doesn't.  I don't see how

18      the answer would be different, first of all.  We're

19      talking about numbers, so whether he's answering as an

20      Alydian employee or the CEO of CoinLab, the answer should

21      be the same.

22             And I also believe that questions about the

23      financial condition of the majority shareholder of the

24      Debtor are fair game at this 341.  The schedules show

25      that there have been transfers between the Debtor,

```
1    significant and large transfers between the Debtor and

2    CoinLab.  So, you know, where CoinLab has transferred

3    further, you know, that should be the subject of this 341

4    hearing.

5         MR. SMITH:  Well, we're not going to get into the

6    all the financials of CoinLab, so to the degree you're

7    trying to determine whether that transaction relates to

8    the Debtor in any way --

9         MR. GALLANCY:  No, I actually --

10        MR. SMITH:  -- you should ask questions about

11   that.

12        MR. GALLANCY:  Yeah.  So let me rephrase it.

13        The schedule that you filed there indicates a

14   10,000 bitcoin capital infusion from XRay Holdings.

15        MS. GLYNN LEVIN:  I'm sorry.  Where are you

16   referring to?

17        MS. SIMONYAN:  That would be Schedule F, and

18   that's the last page of Schedule F.

19        MR. GALLANCY:  Right.

20        MS. GLYNN LEVIN:  So what's your question?

21        MR. GALLANCY:  The question is twofold.  First, is

22   that 10,000 bitcoin transaction that we had just

23   discussed with the 12zz address, that capital infusion

24   from, or related to that capital infusion from XRay

25   Holdings?
```

```
 1          MR. VESSENES:  I believe so.  I believe that those

 2     10,000 coins are the XRay Holdings loan coins, yes.

 3          MR. GALLANCY:  So related to that, so when was the

 4     loan -- and we can put the nerd speak on pause for a

 5     moment here -- when was the loan from XRay Holdings -- -

 6     for capital infusion from XRay Holdings consummated?

 7          MR. SMITH:  Could you distinguish between those

 8     two for me?  Because, as I understood the testimony,

 9     there was both.  There was both initial capital infusion,

10     but there was also --

11          MR. GALLANCY:  Right, I'm referring --

12          MR. SMITH:  -- the $3 million loan.

13          MR. GALLANCY:  I'm referring to the 10,000

14     bitcoins on that schedule.

15          MR. SMITH:  Okay.  And can we clarify that was

16     bitcoins or was some or all of that money?

17          MR. VESSENES:  Both XRay Holdings equity placement

18     and loan were in bitcoins.

19          MR. SMITH:  All right, thank you.

20          MR. VESSENES:  I don't recall exactly but one

21     could easily, I think, see when the coins came in

22     originally.

23          MR. GALLANCY:  My confusion here, I guess, is it

24     looks like, you know, as you can see, the time stamp on

25     this 10,000 coins that we just talked about it is October
```

1    29th, but I had understood that the capital infusion,

2    this 10,000 bitcoins as listed on the schedule over

3    there, that occurred in either August or September.  Am I

4    right?

5          MR. VESSENES:  Approximately, yeah.

6          MR. GALLANCY:  So were those 10,000 bitcoins spent

7    on mining equipment?

8          MR. VESSENES:  Yeah, parts.  Well, they didn't pay

9    for all the parts.  CoinLab is also a creditor, but they

10   defrayed some of the parts cost.

11         MR. GALLANCY:  So I guess what I'm trying to

12   understand, then, is if those 10,000 bitcoins were spent

13   on parts, then the 10,000 bitcoins over here in this

14   address, the 12zz address, how can there still -- I guess

15   I don't understand the reconciliation.  How are there

16   still 10,000 bitcoins in the 12zz address if some of

17   those bitcoins from XRay Holdings were --

18         MR. VESSENES:  You're now just asking about

19   CoinLab finances, completely.

20         MR. GALLANCY:  Well, no, but I felt that the loan

21   was to Alydian or the capital infusion as listed on the

22   schedule to Alydian --

23         MR. VESSENES:  It was.  And Alydian used those

24   bitcoins to pay for parts, and that's the transaction you

25   see here, is a parts payment transaction to CoinLab Inc.

1          MR. GALLANCY:  Okay.  So Alydian received the

2     bitcoins from XRay Holdings and then CoinLab went ahead

3     and bought the parts using U.S. dollars, and then this

4     transfer is a transfer from an Alydian account to

5     CoinLab?

6          MR. VESSENES:  That's correct, in payment for

7     those parts.  In partial payment.

8          MR. GALLANCY:  In partial payment for those parts.

9          MR. VESSENES:  That's correct.

10          MR. GALLANCY:  I understand.  That makes more

11     sense to me.  Okay.  So the terms of the capital infusion

12     listed on that schedule, the 10,000 bitcoin capital

13     infusion, what were the terms that --

14          MR. SMITH:  Let me just clarify that because, as I

15     understood it, the 10,000 bitcoins that are listed on

16     Schedule F was not a capital infusion.  It was a loan.

17          MR. VESSENES:  That's correct.

18          MS. SIMONYAN:  Let's refer to it as a loan.

19          MR. GALLANCY:  Sure, okay.

20          MR. SMITH:  Because there were other capital

21     infusions.

22          MR. GALLANCY:  Sure.

23          MR. SMITH:  Which are not reflected because they

24     don't have to be repaid.

25          MR. GALLANCY:  Sure, sure.  Okay.

1          MR. SMITH:  So I want to make the distinction.

2          MR. GALLANCY:  This is Schedule F, right?

3          MR. SMITH:  Yeah.

4          MR. GALLANCY:  I'll say the 10,000 on Schedule F.

5          MR. SMITH:  That's fine.

6          MR. GALLANCY:  10,000 on Schedule F for clarity.

7     The 10,000 bitcoins referred to on Schedule F, what were

8     the terms of the agreement with XRay Holdings regarding

9     that 10,000 bitcoins?

10         MR. VESSENES:  I think the contract is in the

11    motion, so you could read that.  Yeah.  Is that true?

12         MS. GLYNN LEVIN:  Actually, sorry, no, I don't

13    think it is.  I don't think it is in the record.

14         MR. SMITH:  So Mr. Vessenes --

15         MS. GLYNN LEVIN:  I could be wrong, but at this

16    point I'm not sure.

17         MR. SMITH:  You need to testify as to your

18    personal knowledge if you know the terms between the

19    Debtor and XRay.

20         MR. VESSENES:  There were some details, but it was

21    a 10,000 coin loan and 15,000 coins returned, is the

22    broad financial strokes of that.

23         MR. GALLANCY:  When were the 15,000 coins due?

24         MR. VESSENES:  There's no date associated with

25    when they're due.

1          MR. GALLANCY:  So they could be paid back at any

2    time in the future?

3          MR. VESSENES:  Yeah, there was -- there are no

4    dates attached to it.

5          MR. GALLANCY:  Okay, that makes sense.  And of

6    those 10,000 bitcoins, how many have been used thus far

7    for the purchase of parts and equipment?

8          MR. VESSENES:  100 percent of them.  Alydian spent

9    all of them on parts and equipment.

10          MR. GALLANCY:  Alydian spent 100 percent of them?

11          MR. VESSENES:  Yeah, and that's this transaction

12    you see.

13          MR. GALLANCY:  I see, okay.

14          MR. SMITH:  So we could expect that there would be

15    invoices from CoinLab to the Debtor --

16          MR. VESSENES:  Yes.

17          MR. SMITH:  -- underlying the 10,000 bitcoin

18    value?

19          MR. VESSENES:  Yeah, it's in excess, actually

20    because -- yeah.  But yes.

21          MR. GALLANCY:  Okay.  So CoinLab went ahead and

22    paid for the parts with U.S. dollars.  XRay Holdings lent

23    10,000 bitcoins to Alydian, and then Alydian

24    subsequently, to pay for those parts, transferred those

25    10,000 bitcoins back to CoinLab.  Just so I understand

1      the flow of funds, that's the complete picture?

2              MR. VESSENES:  That's correct.

3              MR. GALLANCY:  Got it, okay.

4              MS. SIMONYAN:  I just want to follow up with a

5      couple of questions.  Is there a written contract?  Are

6      there loan documents?

7              MR. VESSENES:  There is a written service

8      agreement between Alydian and CoinLab.

9              MR. GALLANCY:  Not -- go ahead.

10             MS. SIMONYAN:  Does the service agreement

11     incorporate information about the loan or is there a

12     separate document specifically as to the 10,000 bitcoin

13     loan?

14             MR. VESSENES:  Oh, there's a contract between --

15     there is a contract between Holdings [sic] and XRay.

16             MS. SIMONYAN:  The Debtor and XRay?

17             MR. VESSENES:  Yes, that's correct.

18             MS. SIMONYAN:  And who signed the contract on

19     behalf of Alydian?

20             MR. VESSENES:  I did.

21             MR. GALLANCY:  And on behalf of XRay?

22             MR. VESSENES:  Brian Cartmell.

23             MR. GALLANCY:  And who is Brian Cartmell?

24             MR. VESSENES:  I think he's the --

25             MS. GLYNN LEVIN:  If you know.

1          MR. VESSENES:  He's the, I guess, managing

2     director of XRay.

3          MS. SIMONYAN:  Do you know the date that contract

4     was signed?

5          MR. VESSENES:  No.

6          MS. SIMONYAN:  Can you give me a range?

7          MR. VESSENES:  We were just -- it was sometime --

8          MS. GLYNN LEVIN:  Asked and answered.  He doesn't

9     know.

10          MS. SIMONYAN:  You don't know approximately the

11     date the contract was signed?

12          MR. VESSENES:  Sometime between July and

13     September.

14          MS. SIMONYAN:  Okay.

15          MR. GALLANCY:  Okay.  And Alydian has no bank

16     account right now, so zero U.S. dollars --

17          MR. VESSENES:  That's correct.

18          MR. GALLANCY:  -- that Alydian possesses, right?

19     And how many bitcoins does Alydian possess right now?

20          MR. VESSENES:  Right now?  I gave an estimate

21     earlier.  I said a net of bills, approximately 1,100.  It

22     might be a little more.

23          MR. GALLANCY:  And have those been taken out of

24     addresses at which Alydian is mining and put into a

25     separate address or do those remain in the mining

1     addresses?

2          MR. VESSENES:  Again, I don't know for sure.  Our

3     common practice is to leave them where they're mined,

4     too, though.

5          MR. GALLANCY:  Okay.

6          MS. GLYNN LEVIN:  Are there a lot more questions?

7          MR. GALLANCY:  I have a bunch of additional

8     questions, yes.

9          MS. GLYNN LEVIN:  Well, perhaps we should consider

10    putting this to a 2004 exam because --

11         MR. GALLANCY:  These are general questions.  These

12    aren't related to --

13         MR. SMITH:  There's no time frame on a 341.  If

14    they're legitimate questions, they have a right to ask

15    them.

16         MR. GALLANCY:  Okay.  So just so I know, who are

17    the board members of Alydian?

18         MR. VESSENES:  Just me.

19         MR. GALLANCY:  Just you?  Just you, okay.  And who

20    are the board members of CoinLab?

21         MR. VESSENES:  Just me.

22         MR. GALLANCY:  You're the only board member of

23    CoinLab?

24         MR. VESSENES:  That's correct.

25         MR. GALLANCY:  Interesting.  Interesting.  In

1    communications with investors, you make all the decisions

2    on behalf of Alydian, and you go back to Alydian's

3    investors and say, you know, "These are the decisions

4    I've made," and same thing for CoinLab?

5           MS. GLYNN LEVIN:  Objection.  Is that a question?

6           MR. GALLANCY:  Well, okay.  I'll rephrase the

7    question if you like.

8           MS. GLYNN LEVIN:  Well, could you just maybe ask

9    one part of the question at a time so that he can give an

10   answer?  Because that was sort of compound.

11          MR. GALLANCY:  Sure, of course.

12          MS. GLYNN LEVIN:  I couldn't track it.

13          MR. GALLANCY:  Sure.  Absolutely.

14          So you make decisions on behalf of Alydian as both

15   the managing director and as the sole board member, and

16   then --

17          MR. SMITH:  You might want to stop there.

18          MS. SIMONYAN:  So stop there.  Is that a "yes" or

19   a "no"?

20          MR. VESSENES:  I am always in conversation with

21   shareholders in Alydian, for sure.

22          MR. GALLANCY:  Okay.

23          MR. VESSENES:  And to the extent that the matters

24   relate to other groups, I'm talking to them too.

25          MS. SIMONYAN:  But the ultimate authority to make

 1     financial decisions on behalf of Alydian rests with you;

 2     is that correct?

 3             MR. VESSENES:  I think so.  I mean, although I

 4     will say in bankruptcy mostly my concerns are for the

 5     creditors, right?  So I have significant other parties to

 6     consider.

 7             MR. GALLANCY:  Of course.  Of course.  And just to

 8     be a hundred percent clear, what is Joel Yarmon's

 9     affiliation with Alydian and his affiliation with

10     CoinLab?

11             MR. SMITH:  What's his name again?

12             MR. GALLANCY:  Joel Yarmon.  It's Y-a-r-m-o-n.

13             MR. SMITH:  Okay.

14             MS. GLYNN LEVIN:  And are you --

15             MS. SIMONYAN:  He's a creditor of the estate.

16             MR. GALLANCY:  He's a creditor, but is he -- he's

17     a creditor of the estate, but does he have any other

18     affiliation?

19             MR. VESSENES:  With Alydian?  Not really.

20             MR. GALLANCY:  And with CoinLab?

21             MR. VESSENES:  So he's an investor and a former

22     board member at CoinLab.

23             MR. GALLANCY:  A former board member?

24             MR. VESSENES:  Yeah.

25             MR. GALLANCY:  So okay.  Did Alydian have any

1      other board members before, earlier?

2            MR. VESSENES:  No.

3            MR. GALLANCY:  Did CoinLab have any other board

4      members before?

5            MR. VESSENES:  Are you just talking about CoinLab

6      as a -- like, can't -- what does this have to do with the

7      Alydian bankruptcy, CoinLab's directors?

8            MS. SIMONYAN:  Mr. Smith, I think it's

9      quintessential to the Debtor's --

10           MR. SMITH:  I don't think so under the -- for

11     purposes of this.  Your questions need to be about the

12     assets and liabilities of the Debtor.

13           MR. GALLANCY:  Sure.

14           MR. SMITH:  And prospects for reorganization.

15           MR. GALLANCY:  Sure.

16           MR. SMITH:  That's the context.

17           MR. GALLANCY:  Sure.

18           MR. SMITH:  Some of this other stuff I think is

19     relevant, but --

20           MR. GALLANCY:  Sure.

21           MR. SMITH:  -- to the degree you want to get into

22     the corporate governance of the 65 percent owner of the

23     Debtor, I think you can do that in another forum.  You

24     don't have to do that today.

25           MR. GALLANCY:  Sure.  Okay.  Okay.  So I want to

1    talk about this operating budget.  I'm not sure which

2    exhibit.

3          MS. SIMONYAN:  That's Schedule I and J.

4          MR. GALLANCY:  Schedule I and J, okay.  So here we

5    show your forecast is for 5,421 bitcoins to be mined

6    through the end of February, but I -- does that assume

7    that the equipment gets turned off at the end of

8    February?

9          MR. VESSENES:  No.  We just didn't forecast out

10   past February.

11         MR. GALLANCY:  Got it.  So at today's market rate,

12   we're talking about something close to $5.4 million?

13         MR. VESSENES:  Sure.  Although, again, it varies a

14   lot --

15         MR. GALLANCY:  It varies.  Right.  Of course.

16         MR. VESSENES:  -- day by day.

17         MR. GALLANCY:  Right.

18         MR. VESSENES:  Yeah.

19         MR. GALLANCY:  We all agree it fluctuates.  It

20   says $5.4 million of bitcoins mined, which is, you know,

21   whatever it is.  I think of it as revenue.  You may call

22   it something else.  And total expenses of 900 -- almost

23   $900,000.  Is that correct?

24         MR. VESSENES:  That's the budget through end of

25   December, but not through end of February.

1          MR. GALLANCY:  Okay.  What about through the end

2     of February?  What would be the incremental expense for

3     one month?

4          MR. VESSENES:  I don't know.  I haven't -- we

5     haven't forecasted that out.

6          MR. GALLANCY:  The -- for December, you had

7     mentioned you have six systems deployed, and there were

8     three more being deployed today.

9          MR. VESSENES:  No.  More than that.

10          MR. GALLANCY:  I'm sorry.  Okay.

11          MR. VESSENES:  Six were deployed as of the

12     petition date on October 31st.  There's something close

13     to --

14          MR. GALLANCY:  I'm sorry.  You had said 16.

15          MR. VESSENES:  Something closer to --

16          MR. GALLANCY:  I apologize.

17          MR. VESSENES:  -- 16 now, yeah.

18          MR. GALLANCY:  16 deployed, right.

19          MS. GLYNN LEVIN:  Wait till he finishes his

20     question.

21          MR. VESSENES:  Okay.  I'm sorry.

22          MS. GLYNN LEVIN:  Yeah.

23          MR. GALLANCY:  Okay.  16 deployed.  For the month

24     of December, within your projections, does that

25     contemplate the deployment of the full 32 that you had

1    mentioned, 30 to 32 you had mentioned?

2         MR. VESSENES:  I believe so.  I think the plan is

3    to have them all deployed by the end of December.

4         MR. GALLANCY:  Okay.  Okay.  Got it.  So the

5    expense for operating 32 systems for one month is

6    approximately $441,860?

7         MR. VESSENES:  It will go down a little bit

8    because we will not need all of the contractors and etc.

9    going forward.  It looks like we've got kind of a rolling

10   down in December.

11        MR. GALLANCY:  Got it.

12        MR. VESSENES:  That said, our hosting contracts

13   are month to month because we didn't want to bind Alydian

14   to, you know, a lot of obligations that would hurt the

15   creditors if mining suddenly looks bad or worse than it

16   does now.  So it's very possible hosting prices will

17   change.  We don't know.

18        MR. GALLANCY:  Got it.  Okay.  So -- but this is

19   to the best of your abilities, right?  That's logical to

20   me.  But the December -- to be clear, so we're talking

21   about just for the month of December, just to keep it

22   very concrete, 2,573 bitcoins projected to be generated,

23   which is something -- you know, obviously the values

24   fluctuate, but tell me if I'm wrong here.  We're talking

25   about approximately $2.5 million of bitcoin mining

1       revenue, if we could use the word "revenue" -- maybe we

2       shouldn't -- and expenses of approximately $441,000?

3              MR. VESSENES:  That's our estimate right now.

4              MR. GALLANCY:  That's your estimate.  Does Alydian

5       have any other assets besides the mining equipment that

6       you had mentioned?  I guess maybe some office equipment

7       and stuff like that?

8              MS. GLYNN LEVIN:  Objection.  Asked and answered.

9       The schedules say everything that Alydian owned as of the

10      petition date.  Are you talking about additional coin?

11             MR. GALLANCY:  Well, I guess the reason I'm

12      confused is because, you know, the schedule didn't list

13      the bitcoins, so I just want to make sure that I'm aware

14      of all the assets.

15             MR. SMITH:  Could you ask your question again?

16             MR. GALLANCY:  Does Alydian have any other assets

17      besides the ones listed in the schedule?

18             MR. VESSENES:  With the exception of the bitcoins,

19      which we had talked to the analysts about how to report,

20      no.

21             MR. GALLANCY:  Got it.

22             MR. SMITH:  Can I just jump in and ask, why is the

23      hosting expense going up 50 percent in December?

24             MR. VESSENES:  It's because each system you deploy

25      costs more energy.

1              MR. SMITH:  Okay.

2              MR. VESSENES:  So yeah.

3              MR. SMITH:  So that's to account for the

4      additional --

5              MR. VESSENES:  Exactly.

6              MR. SMITH:  -- deployment?

7              MR. VESSENES:  Yeah.

8              MR. GALLANCY:  Okay.  Okay.  That makes a lot of

9      sense to me.  So all right.  We'll skip that.  The

10     going-forward expenses, to the best of your knowledge, we

11     have this $441,860, right?  Would you anticipate -- or I

12     should say by how much would you anticipate hosting to

13     increase during the month of January?

14             MR. VESSENES:  I don't know.  You know, I'm not

15     the financial guy.

16             MR. GALLANCY:  Okay.  Just in terms of knowing who

17     all the creditors are, one of them is a Sunshine Network

18     Limited?

19             MR. VESSENES:  Yeah.

20             MR. GALLANCY:  Who is the principal of that?

21             MR. VESSENES:  I don't know.

22             MR. GALLANCY:  You don't know?

23             MR. VESSENES:  No.

24             MR. GALLANCY:  Okay.  Well, okay.  Certainly when

25     that entity did a pre-buy contract with you there must

1      have been some party that countersigned, right?

2              MR. VESSENES:  Yeah.

3              MR. GALLANCY:  And you don't know who that party

4      is?

5              MR. VESSENES:  I don't recall.  We have the

6      contract.

7              MR. SMITH:  Was that one of the contracts that

8      you're moving to reject?  So that should be -- that would

9      be attached to the motion for you to look at.

10             MR. GALLANCY:  I didn't see that contract.

11             MS. GLYNN LEVIN:  It's in the record.

12             MR. GALLANCY:  I don't know that it is.

13             MS. SIMONYAN:  I don't think I've seen that one.

14             MR. GALLANCY:  Okay.  But I'll check again.  It's

15     in the record?  Well, fair enough.  I didn't see it,

16     but...

17             MS. GLYNN LEVIN:  Any other questions for Mr. --

18             MR. GALLANCY:  Yeah, I do have a few more.

19             MS. GLYNN LEVIN:  Okay.

20             MR. GALLANCY:  A few more questions here.  I guess

21     we're all -- everyone is looking for this one particular

22     item here?  I was just giving everyone a minute to find

23     it.

24             MS. GLYNN LEVIN:  Yeah.  Schedule -- Exhibit H.

25             MR. GALLANCY:  Exhibit H?

1          MS. GLYNN LEVIN:  Exhibit H to his original

2     declaration filed November 15th.

3          MR. GALLANCY:  It does have it in there.  Okay.

4     Thank you.  That's great.

5          Besides transfers of bitcoins between the Debtor

6     and CoinLab for purposes of payment of -- payment for

7     supplies, were there any other transfers for other

8     purposes?

9          MR. VESSENES:  When?

10          MR. GALLANCY:  Through the history of the company.

11          MR. VESSENES:  So far, I do not believe Alydian

12     has done any other transfers, no.

13          MR. GALLANCY:  Okay.  So all the transfers were

14     just for payment of parts?

15          MR. VESSENES:  Well, there's parts and services.

16     There's --

17          MR. GALLANCY:  Services as well.

18          MR. VESSENES:  Yeah.  Parts and services.

19          MR. GALLANCY:  Got it.

20          MR. SMITH:  And fees.

21          MR. GALLANCY:  And fees.

22          MR. SMITH:  Let's just capture everything.

23          MR. VESSENES:  Yeah.  Yeah.

24          MR. GALLANCY:  Capture it all.  And fees.  Okay.

25          Since bitcoins are obviously, we both know, data,

1    right, how does Alydian -- you know, import asset -- how

2    does Alydian store its bitcoins?

3            MR. VESSENES:  We have a number of addresses that

4    we've generated using a high-entropy key from -- we're

5    using a Swiss quantum random-number generator, and those

6    are kept in a couple of secure places.  And so to -- so

7    the addresses are easily -- fairly easily generated or

8    referred to.

9            MR. GALLANCY:  Sure.

10           MR. VESSENES:  And then there's a process that one

11   goes through to unlock and pull them out.

12           MR. GALLANCY:  Right.  So the private keys are

13   stored on paper?

14           MR. VESSENES:  Yeah, they are.  I have

15   confidentiality and safety questions if we talk too much

16   about where these are kept.

17           MR. GALLANCY:  I won't go too far.

18           MR. VESSENES:  Okay.

19           MR. GALLANCY:  I won't go too far with it.

20           MR. VESSENES:  But that's fine, yeah.

21           MR. GALLANCY:  But they're stored on paper and

22   then put someplace secure?

23           MR. VESSENES:  Some are stored on paper and some

24   are -- we have a lower -- slightly lower security class

25   that are generated incrementally using sort of a BIP32

 1    HD wallet style generation function.

 2          MR. GALLANCY:  Got it.  And those private keys

 3    that are kept secure, we were talking earlier about

 4    access.  Who has access, physical access, to the

 5    locations where those are stored?

 6          MS. GLYNN LEVIN:  How is that a question that a

 7    creditor --

 8          MR. GALLANCY:  I want to make sure that the assets

 9    are being stored securely.  These are important assets of

10    the estate.

11          MR. SMITH:  I don't see it as any different than a

12    question of, you know, what bank is the money kept in.

13          MR. VESSENES:  It's different.  It's like saying,

14    "Where did you keep the cash and who can go get it?"

15    Because if there's a --

16          MR. SMITH:  Well, if the Debtor had a roomful of

17    cash, then one of the questions might be, "What room did

18    he keep the cash in and who can go get it?"

19          MR. VESSENES:  Yeah.  It's fair enough.  But

20    there's a physical risk too.  There's like a real

21    non- -- I mean --

22          MR. SMITH:  If there's a risk in answering the

23    question to the Debtor's assets, then I don't think he

24    should have to answer the question, but that presumes

25    what -- can you explain what --

1          MR. VESSENES:  As an analogy --

2          MR. SMITH:  -- risk is involved?

3          MR. VESSENES:  Yeah.  I mean --

4          MR. SMITH:  Because that seems like a

5     straightforward question.

6          MR. VESSENES:  If I say -- as an analogy say,

7     "Okay, who holds all the diamonds in your diamond

8     company," and I say, "Oh, it's John, John's got access,

9     sole access to it," John is now at physical risk, right?

10    It's on the public record.

11         MR. GALLANCY:  Okay.

12         MR. VESSENES:  Like, men with guns can come to

13    John and take his diamonds.

14         MR. GALLANCY:  Right.  No.  I --

15         MR. SMITH:  I agree with that.

16         MR. VESSENES:  So yeah.

17         MR. SMITH:  But is his question analogous to that?

18         MR. VESSENES:  It is analogous to that.

19         MR. SMITH:  All right.

20         MR. VESSENES:  It is analogous.

21         MR. GALLANCY:  I think earlier you had mentioned

22    that Alydian has something like 1,100 bitcoins right now?

23         MR. VESSENES:  Roughly, I guess.

24         MR. GALLANCY:  So we're talking about a million

25    dollars, right?  So it seems like in the grand scheme of

 1      things I'm not sure that creates a tremendous security

 2      risk.

 3              MR. SMITH:  Well, if he believes it does and

 4      doesn't want to --

 5              MR. GALLANCY:  Okay.

 6              MR. SMITH:  Refuses to answer --

 7              MR. GALLANCY:  Got it.

 8              MR. SMITH:  -- the question on that basis, I

 9      don't --

10              MR. GALLANCY:  Fair enough.

11              MR. SMITH:  -- have any ability to make him answer.

12              MR. GALLANCY:  Fair enough.  Okay.

13              So, again, just to understand a little bit more

14      about the flow of funds, CoinLab billed Alydian

15      $2.6 million between August and November for purchases

16      per the schedule --

17              MS. SIMONYAN:  Statement of financial affairs.

18              MR. GALLANCY:  Right.  Statement of financial

19      affairs.

20              MS. GLYNN LEVIN:  Can you give us a moment to turn

21      to that?

22              MR. GALLANCY:  Sure.

23              MS. SIMONYAN:  It's number 3.

24              MS. GLYNN LEVIN:  Okay.  Can you repeat the

25      question?

1          MR. GALLANCY:  All right.  CoinLab billed

2     approximately $2.6 million between August and November

3     for purchases, according to that schedule.  All of

4     those -- just so I understand, were all of those

5     purchases --

6          MS. GLYNN LEVIN:  So just --

7          MR. GALLANCY:  -- paid for --

8          MS. GLYNN LEVIN:  So hold on.  Are you referring

9     to the itemized list of payments or transfers in

10    schedule -- SOFA, Question 3(B)?

11         MS. SIMONYAN:  That's correct.

12         MS. GLYNN LEVIN:  Okay.  Go ahead.

13         MR. GALLANCY:  All those were paid in bitcoin?

14         MR. VESSENES:  I believe so.

15         MR. GALLANCY:  And the values that we're seeing

16    there are the values -- the approximate U.S. dollar

17    equivalent values on those dates?

18         MR. VESSENES:  No.  We use a fairly industry

19    standard valuation methodology which marks the coins'

20    value to the date that the purchase was made on those

21    coins.  Details of that are in the Alydian and CoinLab

22    master service agreement if you want to read it.  So --

23         MR. GALLANCY:  Was that filed?

24         MS. SIMONYAN:  I don't believe it's on the record.

25         Is it, Counsel?

1              MS. GLYNN LEVIN:  No.

2              MS. SIMONYAN:  Would you be willing to provide

3        that or put it on the record?

4              MS. GLYNN LEVIN:  With appropriate requests.

5              MS. SIMONYAN:  Okay.

6              MR. SMITH:  And given the back and forth, though,

7        let me make sure I just understand the answer.  So

8        generally speaking, these are transfers, not billings,

9        but assuming there are invoices underlying these

10        transfers of bitcoins from the Debtor to CoinLab, the

11        valuations put in the amount paid or the value of the

12        transfers is not a value that is marked to the market as

13        of the day of the transfer, but it's as to the day that

14        purchase --

15              MR. VESSENES:  The purchase was --

16              MR. SMITH:  -- assuming it was equipment.

17              MR. VESSENES:  Yes, that's correct.

18              MR. SMITH:  The purchase or the services were

19        provided?

20              MR. VESSENES:  For services they're marked on the

21        bill date.

22              MR. SMITH:  Okay.  So there is a distinction

23        there?

24              MR. VESSENES:  Yes, that's correct.

25              MR. SMITH:  Okay.

```
 1            MS. SIMONYAN:  Just one more follow-up.  You said

 2      these transfers you believe are bitcoin transfers?  Is it

 3      possible that they're not?  Are you not certain whether

 4      they are or not?

 5            MR. VESSENES:  I don't think so.  I think that

 6      Alydian was only dollars there, but I'm not prepped with

 7      the full audit list here.

 8            MS. SIMONYAN:  Okay.  Does Alydian have any bank

 9      accounts?

10            MR. VESSENES:  No.

11            MS. SIMONYAN:  Checking accounts?

12            MR. VESSENES:  No, not now.

13            MS. SIMONYAN:  So if they were to be dollar

14      transfers, where would the dollars come from?

15            MR. VESSENES:  The initial seed funding was in

16      dollars.

17            MS. SIMONYAN:  Okay.  So at that point did Alydian

18      have a checking account?

19            MR. VESSENES:  No.  CoinLab had a segregated

20      account.

21            MS. SIMONYAN:  So CoinLab had an account that it

22      was -- and the money held by the CoinLab account was held

23      as a trustee for the benefit of the Debtor?

24            MR. VESSENES:  I don't know what it --

25            MS. SIMONYAN:  Well --
```

1              MR. VESSENES:  There's some technical terms,

2       but --

3              MS. SIMONYAN:  Okay.  So --

4              MR. VESSENES:  But it was only Alydian money, and

5       it was only used to pay Alydian bills.

6              MS. SIMONYAN:  And it was a separate segregated

7       account titled under CoinLab's name?

8              MR. VESSENES:  I believe so.

9              MS. SIMONYAN:  And the understanding of the

10      parties was that money belonged to Alydian?

11             MR. VESSENES:  That's correct.

12             MS. GLYNN LEVIN:  Which parties are you referring

13      to?

14             MS. SIMONYAN:  I'm referring to CoinLab and

15      Alydian.

16             MR. VESSENES:  Yeah, that's correct.

17             MS. SIMONYAN:  And is there any sort of an

18      agreement?  Would this be reflected in the operating

19      agreement that you were referring to a moment ago?

20             MR. VESSENES:  The operating agreement postdates

21      the closing of that account, so most U.S. banks stopped

22      dealing with bitcoin businesses a number -- quite a while

23      ago, and so those accounts were closed then.  But they

24      were -- Alydian had at that point spent the dollars on

25      parts and services, so there were no dollars left in it

```
 1    anyway.

 2         MS. SIMONYAN:  Can you give me a date when the

 3    account was closed?

 4         MR. VESSENES:  No, not off the top of my head.

 5         MS. SIMONYAN:  Or an approximate range?

 6         MR. VESSENES:  I don't remember.

 7         MS. SIMONYAN:  But it would have been sometime

 8    after August of 2013?

 9         MR. VESSENES:  That's what I'm saying.  I don't

10    remember, and so it's possible some of those include some

11    dollars and coins, but, you know, I don't believe that

12    they do.  I think they're all bitcoins.

13         MS. SIMONYAN:  Okay.

14         MR. GALLANCY:  So okay.  Back to the flow of funds

15    here, just, again, to make sure I understand properly,

16    XRay Holdings provided the 10,000 bitcoins per the

17    Schedule F that we showed before, and then you sent those

18    bitcoins to an exchange and got U.S. dollars for those

19    bitcoins?

20         MR. VESSENES:  Alydian -- no.  Alydian paid

21    CoinLab for a portion of its bills with those bitcoins.

22         MR. GALLANCY:  Alydian paid CoinLab for a portion

23    of its bills with those bitcoins?

24         MR. VESSENES:  Right.  So Alydian had instructed

25    CoinLab to purchase parts so that it could mine.  CoinLab
```

1    did so, had put out a bunch of money to do that, had

2    billed Alydian.  Alydian couldn't pay all of it, but paid

3    what it could, leaving this -- leaving CoinLab as a

4    creditor.

5              MR. GALLANCY:  Okay.  But the 10,000 bitcoins were

6    sent from XRay to Alydian, and then subsequently sent

7    from Alydian to CoinLab --

8              MR. VESSENES:  Correct.

9              MR. GALLANCY:  -- as repayment for purchases that

10   CoinLab made in U.S. dollars, and that's why the 10,000

11   bitcoins show up at the 12zz address?

12             MR. VESSENES:  Partial payment, correct.  Yeah.

13             MR. GALLANCY:  Partial payment.

14             MS. GLYNN LEVIN:  Wait till he finishes his

15   question.

16             MR. SMITH:  And you say --

17             MR. VESSENES:  Oh, I'm sorry.

18             MR. SMITH:  And you say partial because CoinLab is

19   still owed 600,000?

20             MR. VESSENES:  That's correct, yeah.

21             MR. GALLANCY:  Okay, so got it.  So CoinLab

22   fronted the cash, bought the equipment, and then the

23   bitcoins were transferred subsequently to repay CoinLab.

24   What determined the U.S. dollar amount?  Is it the same

25   accounting methodology that you were referring to a

1    moment ago?

2         MR. VESSENES:  That's correct.

3         MR. GALLANCY:  It is?

4         MR. VESSENES:  Yes.

5         MR. GALLANCY:  Okay.

6         MR. SMITH:  We need to make some more progress.

7    We've kind of been talking around that model of

8    transaction for quite a while.

9         MR. GALLANCY:  Right.  Okay.  No, I understand.

10        Why did you choose XRay Holdings as a provider of

11   capital at that point, that 10,000 bitcoin transaction?

12        MR. VESSENES:  Alydian?  Oh, so --

13        MR. GALLANCY:  As opposed to somebody else.

14        MR. VESSENES:  It was by far the best offer we

15   had.  So we had offers for higher interest rate debt,

16   but --

17        MR. GALLANCY:  Right.

18        MR. VESSENES:  So...

19        MR. GALLANCY:  Okay.

20        MR. VESSENES:  We took the better one.

21        MR. GALLANCY:  And what about CoinLab providing

22   financing for Alydian directly?  Was that not an option?

23        MR. VESSENES:  Not really.  We were at the time --

24   I mean, I don't know how much I need to say about

25   CoinLab, but it was certainly not in CoinLab's model nor

1    in its financial capacity to provide the amount of

2    financing that Alydian needed.

3         MR. GALLANCY:  It was not -- okay.  So CoinLab

4    decided it didn't want to do it, so XRay did it instead?

5         MS. GLYNN LEVIN:  That's not a question he's going

6    to answer as principal of the Debtor.

7         MR. GALLANCY:  Okay.  Sorry.  How many lenders did

8    you approach?

9         MR. SMITH:  Did "the Debtor" approach.

10        MR. GALLANCY:  Did the Debtor approach?

11        MR. VESSENES:  Well, and as some background for

12   the attorney for the trustee, Alydian was out of money.

13   It didn't have money to buy the parts to do anything, so

14   it was kind of an emergency fundraising period.  We

15   talked to quite a number of retail customers that we

16   maybe thought we could sell, maybe about a hundred

17   different ones, give or take a hundred, that we thought

18   we could perhaps sell the bitcoin mining.  We talked to

19   three -- it was a very small number of lenders that we

20   thought would be interested.  We talked to three of them

21   along with those hundred customers, and so...

22        MR. GALLANCY:  Okay.  And none of those offers

23   were as good as the offer from XRay?

24        MR. VESSENES:  One declined.  Crystal Island

25   offered a 20,000 bitcoins back --

1          MR. GALLANCY:  Right.

2          MR. VESSENES:  -- rather than -- and then XRay

3     Holdings offered just for 15,000, so it was significantly

4     better for the -- what are now the creditors, we thought,

5     too.

6          MR. SMITH:  So is that essentially a 50 percent

7     interest rate?

8          MR. VESSENES:  Yeah.  I mean, even more if you --

9     well, I guess the risks are high, obviously, but yeah.

10    So the first -- the one -- the reason Dan's here, his

11    guys offered a hundred percent interest rate and we

12    didn't like that, and then we went with the guys who were

13    the 50 percent interest rate.

14         MR. SMITH:  Okay.

15         MR. GALLANCY:  That's not exactly why I'm here,

16    but that --

17         MR. SMITH:  And again --

18         MR. GALLANCY:  Right.

19         MR. SMITH:  -- although I said there's no limit,

20    there is a limit.

21         MR. GALLANCY:  Right.  Of course.

22         MR. SMITH:  And the limit is probably when --

23         MS. GLYNN LEVIN:  We're getting very close.

24         MR. SMITH:  Okay.

25         MR. GALLANCY:  Yeah.  No.  We know.

```
 1          MS. GLYNN LEVIN:  We're getting close.

 2          MR. GALLANCY:  We know we're approaching it.

 3          MR. SMITH:  Okay.

 4          MR. GALLANCY:  And we're trying to --

 5          MR. SMITH:  You need to think about wrapping up.

 6          MR. GALLANCY:  Trying to blast through the rest of

 7     it as much as we can, as quickly as we can.

 8          MR. SMITH:  Mr. Reyhani, are you still there?

 9          MR. GALLANCY:  He probably put it on mute --

10          MR. SMITH:  Oh.

11          MR. GALLANCY:  -- knowing him.

12          MR. VESSENES:  He's probably on mute.

13          MR. REYHANI:  I'm here.  I was on mute.

14          MR. SMITH:  Okay.  Just wanted to check.

15          MR. GALLANCY:  Yeah.  Okay.  Okay.

16          And did Alydian approach CoinLab and ask for a

17     loan?

18          MS. GLYNN LEVIN:  I think that question was asked

19     and answered.

20          MR. GALLANCY:  It's not what I --

21          MR. SMITH:  I don't think it's relevant.  We're

22     dealing with --

23          MR. GALLANCY:  Sure.

24          MR. SMITH:  For our purposes, we're dealing with

25     the asset base and the obligations as they are.
```

 1            MR. GALLANCY:  Right.

 2            MR. SMITH:  We know that --

 3            MR. GALLANCY:  Okay.

 4            MR. SMITH:  -- whether they approached them or

 5     not, they didn't make a loan.

 6            MR. GALLANCY:  It didn't happen.

 7            MR. SMITH:  It didn't happen.

 8            MR. GALLANCY:  Got it.  Okay.  That makes sense to

 9     me.  Okay.  What else do I have here?

10            MS. SIMONYAN:  Well, let me ask -- I just have a

11     couple of follow-ups, and then it will give you a few

12     more minutes.

13            MR. GALLANCY:  Yeah.

14            MS. SIMONYAN:  Just a couple.  Not a lot.

15            There was an initial capital investment by XRay.

16     You mentioned when you were answering the trustee's

17     questions that it was settled.  Is that correct or did

18     I --

19            MR. VESSENES:  What does "settled" mean?  I'm

20     sorry.

21            MS. SIMONYAN:  I may have misunderstood, but was

22     that repaid?

23            MR. VESSENES:  No.  It's a capital investment.

24            MS. SIMONYAN:  So, okay, I must have misunderstood

25     the answer.  Then I just have a couple of follow-ups

1     about the loan between XRay and the Debtor.  You said

2     there was -- so there was no date for repayment of the

3     bitcoins?

4             MR. VESSENES:  That's correct.

5             MS. SIMONYAN:  So were there any damages

6     contemplated under the agreement in the event those

7     bitcoins are not repaid?

8             MR. VESSENES:  I don't know.  I -- "damages"

9     sounds like kind of a technical word to me.  They're a

10    creditor in the lawsuit, I guess, so...

11            MS. SIMONYAN:  So if I understand correctly, those

12    bitcoins could have been returned at 50 percent interest

13    at any point.  There was no time limit.  There was no

14    definite deadline by which time the bitcoins should have

15    been returned to XRay?

16            MR. VESSENES:  There was no deadline, that's

17    correct.

18            MS. SIMONYAN:  Okay.  So if Alydian chose to repay

19    that in a 150 years, the agreement did not contemplate

20    any additional repercussions from the lengthy delay?

21            MS. GLYNN LEVIN:  That's a legal question and

22    my -- which my client cannot answer based on his personal

23    knowledge and as principal of the company.  It's a legal

24    question.

25            MS. SIMONYAN:  Okay.

1          MR. SMITH:  Well, and their claim is what their

2     claim is, so if there were damages with not meeting a

3     nonexistent deadline, that would be rolled into their

4     claim.

5          MS. SIMONYAN:  I understand in bankruptcy that's

6     what -- their claim is their claim, but I want to

7     understand the content of the loan documents.  Does the

8     loan document provide that in the event Alydian fails to

9     repay there are going to be certain repercussions?  I

10     don't think that there is any legal element to this

11     question.

12          MS. GLYNN LEVIN:  If you know, Peter, otherwise --

13          MR. VESSENES:  I guess, I'm not a lawyer.  I don't

14     even that it's a loan document.  I think it's -- so I

15     don't know how to answer.

16          MS. SIMONYAN:  You didn't believe it's a loan

17     document?  What did you believe it was?

18          MR. VESSENES:  It's a -- I think it was a

19     contract, so I don't know.  We're splitting hairs about

20     things you go to law school for, I think.  I don't know.

21          MS. SIMONYAN:  Well, okay.  So in your

22     understanding, was it a loan or was it some --

23          MS. GLYNN LEVIN:  It's asked and answered.  He

24     said he didn't know.  He thought it was a loan document.

25     He thought it was a contract.

```
 1              MS. SIMONYAN:  Okay.

 2              MS. GLYNN LEVIN:  So...

 3              MS. SIMONYAN:  Do you understand what a loan

 4      means?

 5              MS. GLYNN LEVIN:  Objection.

 6              MS. SIMONYAN:  I don't think you need to go to law

 7      school to understand what a loan is.

 8              MS. GLYNN LEVIN:  Objection.  You're --

 9              MR. SMITH:  Do you have --

10              MS. GLYNN LEVIN:  -- becoming argumentative with

11      my client, and I'm -- now I'm getting to --

12              MS. SIMONYAN:  It's just a question.

13              Do you understand the concept of a loan?

14              MR. VESSENES:  Yeah.

15              MR. SMITH:  Mr. Vessenes, do you have a -- there

16      is a written contract, correct?

17              MR. VESSENES:  That's correct, yeah.

18              MR. SMITH:  A written documentation of the

19      transaction?

20              MR. VESSENES:  Um-hum.

21              MR. SMITH:  All right.  So to the degree you have

22      discovery, that sounds like something --

23              MS. SIMONYAN:  Okay.

24              MR. SMITH:  -- you would want to look at if they

25      won't otherwise provide it.
```

1          MR. GALLANCY:  Okay.

2          MS. SIMONYAN:  Okay.  So going back to Section 3

3     of the SOFA, are those all the transfers that were made

4     by Alydian within 90 days leading to the filing of the

5     bankruptcy petition?

6          MR. VESSENES:  Yeah.  I mean, we've answered the

7     SOFA accurately, so...

8          MS. SIMONYAN:  Does one of these transactions

9     reflect the 10,000 bitcoins that were transferred from

10    Alydian to CoinLab?

11         MR. VESSENES:  I would assume so, I think, but I

12    don't know for sure.  The -- yeah, so I don't know for

13    sure.

14         MS. SIMONYAN:  Okay.  So if that transaction

15    occurred within 90 days of the bankruptcy petition, it

16    should be reflected on the SOFA in this section?

17         MS. GLYNN LEVIN:  Asked and answered.

18         MS. SIMONYAN:  Do you -- okay.  Well, this is a

19    question to the counsel.  Do you intend to amend the SOFA

20    to reflect all the transfers out of the account?

21    Because --

22         MS. GLYNN LEVIN:  He's already testified that the

23    schedules are accurate, that the SOFA is accurate, and

24    that he doesn't anticipate any amendments thereto.  That

25    was one of the very first questions.  So, no, we don't

1     intend to -- if new information comes to your attention,

2     then we'll change it, but as of today there are no

3     amendments necessary.

4          MS. SIMONYAN:  He didn't answer.  He didn't say

5     that it's in there.

6          Was that your answer?  Maybe I misunderstood.

7          MR. VESSENES:  I said I assume so.  I believe it

8     is.

9          MS. SIMONYAN:  You believe it's one of these.  And

10    you wouldn't know which one?

11         MR. SMITH:  "Do you know which one," would be the

12    question.

13         MR. VESSENES:  No.  I know for sure that it's not

14    likely to be just one.  It would have been -- because, as

15    I said, they were not fully paid for, so a payment would

16    have covered a set of invoices, but not completely.

17         MR. SMITH:  Counsel, can I ask you a question

18    while we're still --

19         MS. GLYNN LEVIN:  Yes.

20         MR. SMITH:  -- while we're here for a minute?  I

21    would have expected that 3(C) would be where we would see

22    these and possibly other transactions.  Did you make a

23    distinction that comes to mind as to why it's not

24    capturing all the transactions within a year, since

25    CoinLab is by any definition an insider?

```
 1          MS. GLYNN LEVIN:  If CoinLab is an insider under

 2     the bankruptcy code, then 3(C) may be the appropriate

 3     place to put it, and I'm happy to --

 4          MR. SMITH:  Okay.  Would you take a look at that,

 5     please, and --

 6          MS. GLYNN LEVIN:  I would be happy to review that.

 7          MR. SMITH:  Okay.  And if appropriate, make an

 8     amendment.

 9          MS. GLYNN LEVIN:  May I borrow your --

10          MR. SMITH:  Yeah.

11          MS. SIMONYAN:  Who on behalf of Alydian made the

12     decision to file this bankruptcy case?

13          MR. VESSENES:  I did.

14          MS. SIMONYAN:  Was there any formal procedure or

15     was it documented in any way?

16          MR. VESSENES:  Is the filing of the bankruptcy not

17     enough formal proof that we decided to do it?

18          MS. SIMONYAN:  Actually, no.  There's supposed to

19     be a corporate resolution, and I haven't seen that filed

20     in this case yet.

21          MR. VESSENES:  There may be.  I don't recall.  I'm

22     not sure.

23          MS. SIMONYAN:  Okay.  So your testimony is you

24     don't remember whether the decision to file bankruptcy

25     was formally recorded or documented?  "You don't
```

1      remember" is --

2          MR. VESSENES:  I don't recall.  I signed a lot of

3      paper to do the bankruptcy, so I don't recall if this --

4      if a board resolution was one or not.

5          MS. SIMONYAN:  Okay.  You indicated that CoinLab

6      was holding a checking account for the benefit of

7      Alydian; is that correct?  The account that was closed,

8      you talked about earlier?

9          MR. VESSENES:  Yeah, if -- is "for the benefit of"

10     a technical legal term?

11         MS. SIMONYAN:  Well, CoinLab is on the title of

12     the account, but the understanding between CoinLab and

13     Alydian is that the money belongs to Alydian?

14         MR. VESSENES:  Yeah, the -- it was a deposit.  So

15     Alydian made a deposit with CoinLab for, like, prepaying

16     a vendor for expenses that would come up.

17         MS. SIMONYAN:  Okay.  And that account is closed

18     now?

19         MR. VESSENES:  That's correct.

20         MS. SIMONYAN:  Is there a different account

21     that -- a different checking account that CoinLab is

22     holding for Alydian --

23         MR. VESSENES:  No.

24         MS. SIMONYAN:  -- similar to that one?  Is there

25     any other entity that's holding a similar account for --

1          MR. VESSENES:  No.

2          MS. SIMONYAN:  -- Alydian?  So going forward, how

3     are Alydian's operating expenses paid in dollars?

4          MR. VESSENES:  Well, they are largely incurred by

5     CoinLab, and so CoinLab is willing to be repaid in

6     bitcoins.  That's not the first question the trustee had,

7     actually.

8          MS. SIMONYAN:  Okay.  It was Brian Cartmell that's

9     the principal of XRay Holdings, correct?

10         MR. VESSENES:  I believe so.

11         MS. SIMONYAN:  Does Brian Cartmell have any -- is

12    he an employee or is he --

13         MR. VESSENES:  No.

14         MS. SIMONYAN:  -- an equity holder in the Debtor?

15         MR. VESSENES:  Brian Cartmell?  No.  There are

16    only two equity holders.

17         MS. SIMONYAN:  Is he an equity holder or has he

18    ever been an equity holder of Alydian?

19         MR. VESSENES:  No.

20         MS. SIMONYAN:  Has he ever been on the board of

21    Alydian?

22         MR. VESSENES:  No.

23         MS. SIMONYAN:  Has he ever been on the board or an

24    equity holder in CoinLab?

25         MR. VESSENES:  No.  But --

 1          MS. SIMONYAN:  Okay.

 2          MR. GALLANCY:  Okay.  I'm almost set.  Just a

 3     couple of really quick things here.  I just want to make

 4     sure.  Back to some of these numbers here about revenue

 5     and expenses and some of the call structure stuff, when

 6     you were -- we were talking earlier before, you were

 7     saying one system is six cages, right?  So one system is

 8     just over six terra-hashes we were describing; am I

 9     correct?

10          MR. VESSENES:  I said approximately.

11          MR. GALLANCY:  Approximately.

12          MR. VESSENES:  It varies.

13          MR. GALLANCY:  It varies, right.

14          MR. VESSENES:  I think our -- it's more like 5.9

15     right now.

16          MR. GALLANCY:  Right.  Something like that.  So

17     that $320,000 that was spent thus far sort of -- so what

18     was the schedule?  I apologize.

19          MS. SIMONYAN:  SOFA No. 3?  This?

20          MR. GALLANCY:  No, the $320,000 marked at cost --

21     at which the systems are marked at cost in terms of

22     assets?

23          MS. SIMONYAN:  Oh, Schedule B.

24          MR. GALLANCY:  Yeah.  Sorry.

25          MS. SIMONYAN:  Schedule B.

1          MR. GALLANCY:  That's right.  That's for 16

2     systems, right?

3          MR. VESSENES:  No, that's not correct.  Those

4     filings are as of October 31st.

5          MR. GALLANCY:  Got it.  Okay.  So --

6          MR. SMITH:  The schedule says for six systems.

7          MR. GALLANCY:  For six systems, right.  So okay,

8     so --

9          MR. VESSENES:  I'm sorry.  November 1st, not

10    October 31st.

11         MR. GALLANCY:  Got it.  So that means the

12    $320,000 --

13         MR. SMITH:  And it's actually $379,348.

14         MR. GALLANCY:  $379,000 -- thank you very much --

15    is for six systems.  That's about 36 terra-hashes.  It

16    gets you about $10,527 per terra-hash.  I did the math,

17    so okay.  Using those numbers, to the extent that you

18    have revenue in excess of expense here in December, which

19    perhaps you do, you know, why did you make the

20    decision -- why make the decision not to take that

21    revenue in excess of expense and redeploy that into more

22    systems to generate more bitcoins?

23         MR. VESSENES:  As I told the trustee, things are

24    fluid, and we're still deciding what to do.  The --

25         MR. GALLANCY:  So one possibility would be to keep

1    operating and do, indeed, just that?

2        MR. VESSENES:  It's possible that Alydian would

3    purchase more -- or, I guess, probably the -- to the

4    extent Alydian did any more investment, I would think it

5    would only be to finish out its current parts.

6    Deployments?  Our analysis is that even that will not

7    return capital.  So, you know, what we have right now is

8    a --

9        MR. GALLANCY:  Sorry.  Return capital to whom?  I

10   apologize.

11       MR. VESSENES:  So, you know, if it's going to cost

12   a million dollars or a million and a half dollars, you

13   know, our analysis is that it won't likely return a

14   million and a half dollars to -- at the end of the day to

15   have done that.  So to my mind, we're just -- we're like

16   all about getting as much value for the creditors right

17   now, and I don't think we are going to be engaging in

18   large, speculative investments when we have a shot to do

19   pretty well by the creditors right now, so...

20       MR. GALLANCY:  In spite of bitcoin at its current

21   prices, it doesn't --

22       MR. VESSENES:  I mean, in my judgment, I think

23   it's really risky to imagine taking all the money Alydian

24   has and dumping it back into mining just to maybe pay a

25   little more for creditors.  Like, that doesn't seem like

1     a good idea to me.

2          MR. GALLANCY:  Got it.

3          MS. SIMONYAN:  Just one question.  I promise this

4     is the last one.  You indicated in your declaration as

5     part of the motion to reject executory contracts that one

6     of the possibilities was to sell the assets of the

7     company at a 363 sale; is that correct?

8          MR. VESSENES:  That's a possibility, yeah.

9          MS. SIMONYAN:  Have you approached any -- has the

10    Debtor approached any potential purchasers, or has it

11    been approached by any potential purchasers?

12         MR. VESSENES:  We have not been approached by any

13    potential purchasers.  Pre-petition, we spoke to one

14    company that auctions off mining equipment who was

15    noncommittal.  My understanding from counsel is that if

16    we're going to sell assets there's a formal process to go

17    through, so we haven't done any of that.

18         MS. SIMONYAN:  As of right now, you don't have any

19    entity in mind that would be the purchaser?

20         MR. VESSENES:  I think -- correct me if I'm wrong,

21    but my understanding is you need a fair and open auction

22    if we're going to get rid of all the assets, right?  So,

23    no, I don't.

24         MS. SIMONYAN:  And that's correct, but --

25         MS. GLYNN LEVIN:  Let us know if you have somebody

1      in mind.

2              MR. VESSENES:  But if you've got a buyer, let us

3      know.  Yeah.  Exactly.

4              MS. SIMONYAN:  Well, usually you go into these

5      auctions with a stalking horse bidder already with an

6      offer to purchase the assets, so my question is whether

7      you have somebody like that who has committed to any

8      extent to purchase the assets.

9              MS. GLYNN LEVIN:  Asked and answered.

10             MR. SMITH:  Is there an ongoing market?

11             MR. VESSENES:  There is a real-time market, kind

12     of like --

13             MR. SMITH:  What do you mean by that?

14             MR. VESSENES:  So the mining equipment creates

15     this work.  They're called "hashes."  It's like a

16     deliverable.  You can, strangely, buy and sell hashes,

17     which is a, you know --

18             MR. SMITH:  Separate from the equipment generated?

19             MR. VESSENES:  Absolutely.  You just can --

20     there's a real-time spot market for hashes, and that's

21     that --

22             MR. SMITH:  Is that because the hashes can --

23             MR. VESSENES:  -- $70,000 per terra-hash.

24             MR. SMITH:  Is that because the terra-hashes may

25     turn into bitcoin?

```
 1              MR. VESSENES:  Right.  Exactly.  That's that

 2     400,000 per system number that we had.  Mining hardware

 3     varies quite a lot, and it's how hard it is to manage,

 4     how you could deploy it, how densely it can be put into a

 5     data center, how much energy it costs.  So there isn't

 6     a -- there's certainly no liquid market.

 7              MR. SMITH:  But there are competitors that may

 8     want to ramp up their platforms?

 9              MR. VESSENES:  You know, one of the things -- I am

10     sure that if there were an auction there would be

11     bidders.

12              MR. SMITH:  Okay.

13              MR. VESSENES:  Yeah.

14              MR. SMITH:  Two things before we go.  One,

15     Counsel, are you planning -- is there anybody else you're

16     going to need to hire in terms of professional?

17              MS. GLYNN LEVIN:  There is a possibility that we

18     may hire special counsel.

19              MR. VESSENES:  Special counsel.

20              MS. GLYNN LEVIN:  But that is still up.

21              MR. SMITH:  Okay.

22              MS. GLYNN LEVIN:  It has not yet --

23              MR. SMITH:  All right.

24              MS. GLYNN LEVIN:  -- been decided.

25              MR. SMITH:  And are there -- I guess that brings
```

1      me back to what we were just talking about.

2              MR. VESSENES:  Oh, there's one more.

3              MR. SMITH:  It is --

4              MR. VESSENES:  What's that?

5              MR. SMITH:  Are there brokers for -- would you

6      need to hire a broker to market and potentially sell

7      either the equipment or the hashes or any of the --

8      anything?

9              MS. GLYNN LEVIN:  If we did, we would certainly

10     seek to have one appointed, but I think at this point we

11     don't have --

12             MR. SMITH:  I didn't know those even existed.

13             MS. GLYNN LEVIN:  Yeah.

14             MR. VESSENES:  It's possible.  I don't know that

15     it's necessary.

16             MR. SMITH:  Okay.

17             MR. VESSENES:  Yeah.

18             MR. SMITH:  All right.

19             MR. GALLANCY:  I'm all set.  Actually, I had one

20     more, which I will ask, and then I will get up.  Papers

21     are done here.

22             When you made the agreement with XRay on the

23     Schedule F there, was he -- did you inform him of all the

24     obligations that Alydian had to all of its pre-buyers and

25     all creditors?

1          MR. VESSENES:  Yes.

2          MR. GALLANCY:  So he knew about all of the pre-buy

3     agreements and any other agreements that were out there?

4          MS. GLYNN LEVIN:  He can't answer as to what

5     somebody else knew.

6          MR. GALLANCY:  Sorry.

7          MS. SIMONYAN:  The question was:  Did you inform

8     him?

9          MR. SMITH:  And he answered that.

10          MR. VESSENES:  And I answered it.

11          MS. GLYNN LEVIN:  Yeah.

12          MS. SIMONYAN:  Okay.

13          MR. SMITH:  Okay.

14          MR. GALLANCY:  And the nature of those agreements,

15     the specific parameters of those agreements, did you

16     inform him of the parameters, like the expiration dates

17     of the contracts, the --

18          MR. VESSENES:  I did not deliver all contracts to

19     him, so he did not read every contract, I don't think.

20          MR. GALLANCY:  Okay.  He knew some of the info,

21     but not all of it?

22          MS. GLYNN LEVIN:  Objection as to what somebody

23     else knew as --

24          MR. GALLANCY:  You informed him of some of the

25     information, but perhaps not all of it?

1         MR. VESSENES:  "All" is super broad, so, yes, I

2    did not inform him of all information.

3         MR. GALLANCY:  Was he made aware of any

4    differences amongst the contracts, that there were any

5    contracts that were specific to one particular party or

6    specific to any other particular parties?

7    Differentiation amongst the contracts?

8         MR. VESSENES:  I believe so.  I'm just thinking

9    back.  I believe so.

10        MR. SMITH:  All right.

11        MS. GLYNN LEVIN:  Are these documents for us to

12   keep?

13        MS. SIMONYAN:  You can keep those if you want.

14        MS. GLYNN LEVIN:  Okay.

15        MR. GALLANCY:  Yeah.  What's in there is it's just

16   those --

17        MR. VESSENES:  Bitcoin addresses.

18        MR. SMITH:  But before we close, is there anybody

19   else who would like to ask any questions?

20        MR. FRIEDBERG:  I have a few questions, Mr. Smith.

21        MR. SMITH:  Okay.

22        MR. GALLANCY:  Thanks.

23        MR. FRIEDBERG:  Thank you.

24        MR. GALLANCY:  Thanks very much.

25        MR. SMITH:  Um-hum.

1          MR. FRIEDBERG:  All right.  So my name is Dan

2     Friedberg, and I represent Soule Investments.  Soule is

3     another creditor that entered into sort of what we called

4     these forward contracts.  And I'll try to keep it, and I

5     will keep it, much briefer.  So --

6          MS. GLYNN LEVIN:  Would you mind giving me an

7     estimate?  Because my client might need a break to go to

8     the bathroom or get a drink of water or something.

9          MR. FRIEDBERG:  Certainly, if you'd like to break,

10     but I wouldn't be more than 20 minutes, I think, so...

11          MS. GLYNN LEVIN:  Oh.  Are you okay for 20

12     minutes?  Okay.

13          MR. FRIEDBERG:  And please just tell us if you'd

14     like a break, but okay.

15          So first question was on this Exhibit I and J,

16     which is the forecast.  And I understand that it's not

17     exactly up to date, but so on the executive comp line, so

18     that shows 20 grand a month for November and December?

19          MR. VESSENES:  Um-hum.

20          MR. FRIEDBERG:  Who were the executives?

21          MR. VESSENES:  That would be me.

22          MR. FRIEDBERG:  So that's 20,000 a month for your

23     salary of --

24          MR. VESSENES:  That's correct.

25          MR. FRIEDBERG:  And I apologize.  I'll always try

1      to say "the Debtor," but if I do say "Alydian," I mean

2      "the Debtor."  So 20,000 a month for Alydian, so that

3      would be 240,000 a year.  So is your salary divided

4      between CoinLab and Alydian?

5              MR. VESSENES:  My -- I don't know.  Are we

6      answering questions about CoinLab?  I have an Alydian

7      salary for being the managing director of Alydian.

8              MR. FRIEDBERG:  Well, relevant to the Debtor is

9      that the executive comp is reasonable, and I see you're

10     being paid 240,000 from Alydian.  You also serve as CEO

11     of CoinLab.  What compensation is being paid by CoinLab

12     so we can determine, one, whether it's reasonable, and,

13     two, perhaps more importantly, you know, whether these

14     companies are, indeed, distinct.

15             MS. GLYNN LEVIN:  Are you asking him to testify

16     today about what compensation CoinLab is paying him?

17             MR. FRIEDBERG:  Yes.

18             MR. SMITH:  I don't think he has to do that.

19             But if I can ask something a different way, how

20     many hours a month are you invest -- are you -- of

21     services are you providing to the Debtor?

22             MR. VESSENES:  It's in the full-time range.  I

23     mean, I've got meetings like this, prep for meetings like

24     this.  Yeah.  I mean, I would -- it's close to full time.

25             MR. SMITH:  How many hours a month -- so you're

1     not putting many hours into CoinLab?

2          MR. VESSENES:  I'm working more than 40 hours

3     right now.  CoinLab --

4          MR. SMITH:  So when you say full time, you're

5     talking about 40 hours?

6          MR. VESSENES:  40 hours, sure.

7          MR. SMITH:  So...

8          MR. VESSENES:  It's close to 40 for Alydian.

9          MR. SMITH:  Okay.

10          MR. FRIEDBERG:  Do you have a compensation

11     agreement for that with Alydian?  Pardon me, with the

12     Debtor?

13          MR. VESSENES:  Do I?  No, I don't.

14          MR. FRIEDBERG:  So that's 20,000 being paid just

15     on a handshake, or what's the -- since you're the board

16     member and the sole officer there, what controls are

17     placed on that 20,000?  I mean, what approvals have been

18     done on that?

19          MR. VESSENES:  I don't know that any were needed.

20          MR. FRIEDBERG:  And that's just paid on normal

21     payroll?

22          MR. VESSENES:  No, it would be bitcoin.

23          MR. FRIEDBERG:  So are there employment taxes

24     being deducted from that?

25          MR. VESSENES:  Of course, yeah.

1           MR. FRIEDBERG:  So --

2           MR. VESSENES:  Well, actually, I will say this.  I

3     have not been paid a salary ever by Alydian until post

4     petition.

5           MR. FRIEDBERG:  Oh, I see.

6           MR. VESSENES:  So we're still working out how to

7     get FICA and etc. paid for before we make the payments,

8     but they're in the budget for the court.

9           MR. FRIEDBERG:  But pre-petition there was no

10    salary taken from the Debtor?

11          MR. VESSENES:  That's correct.

12          MR. FRIEDBERG:  Understand.  And the 20,000 was a

13    forecast and hasn't -- probably is being started to be

14    done or hasn't been done.  Is -- okay.  So that was on I

15    and J.  Oh, and the second question I had on this, is the

16    105,000 in severance for December, is that for your

17    contract or is that --

18          MR. VESSENES:  No.  No.  It's for --

19          MR. FRIEDBERG:  That's for some other people?

20          MR. VESSENES:  That's right.

21          MR. FRIEDBERG:  Understand.  And those have

22    employment agreements, too, with --

23          MR. VESSENES:  They should.  Or contracting

24    agreements.  One of those.

25          MR. FRIEDBERG:  Are any of those 105,000, are

1     those employees of CoinLab?

2          MR. VESSENES:  Yes, some of them are.

3          MR. FRIEDBERG:  Okay.  And so the contracts with

4     those providers, are they between the CoinLab and the

5     service providers, or are they between Alydian and the

6     service providers?

7          MR. VESSENES:  They're between CoinLab and service

8     providers, but they only do Alydian work.

9          MR. FRIEDBERG:  I guess my question is, is that

10    105,000 severance charge a charge to Alydian or should

11    that instead be classified as a charge to CoinLab?

12         MR. VESSENES:  So I believe it should be Alydian.

13    And around when Dalsa Barbour, or I guess Bitvestment,

14    who claims to be the same thing, filed a lawsuit and we

15    went bankrupt we had to incentivize employees to stay on

16    to do any Alydian work.  So you can kind of pick your

17    poison.  You can have your experts leave or you can

18    promise -- if they stay, you can -- you'll pay them if

19    you need them to leave later.

20         MR. FRIEDBERG:  Okay.  So that -- those are

21    specifics on that.  So has CoinLab done any mining?

22         MR. VESSENES:  No, not since 2012, and never at

23    any scale.

24         MR. FRIEDBERG:  And did CoinLab ever contract to

25    do any mining?

1           MR. VESSENES:  CoinLab Inc. did have contracts to

2     mine, but here we are talking about Alydian.

3           MR. FRIEDBERG:  So the CoinLab mining rigs are

4     kept separate from the Alydian rigs?

5           MR. VESSENES:  CoinLab owns no mining rigs.

6           MR. FRIEDBERG:  Okay.  So --

7           MS. GLYNN LEVIN:  And maybe you should put on the

8     record that you have a prior representation of CoinLab.

9           MR. VESSENES:  Yeah.  You have an engagement

10    letter with CoinLab Inc.

11          MR. FRIEDBERG:  Well, that's -- I do.  We don't

12    have official engagement letter.  There was a -- when

13    this client was actually referred to me by yourself, and

14    at that time I just received an email from you, the

15    general counsel, saying it was fine for me to represent

16    them.  So, certainly, I never represented CoinLab on any

17    of these matters.

18          MR. GALLANCY:  I think if Mr. Friedberg is

19    conflicted, then some of Mr. Vessenes' attorneys are

20    conflicted with the suit in the Southern District of New

21    York.

22          MR. SMITH:  Well, I'm going to leave it to his

23    interpretation of the professional responsibility whether

24    he's --

25          MR. FRIEDBERG:  I don't think we're --

1          MR. SMITH:  -- conflicted at this point.

2          MR. GALLANCY:  I don't think you're conflicted.

3          MR. SMITH:  So...

4          MR. FRIEDBERG:  We're not part of any --

5          MR. VESSENES:  Well, what --

6          MR. FRIEDBERG:  But, anyway, so that may be the

7     case, but I'd like to move forward.  So okay.  So we got

8     that CoinLab hasn't done mining.

9          MR. VESSENES:  I'm sorry.  Can I ask, are you

10    representing Bitvestment or Soule?

11         MR. FRIEDBERG:  Soule.

12         MR. VESSENES:  Oh, okay.  All right.

13         MR. FRIEDBERG:  Only representing Soule.

14         MR. VESSENES:  So Dan's just rooting for you here.

15         MR. GALLANCY:  Trying to help out.

16         MR. FRIEDBERG:  Pardon me?

17         MR. VESSENES:  Okay.  All right.

18         MR. GALLANCY:  Trying to help out the creditors.

19         MR. VESSENES:  I understand.

20         MS. GLYNN LEVIN:  Okay.  Well, so only one

21    question.  We only have to deal with one questioner at a

22    time.

23         MS. SIMONYAN:  The U.S. trustee is leading this

24    meeting, so please let him direct it.

25         MR. SMITH:  Well, let's keep moving because you --

1              MR. FRIEDBERG:  Sorry, sir?

2              MR. SMITH:  The attorney for the U.S. trustee is

3      getting hungry.

4              MR. FRIEDBERG:  Okay.  So if I -- can we look at

5      our service agreement with Soule?  So I'm just giving

6      your attention to the agreement between the Debtor and

7      Soule, my client.

8              MS. GLYNN LEVIN:  Just, can you give us a moment

9      to find it?

10             MR. FRIEDBERG:  Yeah.

11             MR. SMITH:  Where is that?

12             MR. FRIEDBERG:  That's in the record, but it was

13     actually separately filed.  There was a -- we had to

14     replace the contact.  I believe it was on the 21st it was

15     filed, I believe.  It's not the one that was initially

16     filed.

17             MS. GLYNN LEVIN:  Okay.

18             MR. FRIEDBERG:  We did it as a separate filing.

19             MS. GLYNN LEVIN:  Just give us a moment to find

20     it.

21             MR. FRIEDBERG:  You had replaced two at that time.

22             MS. GLYNN LEVIN:  I am aware of that.  Go ahead.

23             MR. VESSENES:  Okay.

24             MR. FRIEDBERG:  Okay.  So I'm looking at the

25     bitcoin service agreement with Soule Investments Inc. and

1     I see that the -- in the parties in the preamble it's CLI

2     Holdings, Inc., which is the Debtor, but I note that it's

3     defined as CoinLab.  When you entered into --

4          MR. VESSENES:  I think that's just a title.

5          MR. FRIEDBERG:  I understand.  So it was defined

6     as CoinLab.  When you entered into this contract with

7     Soule, did you explain that CLI Holdings differed from

8     CoinLab?

9          MR. VESSENES:  I don't recall.

10         MR. FRIEDBERG:  Okay.  Well, where is the -- so

11    there it indicates that CLI Holdings, Inc. has its

12    principal place of business at Seattle, in the recital;

13    is that correct?

14         MR. VESSENES:  It was correct at the time.

15         MR. FRIEDBERG:  Oh, okay.  But its current place

16    of business is still Seattle, so...

17         MR. VESSENES:  That's not correct.

18         MR. FRIEDBERG:  Or is it in the Seychelles or is

19    it in -- where is its -- where is the Debtor's current

20    place of business?

21         MR. VESSENES:  So the main office would be on

22    Bainbridge Island in Washington.

23         MR. FRIEDBERG:  Is CLI, the Debtor, authorized to

24    do business in Bainbridge?

25         MS. GLYNN LEVIN:  Can you clarify your question?

1          MR. FRIEDBERG:  So you indicated that the Debtor's

2     principal place of business is in Bainbridge, correct?

3     So my question is, is it --

4          MS. GLYNN LEVIN:  No, I don't think that was his

5     testimony.  I think he said his -- its office was in --

6     on Bainbridge Island?

7          MR. VESSENES:  Yeah.  I don't -- I mean, it's --

8          MS. GLYNN LEVIN:  I think that's what he said.  I

9     could be wrong.

10          MR. FRIEDBERG:  Okay.  So where -- pardon me.  I

11     don't mean to be picking at this.  I'm just asking where

12     the --

13          MR. SMITH:  No.  I -- we're all hearing different

14     things.  I believe he did.  The question was, where is --

15          MS. GLYNN LEVIN:  Oh.

16          MR. SMITH:  -- his principal place of business

17     now.

18          MS. GLYNN LEVIN:  Okay.

19          MR. SMITH:  And I thought he testified Bainbridge.

20          MR. VESSENES:  I guess I don't -- I guess, is that

21     a technical question?  I don't know how to answer it.  I

22     am the only employee.  I, you know, tend to work on

23     Bainbridge Island, but there are parts all over the

24     country.  There's no -- there are no parts or assets of

25     Alydian that I am aware of on Bainbridge Island.

1            MR. FRIEDBERG:  But you're the sole employee and

2      do the work from that location generally?  Or no?

3            MR. VESSENES:  I certainly do my work generally

4      from Bainbridge Island, yeah.

5            MR. FRIEDBERG:  Is Alydian authorized or is the

6      Debtor authorized to do business in this state?

7            MR. VESSENES:  I don't know.  I don't know the

8      answer to that.

9            MR. FRIEDBERG:  And -- but CoinLab is authorized

10     to do business in this state?

11           MS. GLYNN LEVIN:  He's not going to answer any

12     questions on behalf of CoinLab.

13           MR. VESSENES:  I don't have counsel here except

14     you, so I'm not sure what I should answer.

15           MR. FRIEDBERG:  Okay.  So CLI Holdings, the

16     Debtor, its business, as you explained it, was to be a

17     bitcoin miner, I believe.

18           MR. VESSENES:  That's correct.

19           MR. FRIEDBERG:  And CoinLab, though, not.  I think

20     you indicated it doesn't do mining.  Does CLI have -- did

21     it register federally to get the mining license from the

22     federals?  From FinCEN?

23           MS. GLYNN LEVIN:  Did who?

24           MR. FRIEDBERG:  Did Alydian get its license to be

25     a money service business from the FinCEN to conduct its

1       activity?

2               MR. VESSENES:  The Debtor has not registered for a

3       money service business with FinCEN.

4               MR. FRIEDBERG:  And has CoinLab registered to do

5       business with FinCEN?

6               MS. GLYNN LEVIN:  Don't answer that.

7               MR. VESSENES:  You have direct knowledge of that

8       as -- since you are payments counsel at CoinLab.

9               MR. FRIEDBERG:  So, Mr. Smith, the reason that I

10      only mention these items is I understand that the focus

11      of this is only on CLI, but --

12              MR. SMITH:  Well, within reason.

13              MR. FRIEDBERG:  But I just wanted to point out

14      that, as you've -- as we've heard, it's the same board,

15      it's the same officer, it's the same office.

16              MR. SMITH:  No.  I understand your argument of

17      corporate disregard in that essentially they're the same

18      thing, and that may be actionable or a basis, but for

19      today's purpose I would like to know again -- because I

20      don't understand the terminology that was used.  What was

21      the registration that you asked about that the testimony

22      was the Debtor does not have?

23              MR. FRIEDBERG:  Oh, registered federally as a

24      money service business with FinCEN, F-I-N-C-E-N.

25              MR. SMITH:  V-I-N-C-E-N?

```
 1            MR. FRIEDBERG:  F, as in Frank.  FinCEN.

 2            MR. SMITH:  FinCEN.  And what's the significance

 3     of that?

 4            MR. FRIEDBERG:  So that's the license to basically

 5     create coin and mine.

 6            MR. SMITH:  And are all --

 7            MR. VESSENES:  That's an incorrect characterization.

 8            MR. SMITH:  And from your understanding, are all

 9     bit mining companies required to be registered?

10            MR. FRIEDBERG:  It's uncertain.

11            MR. SMITH:  Okay.

12            MR. FRIEDBERG:  It's certainly -- people within

13     the states would take that position, but there are many

14     people who disagree with it, so it's a -- I would say

15     that most miners, except for the biggest, probably

16     aren't, so -- however, what the government wants and what

17     the industry is catching up to are two different things.

18            MR. SMITH:  Okay.

19            MS. GLYNN LEVIN:  Are we a little off the topic

20     here?

21            MR. SMITH:  I think we are.

22            What's your next question?

23            MR. FRIEDBERG:  So -- oh.  I was pointing just to

24     the contract only.  So the contract with Soule, I see in

25     paragraph 2 it states in there that -- this is the real
```

1      important thing for my client -- is CoinLab will make

2      commercially reasonable efforts to mine 6,734 --

3              MR. SMITH:  And I don't have the contract in front

4      of me.  Was I correct when I heard that for definitional

5      purposes the use of the term "CoinLab" throughout the

6      text includes the Debtor?

7              MR. VESSENES:  It is only the Debtor.

8              MR. FRIEDBERG:  It is only.

9              MR. SMITH:  Only the Debtor.

10             MR. FRIEDBERG:  Yes.

11             MR. SMITH:  Okay.

12             MR. VESSENES:  Yeah.

13             MS. GLYNN LEVIN:  I'm sorry.

14             MR. FRIEDBERG:  So it says that that --

15             MS. GLYNN LEVIN:  Just hold on.

16             MR. SMITH:  So is that defined -- is --

17             MS. GLYNN LEVIN:  Hold on a second.

18             MR. SMITH:  What does the defined term "CoinLab"

19     refer to?

20             MS. GLYNN LEVIN:  Are you talking about --

21             MR. SMITH:  In the contract.

22             MS. GLYNN LEVIN:  -- this contract?

23             MR. SMITH:  Yeah, in that contract, because I

24     don't have it.

25             MR. FRIEDBERG:  It is the Debtor.

```
 1              MS. GLYNN LEVIN:  Oh.  Yeah.

 2              MR. SMITH:  Okay.  All right.

 3              MR. FRIEDBERG:  So I didn't mean to say -- no.

 4              MR. SMITH:  I didn't know whether it was CoinLab

 5     and the Debtor --

 6              MR. FRIEDBERG:  No.

 7              MR. SMITH:  -- defined CoinLab.

 8              MR. FRIEDBERG:  So --

 9              MR. SMITH:  It's just the Debtor?

10              MR. FRIEDBERG:  So let me just replace the word

11     "debtor" there.  So services to.  It says, "Debtor will

12     make commercially reasonable efforts to mine 6,734

13     bitcoins, odd bitcoins."  Did CoinLab -- or, pardon me,

14     did the Debtor make those commercially reasonable

15     efforts?

16              MR. VESSENES:  Yeah.

17              MR. FRIEDBERG:  And I point in your filing, you

18     actually indicated that -- so this is in your -- in the

19     actual bankruptcy filing here.  So this is on the --

20     actually on the motion to reject executory contracts.

21     There you state in paragraph 14 that Alydian --

22              MS. GLYNN LEVIN:  Sorry.  Paragraph 14 of the

23     motion?

24              MR. FRIEDBERG:  Yes.  The motion to reject.  There

25     it said, "Alydian has uses" --
```

1          MS. GLYNN LEVIN:  Can you give us a moment to find

2     it?

3          MR. FRIEDBERG:  Sure.  So this was in the motion

4     to reject executory contracts.

5          MS. GLYNN LEVIN:  Okay.  I don't see a paragraph

6     14 in the motion.  What are you referring to?

7          MR. FRIEDBERG:  Pardon me.  Oh, pardon me.  It's

8     the declaration in support.

9          MS. GLYNN LEVIN:  Okay.

10         MR. FRIEDBERG:  So this is in Peter's declaration

11    in support of motion to reject executory contracts.

12         MS. GLYNN LEVIN:  Take a moment to read that.

13         MR. FRIEDBERG:  So it -- and I'm just pointing to

14    the very first sentence in paragraph 14 only.  And I'm

15    just going to use the word "Debtor" again just so

16    we're -- it's clear.

17         So there it says, "Debtor has used its best

18    efforts to mine bitcoin."  Would it be correct to say

19    that -- because the language in the contract is a little

20    different where it said "commercially reasonable

21    efforts."  Here is it safe to say that the Debtor used

22    its best efforts to mine bitcoin for my client Soule, or

23    was that intended to indicate that you used best efforts

24    for others and not Soule?

25         MR. VESSENES:  I think we made no representations

1    about Soule in the declaration there.

2        MR. FRIEDBERG:  No.  My question is, did the

3    Debtor use best efforts to mine bitcoin for Soule is the

4    question.

5        MR. VESSENES:  Well, I'm not a lawyer.  I don't

6    fully understand the difference between "commercially

7    reasonable" and "best."  I think I would say Alydian

8    worked as hard as it could to mine bitcoins and -- on

9    behalf of all of its pre-buyers.

10        MR. FRIEDBERG:  Including Soule, though?

11        MR. VESSENES:  Of course.

12        MR. FRIEDBERG:  Okay.  So that's what I wanted to

13    hear.  So now, so you -- so under our -- under the Soule

14    agreement, as indicated, you had to use commercially

15    reasonable efforts.  I note that in -- and I guess I'm

16    just confused here -- is that in an agreement which I

17    didn't know with another party, Dalsa, dated August 2013,

18    it appears that you have to dedicate all your mining

19    output.

20        MR. SMITH:  I'm going to stop you.  These are

21    questions that may or may not lead to actionable claims

22    for your client against the Debtor or others, but they

23    don't go to the Debtor's assets and liabilities and the

24    prospects for reorganization at this point.  If you want

25    to get underneath the contracts and what efforts were

1    made for your client versus other clients and on what

2    dates and at what parts and who knew what about which

3    contract at the time the next contract was done, I think

4    you need to do that through discovery and not here.

5         MR. FRIEDBERG:  So we are in a -- I know that it

6    gets confusing because we talk about bitcoin, but this is

7    simply sort of like a forward delivery contract.  And

8    let's just separate ourselves from bitcoin just to make

9    things clear, and let's just use an example.  Let's say

10   it was a forward delivery contract for gold.  That might

11   be something that, you know, we can all understand.  If

12   we were dealing with that scenario where we had a debtor

13   who had forward contracts for gold, it would be relevant

14   to the creditors to make a determination of whether or

15   not that gold was forthcoming.  That is what the purpose

16   of this hearing is, is to see if there are coin to

17   satisfy the obligation.  In this case, the forward

18   delivery happens to be bitcoin, but it's no different

19   than --

20        MR. SMITH:  But I don't understand the point of

21   the question for today's purposes.  I understand it for

22   litigation purposes.  But you know what contracts were

23   signed, you know when they were signed, you know what

24   promises were made in those contracts that are arguably

25   in contravention of your current client's contract, so we

1     just -- if you have a form of question that deals with

2     where we are today as opposed to contract interpretation

3     or contract -- you know, entering into the contracts,

4     let's have it and get finished up.

5          MR. FRIEDBERG:  Yeah.  Well, I guess the question

6     just points to, you know, they have a prospect,

7     hopefully, of generating these bitcoins.

8          MR. SMITH:  Okay.

9          MR. FRIEDBERG:  You know, basically they're

10    fulfilling the forward contract.

11         MR. SMITH:  Right.  And you're looking at what was

12    Schedule I and J to --

13         MR. FRIEDBERG:  Correct.  Which isn't actually --

14         MR. SMITH:  Okay.  So they have --

15         MR. FRIEDBERG:  -- perfect.

16         MR. SMITH:  They have a potential of 5,400

17    bitcoins.  So taking that, what's your question about the

18    5,400 bitcoins?

19         MR. FRIEDBERG:  That, basically, what the

20    understanding of is which creditors would be entitled to

21    those coins under the documents.

22         MR. SMITH:  Ask that question.

23         MR. VESSENES:  So I think that my -- and I'm not a

24    bankruptcy expert, but my understanding is that a

25    contract like this would be in an unsecured creditor

1      pool.  I don't think Alydian has any secured creditors.

2      So this contract has a fairly simple to understand

3      liquidated damages clause, which --

4           MR. SMITH:  And when you're saying "this

5      contract," you're talking about this -- the one with

6      Soule?

7           MR. VESSENES:  The Soule Investments, yeah.  Which

8      just says that you're entitled to a refund if the Debtor

9      can't deliver.  So when we put the contracts in, we put

10     them right at that refund, essentially saying it's -- you

11     know, it's like a breach, basically, and so your client

12     is entitled to a refund, and that's what I would expect

13     the claim would be.

14          MR. FRIEDBERG:  So I note that the fee per bitcoin

15     in our contract is $7.42 per bitcoin is what my client

16     paid.  Now the price per bitcoin is a thousand dollars.

17     The interpretation is that basically you pay the

18     liquidated damages provision, and that's if the price

19     exceeds 7.2, or is it --

20          MR. VESSENES:  No.  It says very clearly in the

21     contract if we can't deliver we'll refund the money pro

22     rata.  If we can't deliver any, we'll refund a hundred

23     percent, so...

24          MR. FRIEDBERG:  And is your reading that that's --

25     that trumps this requirement that you actually try to

1      mine on our behalf?

2            MS. GLYNN LEVIN:  The contract says what it says,

3      and I just don't think this is the right forum, I'm

4      sorry, to ask for his interpretation of the contract.  He

5      wasn't prepared to discuss that today.  You're asking for

6      him for some legal opinions.

7            MR. SMITH:  I agree with that.  You're asking for

8      his legal opinion of this contract.  You guys will, I

9      presume, be fighting over the terms of the contract in

10     other forums, whether it's claims, objections, or

11     separate adversary proceedings, so I don't --

12           MR. FRIEDBERG:  No, I'm satisfied.

13           MR. SMITH:  Okay.

14           MR. FRIEDBERG:  So -- and I think that's -- oh, I

15     did have a final question on the invoices.  So there's a

16     large amount of funds or bitcoins flowing from the Debtor

17     to CoinLab.

18           MS. GLYNN LEVIN:  Sorry.  Which invoices are

19     you -- are you looking at a document?

20           MR. FRIEDBERG:  No.  It was indicated that there

21     were --

22           MR. SMITH:  The pre-petition transfers?

23           MR. FRIEDBERG:  Yes.  Were backed by an invoice.

24           Who did those invoices and what form were they in?

25           MR. VESSENES:  The finance team at CoinLab

1    generated invoices for Alydian to the extent that CoinLab

2    would purchase the parts.  So they're purchased.

3    They're -- all purchase orders were approved by either me

4    or Hans Olsen, who managed day-to-day operations at

5    Alydian.  Once the purchase orders are approved, the

6    purchase is then made or a promise to pay is entered into

7    with a vendor by CoinLab, and then once the actual

8    payment is made and then the invoices are teed up and

9    sent over to Alydian, and then Alydian remits the coins

10   in exchange.

11          MR. FRIEDBERG:  So it's actually -- there's

12   actually a written invoice done prior to the transfer?

13          MR. VESSENES:  We have hundreds and hundreds of

14   pages of signed purchase orders for parts.

15          MR. FRIEDBERG:  Understand.  And the person

16   signing those on behalf of the parties were the same?  Or

17   the --

18          MR. VESSENES:  No, not necessarily.

19          MR. FRIEDBERG:  No.  Sometimes they -- and they

20   would actually be signed by both sides?

21          MR. VESSENES:  Well, there's no need for a CoinLab

22   purchase order to be signed by Alydian, as you might

23   imagine.

24          MR. FRIEDBERG:  So it's just --

25          MR. VESSENES:  But they're different parties that

1    would have signed them.

2         MR. FRIEDBERG:  Okay.  That's all I have.

3         MR. SMITH:  Any other questions?  All right.  At

4    this point, we will conclude the meeting of creditors.

5    Thank you, everybody.

6         MS. GLYNN LEVIN:  Thank you.

7         MR. VESSENES:  Thank you.

8         (Meeting concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2      STATE OF WASHINGTON        )

3                                 )

4      COUNTY OF SNOHOMISH        )

5           I, the undersigned, under my commission as a Notary

6      Public in and for the State of Washington, do hereby

7      certify that the foregoing digitally recorded proceedings

8      were transcribed under my direction as a certified

9      transcriptionist; and that the transcript is true and

10     accurate to the best of my knowledge and ability; that I

11     am not a relative or employee of any attorney or counsel

12     employed by the parties hereto, nor financially

13     interested in its outcome.

14

15          Signed and dated this 5th day of December, 2013

16

17

18               by [s] Marjie Jackson

19               MARJIE JACKSON, CETD

20

21

22

23

24

25

# EXHIBIT B

Page 1

1   The transcript of this proceeding is a rough draft ONLY
2   and may contain untranslated steno, mistranslates,
3   misspelled proper names, incorrect or missing Q/A symbols
4   and/or punctuation, and is not to be used or considered
5   in any way as the final transcript.
6           SEATTLE, WASHINGTON, January 7, 2014
7                   9:30 a.m.
8                   --oOo--
9
10  PETER VESSENES,          witness herein, having been
11              first duly sworn on oath,
12              was examined and testified
13              as follows:
14
15          E X A M I N A T I O N
16  BY MR. REYHANI:
17      Q.   Okay, thank you.  Hopefully you can see me.
18  We are here in the matter of the Chapter 11 filing of the
19  debtor CLI Holdings doing business as Alydian and this is
20  the Rule 2004 examination of Peter Vessenes.
21          Mr. Vessenes, we have met before, but I will
22  reintroduce myself.  My name is Bryan Reyhani.  I am
23  counsel to the creditor Bitvestment Partners, LLC,
24  formerly known as Dalsa Barbour.  Good morning.
25      A.   Good morning, Mr. Reyhani.  How are you?

Page 2

1       Q.   I'm fine, thank you.  And --
2           MS. SIMONYAN:  Bryan, hang on one second.  We
3   have the tech people here.
4           (Discussion off the record.)
5           MS. SIMONYAN:  We are being told that we are
6   transmitting just fine.
7           MR. REYHANI:  This Rule 2004 examination is
8   being held in accordance with the Federal Rules of
9   Procedure and Rule 2004 of the Bankruptcy Code.
10          Ms. Glynn Levin, I assume we can agree to
11  reserve all objections except as to form.
12          MS. GLYNN LEVIN:  I'm not sure what that means.
13  That's not something I hear in our district.  What do you
14  mean?
15          MR. REYHANI:  You are not going to object as to
16  relevance or anything else at this time; you are just
17  going to object as to the form of a question?
18          MS. GLYNN LEVIN:  I could object to
19  attorney-client privilege if you are asking me what did
20  Peter and I talk about.  That's not form, I don't think.
21  That's substance.
22          MR. REYHANI:  I understand.
23          MS. GLYNN LEVIN:  Yes.
24          MR. REYHANI:  Let's move on.
25          E X A M I N A T I O N

Page 3

1   BY MR. REYHANI:
2       Q.   Mr. Vessenes, can you state your full name for
3   the record?
4       A.   My name is Peter Joseph Vessenes.
5           MR. REYHANI:  And I'm going to ask that Tereza
6   pass out what we will mark as Exhibit 1.  It's the ex
7   parte order authorizing the Rule 2004 examination that
8   was executed by Judge Overstreet on September 12, 2013.
9           (Exhibit No. 1 marked.)
10  BY MR. REYHANI:
11      Q.   Since I'm flying a little bit blind right now,
12  have you had an opportunity to review the document, Mr.
13  Vessenes?
14      A.   No, but I'm reading it right now.
15      Q.   Please let me know when you are ready.
16      A.   Okay.  I'm on page 4.  I'm getting there.  Okay
17  I've read it.
18      Q.   Okay.  Have you seen this document before
19  today?
20      A.   Yes.  Well, I've seen one like it at least.
21  I'm not sure if I have seen this exact one or not.
22      Q.   When was the first time you saw this document?
23      A.   I don't recall.
24      Q.   Have you discussed this document with anyone
25  prior to today?

Page 4

1       A.   Yes.
2       Q.   With whom did you discuss it?
3       A.   My attorney.
4       Q.   Anyone else?
5       A.   I've discussed content related to the document
6   with my -- with my of my attorneys, and maybe, maybe some
7   contractors, but I think I wouldn't say very much.
8   Mostly with the attorney.
9       Q.   What did you discuss with the contractors?
10      A.   I'm not sure I understand the question.  What
11  do you mean?
12      Q.   You just stated that you discussed this
13  document with contractors.  What did you discuss with the
14  contractors?
15      A.   Again, I don't recall discussing specific, any
16  specific items here.  However, I did receive a few
17  questions from Kelly Gates about producing some financial
18  statements and other things.  That's all to my memory.
19      Q.   Who is Kelly Gates?
20      A.   She's a controller for CoinLab, Inc., and she
21  works -- she works for Denali, which is in the process of
22  getting appointed by the court to be Alydian's outsource
23  CFO provider, CFO controller provider.
24      Q.   So information regarding this proceeding you
25  needed to obtain from CoinLab's controller?

Page 5

1   A.   Well, she also -- they have a contract with
2   Alydian, so I'm not sure what you mean by that, but yes,
3   we spoke to Kelly Gates about it.  Or I did at least.
4       Q.   And what was the scope of the information Kelly
5   Gates provided to you?
6       A.   Well, she didn't provide me any information.
7       Q.   You just had discussions about information with
8   her?
9       A.   Yeah, that's right.
10      Q.   And what did you discuss?
11      A.   Like where -- how to pull the CoinLab and
12  Alydian invoices detailing the parts payments.  I think
13  that was largely the questions.
14      Q.   Just so we are clear today, when I say debtor
15  CLI holding or Alydian I'm referring to CLI holding the
16  entity that filed for Chapter 11 bankruptcy protection in
17  the Western District of Washington.  Is it your
18  understanding, Mr. Vessenes that you are appearing for
19  this examination today as a person knowledgeable about
20  the items described in Exhibit A of the Rule 2004 order?
21      A.   Mmm well, I don't think I'm required to,
22  because this order was just part of what the judge
23  signed, right?  So not everything on this list is anyone
24  required to give you; is that correct?
25      Q.   All I asked you was, do you understand that you

Page 6

1   are here to testify as a person knowledgeable about the
2   items described in Exhibit A of the Rule 2004 order?
3       A.   Well, I'm not.  I'm here to testify about some
4   of them.
5       Q.   Have you had a chance to review the items
6   listed in Exhibit A?
7       A.   I have, yeah.
8       Q.   Do you have knowledge of each of them?
9       A.   No, not necessarily.
10      Q.   Is there anyone other than you that would have
11  more knowledge regarding items specified in Exhibit A?
12      A.   I don't know.  I would have to reread it with
13  that in mind.  Would you like me to do that?
14      Q.   Sure.  Let's do it together.  The first one, a
15  list of all addresses that debtor had utilized and has
16  previously utilized to mine, receive, transfer, store,
17  hold or otherwise control bitcoins and copies of any and
18  all records and documents relating to these addresses.
19          Are you the person with the most knowledgeable
20  about that request?
21      A.   Perhaps.  There's so many, no one could know
22  all of them off the top of my head.
23      Q.   Who else would know it off the top of their
24  head?
25      A.   Again, we have technical staff who might

Page 7

1   remember more of them than I do, but I don't think it's
2   material, right?  We gave you the list.
3       Q.   I'm just asking if you are the person with the
4   most knowledgeable regarding this information.
5       A.   I'm saying I don't know.
6       Q.   Who else has knowledge?
7       A.   Robert Batten Bobby Seidensticker might.  It's
8   possible.
9       Q.   Who else?
10      A.   I mean I would think that that would be the probably
11  the limits of likely people who might have more Alydian
12  address as memorized than I do.
13      Q.   No. 4, copies of any and all records and
14  documents relating to the business loan extended to the
15  debtor by XRAY Holdings including without limitation the
16  loan documents, corporate resolutions minutes and
17  correspondence.
18          Would anyone have more knowledge about that
19  than you?
20      MS. GLYNN LEVIN:  To the best of your
21  knowledge.
22      THE WITNESS:  It's possible one of our
23  attorneys is more familiar with the corporate
24  resolutions, minutes and correspondence than me.
25  BY MR. REYHANI:

Page 8

1       Q.   Other than your attorney?
2       A.   I don't believe so.
3       Q.   No. 5, copies of all records?
4       A.   I'm sorry.  Go ahead.  I have a question, but.
5       Q.   Sure, what is your question?
6       A.   Well, originally you asked about all the
7   numbers on this list, but now you are skipping 2 and 3.
8   So are we skipping them in general for whatever
9   representations you are asking me about this list or not?
10      Q.   I'm goings towards the documents that are
11  relating to Alydian.  If you want to discuss CoinLab, I'm
12  more than happy to discuss CoinLab if you would like to
13  refer back to No. 2.  No. 2, a list of all addresses that
14  CoinLab utilizes and has previously utilized to mine,
15  receive, transfer, store hold and otherwise control
16  bitcoins and copies of any and all records relating to
17  these addresses.  Would anyone have more knowledge
18  concerning CoinLab's addresses than you?
19      A.   Well, I don't think that's germane to this
20  deposition.
21      Q.   You just asked me about those.  So I think it's
22  germane now?
23      MS. GLYNN LEVIN:  I think he was just trying to
24  clarify what the scope of today's deposition was on since
25  you referred to Exhibit A and we started with one and

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 9

1  then went to four, I think he was just asking for
2  clarification, not -- I wouldn't interpret that as he's
3  offering to testify more 2 and 3.
4      THE WITNESS:  I'm not offering but I mean if
5  the court reporter I don't know if you could read back
6  his first question about this, he said everything on this
7  list, and I don't think any many of these questions no
8  one is required to be here to answer to today and so I
9  just want to be precise about what we're discussing.
10 BY MR. REYHANI:
11     Q.   Overall would anyone have more knowledge
12 regarding the information that you are required to
13 testify about today on Exhibit A other than you?
14     A.   Again, it's super broad.  If you want to go
15 through line by line, I'm happy to.  I mean.
16     Q.   Okay.
17     A.   It's your -- I'm not going to answer your
18 gentle generalities Bryan.
19     Q.   Okay then we're going to be here all day on
20 this first question.  No. 5 copies of all records and
21 documents relating to any and all current and past
22 obligations owed by the debtor to CoinLab.  Would anyone
23 have more information than you regarding this?
24     A.   Well, I guess I'm not sure how to answer that.
25 I believe we have produced everything that we have for

Page 10

1  you, but I certainly was not the person with the
2  knowledge to make all that production.
3      Q.   No. 6, copies of any and all records and
4  documents relating to the debtor's transfer of 10,000
5  bitcoins to CoinLab on or about October 29, 2013.  Would
6  anyone have more information than you concerning that
7  transfer?
8      A.   Possibly.  I'm not sure.  Again, same thing.
9  We produced the documents for you, and I believe I could
10 speak to them.  Bitcoins) .
11     Q.   Who knew more than you, possibly?
12     A.   I'm not the records keeper.  So when our
13 employees pulled together documents and records for your
14 request, as they're reading through them all and pulling
15 them together, they might well have more knowledge than I
16 do, but that's not to say that I can't speak to those
17 documents.
18     Q.   What employees pulled the records?
19     A.   I don't know.  I don't know.  It would vary
20 depending on the records, I imagine.
21     Q.   You don't know what employees pulled records in
22 response to this Rule 2004 exam?
23     A.   Probably every -- well, no, not precisely, no.
24 I haven't been in the office.
25     Q.   What employees does Alydian have?

Page 11

1      A.   Well, other than me, Alydian has no employees.
2  It's not clear so I'm not sure if I'm an employee or not.
3  The lawyers are sort of opining on that for me right now.
4  So between zero and one.
5      Q.   So if you are the only employee, what other
6  employees could possibly have pulled the documents?
7      A.   Well, often documents would be kept by
8  contractors, for instance, Hans Olson's company C ten is
9  a contractor.
10     Q.   Did Hans Olson produce documents in this
11 matter?
12     A.   I believe so.
13     Q.   What other contractors?
14     A.   Other than Kelly Gates, I have no knowledge of
15 any others.
16     Q.   As you sit here today, you have no knowledge
17 who pulled documents responsive to this Rule 2004 exam?
18     A.   I just told you two people.
19     Q.   Other than those two, you have no idea who
20 pulled documents?
21     A.   No.
22     Q.   And Hans is an employee of CoinLab?
23     A.   No.
24     Q.   He's not?
25     A.   No.

Page 12

1      Q.   Okay.  So as you sit here today we could go
2  through the rest of this, but you have no idea who pulled
3  any documents other than Ms. Gates and Mr. Olson
4  responsive to the various requests pertaining to the Rule
5  2004 exam?
6      A.   I don't currently recall having actual
7  knowledge of anyone else doing it.
8      Q.   Is Hans a contractor of CoinLab, Hans Olson?
9      A.   Yes.
10     Q.   What did you do to pull any documents?
11     A.   I pulled -- I used an email search tool to
12 search through emails.  I think that's mostly what I did.
13     Q.   You did nothing else to provide documents
14 responsive to the Rule 2004 exam?
15     A.   I also provided a list of -- the list of
16 addresses, the Alydian addresses.
17     Q.   What else did you do?
18     A.   For direct document production, I don't recall.
19     Q.   The vat majority of the documents in this
20 matter have been produced in span of the last week.  You
21 don't recall what you did to produce documents?
22     A.   Mr. Reyhani, how many pages do the address and
23 emails take up of what we delivered to you?  Do you know?
24     Q.   Mr. Vessenes I'm asking you the questions,
25 please.

Rough Draft of Peter Vessenes                                    In re Alydian

Page 13

1    A.   I'm just asking you make you said the vast
2    majority, blah blah blah, but over I personally worked on
3    my vacation and delivered over 4,000 pages of discovery
4    to you in the last week and you're asking me if I
5    remember about anything else?
6    **Q.   Yes. I asked you what you did.**
7    A.   And I answered.
8    **Q.   You said you pulled emails.  What else did you**
9    **do?  And you provided addresses.  What else did you do?**
10   A.   I don't recall anything else significant.
11   **Q.   Have you ever been deposed?**
12   A.   Never, but I'm enjoying it so far.
13   **Q.   Have you ever testified at a trial or**
14   **arbitration or any other proceeding?**
15   A.   Yes.
16   **Q.   How many times?**
17   A.   Well, I'm not sure.  Once in New York.  You
18   were there for that.  Once for a creditor, a creditor
19   conference, I guess, or interview with creditors or
20   something.
21       MS. SIMONYAN:  Let the record reflect and
22   debtor's counsel is passing notes to the debtor.
23       MS. GLYNN LEVIN:  Sure.
24       THE WITNESS:  Once when we appeared in court
25   before Judge Overstreet, she asked me some questions.

Page 14

1    I'm not sure if you would count that or not.  I don't
2    recall any other times.
3    BY MR. REYHANI:
4    **Q.   So outside of the litigation currently in the**
5    **southern district of New York between Bitvestment and**
6    **CoinLab and the current bankruptcy proceeding for CLI.**
7    **You don't recall testifying in any other matter or**
8    **action?**
9    A.   No.
10   **Q.   I want to go over some basics.  I know we got**
11   **into some questions a little bit in advance, but I want**
12   **to go over some ground rules for this exam with you**
13   **today.  I'm going to ask you a series of questions.  If**
14   **you don't understand the question that I ask, please ask**
15   **me to clarify it and I will do so.  I don't want you to**
16   **guess.  Do you understand that?**
17   A.   Yes.
18   **Q.   To assist the court reporter, you have to**
19   **answer all of my questions verbally and to assist me**
20   **since I can't see you, meaning you have to say yes**
21   **instead of nodding your head and try not to say uh-huh or**
22   **speak at the same time that I'm speaking.  Okay?**
23   A.   Yes.
24   **Q.   Your lawyer may object to the form of a**
25   **question, but you should go ahead and answer the question**

Page 15

1    anyway.  Are you taking any medications or drugs of any
2    kind which might make it difficult for you to understand
3    and answer my questions today?
4    A.   No.
5    **Q.   If you need to take a break for any reason,**
6    **please let me know and you can take a break.  Do you**
7    **understand that?**
8    A.   Yes.
9    **Q.   You also understand that you are under oath**
10   **today?**
11   A.   Yes.
12   **Q.   Do you understand that your testimony here**
13   **today may be utilized in court?**
14   A.   I have a question about that.  I do, but in
15   which court proceedings.
16   **Q.   Do you understand that your testimony here**
17   **today may be utilized in court?**
18   A.   No, I don't understand.
19   **Q.   Do you understand your testimony here today is**
20   **the same as if you testifying in court?**
21   A.   Can you clarify that?  What do you mean by
22   that?
23   **Q.   You understand you are under oath?**
24   A.   Yes.
25   **Q.   And your testimony here today is akin to**

Page 16

1    testimony that you would give at a trial?
2    A.   I guess I don't understand that mean.  So
3    I will say no, I don't understand that.
4    **Q.   You don't understand that you don't understand**
5    **that your testimony here today that you are under oath is**
6    **the same as testimony that you would provide before a**
7    **court; you don't understand that?**
8        MS. GLYNN LEVIN:  Asked and answered.  I mean
9    he knows he's under oath and that's if it's going to be
10   used in court and trial, then you can use the court
11   procedures and the Court rules to use it.
12       MR. REYHANI:  Okay I just want to make sure
13   your client understood that seems it seems be fairly
14   combative in answers questions today.
15   BY MR. REYHANI:
16   **Q.   Are you knitting while you are answering**
17   **questions Mr. Vessenes?**
18   A.   I am currently knitting, yes.
19   **Q.   You are knitting during your testimony?**
20   A.   I just told you what I was doing, but it may
21   change.  Would you prefer I not knit, Mr. Reyhani?
22   **Q.   I just prefer that you take this seriously.**
23   A.   I am very serious.
24   **Q.   You will have an opportunity to review your**
25   **testimony after this Rule 2004 exam but you cannot make**

Rough Draft of Peter Vessenes                                    In re Alydian

Page 17

1  substantive changes to your testimony.  Please ensure
2  that you answer truthfully and accurately.  Okay?
3      A.   Yes.
4      Q.   So what did you do to prepare for this Rule
5  2004 exam?
6      A.   I reviewed previous testimony that we had
7  given.  I read over declarations that I made.  I skimmed
8  the 100,000 addresses and I reviewed many of the pages
9  that we delivered to you.  I read, I'd say, most of the
10 titles of the emails and a reasonable percentage of the
11 emails that were delivered.
12     Q.   Is that all you did?
13     A.   Well, I also worked on producing many of the
14 documents.  I don't recall more than that.
15     Q.   Did you meet with anyone in preparation for
16 this Rule 2004 exam?
17     A.   Yes, I met with my attorneys.
18     Q.   Which ones?
19     A.   Deirdre Glynn Levin, Roger Townsend.
20     Q.   How many times did you meet with them?
21     A.   Can you clarify specifically about this?  I'm
22 not sure I understand.  Ever?
23     Q.   I'm asking you what you did to prepare for this
24 examination today.  How many times did you meet with your
25 lawyers to prepare for this examination?

Page 18

1      A.   In preparation for this examination, we met
2  once.
3      Q.   For how long?
4      A.   Oh, I don't know.  Perhaps a couple of hours.
5      Q.   In preparation for this exam, did you review
6  all the various bitcoin addresses utilized by the debtor?
7      A.   What does utilize mean?
8      Q.   Mine, store, hold, transact, transfer.  Any
9  address where bitcoins were in and out of or held at any
10 time, did you review those addresses?
11     A.   Yes.
12     Q.   And how long did that review of transactions
13 take you?
14         MS. GLYNN LEVIN:  Can you clarify what you
15 meant by transactions?  Is the mine?
16 BY MR. REYHANI:
17     Q.   Utilize how long did it take you to review the
18 bitcoin addresses and the transactions in and out or
19 storage or mining or otherwise utilized, how long did it
20 take you to review those addresses and the ins and outs
21 or holding of bitcoins?
22     A.   Well, I didn't say I reviewed all the
23 transactions.  I just said that I had reviewed the
24 addresses utilized.
25     Q.   So you in your preparation for this for your

Page 19

1  testimony today, you didn't review all the transactions
2  relating to the debtor?
3      A.   I did not review every bitcoin transaction
4  related to the debtor for this.
5      Q.   Don't you think it was incumbent upon you in
6  this bankruptcy proceeding to have actually been prepared
7  to review all the transactions and discuss all the
8  transactions here today at the Rule 2004 exam?
9          MS. GLYNN LEVIN:  Objection to the extent that
10 asks for attorney-client privilege communications.
11         MR. REYHANI:  I asked him if it was incumbent
12 upon him to be prepared to discuss all transactions that
13 are the subject of this bankruptcy.
14         MS. GLYNN LEVIN:  I know what you asked, but my
15 objection stands because I don't know what you mean by
16 incumbent upon.  Are you saying he has a legal duty to do
17 that?  Can you clarify or rephrase your question?
18         MR. REYHANI:  I can clarify.  Judge Overstreet
19 already is apparently cognizant of the fact that the
20 debtor has been slow to say the least in terms of
21 producing documents and data relating to their assets and
22 to what has transpired with their financials.  She made
23 apparently abundantly clear that Mr. Vessenes should be
24 well prepared today in terms of discussing the goings-on
25 of the debtor.  So I ask Mr. Vessenes if he did not

Page 20

1  believe it was incumbent upon him to come prepared and
2  have reviewed all the various transactions relating to
3  the debtor.  There is nothing privileged about that
4  question.
5  BY MR. REYHANI:
6      Q.   Mr. Vessenes I'm going ask you the question
7  again.  Did you not think it was incumbent upon you to
8  review all the various transactions relating to the
9  debtor and be prepared to discuss those here today?
10     A.   I don't know what incumbent means, but I'm
11 prepared to discuss all the Alydian transaction today.
12     Q.   Okay.  Where did you go to college, Mr.
13 Vessenes?
14     A.   I went to brown university.
15     Q.   And what was your major?
16     A.   Mathematics.
17     Q.   And cryptography?
18     A.   I had an emphasis in cryptography, yes.
19     Q.   And you don't know what the word "incumbent"
20 means?
21     A.   I couldn't get into an English class.  It's a
22 true story.  There was a lottery and I wasn't allowed in.
23     Q.   I know that I can't see you but I know you can
24 see me and no one is laughing at this Mr. Vessenes, it's
25 very serious.

Page 21

1    A.   Mr. Reyhani, you often mix technical legal
2  words in with other questions and I think it's very fair
3  for me to ask or explain to you if I don't.
4       Q.   Incumbent is not a legal word, Mr. Vessenes.
5  How many addresses were there -- how many addresses did
6  Alydian, the debtor, utilize to transact hold mine store,
7  sell bitcoins?
8       A.   I believe it's six.  I would like to look at
9  what we produced to make sure that that's true, but.
10      Q.   Did you bring any documents with you today?
11      A.   I did not.
12      Q.   Did someone else bring documents on your
13 behalf?
14      A.   Not that I know of.
15      Q.   Other than your attorney, did you discuss your
16 testimony with anyone else?
17      A.   What testimony?
18      Q.   The testimony that you are providing today,
19 have you discussed in advance your testimony here today
20 with anyone else other than your counsel?
21      A.   Not particularly.
22      Q.   Not particularly with whom?
23      A.   Not particularly I think is no to the best of
24 my memory.
25      Q.   You don't recall whether you spoke about your

Page 22

1  potential, your testimony here today with anyone?
2       A.   Well, I told my wife about it.
3       Q.   Okay.  Anyone else?
4       A.   Other than attorneys, possible.
5       Q.   Yes, other than counsel.
6       A.   It's possible.  I'm not sure I understand what
7  you are asking for.  Did I mention it to anyone?  Is that
8  what you mean?
9       Q.   Did you discuss your testimony the fact that
10 you were testifying here today, with anyone?
11      A.   Yes, I did.
12      Q.   With whom?
13      A.   My wife.
14      Q.   Anyone else?
15      A.   Yes.  Bobby Seidensticker.
16      Q.   Anyone else?
17      A.   Not to my memory.
18      Q.   What did you discuss with Bobby Seidensticker?
19      A.   I just told him I wouldn't be in the office
20 today working because I had to be at a deposition.
21      Q.   What is your position with the debtor?
22      A.   I'm the managing director.
23      Q.   Do you have any other titles?
24      A.   I don't know.  I don't think so.
25      Q.   Do you hold any other employment?

Page 23

1       A.   Yes.
2       Q.   With whom?
3       A.   CoinLab, Inc.
4       Q.   What is your position with CoinLab, Inc.?
5       A.   I'm the CEO.
6       Q.   Do you hold any other employment?
7       A.   No.
8       Q.   How long have you held both of these positions?
9       A.   I've been the CEO of CoinLab, Inc., since
10 September of 2011.  I have not always been the senior
11 director or executive at Alydian.  I was at launch, which
12 was, I believe, October of 2012, roughly, and Hans was,
13 Hans Olson, was briefly CEO of Alydian in the summer, and
14 then quit, and I took up the managing director role
15 again.
16      Q.   Hans Olson was the CEO of Alydian in the summer
17 of 2013?
18      A.   Yeah, that was his title that we went to the
19 press with, that's correct.
20      Q.   What are your current responsibilities at the
21 debtor?
22      A.   Essentially maximizing the value of the estate
23 for the concerts.
24      Q.   What do you do on a day-to-day basis regarding
25 mining, management, things of that nature?

Page 24

1       A.   I respond to discovery requests.  I talk to
2  lawyers about outstanding litigation with Alydian.  I
3  talk to the technical and management team at Alydian
4  about decisions relating to deployment of mining systems,
5  hosting.  Right now it's mostly like hosting questions
6  and mining deployments.
7       Q.   So your responsibilities center on mining and
8  the management of that, correct?
9       A.   I already told you what my responsibilities
10 are.
11      Q.   Okay.  And your responsibilities were generally
12 the same prior to the debtor filing Chapter 11, correct?
13      A.   No.  Then I was able to spend more time trying
14 to add value to Alydian because I didn't have to deal
15 with litigation.
16      Q.   Okay.  Well, the debtor here is the one that
17 filed for Chapter 11, so you had more responsibilities
18 beforehand?
19      A.   No.  I had personally -- well, I don't know if
20 I had more or less.  Like I said, since you are the one
21 who sued us originally, I think you know you do have a
22 part to play what my daily job is right now.  We had --
23 we had a larger staff and a happier staff before
24 bankruptcy.  So I had fewer responsibilities then than I
25 do now.  People have quit.

Rough Draft of Peter Vessenes                                              In re Alydian

---

Page 25

1    Q.   You are receiving $20,000 a month from the
2  debtor?
3    A.   Not yet, no.
4    Q.   Not yet, no, okay.  Are you expecting to
5  receive $20,000 a month from the debtor?
6    A.   Yes.
7    Q.   But prepetition you were receiving no money in
8  the form of a salary from the debtor?
9    A.   That's correct.
10   Q.   Is there a written agreement concerning this
11 $20,000 that you are going -- that you are expecting as a
12 salary?
13   A.   There's not an executed agreement yet.
14   Q.   Is there an unexecuted agreement?
15   A.   I've been told there is, but I haven't had time
16 to review it.
17   Q.   Who told you?
18   A.   My attorney.
19   Q.   Where is the unexecuted agreement?
20   A.   I don't know.  I would presume with her.
21   Q.   We would request that that unexecuted agreement
22 be promptly produced at the conclusion of this
23 examination.
24        Who negotiated -- who negotiated your salary?
25   A.   We used -- so no one negotiated the salary.

Page 26

1  Instead we used the same terms that we had negotiated
2  with Hans Olson when he was running Alydian.  So we used
3  sort of a preexisting arm's length transaction to peg the
4  salary.
5    Q.   Why did the fee -- why did your salary only
6  start post-petition and that one you took over in
7  September?  And by took over, I mean took over as CEO.
8    A.   It was a fairly fluid and slow process where
9  Hans stepped out and I stepped in, and I think we
10 realized no one else was wiggle to run Alydian at all
11 post-petition and so our choice was either pay for
12 management talent or go chapter seven right then and we
13 decided that going Chapter 7 would not benefit the
14 creditors.
15   Q.   You weren't receiving a salary as CEO prior to
16 Hans Olson being CEO from Alydian; is that correct?
17   A.   That's correct.
18   Q.   But now post-petition you are electing to
19 collect a salary?
20   A.   I'm hoping to.
21   Q.   Does anyone share management responsibilities
22 at Alydian with you?
23   A.   Yes.
24   Q.   Who?
25   A.   Hans Olson.

Page 27

1    Q.   Anyone else?
2    A.   No.
3    Q.   And Hans Olson is an independent contractor?
4    A.   Yes.
5    Q.   Do you have a staff or anyone that works with
6  you at Alydian?
7    A.   What do you mean?  Are there other -- I don't
8  understand the question.
9    Q.   Who works on behalf of Alydian?
10   A.   Hans Olson, Robert Batten, Bobby Seidensticker,
11 various part-time contractors.
12   Q.   What are Hans Olson's responsibilities?
13   A.   He manages day-to-day operations.
14   Q.   To this day?
15   A.   Yes.
16   Q.   So is Hans the de facto CEO of the company?
17   A.   No.
18   Q.   That's you?
19   A.   I don't know what de facto means, but I said
20 I'm the managing director and senior leader.
21   Q.   If Hans is running the day-to-day operations at
22 Alydian, what are you doing?
23   A.   I already told you what I do.
24   Q.   Repeat it for me, please.
25   A.   I deal with litigation.  I oversee decisions on

Page 28

1  mining deployments and hosting contracts.  I try and keep
2  people like Hans and Robert and Bobby working so that
3  everything doesn't stop.
4    Q.   Is Hans still collecting 20,000 a month?
5    A.   I don't believe that's the exact number, but
6  yes he's still -- well, I don't know.  Hans is on an
7  hourly contract with a cap.  So I don't know exactly what
8  he's collecting right now.
9    Q.   So now both you and Hans are collecting a
10 salary that both Hans, that only Hans was collecting
11 before?
12   A.   That's not what I said.
13   Q.   Well, beforehand -- all right let's take this
14 step-by-step.  Prior to Hans becoming CEO, you were not
15 collecting a salary from Alydian is that correct?
16   A.   That's correct.
17   Q.   Hans starting collecting a CEO salary during
18 the summer of 2013, when he was appointed CEO, correct?
19   A.   That's not correct.
20   Q.   Did you not testify that the $20,000 was the
21 same $20,000 that Hans was collecting when he was CEO?
22   A.   I did.  However, Hans's compensation has been
23 the same since we first contracted with him.
24   Q.   So how did you arrive at the $20,000 figure for
25 your salary?

---

Page 29

1  A.  Like I said, we looked at Hans's, the amount
2  that we paid Hans.  Again, he's got an hourly and a cap.
3  And I believe we -- I think we wrote it down a little
4  bit.  I think Hans's cap is a little over that amount and
5  we chose that as a fair salary since it's less than we
6  had ever paid the most senior leader.
7  Q.  And by we, who is we decided that was a fair
8  salary?
9  A.  What with Hans?  Alydian did.
10  Q.  Your salary, who is the we?  Who decided that
11  your salary was fair?
12  A.  Like I said, we chose -- we chose to peg it
13  against a previous arm's length transaction because we
14  were worried about -- I can't think of the word, but we
15  just want to make sure we had something that was less
16  than a previous arm's length transaction for similar
17  services.  That was the decision.
18  Q.  Who is we?
19  A.  In this case.
20  Q.  You?
21  A.  I did and I took advice from my lawyers.
22  Q.  Which lawyers provided you that advice?
23  A.  I don't recall.  I certainly talked about it
24  with CoinLab's counsel, Wendy, and I spoke to Deirdre
25  about it as well.

Page 30

1  Q.  And Hans is still collecting about $20,000 a
2  month?
3  A.  For November that is the case.  I have not seen
4  his December bills.  So I don't know what his December
5  amounts will be.
6  Q.  So post-petition now both you and Hans are
7  collecting $20,000 a month from Alydian, correct?
8  A.  I just said that I don't know that that's the
9  case for Hans in December.
10  Q.  But for November that was the case?
11  A.  Well, and I have not collected any yet.
12  Q.  Do you have any reason to expect Hans not to
13  collect $20,000 for December or January?
14  A.  I don't know.  I don't know.  It's -- he had
15  some vacation time, which since he's a contractor we
16  don't pay for.  I'm not sure what his December or January
17  numbers will be.
18  Q.  Do you report to anyone?
19  A.  What do you mean by that?  Do I have
20  responsibilities or who do you report?  What do you mean.
21  Q.  Do you report to anyone, report to a board of
22  directors, do you report to anyone, do you report to
23  shareholders do you report to anyone?
24  A.  Yeah, so as the Alydian managing director I
25  report to -- I have two shareholders, CoinLab, Inc., and

Page 31

1  XRAY Holdings.
2  Q.  Anyone else that you report to?
3  A.  As the director of Alydian, no.  I guess.
4  Q.  Are you the sole director?
5  A.  I report to the court now as well, the trustee
6  because the company is in Chapter 11 protection.
7  Q.  Are there any other a directors of Alydian
8  aside from you?
9  A.  No.
10  Q.  As CoinLab, what is their percentage stake in
11  Alydian?
12  A.  CoinLab owns 65 percent of Alydian.
13  Q.  Who do you report to at CoinLab?
14  A.  As the managing director of Alydian.
15  MS. GLYNN LEVIN:  Are you saying -- I don't
16  know that his testimony was that he reported to somebody
17  at CoinLab.  So can you rephrase your question?
18  MR. REYHANI:  He testified that he reports to
19  the two shareholders, CoinLab and XRAY.  They're
20  obviously both companies and I'm sure he's speaking to a
21  person.
22  Q.  So who at CoinLab do you report to?
23  A.  I don't know that I report to a person at
24  CoinLab.  To the extent the CoinLab shareholders or board
25  would want reports from Alydian, I would produce them.

Page 32

1  Q.  Who which CoinLab shareholders or board members
2  do you provide Alydian reports to?
3  A.  Well, in the past -- it depends.  Right now no
4  CoinLab shareholders or board members have asked for
5  reporting but as recently as September, October, it would
6  have been Joel Yarmon, Draper Venture Capital.  I'm
7  trying to think.  There are probably you know -- there's
8  manfield, light speed.  So often investors from the funds
9  that have invested in CoinLab will have questions about
10  Alydian needs to answer.  Ribbit Capital.
11  Q.  So we have Joel Norman from Draper VC, Ribbit
12  Capital.  Anyone else?
13  A.  I just told you some others.
14  Q.  I'm sorry who else was there?
15  A.  Mayfield, Lightspeed.
16  Q.  Who do you speak to at XRAY regarding Alydian?
17  A.  Brian Cartmell.
18  Q.  Anyone else?
19  A.  No.
20  Q.  How do you communicate with the shareholders?
21  A.  Mostly by phone.
22  Q.  Do you email the shareholders?
23  A.  Occasionally.  I don't email a lot right now
24  but sometimes.
25  Q.  Do you email less now that you are involved in

Rough Draft of Peter Vessenes                                    In re Alydian

Page 33

1  two different litigations?
2     A.   I wouldn't tie it to litigation, but yes I do
3  email less than I used to because I'm busier.
4     Q.   Do you use text messages to interact with the
5  shareholders and their representatives?
6     A.   Very rarely.  Never for corporate information,
7  but I might set up a phone call or something over text
8  messages.
9     Q.   Do you use instant messaging with the
10 shareholders and their representatives?
11    A.   Not really.  Maybe -- I might Skype with Brian
12 Cartmell occasionally.
13    Q.   The answer is yes or no.  Do you use instant
14 messages to communicate with shareholders and their
15 representatives?
16    A.   No.
17    Q.   Do you use encrypted email to communicate with
18 any of the aforementioned individuals or entities?
19    A.   No.
20    Q.   Were you -- you are the only board member of
21 Alydian, that's correct?
22    A.   Yes.
23    Q.   Were you always the only board member?
24    A.   Yes.  Tereza, could I have so more water?
25    Q.   Did you at any time confer with Brian Cartmell

Page 34

1  when making business decisions on behalf of the debtor?
2     A.   Yes.
3     Q.   What decisions did you confer with Mr. Cartmell
4  about?
5     A.   Can you be more specific?
6     Q.   You just testified that you consulted with Mr.
7  Cartmell when making business decisions on behalf of the
8  debtor.  Which business decisions did you consult with
9  Mr. Cartmell about?
10    A.   Mr. Cartmell and I have been in business
11 together since October of 2012.  Where would you like me
12 to start?
13    Q.   Start at the beginning.
14    A.   Are you serious?  I talked to him three or four
15 times a week for a year and a half.  Do you wish a full
16 accounting?
17    Q.   What do you talk about?
18    A.   Progress of the mining project, business models
19 around the mining project, capital into the mining
20 project, project status.
21    Q.   What else?
22    A.   Just anything related to the ongoing operations
23 of Alydian.
24    Q.   Did you discuss the pre-buy contracts with Mr.
25 Cartmell?

Page 35

1     A.   Yes.
2     Q.   And Mr. Cartmell had knowledge of all the
3  contracts?
4     MS. GLYNN LEVIN:  Could you define what you
5  mean by pre-buy contracts.
6     MR. REYHANI:  I can even though your client
7  seems to understand want pre-buy contracts are all of the
8  pre buy contracts that Alydian the debtor entered into
9  with customers wherein Alydian took X-dollars and
10 promised to deliver to the promised to deliver bitcoins
11 in the future and we could debate whether.
12    MS. GLYNN LEVIN:
13    MR. REYHANI:  The legality of it.  Those are
14 the pre-buy contracts.
15    MS. GLYNN LEVIN:  Okay.  Do you understand that
16 what he means.
17    MR. REYHANI:  Can you restate that question?  I
18 have just kind of forgotten the first part of it.
19 BY MR. REYHANI:
20    Q.   Sure was Mr. Cartmell contemporaneously aware
21 of all the pre-buy agreements that are entered into with
22 the various customers?
23    A.   What does contemporaneously mean?
24    Q.   As of that date.
25    MS. GLYNN LEVIN:  Actually I think your

Page 36

1  question was your earlier question was something
2  different.
3     THE WITNESS:  I don't mind answering.  I just
4  want a specific question I can answer.  So as of what
5  date?
6  BY MR. REYHANI:
7     Q.   As of dates of the contracts.
8     A.   I'm still -- so I do not believe he knew all
9  the details of pre-buy contracts contemporaneous with the
10 signing of those contracts, if I'm using the word
11 correctly.
12    MS. GLYNN LEVIN:  And actually I want to make
13 sure that the objection is that he's only testifying as
14 to what he knows and he's not speaking on behalf of Mr.
15 Cartmell.  So just his personal knowledge.
16    MR. REYHANI:  All I'm looking for his personal
17 knowledge but he said he had three to four calls a week
18 with Mr. Cartmell, so?
19 BY MR. REYHANI:
20    Q.   So would Mr. Cartmell have been made aware of
21 the pre-buy contracts shortly after they were executed?
22    MS. GLYNN LEVIN:  To the extent that you can
23 answer with your personal knowledge, yes.
24    THE WITNESS:  Generally he would have and I
25 certainly would have known -- well, let me think.  I

Rough Draft of Peter Vessenes                                    In re Alydian

Page 37

1  guess I would say generally yes he would have been -- he
2  would have known about signing them but he may not have
3  known about each individual one.  He might have just
4  heard a summary from me.
5  BY MR. REYHANI:
6     Q.   Have you emailed with Mr. Cartmell?
7     A.   Sure.
8     Q.   Do you have text messages to and from Mr.
9  Cartmell?
10    A.   No.
11    Q.   Do you have any instant messages to and from
12 Mr. Cartmell?
13    A.   What do you mean by instant messages?
14    Q.   AOL, IM, Yahoo, instant message, Google talk,
15 any instant message type product.
16    A.   No, I have none of those.
17    Q.   And do you have any encrypted emails to and
18 from Mr. Cartmell?
19    MS. GLYNN LEVIN:  Could you explain for me what
20 an encrypted email is before I decide whether my client
21 should or should not answer that.
22    MR. REYHANI:  Sure.
23 BY MR. REYHANI:
24    Q.   Actually, Mr. Vessenes, why don't you explain
25 what an encrypted email is?

Page 38

1     MS. GLYNN LEVIN:  Why don't you explain what
2  you mean by your question as an encrypted email?  Maybe
3  we all understand the same thing.
4     MR. REYHANI:  I know what it means, and your
5  client you understand the question.  So why doesn't your
6  client explain what an encrypted email and then he can
7  testify as to whether Mr. Cartmell and he have encrypted
8  emails to and in each other.
9     MS. GLYNN LEVIN:  He's not here to testify
10 about technology.  So you need to define it on the record
11 so that I understand it and then he can answer the
12 question.
13 BY MR. REYHANI:
14    Q.   An encrypted email refers to email that
15 utilizes PGP or GPG encryption.  Does that help you all?
16 Probably not.  Mr. Vessenes, have you engaged in the
17 exchange of encrypted emails with Mr. Cartmell?
18    A.   I'm sorry.  I just stepped away for a drink.
19 One second.  Yes.
20    Q.   How many encrypted emails were sent between you
21 and Mr. Cartmell?
22    A.   A very small number.
23    Q.   Less than ten or less than a hundred?
24    A.   Less than ten.
25    Q.   What were those encrypted emails about?

Page 39

1     A.   Oh, I don't recall.
2     Q.   You went out of your way to send an encrypted
3  emails and you don't recall what they were about?
4     A.   No, that's not what happened.
5     Q.   What happened?
6     A.   Mr. Cartmell for a while sent me one or two
7  encrypted emails.  So really a small number but I'm not
8  in the habit of encrypting my emails so we didn't
9  continue with the practice.
10    Q.   Have you ever sent an encrypted email?
11    A.   Yes.
12    Q.   Who have you sent an encrypted email to?
13    A.   Oh, I don't know.
14    Q.   Have you sent any encrypted emails concerning
15 the bankruptcy of the debtor?
16    A.   No.
17    Q.   Have you sent any encrypted emails regarding
18 any of the creditors in this bankruptcy?
19    A.   No to my recollection.
20    Q.   Other than Skype and encrypted emails and
21 emails and I think you said possibly some text messages,
22 have you engaged in any other forms of communication with
23 Mr. Cartmell?
24    A.   No. Well, yeah, no.
25    Q.   What other form of communication?

Page 40

1     A.   Well, I was thinking -- I mean we talk on the
2  phone or the Skype is like a video or odd I don't chat.
3  So I don't know if that's covered or not by your
4  question.
5     Q.   Other than the telephone, email, Skype,
6  encrypted email, possibly some text messages, any other
7  forms of communication with Mr. Cartmell?
8     A.   No.
9     Q.   Why, why would you confer with Mr. Cartmell
10 when making a business decision on behalf of the debtor?
11    A.   He is the director of a company that controls,
12 that owns 35 percent of the debtor, and is our largest
13 creditor.
14    Q.   Did Mr. Cartmell ever sway you to make a
15 decision that you did not agree with on behalf of the
16 debtor?
17    A.   I'm not sure I understand your question.
18    Q.   Did you ever have a discussion with Mr.
19 Cartmell about the business of the debtor where you
20 wanted to do X and he wanted to do Y and you ended up
21 doing Y because Mr. Cartmell wanted you to do that?
22    A.   I don't recall a circumstance like that.
23    Q.   Would anything refresh your recollection?
24    A.   I guess yeah, sure, ask away.  Refresh away.  I
25 mean.

Page 41

1    Q.   Did you confer with Mr. Cartmell prior to
2    filing the Chapter 11 petition in this proceeding?
3    A.   Yes.
4    Q.   And what did you and Mr. Cartmell discuss?
5    A.   Whether or not we should file for Chapter 11
6    bankruptcy protection.
7    Q.   And what was the contents of that conversation?
8    A.   We both agreed we should do it.
9    Q.   Did you confer with Joel Yarmon when making
10   decisions on behalf of the debtor?
11   A.   Sure, yes.
12   Q.   Why?
13   A.   Well, because he's on the CoinLab board, he
14   often would provide opinions for the shareholders of
15   CoinLab as to what they would like done.
16   Q.   He's currently on the CoinLab board?
17   A.   Not currently.
18   Q.   As of when was he off the CoinLab board?
19   A.   I don't recall, but I think we delivered to you
20   his resignation letter as part of discovery.
21   Q.   Was it in the last couple months, was it last
22   year?  Do you have an approximate time frame?
23   A.   Well, it was certainly not last year, but like
24   I said, I thought I gave you the document so you could
25   know the precise dates.  I don't have them off the top of

Page 42

1    my head.
2    Q.   Joel Yarmon is employed by what company?
3    A.   Draper Venture Capital or if might be called
4    Draper Associates.  I don't know how much you know about
5    venture capital, but Tim Draper has about 30 funds.  I
6    think it's Draper Venture Capital, but it might be Draper
7    Associates.
8    Q.   It's a venture capital firm associated with Tim
9    Draper, correct?
10   A.   That's correct.
11   Q.   Did you email with Joel Yarmon concerning the
12   business of the debtor?
13   A.   In what time frame?  When you say.
14   Q.   Ever.
15   A.   When you say debtor, are you referring to
16   Alydian pre- and post-petition?
17   Q.   Yes.
18   A.   Because prepetition was not yet the debtor.
19   Q.   I understand that.  I said beforehand that we
20   were going to call Alydian, CLI, the debtor all the same
21   name.
22   A.   Thank you for reminding me.  So yes of course
23   we have emailed about Alydian.
24   Q.   Was Joel Yarmon involved in making business
25   decisions on behalf of debtor?

Page 43

1    A.   No.  He provided advice.
2    Q.   What kind of advice did he provide to you?
3    A.   He might have -- business advice, opinions
4    about the venture capital community, thoughts on how to
5    run the business.
6    Q.   Did he provide advice as to whether or not to
7    adhere to a pre-buy agreement on behalf of any customers?
8    A.   I don't recall.
9    Q.   You don't recall ever seeking Mr. Yarmon's
10   advice regarding the contracts that the debtor entered
11   into?
12   A.   That's not the first question you asked.  Is
13   this a second question or a follow-up to your first one?
14   Q.   Whatever you'd like.  Just answer the question.
15   A.   Can you say it again?
16   Q.   You don't recall ever speaking with Joel Yarmon
17   or receiving advice or speaking to him about pre-buy, the
18   customers pre-buy contracts on behalf of the debtor?
19   A.   Say it again, sorry.
20       MS. GLYNN LEVIN:  Maybe you could break it up.
21   It's kind of a compound question, Bryan.
22   BY MR. REYHANI:
23   Q.   Sure, no problem.  We can take it one step at a
24   time.  You had conversations with Joel Yarmon concerning
25   the business of the debtor, correct?

Page 44

1    A.   Yes.
2    Q.   And you received advice from Joel Yarmon
3    concerning the business of the debtor, correct?
4    A.   Yes.
5    Q.   Did you engage in discussions with Joel Yarmon
6    and by discussions I mean oral or written, concerning the
7    pre-buy contracts of the debtor?
8    A.   Yes.
9    Q.   And what did Mr. Yarmon tell you about the
10   pre-buy contracts of the debtor?
11   A.   When at what point in time?
12   Q.   You can start at the beginning.
13   A.   He originally -- I don't really remember what
14   he thought when we first did the pre-buy contracts.  I'm
15   sure we discussed -- we discussed them then, but I think
16   he felt -- yeah, I don't, I don't really recall when we
17   first started signing the pre-buy contracts in late 2012.
18   He liked the idea of them.  As you may know, he's a
19   creditor himself, so he purchased some.  I think if we
20   fast-forward, we spent a lot of time discussing in June
21   and July, when Alydian was running out of money, what to
22   do, like should we just wind it down, should we try and
23   sell a portion of the mining rigs to get enough funding
24   to finish the project, should we take on investment,
25   should we just deliver rigs to those customers that

Page 45

1  wished them.  So we had many discussions about that.
2      Q.    Did you have -- I'm sorry I didn't mean to
3  interrupt you?
4      A.    Oh, no, please go ahead.
5      Q.    Did you have any discussions with Mr. Yarmon
6  concerning the contract of investments?
7      A.    Yes.
8      Q.    Can you describe the contents of those
9  discussions?
10     A.    Well, actually, we never spoke about
11 Bitvestment.  There were two contracts with Dan Gallancy
12 that then got assigned, mmm.
13          MS. GLYNN LEVIN:  Just answer the question.
14          THE WITNESS:  To Dalsa Barbour, right.  So we
15 didn't ever talk specifically about Dan's first two
16 contracts.  The Dalsa Barbour agreements, I mean, I don't
17 know.  I think he thought -- I probably couldn't repeat
18 in public what he thought about your client or his
19 perspective.
20          MS. GLYNN LEVIN:  He didn't ask what somebody
21 else thought about it.  He asked about discussions.  So
22 that's the question on the table.
23          THE WITNESS:  I mean, I think what we mostly
24 discussed was whether or not Dan would be able to sink
25 Alydian, force it into bankruptcy and take away any

Page 46

1  chance that other purchasers would get any money out of
2  the company or not.  So those were most of the
3  conversations we had.
4  BY MR. REYHANI:
5      Q.    Did you email with Joel Yarmon?
6      A.    Occasionally.
7      Q.    Do you still email with Joel Yarmon?
8      A.    Occasionally.
9      Q.    Do you email with anyone else at Tim Draper's
10 venture capital shop?
11     A.    It's possible.  Not often.
12     Q.    With whom do you email at Tim Draper's venture
13 capital shop?
14     A.    Very occasionally I might email with Tim or
15 they have internal, you know, like a they will have their
16 accounting people or their legal folks get ongoing
17 reports.
18     Q.    Anyone else specifically?
19     A.    Not that I recall.
20     Q.    Do you text message, text message with Joel
21 Yarmon?
22     A.    Yes.
23     Q.    And that's in the past and presently?
24     A.    Yes.
25     Q.    Do you instant message with Joel Yarmon?

Page 47

1      A.    No.
2      Q.    Do you send encrypted emails to and from Joel
3  Yarmon?
4      A.    No.
5      Q.    Are there any other forms of communication with
6  Joel Yarmon?
7      A.    We have talked phone and email and text
8  message.  I think that's it.
9      Q.    What are Alydian's storage and backup
10 procedures concerning communications?
11     A.    Well, currently, since we're in dispute mode,
12 we retain everything.
13     Q.    And prior to -- when did this dispute mode
14 start?
15     A.    We typically had a 15-day retention policy.  We
16 turned that off sometime in early 2013.  So since then we
17 have kept everything.
18     Q.    And by everything, does that include emails?
19     A.    Yes.
20     Q.    Does that include text messages?
21     A.    It's possible if a phone crashed or wiped out.
22 We don't have an enterprise backup solution, but so no,
23 we don't -- yeah, I can't say if we have got every text
24 message in the same way that I know we have got all the
25 emails, but employees know that they need to retain their

Page 48

1  communications.
2      Q.    Does Alydian capture instant messages?
3      A.    That's a good question.  That's a technical
4  question I don't have an answer to.  I'm not sure.  I
5  think that with -- I believe that Google chat captures
6  all that and stores it in the same place.
7          MS. GLYNN LEVIN:  Can I ask a clarification
8  question?  So do you mean does Peter capture or Alydian,
9  and by Alydian who do you mean?  Are you talking about --
10         MR. REYHANI:  The company.
11         MS. GLYNN LEVIN:  So you're talking about some
12 amorphous sort of company data, data where that
13 information or those communications are stored apart from
14 an individual?
15         MR. REYHANI:  I'm asking if the company has a
16 data retention policy and the company Alydian or anyone
17 on Alydian's behalf captures communications just like
18 your emails are captured through your law firm and your
19 text messages are likely captured if you have a
20 company-issued phone and just like your IMs are likely
21 captured.  I'm asking if Alydian captures and stores this
22 information, and Mr. Vessenes testified that they had a
23 15-day retention policy.  They turned that off earlier in
24 2013.  He believed they captured email.  He's not sure on
25 text messages or if the phone crashes.  He thinks that

Rough Draft of Peter Vessenes
In re Alydian

Page 49

1  IMs, instant messages, might be captured but he's not
2  sure.  I think that was what your client has testified
3  about.  So I'm not asking if Peter is capturing it.  I'm
4  asking if the company is capturing it.
5        MS. GLYNN LEVIN:  Okay, thank you.
6        MR. REYHANI:  And retaining it.
7        MS. GLYNN LEVIN:  Thank you.
8        THE WITNESS:  Mr. Reyhani, could I have a
9  break?  I need a bathroom break.  Is that okay with you?
10       MR. REYHANI:  As I said before, you are free to
11 always ask me for a break.  Not a problem.  How about we
12 go off the record for about ten minutes?
13       MS. GLYNN LEVIN:  So ten minutes to the hour.
14       THE WITNESS:  We will see you then.
15       MR. REYHANI:  Once we go off the record --
16 let's go off the record now.
17            (A break was taken from
18            10:39 a.m. to 10:56 a.m.)
19 BY MR. REYHANI:
20    Q.   Is Joel Yarmon still involved with Alydian?
21    A.   What do you mean by "involved"?
22    Q.   Does he assist in the decision-making
23 capabilities?
24    A.   No.
25    Q.   What is Joel's involvement with Alydian at this

Page 50

1  date?
2     A.   He's still going.  He's a creditor.  He's a
3  potential buyer within the bankruptcy, like he and Tim
4  might be interested in buying the rigs (Chk.
5     Q.   You have had discussions with Mr. Yarmon about
6  purchasing the rigs?
7     A.   Yes.
8     Q.   What did you discuss with Mr. Yarmon concerning
9  buying the mining rigs?
10    A.   I told him that we were hoping to sell them,
11 and he like all creditors had received notice of the
12 motion for the sale.  He indicated to me that he and Tim
13 might be interested in purchasing them.
14    Q.   Was anything else discussed with Mr. Yarmon
15 concerning the potential sale of the mining rigs?
16    A.   No.  I referred him to Keller Rorback.
17    Q.   How many conversations did you have with Mr.
18 Yarmon concerning the potential sale of the mining rigs?
19    A.   One.
20    Q.   Was it in person on the telephone or email?
21 How was it?
22    A.   It was on the telephone.
23    Q.   I'm sorry.  I couldn't hear that answer.  How
24 did you communicate with Mr. Yarmon about that?
25    A.   It was on the telephone.

Page 51

1     Q.   How long was the telephone call?
2     A.   I don't recall.
3     Q.   When was the telephone call?
4     A.   I don't recall.
5     Q.   Was it in 2014 or 2013?
6     A.   I don't recall.
7     Q.   Was it prior -- was it prior to or after the
8  debtor made a motion to sell the equipment?
9     A.   Like I told you, it was after because he had
10 received notice like all the other creditors.
11    Q.   Did you have any discussions with Joel Yarmon
12 concerning the fact that you were thinking about selling
13 all the equipment before filing the motion?
14    A.   I don't recall.
15    Q.   You don't recall if -- you don't recall if you
16 had a conversation with Joel Yarmon concerning the
17 potential sale of the debtor's mining equipment prior to
18 you filing that motion to sell?
19    A.   That's correct.
20    Q.   Did you speak with anyone else concerning the
21 potential sale of the mining rigs?
22    A.   Yes.
23    Q.   Who?
24    A.   Deirdre Glynn Levin.  Wendy Wallace at CoinLab.
25 Hans Olson.  Bobby Seidensticker.  That's it, I believe.

Page 52

1     Q.   What were the contents of your conversation
2  with Wendy Wallace?
3     A.   She's corporate counsel for CoinLab.
4     Q.   Yes, and you are selling the equipment on
5  behalf of Alydian.  There's no privilege.  What were your
6  conversations regarding -- with Wendy Wallace concerning
7  the sale of the mining rigs?
8        MR. TOWNSEND:  Objection to the characterization
9  of whether there is a privilege or not for CoinLab.  Your
10 communications with your general counsel are privileged.
11       MR. REYHANI:  In his capacity as an employee of
12 CoinLab here, he's communicating with an attorney at
13 CoinLab concerning the sale of mining rigs of Alydian.
14 There's nothing privileged about that.  You can answer
15 the question.
16 BY MR. REYHANI:
17    Q.   What were the contents of your communications?
18       MR. TOWNSEND:  Don't answer that question.
19       THE WITNESS:  Yeah, but you just asked me if I
20 personally had talked to anyone and I told you.
21 BY MR. REYHANI:
22    Q.   Wendy Wallace.  What were your communications
23 with Wendy Wallace concerning the sale of the mining rigs
24 on behalf of Alydian?
25       MR. TOWNSEND:  I'm going to interject here.  I

Page 53

1  don't think you have made a record that this is a
2  nonlegal communication or laid the foundation. And I
3  don't know what the answer is, but certainly a CEO can
4  have a privileged communication with the CEO's general
5  counsel, and so unless the question is clarified, that's
6  a privilege, seeks privileged communication.
7        MR. REYHANI: Roger, it's not a privileged
8  communication and you know it. He's discussing the sale
9  of mining rigs regarding the debtor which is Alydian of
10  which he is the director with someone else at CoinLab.
11  There's nothing privileged about it. She wasn't acting
12  in her capacity as his attorney regarding those
13  communications. She wasn't providing advice, and if she
14  was, we are entitled to know it because they were there's
15  no privilege there whatsoever and if you want to fight
16  about it we can bring it in front of Judge Overstreet but
17  he is acting in the best interest of Alydian or supposed
18  to be. He's having communications with people at CoinLab
19  regarding the sale of mining rigs. We're entitled to
20  know what the contents of those discussions were.
21        MR. TOWNSEND: Bryan, it sounds like you were
22  present at that conversation. I was not. You are making
23  a lot of characterizations, a lot of assumptions
24  regarding what happened to that communication, and I
25  don't think you have made a record that those are

Page 54

1  nonlegal communications.
2        MS. SIMONYAN: Does Wendy Wallace represent the
3  debtor?
4        MR. TOWNSEND: Wendy Wallace is the general
5  counsel for CoinLab, Inc. Mr. Vessenes is the CEO of
6  CoinLab, Inc. You asked a very general question about
7  the communications between the CEO and the company's
8  attorney. Unless you can narrow that question, that
9  calls for attorney-client privileged communication. I'm
10  not saying you can't. There's not a question you can't
11  ask, but you haven't done it.
12        MR. REYHANI: Of course. No problem.
13  BY MR. REYHANI:
14        Q.  In this bankruptcy proceeding you are acting in
15  your capacity as the debtor's CEO or managing director or
16  whatever your title is, correct, Mr. Vessenes?
17        A.  The managing director, Mr. Reyhani, yes.
18        Q.  Okay, the managing director and in your
19  capacity of managing director you are trying to usher
20  Alydian through this bankruptcy process, correct?
21        A.  I don't know what "usher" means, but I'm in
22  charge of the debtor right now, yes, that's correct.
23        Q.  And in your capacity as being in charge of the
24  debtor you are exploring all options to maximize creditor
25  value, correct?

Page 55

1        A.  That's correct.
2        Q.  And in that capacity you had discussions
3  concerning the sale of mining rigs, correct?
4        MS. GLYNN LEVIN: Objection to the extent it
5  calls for attorney-client privileged communications.
6  Otherwise he can answer.
7  BY MR. REYHANI:
8        Q.  You can answer the question.
9        A.  Yes, that's correct.
10        Q.  And you had communications with people outside
11  of Alydian concerning the sale of mining rigs, correct?
12        A.  Yes.
13        Q.  And you had conversations with Wendy Wallace
14  concerning the sale of those mining rigs, correct?
15        A.  I believe so.
16        Q.  Well, about three minutes ago you said yes so
17  now you believe so. What were the contents of those
18  conversations with Wendy Wallace?
19        A.  Are we just back at that same conversation?
20  Are you asking are you asking acting in my capacity as
21  Alydian's managing director did I approach CoinLab's
22  generally counsel? Is that what you are asking?
23        Q.  That's not what I asked. Should we go through
24  the whole litany of questions that I just asked to get to
25  this stage. You are acting on behalf of the debtor; you

Page 56

1  are the managing director of the debtor?
2        A.  At times, that is so.
3        MR. TOWNSEND: Don't talk over him.
4        THE WITNESS: I'm sorry, go ahead, please
5  continue.
6  BY MR. REYHANI:
7        Q.  You are essentially the point person for the
8  debtor in this bankruptcy proceeding, correct?
9        A.  I'm the managing director of Alydian, yes.
10        Q.  And your job we'll go through this again is to
11  attempt to maximize creditor value in this bankruptcy
12  proceeding correct?
13        A.  That's correct.
14        Q.  And you are doing --
15        MS. GLYNN LEVIN: Go ahead. No, go ahead.
16  BY MR. REYHANI:
17        Q.  And as managing director of the debtor, you
18  elected to file a motion to sell the mining rigs in this
19  proceeding, correct?
20        MS. GLYNN LEVIN: Again, to the extent that you
21  are asking about advice, I am going to object. I
22  understand where you are going, so let's just get there,
23  and maybe ultimately this is a question that does need to
24  be ruled on by the Court as to if you want to know what
25  his communications were with Wendy Wallace because there

Rough Draft of Peter Vessenes                                    In re Alydian

Page 57

1  is an objection on the record that that is subject to
2  attorney-client privilege, and I mean it has actually not
3  come up before frankly, and it is not.
4      MR. REYHANI: I would love to hear -- let's
5  preserve this for the record -- what is the
6  attorney-client privilege between the managing director
7  of Alydian and the general counsel of CoinLab when the
8  managing director of Alydian is trying to maximize
9  creditor value by selling mining rigs if he had a mining
10 rig discussion regarding the sale, you guys can't just
11 sit there and shake your heads and say it's privileged.
12 We can come back here and do this again in a couple of
13 days, that's fine, but you both well know that there's no
14 privilege whatsoever regarding Mr. Vessenes's
15 conversation as a managing director of Alydian and him
16 having conversations with the general counsel of CoinLab.
17 That's absurd.
18     MR. TOWNSEND: It's not. I mean, my position
19 is to the extent that you -- I mean, you already asked
20 him about motions and legal decisions, and to the extent
21 we're talking about that, that's outside -- that's within
22 the scope of the privilege. To the extent you are asking
23 about a business decision or decision that might pertain
24 to her capacity as an other than legal counsel, then I
25 think that's potentially fair ground. I don't think you

Page 58

1  have made that record and I think that -- look, she's
2  providing legal advice to Mr. Vessenes, and we're not
3  going to waive that privilege.
4      MR. REYHANI: I haven't heard any testimony
5  that she's provided any legal advice whatsoever.
6      MR. TOWNSEND: You are not going to hear
7  testimony about the legal advice. That's the nature of
8  the privilege, right? We're not going to tell you the
9  privilege, the privileged communication to the extent
10 there are any and frankly I don't even know and I don't
11 know if you have made a record that there are or there
12 are not privileged communication.
13     MR. REYHANI: How could there possibly be a
14 privileged communication between Mr. Vessenes as the MD
15 of Alydian, the debtor, and the GC of another company?
16     MS. GLYNN LEVIN: Bryan, I respect your
17 position. You need to respect ours and we need to figure
18 out how to move on and resolve this, I think, in another
19 way, because.
20     MR. TOWNSEND: And you didn't frame the
21 question appropriately. Mr. Vessenes is the CEO of
22 CoinLab and.
23     MR. REYHANI: Roger, Roger, I'm not -- if you
24 want to do the ten-step tango again, fine.
25 BY MR. REYHANI:

Page 59

1      Q.  Mr. Vessenes, you are the managing director of
2  Alydian, correct?
3      MR. TOWNSEND: We don't need to go through the
4  same questions again. If you feel like your record is
5  complete, I don't, but, you know, proceed with your
6  deposition.
7      MR. REYHANI: That's fine. If you don't, I
8  want to have a complete record.
9  BY MR. REYHANI:
10     Q.  Mr. Vessenes, you are the managing director of
11 Alydian, correct?
12     MR. TOWNSEND: Objection; asked and answered
13 many times.
14 BY MR. REYHANI:
15     Q.  You can answer the question.
16     A.  Yes.
17     MS. GLYNN LEVIN: That's not controverted. I
18 mean, go ahead and ask him something that controversial
19 just in the interest of time, Bryan. I mean, I
20 understand your concern and I understand what you are
21 asking for, I do, and you have put it on the record and
22 we have stated our position. I respect yours, and I just
23 don't think we're going to be able to resolve it right
24 now. So in the interest of time, let's.
25     MR. REYHANI: You actually haven't.

Page 60

1      MS. GLYNN LEVIN: Let's figure out how it's
2  going to be -- maybe it will have to be resolved by the
3  court.
4      MR. REYHANI: I mean Judge Overstreet has
5  already been concerned about Mr. Vessenes purportly
6  hiding behind CoinLab let me finish speaking.
7      MS. GLYNN LEVIN: Go ahead.
8      MR. REYHANI: And your objection is a total
9  farce, given that basic law school 101 will tell you that
10 there -- how could you possibly have a privileged
11 communication between the MD of the debtor and a
12 different company that might be interested in purchasing
13 the assets? Do you understand what you are objecting to?
14     THE WITNESS: I'm sorry to interrupt you, but I
15 would like another quick bathroom break. I'm not feeling
16 well. Maybe you guys can argue about this while I'm
17 gone.
18     MS. GLYNN LEVIN: You need to be here. Let's
19 go ahead and take a break. Do you mind if he takes a
20 bathroom break?
21     MR. REYHANI: Sure, we can take a five-minute
22 break.
23     (A break was taken from
24       11:10 a.m. to 11:16 a.m.)
25     MR. REYHANI: I'd like to note for the record

Page 61

1 that Mr. Vessenes was conferring with list attorneys.
2 BY MR. REYHANI:
3  Q. Mr. Vessenes did you discuss anything
4 substantive regarding your testimony with your counsel?
5    MS. GLYNN LEVIN: What.
6    THE WITNESS: I'm not sure I understand. Do I
7 have to disclose conversations with my attorneys.
8    MR. TOWNSEND: No.
9 BY MR. REYHANI:
10  Q. There was a question on the table. You asked
11 for a bathroom break. We took a break. You were
12 conferring with your attorneys before you answered the
13 question. I'd like to know, were you discussing the
14 contents of your testimony?
15  A. Yeah I was curious whether or not just what
16 they thought about the privilege question and I did ask
17 them about that.
18  Q. Mr. Vessenes CoinLab and Alydian are two
19 distinct companies correct?
20  A. That is correct.
21  Q. Just as Alydian and Boeing are two distinct
22 companies, correct?
23  A. It is not the same.
24  Q. It is what?
25  A. It's not the same as Alydian and Boeing?

Page 62

1  Q. You have two distinct corporate entities,
2 correct?
3  A. Yes.
4  Q. If you had a conversation with Boeing's
5 generally counsel concerning the sale of mining rigs, do
6 you think that would be privileged?
7    MS. GLYNN LEVIN: That calls for a legal
8 conclusion and I will object. Immaterial I'm just
9 curious as to his opinion.
10    THE WITNESS: I'm not a lawyer Mr. Reyhani. I
11 have no idea.
12    MS. GLYNN LEVIN: You just ask him factual
13 questions and what he has personal knowledge of.
14 BY MR. REYHANI:
15  Q. Did you have business discussions with Ms.
16 Wallace or legal discussions with Ms. Wallace?
17  A. In my capacity as the Alydian managing
18 director?
19  Q. Yes.
20  A. In my capacity as the Alydian managing
21 director, I'm not sure I ever -- I'm not sure I've had
22 any discussions with Ms. Wallace as the ad Alydian
23 managing director.
24  Q. You just testified that you discussed with her
25 the sale of mining rigs on behalf of as the managing

Page 63

1 director of Alydian.
2  A. I don't think I did. I think that you are
3 misstating what I said.
4  Q. You testified, and we can have the court
5 reporter read back what you testified to, I said who did
6 you discuss the sale of mining rigs with on behalf of the
7 debtor. You said Wendy Wallace, Bobby Seidensticker and
8 a few other people.
9  A. Oh, maybe I misunderstood what on behalf of the
10 debtor meant if that's the case. Alydian's legal advice
11 on the bankruptcy almost all comes from Deirdre Glynn
12 Levin. In fact, actually that's it, because we have no
13 other special counsel. So Alydian doesn't go to anyone
14 for legal advice outside Deirdre, you know, as a matter
15 of communication, yes, so.
16  Q. Since you have not sought legal counsel in
17 connection with the bankruptcy proceeding on behalf of
18 Alydian from anyone other than Ms. Glynn Levin --
19    MR. TOWNSEND: Objection.
20 BY MR. REYHANI:
21  Q. -- tell me what you discussed with Ms. Wallace
22 about.
23    MR. TOWNSEND: Objection; misstates prior
24 testimony. Go ahead, you can answer.
25    THE WITNESS: I told her we were likely to try

Page 64

1 and get these sold as quickly as possible, and that it
2 seemed like, given the market prices at the time, that
3 would make the most money for the estate.
4 BY MR. REYHANI:
5  Q. What else did you discuss with her?
6  A. About Alydian mining sale.
7  Q. The sale of the mining rigs.
8  A. On behalf of Alydian? Nothing that I recall.
9  Q. What did Ms. Wallace say to you?
10  A. I don't recall. Not much.
11  Q. Why would you have discussed this with Wendy
12 Wallace?
13  A. My office is next to hers and I was talking to
14 her.
15  Q. You discussed the sale the mining rigs with
16 Bobby Seidensticker?
17  A. Yes.
18  Q. What did you discuss with him?
19  A. I asked him to please stay because if he quits
20 the mining rigs will stop working and we will have no
21 future bitcoins mined.
22  Q. Who else did you discuss the sale. Mining rigs
23 with? We have Wendy. We have got Bobby. You have Joel.
24 You have Tim. Joel Yarmon and draper. Who else have you
25 had these discussions with?

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 65

1    A.   Hans Olson.
2    Q.   What did you discuss with Hans Olson?
3    A.   I asked him how long he would be willing to
4    stay around and he said end of January.
5    Q.   Does he have another job lined up?
6    A.   I don't know.
7    Q.   Does he have another mining project lined up?
8    A.   I don't know.
9    Q.   Would Joel Yarmon or Tim Draper have the
10   capability of running the mining rigs that you are trying
11   to sell?
12       MS. GLYNN LEVIN:  Objection.  I mean to the
13   extent you are personal knowledge of their capability.
14       THE WITNESS:  I would -- I don't think so.  I
15   don't know.  You mean them personally?  I doubt it.
16   BY MR. REYHANI:
17   Q.   They would need to hire a team of people to
18   assist them to run the mining rigs?
19       MS. GLYNN LEVIN:  Again, objection.  If you
20   have personal knowledge of that, but if you have
21   discussed that with them, you can testify.
22       THE WITNESS:  Yeah, I don't know.  I mean what
23   I do know is that draper has -- they do have highly
24   technical employees.  I have no idea if they have got the
25   people you need to operate these or not.

Page 66

1    BY MR. REYHANI:
2    Q.   Did you discuss with Joel Yarmon that you would
3    sell the mining figures to Mr. Yarmon, Mr. Draper or to
4    CoinLab and that you continue to run the operation?
5    A.   No.
6    Q.   Did you discuss a price with Mr. Yarmon or Mr.
7    Draper?
8    A.   I told him what we talked about putting in the
9    motion.
10       MS. GLYNN LEVIN:  With who?  I'm sorry, that's
11   kind of a -- I realize that they work together, but can
12   you make sure you don't give a compound question about
13   the discussions?  So let's just answer the first one as
14   to Yarmon and then as to draper.  Those are two different
15   people, right?
16       THE WITNESS:  They are indeed.
17       MS. GLYNN LEVIN:  Yes, so do you want to
18   restate your question, please?
19       MR. REYHANI:  Sure could the court reporter
20   read back my question.
21       (Record read.)
22       MR. REYHANI:  Thank you.
23   BY MR. REYHANI:
24   Q.   Mr. Vessenes, did you discuss a price for the
25   sale of the mining rigs with Mr. Yarmon?

Page 67

1    A.   Possibly.  I believe -- it's possible.
2    Q.   What price was discussed?
3    A.   Well, I told him, you know, that we're planning
4    on some sort of bidding procedure to maximize the price,
5    and that I think we put in our court -- did we put in our
6    declaration a dollar amount?  I don't recall.
7        MS. GLYNN LEVIN:  I can't say.
8        THE WITNESS:  You can't say.  At one point we
9    planned on putting a minimum bid of $2,000 per terahash
10   as a minimum price in.  So I believe that I told him that
11   that would be the opening bid or the minimum bid.
12   BY MR. REYHANI:
13   Q.   So Alydian would be willing to sell their
14   mining rigs for $2,000 per terahash times 212; so
15   approximately $420,000, that be the minimum bid that
16   Alydian would accept?
17   A.   It's true that that would be the minimum bid
18   that would be accepted, but we would only sell to the
19   highest bidder.  I think that's what we told the Court.
20   I would start -- my approach would be to start bidding
21   low and see what happens, hope for more bidders.
22   Q.   Are you planning on bidding?
23   A.   No, I won't bid.
24   Q.   Personally on the mining figures?
25   A.   No, I won't bid.

Page 68

1    Q.   Is CoinLab going to bid?
2        MS. GLYNN LEVIN:  To the extent you know.
3        THE WITNESS:  CoinLab will not bid for those
4    rigs.
5    BY MR. REYHANI:
6    Q.   Will board members of CoinLab bid on the rigs?
7        MS. GLYNN LEVIN:  To the extent you know.
8        THE WITNESS:  There's only one current board
9    member of CoinLab, which is me, and I don't plan on
10   bidding on the rigs.
11   BY MR. REYHANI:
12   Q.   Will shareholders of CoinLab bid on the rigs?
13   A.   I don't know.
14   Q.   These rigs are held in data centers, correct?
15   A.   That's correct.
16   Q.   And to the layperson, to all the lawyers in the
17   room and everyone else, they're pretty complex pieces of
18   machinery, correct?
19   A.   That's correct.
20   Q.   There are a specialized chipsets.  They're
21   running -- they're highly specialized and would likely
22   need someone with possibly your level of sophistication
23   or Mr. Olson's level of sophistication to continue to run
24   those rigs, correct?
25   A.   That's not correct.

1  Q.   Explain to me who can run these rigs properly.
2  A.   Well, I could not and neither could Mr. Olson.
3  It requires engineers.
4  Q.   Okay.  Electrical engineers, computer science
5  majors?  What are we talking about here?
6  A.   You need a UNIX system administrator and
7  possibly an electrical engineer.
8  Q.   Are all the mining rigs around the world the
9  same?
10  A.   No.
11  Q.   You guys -- Alydian made its own rigs?
12  A.   Yes.
13  Q.   Based upon its own design plans?
14  A.   What is a design plan?
15  Q.   A schematic for a rig prior to putting it
16  together, did you have a schematic or a design plan prior
17  to putting together the rig, or did you just guess and
18  put together all the components?
19  A.   Alydian, I suppose, had its own, I don't know
20  if you would call them schematics but had a number of
21  designs.
22  Q.   We will come back to the rigs.  Who is Jodie
23  Brady?
24  A.   She's the former CFO of CoinLab, Inc.
25  Q.   And you say "former."  When did she become the

1  former?
2  A.   I don't recall.  She resigned as CFO sometime
3  in the summer.
4  Q.   Was she involved with Alydian?
5  A.   Yes.
6  Q.   What services did she provide to Alydian?
7  A.   Financial oversight, forecasting probably
8  some -- accounting.  Maybe some bookkeeping.
9  Q.   Why did she resign as CFO of CoinLab?
10  A.   I gave testimony about that in New York
11  already.
12  MS. GLYNN LEVIN:  You can answer.
13  THE WITNESS:  But essentially she felt that
14  CoinLab was investing too much money in Alydian and that
15  it was likely to go under.
16  BY MR. REYHANI:
17  Q.   Does she still provide services to the debtor?
18  A.   No.
19  Q.   Alydian?
20  A.   That is the debtor.
21  Q.   Does she still provide services to CoinLab?
22  A.   No.
23  Q.   Who is currently working on the Alydian, on the
24  Alydian mining rig project?
25  A.   Hans Olson, Robert Batten, Bobby Seidensticker,

1  and a number of contractors and part-time people.
2  Q.   What are their, generally, their educational
3  and professional background?
4  MS. GLYNN LEVIN:  Specifically who are you
5  talking about?  Can we go one by one?  Because I think
6  that.
7  MR. REYHANI:  Sure.  I'm sorry.
8  BY MR. REYHANI:
9  Q.   I want to know what type of individuals are
10  necessary to make the project work.  So I was asking for
11  the general background of Mr. Olson, Mr. Seidensticker,
12  Mr. Batten, the contractors.  We could take this one by
13  one if it's easier.  What is Mr. Olson's background?
14  A.   I believe he's an electrical engineer by
15  training.  He gave some testimony in New York, though,
16  which you have about his education background and his
17  work background.
18  Q.   And he's the chief engineer on the project?
19  A.   No, he's not.
20  Q.   Who is the chief engineer on the project?
21  A.   Robert Batten.
22  Q.   So what is Hans Olson doing on the project?
23  A.   Didn't we already talk about this earlier
24  today?
25  Q.   I'm asking you again.

1  A.   He's sourcing hosting agreements.  At this
2  point, Hans is kind of close to God (chk).  He's
3  negotiating final hosting deals.  He's providing
4  day-to-day management of contractors and employees, or
5  not employees but contractors.
6  So like this week they're -- he was leading a
7  burned-out board repair thing where a bunch of the mining
8  boards have some little problem but they have enough
9  parts to repair them, and he has rounded up the people to
10  do that and make sure they have the resources to do it,
11  that sort of thing.  Day-to-day ops.
12  Q.   How many -- aside from Mr. Olson and Mr.
13  Seidensticker and Mr. Batten, how many other contractors
14  do you have working on the project?
15  A.   I don't know.
16  Q.   Two, ten, twenty?
17  A.   At peak assembly, it was at least 15.  I
18  believe it's very small right now, but I don't know.  I'm
19  just not sure where they're at exactly.
20  Q.   If you want to hire -- what is Mr.
21  Seidensticker's background?
22  A.   He has a computer science degree.
23  Q.   And Mr. Batten?
24  A.   I don't know.  I'm not sure.
25  Q.   Mr. Batten, did you hire Mr. Batten?

Rough Draft of Peter Vessenes                                           In re Alydian

Page 73

1    A.   No.  Hans did.
2    **Q.   Did Hans discuss the hire with you?**
3    A.   Yes.
4    **Q.   And what did he say concerning Mr. Batten and**
5    **the need to hire him at debtor?**
6    A.   Well, it wasn't the debtor, but he -- he said
7    he had worked with him on previous projects and that he
8    could save the project from crashing and burning.
9    **Q.   Is Mr. Batten an electrical engineer?**
10   **MS. GLYNN LEVIN:  I think he already said he**
11   **didn't know his background.**
12   BY MR. REYHANI:
13   **Q.   What is he actually doing on a day-to-day basis**
14   **at the debtor?**
15   A.   What is Robert Batten doing right now?  He's
16   like -- there's this problem where some of the boards
17   exploded and send out like a mole ten lava thing and
18   melts everything and sends smoke everywhere.  He's
19   figuring out why that happens and making sure that all
20   the boards that exhibit that problem get pulled and fixed
21   before they melt the data center down.  I was like oh my
22   God when they told me.  I was like awe.
23   **Q.   If you wanted to hire other employees or**
24   **consultants or contractors or whatever you might call**
25   **them to work on the Alydian project, how would you go**

Page 74

1    **about procuring such individuals?**
2    **MS. GLYNN LEVIN:  And what do you mean by the**
3    **Alydian project?  I mean just.**
4    MR. REYHANI:  Mining a bitcoin.
5    MS. GLYNN LEVIN:  We have got lots of different
6    hostings so I want to make sure if you are going to use
7    project, then define what you mean by project.  Do you
8    mean.
9    BY MR. REYHANI:
10   **Q.   Okay Mr. Vessenes does Alydian do anything**
11   **other than mine bitcoins?**
12   A.   No.  Well, I suppose it's trying to sell its
13   mining rigs.  So those are the two things.
14   **Q.   I think we all know what project is.  If you**
15   **needed other individuals to assist Alydian on the bitcoin**
16   **mining project, how would you go about procuring such**
17   **individuals?**
18   A.   I don't think that we do.  I think we're
19   actually trying to wind down at this point.
20   **Q.   I didn't say what you are doing.  I said if you**
21   **wanted other individuals to assist Alydian on the bitcoin**
22   **mining project and their rigs, how would you go about**
23   **procuring such individuals?**
24   A.   But to do what?  It would vary, I suppose.  If
25   I needed a manager, I would recruit a manager.  If I

Page 75

1    needed an electrical engineer, I would recruit a
2    electrical engineer.  If I need ed a software guy I would
3    work recruit a software guy.
4    **Q.   And that's a fairly simple task to be able to**
5    **recruit those individuals?  You could post something**
6    **online for a jobsite or you could ask a friend?  There's**
7    **plenty of electrical engineers or managers around that**
8    **could assist you with the project.**
9    **MS. GLYNN LEVIN:  If you know.  This is just a**
10   **second.  This is kind of going outside the scope of**
11   **what -- this is kind of hypothetical and I'm not even**
12   **sure you have established that my client is the one that**
13   **does, that has that task to go out and hire people.  So I**
14   **mean, I'm not quite sure where this is going but it seems**
15   **to be getting a little far a stray and little outside our**
16   **scope, I think.**
17   MR. REYHANI:  I disagree.
18   BY MR. REYHANI:
19   **Q.   Mr. Vessenes you put in your declaration that**
20   **you submitted yesterday that you anticipate people**
21   **leaving the project as of January 31st, correct?**
22   A.   That's correct.
23   **Q.   Okay.  But those people are readily replaceable**
24   **by other individuals out, out there in the world that**
25   **have the same backgrounds, correct?**

Page 76

1    A.   Well, while one might be able to recruit
2    someone with a similar resume, that does not mean that
3    they have the facility with bitcoin mining or with the
4    Alydian systems to drop in and replace.  So.
5    **Q.   What is so specialized about Alydian's?**
6    **Continue on, I'm sorry.**
7    A.   No, go ahead.
8    **Q.   What is so specialized about Alydian's systems?**
9    A.   They're a custom architected with custom
10   software and custom hardware, so maybe an analogy that
11   would help you would be if you were to buy an old Italian
12   sports car you might want a mechanic, not just any
13   mechanic but one who knows Italian sports cars.
14   **Q.   So there would be a very potentially limited**
15   **people who would be able to run the Alydian mining rigs,**
16   **correct?**
17   A.   I don't know the answer to that.  So I'm not
18   sure but I would say that I don't have a long list of
19   them in front of me right now.
20   **Q.   And among the people most specialized to run**
21   **the Alydian mining rigs would be Hans Olson and whatever**
22   **engineers are currently working on the project, correct?**
23   A.   As I said, I don't believe Hans could run the
24   rigs on his own.  I think you would need a Lynn in this
25   case system administrator and a electrical engineer.  But

Page 77

1 Hans hasn't practiced as an electrical engineer in a long
2 time.
3   **Q.   But he's a chip engineer with at least 35 years**
4 **of experience, correct?**
5   A.   I don't know.  You tell me.
6   **Q.   He works with you, Mr. Vessenes.**
7     MS. GLYNN LEVIN:  If you know.
8     THE WITNESS:  Like I said, I don't recall all
9 the stuff and you have probably got his trial declaration
10 right there.
11 BY MR. REYHANI:
12   **Q.   Who designed the debtor's mining rigs?**
13   A.   What part of the mining rigs?
14   **Q.   Start from the beginning.**
15   A.   Well, the mining rigs contain software, custom
16 hardware, custom chips, board layouts, power supplies,
17 enclosures, cooling systems.  What are you interested in?
18   **Q.   All of it.  Who put together the rig, who**
19 **designed it, who put out the specs to be able to put the**
20 **whole thing together?  Was it one person, was it more**
21 **than one person, was it -- did you outsource it to some**
22 **third party?**
23   A.   It varies, depending --
24   **Q.   Did Mr. Olson?**
25   A.   -- on the parts.

Page 78

1   **Q.   Who designed the software?**
2   A.   The software split between the bitcoin client,
3 the bitcoin pool software, something called the stratum
4 server.  Then there's middle level proxy server, and
5 below the midlevel proxy server is a piece that controls
6 that controls something called FPGAs, which are like
7 programmable mini-computers.  There's software that runs
8 on the FPGAs that talks to the chips, and there's the
9 chips themselves.  That's just the software.  What part
10 would you like me to talk about?
11   **Q.   Who had the know-how to put all that together**
12 **on the software side?**
13   A.   Probably a thousand people worked on that full
14 software stack I just described to you.
15   **Q.   Who worked on it at Alydian to be able to pull**
16 **it all together?**
17   A.   A number of contractors worked on the embedded
18 software.  Robert Batten did FPGA programming.  Bobby
19 Seidensticker worked on the some of the system stuff, and
20 some of the low level embedded software.
21     Like I said, there's, you know, many, many more
22 people and often the code will rely on code written from
23 other people and so on.
24   **Q.   Let's discuss the chipsets that are being**
25 **utilized.  Who was able to make those work?**

Page 79

1   A.   By "chipset" do you mean the mining chip
2 itself?
3   **Q.   That and if there are others, feel free to**
4 **elaborate.**
5   A.   I'm just not sure I understand what you mean.
6 Do you mean like the little computer chip that was made
7 by SMIC?  Is that what you are referring to?
8   **Q.   Yes.**
9   A.   What was his name?  Brad Martin did -- Brad
10 Martin and four or five other contractors did the first
11 draft on circuit design, logic and circuit design for the
12 chip and then a company called bright finished what is
13 called layout, layout and test.
14   **Q.   Who dealt with the cooling component of these**
15 **mining rigs?**
16   A.   I don't know.  It was a contractor that Robert
17 hired.  I don't recall the name.
18   **Q.   Who possesses the design plans for these rigs?**
19   A.   I don't know what you mean by "design plans."
20   **Q.** We went through this before.  Is there some
21 type of schematic or blueprint or something?  I mean I
22 don't care if you are putting together a
23 multi-thousand-dollar mining rig just from thin air.  I'm
24 sure someone is laying it out and putting it down and
25 putting pen to paper and laying out how this all goes

Page 80

1 together.  Who possesses that layout design, plan?
2   A.   And I don't know what "possesses" means to you,
3 but Robert Batten probably did most of the designs in
4 concert with perhaps some outsourced design firms.
5   **Q.   Where do those designs sit today?**
6   A.   If they are in Robert's possession, they would
7 be on his computer in the offices in Portland.  If
8 they're in possession of -- if they're in the possession
9 of vendors, they would presumably be with the vendors.
10   **Q.   Do you have Mr. Olson's telephone number and**
11 **email address?**
12   A.   Yes.
13   **Q.   Could you provide it, please?**
14   A.   Right this moment?
15     MS. GLYNN LEVIN:  No.  Provide it later.
16     THE WITNESS:  It will be provided, sure.
17 BY MR. REYHANI:
18   **Q.   You don't know Mr. Olson's telephone number and**
19 **email address?**
20   A.   You want it right now?  It's Hans at
21 CoinLab.com.
22   **Q.   And what is his telephone number?**
23   A.   I don't have it.  I have it in my phone, but I
24 left my phone behind today.  I'm sorry.
25   **Q.   What is Mr. Seidensticker's email address?**

Rough Draft of Peter Vessenes | In re Alydian

Page 81

1    A.   Bobby at CoinLab.com.

2    Q.   **And do you have his telephone number?**

3    A.   Same story.

4    Q.   **And Mr. Batten?**

5    A.   Robert at CoinLab.com.

6    Q.   **And do you have his telephone number?**

7    A.   No, not on me.

8    Q.   **We would request his telephone number and all**

9 **of their addresses also at the conclusion of this**

10 **examination.**

11    **What -- is Mr. Batten an employee of CoinLab?**

12    MS. GLYNN LEVIN:  Wait a second.  We're not --

13 we'll talk about that later.  I'm not sure about that

14 request.  I'm just not sure about that request at this

15 point, why he would have to turn over those phone numbers

16 at this point.  Can you go through me?

17    MR. REYHANI:  Sure, if you want to give it to

18 me by tonight, that's fine.  I mean, it's readily

19 accessible information.

20    MS. GLYNN LEVIN:  Because you want to speak to

21 these people?

22    THE WITNESS:  They should have a chance to get

23 representation if lawyers are going to call them.

24    MS. GLYNN LEVIN:  For sure.  One of them is a

25 creditor at least, so I don't know if he has

Page 82

1 representation.  Anyway, we can talk about that at the

2 end.  You can continue.

3    MR. REYHANI:  That's fine.  It's not your fight

4 to fight, and we're still entitled to the information.

5 BY MR. REYHANI:

6    Q.   **So is Mr. Batten an employee of CoinLab?**

7    A.   Yes.

8    Q.   **If Alydian were to sell its mining rigs, as you**

9 **indicated is the best course of action for Alydian for**

10 **the creditors, is there any reason that a purchaser**

11 **should be concerned that the rigs would be nonfunctional**

12 **next month?**

13    A.   Well, I would assume Alydian will sell

14 everything as is, where is, so Alydian certainly won't

15 make any representations or warranties going out past of

16 the purchase date.  I don't know of any reason they won't

17 keep running, but I'm not an electrical engineer.

18    Q.   **Okay.  But they're in good working condition as**

19 **we sit here today, correct?**

20    A.   I just told you some exploded with volcanos of

21 lava.  They're not in all good working condition.  But

22 many are.  I mean they're made up a lot of components.

23 If any one fails, part or all of that system may or may

24 not continue working.  So it varies is the answer.

25    Q.   **How many how many rigs are up and running**

Page 83

1 **today?**

2    A.   I don't know because we denominate it in

3 bitcoin mining speed rather than rigs.  I believe

4 something like 175 terahashes is mining currently.

5    Q.   **Out of a potential 212 or so --**

6    A.   No, it will be less.

7    Q.   **-- terahashes?**

8    A.   No.  It will be less than that.

9    Q.   **Are you sure?  Do you need to revisit your**

10 **declaration?  It would be less than 212?  What is the**

11 **maximum terahash output from your mining rigs?**

12    A.   It is changing all the time because we have

13 parts that go bad or, you know, other potential problems.

14 I spoke with Bobby Seidensticker last night and

15 I'm getting different numbers from different people.  He

16 thinks 195, maybe.  Hans thinks 190.  It could be 200.

17 Somewhere in that range.

18    Q.   **The parts for Alydian's mining rigs are paid**

19 **for in U.S. dollars, correct?**

20    MS. GLYNN LEVIN:  By who?

21    THE WITNESS:  Alydian paid for some of its

22 parts with dollars and some with bitcoins.

23 BY MR. REYHANI:

24    Q.   **Okay.  If Alydian were to receive a U.S. dollar**

25 **denominated cash infusion, it could purchase parts for**

Page 84

1 **more rigs; isn't that correct?**

2    MS. GLYNN LEVIN:  Objection; hypothetical.  I

3 mean, what are you talking about?  Did you ask him if

4 Alydian is intending to do that?

5    MR. REYHANI:  No, I didn't.  I just said, if

6 Alydian received money, it would have the ability to

7 purchase more rigs, correct?

8    MS. GLYNN LEVIN:  Ability?  I'm not just not

9 sure what you are getting at, where this is going.  This

10 sounds very hypothetical.  There is a motion that is

11 pending for Alydian to sell its mining rigs.  That's the

12 extent of the operation at this point.

13 BY MR. REYHANI:

14    Q.   **That's all well and good, but it's currently**

15 **mining bitcoins to this day, right, Mr. Vessenes?**

16    A.   That's correct.

17    Q.   **If Alydian received a cash infusion, could it**

18 **not apply such cash to purchase parts for more mining**

19 **rigs?**

20    A.   I suppose that it could.

21    Q.   **And with more mining rigs Alydian could mine**

22 **more bitcoins, correct?**

23    A.   That's not necessarily so.  So I would say no.

24    Q.   **Okay.  If you would like to be evasive, we can**

25 **play with this for five minutes.**

Page 85

1   A.   I'm not being evasive, Mr. Reyhani.
2   Q.   If Alydian --
3   A.   I'm being precise.
4   Q.   If Alydian -- no, you are being evasive.  If
5   Alydian --
6        MR. TOWNSEND:  Objection; argumentative.
7   BY MR. REYHANI:
8   Q.   If Alydian went from 200 terahashes of
9   computing power to 400 terahashes of computing power,
10  would Alydian not mine more bitcoins?
11  A.   It would not necessarily mine more bitcoins,
12  because --
13  Q.   The probability of it mining more bitcoins --
14  yes, because what?
15  A.   Because it depends on what the rest of the
16  bitcoin mining network is doing at the time.  If Alydian
17  has 1 percent of all mining, which it doesn't I believe
18  have right now, but if it did, and then the rest of the
19  mining network triples in speed and Alydian only doubles,
20  it will mine less bitcoins.
21  Q.   So if Alydian's terahash output became 2
22  percent of the mining of the total computer terahash
23  network as opposed to 1 percent, isn't it a fact that
24  Alydian would be mining more bitcoins?
25  A.   If Alydian increases the percentage of total

Page 86

1   mining power against the global mining power that it is
2   competing with, it will on average mine more bitcoins,
3   that's correct.
4        MR. REYHANI:  I'm going to ask Tereza to hand
5   out to be marked as Exhibits 2 and 3 by the court
6   reporter the declaration of Peter Vessenes in support of
7   motion for bidding procedures order and for sale of
8   assets under 11 U.S.C. 363.  That will be marked
9   Exhibit 2, and to be marked as Exhibit 3, the
10  supplemental declaration of Peter Vessenes.
11       MS. GLYNN LEVIN:  Bryan, can you give us an
12  idea when we might take a lunch break, because here on
13  this coast it's noon, or almost noon?
14       MR. REYHANI:  Sure.  You tell me what is best
15  for you.  I'm happy to accommodate.
16       MR. TOWNSEND:  We can go off the record for this
17  one.
18       (Discussion off the record.)
19       (Exhibit Nos. 2 and 3 marked.)
20  BY MR. REYHANI:
21  Q.   We're back on the record.  Before you, Mr.
22  Vessenes, marked as Exhibits 2 and 3 are your first
23  declaration in support of the motion to sell and the
24  supplemental declaration in support the same motion.
25       Have you seen these -- do you need a minute to

Page 87

1   review the documents or are you familiar with them?
2   A.   I'm familiar with them.  I would like a moment
3   just to skim them and make sure I recognize the whole
4   document.  Is that all right with you?
5   Q.   Please.
6   A.   (Witness reviews document.)
7        I have read it and I'm familiar with 2.  I'm
8   quite familiar with what I assume Exhibit 3 is, but give
9   me a second here.
10       MS. GLYNN LEVIN:  Just for the record,
11  Exhibit 2 has an Exhibit A to it, and I do not see that
12  attached, at least not in my copy today.  That is
13  referenced in paragraph 5.
14       MR. REYHANI:  That's noted.  Thank you.
15       THE WITNESS:  All right, Bryan.  Go ahead.
16  BY MR. REYHANI:
17  Q.   So is it fair to say I assume you have seen
18  these documents before?
19  A.   Yes.
20  Q.   Let's discuss the first declaration.  Did you
21  discuss this document with anyone?
22  A.   I'm sorry, which exhibit are you referring to?
23  Q.   Exhibit 2, your first declaration in support of
24  the motion to sell.  Did you discuss that document with
25  anybody?

Page 88

1   A.   Yes.
2   Q.   With whom did you discuss it?
3   A.   Deirdre Glynn Levin.
4   Q.   Anybody else?
5   A.   Not that I recall.
6   Q.   The Exhibit 3, the second declaration, did you
7   discuss that document with anybody?
8   A.   Yes.
9   Q.   Prior to today?  With whom?
10  A.   Deirdre Glynn Levin.
11  Q.   Anybody else?
12  A.   Roger Townsend.
13  Q.   Anybody else?
14  A.   No.
15  Q.   If I could turn your attention to paragraph 16
16  of the supplemental declaration that is in your hand,
17  Exhibit 3.  We have here the comment that we discussed
18  earlier that, and I quote, because Alydian's core team
19  has stated they likely do not wish to remain on after
20  January 31, 2014.
21       Who is this core team?
22  A.   Robert -- hold on.  My names got all funny.  I
23  say them in order.  Hans Olson, Bobby Seidensticker, and
24  Robert.  I just blanked on his last name.  I've said it
25  too many times today.  Robert.

Rough Draft of Peter Vessenes                                         In re Alydian

---

Page 89

1        MS. GLYNN LEVIN:  Batten.
2        THE WITNESS:  Robert Batten.  Thank you.
3   BY MR. REYHANI:
4        Q.   And who do these three individuals report to?
5        A.   To me.
6        Q.   And they are all CoinLab employees?
7        A.   No, that's not correct.
8        Q.   Who is a CoinLab employee?
9        A.   Bobby Seidensticker and Robert Batten.
10       Q.   And Mr. Olson is a contractor to CoinLab?
11       A.   That's correct.
12       Q.   Are you laying them off after January 31, 2014,
13  so that they can't work on the project anymore?
14       A.   No, they threatened to quit unless they were
15  paid retention bonuses, and this is the date they were
16  willing to stay to.
17       Q.   Do they have other jobs lined up about which
18  you are aware?
19       A.   I don't know.
20       Q.   If CoinLab continued to compensate them at
21  their current rate, would they stay on?
22       A.   Not to work on Alydian.  I don't believe any of
23  them would stay on.
24       Q.   So they would just all quit their jobs and
25  collect unemployment or quit their jobs and not collect

Page 90

1   unemployment because they weren't fired?
2        MS. GLYNN LEVIN:  If you know.
3        THE WITNESS:  I don't know.
4   BY MR. REYHANI:
5        Q.   On the next page, towards the tail end of
6   paragraph 17, line 7, you noted that the mining rigs you
7   believe would yield $6.2 million in the spot market; is
8   that correct?
9        A.   That's correct.
10       Q.   And yet Alydian is willing it sell them for
11  approximately $400,000 as a minimum bid in this
12  bankruptcy proceeding?
13       A.   That's a long question.  I said that was a
14  minimum bid, but I said that we would sell them to the
15  highest bidder.
16       Q.   What if the highest bidder was $400,000?  You
17  would proceed with a $400,000 sale when the product is
18  purportedly worth 6.2 million?
19       A.   I think that provided we feel we have got a
20  good and broad recognition of bidders and that we have a
21  fair process, if that's the market price, that's the
22  market price.
23       Q.   You claim here that the rigs were worth more
24  just a few weeks ago they would have generated about
25  $11 million in sale in December, correct?

Page 91

1        A.   No, I say that the spot market price times the
2   amount of mining was $11 million.
3        Q.   So if you were to attempt to sell those rigs
4   you should receive somewhere in the ballpark of
5   $11 million correct?
6        A.   No, and in fact.
7        Q.   At that time?
8        A.   Not necessarily.  In fact if you keep reading
9   that same paragraph I plain that that's not the case.
10       Q.   How much would you have gathered -- how much
11  would you have collected if you sold these rigs in the
12  middle of December of 2013?
13       A.   I don't know.
14       Q.   So if today's spot market price was
15  $6.2 million, what is the sale price?
16       MS. GLYNN LEVIN:  Object.
17  BY MR. REYHANI:
18       Q.   What would be the sale price today of these
19  mining rigs?
20       A.   Well, we don't know.
21       Q.   You generated the $6.2 million figure by
22  looking into the marketplace and seeing what other mining
23  rigs or the amount of computing power is being generated
24  out in the publicly available world, correct?
25       A.   No, that's not quite correct.

Page 92

1        Q.   How did you generate the $6.2 million figure?
2        A.   I looked at a realtime market which is for
3   hashing only.  You buy and sell hashes at this realtime
4   market.  And I took the spot price, the price that trades
5   were clearing at right then, and we multiplied that by
6   the amount of capacity that we had.
7        Q.   So all things being equal, do you mean hosted
8   mining?
9        A.   The spot market, as I explain in my
10  declaration, is not quite like buying a mining rig.
11  Someone else provides the hashes and they promise to
12  provide them forever, and they promise to do all the
13  maintenance and operations work on them.
14       So when someone buys that promise on a spot
15  market, they're buying a maintenance-free operations,
16  cost-free hash, but they're taking counterparty risk as
17  well, which is to say that perhaps the company will go
18  away that is providing those hashes.  And so it's not
19  apples to apples, making a trade on a spot market like
20  that, and purchasing underlying hardware.
21       Q.   On the spot market -- I just want to make sure
22  I understand your testimony.  On the spot market the
23  hosted mining of these hashes forever would essentially
24  potentially yield Alydian $6.2 million, yet with the
25  belief that someone is going to be receiving bitcoins in

---

Page 93

1  the future, that would generate $6.2 million and then
2  some?
3      A.   Oh, my God.  Can you please break that up?  I'm
4  sorry.  That was like a full paragraph.  What do you want
5  to know?
6      Q.   Why would someone pay of $6.2 million for a
7  product that you claim can't generate sufficient bitcoins
8  to even meet the debtor's contracts?
9          MS. GLYNN LEVIN:  Objection.  It's not a
10  question that the debtor can answer, but if you can
11  answer, but it's not really calling for his personal
12  knowledge.
13         THE WITNESS:  I still don't understand because
14  you're mixing like a whole bunch of stuff about creditor
15  claims and pricing values and all that.  What do you want
16  to know?
17  BY MR. REYHANI:
18      Q.   Well, you are trying to rush this whole sale
19  process through bankruptcy court by claiming in the spot
20  market you could get $6.2 million for the terahashes.
21         My question to you is, if you think you can
22  get -- the person who would be making that investment
23  would probably want to see a return on that $6.2 million,
24  correct?
25      A.   Agreed.

Page 94

1      Q.   And you have testified in your declarations and
2  in various proceedings that you think the rates of
3  Alydian's generated bitcoins is going to go down to nil
4  eventually?
5      A.   Well, it won't go to zero, but it will get very
6  low.
7      Q.   So is it your -- so the person that would be
8  investing $6.2 million for a hosted mining contract would
9  have the belief and assumption that those mining rigs
10  would generate at least $6.2 million of bitcoin; isn't
11  that correct?
12         MS. GLYNN LEVIN:  Objection; hypothetical and
13  it's outside his personal knowledge.
14         MR. REYHANI:  It's squarely within his personal
15  knowledge.  He's got more experience in this space than
16  almost anyone in the world.
17         THE WITNESS:  Thanks.
18         MR. REYHANI:  He's the chairman of bitcoin
19  foundation.  He understands --
20         MS. GLYNN LEVIN:  Which is great, but it
21  doesn't --
22         MR. REYHANI:  It doesn't what?  I don't
23  appreciate the laughter.  I'm asking him a question.  In
24  any business, wouldn't someone who is paying $6.2 million
25  for a hosted mining equipment expect at least that rate

Page 95

1  of return.
2          THE WITNESS:  So I don't know.  I have no idea
3  what someone who is buying or trading bitcoin mining
4  hashes would expect, but I could tell you, like I mean I
5  could imagine people trading for all kinds of reasons.
6  Like you might buy something because you expect other
7  people to push the price up and then sell it later.  You
8  might buy it to cover a hedge out some other complex
9  financial instrument you have.  I could imagine a lot of
10  reasons, but I don't really know.
11  BY MR. REYHANI:
12      Q.   You would buy a mining rig to hedge against
13  another complex financial instrument?
14      A.   I might not, but someone could.
15      Q.   Explain to me how that would work.
16         MS. GLYNN LEVIN:  Just for the record, while I
17  appreciate the comment about my client's expertise in the
18  area, he isn't here as an expert witness.  So to the
19  extent that he has opinions that relate to the business
20  decision of a debtor in possession, that's one thing.  To
21  the extent that you are asking opinions that are really
22  like opinion-type testimony, I don't think that's
23  appropriate for a 2004 exam.  He's here to testify as to
24  the facts about the debtor.  That's the scope of a 2004.
25  It's been pretty broad.  I've really not objected too

Page 96

1  much about relevance, but he's not here to testify as an
2  expert witness.
3          MR. TOWNSEND:  He has opined about the price of
4  the rigs numerous times in various declarations.
5          THE WITNESS:  And I would like to say so far I
6  have been correct.  The price keeps dropping and it is
7  very unlikely that these systems will ever mine what they
8  would have gotten if they could have been sold earlier,
9  and the price keeps going down and I explain why I think
10  that's true here.  And I'm happy to have it on the
11  record, I put that in the declaration, but you asked me,
12  Bryan, maybe in the interest of time because it's before
13  lunch, why would someone do this.  I don't know.  I think
14  that the current spot prices are overexuberant and that
15  is a very very good reason to sell these quickly.  Now,
16  if we have been able to move more quickly, we probably
17  could have made more money at it but slowing things down
18  on a sale is just increases the risk that there's like
19  another large market correction where they're worth less
20  and less.  I mean, it's very does not seem to me to be in
21  any way good for the estate to hold on to these things if
22  it is true that there are people paying this 35- to
23  $40,000 per terahash.  I mean, there's no world in which
24  a terahash will deliver that much return, net of
25  expenses.

1       So to my mind, like this is an area your client
2  and all the creditors should be aligned on, which is like
3  if this is truly the spot market price, you should sell
4  these things as fast as you can because like the market
5  may change, and it has changed quite a lot in the last
6  week or two, in fact.  You know, I don't see any reason
7  why it won't continue to drop, I mean.
8  BY MR. REYHANI:
9       Q.    So what was the spot market price when you
10 completed the bankruptcy schedules filed on November 1st
11 or November 15th, when you were discussing the assets of
12 Alydian?  You quantified the assets at around
13 1.6 million, when apparently it was either 6.2 million or
14 11 million or a heck of a lot more.  What would have been
15 the spot market price on that day?
16      A.    I don't know.  I'm not sure.
17      Q.    You testified earlier that your data rigs, that
18 your mining rigs are kept at a data center, right?
19      A.    Yes.
20      Q.    What sort of security measures are in place to
21 ensure that any data center employees or other outsiders
22 don't highjack the rigs for their own personal use?
23      A.    What do you mean by "highjack"?
24      Q.    These are the debtors rigs, right?
25      A.    Yes.

1       Q.    And they're being housed in a data center with
2  lots of other mining rigs and lots of other equipment
3  from other companies and God only knows what is at these
4  data centers, correct?
5       MS. GLYNN LEVIN:  If you know.
6       THE WITNESS:  They vary.  They're in multiple
7  locations and each location is a bit different.
8  BY MR. REYHANI:
9       Q.    So how are you preventing anyone else from
10 accessing the mining rigs and/or output of such mining
11 rigs such that the bitcoins don't just go to Alydian?
12      A.    Do you mean physically preventing?
13      Q.    Sure, we can do physically to start.
14      A.    Well, each of the data centers has their own
15 security procedure.  We're getting a call.
16      Q.    Do you have -- do the rigs require a private
17 keys or passwords or other software?
18      MR. TOWNSEND: Wait one second.  Bryan, wait one
19 second.  We're having a technical issue.  Maybe you could
20 start over.  It came up as a call.  So we got a little
21 interrupted there.  I think we're okay now, though.
22      MR. REYHANI:  No problem.
23      THE WITNESS:  Go ahead.
24 BY MR. REYHANI:
25      Q.    Do rigs -- on the software side, do the rigs

1  require private keys or passwords or other safeguards to
2  ensure that only Alydian employees or Alydian personnel
3  are the only ones who are accessing the rigs?
4       A.    That's correct.
5       Q.    What security measures on the software side do
6  you have in place?
7       A.    There is monitoring software so you know
8  instantly if one is turned off or gone bad or stopped
9  producing.  And then they have fairly standard like UNIX
10 system security.  So public private key system in place
11 for logging in.  Like as an example, even I can't log
12 into them.  So they're quite tightly controlled access to
13 them.
14      Q.    Who has access to those private keys, if you
15 can't log into them?
16      A.    Bobby Seidensticker and Robert Batten.
17      Q.    So what do you have in place to prevent them
18 from diverting mined bitcoins to any other address other
19 than an Alydian address?
20      A.    Are you asking are my employees stealing mined
21 coins, employees and contractors?  Well, fundamentally
22 you have to trust your engineers at some level there's --
23 or probably you know the Latin, Bryan, but I don't.  Who
24 will guard the guardians, right?  So what you can do,
25 though, is do a statistical analysis of your mining speed

1  versus how many coins you have generated and assess if
2  coins have sort of probabilistically gone missing.
3       Q.    Have you conducted such an analysis?
4       A.    No.
5       MS. GLYNN LEVIN:  Is this a good time to take a
6  break, Bryan, or do you -- is this a good time to take a
7  break or to you want to finish your question lineup?
8       MR. REYHANI:  You know what?  Let me finish
9  this question let me get one more document in and I just
10 have a couple of questions there and that's actually a
11 perfect time to stop.
12      MR. TOWNSEND:  And I think I sort of stepped by
13 feet into a question before and I don't -- you were
14 asking about security on rigs, physical security, and I
15 don't know that that got finished, and then you all went
16 to software security, and I don't know if you want to
17 know that but I think I interrupted that question with a
18 phone call and whatnot.  So I don't know if you want to
19 continue to know that, but my sense was that question
20 didn't get answered completely and I don't know if you
21 want to continue that.  Maybe the witness did answer.
22      THE WITNESS:  I don't have a lot more to say
23 about the data security, but I'm happy to try if you
24 want.
25      MR. REYHANI:  I believe he addressed that

Rough Draft of Peter Vessenes                                                      In re Alydian

Page 101

1  question.  I was fine with that?
2        MR. TOWNSEND:  Okay.
3        MR. REYHANI:  That's okay.  Thank you.
4  BY MR. REYHANI:
5        Q.   Regarding Hans and -- Hans Olson and Mr.
6  Seidensticker and Mr. Batten, you indicated they wanted a
7  retention bonuses to stay on.  How much were they
8  requesting?
9        A.   I think the total amount in addition to the
10 November was about $250,000.
11       Q.   How much do each of them make per year?
12       A.   I told you Hans's numbers.  I don't have -- you
13 know, I don't remember off the top of my head.  I don't
14 want to give you wrong numbers.  Both of them are under
15 200, though.
16       Q.   So essentially they all wanted a 50 percent
17 retention signing bonus to stay on?
18       A.   Again, I can't do the math for you right now,
19 but.
20       Q.   Let's do one more document and then we will
21 break for lunch.  If Tereza could distribute what we are
22 going to mark as Exhibit 4.  It is the -- actually,
23 before we do that, if we can go back to Peter's
24 declaration, Exhibit 2.
25            You previously discussed in your declarations

Page 102

1  that Alydian is an incubated company and that CoinLab is
2  the incubator, correct?
3        A.   Yes, that's correct.
4        Q.   Okay.  And that Alydian was being charged a
5  10 percent administrative fee on top of whatever was
6  being invoiced to Alydian to a maximum of $5,000 per
7  invoice, correct?
8        A.   Yes, that's correct.
9        Q.   So and Alydian was -- CoinLab was actually
10 invoicing Alydian about weekly, right, correct?
11       A.   No, that's incorrect.
12       Q.   That's incorrect?  How often was Alydian being
13 invoiced by CoinLab?
14       A.   It varied, but it was never more often than
15 weekly that I'm aware of.  It was probably more, I think
16 once or twice a month.
17       Q.   So let's say if it was twice a month.  So if
18 there were two invoices that means Alydian would be
19 paying a $10,000 fee to CoinLab for the invoices that
20 month instead of a $5,000 fee isn't that correct?
21       A.   That's a maximum amount.
22       Q.   And if Alydian was being invoiced four times a
23 month weekly instead of just once a month, as was
24 possible, that means Alydian was paying a $20,000
25 administrative fee to CoinLab instead of just $5,000 a

Page 103

1  month, correct?
2        A.   No, that's not correct.  It depends on how much
3  was spent on Alydian's behalf.
4        Q.   Okay.  Per invoice there was a $5,000 maximum
5  administrative fee that was being charged to Alydian,
6  correct?
7        A.   Correct.
8        Q.   And if you broke that 10 percent threshold or
9  $5,000, if there was four invoices a month, Alydian would
10 have been charged $20,000 a month in admin fees as
11 opposed to $5,000 a month, correct?
12       A.   If one if Alydian incurred $200,000 of expenses
13 and it was billed in four invoices, then it would have
14 been $20,000 in fees, but if it had been billed in one
15 invoice, it would have been $5,000 in fees.
16       Q.   Okay.  On top of the administrative fees
17 CoinLab was also charging a management fee to Alydian;
18 isn't that true?
19       A.   Yes, that's correct.
20       Q.   And that management fee ranged from 15,000 to
21 $25,000?
22       A.   I don't recall off the top of my head.
23       Q.   How often was that management fee charged?  Per
24 invoice, weekly, monthly, bimonthly?
25       A.   No that fee was an assessment on what percent

Page 104

1  of my and other senior management time the Alydian
2  project took up.  So it was billed as a percentage of
3  senior management time.
4        Q.   Okay.  So if Alydian was getting charged four
5  invoices with $200,000 spent plus the management fee,
6  Alydian could have been paying and we can go through the
7  invoices when we continue this, could have been paying
8  instead of $5,000 per month they were paying $40,000 per
9  month to CoinLab, correct?
10       A.   I'm sorry.  I'm kind of lost in the math again.
11 You got all the invoices.
12       Q.   If there was a?
13       A.   Could we talk about a specific invoice?
14       Q.   We got the invoices at 10 o'clock last night,
15 so I think that will have to pick under the invoices in
16 the future, but if there were four invoices in a month
17 that equates to $20,000 in administrative fees and
18 there's an invoice in that month that has a $25,000
19 management fee, that means Alydian was paying not $5,000
20 to CoinLab per month but $45,000 to CoinLab per month,
21 correct?
22       A.   Well, that's all hypothetical.  I mean, what if
23 we could imagine daily invoices and choose any number you
24 wanted in a hypothetical?  But I -- so.  We.
25       Q.   We could but you as the managing director of

Rough Draft of Peter Vessenes                                                In re Alydian

Page 105

1   **Alydian have a fiduciary duty to the company, correct?**
2   A.   That's -- well, at this point to, I think the
3   estate, that's correct.
4       **Q.   If we could go back to Exhibit 4 that Tereza**
5   **was distributing I only have a couple questions here and**
6   **then we can break for lunch?**
7   A.   I'm sorry, Bryan are we done with 2 and 3?  Can
8   I pass them to the court reporter?
9       **Q.   Yes for the time being we're done with 2 and 3**
10  **thank you.**
11          (Exhibit No. 4 marked.)
12  BY MR. REYHANI:
13      **Q.   Exhibit 4 is the motion for order approving**
14  **notice of sale, bidding procedures order, and setting**
15  **hearing on sales of assets and granting other relief (Chk**
16  **doc).**
17          If you could take a moment to review the
18  **document, Mr. Vessenes.**
19          MS. GLYNN LEVIN:  My copy does not have the
20  **Exhibit A attached, which is the proposed order.**
21          MR. REYHANI:  Neither does my copy.  We could
22  either add it on, but it's not completely relevant for my
23  questioning right now.  So I'm fine either way.
24          MS. GLYNN LEVIN:  Okay.
25          THE WITNESS:  I haven't read this in some time,

Page 106

1   Bryan.  It's going to take me ten or twelve minutes to
2   get through it, unless you would like me to skip that and
3   not rep to the whole document, if you've got a specific
4   question.
5   BY MR. REYHANI:
6       **Q.   Yes, I have some specific questions and if**
7   **there's anything you are uncomfortable asking without**
8   **full review of the document, I'm more than happy to pick**
9   **it up after lunch?  Okay?**
10  A.   All right, go for it.
11      **Q.   So to be clear -- and you testified earlier**
12  **about Alydian selling the rigs on an as is, where is**
13  **basis, correct?**
14  A.   I believe that's correct, yes.
15      **Q.   Alydian's mining rigs are meant to be used in a**
16  **data center, correct?**
17  A.   Well, perhaps.  They're meant to use anywhere
18  with proper cooling.
19      **Q.   You are not going to take a mining rig and**
20  **probably bring it to your house, correct?**
21  A.   I'm not, that's correct.
22      **Q.   For safety purposes, the data center where**
23  **there's proper power and cooling is likely the best bet,**
24  **agree?**
25  A.   I would agree with that.

Page 107

1       **Q.   So the pool of purchasers of these rigs would**
2   **be someone who has the expertise to operate these rigs in**
3   **a data center, correct?**
4   A.   No, not necessarily.  It could be someone who
5   has got a technical staff or technical contractors that
6   are willing to run them.
7       **Q.   Right, they would have the expertise to run it**
8   **in a data center, correct?**
9   A.   I'm just saying the financial buyer may have no
10  such expertise.
11      **Q.   Right, but they would have the technical**
12  **individuals below them that would be age to run it in a**
13  **data center?**
14  A.   I would presume so.  But I don't know.  I'm not
15  sure.
16      **Q.   Have there been any bidders so far?  We don't**
17  **even have an order allowing this to receive bids.  I mean**
18  **you can ask if we have had inquiries?**
19          MR. REYHANI:  You.
20  BY MR. REYHANI:
21      **Q.   You can answer yes or no.  Have you had any**
22  **bidders?**
23  A.   There are no bids.
24      **Q.   Have you had any inquiries?**
25  A.   Yes.

Page 108

1       **Q.   By whom?**
2   A.   The only person I have spoken to directly is
3   Joel Yarmon.  The others have contacted Keller Rorback.
4   Well, there's one other.  I don't remember his name, the
5   guy are from Idaho.  Someone from Idaho.
6       **Q.   I think you testified earlier and if I'm wrong,**
7   **Mr. Vessenes correct me, did you speak with Mr. Draper**
8   **about this?**
9   A.   No.  Joel Yarmon.  And I just said Joel Yarmon.
10  I reiterated that.
11      **Q.   Okay.  And somebody in Idaho?**
12  A.   That's correct.
13      **Q.   Anyone television about which you are aware?**
14  A.   There are more.  I've heard there are more, but
15  I have not.  I have no direct knowledge of them.
16      **Q.   Has any entity or individual in connection with**
17  **the purchase of the mining potential purchase of the**
18  **mining rigs conducted any due diligence?**
19  A.   No.
20      **Q.   Has the debtor -- what marketing efforts**
21  **regarding the potential sale has the debtor performed?**
22  A.   I don't believe we're allowed to do marketing
23  until we have got a court order approving it, but we are
24  ready to do some marketing.
25      **Q.   You are ready to do some marketing?**

Page 109

1    A.    Yes, once the court approves.
2    Q.    Is that what you said?
3    A.    That's correct.
4    Q.    What kind of -- what is the scope of the
5    marketing you intend to under that you intend to do?
6    A.    We would do a large scale PR push in interested
7    financial journals.  Anyone who has written about this
8    bankruptcy or mining.  We would reach out directly to the
9    bitcoin industry press so there's some formal ones and
10   some informal areas.  We would there's probably --
11   there's a list of mines, mining market providers you know
12   possible and future, current we would contact them and
13   encourage them to bid.  Other possible there's probably a
14   short list of bitcoiners who might be interested as well.
15   So we would do some -- like we're not clear if -- I mean,
16   something about the bitcoin mining space and I believe
17   this is why the prices are so high, is people who are new
18   to the space who are more investor types or financial
19   types rather than bitcoin types are getting interested.
20   So we want to make sure we hit those people up.  And I
21   think you get to them through -- you get to them through
22   like the financial times and the journal and so on.  Now,
23   bitcoin insiders or technical types will be going to coin
24   desk or reading bitcoin talk or read at bitcoin forums or
25   other places so you will want to hit those as well to get

Page 110

1    both parties there.
2    Q.    But no marketing to date, right?
3    A.    Correct.
4    Q.    Out of curiosity, why would anyone contact your
5    attorney when a notice hasn't gone out yet?
6    A.    There were news stories written about us in the
7    Wall Street Journal mentioning it and people are
8    interested, apparently, in buying mining rigs.  So they
9    got in touch because of that.
10   Q.    Do you know how many people reached out to
11   Ms. Glynn Levin?
12   A.    No, I don't.
13   Q.    She didn't tell you that there's like dozens of
14   people knocking down your door to buy these rigs or two
15   people?
16   A.    You are just asking about a privileged
17   conversation.  No.
18   Q.    No, there's nothing privileged about it.
19   That's not a legal communication.  She was relaying to
20   you how many people made a narrow regarding the assets of
21   the estate.  That's interesting.  We are entitled to
22   know.  How many people reached out to Ms. Glynn Levin to
23   say they are interested in purchasing the mining rigs?
24   A.    I don't know.
25         MR. TOWNSEND: Don't absence communications with

Page 111

1    regarding your lawyer.  Mr. Ray's view on attorney-client
2    privilege is not something you should.
3         THE WITNESS:  I will make sure I won't relay it
4    to my children in explaining the law to them.
5         MR. REYHANI:  I think now is a good time for a
6    break, and we can go off the record.
7             (A lunch break was taken
8              from 12:29 p.m. to 1:19 p.m.)
9         MR. REYHANI:  We're back on the record.  If
10   Tereza could pass out what we're going to mark as
11   Exhibit 5, which is the order granting the investment
12   partners LLC's motion to compel.
13             (Exhibit No. 5 marked.)
14           E X A M I N A T I O N (Continued)
15   BY MR. REYHANI:
16   Q.    Let me know when you are done reviewing the
17   document.
18   A.    I'm sorry, do you have Exhibit A?
19   Q.    It's attached.  It should be.
20   A.    Every paragraph refers to Exhibit A.
21         MS. GLYNN LEVIN:  Do you not have it.
22         THE WITNESS:  I don't know if I do or not.
23         MR. REYHANI:  It should be page 6.
24         THE WITNESS:  Yes I do hold on.
25         MS. SIMONYAN:  It's there, but it's also on

Page 112

1    Exhibit 1, if your copy does not have it.
2         MS. GLYNN LEVIN:  Just use the one that is
3    there it.  I think you've got it.
4         THE WITNESS:  What do you want Bryan?  You want
5    me to read this whole thing or what.
6    BY MR. REYHANI:
7    Q.    You don't have to read the whole thing, but if
8    I need something specific from you, I will allow you the
9    time to review it.
10         Have you seen this document before?
11   A.    I have seen the order and the exhibit
12   separately before, yes.
13   Q.    Okay.  And do you recall the first time you saw
14   the document?
15   A.    No.
16   Q.    Did you discuss this order with anyone
17   previously?
18   A.    Yes.  Actually, I need to amend.  I have never
19   seen the confidentiality agreement that's Exhibit 1.
20   Q.    Okay.  Have you seen -- you have seen the order
21   and the attachment, Exhibit A?
22   A.    Yes.
23   Q.    And you have discussed that with individuals
24   prior to your testimony today?
25   A.    Yes.

Rough Draft of Peter Vessenes                                          In re Alydian

Page 113

1   Q.   With whom have you spoken about it?
2   A.   Deirdre Glynn Levin.  You have actually already
3   asked this the same list.  Because we went over this.
4   Kelly Gates.  I don't remember anyone else.
5   Q.   Did you understand what was being --
6   A.   Go ahead.
7   Q.   Okay.  Did you understand what was being
8   required of you to produce?
9   A.   I believe so, by and large.
10  Q.   And you understood what you were supposed to
11  produce with regard to No. 1 in Exhibit A, a list of all
12  addresses that debtor utilizes and has previously
13  utilized to mine, receive, transfer, store, hold and
14  otherwise control bitcoins and copies of any and all
15  records and documents relating to these addresses; you
16  understood that?
17  A.   I believe so.
18  Q.   Did you produce this information?
19  A.   Yes.
20       MR. REYHANI:  I'm going to ask Tereza to hand
21  out what we're going to mark as Exhibit 6.  It is a 27
22  page document with a black watermark on it that contains
23  a series of columns and data.  It's Bates stamped CLI
24  Chapter 11-00001 through CLI Chapter 11-00027.
25       (Exhibit No. 6 marked.)

Page 114

1       THE WITNESS:  I'm swimming in paper here.  Will
2   you need to refer to Exhibit 5 in the future Bryan or can
3   I set it aside.
4       MR. REYHANI:  You can set it aside for the time
5   being.
6   BY MR. REYHANI:
7   Q.   Have you seen this document before?
8   A.   I don't recall seeing it.  No, maybe I do.
9   It's -- perhaps I do.  I'm not sure.  It's lengthy what
10  was the -- was this a paper form when you got this
11  originally, obviously?  Yeah I'm not sure if I have seen
12  this exact document before or not.
13  Q.   Could you put the -- did you put the watermark
14  on this document?
15  A.   No.  I did not print any documents myself at
16  all.
17  Q.   Did you put the watermark on the document?
18  A.   I just said no.
19  Q.   Who put the watermark on the document?
20  A.   I don't know.
21  Q.   You don't know who put the watermark on the
22  document?
23       MS. GLYNN LEVIN:  Asked and answered.
24  BY MR. REYHANI:
25  Q.   Did anyone at the debtor put the watermark on

Page 115

1   this document?
2   A.   I don't believe so, but I'm not sure.
3   Q.   Did your attorney put the watermark on this
4   document?
5   A.   I don't know.
6   Q.   So you don't know how this watermark --
7   A.   My God, Bryan how many times do you need to ask
8   it?
9   Q.   I'm just you know -- do you think that this 27
10  page document -- was this in response to No. 1 for a list
11  of all address he is that the debtor utilizes?
12  A.   I don't see any addresses on here, although it
13  appears to be a list by address of transactions, and
14  certainly the transaction ID specified there would allow
15  you to find an address if you so chose.
16  Q.   So whoever received this needed to go on to a
17  fishing expedition to figure out what the addresses are?
18  A.   I'm sorry, can you define fishing expedition?
19  Q.   Are the addresses that the debtor utilized to
20  previously mine, receive, transfer, store hold or
21  otherwise control bitcoins are those addresses listed on
22  this 27 page document?
23  A.   I don't see them, although I do see short forms
24  of them on the title.
25  Q.   Are the full addresses anywhere on this

Page 116

1   document?
2   A.   No, not that I see.
3   Q.   Who prepared this document?
4   A.   I believe this is -- this is a standard
5   financial report that goes to the trustee, detailing all
6   transactions for Alydian, I think.  So this is just part
7   of our internal audit that the trustee sees so they know
8   we're taking good care of the bitcoins, and that's why
9   you see them titled by the short form of the address on
10  the top.
11  Q.   Isn't this information off of block chain dot
12  info, Mr. Vessenes?
13  A.   I don't believe it is.  I believe this is an
14  internal Alydian report.  At least I've never seen a
15  block chain page that looks like this.
16  Q.   You testified earlier that Alydian used, uses
17  or utilizes six addresses in total?
18  A.   I believe so.
19  Q.   Those six addresses on these 27 pages?
20  A.   I just totalled you there are no full addresses
21  on these pages.  Are you complaining about getting a full
22  transaction log?  I don't understand.
23  Q.   In this was an internal document, what software
24  produces this document?
25  A.   Excel.

Rough Draft of Peter Vessenes                                      In re Alydian

Page 117

1    Q.   Excel?
2    A.   Yes.
3    Q.   Where is the data dump for this document?
4    A.   I don't understand.
5    Q.   From?
6    A.   I don't understand.
7    Q.   Where are you getting the data to populate the
8    excel spreadsheet?
9    A.   I don't know.  I don't prepare the spreadsheet
10   myself.
11   Q.   Who prepared this?
12   A.   Probably Kelly Gates but you sound so angry
13   about it, Bryan.  I still don't understand why.
14   Q.   Well, you have been -- the debtor lab compelled
15   to produce a list of all addresses that the debtor
16   utilizes and has previously utilized to mine, receive,
17   transfer, store, hold and otherwise control bitcoins and
18   other documents, and the debtor represented that this
19   document was responsive to request No. 1?
20   A.   Well, I would call it like a helpful supplement
21   to the list of addresses, in that we gave you a full
22   list, which you have repeatedly asked for many times, and
23   then this is a -- we pulled out all the actual
24   transactions for you.  I don't know.  It doesn't seem
25   like worth being angry over.

Page 118

1    Q.   Does this document contain the six bitcoin
2    addresses that the debtor utilized?
3    A.   It does not contain any full bitcoin addresses.
4    Q.   Can you read what is under the watermark?
5    A.   Can you give me a specific spot?  These are
6    photocopies, too.  So.
7    Q.   How else are we supposed to pass out the
8    documents?
9    A.   I don't know, I'm not a lawyer, but go ahead,
10   tell me what you want me to read.
11   Q.   If you can read under --
12   MS. SIMONYAN:  Why don't you turn to Bates
13   stamp 1100005.
14   THE WITNESS:  Okay.
15   MS. SIMONYAN:  Let's read, let's say, the last
16   line.
17   THE WITNESS:  You would like me to read the
18   last line?
19   MS. SIMONYAN:  Yes.
20   THE WITNESS:  All of it?
21   MS. SIMONYAN:  Actually, read the last ten
22   digits on the last line.
23   THE WITNESS:  72C2475844C5.
24   MR. REYHANI:  What page?
25   THE WITNESS:  1100005, last line.

Page 119

1    MS. SIMONYAN:  Can you read the last digits of
2    the third line from the bottom?
3    THE WITNESS:  It looks like 30E8154E2C8.
4    BY MR. REYHANI:
5    Q.   Can you repeat what you just said?
6    A.   Sure.  30E8 -- let's see -- 154E2C8.
7    Q.   That's not -- I think you said 1.
8    A.   Is this a good use of deposition time?  I just
9    ask you.  If you were to ask --
10   Q.   Yes, it is.
11   A.   Okay, great, because if you ask Dan, even a
12   very small number of these letters upfront could be
13   turned into a transaction search on any open bitcoin
14   website.
15   MS. GLYNN LEVIN:  And just I mean, for the
16   record, the watermark looks darker on some pages than
17   others, and if there are some, it was not intended to
18   obscure the information underneath.  If you can't read
19   the information underneath, I can certainly ask my office
20   to send you another copy, but yeah, the way they are
21   photocopied, it does some of them are harder to read than
22   others.  I'm certainly happy to provide you a copy that
23   is more legible.  Would that help?
24   MR. REYHANI:  I don't understand the need for
25   this ridiculous watermark in the first place, but that's

Page 120

1    besides the point.
2    BY MR. REYHANI:
3    Q.   So this document that was provided to us in
4    response to No. 1 doesn't have all six, all six of the
5    addresses?
6    A.   There's a large list of addresses that includes
7    all the addresses.
8    MR. REYHANI:  Okay.  So let's look at the large
9    list of addresses.  I'm going to ask Tereza to please
10   pass out what we're going to mark as Exhibit 7, and I
11   don't know it's about a thousand plus pages of --
12   THE WITNESS:  I'm sorry.  Just to stop you for
13   a second, I believe that all six of the end use addresses
14   are uniquely identified in this document right at the top
15   header, and they're actually identified in the manner
16   that you have requested be used, in a short form, and
17   they're further identifiable because any of the
18   transactions on any of these pages will let you confirm
19   the address.
20   So I would say that there are, you know, two or
21   three separate ways you could use just this one document
22   for the addresses.  Do you see it right there at the top
23   of page 1, 1EGHYG?
24   And even in the creditor conference Dan said
25   well, let's just use short forms the addresses.  I think

Page 121

1  you agreed with the Court to use short forms of the
2  addresses at a times.  So they're right there on top.
3        MS. SIMONYAN:  The Court specifically ruled
4  that you provide the full form of the addresses.
5        THE WITNESS:  We have done that as well.  We
6  have done that as well.
7        MR. REYHANI:  Where?  Where is it in this
8  document?
9        THE WITNESS:  It is in this thousand-page
10  document.
11       MR. REYHANI:  Let's look at the thousand-page
12  document.
13       (Exhibit No. 7 marked.)
14  BY MR. REYHANI:
15     Q.   So now we're going to go look at what we're
16  going to mark as Exhibit 7.
17     A.   Can I put 5 back?  That's all right.  I will
18  just hold on to it.
19       MS. SIMONYAN:  I just have one copy for you.
20       MS. GLYNN LEVIN:  We don't want another copy.
21       MS. SIMONYAN:  I didn't think so.
22  BY MR. REYHANI:
23     Q.   So this -- have you seen this document before?
24     A.   Excuse me.
25     Q.   Are you okay?

Page 122

1     A.   Oh, yeah, I'm fine.  Thanks.  Go ahead, you
2  were saying?
3     Q.   Have you seen this document before?
4     A.   I've seen pages of this document before.
5     Q.   Which pages have you seen before?
6     A.   Oh, please.  Of the thousand pages, I don't
7  know.
8     Q.   Who prepared this document?
9     A.   I prepared this document.
10     Q.   How did you prepare this document?
11     A.   I took the list of Alydian public bitcoin
12  addresses and I printed them to PDF.
13     Q.   I would like to note for the record that
14  counsel is passing notes to the witness?
15       MS. GLYNN LEVIN:  There's no note on it.  It's
16  just a sticky in case you were going to tab a page.
17  There's nothing on it.  See?
18       THE WITNESS:  I didn't even think to read it.
19  BY MR. REYHANI:
20     Q.   So all these addresses are publicly available,
21  right?
22     A.   No, they're not.  Many of them have not been
23  used and are in fact private.  And even if they were the
24  court ordered, they would all be kept, kept confidential.
25     Q.   All transactions regarding bitcoin are in the

Page 123

1  public domain, correct?
2     A.   Well, I'm not a lawyer, but I would say that
3  while data is sent out, information about the data, that
4  doesn't mean that information about the data is public.
5  For instance owners, purposes, all those things.
6     Q.   I can locate any transaction all transactions
7  regarding bitcoin are publicly available, correct?
8     A.   That's correct.  That's correct.  You can
9  locate a transaction, but if you were to then determine
10  the owner of one or the other end of the transaction, you
11  would have information that certainly is not necessarily
12  public.
13     Q.   Who put the watermark on this document?
14     A.   I don't know.
15     Q.   Was it you?
16     A.   I just answered your question.  I will wait, if
17  you have ones that I haven't answered.
18     Q.   Did you put the watermark on this document?
19     A.   No.
20       MS. GLYNN LEVIN:  Asked and answered.
21  BY MR. REYHANI:
22     Q.   Did you put the watermark on this document?
23     A.   I've said no already.
24     Q.   Did anyone at Alydian put the watermark on this
25  document?

Page 124

1     A.   I don't believe so.
2     Q.   Did your attorney put the watermark on this
3  document?
4     A.   I don't know.
5       MS. GLYNN LEVIN:  My offer stands as I said
6  before as to paragraph -- as to your other exhibit, if
7  the watermark obscures the information below, it is
8  certainly not intended to do that.  If it does that, then
9  please let us know and we will make sure that that
10  problem is corrected.
11       MR. REYHANI:  I appreciate it, but I think the
12  obnoxious nature of the first watermark is just doubled
13  and compounded by the ridiculous or watermark on the
14  second set of documents.
15       MS. GLYNN LEVIN:  The same for the request on
16  such short time.
17       MS. SIMONYAN:  It is a court order.  It's not a
18  request.
19  BY MR. REYHANI:
20     Q.   Mr. Vessenes, do you believe that this document
21  is responsive to request No. 1?
22     A.   Yes.
23     Q.   So in those thousand pages, show me where the
24  six addresses are.
25     A.   Okay.  Pull out your first document you showed

Page 125

1  me, Exhibit 6.  Do you have it, Mr. Reyhani in your hand?
2  **Q.   I have it in my hand.**
3      A.   Can you read to me the letters on the top of
4  it?
5      **Q.   Show me where the six addresses are on this**
6  **document?**
7      A.   Mr. Reyhani, I am answering your question.  Can
8  you tell me the letters on the top?  I just want to make
9  sure we have both got them.  I would like to teach you to
10 do is so you can look later if you.
11         MR. REYHANI:  Counsel, direct your client to
12 answer the question.  Show me where the six addresses
13 are.
14         THE WITNESS:  You want me to show you where the
15 six addresses are?  Give me some time.
16         MR. REYHANI:  I'm noting on the record it's
17 4:53 PM now in New York, and the witness is now going
18 through a thousand pages of paper.
19         MS. GLYNN LEVIN:  The witness is doing what you
20 asked hi to do, isn't he?
21         THE WITNESS:  I already told you I think this
22 is a waste of time and we pulled out every transaction in
23 a separate report for you.  If you want to spend the
24 deposition this way, that's absolutely your choice.  I
25 don't want to get them out of the order.

Page 126

1         MS. GLYNN LEVIN:  They're Bates stamped at the
2  bottom.
3         THE WITNESS:  That would be a really fun job.
4  Let's make sure Tereza doesn't have to do that.  Oh, hold
5  on.  I think I got did I get them out of order?  No, I
6  didn't.  All right.
7  BY MR. REYHANI:
8      **Q.   Mr. Vessenes I'm going to save you the trouble.**
9  **We're two minutes in now and you haven't been able to**
10 **locate a single utilized address used by the debtor in**
11 **this thousand pages of data.  A list, could you not have**
12 **just typed the six addresses into a single email and**
13 **provided it to us?**
14     A.   We offered that and you insisted to the Court
15 that you get the whole list three times.  I offered that
16 in the declaration.
17     **Q.   I don't know what you are talking about?**
18     A.   I offered that in the creditor interview and we
19 offered that and Tereza said no we need all one hundred
20 thousand if you claim they haven't been used.  Weed
21 offered that again in the conferences with the judge.
22 You guys are the ones that asked for this list?
23         MS. SIMONYAN:  Could you turn to Exhibit No. 7?
24         MS. GLYNN LEVIN:  There's still a question on
25 the table and he's still trying to answer that one.

Page 127

1         MS. SIMONYAN:  Bryan has withdrawn the
2  question.
3         MS. GLYNN LEVIN:  Is the question withdrawn?
4         MR. REYHANI:  Well, now we're three minutes in
5  and I want to look for a single address.  We will keep
6  noting.  We will just keep noting it Ford.  He's looking
7  for six addresses in a span of a thousand plus pages.  He
8  could be looking for hours, the point is we asked, let's
9  re-read request No. 1 a list of all address he is
10 utilized by the debtor.
11         THE WITNESS:  And this is that list.  This is
12 the list that for any reason utilized.  This is on your
13 guys' head.  We tried to tell you there were a lot of
14 addresses and you insisted on having them all.  Would you
15 prefer the short list?
16         MR. REYHANI:  Sure.
17         THE WITNESS:  Okay.
18         MR. REYHANI:  I'll tell you what.  Why doesn't
19 Tereza circulate the document we're going to mark as
20 Exhibit 8?
21         THE WITNESS:  Are you done with 5, 6 and 7?
22         MR. REYHANI:  For the time being, unless you're
23 still looking for an address.
24         THE WITNESS:  Like I said --
25         MS. GLYNN LEVIN:  The question is not --

Page 128

1         MR. REYHANI:  Are you still looking?
2         MS. GLYNN LEVIN:  Is the question still on the
3  table or not?  If it is, then he's asked to do it and it
4  not, then he won't.
5         MS. SIMONYAN:  He doesn't have to do it.  No,
6  he doesn't have to keep searching.
7         Exhibit 8, the email?
8         MR. REYHANI:  Yes, Exhibit 8.  It's an email
9  from me to your attorney, Ms. Glynn Levin, on Friday,
10 January 3rd.
11         (Exhibit No. 8 marked.)
12 BY MR. REYHANI:
13     **Q.   I will read it into the record.  It says**
14 **Deirdre, to be abundantly clear, we don't want addresses**
15 **that were generated and never utilized only addresses**
16 **that were in fact utilized to mining transaction s**
17 **transfer of storage, etc., thanks.  Bryan.**
18         **Have you seen this document before?**
19  A.   No.
20     **Q.   No?  Your attorney didn't share this with you?**
21  A.   No.
22     **Q.   Are we asking for hundreds of thousands of**
23 **addresses here, or are we asking for only ones that were**
24 **utilized?**
25     A.   In that email, it's clear you would only like

Rough Draft of Peter Vessenes                                    In re Alydian

Page 129

1  to see six.
2      MS. GLYNN LEVIN:  There's a court order, Bryan.
3  So I don't know -- I have to abide by the court order.
4      MS. SIMONYAN:  Read the court order again.
5  Read No. 1.
6      MS. GLYNN LEVIN:  I'm not under oath here.  I'm
7  just telling you we have to abide by the court order.
8      MR. REYHANI:  Right, and it said a list of
9  utilized addresses.
10     THE WITNESS:  But you guys have gone on the
11  record saying -- whatever.
12  BY MR. REYHANI:
13     Q.   So do we have the six full addresses that the
14  debtor has utilized to mine, store, transfer, utilize
15  bitcoins?  Dove the six full addresses anywhere?
16     A.   I believe they're in that document, the
17  thousand-page document.  If you would like them quickly,
18  the very fastest way to get them, Dan could just search
19  on those short form addresses on the top of Exhibit 6 and
20  he could have them in shorter than this conversation
21  took.  If you would like us to produce the full form of
22  those, we could do that as well, I don't mind, in a
23  separate document, either way.
24     Q.   Okay.  Even short form on the first document,
25  how many addresses are there?

Page 130

1      A.   One, two, one -- well, the first three pages
2  are for one address.  The fourth page is for a second.
3  One, two...
4          A whole bunch of them are for the next one.
5  That's the one that is mine to from BBC guild. (Chk doc)
6  So there's a whole bunch of transactions there.
7          Then there's another one after that that is one
8  page, and you have a separate one at the end.  That's two
9  pages.
10     Q.   How many is that?
11     A.   I don't know.  I lost count.  One, two, three,
12  five, maybe.  How many do you count?  I count five.
13     Q.   I count five.  Do you count five?
14     A.   Yes.  So, Bryan, would you like just the six
15  separate?  Is that what you are saying?  Because you have
16  made a couple production requests in the course of the
17  deposition.
18     Q.   I think our request is still outstanding.
19     MR. REYHANI:  I would like for Tereza, please,
20  to pass around what we're going to introduce as Exhibit
21  No. 9.
22     THE WITNESS:  Wait, I'm not sure I understand.
23  You are saying we haven't fulfilled the order for No. 1?
24  Is that what you are saying?
25     MS. GLYNN LEVIN:  You still think that one is

Page 131

1  not has not been provided to you?  We certainly intend to
2  provide it.  If you don't think you have it, tell me and
3  we will find another way of getting it to you, even if I
4  have to have my, you know, assistant call and read the
5  address out.  Well, it's still -- it's got to be
6  confidential.  I could read it out, write it down on a
7  piece of paper and then it be created as an exhibit.
8  Would you like to do it that with an I?  I don't want
9  there to be any outstanding discovery requests after
10  today.  I want to make sure we have satisfied all the
11  discovery requests.  So please tell me if you don't think
12  we have satisfied all of your discovery requests.
13     MR. REYHANI:  You certainly have not satisfied
14  our discovery requests.  You have had weeks to produce
15  the most basic of information of six address.
16     MS. GLYNN LEVIN:  Which ones?
17     MR. REYHANI:  Excuse me.  I'm not done.  Excuse
18  me.
19     MS. GLYNN LEVIN:  Okay.
20     MR. REYHANI:  Let me finish.  I let you speak.
21  You have had weeks now to produce actually you should
22  have produced all this stuff since November 1st, six
23  addresses where the debtor pulls, has done transactions,
24  transfers accounts.
25     We're now January 7th, and you are sitting here

Page 132

1  asking me whether you think that you have fulfilled your
2  obligation to produce six addresses.  You could literally
3  type it into an email, yet we get Exhibit 6, which is 27
4  pages of utter nonsense with a ridiculous and obnoxious
5  watermark on top of it.
6      THE WITNESS:  I object.  This is a full --
7      MS. GLYNN LEVIN:  Bryan, please don't lecture
8  me.  I don't need a lecture.  Just if you don't have the
9  six addresses if you can't find them in what we gave you,
10  I will find another form to give you.  I don't want there
11  to be outstanding discovery requests.  The Court doesn't
12  have time for that.  So I will if you want the six
13  address he is.
14     MR. REYHANI:  Of course they don't.
15     MS. GLYNN LEVIN:  I will make sure you get
16  those before end of business today, okay?
17     MR. REYHANI:  How long does it take to type an
18  email?
19     MS. GLYNN LEVIN:  Right now I'm not in my
20  office, but if you want those, I can make arrangements to
21  get those to you like this afternoon.
22     MR. REYHANI:  You do what you feel is
23  appropriate, but you are -- the debtor is in contempt of
24  the cord court order.
25     MR. TOWNSEND: Objection, please.

Rough Draft of Peter Vessenes                                        In re Alydian

Page 133

1   MS. GLYNN LEVIN: I'm sorry, you are not the
2   judge. If you want to make the order, you want to make
3   the motion, fine, I'm offering it to get to you. I'm not
4   saying we're not turning it over. What I'm saying is
5   apparently you can't find it in what we've produced and
6   if you can't find it, I want to make it easy. This is
7   not meant to be confrontational. I will get you the six
8   addresses. Can I have five minutes now to contact our
9   offices to get that for you? Would you like that now?
10  MR. REYHANI: You could do it later today.
11  That fine.
12  MS. GLYNN LEVIN: Okay. The next break.
13  MR. REYHANI: You feel.
14  MS. GLYNN LEVIN: At the next break I'm
15  offering to do so we need to make sure we have a break
16  sufficiently long to get that.
17  MS. SIMONYAN: We needed that information prior
18  to the deposition, and that is the reason why the judge
19  specifically said set a separate deadline for that
20  production of 24 hours within entry of the order.
21  MS. GLYNN LEVIN: Another lecture. So if you
22  want it, I will make sure. Let's take a break right now.
23  THE WITNESS: But -- and the lawyers you may
24  not understand this, but we have actually gone ahead and
25  done the audit against these addresses for you and

Page 134

1   delivered it to you.
2   So Bryan calls this a useless thing. This is
3   actually this is like every transaction for these Alydian
4   addresses by date, date stamped, with a bitcoin
5   transaction. I will just tee it up for you right here.
6   MS. GLYNN LEVIN: Let's take a break now and we
7   will get the remainder of the -- can we take a break
8   right now, Bryan?
9   MR. REYHANI: No. You can get it at the
10  conclusion of the deposition. I would like for Tereza to
11  circulate what we were able to pull off the Internet
12  regarding what you have marked confidential. We're going
13  to mark it as Exhibit 9.
14  MS. SIMONYAN: Bryan, the schedules, correct,
15  the bankruptcy schedules?
16  MR. REYHANI: No, the block chain transactions.
17  MS. SIMONYAN: Got it.
18  MR. REYHANI: It was going to be later.
19  (Exhibit No. 9 marked.)
20  BY MR. REYHANI:
21  Q. So what we have marked as Exhibit 9 data that
22  we were able to pull ought the Internet off 6 of block
23  chain dot info regarding those few addresses that you
24  provided, which anybody in the public can download?
25  A. While that is correct, it is not public

Page 135

1   knowledge that these are our addresses and that's one of
2   the things that the confidentiality is intended to
3   protect.
4   Q. This is the same data, correct, generally?
5   A. I haven't read it all, but it looks similar so
6   I would say Bryan you have got the six. I'm just
7   counting up here. So did you jut put us through that
8   whole harangue when you already had all of our six
9   addresses and then complain that we're wasting your time?
10  Do I understand that?
11  Q. And you notice that the transaction history
12  have the full addresses at the top?
13  A. Yes.
14  Q. So let's turn to what we're going to mark as
15  Exhibit 10, which is the summary of the bankruptcy
16  schedules.
17  MS. GLYNN LEVIN: Wait a second. Was this
18  marked Exhibit 9?
19  MR. REYHANI: Yes.
20  MS. GLYNN LEVIN: And that's 15 pages, 16 pages
21  long?
22  MR. REYHANI: It is 16 pages of transactions
23  relating to addresses correct.
24  THE WITNESS: I don't understand. You still
25  want us to email this to you or not?

Page 136

1   MR. REYHANI: Please turn to the bankruptcy
2   schedule.
3   THE WITNESS: Wait, wait, wait. You made a
4   request. Do you still want us to email it to you.
5   MR. REYHANI: Please turn to the next exhibit.
6   It is the summary of schedules.
7   (Exhibit No. 10 marked.)
8   BY MR. REYHANI:
9   Q. Marked as Exhibit 10 is the summary of
10  schedules filed by the debtor in this proceeding. It is
11  31 pages long, and it is digitally signed by Mr. Vessenes
12  on page 31 and some other pages.
13  Have you seen this document before, Mr.
14  Vessenes?
15  A. It's quite long. I recognize most of the
16  pieces of it. I'm not sure I have seen it all in one
17  place before.
18  Q. Turn to page 23. Is that your digital
19  signature on that page?
20  A. Yes.
21  Q. And is that your digital signature also on
22  page 31, the last page?
23  A. Yes.
24  Q. And you signed these under penalty of perjury
25  and under oath that all the information contained herein

Rough Draft of Peter Vessenes                                In re Alydian

Page 137

1 is accurate?
2    A.   I said that they were correct to the best of my
3 knowledge, information and belief at the time.
4    Q.   Okay.  And you have about 1.6 million in assets
5 listed on the first page, and that information is spelled
6 out in detail on pages 4 and 5 of the personal assets of
7 the debtor; is that correct?
8    A.
9       MS. GLYNN LEVIN:  Well, just to be fair to him,
10 the summary of schedules is generated by the software.
11 So it is drawn from the data that is -- that the rest of
12 the schedules are created from.
13 BY MR. REYHANI:
14    Q.   Okay.  Who provided the information to go into
15 the schedules, Mr. Vessenes?
16    A.   Which schedule are you interested in?
17    Q.   Any of the schedules.  You attested to this
18 document.  Who provided the information that contains the
19 information herein?
20    A.   I did for real property.  For personal
21 property -- I'm sorry, go ahead.
22    Q.   Yes so I see that you have noted some laptops,
23 some routers, some chairs, a couple fans.  You have also
24 noted some manufacturing parts that are on their way and
25 you have also noted some deployed mining rigs already to

Page 138

1 bring you to your total of $1.648 million in personal
2 property of the debtor.  Am I reading that correctly?
3    A.   Yes, although I did not prepare the data for
4 schedule B, but you're -- I think you have got a pretty
5 good summary of what is written there.
6    Q.   And there is no bitcoins listed on this
7 summary, is there?
8    A.   Not that I see.
9    Q.   And there's no bitcoins listed anywhere in this
10 31 page summary of schedules of the debtor's assets,
11 correct?
12    A.   That's correct.
13    Q.   As of the date of the petition, how many
14 bitcoins did the debtor have in their custody or control?
15    A.   I think zero.
16    Q.   Zero?
17    A.   I believe so.
18    Q.   How many bitcoins are currently within the
19 debtor's custody or control?
20    A.   Today?  Do you mean like today right now?
21    Q.   Today.
22    A.   I don't know exactly.
23    Q.   Mr. Vessenes, you are here to testify regarding
24 the debt's assets?
25    A.   They've been mining while we're sitting here.

Page 139

1 I have no phone or way to check.  I cannot tell you
2 exactly how many we have right now.
3    Q.   How many were there last night?
4    A.   I'm not sure.  When did you print up your
5 audit?  We could read that.
6    Q.   Pawing, how many bitcoins does the debtor
7 possess?
8    A.   I'm doing some math.  Hold on.  There is 1,900
9 there.  There is 175 there.  So that's 2,075.  Something
10 like, I don't know, 3,500 right now, maybe something like
11 that, roughly.  I'm just going off the reports you gave
12 me, though.
13       MS. GLYNN LEVIN:  Personal knowledge.
14       THE WITNESS:  Which I now have from reading the
15 exhibit.
16       MS. GLYNN LEVIN:  But you don't know how that
17 was generated, so.
18       THE WITNESS:  Yeah, I'm not sure the date that
19 they're.
20 BY MR. REYHANI:
21    Q.   When was the last time you looked to calculate
22 a total of the amount of bitcoins that the debtor
23 possessed?
24    A.   Personally?
25    Q.   Daily, every other day?

Page 140

1    A.   No, personally I rarely look.  The last time I
2 personally totaled them up was for the November report to
3 the U.S. trustee.
4    Q.   You don't care how many bitcoins the debtor
5 possesses?
6    A.   I care very much.
7    Q.   How many bitcoins did the debtor mine in
8 December?
9    A.   I don't know an exact number.
10    Q.   You're operating as debtor in possession and
11 you don't know how many bitcoins the debtor mined in
12 December?
13    A.   It is total immaterial.  There is a financial
14 audit that could tell us at any time.  I don't need that
15 number at the tip of my fingers.  You also could audit it
16 very easily looking at those addresses.  What is the
17 point of this line of questioning?  You could get down
18 the microsecond, exactly how many we had at any one
19 moment.
20    Q.   Would over 2,500 bitcoins in December make
21 sense?
22       MS. GLYNN LEVIN:  Only if you know.
23       THE WITNESS:  We mined between probably 60 and
24 80 bitcoins a day in the month of December.  So I would
25 say that's in the ballpark.

Rough Draft of Peter Vessenes                                      In re Alydian

---

Page 141

BY MR. REYHANI:

Q.   I believe in late November you actually prognosticated at least 100 bitcoins a day.  So 2,500 sounds fine.

How many bitcoins did the debtor mine in November?

A.   I don't know.  It's in our filings for the court.  I can't -- again, I can't give you an exact number right at this moment.

Q.   Did you not prepare at all to testify regarding the assets and the basis and everything else regarding the debtor today?  It sounds like you don't know anything.

A.   I thought you said I was an expert in bitcoin, I know everything earlier, Bryan.  If you want financial reports, which we have provided and you have the ability also to look at based on the bitcoin address, we can roll over those.  I don't think that's the best use of our time.  It is independently.

MS. GLYNN LEVIN:  Just answer his question.

THE WITNESS:  So, yeah, I prepared the things that would be most useful and helpful for you.

BY MR. REYHANI:

Q.   And the debtor continuing to mine bitcoins and the amount of bitcoins is not important?

---

Page 142

A.   It's absolutely important, but my knowledge of how many it has this moment has no bearing on that.

Q.   And you understand you are here to today about the debtor's assets?

A.   Well, I thought I was here to testify to what would be responsive to quite a broad range of questions you had about the debtor.  If you'd like, I can pull you up exact numbers for those if you give me a little time.  I can do them right now.

Q.   In January so far, how many bitcoins has the debtor mined?

A.   I don't know, but again we're between 60 and 75 a day right now.  So I would estimate -- what's today right now?  It is the 7th.  We're halfway through the 7th.

MS. GLYNN LEVIN:  Don't guess.

THE WITNESS:  Between 3- and 500, I would guess.  My lawyer said not to guess.

BY MR. REYHANI:

Q.   So ballpark we have mined around 4,500 bitcoins since the petition was filed in this matter?

A.   I don't know.  I'm kind of lost now with the math now, Bryan.  If you would like, I can read all your mining reports again.

Q.   Approximately 1,500 in November, approximately

---

Page 143

2,500 in December and approximately 500 so far in January?

MS. GLYNN LEVIN:  He said he didn't have the specifics.

MR. TOWNSEND:  He's looking it up, though.

MS. GLYNN LEVIN:  Do you want him to look it up, or do you want him to answer from the top of his, from his memory?

MR. REYHANI:  I said approximately 4,500. Would you agree with me on that?

THE WITNESS:  No, I wouldn't.  I can't rep to it, unless you give me time to add it up, which I'm happy to do.

MR. TOWNSEND:  If you have a question, you are entitled to answer it.

THE WITNESS:  Okay, hold on.

MR. REYHANI:  If you want to go -- did you want to go take ten, twenty minutes to look it up, and you didn't come prepared for this today, that's fine, go look it up.

MR. TOWNSEND:  Objection.

MS. GLYNN LEVIN:  No, go ahead.  Keep asking questions.

THE WITNESS:  It's up to Bryan if he wants me to take the time to get him the precise numbers right

---

Page 144

now.  That's fine.  What do you wish me to do, Mr. Reyhani?

BY MR. REYHANI:

Q.   If the debtor mined 4,500 bitcoins since the date of petition, what is the U.S. dollar value of that amount of mined bitcoins?

MS. GLYNN LEVIN:  If you have personal knowledge of that.

THE WITNESS:  It varies.  How do you wish me to price it?

BY MR. REYHANI:

Q.   I don't know, today it was trading at about a high of 957.  Let's use 900, so we use round numbers.  If it's $900 a bitcoin, what is the U.S. dollar of 4,500 bitcoins?

MR. TOWNSEND: I will rep to you that, according to bit stamp, bitcoin prices are 813 at this moment.

THE WITNESS:  It sounds like bitcoin is crashing horribly.  Do you want me to multiply 4,500 times 813 for you or some other number?  Do you want a mark-to-market price or value at the time they're generated?

MR. REYHANI:  Use whatever number you want.

MS. GLYNN LEVIN:  Just explain.

THE WITNESS:  4,500 times 800 I'm happy to

---

Rough Draft of Peter Vessenes                                    In re Alydian

Page 145

1  calculate for you.  I don't know, what is that,
2  3.25 million, something like that.  That would be
3  what 800 times 4,500 is.
4  BY MR. REYHANI:
5      Q.    And it's your testimony that the debtor is on
6  **pace to mine approximately 2,000 bitcoins in the month of**
7  **January, if it's 60 to 75 bitcoins a day?**
8      A.    No, it's not my testimony that that's the case.
9      Q.    Is that the case?
10     A.    No.  The debtor is not on -- I'm sorry, I don't
11 recall the word you used, but I'm not sure that at the
12 current mining speeds 2,000 coins will be mined in
13 January.  I don't think that's likely.
14     Q.    What do you take is a fair approximation of
15 **the amount of bitcoins that would be mined in January?**
16     A.    Well, we'll put together a formal projection
17 for the court shortly.  Bitcoin mining speeds are going
18 up, as they have been for quite some time.  So you have
19 to discount out how much you think you'll earn because
20 you are competing with other miners.
21         If I had a computer, I could probably give you
22 a fair estimate, but, yeah, I don't know.  Between 1,500
23 and certainly less than 2,000.  Almost certainly more
24 than 1,500, if all the equipment stays up and running.
25     Q.    What about February?

Page 146

1      A.    Well, it will certainly be less than January.
2  Dan is nodding over there.  He's probably got the numbers
3  right at his fingertips but if January is 1,500, February
4  will be more like 8- or 900, maybe 11.  So much of it
5  depends on what other mining companies deploy, which we
6  just don't know.
7      Q.    What about March?
8      A.    I have no idea.  No one knows what March holds,
9  and those are all the by the way -- those are gross.  So
10 you have got to offset costs, operating costs and other
11 expenses for running them.
12     Q.    You can offset anything you want.  I'm just
13 **asking you what the total amount of bitcoins being mined**
14 **are.**
15         Let's turn to Sofa 3 B on page 25 of the
16 **document before you.**
17     A.    Sofa.  After this question, I would like to
18 take a short break, if that's okay.
19     Q.    Yes.
20         MS. SIMONYAN:  That's page 25.
21         THE WITNESS:  Okay, thank you, Tereza.
22 BY MR. REYHANI:
23     Q.    Are you familiar with the data on this page?
24     A.    Yes, somewhat.
25     Q.    Did you provide this information?

Page 147

1      A.    No.  Probably our bookkeeper accountant did.
2      Q.    Can you walk through for me the whole middle
3  **section regarding the dates of payments and transfers and**
4  **the amount paid or value of transfers regarding CoinLab?**
5      A.    Yeah, we've actually provided now to you twice
6  this information in discovery, the invoices from CoinLab
7  to Alydian, which you have referred back to.  So these
8  are intended just to detail out what the invoices that
9  Alydian, you know, that Alydian owed are.  And so they're
10 dated at invoice date.
11     Q.    I'm sorry.  Can you -- what are the dates that
12 **we're seeing?**
13     A.    These would be the invoice dates of invoices
14 delivered to Alydian.
15     Q.    From CoinLab?
16     A.    Yes.
17     Q.    So on August 7, 2013, August 19, 2013, and so
18 **on, CoinLab delivered invoices to Alydian in the amounts**
19 **that are represented in the next column amount of with**
20 **the dollar figures, correct?**
21     A.    That's correct.
22     Q.    And here here's a good example.  In August
23 **there were three invoices totaling about $500,000.  So**
24 **Alydian would have paid $15,000 in administrative fees,**
25 **correct?**

Page 148

1      A.    Yes, or what is that?  Two and a half percent
2  or something.
3      Q.    And the same for September, there's three
4  **invoices for September?**
5      A.    And then two for October.
6      Q.    So Alydian was paying?
7      A.    And two for October.
8      Q.    Okay.  The title of the column says dates of
9  **payments.  You have indicated to me that these are the**
10 **dates of the transfer, the dates of the invoices.**
11     A.    Yeah, I believe so.  I don't think that payment
12 was effected on the dates listed here.  I think those are
13 the invoice dates.  Or yeah, I think that's correct.
14     Q.    So the schedule is all wrong?
15     A.    No, I didn't say that.  I just said that I
16 believe those are the invoice dates.
17     Q.    So what are the payment dates?
18     A.    I believe -- I don't know for sure.  I think
19 most of those to the extent they were paid, and a bunch
20 weren't, we paid on October 30th.
21     Q.    Most were paid on October 30th?
22     A.    Of the ones that were paid, it was paid, I
23 believe, on October 30th.
24     Q.    Where is -- is that reflected by the $580,000
25 **payment on October 30th?**

Page 149

1    A.   No, that's the invoice amount, I think.  I
2  don't know.  I believe that's -- I believe that's the
3  case.
4        MS. GLYNN LEVIN:  Personal knowledge.  Only if
5  you know.
6        THE WITNESS:  I don't know.  I don't know
7  precisely.
8        MS. SIMONYAN:  He signed these under oath.
9  What do you mean personal knowledge?  He signed these
10 under oath.  He's here at a 2004 exam to testify about
11 his bankruptcy schedule.
12       MS. GLYNN LEVIN:  He said he's not sure.  He's
13 been testified to ask under oath.  He said, you know, I'm
14 not sure based on whether it is the invoice date or the
15 date of transfer.  He said I am not sure.  That's what he
16 said.
17       MS. SIMONYAN:  We have a specific change with
18 the phone conference with the judge where the judge
19 specifically said that he needs to come prepared to
20 testify about his bankruptcy schedules, his assets.
21       MS. GLYNN LEVIN:  He's not the bookkeeper.
22 Tereza he's not the bookkeeper.  He said these were
23 prepared by the bookkeeper.  If you want the specific
24 dates of that these invoices were paid, ask me and I will
25 certainly do my best to find those.  I'm not trying to.

Page 150

1        MS. SIMONYAN:  You were supposed to provide
2  this information in the bankruptcy schedules.
3        THE WITNESS:  We actually did.  You have got
4  these.  You have got all invoices.
5        MS. GLYNN LEVIN:  You have got all the
6  invoices.
7        THE WITNESS:  Actually you have all the payment
8  dates too.
9        MS. SIMONYAN:  He don't have the payment dates.
10 You are tell me all the payment dates are incorrect in
11 this.  We asked for.
12       THE WITNESS:  Excuse me, you have bank
13 statements and you have every bitcoin address and every
14 bitcoin transaction much you have all the payment dates.
15 You have every by the of money Alydian.
16 BY MR. REYHANI:
17    Q.   I have a few questions.  Who is the bookkeeper?
18    A.   Kelly Gates.
19    Q.   What is her email address?
20    A.   Kelly at CoinLab.com.  Actually, she might have
21 a Denali one as well.
22    Q.   What is her telephone number?
23    A.   Why don't you try her at the CoinLab address.
24    Q.   What is her phone number?
25    A.   I don't know.

Page 151

1    Q.   You don't know her telephone number?
2    A.   Like I said, as I told you earlier today it's
3  on my cellphone, which I have left behind.
4        MS. SIMONYAN:  Will you provide this
5  information?
6        MS. GLYNN LEVIN:  Which information.
7        MS. SIMONYAN:  The contact information for the
8  bookkeeper who prepare the schedules.
9        MS. GLYNN LEVIN:  The bookkeeper didn't prepare
10 the schedules.
11       MS. SIMONYAN:  I just testified that the
12 bookkeeper prepared schedule B.
13       MS. GLYNN LEVIN:  Schedule B?
14       MS. SIMONYAN:  Yes.
15       MS. GLYNN LEVIN:  What schedule B.
16       MS. SIMONYAN:  Schedule B is the list of
17 personal assets.
18       MS. GLYNN LEVIN:  We're on a sofa.  We're under
19 sofa question 3 B, and that's what we're talking about.
20       MS. SIMONYAN:  Obviously the bookkeeper has
21 played a key role in preparing the bankruptcy schedules.
22 Will you provide her contact information so we can get
23 information from her.  Obviously Peter is not prepared to
24 testify about it completely.
25       MS. GLYNN LEVIN:  He doesn't know everything

Page 152

1  down to the last penny or the last transaction, nor would
2  any managing person know, nor is he expected to know.
3  He's testified just about everything and I think he's
4  satisfied the minimum requirements for the debtor.  If
5  you want to lecture, that's the lecture.  If you want the
6  specific dates that the invoices were paid, ask me and I
7  will make an effort to get those from the bookkeeper or
8  whoever has them.  I'm happy to provide those, no
9  problem.
10       MS. SIMONYAN:  But right now you are
11 instructing your client to not provide the contact
12 information for the accountant who prepared the schedules
13 is that correct?  If I'm wrong tell me.
14       THE WITNESS:  I already gave it.
15       MS. SIMONYAN:  We want the phone number.
16       MS. GLYNN LEVIN:  The problem is you keep
17 saying the accountant who prepared the schedules.  That's
18 the predicates in not correct.  You want the name of the
19 accountant or the address or the email or phone number,
20 that's one thing if you want the name of the person who
21 prepared the schedules, that's not necessarily the same
22 person.
23       MR. REYHANI:  Who prepared the schedules.
24       MS. SIMONYAN:  Is the predicate not correct?
25 Did Kelly not help prepare the schedules.

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 153

1    MR. TOWNSEND: The two deposers here is throwing
2    me out.
3        MS. SIMONYAN:  We're both attorneys of record.
4        MR. TOWNSEND: No, I don't.
5        MS. SIMONYAN:  We both appear in this case.
6    You are sitting together here making combined objections.
7        MR. TOWNSEND: I represent different people.
8        MS. GLYNN LEVIN:  You get one person to ask the
9    question.  I promise, if Bryan -- I will keep answering
10   your question.  If you want the dates, if you want the
11   dates of all all of the invoices and dates they were
12   paid, if you don't feel that 3 B is accurately reflect --
13       THE WITNESS: Actually, 3 B has been amended.
14   We filed an amendment with the Court already.
15       MS. GLYNN LEVIN:  I don't know about that.
16       THE WITNESS: I thought we did.
17       MS. GLYNN LEVIN:  If you want that, I know we
18   have provided all the invoices but if you specifically
19   want another set of information as to when they were
20   paid, I'm perfectly happy to obtain that information.
21       THE WITNESS: That's totally fine.
22       MS. GLYNN LEVIN:  If you give me a day or two,
23   I will get that, okay?
24       MR. REYHANI: By all means.
25   BY MR. REYHANI:

Page 154

1    Q.   So none of these payments on sofa 3 B are
2    actually accurate, right, Mr. Vessenes?
3        A.   Again, I believe the numbers are correct, but I
4    think that they are invoice amounts.  I believe that
5    they're invoice amounts.
6        Q.   They are not the payment dates, correct?
7        A.   I just -- I told you as much as I know.  I
8    don't believe so.  I believe that they're the invoice
9    dates rather than the payment dates.
10       Q.   I'm sure you are aware that the debtor in this
11   matter transferred about $3 million on the eve of
12   bankruptcy.  Where did that money go or do you not know
13   about that either?
14       A.   I like that question.  Those paid open
15   invoices.
16       Q.   I'm fascinated that you actually find this
17   funny.  It is very serious and the fact you come in here
18   and don't know about all this money, it's personally just
19   been an affront to the bankruptcy process.  The debtor
20   transferred $3 million on the eve of bankruptcy.  Where
21   did it go?
22       A.   Bryan, you have persisted in insulting me and
23   complaining when I laugh it off.  I am trying to answer
24   your questions.  So Alydian paid as much of the open
25   CoinLab invoices as it could with those coins.

Page 155

1        Q.   Explain to me how they did that?
2        A.   Alydian just transferred bitcoins to a CoinLab
3    owned address and the as you know, because you have now
4    seen the reports that offset some but not all of the open
5    CoinLab invoices and rest was put into a claim for
6    bankruptcy.
7        Q.   So Alydian transferred all their bitcoins on
8    the eve of bankruptcy to cover prior out standing
9    invoices from CoinLab?
10       A.   Correct.
11       Q.   How did you calculate the formulate that was
12   being utilized to cover the invoices?
13       A.   We used a standard formula, the same that the
14   bitcoin foundation does, and other companies use for
15   reimbursements in bitcoin.  So on the date that a part is
16   purchased or that the -- yeah, on a date that an actual
17   payment is made, the bitcoin price of the previous day,
18   the previous day volume weighted average price is used,
19   and that's the price that the transaction occurs at.  So
20   they're all mark to market on the day that the part was
21   purchased.
22       Q.   How much was bitcoin in early August 2013?
23       A.   I don't know off the top of my head.  Would you
24   like me to look it up for you?
25       MS. GLYNN LEVIN:  No, no.

Page 156

1    BY MR. REYHANI:
2        Q.   How much was bitcoin when the debtor filed its
3    petition?
4        A.   The previous day bitstamp volume weighted
5    average price for November 1, so we would use the 10/30
6    price, was $200.40, give or take.
7        MR. REYHANI: I would like for Tereza to
8    circulate what we're going to mark as Exhibit 11.  It's
9    the operating agreement between CoinLab and the debtor.
10       (Exhibit No. 10 marked.)
11   BY MR. REYHANI:
12       Q.   It's a four-page document dated November 4,
13   2013, executed by Peter Vessenes on behalf of the debtor
14   and executed by Peter Vessenes on behalf of CoinLab?
15       A.   Are you done with 10, Bryan?
16       Q.   For the time being.
17       Have you seen this document before?
18       A.   Yes, although the fonts are funny on it, but
19   yeah I have seen it.
20       Q.   And there was no written operating agreement by
21   and between CoinLab and Alydian before this one dated
22   November 4, 2013, correct?
23       A.   That's correct.
24       Q.   Who drafted this document?
25       A.   I don't recall.  It may have been -- I don't

Rough Draft of Peter Vessenes                                    In re Alydian

Page 157

1  recall.
2  **Q.   Did you draft it?**
3  A.   No, I did not draft this document.  I said I
4  don't recall.
5  **Q.   Did your lawyer draft it?**
6  A.   Certainly.  Certainly a lawyer drafted this.
7  **Q.   Certainly what?  I'm sorry.**
8  A.   Certainly a lawyer drafted this.
9  **Q.   Did you discuss this operating agreement with**
10 **your bankruptcy counsel prior to executing it?**
11 A.   Yes.
12 **Q.   And paragraph 4 on page 2, Alydian could pay**
13 **its invoices to CoinLab in either U.S. dollars or**
14 **bitcoin, correct?**
15 A.   Yes.
16 **Q.   But here Alydian transferred 10,000 bitcoin to**
17 **CoinLab to cover prior expenses, correct?**
18 A.   They transferred bitcoin to cover prior
19 expenses prepetition.
20 **Q.   Prepetition.  Whether those expenses could have**
21 **been paid by Alydian in U.S. dollars, correct?**
22 A.   No, Alydian had no dollars at that time.
23 **Q.   Could Alydian not have sold those bitcoins at**
24 **the current market value of bitcoin and transferred that**
25 **cash to CoinLab?**

Page 158

1  A.   Not quickly or easily.
2  **Q.   Not quickly or easily?**
3  A.   No.  It would have needed banking, a bank
4  account, and it would have needed to open exchange
5  accounts, go through AML and KYC procedure.  So it was
6  not immediately, but -- are you asking on October 30th?
7  **Q.   Mr. Vessenes, I don't need to remind you are**
8  **under oath.  Couldn't have Alydian relatively easily have**
9  **sold those 10,000 bitcoins and paid in cash prior**
10 **invoices to CoinLab?**
11 A.   On October 30th?
12 **Q.   Yes.**
13 A.   No, it could not have on October 30th easily
14 have sold all those bitcoins for cash.
15 **Q.   Alydian couldn't have found a private buyer to**
16 **purchase those bitcoins?**
17 A.   Not in a single day.
18 **Q.   Alydian couldn't have gone to an exchange?**
19 A.   I have already told you not in a single day.
20 It takes quite a while to get AML/KYC out of the exchange
21 right now.  It could be upwards of a couple of weeks,
22 depending on the quality of the exchange, and selling an
23 amount of that size would move the market prices
24 significantly.
25 **Q.   If Alydian had set up these accounts**

Page 159

1  beforehand, Alydian had the ability to pay cash prior
2  invoices that CoinLab purportedly invoiced it for,
3  correct?
4  A.   I see what you are getting at, but the answer
5  is no.  Alydian had only bitcoins in the months leading
6  up to in the months leading up to the petition.  So one
7  way or the other it has got to sell bitcoins to pay for
8  its cash expenses.
9       Now, Alydian is not likely to get credit from
10 anyone.  So either Alydian is moving along and every time
11 it needs cash it is selling bitcoins to get cash and then
12 sending it to whoever wants to buy it, or it has got an
13 arrangement, like the one it had with CoinLab, where it
14 will sell the bitcoins on the day the purchase is made.
15      Now, those two situations come to the same
16 thing.  If Alydian has got to go buy parts on
17 September 15th for cash, it either sells coins on
18 September 15th for cash or what?  What else does it do?
19 It has got to somehow get dollars.
20      So, you know, if you would say like couldn't
21 Alydian have sold a bunch of bitcoins on October 30th for
22 purchases made in August, the answer is no.  There are no
23 companies that would extend Alydian credit to do that.
24      Can we have our break now, Mr. Reyhani?  We
25 talked about it a little while ago.

Page 160

1       MR. REYHANI:  Sure, five minutes?  Hello?  Will
2  that work?
3       THE WITNESS:  Yes, that's fine.
4       MR. REYHANI:  We will go off the record and be
5  back in five minutes.
6       (A break was taken from
7       2:43 p.m. to 2:52 p.m.)
8  BY MR. REYHANI:
9  **Q.   So Mr. Vessenes, we were talking about these**
10 **invoices and the amount of money that was transferred out**
11 **of the debtor's estate on the eve of bankruptcy,**
12 **approximately $3 million worth of bitcoin was transferred**
13 **out.  Where did that money go?**
14      MS. GLYNN LEVIN:  Objection.  I'm not sure his
15 testimony said anything about $3 million.  I think that
16 was your question, but I don't think he testified about
17 that.  I could be wrong, but you could ask him if it was
18 $3 million.
19      MS. SIMONYAN:  Sofa number 3 it may not be
20 precisely 3 million but sofa Mr. Vessenes has just
21 testified that the transfers actually occurred on
22 October 30th, I believe was his testimony.
23      THE WITNESS:  I said I believe that was the
24 case.
25      MS. SIMONYAN:  So that's what Bryan is asking

Rough Draft of Peter Vessenes                                    In re Alydian

Page 161

1  about.
2       THE WITNESS:  Sorry, can you say it again?
3  Bryan?  I just lost the thread.
4  BY MR. REYHANI:
5       Q.   The transfers on October 30th, all those
6  transfers of bitcoin went to CoinLab?
7       A.   Yes.
8       Q.   And instead of selling the bitcoin on the price
9  as of that date, you -- how did you quantify the value of
10  the bitcoin that pertained to the invoices?
11      A.   Although there was no contract with Alydian at
12  the time, this contract is an attempt to memorialize how
13  the company it operated and the way they operated was by
14  pegging the price to the volume weighted average price on
15  the prior day to when a purchase was made.
16      Q.   So you were market to marking back to when the
17  purchase was made as opposed to what the bitcoin was on
18  the date of transfer?
19      A.   That's correct.
20      Q.   So if bitcoin was trading at $200 on
21  October 30th, what was trading at $100 on August 7th, you
22  were only giving it a value of $100 instead of $200?
23      A.   If a purchase was made on -- I forget the date
24  you said -- August 7th, and then the price on that day --
25  if a purchase was made on Alydian's behalf on August 7th,

Page 162

1  and bitcoin prices were at $100, then the bill to
2  Alydian, if it were remitted in bitcoin, would remit at
3  the August 7th price regardless of what the future price
4  is.  It could go up or down.
5       Q.   But on October 30th you could have sold the
6  bitcoins for $200 and transferred $100 of that to CoinLab
7  to cover the invoice because the operating agreement says
8  you could cover it in cash, correct?
9       A.   We had no operating agreement on October 31st
10  or 30th, whatever the last day of the month of October
11  is.
12      Q.   You just said you were trying to memorialize
13  the prior agreement, and it says here that you can pay in
14  cash and/or bitcoin.
15           So it would have been in Alydian's best
16  interest if you sold the bitcoins and paid cash to
17  CoinLab, correct?
18      A.   If it had been able to do that on short notice,
19  it would have been.  However, I do think it was able to
20  do that on a short notice.
21      Q.   I want to turn your attention back to your
22  declaration -- it's Exhibit 2 -- for a minute.
23      A.   Okay, go ahead.
24      Q.   And on paragraph 12 you have that CoinLab
25  wished to purchase bitcoins at this time.

Page 163

1       A.   That's correct.
2       Q.   So you were bullish on -- CoinLab was bullish
3  on bitcoin, correct?
4       A.   That's correct.
5       Q.   And you are the man in charge of CoinLab as the
6  title of CEO, correct?
7       A.   Correct.
8       Q.   So you were trying to collect as many bitcoins
9  as possible for CoinLab, correct?
10      A.   Oh, you are not asking me about CoinLab
11  business plans at the time.
12      Q.   You put this into your own declaration; CoinLab
13  wished to purchase bitcoins at this time.
14      A.   And I have told you that is correct, but you
15  extended that and said as many as we wanted, and I'm
16  saying I won't comment on that.  That's part of CoinLab's
17  business plans.
18      Q.   You personally are bullish on bitcoin, correct?
19      A.   As the chairman of the bitcoin foundation, I
20  don't often make bitcoin price recommendations.
21      Q.   The answer is yes or no?  Are you bullish on
22  bitcoin?
23      A.   I'm telling you you are not here deposing me in
24  my personal capacity, and there are possible market
25  impacts to me making statements about future price of

Page 164

1  bitcoins.
2       Q.   You are the man in charge of both Alydian and
3  CoinLab and you have here that CoinLab wished to purchase
4  bitcoins at this time.  You wouldn't have CoinLab do
5  something that was adverse to your own personal opinion,
6  correct?
7       A.   Well, that's not the case.  There are lots of
8  reasons a corporation might choose to act in a way
9  different than I would prefer.
10      Q.   Tell me, was CoinLab acting in a way that was
11  adverse to what you would prefer?
12           MS. GLYNN LEVIN:  This individual is
13  representing the debtor, and CoinLab is not the debtor
14  here, CoinLab is a creditor.  So you are going to have to
15  frame your questions to him as a spokesman for the debtor
16  only.
17  BY MR. REYHANI:
18      Q.   I'm phrasing my questions correctly.  You as
19  the chief executive of Alydian, were you bullish on
20  buying bitcoins at this time?
21      A.   Did Alydian think bitcoin prices would go up?
22  What time are you asking about?
23      Q.   The same time that CoinLab wished to purchase
24  bitcoin.
25      A.   That's a fairly broad range.  Can you say more?

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 165

1    Q.    Oh, my God.  Use the range that is in your
2    declaration at paragraph 12.
3    A.    There's not really a range given here in the
4    declaration, either.  Alydian has alternately been
5    bullish and bearish on the price of bitcoin over the time
6    frame that this declaration covers.  How's that?
7    Sometimes we think --
8    Q.    When was Alydian alternately bullish and
9    bearish about bitcoin?  Tell me those time frames.
10   A.    Alydian was bullish on the price when it
11   dropped down to 4- or 500 on the China news a few weeks
12   ago.  We were very bearish on the price when KNC miner
13   introduced their new mining, they're 20 nanometer mining
14   rigs.  I didn't --
15   Q.    Did CoinLab have the same opinion during the
16   same time?
17        MS. GLYNN LEVIN:  What was the question?
18        THE WITNESS:  He asked if CoinLab had the same
19   opinion during the same time.
20        MR. TOWNSEND:  Objection.  That's outside the
21   scope.
22        MR. REYHANI:  That's not outside the scope.
23   It's right in his declaration.  CoinLab wished to
24   purchase bitcoins at this time.  If you want to discuss
25   it with Judge Overstreet, that's fine.  It seems like the

Page 166

1    same person making the same call.
2         MR. TOWNSEND:  No, it's just the 30(b)(6).
3         THE WITNESS:  It's not necessarily that you
4    make the same call for the two companies.  One company is
5    producing only bitcoins.  It has got different worries.
6    It has got different liabilities.
7    BY MR. REYHANI:
8    Q.    Right, but you believed at that time that
9    bitcoin was going to increase in value?
10        MR. TOWNSEND:  Objection.
11   BY MR. REYHANI:
12   Q.    Otherwise you wouldn't want to purchase it,
13   correct?
14        MR. TOWNSEND:  Objection.  Ambiguous as to
15   "you."
16   BY MR. REYHANI:
17   Q.    You personally.
18   A.    I personally.  I personally did not buy any
19   coins over that time and in fact sold quite a few.
20   Q.    On behalf of CoinLab did you not purchase
21   bitcoins?
22   A.    I said right there yes, we did.
23   Q.    So if instead of transferring 10,000 bitcoins
24   to Alydian -- to CoinLab from Alydian, Alydian
25   essentially would have had doubled the amount of money

Page 167

1    had it just sold the bitcoins and just paid the invoices
2    in cash, is that not correct?
3    A.    I don't think that's correct.
4    Q.    Well, you were mark to marketing them at prices
5    that were substantially below $200, 100, 125, whatever it
6    is.  So if you're quantifying those bitcoins at those
7    prices instead of $200 or so on that date --
8    A.    You throw in a double.  The actual number is
9    going to depend on thousands of different transactions.
10   So every time a purchase was made, you know, that's going
11   to impact the value.
12   Q.    Of course.  Let's just use round numbers.  If
13   you are transferring a $200 value bitcoin for $100
14   instead selling that bitcoin for $200 and transferring
15   $100, Alydian is essentially paying double for those
16   invoices, correct?
17   A.    Well, you...
18   Q.    Just answer the question.  Are they paying
19   double if they're transferring a $200 value bitcoin for a
20   $100 invoice?
21   A.    Like I said, I'm not sure compared to what
22   other alternative, so the --
23   Q.    I didn't ask you about an alternative.  If
24   Alydian is transferring a $200 value bitcoin on
25   October 30th on an invoice that is worth $100 --

Page 168

1    A.    Say that again.  I'm sorry.  One second.
2         MR. TOWNSEND:  If you are going to have a
3    double, there's got to be two things, right?
4         THE WITNESS:  From something else?
5         MR. TOWNSEND:  Yes.  There's got to be an
6    alternative.
7         THE WITNESS:  You know the invoices -- I agree.
8    Like what is the alternative?  What was Alydian's
9    alternative to pay because you're asking -- you're saying
10   it spent twice what it should have, right?  Is that your
11   question, did Alydian pay twice what it should have.
12   BY MR. REYHANI:
13   Q.    I'm asking the questions, Peter.  Not you.
14   A.    I'm just trying to get to an answer.
15        MR. REYHANI:  Counsel, can you ask him to
16   answer the question?
17   BY MR. REYHANI:
18   Q.    If you have a $200 value bitcoin on
19   October 30th and you are referring it for a $100 value
20   invoice, are you not paying double the amount of the
21   invoice?
22   A.    No, you're not, because the invoice might have
23   terms different from the market price on that date.
24        MS. GLYNN LEVIN:  All I know is you are getting
25   into some hypotheticals, and the question has been asked

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 169

1  and answered, and I kind of feel like you are getting to
2  the point where you are sort of badgering the witness
3  here.
4        MR. REYHANI:  If your client would sort of
5  answer the question, we wouldn't have to go down this
6  road.  It's a very simple question.
7        MS. GLYNN LEVIN:  The point is made.  You are
8  never going to convince him.
9        MR. REYHANI:  Ms. Glynn Levin, let me finish.
10       MS. GLYNN LEVIN:  It's Glynn Levin.
11       MR. REYHANI:  I'm not convincing him of
12  anything.  I'm asking a question.  He's the chief
13  executive officer of a company.  He's the managing
14  director of another company.  He's got a lot of money,
15  bitcoins on his hands.  I'm asking a very basic question
16  of a math major.
17  BY MR. REYHANI:
18       Q.   If you transfer a $200 value bitcoin on
19  October 30th for an invoice that is worth $100, are you
20  not paying double the amount of the invoice, simple as
21  that, yes or no?
22       A.   Okay, so, again, it depends on the invoice
23  terms.
24       Q.   Yes or no?
25       A.   It depends on the invoice terms, Mr. Reyhani.

Page 170

1  So if the invoice is specified a certain -- like if you
2  have a euro-denominated invoice and the euro moves
3  around, the value of the invoice changes.  It's the same
4  thing.
5        The price and the value of the invoice, of that
6  invoice line item, were fixed on the date of purchase.
7  So you can construct an imaginary scenario, which that's
8  not the case, and we could imagine invoices which someone
9  would only have to pay a quarter of the bitcoin price,
10  but that is not in fact what those invoices were.  That's
11  now how they're specified.
12       So, you know, it is true that -- it is
13  certainly true that if you could sell a bitcoin for $200
14  and use it to cover a $100 liability, you should do that.
15  That is certainly true.
16       Q.   In document, in Exhibit 6 -- I don't know what
17  you guys can see because my screen is not up.  In
18  Exhibit 6 that you produced or Exhibit 9, the billing --
19       A.   I'm sorry, say again.  Exhibit 6?
20       Q.   Exhibit 6 or Exhibit 9, whichever might be
21  easier for you to possibly handle the next set of
22  questions.
23       MS. GLYNN LEVIN:  These two.
24       THE WITNESS:  I'm listening.  Go ahead.
25  BY MR. REYHANI:

Page 171

1        Q.   I just think it might be helpful for you to --
2  I just think it might be helpful for you to have the
3  documents in front of you when you are answering these
4  questions.
5        Are you able to show on one of these documents
6  the transfer of the bitcoins from Alydian to CoinLab to
7  cover the invoices on October 30th?
8        A.   So the very first page, the top one.
9        MS. GLYNN LEVIN:  Which exhibit.
10       THE WITNESS:  Of Exhibit 9.
11  BY MR. REYHANI:
12       Q.   Yes.
13       A.   That's one of them.  The second page, the top
14  line, that's one of them.  The fourth page, the top line,
15  that's one of them.
16       The fifth page, the 2BCT outs (Chk doc), the
17  628.4 and 1000.0 in the top ten lines, those are they.  I
18  believe that's all of them.
19       Q.   So it's my understanding, and you can correct
20  me if I'm wrong, that Alydian was utilizing, and I'm
21  going to use the short version, the bitcoin address at
22  1EGHVG as the address that was mining, to which it was
23  mining bitcoins; is that correct?
24       A.   Are you identifying a bitcoin address in short
25  form to me now?  I really appreciate the convenience.

Page 172

1        MS. GLYNN LEVIN:  Which page are you referring
2  to?  Are you referring to a document?
3        THE WITNESS:  He's saying page 5.
4        MR. REYHANI:  I didn't refer to any page.
5        THE WITNESS:  It's on page 5.  I'm sorry, I was
6  so appreciative of that easy way to refer to bitcoin
7  addresses.  You're saying 1EGHG -- 1EGHVG, that one?
8  BY MR. REYHANI:
9        Q.   Page 5.
10       A.   Yes.
11       Q.   1EGHVG.  (Chk fig.
12       A.   Sure.
13       Q.   And at this point Alydian was mining, was solo
14  mining to this address, correct?
15       A.   At which point?  I'm sorry.
16       Q.   During all -- these mines, these VTC of 25 in
17  (Chk doc) the third column, that's Alydian mining
18  bitcoins, correct?
19       A.   That's correct.
20       Q.   And Alydian wasn't doing this in a pool or
21  anything like that; Alydian was doing this by itself,
22  correct?
23       A.   It's possible it was also pool mining at the
24  same time, but over the course of -- over the course of
25  these -- you know, these 25 coin BTCN's (chk doc), as

Rough Draft of Peter Vessenes                                    In re Alydian

Page 173

1 they're referred to on this report, are the result of
2 solo mining by Alydian mining rigs.
3    Q.   Okay.  And it appears at the top on
4 November 8th that that's the last day that mining
5 occurred at this address.  Does that appear correct?
6    A.   I believe -- yes, it looks like that way from
7 this report, for sure.
8    Q.   So if Alydian -- Alydian is currently mining
9 bitcoins, correct?
10   A.   That's correct.
11   Q.   So what address is Alydian currently mining
12 bitcoins at instead of this 1EGH address?
13   A.   The page 6 has the address 18AQUBK, that one.
14 That is the current mining address for Alydian (Chk doc).
15   Q.   18AQUB?
16   A.   Yes.
17   Q.   So Alydian is not mining -- so the mining
18 equipment that was being utilized for the prior mining
19 address, 1EVGH, is that equipment still being used?
20   A.   Oh, yeah.  You just point it over to the mining
21 pool.  It's a configuration change.
22   Q.   So that equipment is now being used to the 18AQ
23 address, correct?
24   A.   That and more, yes, because we have deployed
25 more equipment since then.

Page 174

1    Q.   So all is it fair to say that all of Alydian's,
2 all of the debtor's, mining rigs are mined to this 18AQ
3 address?
4    A.   I believe that's so.  That's certainly the
5 general operating plan.
6    Q.   And on December 13th the debtor transferred
7 2,325 bitcoins from the 18AQ address into the 147BY7
8 address; is that correct?
9        MS. GLYNN LEVIN:  Are you referring to a
10 particular line item on what page?
11       THE WITNESS:  Page 3.
12       MS. SIMONYAN:  Oh, no.  Page 8 or page 3.
13       THE WITNESS:  Oh, no.  Page 8 or page 3.
14       MS. SIMONYAN:  It's 8.
15       THE WITNESS:  I guess you can see it on both
16 places.  Hold on.  I'm on page 3.  Let me go to 8.
17       Yes, the other half of those is on page 3.  You
18 will see them in your own reports there.  Do you see
19 them?
20 BY MR. REYHANI:
21   Q.   You just need to speak up a little.  I couldn't
22 hear what you are you were saying?
23   A.   The other half of those is on page 3, if you're
24 looking for them.
25   Q.   Okay, right, and they went into the 147B

Page 175

1 account, correct?
2    A.   Yes, that's right.
3    Q.   What was the purpose of the transfer of 2,325
4 bitcoins on that date into that 147BY7 address?
5    A.   There's a technical reason.  Would you like me
6 to explain it?
7    Q.   Any reason you have is welcome.
8    A.   So when you -- bitcoin is not really designed
9 to have multiple transactions in a single address.  The
10 way the protocol specified, it imagines that all money
11 moves from one address to one or more new addresses, and
12 so you -- the core bitcoin client and the historical way
13 that bitcoin clients work, you don't reuse an address
14 ever.
15       Now, because of how it was conceived of,
16 there's some operations in bitcoin that become more
17 difficult to do, if you sort of abuse the chance of
18 dumping a lot of transactions on a single address.  And
19 so we're cognizant that -- it's, you know, since the
20 bitcoin, since the core -- since the bitcoin paper came
21 out, you know, businesses, like Alydian, use, want to use
22 bitcoin, and it's much, much harder to audit and keep
23 track of coins if you are constantly choosing a new
24 address for every transaction, and so as a matter of
25 practice, for a lot of reasons, people tend to stick with

Page 176

1 one or a small number of addresses just like Alydian has.
2       There's a weird thing that happens when you
3 have too many what are called unspent outputs.  So every
4 time we mined at a pool, it would pay once we have five
5 bitcoins paid out to us.  And that's like a good amount
6 of money to trust a pool server with.  It's like right
7 between 1,500 and five grand.  So we wanted that money
8 sent out, and you can see -- actually, you can see right
9 up on page 8, leading up to this, that every few hours,
10 4 hours, 3 hours, 2 hours, we're getting four, five grand
11 from that pool server of people we've never met, right?
12      So those all add up, and they make working with
13 that address very difficult, and they add a cost to the
14 rest of the bitcoin network.  And so what you do to sort
15 of solve that problem is you recombine outputs, it's
16 called.  So you make like a very large transaction, and
17 you have to pay extra to the bitcoin network because you
18 are like making some giant, giant transaction that pulls
19 together all these little bitcoin transactions and puts
20 them into one new output, and that keeps the clients like
21 leaner and it helps everyone on the network.  They don't
22 have to deal with all these like large numbers of unspent
23 outputs.
24      So you can see then after that we upped the
25 payouts to ten rather than five.  That's in an attempt

Rough Draft of Peter Vessenes                                    In re Alydian

## Page 177

1  just to make sure that, you know, we don't have to do
2  they recombining transactions that often, and, you know,
3  we are probably due for another one, I would say, because
4  we've got quite a few unspent outputs here.
5      Q.   Hold on one second.  Hold on.  So the transfer
6  of the 2,325 bitcoins in layman's terms is to help clean
7  up the network?
8      A.   I'm sorry.  The one that we're referring to on
9  page 8 here?
10     Q.   Either one.  They're at 950, 950 and 425, the
11 three transfers --
12     A.   Yes.
13     Q.   -- is to help --
14     A.   It's hygiene.  Good bitcoin hygiene.
15     Q.   Is that for your benefit or for the network's
16 benefit?
17     A.   Well, it benefits Alydian marginally because
18 it's just it's quite hard to get secured tools that will
19 deal with thousands and thousands of unspent outputs, and
20 so like it's a pain and if you do want to be able to
21 spend those coins, it is better, much better to have
22 combined them, but it also helps the network as a whole.
23     Q.   Okay.  So let's stick with page 3.  On the 13th
24 of December, Alydian -- hold on one second.  So the
25 147BY7 is an Alydian address?

## Page 178

1      A.   Yes.
2      Q.   So further up that food chain, 4:58 PM, on the
3  13th of December?
4          MS. GLYNN LEVIN:  What.
5          THE WITNESS:  The top two lines of page 3.
6  BY MR. REYHANI:
7      Q.   167 bitcoins were transferred out to an address
8  1JKG.  You don't see the address, but you see the 167.1
9  being transferred out, correct?
10     A.   Yes.
11     Q.   Who controls the recipient address 1JKG that
12 received that 167 bitcoin?
13     A.   That is a CoinLab address.
14     Q.   Alydian transferred 167 bitcoins to CoinLab.
15 What was the purpose of that transfer?
16     A.   To pay a November invoice.
17     Q.   To pay the November invoice?  Is that what you
18 said?
19     A.   I said to pay a November invoice.
20     Q.   I'm sorry, I actually didn't hear you to pay?
21     A.   To pay a November invoice, yes, that's correct.
22     Q.   How much was that invoice?
23     A.   I think you should have it in your discovery
24 docs.  There's a November 15th and a November 30th
25 invoice.  And those -- you haven't asked about the other

## Page 179

1  one, but those two payments are one for each invoice.
2  You know Bryan I think you are going to find like you can
3  argue this one, but December CoinLab took a big hit
4  spending a thousand dollar bitcoins.  Alydian is allowed
5  to remit it whatever it is going to be six or $700 coins.
6  You know, I don't know.  I mean this goes up and down.
7          MS. GLYNN LEVIN:  Wait for a question.
8          THE WITNESS:  I mean, I don't want everyone to
9  waste their time worrying about this right now, they can
10 spend the dep time how they want, I guess.
11 BY MR. REYHANI:
12     Q.   Did you consult with your bankruptcy counsel
13 before making those transactions?
14     A.   Which transaction?
15     Q.   The two transfers out CoinLab on December 13th?
16     A.   No.
17     Q.   You thought it was just okay to pay those bills
18 without consulting?
19     A.   It's a post-petition payment for a
20 post-petition service agreement for hosting.  Hosting and
21 employees for Alydian.  It seems legitimate to me.
22     Q.   So an insider?
23     A.   Do you want the mining rigs running?
24          MS. GLYNN LEVIN:  Is there a question just a
25 second.

## Page 180

1          THE WITNESS:  No, no.
2          MS. GLYNN LEVIN:  Is there a question?
3          THE WITNESS:  I want to hear what he imagines
4  should be.
5          MR. REYHANI:  Did you consult with counsel.
6          MS. GLYNN LEVIN:  And he answered that
7  question.
8          THE WITNESS:  I said no.
9          MS. GLYNN LEVIN:  He answered that question.
10         MR. REYHANI:  It just struck me as odd that he
11 didn't consult with his attorney before transferring out
12 almost $400,000 worth of assets to an insider.
13         MS. GLYNN LEVIN:  A it's privileged and B I'm
14 sorry that you think it's odd but there's no question on
15 the table.
16         MR. REYHANI:  No it's not privileged because he
17 said he didn't speak with you so there's nothing
18 privileged about it.
19         MS. GLYNN LEVIN:  Well, whether someone.
20 BY MR. REYHANI:
21     Q.   Who did you speak to about the transfer of
22 these assets prior to doing it?
23     A.   Kelly Gates.
24     Q.   That's it?
25     A.   I believe so.

Rough Draft of Peter Vessenes                                    In re Alydian

Page 181

1    Q.   Did anyone negotiate the invoices on behalf of
2   Alydian?
3    A.   Negotiate the invoices on behalf of Alydian?
4   What do you mean?
5    Q.   Did anyone ask to see underlying bills to make
6   sure that the invoices from Alydian -- from CoinLab were
7   up to snuff?
8    A.   Like is CoinLab padding or stuffing the
9   invoices or has anyone at Alydian checked if CoinLab is
10  padding or stuffing the invoices?  Is that what you're
11  asking?
12   Q.   I think your job as debtor of possession is to
13  maximize the creditors.  Did anyone ask to look at the
14  underlying invoices?
15       MR. TOWNSEND: Answer his questions.
16       THE WITNESS:  Did anyone ask to -- yes, of
17  course.  So Kelly checks all the invoices.
18  BY MR. REYHANI:
19   Q.   Kelly works for CoinLab, doesn't she?
20   A.   No, she works for Denali, and Denali works for
21  both -- has contracts with both Alydian and CoinLab.
22   Q.   So Kelly is issuing invoices on behalf of
23  CoinLab and approving them on behalf of Alydian?
24   A.   I would approve the final invoices on Alydian's
25  behalf and the payment.

Page 182

1    Q.   Did you look at the underlying invoices?
2    A.   Not all of them.  I'd be happy to review the
3   line by line invoices with you, if you'd like.
4    Q.   Who negotiated the operating agreement on
5   behalf of CoinLab and on behalf of Alydian?
6    A.   I think we've already been through that.  I
7   signed both sides of that agreement.
8    Q.   Anyone else -- was anyone else involved with
9   the -- was there any negotiation whatsoever between
10  CoinLab and Alydian at all?
11   A.   I'm not sure what would be negotiated there but
12  we didn't have separate parties negotiating it.
13   Q.   Where are the invoices for the underlying
14  purchases?  Where do they reside?
15   A.   I'm sorry, which purchases are you referring
16  to?
17   Q.   Any purchase.  CoinLab is invoicing Alydian and
18  is stating that X widget cost Y dollars.  Where are those
19  invoices?
20   A.   The invoices that CoinLab presented to Alydian?
21   Q.   The invoices that CoinLab received and was
22  charging Alydian for.
23   A.   Oh.  They're in CoinLab files.
24   Q.   We ask for those invoices to be produced?
25       MS. GLYNN LEVIN:  Actually, the judge already

Page 183

1   ruled that that was burdensome, overly burdensome.  If
2   there are some specific ones I'm happy to ask, have the
3   bookkeeper extract those, but this was discussed at the
4   motion to compel and I mean, for every invoice there are,
5   you know, ranging anywhere from five to ten to sometimes
6   many, many underlying invoices or for parts and the judge
7   said that we were not required to turn those over, but
8   I'm certainly happy, as I said, to turn over a sample so
9   you can look at them make whatever conclusions you want
10  to but I'm not going to turn over all of them.  We were
11  not ordered to do that.
12  BY MR. REYHANI:
13   Q.   Where in CoinLab files are the invoices stored?
14  Is it hard copy file cabinet that is sitting in Kelly's
15  office?  Do you scan them and put them into an electronic
16  folder?  How do you store them?
17   A.   So there are thousands and it would vary.  Some
18  vendors remit electronically, some on paper.
19   Q.   Store items project are they sitting on one
20  person's local drive are they offer a server-S do you use
21  enclosed storage?  How do you store documents on behalf
22  of the debtor and on behalf of CoinLab, assuming it's the
23  same process?
24   A.   Alydian's data -- Alydian doesn't have a lot of
25  data storage.  It would be just on computers mostly, I

Page 184

1   guess.  Paper files for Alydian would be kept in Portland
2   or in on Bainbridge island.
3    Q.   Are all of the corporate documents or are
4   certain of the corporate documents, does everyone just
5   keep their own files locally or is there a central drive
6   that everybody can access corporate documents?
7    A.   Alydian, it doesn't really have the standard
8   way of doing it.  Some things might be shared on drop
9   box, some might not.  I don't know.  I wouldn't say we
10  have a standard way that Alydian does things.
11   Q.   So just Alydian uses drop box to store their
12  files?
13   A.   I believe so.  Some files.
14   Q.   And you wouldn't use drop box unless you
15  thought it was secure, correct?
16   A.   Security is a range, Bryan.  Could you ask me
17  more about that?  Or say more about that?
18   Q.   You wouldn't put your company's documents at
19  risk if you thought they were being stored in an insecure
20  environment, correct?
21   A.   By security, what do you mean?  Do you mean
22  secure from theft, from loss, from damage, from being
23  stolen, being read by others?
24   Q.   Are we really going to get into semantics about
25  security?

Rough Draft of Peter Vessenes                                    In re Alydian

Page 185

1    A.   Why are you asking about drop box and security
2    then?  Do you want to know -- I mean.
3         MS. GLYNN LEVIN:  Just answer the question.
4    BY MR. REYHANI:
5         Q.   Do you store your documents on drop box?
6         A.   Alydian stores some of its documents on drop
7    box and I believe that drop box's security is suffer for
8    those documents which Alydian stores there.
9         Q.   And does CoinLab utilize drop box too?
10        A.   I don't think we're talking about CoinLab.
11        MS. GLYNN LEVIN:  Objection.
12   BY MR. REYHANI:
13        Q.   Does Katie use dropbox for her functions as the
14   Alydian bookkeeper and the CoinLab bookkeeper?
15        A.   I don't know who Katie is.
16        Q.   Who is the bookkeeper?
17        A.   Kelly Gates.
18        Q.   Does Kelly use drop box for the storage of
19   documents relating to Alydian and CoinLab?
20        A.   She may use drop box for Alydian files.  I'm
21   not sure.  She certainly accesses old files, old Alydian
22   files on drop box.  I'm not sure if she's in the habit of
23   storing new ones there or not.  I'd like a bathroom
24   break.
25        Q.   Okay, you can take five minutes.

Page 186

1    A.   I will be right back.
2         (A break was taken from
3         3:35 p.m. to 3:37 p.m.)
4         MR. REYHANI:  We're back on the record.  If
5    Tereza would be kind off enough to circulate the XRAY
6    loan agreement as our next exhibit.
7         (Exhibit No. 12 marked.)
8    BY MR. REYHANI:
9         Q.   Have you seen this document before, Mr.
10   Vessenes?
11        A.   Yes.
12        Q.   And just for the record, this is a document
13   that has been represented as a loan agreement of bitcoins
14   from XRAY to CLI doing business as Alydian dated
15   apparently August 29, 2013.  It's Bates stamped CLI
16   Chapter 11 00028 through 00029.  When was the first time?
17        MS. GLYNN LEVIN:  And just a second and who
18   made the representation as to what it was?  Where do you
19   have that?  What are you referring to?
20        MR. REYHANI:  I believe Mr. Vessenes has made
21   that representation before, but we could ask Mr.
22   Vessenes.
23   BY MR. REYHANI:
24        Q.   What does this document represent?
25        A.   I would call it a capitalization summary I

Page 187

1    guess is the title.
2         Q.   And when was the first time you saw this
3    document?
4         A.   Probably August 29th, I would imagine.
5         Q.   Did you discuss this document with anyone?
6         A.   Yes.
7         Q.   Who?
8         A.   Brian Cartmell.  Jodie brady.
9         Q.   Who was the second person?
10        A.   Jodie brady.  Joel Yarmon.
11        Q.   Anyone else, or is that it?
12        A.   I don't recall anyone else.
13        Q.   What did you discuss with Jodie Brady about
14   this document?
15        A.   Whether or not we should sign it.  If we felt
16   it was a better offer than the Crystal Island offer.
17        Q.   What did Jodie Brady say to you about this?
18        A.   She felt that we probably just have shut
19   Alydian down just right then, but that this offer was
20   certainly better than the other offers we had.
21        Q.   And you discussed this document with Joel
22   Yarmon, too, you just said?
23        A.   Yes.
24        Q.   What did you discuss with Mr. Yarmon about this
25   document?

Page 188

1    A.   Whether we should sign it.
2         Q.   What did he say?
3         A.   I think he like Jodie was 50/50.  I think he
4    thought it was a long shot to take any money on to do
5    this, but that if it capped CoinLab's further liabilities
6    for the project, he was into it.
7         Q.   Who drafted this document?
8         A.   I did.
9         Q.   Where did you draft it?
10        A.   On my computer.  I don't know.
11        Q.   Your home computer, your work computer?  Do you
12   have one computer?
13        A.   I drafted it on a work computer.
14        Q.   Did you store it locally or in the cloud?
15        A.   I don't recall.
16        Q.   Where do you tend to store your documents?
17        A.   It varies.
18        Q.   It varies on what?
19        A.   I don't know how to answer.  Some documents
20   would be stored on the cloud and some would be on my hard
21   drive.
22        Q.   I notice some handwriting on this document.
23   Whose handwriting is on the top right corner that says
24   file, please, Cartmell in quotes?
25        A.   I don't know.

Page 189

1    Q.   Is your handwriting?
2    A.   No.
3    Q.   Who else would have access to this document
4    that would be filing it?
5    A.   It could be -- I don't know.  It could have
6    been my assistant.  Someone on the legal staff.  It could
7    have been Jodie Brady.
8    Q.   Who is your assistant?
9    A.   Her name is Mary.
10   Q.   Mary what?
11   A.   Phillips.
12   Q.   Is she still your assistant?
13   A.   Yes.
14   Q.   What is her email address?
15   A.   Mary at coin lab.com.
16   Q.   And do you have her telephone number?
17   A.   Not on me.
18   Q.   You don't know your own assistant's phone
19   number?
20   A.   I store it all on my phone.
21   Q.   How long has she been your assistant for?
22   A.   Oh, I don't know.  I'm not sure.  Maybe a year,
23   give or take.
24   Q.   We're going to request her contact information
25   as well at the conclusion of this examination.

Page 190

1        So you don't know whose handwriting is that.
2    On the bottom right corner, it says there's some initials
3    and a date.  Whose handwriting is that?
4    A.   I don't know.
5    Q.   XRAY is providing to the debtor in the form of
6    a capital call, purported capital call and debt
7    structure, 12,535 bitcoins, and you don't know whose
8    initials are on the bottom right corner of this page?
9    A.   You asked me whose handwriting that was.  I
10   believe that's Brian Cartmell's initials.
11       MS. GLYNN LEVIN:  Only if you know.
12   BY MR. REYHANI:
13   Q.   Is that Brian Cartmell's handwriting?
14       MS. GLYNN LEVIN:  Oh, please.
15       THE WITNESS:  I couldn't say for sure.
16       MS. GLYNN LEVIN:  Objection.  He cannot say
17   whose handwriting it is.  (Chk doc).
18       MS. SIMONYAN:  If he knows, why not.
19       MS. GLYNN LEVIN:  If he saw him write it, but
20   he has testified he doesn't know who wrote it.
21   BY MR. REYHANI:
22   Q.   Did you see Brian Cartmell write that?
23   A.   No.
24   Q.   Let's turn to the second page.  Is that your
25   signature in the two signature blocks above your

Page 191

1    typewritten name?
2    A.   Yes.
3    Q.   Above Brian Cartmell, is that his signature?
4    A.   He told me that it was.
5    Q.   How did he tell you that it was?
6    A.   He sent back this document and said here's a
7    signed version of it.
8    Q.   How did he transmit the document to you?
9    A.   I think over email, but I don't recall.
10   Q.   So there's email correspondence that relates to
11   the transmission of this document?
12       MS. GLYNN LEVIN:  Asked and answered.  He said
13   he did not know.
14       MR. REYHANI:  That's not what he said.
15   BY MR. REYHANI:
16   Q.   Is there email transmission correspondence --
17       MS. GLYNN LEVIN:  He said I think it was email.
18   I don't know.
19       MR. REYHANI:  I'm asking him again.
20   BY MR. REYHANI:
21   Q.   Do you recall how this was transmitted to Mr.
22   Cartmell to and from?
23   A.   No.  But like I said.
24   Q.   Where were you?
25   A.   Go ahead.

Page 192

1        MR. TOWNSEND: Did you finish your answer.
2    BY MR. REYHANI:
3    Q.   Where were you when you signed this?
4    A.   I was on Bainbridge island Washington.
5    Q.   And where was Mr. Cartmell?
6    A.   I don't know.
7    Q.   Was Mr. Cartmell in the states?
8    A.   I don't know.  I don't know where he was.
9    Q.   Was he in New Zealand?
10   A.   How many times would you like me to say it.  I
11   don't know where he was.
12   Q.   I just curious if it was signed on
13   August 29th in the United States time or in August 29th
14   New Zealand time?
15       MS. GLYNN LEVIN:  And what is the reason for
16   this, because -- what is reason for knowing this?  It is
17   signed on a date.  It doesn't even actually say signed.
18   August 29th it is handwritten.  But what is the reason?
19   Help us explain.  Help us understand this, because I
20   don't understand.
21       MR. REYHANI:  I think you need to talk to your
22   client, then, if you don't understand the importance of a
23   document wherein the debtor is taking on a
24   12,300-something bitcoin loan from an individual who is
25   sometimes located halfway around the world.  I think it's

Page 193

1  kind of important to make sure that there's no funny
2  business going on between a debtor and the 35 percent
3  equity holder in the company.
4     MS. GLYNN LEVIN:  We have not made any claim
5  that there is any funny business.  You have.  So why
6  should my client be concerned about that?  If you want to
7  ask if there's any funny business, then ask him that, do
8  you know if there is any funny business, and he will tell
9  you yes or no.  You can ask Mr. Cartmell.
10    You are asking where people work, whether they
11 were standing.  I just -- I personally don't get it, and
12 I'm about to say we should end this line of questioning
13 and move on to the next.
14    MR. REYHANI:  Okay, well, you can do what you
15 want.  My questions are completely valid and I think you
16 know who signed the actual loan agreement where they were
17 and how it was transmitted are relevant questions.  You
18 can disagree all to your heart's content.
19    MS. GLYNN LEVIN:  I think those questions have
20 been answered.
21 BY MR. REYHANI:
22    Q.   So ultimately the debtor received 10,000
23 bitcoins from XRAY on August 31st at the address
24 beginning GZYCY, correct, 1GZYCY?
25    A.   I don't know what date off the top of my head I

Page 194

1  received them, but yes 10,000.
2     Q.   Look at -- you could look at refer to Exhibit 9
3  to assist you.
4     A.   10,000 coins were sent to 1GZY.
5     Q.   And the debtor you stated already elected to go
6  with the XRAY loan because the terms were better than the
7  moneys to be received from Crystal Island?
8     A.   Yes.
9     Q.   Okay.  And Daniel Gallancy, he conducted due
10 diligence to determine if Crystal Island should provide
11 the moneys that the debtor was seeking at that time,
12 correct?
13       MS. GLYNN LEVIN:  If you know.
14       THE WITNESS:  I don't understand that question.
15 Say it again.
16 BY MR. REYHANI:
17    Q.   Did Mr. Gallancy conduct due diligence?
18       MS. GLYNN LEVIN:  If you know.
19 BY MR. REYHANI:
20    Q.   In an effort for the debtor to possibly procure
21 moneys from Crystal Island?
22    A.   Yes.
23    Q.   And he spent -- based upon your recollection,
24 did he spend a couple of weeks conducting such due
25 diligence?

Page 195

1        MS. GLYNN LEVIN:  If you know.  Personal
2  knowledge.
3        THE WITNESS:  I don't know.  He spent --
4     MR. REYHANI:  I asked him his recollection.
5  You don't need to interrupt every question.
6     MS. GLYNN LEVIN:  You asked him did Daniel do
7  this, did Daniel do that.  That's not within his personal
8  knowledge.  So yeah I need to object.  So you got to ask
9  what this debtor knows.
10    MR. REYHANI:  Ms. Glynn Levin, please I'm
11 asking you -- I'm extending to you a professional
12 courtesy.  Don't embarrass yourself.  Mr. Gallancy had
13 personal conversations and meetings with members of Mr.
14 Vessenes and his team.  Of course he's got personal
15 knowledge about it.  He may not recall, that's fine, but
16 don't sit here and say he doesn't have personal
17 knowledge.
18    MR. TOWNSEND:  I think it's a semantic thing.  I
19 think you answered the question about what the intent of
20 Mr. Gallancy's actions were, and so I think that's where
21 the pause came, not whether or not it was --
22    MR. REYHANI:  I just said did he conduct, did
23 he conduct due diligence of the debtor.
24    MR. TOWNSEND:  That's not what you said, but
25 that's a fine question.

Page 196

1        THE WITNESS:  Yes, he did conduct due
2  diligence.
3  BY MR. REYHANI:
4     Q.   And you and other members of your staff
5  answered questions that Mr. Gallancy posed in general?
6     A.   Yes.
7     Q.   And he was able to look at the equipment and
8  just get a thorough understanding as a to the debtor,
9  correct?
10    A.   That's what he said, yes.  That's what he told
11 us.
12    Q.   And but you elected not to take the capital
13 from Crystal Island but you took it from XRAY because the
14 terms were better to the debtor, correct?
15    A.   That's correct.  They were better for everyone,
16 actually.
17    Q.   Okay.  But that was the debtor's decision I
18 mean the shareholders could have still benefited from Mr.
19 Gallancy's due diligence work, correct?
20    A.   Shareholders could have benefited from Mr.
21 Gallancy's what, from his due diligence?  I'm not sure.
22    Q.   Yes?
23    A.   I'm not sure I understand how.
24    Q.   If the debtor accepted the money and the money
25 was utilized for mining rigs or whatever the money would

Page 197

1   **have been utilized for the shareholder could have**
2   **benefited from such moneys, correct?**
3      A.   Well, I think actually in point of fact no.
4   This project was a loser and more money would have just
5   made it worse.  So no, I don't believe that additional
6   moneys would have benefited Alydian.
7      **Q.   If Alydian put more mining rigs to work earlier**
8   **on in the process with the moneys from Crystal Island,**
9   **would the shareholders not have benefited from the**
10  **increase in?**
11     A.   Who he who he.  Start with can you break that
12  way down?  That's like this huge set of hypotheticals.
13     **Q.   It's a single question.  If valued put the**
14  **moneys to work from Crystal Island to mine bitcoins at**
15  **the time bitcoins were trading lower in price would that**
16  **not have been to the benefit of the shareholders?**
17     **MS. GLYNN LEVIN:  You can say I'm basing myself**
18  **or whatever, but this is about litigation and our 2004**
19  **exam is about your client's claims against the estate and**
20  **the estate and its assets.  What you are talking about is**
21  **some contract interpretation stuff.  If you want to -- if**
22  **you want if we're going to deal with claims objection and**
23  **litigation, fine we can do that under the federal rules,**
24  **but you are outside the scope of 2004.**
25     MR. REYHANI:  Actually I don't think I'm

Page 198

1   outside the scope of 2004.
2      MS. GLYNN LEVIN:  You are not a bankruptcy
3   lawyer my friend and when you become one you will
4   understand what the scope of 2004 is.
5      MR. REYHANI:  So you're right and I guess we're
6   friends, but let's see, the scope of examination on the
7   2004 under debtor under this rule may relate to the acts,
8   conduct or property or as to the liability and financial
9   condition of the debtor or any matter which may affect
10  the administration of the debtor's estate or the debtor's
11  right to discharge and under eleven it has to go with
12  anything consummation of a plan consideration and in
13  other relevant matter of the case or to the formulation
14  of a plan.  (Chk doc).
15     So I think moneys that were presented to the
16  debtor that could have been utilized for mining rigs is
17  certainly relevant to the consideration or formulation of
18  a plan.
19     MS. GLYNN LEVIN:  No it has to do sir with your
20  contract and whether in your client's claims certain
21  contracts were or were not consummated and the debtor's
22  decision to go forward with a different kind of
23  investment and different kind of investor.  That is not
24  2004 material.  That's the basis.
25     MR. REYHANI:  That's your opinion.  That's not

Page 199

1   what the rule says.
2      MS. GLYNN LEVIN:  That may be and right now I'm
3   here predicting my client and his time and this is the
4   end of this line of questioning.  We're not going to be
5   talking about Crystal Island.  Crystal Island is not in
6   this case.  If there's litigation go ahead and file it
7   but we don't have that before us today.
8      MS. SIMONYAN:  Are you instructing your client
9   not to answer questions about the administration.
10     MS. GLYNN LEVIN:  No, he can talk about the
11  administration.
12     MS. SIMONYAN:  Of the bankruptcy estate.
13     MS. GLYNN LEVIN:  Of this estate which started
14  on November 1st and you are talking about October 29,
15  2013.
16     THE WITNESS:  August 29th.
17     MS. GLYNN LEVIN:  Or August, in that area.  So
18  let's get back to 2004.
19     MS. SIMONYAN:  You are looking and citing from
20  the document.
21     MS. GLYNN LEVIN:  I am talking to him.
22     MS. SIMONYAN:  Well talk to me, because I'm
23  sitting here representing my client.  Talk to me now and
24  then you can turn and talk to him.  Your client has two
25  attorneys sitting here and making objections on his

Page 200

1   behalf.  I think you are in no position to object to two
2   attorneys representing the --
3      MS. GLYNN LEVIN:  It's one or the other.  It's
4   either Bryan or you.
5      MS. SIMONYAN:  According to gospel by Deirdre?
6   You cannot make these statements without any authority.
7   You cannot make these statements and make --
8      MS. GLYNN LEVIN:  Tereza, check your rules.
9   One lawyer per client.
10     MS. SIMONYAN:  Accordingly to what rule?  I
11  want to check the rule.  Tell me the rule.  I want to
12  check the rule, and if that's the case, what is Mr.
13  Townsend doing here?
14     MS. GLYNN LEVIN:  He's representing a different
15  party, which is also a creditor.
16     MS. SIMONYAN:  It's not the examination of a
17  different party.
18     MS. GLYNN LEVIN:  Are there any more questions,
19  Bryan?  Are there more questions?
20     MS. SIMONYAN:  There is a question on the
21  table.  Are you instructing your client not to answer
22  questions about documents that underlie claims?
23     MS. GLYNN LEVIN:  Which document?
24     MS. SIMONYAN:  The documents that you were
25  reading from a moment ago.

Rough Draft of Peter Vessenes                                          In re Alydian

Page 201

1 THE WITNESS: That's not what he was asking
2 about.
3 MS. GLYNN LEVIN: No, we're not talking about
4 documents. This has to do -- he's talking about Crystal
5 Island. I don't see anything about Crystal Island on
6 this page.
7 MS. SIMONYAN: Could you read back the last
8 question, please?
9 MS. GLYNN LEVIN: If you want to talk about
10 Crystal Island, then let's see the Crystal Island
11 documents and we'll see if it's relevant.
12 MR. REYHANI: Ms. Glynn Levin, your client
13 refers to Crystal Island in his own declarations. I was
14 just making a point that had the debtor utilized those
15 moneys.
16 MS. GLYNN LEVIN: Well, then make the point in
17 court if you think it's important. If you think it is
18 going to get you somewhere, you can go ahead and make
19 that point in court, or start some litigation.
20 MR. REYHANI: Your client doesn't need any more
21 litigation. We're asking a question. I was asking a
22 question as to whether the shareholders would have
23 benefited had they accepted the money. That was it.
24 MS. GLYNN LEVIN: The shareholders of what?
25 MR. REYHANI: Alydian.

Page 202

1 THE WITNESS: What does this have to do with
2 putting a go forward plan together? Can you explain that
3 to me Bryan is there money on the table for Alydian
4 possibly as part of a restructuring? I'm just trying to
5 understand.
6 MR. REYHANI: I'm going to ask counsel again to
7 direct their client to just answer the questions and stop
8 asking questions, and I'd like to note for the record
9 that Mr. Vessenes is knitting again during the course of
10 this testimony.
11 THE WITNESS: I was waiting for the lawyers to
12 argue it out but I'll stop, that's fine.
13 MR. TOWNSEND: If you don't understand the
14 question, you can ask questions about it Peter.
15 THE WITNESS: So what is your question, Bryan?
16 BY MR. REYHANI:
17 **Q. Couldn't the shareholder have benefited from**
18 **crystal island's moneys?**
19 MR. TOWNSEND: Objection calls for speculation.
20 THE WITNESS: The shareholders of Alydian?
21 BY MR. REYHANI:
22 **Q. You can answer the question.**
23 A. So would the shareholders of Alydian have
24 benefited from Crystal Island money? Is that your
25 question? I just want to understand.

Page 203

1 **Q. Couldn't they have? Yes, couldn't they have.**
2 A. Is that any different from would they have? Is
3 there a reason you corrected would to a could. I'm not
4 sure I understand. I just want to hear your question.
5 Couldn't the Alydian shareholders have benefited from
6 crystal island's money? Is that your question?
7 **Q. Yes.**
8 A. The answer is no.
9 **Q. Okay. If the debtor put those moneys to work**
10 **and were mining with such moneys, wouldn't the**
11 **shareholders have benefited from the increase in bitcoin**
12 **price from one hundred to $900 in the interim?**
13 MS. GLYNN LEVIN: Oh my God, objection,
14 speculative.
15 THE WITNESS: No, because crystal.
16 BY MR. REYHANI:
17 **Q. We'll move on since this seals to be such a**
18 **difficult question for the debtor to answer?**
19 MS. GLYNN LEVIN: Let's get to it. Let's find
20 out about his claim. Let's find out about his claim in
21 the bankruptcy. This is not even a -- Cedar Mill is not
22 a party in interest. Did you represent that entity, too?
23 Or Crystal Island is not a party in interest here. So
24 I'm totally perplexed.
25 MR. REYHANI: I don't know what you're talking

Page 204

1 about. Your client had a fiduciary duty to act in the
2 best interest of shareholders and to attempt to do what
3 was necessary to form on contracts. Your client the
4 debtor -- excuse me, let me finish.
5 MS. GLYNN LEVIN: Go ahead.
6 MR. REYHANI: Your client elected to -- thank
7 you. Your client elected to reject certain moneys
8 because they thought certain terms were better. My
9 question merely asked couldn't it have benefited the
10 shareholders, the customers, whoever it may be, for the
11 debtor to have accepted those moneys, mined with those
12 moneys and received the benefits of an $800 price
13 increase in bitcoin in the interim. That was it. It's
14 not that complicated a question, but if we can't answer
15 that question, we'll move on.
16 MS. GLYNN LEVIN: No, no don't answer that.
17 Move on. Outside the scope and not relevant. So go
18 ahead and move on.
19 MR. REYHANI: Our interpretation of what is
20 relevant to the debtor in bankruptcy is obviously far
21 afield.
22 MS. GLYNN LEVIN: I guess so.
23 BY MR. REYHANI:
24 **Q. So Alydian also received in addition to ten**
25 **thousand bitcoins Alydian received 2,535 bitcoins on**

Page 205

1  August 31st at the 14PXFR (chk doc) account; is that
2  correct?
3       A.   Sorry.  Just one moment.  Those were not
4  received on August 31st most likely.  Did you generate --
5  if you generated this report with block chain, it will be
6  using GMT time, and we're Pacific time, so we're many
7  hours behind.  So it's likely August 30th.
8       Q.   Okay.  Let's use the 30th.  Did Alydian receive
9  2,535 bitcoins at address 14PXFR?
10      A.   Yes.
11      Q.   And that is currently an Alydian controlled
12 address?
13      A.   Yes.
14      Q.   14 PXFR?
15      A.   It has always been an Alydian address.
16      Q.   Can you show me -- well, maybe it's in the
17 thousands.  If you are going to tell me if it's in the
18 thousand-page document, then so be it.  Is the 14 PXFR in
19 address noted in Exhibit 6, which is the 27 page document
20 that is supposed to list all the Alydian addresses?
21      A.   I did not see this there.  Well, that document
22 does not list purport to list all Alydian address.  It is
23 a list of transactions that we previously generated and
24 included as part of the discovery, but I did not see it
25 in there.

Page 206

1       Q.   So according to your declarations, we have
2  gone -- the number has fluctuated a little bit today, but
3  Alydian at max capacity would have 36 mining rigs running
4  in around 5.9 (chk fig) terahashes per system for a total
5  of a little bit more than 212 terahashes, correct?
6       A.   That was an earlier declaration.  I think that
7  the final numbers are likely to be less than that.
8  Closer to 200.
9       Q.   Okay.  We can use 200, that's fine.
10           And would you agree with me that the hash rate
11 around now is about 13,000 terahashes, a little under?
12      A.   I don't know.  I think in terms of bitcoin
13 difficulty.  The difficulty is at 1.4 billion, currently.
14 So that probably corresponds roughly to what you are
15 discussing.
16      Q.   So at the current hash rate, Alydian's rigs
17 constitute about 1.66 percent of the total network hash
18 rate?  Would you agree with me on that point?
19      A.   No.  We are currently mining 175 to 180
20 terahashes.
21      Q.   1.5?
22      A.   I don't know.  You want me to divide 180 by
23 what?  13,000?
24      Q.   13,000, or actually 12,480 to be more precise.
25      A.   Do you guys have a calculator?

Page 207

1       MR. TOWNSEND:  Yes.
2       THE WITNESS:  All right, pass it over.  Shoot,
3  I lost it.  Hold on.  Where is it?  180 divided by 13,000
4  is 1.38 percent, I guess.
5  BY MR. REYHANI:
6       Q.   Okay, so --
7       A.   But you should -- but you should know -- let me
8  qualify that, because however many mining systems are
9  mining right now, and you can get various estimates on
10 that, all miners earn at a rate based on the last, the
11 most recent difficulty change from the bitcoin network.
12           And so if you're -- you know, if you want to
13 determine what percent of bitcoins are being mined by
14 you, you have got to be careful when you are doing the
15 math to distinguish between how many rigs are mining
16 right now and what the bitcoin network difficulty is.
17 They're different numbers.
18      Q.   I understand.  So Alydian is generating, I
19 think you said before, somewhere between 60 and 75
20 bitcoins a day for the time being?
21      A.   Sure.
22      Q.   So at around 900 bucks a coin, Alydian could
23 generate and sell those bitcoins and have a daily revenue
24 of greater than $54,000, approximately?
25      A.   I think we just said bitcoins are at 800.  The

Page 208

1  revenue number varies a lot day by day, but 70 times 800
2  is 56,000, 50,000, 55.
3       Q.   We're just using round numbers right now.  56,
4  55, 54, I don't really care.  We will use $55,000.
5           So if Alydian is generating $5,000 a day, that
6  equates to approximately 1.6 million over the course of a
7  month?
8       A.   Hold on.
9       MR. TOWNSEND:  The question is about the top
10 line revenue?
11      THE WITNESS:  I guess it's not really revenue.
12 It's asset accumulation.  But 55,000 times 31 is
13 1.7 million.
14 BY MR. REYHANI:
15      Q.   And if the debtor continues to operate instead
16 of selling its equipment it will continue to produce
17 bitcoins, correct?
18      A.   That is correct.
19      MR. REYHANI:  If Tereza would be so kind to
20 circulate the next document, which we are going to mark as
21 13, I believe.  It's the single-page document titled the
22 Alydian operating budget.
23 BY MR. REYHANI:
24      Q.   Mr. Vessenes, are you familiar with this
25 document?

Rough Draft of Peter Vessenes | In re Alydian

Page 209

1   A.  Yes.
2   **Q.**  **Do you recall the first time you saw this**
3 **document?**
4   A.  No.
5   **Q.**  **Did you prepare this document?**
6   A.  No.
7   **Q.**  **Who prepared this document?**
8   A.  The original was prepared -- the updated
9 version was prepared by Kelly Gates.
10   **Q.**  **Did you look at it before it was filed?**
11   A.  Yes.
12   **Q.**  **Can you just walk us through the various line**
13 **items so we have a proper understanding?**
14   A.  Okay.  Bitcoins mined is an estimate of the
15 amount of bitcoins to be mined for a given month.  You
16 should note there's a typo.  We have January 2013 and
17 February 2013, but it should be January 2014 and
18 February 2014.
19   **Q.**  **Okay.**
20   A.  We agreed that the trustee at the time not to
21 forecast dollar value to the coins.  We didn't know what
22 they would be.  So there's just bitcoins mined.
23       The project management, that would include Hans
24 certainly, perhaps Bobby, I'm not sure.  There's Bobby,
25 Robert and Hans, that will be included somewhere in

Page 210

1 project management.  And I suppose possibly contractors
2 between the two of them.  Executive compensation.
3   **Q.**  **Are the two --**
4   I'm sorry.  Go ahead.
5   **Q.**  **Are the two engineers expected to maintain the**
6 **systems Bobby and Robert?**
7   A.  Yes, that's correct.
8   **Q.**  **Okay, please go on to executive comp.**
9   A.  We have talked about that.  That's a budget for
10 me.  Severance is mislabeled.  It was a retention is a
11 better word for it.
12   **Q.**  **So debtor paid $105,000 in retention moneys to**
13 **certain people?**
14   A.  Not all of that yet.  So the total amount is
15 about $350,000 that the team asked for.
16   **Q.**  **Wait, I'm sorry.  There's 105,000 listed there.**
17 **The total amount is how much?**
18   A.  As I told you earlier, it's 250 -- it was 105
19 available in December and 250 the end of January.
20   **Q.**  **So that's $355,000 in retention moneys?**
21   A.  Yes.
22   **Q.**  **And who is all that for?**
23   A.  Hans, Robert and Bobby.
24   **Q.**  **Earlier you testified that that trio wanted**
25 **$250,000 total.  How are we up to --**

Page 211

1   A.  I said additional from the November, December.
2 250 additional.
3   **Q.**  **So you paid them a retention bonus on top of**
4 **their salaries and now they're going to get another**
5 **retention bonus?**
6   A.  Yes, they wanted some to stay through end of
7 the year and more to stay through the end of January.
8   **Q.**  **There are other engineers that could assist**
9 **with this project, correct?**
10   A.  I think we've already had that conversation.
11   **Q.**  **I understand that, but you are now paid**
12 **$355,000 for three people for two months of retention**
13 **bonuses or planning to pay?**
14   A.  Yes, and in my judgment that's much better than
15 having them leave tomorrow and all the rigs turning off
16 since that's just six or seven days of downtime.  So if
17 we can't replace a whole functional team in seven days,
18 we've lost money.
19   **Q.**  **What about the contractors?**
20   A.  Contractors are -- those are people doing
21 installation, assembly, et cetera.  Mostly like day
22 labor, I would say.
23   **Q.**  **Keep going on.**
24   A.  Hosting expenses.  That's the sort of power
25 cooling and real estate costs for hosting the rigs.  NRE

Page 212

1 stands for nonrecurring expenses, engineering.
2 Nonrecurring engineering, I think.  Those are charges
3 that hosting providers charge upfront for installing our
4 rigs because they often need special cooling or power.
5       Admin services will be bookkeeping mostly.
6 Some accounting.  Got to get tax folks in for Alydian.
7 Travel is mostly going to be travel to and from hosting
8 locations for employees doing installations.  Office
9 rent, self-explanatory as is utilities.  Miscellaneous is
10 probably just that, small items.  Capital expenditures,
11 that would have been the purchase of final parts so stuff
12 like the last boards or heat sinks or chips for
13 mining systems.  Inventory write off that could be two
14 things many I'm not sure what that is.  It might either
15 be Alydian has a bunch of chips that it decided not to
16 turn into boards and mine with them.  So it might be
17 writing those chips off.  I would guess that's what that
18 is.  It might also be just a misnamed depreciation line
19 item.  So the systems depreciate quite rapidly as we
20 discussed.  But I think that that's the chips being
21 written off.
22       MS. SIMONYAN:  It's listed as an expenditure.
23 How is that an expenditure if it's a write-off for
24 depreciation?
25       THE WITNESS:  I'm sorry.  I just want to answer

Rough Draft of Peter Vessenes                                    In re Alydian

Page 213

1  questions from Bryan.
2      MS. SIMONYAN:  Bryan, can you ask the same
3  question, please?
4  BY MR. REYHANI:
5      Q.  Why is it listed as a spurn /KHAOUR?
6      A.  I'm sorry what the capital spurn /KHAOURS.
7      MS. SIMONYAN:  No, inventory write-off.
8  BY MR. REYHANI:
9      Q.  Inventory write-off.
10     A.  Yeah, I mean that's something an accountant
11 puts together to keep accrual basis understanding of what
12 is happening on the books.  It is not a cash transaction,
13 the write-offs.  It's like saying oh, we have these we
14 bought these parts and we booked at them cost on our
15 balance sheet and now they're not worth anything and so
16 you write them off.  It doesn't materially impact the
17 cash holdings of the company.
18     Q.  That would actually help the company from a tax
19 perspective, no?
20     A.  It would, yes.
21     Q.  So Alydian the debtor has a total expenses for
22 the month of December of about $442,000, correct?
23     A.  That was the estimate.  I believe the final
24 numbers were lower like we came in under budget.
25     Q.  That's good?

Page 214

1      A.  I agree.
2      Q.  And Alydian mined approximately 2573 bitcoins
3  that was what was expected?
4      A.  That was a forecast as of November 27th, I
5  think we mined more about -- we mined more bitcoins than
6  that in December, though.  So we beat our revenue budget
7  as well.  Our bitcoin mining budget as well.
8      Q.  So let's just say 2,600 and maybe there's more.
9  So Alydian mined 2,600 bitcoins times eight or nine
10 hundred bucks.  We're looking at 1.8 million or so
11 dollars U.S. dollars and only had expenses of less than
12 442,000, correct?
13     A.  If you take 2,600 coins times today's price,
14 yes.  They were worth less at the end of December,
15 though, significantly.  So again we get to -- we just get
16 to when you want to price, price and market them, but
17 Alydian had significantly net income in December,
18 definitely.
19     Q.  And January with 1,600 or so bitcoins
20 anticipated and expenses of 775, it's going to be again
21 profitable in January?
22     A.  I'm sorry, I think you've -- I'm sorry Bryan to
23 interrupt you, but I think you have misread the chart.
24 There are no forecast expenses for January.  On this
25 sheet.

Page 215

1      Q.  So, that is total, okay.  So even if -- what
2  are the forecast expenses do you think for January,
3  around 440 something thousand, a little bit more, a
4  little bit less?
5      A.  It should be less than December, excepting the
6  severance, not severance but this retention.  Hosting is
7  going to come in a little under what we thought.  We did
8  better in hosting.  And that's really the big driver
9  right now.  So it will be below again like pull out that
10 severance line the retention line much the operating
11 expenses will be less.
12     MS. GLYNN LEVIN:  There's legal.
13     THE WITNESS:  There is legal.  Legal is not on
14 here.
15 BY MR. REYHANI:
16     Q.  So what is a fair number for the total expenses
17 do you think for the debtor for January?  400,000?
18     A.  Again, I don't know.  I'd prefer to bring like
19 some from our accounting staff.  That would be the proper
20 thing.
21     Q.  But it should be under the 440?
22     A.  I will say this.  As soon as we produce it, I
23 will happily send you a copy it.  I would be happy to do
24 that.  I don't mean produce in a legal sense, but as soon
25 we've got a forecast, I will have it sent on to you guys.

Page 216

1      Q.  But the expenses should be within the ballpark
2  of the prior month's expenses?
3      A.  I would think so.  All in, I would think so.  I
4  haven't seen the latest legal bills.  So that would be
5  one exception.
6      Q.  So if those expenses for January as compared to
7  the potential revenue of mining, you should mine
8  approximately $1.3 million' worth of bitcoin in January
9  if your projections hold true, correct at today's U.S.
10 dollar value?
11     A.  We've got 1,600 times 800 or something.  1.2,
12 1.3 million in asset accumulation?  Okay, sure.
13     Q.  And the same holds true with -- and I noticed
14 that have been having the amount of projected bitcoins if
15 the hashing network slows down, you should be able to
16 increase the amount of those projected bitcoins per
17 month, correct?
18     A.  If the market -- of course the slower the
19 growth rate of competing bitcoin miners, the longer the
20 rigs will take to kind of, you know, work through what
21 they have got.
22     Q.  Indeed the hash rate growth has in fact slowed
23 down, correct?
24     A.  Since when?
25     Q.  Since middle of December?

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 217

1   A.   Oh, it's probably -- it's just been two weeks.
It's too early to get a strong sense.  My last
3 recollections are that growth rate is at between eleven
and 15 percent per what do you call it?  Per set of
5 2016 blocks.
6   Q.   Regarding all the pre-buy contracts that the
debtor entered into, did any of them have hard deadlines
8 on which the bitcoins absolutely must be paid?
9   A.   The pre-buy contracts all of the original ones
10 had a one-year term.
11  Q.   A one-year term, okay.  And they all expired
12 last month, December 2013, correct?
13  A.   No, that's not correct.
14  Q.   With the exception of Bitvestment, did all the
15 debtor pre-buy contracts with its customers expire in
16 December of 2013?
17  A.   No, I don't believe so.
18  Q.   Whose contract do you not believe expired last
19 month?
20  A.   I believe there's some January and February
21 contracts as well.
22  Q.   For the sake of argument, let's say they all
23 expired.  If they all expired, those contracts were
24 supposed to be refunded in U.S. dollars, correct?
25      MS. GLYNN LEVIN:  Objection; calls for a legal

Page 218

1 conclusion clearings.  You can ask him what his
2 understanding is, but there's been litigation on this
3 already.  I actually don't know what you are talking
4 about.
5 BY MR. REYHANI:
6   Q.   Do the contracts have a clause that say that
7 after a year to the extent bitcoins aren't provided to
8 those customers, that they are to be refunded in U.S.
9 dollars?
10      MS. GLYNN LEVIN:  Which contracts are you
11 talking about, Bryan, because I don't know that they're
12 all the same?  I mean you are talking about contracts
13 that would probably include your own client's contract,
14 which is not necessarily the same as the rest.  So can we
15 look at a specific one?
16      MR. REYHANI:  Sure we can go pull ought the
17 various contracts and do this painstakingly slowly.
18 Let's look at another exhibit.  We're going to move on.
19      MS. GLYNN LEVIN:  Good.
20      MR. REYHANI:  We're going to move on.  If
21 Tereza could pass out what we are going to mark as
22 Exhibit 14.  It's the monthly financial report for the
23 debtor.  It is a 17-page document that was filed on
24 December 17, 2013.
25      (Exhibit No. 14 marked.)

Page 219

1      MS. SIMONYAN:  Is this the first page you have?
2      THE WITNESS:  The first page I have says
3 monthly financial report for corporate.
4 BY MR. REYHANI:
5   Q.   Are you familiar with this document?
6   A.   I just was looking at the first page.  Hold on.
7   Q.   Let me know when you are done.
8   A.   I'm familiar with the content of the document,
9 yes.
10  Q.   And on the second page, is that your digital
11 signature there, attesting that the information is
12 provided under penalty of perjury?
13  A.   Yes, to the best of my knowledge.
14  Q.   Would you be so kind as to walk us through the
15 information starting on the third page?
16  A.   Sure.  Page 3, this is a statement of assets
17 and liabilities for the debtor as of November 30, 2013.
18 The debtor had no cash or cash held by others.  It had
19 bitcoins that we valued on the balance sheet at $129,000.
20 $129,168 dollars.  We had no notes receivable.
21      MS. GLYNN LEVIN:  Just ask for other question.
22      THE WITNESS:  Do you have other questions.  Do
23 you want me to walk through one by line?
24 BY MR. REYHANI:
25  Q.   You valued the accounts receivable net.  Why is

Page 220

1 that on the -- how is that an account receivable?
2   A.   Yeah, that's a good question.  That's intended
3 to be the bitcoin asset line.  I'm not sure why it reads
4 AR net.  That would maybe be a decision that the
5 bookkeeper made for accounting reasons, but it's under
6 current assets, so it's intended to -- it's intended to
7 read just like any other current asset, which is to say
8 it's available for use right away.
9       MS. SIMONYAN:  Right.  Before you object, I'm
10 helping out.  There's an explanation on the following
11 page.  That's what it's intended to be the bitcoin
12 assets.  So because this is a pre-made form, that's why
13 it's listed.  They had to fit it somewhere.
14      THE WITNESS:  Yeah, there we go.  So I guess --
15 thank you, Tereza.  And our name is in that column to the
16 right.
17 BY MR. REYHANI:
18  Q.   So forgive me, I'm not a balance sheet kind of
19 guy, but Alydian mined, we discussed they mined 1,500 --
20 it mined 1,500 bitcoins in November or something in that
21 ballpark, and the price on November 30th was
22 approximately $1,132, which quantifies for a total value
23 of $1.6 million in bitcoin value and the debtor is
24 equating it to $129,000?
25  A.   That's correct.

Rough Draft of Peter Vessenes                                    In re Alydian

1   Q.   Can you explain that?
2   A.   Yes, I can.  Would you like me to?
3   Q.   Yes, please.
4   A.   So Alydian carries -- Alydian is accumulating
5   assets, and, you know, we feel the most tax efficient way
6   to keep track of what we're doing.
7        Now, when you do asset accumulation, you book
8   the assets you acquire at cost.  So if you are going to
9   dig gold out of the ground, you take the cost of digging
10  the gold out and you book the gold at cost.  Oil the same
11  thing.
12       So Alydian's balance sheet is going to show
13  bitcoins at the cost of producing them, and when and if
14  Alydian sells coins, uses them to buy things, hosting and
15  other things, they're then converted into dollars at the
16  value agreed on, and you then would book revenue for them
17  then, but you don't book it as revenue and you don't mark
18  it to market ahead of time.
19       So when we discussed this with the attorney for
20  the trustee, because the balance sheet is -- I mean, it
21  gives you no help in determining how many bitcoins
22  Alydian has, right?  I mean, you can't scan this balance
23  sheet and understand how many bitcoins.  And so we're
24  providing the trustee with that same report we gave you
25  guys, the transactional list by date, so you can just sum

1   up how many coins Alydian actually has.
2        And then for this next month, they also want an
3   end-of-month mark-to-market price for them, but that
4   won't go on this balance sheet because that's not like
5   the advice Moss Adams has given Alydian.  The advice we
6   have gotten from the CPA firm is that bitcoins should be
7   booked at the cost of generating them.
8   Q.   So it cost Alydian 130,000 bucks to mine $1.6
9   million in bitcoins?
10  A.   Yes.  Again, we've been over the budget and so
11  on.  Some of the costs, some costs are accrued to like
12  the cost basis accounting for the coins and some aren't.
13  I don't understand all the accounting mechanics, but
14  that's how much cost the accountant say should be accrued
15  to those coins.
16  Q.   So it cost compared to the value, so the cost
17  of 100 -- it cost Alydian $130,000 to mine the value of
18  $1.6 million bitcoins as of November 30th?
19  A.   Well, no.  Well, I mean it cost Alydian
20  approximately 330,000 to mine those coins.  However, of
21  those costs, you know, 130,000 of them are sort of
22  bookable as the bitcoin cost on the balance sheet.
23  Q.   Who is the accountant that is providing this
24  advice?
25  A.   Moss Adams.

1   Q.   Is there anyone in particular at that firm?
2   A.   There is, probably.  I don't know their name,
3   though.
4   Q.   You don't know the person at Moss Adams who is
5   assisting with these schedules?
6   A.   No.
7   Q.   Prior to signing off on this submission, did
8   you have any questions for the accountants or did you
9   just take it at face value and sign it?
10  A.   No.  I've been through this cost base
11  accounting conversation over quite some period of time,
12  and I'm comfortable with it.
13       A bitcoin mining company -- I think you will
14  find this quite standard -- is going to book their
15  bitcoins at cost, and it, A, saves a whole bunch of work
16  recalculating the balance sheet every day based on market
17  changes and, B, is appropriate for what they did.  They
18  went out and made their coins.  They cost what they cost
19  to make.  And so in a circumstance like --
20  Q.   I'm sorry?
21  A.   In circumstances like that, in extractive
22  industries, as well as bitcoin mining, you often just
23  create a management report that provides more use full
24  data for people, and that's what we're doing for the
25  trustee and we're doing internally, so.

1   Q.   Well, isn't it more accurate from an accounting
2   standpoint to actual market to market your assets on a
3   daily basis so you understand the overall health of a
4   company?
5   A.   You just told me you're not a balance sheet
6   guy.  I'm telling you CPA's and extractive industries say
7   you should book these assets at cost.  It's far more tax
8   fitter for the debtor which is going to hit all the
9   creditors like you want a tax efficient treatment on this
10  Mike, believe me, and I mean this is the proper way to do
11  cost base accounting for asset accumulation.
12  Q.   So what is included in inventory of
13  1.55 million?
14  A.   So that's mining rigs and systems less
15  depreciation.  Yeah, I guess we're pulling depreciation
16  out on this fixed asset.  Let me see.  Hold on.  This is
17  as of November 30th.  I would -- mmm.  Okay, so let me
18  read through these.  We've got inventory and then below
19  fixed assets we've got deployed systems and then we've
20  got depreciation.
21       So I believe inventory, our systems that have
22  not yet been employed and are not running.  So as
23  November 30th there was $1.5 million in parts and systems
24  not yet deployed.  Again, that's the cost.  And then
25  there's equipment.  The deployed equipment was $547,000.

Page 225

1  Above we have accumulated 364,000 of depreciation.
2      Q.   Where are -- forgive me.  Are the mining rigs
3  only included in deployed systems, or are they also
4  included in inventory?
5      A.   When they're in inventory they're not yet
6  running and once they are running, they're in deployed
7  systems.  So the snapshot you see here at the end 69
8  November shows that we had a lot of stuff not yet out and
9  deployed for hosting.
10     Q.   So this 1.5 million in inventory and five
11  hundred thousand in equipment, let's call it $2 million
12  for the sake of round numbers, this $2 million of
13  inventory and equipment is what you contend now has a
14  spot value of $6.2 million?
15     A.   Well, I didn't -- well, if you could sell it
16  all at spot, as of the date of the declaration, it would
17  generate about the $6 million.
18          As I say in my declaration, the market are
19  quite illiquid, and so you would move the market around a
20  lot putting even a tenth of our capacity on to it.  So we
21  don't know the accurate market price, and I've said that
22  a number of times.  I don't think we will until we get
23  bidders in.
24     Q.   You have under liability other accounts payable
25  and notes payable.  Can you walk through the bottom half

Page 226

1  of this balance sheet?
2      A.   Other accounts payable, those would be
3  purchases that CoinLab made on Alydian's behalf that have
4  not yet been paid for as of November 30th.  Notes payable
5  would be prebuyers, and the Cartmell contracts, I
6  believe.  No, the bitcoins due investors...
7          MS. GLYNN LEVIN:  Those are post-petition.
8          THE WITNESS:  Oh, yeah, so it's post-petition.
9  So I guess I would, you know, I would I'm not sure
10  exactly how those total up.  But I would think between
11  notes payable and other we've got all the pre-buy
12  contracts and the cart contract.
13  BY MR. REYHANI:
14     Q.   Did you review this document before your
15  testimony today in preparation for your testimony today?
16     A.   I haven't seen this since we filed it, no.
17     Q.   So if you can't answer the bottom half of this
18  balance sheet as to what stands for what, would there be
19  a better person to ask these questions of?
20     A.   Would you -- I mean, I'm happy to provide you
21  what line items of the notes payable account and the
22  other, if you would like to see them.  Would that help
23  you?
24     Q.   If there's a breakdown as to pretty much this
25  whole entire balance, that probably would be helpful,

Page 227

1  yes.
2      A.   I mean yeah, we can go into QuickBooks and get
3  you a more detailed report of the balance sheet.  I don't
4  mind.
5      Q.   Okay, I welcome that.  But your accountant at
6  moss add documents who you don't know the person's name
7  is the one who recommended that this is how the
8  information be inputted on this balance sheet, correct?
9      A.   They provided the advice on the cost base
10  accounting for bitcoin mining, yes.
11     Q.   Let's turn the page, please.  If you could
12  explain the data on this page, I would appreciate it.
13     A.   What page are you on?
14         MS. SIMONYAN:  Four.
15  BY MR. REYHANI:
16     Q.   Page 4 of 17 as filed.
17     A.   What do you want to know?  About it?  We have
18  summed up the liabilities column.  There's $882,417 in
19  capital stock.  That would be the capital call conceived
20  of on the August 29th document, CoinLab's 550K and
21  Cartmell's 2,500 bitcoins.  There's the initial seed
22  round from Cartmell of $500,000. (Chk doc
23         Retained earnings is -- you would sum up the
24  sort of like carry forward losses and earnings of the
25  corporation so far.  So that will be the offset you will

Page 228

1  take against any income the IRS assesses against the
2  company.
3          The negative equity shows the company is
4  insolvent.  Anything else I can tell you there?
5      Q.   Now, if could you turn to the next page,
6  please.
7      A.   Yes.
8      Q.   What is the depreciation of 290,000 in the
9  third column towards the bottom?
10     A.   So we depreciate the mining rigs I think on a
11  five or six-month schedule assuming that they won't be
12  profitable to run after that period of time.  So
13  depreciation is just it's again it's accounting.  You are
14  trying to keep track of the value of your assets.  So
15  that's our charge against the rigs, basically, what we
16  think their hard asset value is.
17     Q.   When did the debtor determine design parameters
18  for Alydian's chips?
19     A.   It was an iterative process.  So it happened
20  over a long period of time.  Are there any design
21  parameters --
22     Q.   When did it start?
23     A.   What design parameters are you most interested
24  in?
25     Q.   What Alydian decided to go with 65 nanometer

Rough Draft of Peter Vessenes                                           In re Alydian

Page 229

1    chips.
2    A.   We decided to do that -- we actually had a --
3    we originally planned on 110-nanometer project as of
4    October, and we -- we sold some pre-buy contracts.  Two
5    things happened.  One is we sold enough pre-buy contracts
6    that it looked like we could jump processes a couple
7    jumps, and we also brought on Hans Olson who had better
8    relationships with foundries and Hans was able to get a
9    significantly cheaper quote for 65 nanometer chips than
10   we had seen so far.  And at the time that was the
11   smallest geometry anyone had announced for bitcoin
12   mining, as so we thought that made sense to do.  That was
13   probably Q1 of 2013, I guess.
14   Q.   And by October in your prior statement you
15   meant October 2012?
16   A.   October 2012 was -- around then we were
17   planning on a 110-nanometer process.
18   Q.   There were smaller chips on the market overall,
19   though, correct?
20   A.   I'm sorry, what do you mean?
21   Q.   There were smaller chips on the market overall,
22   like you could have 55 nanometers or 45
23   nanometers chips at that time, correct?
24   A.   What time?
25   Q.   When you elected to go with 65's.

Page 230

1    A.   So at the time, if we wanted to have a smaller
2    geometry, we would have needed significantly more money
3    for the mask.  We paid $400,000 for the mask for 65
4    nanometer.  And I think you know the next significant
5    process jump would have been close to a million dollars
6    just for the mask, no chips.  So yeah chip manufacturers
7    offered other chip sizes but not in our price range.
8    Q.   And the proof of work within the bitcoin
9    network uses the algorithm known as Shaw 256, correct?
10   A.   Among other things.
11   Q.   And that algorithm has been the same algorithm
12   since the creation of bitcoin in 2009?
13   A.   The bitcoin algorithm has not changed since
14   2009.
15   Q.   So anyone running mining equipment that runs
16   that algorithm Shaw 256 can participate in bitcoin
17   mining, correct?
18   A.   Anyone running the bitcoin mining algorithm can
19   participate in bitcoin mining.
20   Q.   We're at our last document, which is the if
21   Tereza would be kind enough to hand it out.  It is the
22   petition, the bankruptcy petition in this matter filed on
23   November 4th.  It's a ten page document, and we're
24   marking it as Exhibit 15.
25   MS. SIMONYAN:  You know I don't have that

Page 231

1    printed out.  Are you going to reference to specific
2    portions of the document, because I can print it out
3    fairly quickly.
4    MR. REYHANI:  You know, if it's easier, I will
5    withdraw that exhibit for now, and.
6    BY MR. REYHANI:
7    Q.   And do you generally understand what
8    information the debtor was required to provide to the
9    Court in connection with its bankruptcy petition?
10   A.
11   MR. TOWNSEND: Objection that calls for a legal
12   conclusion, vague, ambiguous.  It calls for a narrative.
13   BY MR. REYHANI:
14   Q.   Do you understand that debtor is obligated to
15   advise the court of all of its assets in the bankruptcy
16   proceeding?
17   MS. GLYNN LEVIN:  Objection.
18   MR. TOWNSEND:  Objection.
19   MS. GLYNN LEVIN:  Calls for a legal conclusion.
20   BY MR. REYHANI:
21   Q.   What is your understanding of what you are
22   required to provide the court in the bankruptcy
23   proceeding on behalf of the debtor?
24   A.   , I mostly just relied on my lawyers to tell me
25   what to put together.  I'm not a bankruptcy expert or a

Page 232

1    lawyer.  If they said put some documents into the court
2    or file them or if the judge has requested something or
3    the trustee has requested something, we try to be
4    responsive to that.
5    Q.   What types of information do you believe that
6    you are supposed to provide to the Court?
7    A.   Again like I said, I don't know about supposed
8    to.  I think we have provided lists of what Alydian has
9    what we think it owes, key contracts, you know future
10   plans, information about the estate that we think would
11   be useful to creditors and the trustee and the judge.
12   Q.   Who did you discuss the bankruptcy filing with
13   prior to filing the petition?
14   A.   Deirdre Glynn Levin, Brian Cartmell, Joel
15   Yarmon.
16   Q.   Who was the first person?  I'm sorry, I
17   couldn't hear you?
18   A.   Deirdre Glynn Levin, my attorney.
19   MS. GLYNN LEVIN:  Right here.
20   THE WITNESS:  And roger towns.
21   BY MR. REYHANI:
22   Q.   Joel Yarmon who else?
23   A.   Joe Yarmon Brian Cartmell and roger Townsend.
24   Q.   We noticed that the debtor filed proofs of
25   claim on behalf of a number of creditors.  Are you aware

Rough Draft of Peter Vessenes                                                    In re Alydian

Page 233

1   of that?
2      A.   No.  I was not aware of that.
3      **Q.   Do you know?**
4      A.   No, maybe I was.  What does that mean, Bryan?
5   Can you explain?  I just want to see.
6          MS. GLYNN LEVIN:  He has to show them to you.
7   BY MR. REYHANI:
8      **Q.   Are you aware that the debtor Alydian filed**
9   **proofs of claim on behalf of a number of creditors in**
10  **this action?  If you are not aware, you are not aware?**
11     A.   I'm not sure.  If you have got something for me
12  to look at I would be happy to look at it and tell if I
13  knew about it but I'm not sure based on just that.
14     **Q.   Have you spoken with any creditors in this**
15  **matter about filing a claim on their behalf?**
16     A.   No, I don't think so.  That I would file a
17  claim on behalf of another creditor?
18     **Q.   That the debtor would file a claim on behalf of**
19  **a creditor.**
20     A.   Is the debtor filing claims on behalf of other
21  creditors.  Not to my knowledge.
22     **Q.   Has the debtor been communicating with any**
23  **creditors?**
24     A.   Of course.  For instance, I am a creditor.
25     **Q.   What other creditors?**

Page 234

1      A.   The debtor communicates with communicated with
2   Dan Gallancy with Joel Yarmon, with Brian Cartmell, Peter
3   Vessenes, CoinLab, Inc., Ming Lung Chung, Soule
4   Investments.
5      **Q.   Who was the one before Soule?  I couldn't hear**
6   **you, I'm sorry.**
7      A.   He's one of your clients.  Ming.  Okay.  Let me
8   see who else I remember.
9          Christopher Koss.  Bobby Seidensticker.  Jon
10  Chin.  I think that's the list, to the best of my
11  recollection.
12     **Q.   How are you communicating with the creditors?**
13     A.   Mostly by phone, I think.
14     **Q.   Who have you had telephone discussions with?**
15     A.   Ming.  I suppose Ming is not a creditor of
16  Alydian, actually.  I've had -- since when?  Ever?
17     **Q.   Post-petition.**
18     A.   Post-petition.  Cartmell.  Phone conversations,
19  Yarmon, Chris Koss, Bobby Seidensticker.  That might be
20  all.  Jon Chin, maybe.  I'm not sure about John.
21     **Q.   You said Roger Vierra (chk spell)?**
22     A.   I have not spoken to Roger Vierra on the phone
23  post-petition.
24     **Q.   Barry Silbert?**
25     A.   I have talked to Barry Silbert.

Page 235

1      **Q.   What did you guys discuss?**
2      A.   That Alydian is in bankruptcy and he just
3   wanted, as a creditor, to know what the plan was.
4      **Q.   Did he have any recommendations?**
5      A.   I think he liked our plan.
6      **Q.   He liked your plan to reject his purported**
7   **executory contract?**
8      A.   No, we didn't discuss that.  He liked our plan
9   to sell the mining rigs and get money to the creditors as
10  quickly as possible.
11     **Q.   You said you had a discussion with Soule,**
12  **S-O-U-L-E?**
13     A.   Yeah, we spoke with Jack Zwick from Soule.
14     **Q.   And what was the contents of your discussion?**
15     A.   Mmm, I don't remember.  Let me think.  He
16  wanted to get Alydian to pay him out early.  I don't
17  remember exactly.  I think he wants more -- he wanted
18  more than a refund on his coins.  That was the upshot of
19  the conversation.  We didn't talk a lot of details,
20  though.
21     **Q.   I have nothing further at this time.  We're**
22  **going to leave the record open if after the documents**
23  **that were provided late last night.  We need to review**
24  **additional documents.  We need the information that we**
25  **requested today hopefully in due course, and so we can**

Page 236

1   **follow up hopefully at a convenient time for everyone in**
2   **the coming days or weeks, and behalf of Bitvestment I do**
3   **appreciate your time, Mr. Vessenes, and yours as well as**
4   **Ms. Glynn Levin and Mr. Townsend.  And, Tereza, anything**
5   **on your end?**
6          MS. SIMONYAN:  No.  I have nothing further.
7          MS. GLYNN LEVIN:  So we are expecting some
8   documents under 2004 to be produced by Bitvestment.
9          THE WITNESS:  Yesterday.
10         MS. GLYNN LEVIN:  As well.  I don't think we
11  received anything.
12         MR. REYHANI:  Are we done.
13         MS. GLYNN LEVIN:  We can go off the record.
14         MR. REYHANI:  That concludes it.
15
16         (Deposition concluded at 4:57 p.m.)
17
18         (By agreement between counsel and
19          the witness, signature was reserved.)
20          --oOo--
21
22
23
24
25

# EXHIBIT C

**Amended SOFA 3(b) and (c)**

## CoinLab

Invoice List byDate
All Dates

| Invoice Date | Invoice Number | Invoice Amount | Invoice BTC Equivalent (See note 1) | Average BTC rate for invoice (See note 2) | USD Pymt Date #1 | Type of Pymt | Amount of Payment | USD Pymt Date #2 | Type of Pymt | Amount of Payment | Equity and Bankruptcy Tx | Type of Credit | Amount of Payment | BTC Pymt Date #1 | Type of Pymt | Amount of Payment | Invoice Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/01/2012 | 1014 | 25,000.00 | | | 11/21/12 | USD | $ 25,000.00 | | | | | | | | | | 0.00 |
| 12/01/2012 | 1002 | 22,133.03 | | | 12/2/12 | USD | $ 22,133.03 | | | | | | | | | | 0.00 |
| 12/27/2012 | 1004 | 39,872.51 | | | 12/27/12 | USD | $ 39,872.51 | | | | | | | | | | 0.00 |
| 12/27/2012 | 1005 | 25,000.00 | | | 12/27/12 | USD | $ 25,000.00 | | | | | | | | | | 0.00 |
| 01/09/2013 | 1006 | 5,062.20 | | | 1/10/13 | USD | $ 4,602.00 | 1/16/13 | USD | $ 460.20 | | | | | | | 0.00 |
| 01/15/2013 | 1007 | 29,173.90 | | | 1/16/13 | USD | $ 29,173.90 | | | | | | | | | | 0.00 |
| 01/28/2013 | 1009 | 21,665.10 | | | 1/29/13 | USD | $ 21,665.10 | | | | | | | | | | 0.00 |
| 01/29/2013 | 1010 | 26,657.86 | | | 2/1/13 | USD | $ 26,657.86 | | | | | | | | | | 0.00 |
| 02/01/2013 | 1011 | 25,000.00 | | | 12/2/12 | USD | $ 10,000.00 | 2/8/13 | USD | $ 15,000.00 | | | | | | | 0.00 |
| 02/07/2013 | 1016 | 13,569.19 | | | 2/8/13 | USD | $ 13,569.19 | | | | | | | | | | 0.00 |
| 02/11/2013 | 1019 | 1,749.00 | | | 2/12/13 | USD | $ 1,749.00 | | | | | | | | | | 0.00 |
| 02/14/2013 | 1020 | 9,656.55 | | | 2/14/13 | USD | $ 9,656.55 | | | | | | | | | | 0.00 |
| 02/25/2013 | 1023 | 39,674.80 | | | 2/26/13 | USD | $ 39,674.80 | | | | | | | | | | 0.00 |
| 02/27/2013 | 1024 | 8,557.82 | | | 2/27/13 | USD | $ 8,557.82 | | | | | | | | | | 0.00 |
| 03/04/2013 | 1025 | 25,000.00 | | | 3/4/13 | USD | $ 25,000.00 | | | | | | | | | | 0.00 |
| 03/12/2013 | 1026 | 32,938.46 | | | 3/12/13 | USD | $ 32,938.46 | | | | | | | | | | 0.00 |
| 03/12/2013 | 1027 | 3,293.85 | | | 3/12/13 | USD | $ 3,293.85 | | | | | | | | | | 0.00 |
| 03/14/2013 | 1028 | 11,177.84 | | | 3/14/13 | USD | $ 11,177.84 | | | | | | | | | | 0.00 |
| 03/22/2013 | 1029 | 40,260.00 | | | 3/22/13 | USD | $ 40,260.00 | | | | | | | | | | 0.00 |
| 03/28/2013 | 1034 | 4,754.75 | | | 3/28/13 | USD | $ 4,754.75 | | | | | | | | | | 0.00 |
| 03/28/2013 | 1035 | 56.91 | | | 3/28/13 | USD | $ 56.91 | | | | | | | | | | 0.00 |
| 04/02/2013 | 1036 | 27,058.22 | | | 4/2/13 | Credit | $ 10,000.00 | 4/4/13 | USD | 17,058.22 | | | | | | | 0.00 |
| 04/12/2013 | 1038 | 5,426.85 | | | 4/12/13 | USD | $ 5,426.85 | | | | | | | | | | 0.00 |
| 04/17/2013 | 1041 | 7,018.46 | | | 4/17/13 | USD | $ 7,018.46 | | | | | | | | | | 0.00 |
| 04/22/2013 | 1042 | 7,269.35 | | | 5/8/13 | USD | $ 7,269.35 | | | | | | | | | | 0.00 |
| 04/30/2013 | 1043 | 24,275.41 | | | 4/30/13 | USD | $ 24,275.41 | | | | | | | | | | 0.00 |
| 04/30/2013 | 1044 | 11,923.26 | | | 4/30/13 | USD | $ 11,923.26 | | | | | | | | | | 0.00 |
| 04/30/2013 | 1045 | 15,000.00 | | | 4/30/13 | USD | $ 15,000.00 | | | | | | | | | | 0.00 |
| 05/08/2013 | 1046 | 15,000.00 | | | 5/8/13 | USD | $ 15,000.00 | | | | | | | | | | 0.00 |
| 05/08/2013 | 1047 | 105,764.45 | | | 5/8/13 | USD | $ 105,764.45 | | | | | | | | | | 0.00 |
| 05/15/2013 | 1052 | 237,023.00 | | | 5/15/13 | USD | $ 237,023.00 | | | | | | | | | | 0.00 |
| 05/22/2013 | 1053 | 24,471.70 | | | 5/22/13 | USD | $ 24,471.70 | | | | | | | | | | 0.00 |
| 05/31/2013 | 1054 | 27,111.14 | | | 6/6/13 | USD | $ 27,111.14 | | | | | | | | | | 0.00 |
| 06/15/2013 | 1055 | 15,000.00 | | | 6/24/13 | USD | $ 15,000.00 | | | | | | | | | | 0.00 |
| 06/15/2013 | 1056 | 23,107.29 | | | 6/24/13 | USD | $ 23,107.29 | | | | | | | | | | 0.00 |
| 06/30/2013 | 1057 | 58,130.94 | | | 7/3/13 | USD | $ 58,130.94 | | | | | | | | | | 0.00 |
| 06/30/2013 | 1058 | 21,117.47 | | | 7/3/13 | USD | $ 21,117.47 | | | | | | | | | | 0.00 |
| 06/30/2013 | 1059 | 3,054.07 | | | 7/18/13 | USD | $ 3,054.07 | | | | | | | | | | 0.00 |
| 06/30/2013 | 1060 | 1,520.86 | | | 7/18/13 | USD | $ 1,520.86 | | | | | | | | | | 0.00 |
| 07/17/2013 | 1061 | 57,415.39 | | | 7/18/13 | USD | $ 57,415.39 | | | | | | | | | | 0.00 |
| 07/25/2013 | 1062 | 97,635.85 | 1,053.27852798 | | 8/12/13 | USD | $ 81,513.37 | 8/16/13 | USD | $ 1,000.00 | 8/31/13 | Equity | 15,122.48 | | | | 0.00 |

**13-19746-KAO. Page 1 of 2**

**Amended SOFA 3(b) and (c)**

| Date | Inv | Amount | BTC | Rate | Date | Type | Amount | Date | BTC | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/31/2013 | 1063 | 61,722.51 | | | 8/31/13 | Equity | 61,722.51 | | | | 0.00 |
| 07/31/2013 | 1064 | 235,535.78 | | | 8/31/13 | Equity | 235,535.78 | | | | 0.00 |
| 08/07/2013 | 1065 | 136,454.77 | | | 8/31/13 | Equity | 136,454.77 | | | | 0.00 |
| 08/19/2013 | 1066 | 104,261.03 | | | 8/31/13 | Equity | 104,261.03 | | | | 0.00 |
| 08/31/2013 | 1067 | 221,589.36 | 1,816.70437590 | 121.97326265 | 8/31/13 | Equity | 2,584.23 | 10/31/13 | 1,795.51751950 | 219,005.13 | 0.00 |
| 09/12/2013 | 1068 | 287,068.77 | 2,337.61252850 | 122.80425712 | | | | 10/31/13 | 2,337.61252850 | 287,068.77 | 0.00 |
| 09/19/2013 | 1069 | 719,574.80 | 5,739.76941410 | 125.36649961 | | | | 10/31/13 | 5,739.76941410 | 719,574.80 | 0.00 |
| 09/30/2013 | 1070 | 294,240.17 | 2,352.53304470 | 125.07376705 | | | | 10/31/13 | 2,352.53304470 | 294,240.17 | 0.00 |
| 10/15/2013 | 1071 | 239,054.58 | 1,861.62369739 | 128.41186988 | | | | 10/31/13 | 1,861.62369739 | 239,054.58 | 0.00 |
| 10/30/2013 | 1072 | 580,809.69 | 3,083.44959521 | 188.36360773 | 11/1/13 | BKRP Claim | $389,765.00 | 10/31/13 | 1,014.23354705 | 191,044.69 | 0.00 |
| 10/31/2013 | 1073 | 13,450.26 | 66.90007461 | 201.04999999 | 11/1/13 | BKRP Claim | $ 13,450.26 | | | | 0.00 |
| TOTALS | | 4,088,339.20 | | | $   1,145,936.58 | | $ 33,518.42 | | $958,896.06 | | $   1,949,988.14 |

Note 1:  Number of bitcoins owed per invoice are calculated based on the date CoinLab made payment to vendor on behalf of Alydian.  The "weighted price" rate posted by Bitstamp on the day prior to payment is always used.  Thus one invoice will use more than one rate because each invoice includes more than one payment.

Note 2:  The "Average BTC Rate per Invoice" is an internal number calculated as:  The USD amount of the invoice divided by the "Number of bitcoins" owed for that invoice.  It represents the average rate of the bitcoin used for one particular invoice.  This allows the Company to allocate partial payments for an invoice.

Note 3:  On 2/1/13, Invoice #1011 was issued from CoinLab to Alydian.  It included a "prepayment" made to Keterex on 12/4/12 made by CoinLab on behalf of Alydian.  CoinLab asked Alydian to prepay CoinLab as well, so Alydian paid CoinLab $10,000 on 12/2/12 for this expense.  CoinLab did not place it on an invoice until 2/1/13.

# EXHIBIT D

Hon. Karen A. Overstreet
*Ex Parte*

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CLI HOLDINGS, INC. dba ALYDIAN, | ) | NO. 13-19746 |
| | ) | |
| Debtor. | ) | EX PARTE MOTION TO |
| | ) | SHORTEN TIME |

## I.   RELIEF SOUGHT

COMES NOW, CLI HOLDINGS, INC. dba ALYDIAN ("Alydian") by and through its

attorneys, Deirdre Glynn Levin and Keller Rohrback, and seeks that the Court enter an order to

shorten time to hear Alydian's Motion to Approve Bidding Procedures and Sale of Assets under

11 U.S.C § 363.  This motion is based on the records and files herein, and on the supporting of

Peter Vessenes.

## II.   FACTS

Alydian is seeking an order to sell its assets which consist of bitcoin mining rigs.  The

market price for bitcoin mining is volatile, and it appears it is trending downwards.  *See*

Vessenes Declaration.  Market prices have dropped significantly.  *Id*.  The hearing to approve

bidding procedures and the sale hearing should be expedited because Bitcoin mining companies

EX PARTE MOTION TO SHORTEN TIME (13-19746) Page - 1

N:\Clients\29744\1\Pleadings\363.Sale\Shorten time.122313\MtnToShortenTime.122313.doc

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

are planning on delivering mining rigs in the first two quarters of 2014 in large numbers.  Also,

Alydian wants to sell its rigs before these are delivered by competitors, which may afford a

better market and a higher price for its assets.

Also, employees are only committed to providing services to Alydian until the end of

January 2014.  Alydian needs to ensure it has sufficient time to transition the rigs to a purchaser

or purchasers while employees are still available to assist with the transition.

## II.    ARGUMENT

LBR 9013-1(d)(3)(C) allows the court to shorten time on showing of exigent

circumstances.  Mr. Vessenes has testified that Alydian needs to sell the assets of this estate.

Waiting until the court's next calendar on January 17, 2014 will be a detriment to the estate.  The

circumstances are clearly exigent.  Alydian requests that the Court enter an order shortening time

so that its underlying motion may be heard on January 3, 2014 or as soon as possible thereafter.

## III.    CONCLUSION

For the reasons stated herein, respectfully, the Court should grant the motion for an order

to shorten time to hear the underlying motion.  A copy of a proposed order is attached as an

exhibit hereto.

DATED this 23rd day of December 2013.

KELLER ROHRBACK L.L.P.

By: */s/Deirdre Glynn Levin*
    Deirdre Glynn Levin, WSBA #24226
    Attorneys for Alydian

Presented by:

KELLER ROHRBACK L.L.P.

By: */s/Deirdre Glynn Levin*
    Deirdre Glynn Levin, WSBA #24226
    Attorneys for Debtor CLI Holdings, Inc. dba Alydian

EX PARTE MOTION TO SHORTEN TIME (13-19746) Page - 2

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

N:\Clients\29744\1\Pleadings\363.Sale\Shorten time.122313\MtnToShortenTime.122313.doc