UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
BITVESTMENT PARTNERS LLC,                                    :
:
                                        Plaintiff,           :
:
                          -against-                          :
:                          13 Civ. 7632 (RWS)
:
COINLAB, INC., CLI HOLDINGS, INC., ALYDIAN :
INC., PETER VESSENES, and JOHN DOE,                          :
:
                                        Defendants.          :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SUPPLEMENTAL DECLARATION OF BRYAN REYHANI IN SUPPORT OF**
**PLAINTIFF'S PRELIMINARY INJUNCTION**

BRYAN REYHANI declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am an attorney duly admitted to practice before the Bar of this Court and am a

partner at the law firm Reyhani Nemirovsky LLP, attorneys for Plaintiff in this action.

2.      I make this supplemental declaration pursuant to Local Rule 6.1(d) and in support

of Plaintiff's preliminary injunction continuing the restraints set forth in the second Temporary

Restraining Order and requiring Defendant CoinLab Inc. to turn over to Bitvestment's counsel

7,984.006735 bitcoins to be held in escrow pending the conclusion of this matter, and employ

best efforts as set forth in the proposed accompanying order or, alternatively, requiring the

immediate delivery of the 7,984.006735 bitcoins in Defendants' control to Plaintiff.

3.      In support of Plaintiff's Supplemental Memorandum, I attach as Exhibit A hereto

a true and correct copy of the U.S. Bankruptcy Court, Washington State, *In re CLI HOLDINGS,*

*INC. dba ALYDIAN*, No. 13-19746-KAO ("Bankruptcy Proceeding") January 10, 2014

Transcript of the hearing before the Honorable Karen A. Overstreet.

4.       The following transcript excerpts are particularly relevant to the issues currently

before the Court.

i.   **The Court questions whether CoinLab, not Alydian, owns the mining rigs**:

THE COURT: You have Exhibit 1 that has a really detailed listing, and some of the items on there have large values ascribed, but where do I actually find the rigs on Schedule B?

MS. GLYNN LEVIN [DEBTOR ALYDIAN'S COUNSEL]: I'm not sure that the rigs -- well, I should be careful about saying that.

THE COURT: And I only ask because in Exhibit N, the operations agreement that Mr. Vessenes signed post-petition, it says, "In order to implement the system Alydian requires, and CoinLab is willing and able to provide, use of CoinLab's computer hardware, mining rigs, mining chips, inventory, hosting contracts, offices, etc.," which implies to me that it's CoinLab which owns the rigs and not the debtor.

Tr. 12:13-13:1

ii.   **The Court questions bonus payments made by Alydian to CoinLab employees post-petition**:

MS. GLYNN LEVIN: The actual bonuses that were paid in December were only a total of $46,000 to two of the three members of the team.   . . .

THE COURT: So I'm trying figure out --

MS. GLYNN LEVIN: Yes.

THE COURT: -- how in a Chapter 11 proceeding the debtor pays random bonuses without any court approval at all and without demonstrating that there's a contract in place.

MS. GLYNN LEVIN: Well, they --

THE COURT: How does that happen?

MS. GLYNN LEVIN: They --

THE COURT: I haven't read the bankruptcy code provision, but there is even a provision in the bankruptcy code for the payment of incentive compensation.

MS. GLYNN LEVIN: There are, and they are not employees of the debtor. They are employees of CoinLab.

THE COURT: So that concerns me even more. Now what you're saying is the debtor agreed to pay significant incentive compensation to employees of an insider without any court approval at all.

Tr. 23:15-24:1

    iii.    **The Court finds Mr. Vessenes is not a credible witness**

THE COURT: Well, I'm not satisfied that there isn't some hiding of information, . . .

. . .

THE COURT: I know full well that our -- one of our panel trustees is likely not going to be able to operate this business, so we need to find a way to get some money to creditors that makes sense.  But if you're asking me am I satisfied with the credibility of Mr. Vessenes? No, I am not.

Tr. 39:15-40:1

    iv.    **The Court is concerned about transfers of money to CoinLab**

THE COURT: I mean, my preference would certainly be that CoinLab shouldn't be paid anything except by a motion and order of the Court, or somebody needs to be looking at the invoices.  Because this is a lot of money being transferred to what is clearly an insider.

MS. GLYNN LEVIN: Yes.

THE COURT: Before and after bankruptcy with virtually no oversight by anyone, and that concerns me.

Tr. 41:17-24

    v.    **The Court is concerned that Mr. Vessenes was caught [lying] at his deposition**

THE COURT: I guess I don't understand how the mining works such that when the November monthly report was filed on December 17th, it showed no revenue, and it wasn't until the day after Mr. Vessenes's deposition that it was amended to show $1.8 million.

. . .

THE COURT: Well, he's not testifying. I mean, here's the problem. I am being left with the impression that Mr. Vessenes got caught at his deposition when confronted with these numbers and had to disclose them --

MS. GLYNN LEVIN: No.

THE COURT: -- that, in fact, the company had earned $1.8 million. And the debtor needs to do something to dispel that impression.

Tr. 58:1-7 and 60:15-22

> vi.   **The Court questions whether transfers to CoinLab by Alydian are valid**

THE COURT:  With regard to CoinLab, I am not satisfied with these huge payments to CoinLab without any court approval. We have post-petition agreements and payments; prepetition, possibly; very large preference transactions.

Tr. 121:23-122:4

> vii.   **The Court determines that the operating agreement between Alydian and CoinLab is invalid**

THE COURT:  Post-petition contracts. I suppose the debtor could argue this was in the ordinary course of business, but I'm going to say it's not. A contract signed between the debtor and a related entity which is signed by the person that I am counting on to be in charge of the debtor in possession, Mr. Vessenes, when he signs with both hats on, I have to have all of my systems on high alert.  And with a contract like this, it says a number of things that are interesting in the proprietary materials section. We actually have, "CoinLab hereby assigns and transfers to Alydian, without separate consideration, all right, title, and interest that CoinLab may have in the proprietary materials." I don't know what that means or why that's in here, but things like that concern me when the person who is supposedly the business person interacting with Ms. Glynn Levin has signed on behalf of both companies. This is not valid until there is a motion to approve it, notice to creditors, and an order signed by me.

Tr. 125:11-126

> viii.   **The Court is considering dismissing the case sua sponte**

THE COURT:  [T]his is in reality a two-party dispute, and I agree with that, and I am very close to sua sponte dismissing this case and letting the parties just fight it out in state court or in federal court in New York, where perhaps they ought to be.

Tr. 119:2-6.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of January 2014, New York, New York.

_/s/ Bryan I. Reyhani_
Bryan I. Reyhani

# EXHIBIT A

1              UNITED STATES BANKRUPTCY COURT

2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    -----------------------------------------------------
                                         )
4    In Re:                              ) No. 13-19746-KAO
                                         )
5    CLI HOLDINGS, Inc. d/b/a ALYDIAN,   )
                                         )
6              Debtor.                   )
                                         )
7    -----------------------------------------------------

8                          HEARING

9          Before the Honorable Karen A. Overstreet

10                    January 10, 2014

11             Digitally Recorded Proceedings

12   -----------------------------------------------------

13

14

15

16

17

18

19

20

21

22

23   Transcribed by:    Shanna Barr, CETD

24                      Reed Jackson Watkins

25                      206.624.3005

```
 1                     A P P E A R A N C E S

 2

 3          For CLI Holdings Inc.:

 4              DEIRDRE GLYNN LEVIN
                Keller Rohrback LLP
 5              1201 Third Avenue
                No. 3200
 6              Seattle, Washington 98101

 7

 8          For Bitvestment Partners LLC f/k/a Dalsa Barbour LLC:

 9              TEREZA SIMONYAN
                Lane Powell PC
10              1420 Fifth Avenue
                Suite 4200
11              Seattle, Washington 98101

12

13          For Soule Investments:

14              JERRY N. STEHLIK
                Bucknell Stehlik Sato & Stubner LLP
                2003 Western Avenue
15              Suite 400
                Seattle, Washington 98121
16

17          For CoinLab:

18              JANE PEARSON
                Foster Pepper PLLC
19              1111 Third Avenue
                Suite 3400
20              Seattle, Washington 98101

21

22          Also Present:

23              WENDY WALLACE
                General Counsel for CoinLab
24

25
```

```
1                      January 10, 2014

2                        --oo0oo--

3

4           THE COURT:  Good morning.  Please have a seat.

5           MR. STEHLIK:  Good morning, Your Honor.

6           THE COURT:  All right.  This is the time that I

7    have set for the case CLI Holdings, Inc.  It's Case

8    No. 13-19746.  It is a motion to establish bidding

9    procedures in connection with a proposed sale.  So what

10   I'd like to do is start with appearances for the record.

11          Ms. Glynn Levin, we can start on your side.

12          MS. GLYNN LEVIN:  Thanks.  Deirdre Glynn Levin on

13   behalf of the debtor, Your Honor.  And next to me is the

14   principal of my client, Peter Vessenes.

15          THE COURT:  All right.

16          MS. GLYNN LEVIN:  And he is available today to

17   testify orally if that's what the Court --

18          THE COURT:  Okay.  I don't normally -- wouldn't

19   normally take --

20          MS. GLYNN LEVIN:  Yes.

21          THE COURT:  -- testimony on my calendar, but go

22   ahead.

23          Ms. Simonyan?

24          MS. SIMONYAN:  Your Honor, Tereza Simonyan on

25   behalf of Bitvestment Partners LLC.  Good morning,
```

1       Your Honor.

2              MR. STEHLIK:  Good morning, Judge.  Jerry Stehlik

3       on behalf of Soule Investments LLC, a creditor.

4              MS. PEARSON:  And, Your Honor, Jane Pearson here

5       this morning for CoinLab.  And with me is general counsel

6       for CoinLab Wendy Wallace.

7              THE COURT:  All right.  Ms. Glynn Levin, it's your

8       motion, so why don't I turn the podium over to you first.

9              MS. GLYNN LEVIN:  Good morning, Your Honor.

10      Deirdre Glynn Levin again on behalf of the debtor, and it

11      is the debtor's motion under Section 363 to seek the

12      approval for bidding procedures.

13             The Court has had some familiarity with this case,

14      but I will briefly review for the record what I think are

15      the key facts, and would like to go through -- then

16      through the law and the elements that the debtor believes

17      it has -- will be able to establish by the end of today's

18      hearing, has established on the record, and then I'd like

19      to address the two objections that were filed.  One

20      objection was just filed yesterday at 5:00 p.m., so

21      suffice to say, there was --

22             THE COURT:  Okay.  Well, responses were due by

23      January 8th.

24             Yours was due later, right?  Right.  Because I

25      extended it, so it was timely.

1          MS. GLYNN LEVIN:  Oh, I'm not saying it wasn't

2     timely, Your Honor, just that there wasn't an opportunity

3     to prepare a written reply.  So to the extent I am able,

4     I am happy to address those in my oral arguments.  But

5     there are some specific factual allegations that seems

6     important to -- may be important on the record to refute,

7     although in my view, those are not related to the sale

8     motion.  They are -- there are other remedies available.

9          THE COURT:  Okay.  But in my view, they're the

10    elephant in the room.

11         MS. GLYNN LEVIN:  All right.

12         THE COURT:  Because if I can't trust the debtor to

13    operate post-petition in conformance with the code and I

14    can't trust the debtor's principal to use the monies as

15    required in a Chapter 11 proceeding, then we have a huge

16    problem.  So I do need you to address those factual

17    issues today.

18         MS. GLYNN LEVIN:  Well, I am happy to address

19    them, but they are -- I mean, they really require the

20    testimony because the basis for some of those objections

21    are in excerpts from a 2004 exam, which we saw, again,

22    yesterday for the first time after 5:00 p.m., and the

23    only way to really address them specifically is to be

24    able to allow Mr. Vessenes to testify.

25         THE COURT:  Okay.  Well, you can address them with

```
1       what you think his response will be to those contentions,
2       but I think fundamentally at issue in the case is whether
3       it makes any sense at all to sell equipment at this point
4       in time when the debtor appears to be generating
5       significant income through the mining of bitcoin.
6               MS. GLYNN LEVIN:  Yes.
7               THE COURT:  So you need to make that comparison
8       for me today.
9               MS. GLYNN LEVIN:  Absolutely.
10              THE COURT:  How much are we going to get for the
11      equipment versus how much is this debtor able to generate
12      on the monthly basis for the benefit of the creditors.
13              MS. GLYNN LEVIN:  Oh, absolutely, Your Honor.  And
14      there are -- this case is really all about time.  You
15      know, you might say, well, it's really all about bitcoin
16      or it's all about, you know, a virtual currency, but in
17      some ways it's all about time, and it's sort of a ticking
18      time bomb.  Not that it's going to explode, but rather
19      it's going to -- that the ability for the economic stream
20      and the business model is -- has changed so rapidly that
21      it makes it imperative to sell these rigs now.  And in
22      the debtor's business judgment, it is the right time to
23      sell them right now, and I'll go through that in a little
24      bit more detail.
25              I wanted to make sure that Your Honor had an
```

1    opportunity to see the supplemental declaration of

2    Mr. Vessenes that was filed on --

3         THE COURT:  I did --

4         MS. GLYNN LEVIN:  -- January 6th.  There are a

5    couple of exhibits to that declaration which I think are

6    really key and which perhaps with more elaboration can

7    help allay some of the Court's concerns.

8         So a little bit about the background to the --

9    again, we have a case that was filed on a fairly

10   expedited basis, November 1st, 2013, and the reason for

11   filing that, while it was alluded to, well, this is not a

12   case that was filed under sort of the typical debtor's

13   circumstances, in fact, it really was very typical in

14   that there was litigation that had commenced in the U.S.

15   District Court in New York, Southern District of New

16   York, and notably brought by the same creditor who is

17   objecting today, and that a stay of that proceeding was

18   necessary under 362.  And that actually triggered the

19   filing, and in the course of the next eight to ten weeks

20   we've seen an evolution of facts which will lead me up to

21   the point today where we assert that there are more than

22   adequate grounds for a sale.

23        First of all, how exactly does the debtor operate?

24   Your Honor heard at the 2004 hearing on December 30th

25   that there is an underlying operating agreement which

```
 1    memorializes the past operating protocols between one of
 2    the owners of the debtor -- that's CoinLab, Inc. --
 3    again, represented by Jane Pearson today -- who owns 65
 4    percent of the common stock.  The other owner is also a
 5    creditor.  And all creditor claims, by the way, have --
 6    shall I say the deadline has passed.  They have not all
 7    filed, but the deadline has passed.
 8            THE COURT:  Deadline for claims.
 9            MS. GLYNN LEVIN:  Correct.  The debtor is in this
10    arrangement, this operating agreement with CoinLab
11    whereby CoinLab sources out the vendors, sources out
12    the -- all the equipment, all the -- all of the parts,
13    really, for these --
14            THE COURT:  Okay.  But let me stop you for just a
15    second --
16            MS. GLYNN LEVIN:  -- mining rigs --
17            THE COURT:  -- because there's all kinds of stuff
18    going on in here, like there's ringing and there's
19    vibrating.  So if everybody could just turn whatever
20    these things are off.
21            MS. GLYNN LEVIN:  Let's make sure everything is
22    off.
23            THE COURT:  It's sort of interrupting the flow of
24    Ms. Glynn Levin's argument.  I think the buzzing has
25    stopped.
```

1          MS. GLYNN LEVIN:  Under that operation agreement,

2     the -- CoinLab invoices the debtor and the debtor

3     reimburses CoinLab for all of its products, all of its

4     inventory, everything that has been --

5          THE COURT:  So you're talking about their

6     prepetition operating agreement, right?

7          MS. GLYNN LEVIN:  It's --

8          THE COURT:  Because I think, according to the one

9     that Mr. Vessenes signed post-petition, it indicates that

10    they have operated under an informal working

11    relationship, so I don't believe I have seen a

12    prepetition written agreement between these two entities.

13         MS. GLYNN LEVIN:  To the best of my knowledge,

14    there is no --

15         THE COURT:  Okay.

16         MS. GLYNN LEVIN:  -- written agreement, but that

17    has been the protocol.  So the -- this operating

18    agreement memorializes the past and makes it clear as to

19    the companies' relative rights and responsibilities.

20    Under that arrangement, CoinLab invoices the debtor for

21    its direct costs plus an administrative fee up to ten

22    percent subject to a maximum of $5 ,000 per invoice.  All

23    of those invoices for the last year were turned over

24    in -- under the Rule 2004 production, and the SOFA --

25         THE COURT:  To Bitvestment?

1          MS. GLYNN LEVIN:  Yes.  And the SOFA 3(b) and 3(c)

2     were amended also to ensure that there was an index of

3     all of those invoice dates, dates of payments and

4     amounts, and there is a -- there's a sort of an

5     evolution.  At the beginning, those were paid in dollars.

6     Later they were paid in bitcoin, which is permitted under

7     the operating agreement.  CoinLab was not paid out in

8     full.  There were some points made about payments made

9     within the first few days prepetition --

10          THE COURT:  Two days before the petition.

11          MS. GLYNN LEVIN:  Prepetition.  Those were based

12     on documented invoices, and CoinLab is, in fact, not paid

13     out in full.  It is a general unsecured creditor, and

14     that's documented --

15          THE COURT:  So doesn't that make it like a really,

16     really large preference?

17          MS. GLYNN LEVIN:  They were -- one would need to

18     go through the preference analysis.

19          THE COURT:  One would need to go through that

20     because a payment of in excess of a million dollars two

21     days before the petition date would certainly be the

22     subject of a concern over preference recoveries.

23          MS. GLYNN LEVIN:  And we can certainly get into

24     that.  In terms of the dollar amount, I'm going to be

25     really careful about talking about dollar amounts when --

1    because these exchange rates that have been used, I mean,

2    they fluctuate in -- with a great deal of -- there's a

3    great deal of variation in them, so to say that there was

4    a transfer made in a certain amount of dollars, at least

5    in the objections that I've seen, there is no real way of

6    calculating how those dollar figures came up.  But it's

7    undeniable that those were amounts that were invoiced

8    over the prior couple of months.  There has been a

9    regular pattern -- invoice and then payments in either

10   dollars or bitcoin -- and CoinLab -- I mean, CoinLab is

11   essentially the only provider of services, goods and

12   services.

13            THE COURT:  But Ms. Pearson can represent

14   CoinLab --

15            MS. GLYNN LEVIN:  Yes.

16            THE COURT:  -- as to whether these were payments

17   in the ordinary course of business.

18            MS. GLYNN LEVIN:  Indeed.  Over the course of

19   approximately eight, nine months between December 2012

20   and August 2013, the debtor entered into this -- a number

21   of bitcoin service agreements, and essentially what those

22   were were presales with several customers.  The debtor

23   brought a motion to reject those as executory contracts.

24   Only two of those customers objected and a hearing took

25   place on December the 6th.  The Soule Investment hearing

1      was continued to next Friday, the 17th.  Bitvestment made

2      its arguments, and the debtor's motion was denied.  But

3      as to all the other customers, the executory contracts

4      have, in fact, been rejected under the Court's ruling.

5      And all of those creditors, again, except one, actually,

6      filed a proof of claim.  There are, as well, two other

7      creditors:  XRay Holdings, which is both a shareholder

8      and lender, has a $3 million claim; and as, again, I

9      said, CoinLab has a trade credit of over $400,000.

10            Let's get to the assets for the -- that are for

11     sale here.  I hope I have done an adequate job in my

12     pleadings to articulate what these assets are, and I --

13            THE COURT:  Well, I'm confused, to tell you the

14     truth, because I don't know what they're called.  If I

15     look on Exhibit B, where do you actually find them?  You

16     have Exhibit 1 that has a really detailed listing, and

17     some of the items on there have large values ascribed,

18     but where do I actually find the rigs on Schedule B?

19            MS. GLYNN LEVIN:  I'm not sure that the rigs --

20     well, I should be careful about saying that.

21            THE COURT:  And I only ask because in Exhibit N,

22     the operations agreement that Mr. Vessenes signed

23     post-petition, it says, "In order to implement the system

24     Alydian requires, and CoinLab is willing and able to

25     provide, use of CoinLab's computer hardware, mining rigs,

1      mining chips, inventory, hosting contracts, offices,

2      etc.," which implies to me that it's CoinLab which owns

3      the rigs and not the debtor.  So then when I go to

4      Exhibit B, I'm wondering, where are they?  What are they

5      called on here?

6           MS. GLYNN LEVIN:  So I had the same questions when

7      I started working on this case, so let me explain.  And I

8      might add that Schedule B was also amended, although it's

9      used, to add bitcoin balances held in accounts totaling

10     approximately $5,000 as of the petition date.  But

11     Your Honor is referring to, really, hardware.  So the

12     process is that CoinLab goes out, sources all of this,

13     brings in all of these parts from multiple vendors.  And

14     we're talking everything from the screws that the

15     computers are -- used to the chips.  Very, very

16     complicated rigs that are then put together into systems.

17     The Schedule B outlined some inventory, which are the

18     parts which were not yet put into systems.  In other

19     words --

20           THE COURT:  Right.

21           MS. GLYNN LEVIN:  -- the miscellaneous parts not

22     yet part of the -- of a launched system.  The launched

23     systems actually at the time of the -- at the filing,

24     there really weren't that many launched systems.  All of

25     those parts were in the process of being launched, and I

1    think as of --

2         Correct me if I'm wrong, around mid November, the

3    first systems were launched?  Would that be correct?

4         MR. VESSENES:  No.  The first ones were launched

5    in July.

6         MS. GLYNN LEVIN:  The first ones were launched in

7    July?

8         MR. VESSENES:  And then we just finished -- should

9    have finished today, I think, with the last ones.

10        MS. GLYNN LEVIN:  The last ones were finished

11   today.  So it's an evolving process, but -- so what we

12   have for sale today is really sort of the culmination of

13   all the services and parts and intellectual --

14        THE COURT:  Thirty-four systems.

15        MS. GLYNN LEVIN:  Correct, 34 systems.  The way

16   it's -- we have framed this for sale is rather by selling

17   the -- rather than selling them for system, in this

18   industry it's -- they are -- it's described as

19   "terra-hash," which is really power or, in my sort of

20   novice way of looking at this, is really kind of like

21   horsepower.  It's the power that a system has.

22        THE COURT:  Okay.  But doesn't that mean that you

23   would then amend Schedule B again to turn this work in

24   process into 34 systems which are generating a total of

25   170 terra-hashes of power?

1          MS. GLYNN LEVIN:  Actually, and approximately 200

2     now.  I mean, if we were to have to amend Schedule B

3     every time we added power, I would probably be amending

4     that --

5          THE COURT:  Right.  Agreed.

6          MS. GLYNN LEVIN:  -- multiple, multiple times

7     with --

8          THE COURT:  Then how do I figure out how the

9     debtor values these systems, and why is it that CoinLab

10    claims to own rigs in this agreement that Mr. Vessenes

11    signed for himself and CoinLab?  I mean, who --

12         MS. GLYNN LEVIN:  I'm not sure which agreement

13    you're looking at.

14         THE COURT:  Well, what I don't understand is we --

15    when we try to sell something in bankruptcy, we actually

16    have to demonstrate to the buyers what's being sold.  And

17    I think this is a question Mr. Stehlik asks --

18         MS. GLYNN LEVIN:  Yes.

19         THE COURT:  -- on behalf of his client.  Where is

20    the description of what is being sold, and does the

21    debtor have proof that the debtor actually owns what's

22    being sold?

23         MS. GLYNN LEVIN:  Absolutely, Your Honor.  I'm not

24    sure what agreement you're referring to that says that

25    the CoinLab owns --

1           THE COURT:  I'm referring to the operations

2     agreement dated November 4th, 2013, between CoinLab and

3     the debtor, which was clearly signed post-petition, and

4     it's signed by Mr. Vessenes as the managing director of

5     the debtor, and it's signed by Mr. Vessenes as the chief

6     executive officer of CoinLab.  And it says in the

7     recitals that CoinLab is willing and able to provide use

8     of its hardware, mining rigs, mining chips, inventory,

9     etc., making it sound like it's CoinLab that really owns

10    everything.  And the only thing referenced in this

11    agreement that appears to be owned by the debtor is

12    called proprietary materials.

13          MS. GLYNN LEVIN:  Well, those -- they may start

14    out being owned -- I mean, they are -- the parts which

15    then become launched into systems by the debtor start out

16    as being owned by CoinLab.  CoinLab pays for them, for

17    the parts, but then they are effectively manufactured.

18    Like any manufacturing process, it's going through a

19    series of steps, and in our timeline, in our sequence,

20    once those are -- once they are invoiced and the debtor

21    pays for them, then effectively they're owned by the

22    debtor.  I don't think -- certainly, counsel for CoinLab

23    can make these arguments as well, but there's no question

24    at all that the debtor owns these.  The debtor is on the

25    record saying it's selling them.  It has the rights to

1    sell them.  No one else is claiming the rights to sell

2    them or own them.

3         THE COURT:  So the debtor owns these 34 systems.

4    And I haven't seen the CoinLab invoices, so I don't know

5    whether -- I assume based upon the position you've taken

6    that they do not reserve a security interest in these

7    systems and that the monies they claim they are owed in

8    the proof of claim file are completely unsecured monies.

9         MS. GLYNN LEVIN:  Absolutely correct.  There is no

10   security.

11        THE COURT:  All right.

12        MS. GLYNN LEVIN:  There is no security instrument

13   at all here.  Does that --

14        THE COURT:  So based upon your evidence that's in

15   the record, what do you say is the value that the debtor

16   believes it can obtain by selling these 34 systems?

17        MS. GLYNN LEVIN:  Okay.  So let's go to value and

18   let's go to sale and let's go to the marketplace.

19        THE COURT:  Right.

20        MS. GLYNN LEVIN:  Because this isn't a selling --

21   these aren't selling used cars.  There's no Blue Book

22   value.  There's no appraisal where one comes in and

23   says -- you know, has an independent appraiser who has

24   special qualifications and says, "I think this is what

25   these are due."  In fact, the expert -- probably one of

1    the worldwide experts in what these things are valued at

2    is sitting to my right.  It's Mr. Vessenes himself.  And

3    the objections about the value, I noticed, were not

4    supported by any evidence at all other than some

5    miscellaneous excerpts of his own testimony.  There's no

6    other opposing testimony of any expert to say, you know,

7    you're selling these way too low or you're selling these

8    way too high so that, you know, no potential buyer could

9    ever potentially --

10            THE COURT:  Well, how I'm --

11            MS. GLYNN LEVIN:  -- would ever want to buy that.

12            THE COURT:  How I'm looking at it, though, is if

13    the debtor has income of $1.8 million for one month, the

14    first month of bankruptcy -- in other words, this is a

15    unique debtor because this debtor apparently doesn't

16    suffer any problems as a result of being in bankruptcy.

17    For example, a retail store everybody knows is in

18    bankruptcy, now the sales drop.  It's not one of those

19    debtors.  This is a debtor that seems to be able to make

20    a lot of money in the post-petition period, so what I

21    need to be convinced is that selling the -- this

22    equipment is going to yield more money than, say --

23            MS. GLYNN LEVIN:  Absolutely.

24            THE COURT:  -- three, four, five, six months worth

25    of operations.  And so that's the question I'm asking is

1    where in the evidence can I find that more money can be

2    made by selling this than just generating bitcoin.

3        MS. GLYNN LEVIN:  I do want to address that, and I

4    think the supplemental declaration of Mr. Vessenes and

5    the two exhibits chart that.  And it does require a

6    little bit of sort of a combination of economics and

7    science in understanding the risk in the market.  And

8    this is a very unique industry.  This is not selling

9    stores.  This is not selling coffee shops.  This is

10   selling essentially the mining rigs, the hardware and all

11   of the software and all of the -- everything that goes

12   along with it to a third-party buyer, either in whole or

13   in parts, to a third-party buyer.

14       And the reason why we are looking at a key

15   change -- in fact, it's not a change right now.  It's

16   been a change that has been happening over -- since the

17   debtor actually filed and perhaps even before.  It's that

18   the industry is changing so rapidly.  The evidence on the

19   record is that more and more miners are joining this

20   industry, way, way more than was ever anticipated, and

21   because more miners are joining this industry and because

22   there is a fixed number of bitcoins that may be mined

23   daily, the profit margin is going down for every miner.

24   Every miner is now having to work harder, and the

25   production -- the demands for production are that much

1       more difficult in order to produce it.

2             Now, yes, the debtor had an excellent December,

3       but the trend is not continuing.  The trend is not

4       continuing to go up.  In fact, the trend is going the

5       other way.  The curve is going the other way, and that's

6       partly because of more and more parties entering this

7       mining space.  And, also, the demand for bitcoin is also

8       very fluctuating.  It's a -- again, and one could do an

9       entire course in economics just on the demand for bitcoin

10      and all the different factors that go into the demand,

11      everything from Chinese government to what's going on in

12      Germany to whether Overstock.com is accepting it.  I

13      mean, there are lots of market forces pro and con.

14            The key thing for your -- for the Court's concern

15      here today is -- and perhaps we should turn to that

16      declaration -- is to look at that and to see if I can

17      answer that, look at those exhibits or offer my client to

18      be able to answer them, answer those questions.

19            So let's look at Exhibit A.  It's one that is

20      Document 92-1 on -- in the docket.  So if we look at the

21      projection from January 8th going -- of last year, the

22      mining difficulty, which is a function of how many -- is

23      a function of a number of factors, but including how many

24      other miners there are in the market, is very, very low.

25      It's practically at zero.  If you look over the next six

1    months, it starts to increase very slowly.  It's now

2    going up.  We see over at around July 11th it's now going

3    up.  It's starting to climb.  And by -- say by the

4    petition date, the scale is now increasing, and the

5    figure in our record is that the increase of mining

6    difficulty is now at 43,000 percent, which is a figure I

7    don't think I've ever used before in any, ever, context.

8         Exhibit B shows -- goes to another economic

9    question.  It goes back to the question of hardware, the

10   mining rigs.  What about those?  They are being

11   manufactured by other companies all over the world.  A

12   couple were referenced in Mr. Vessenes's declaration.

13   What's happening with the price of mining rigs?  Let's

14   look at that, Exhibit B.  The mining rigs, which is what

15   we have to sell here, just in the last 30 days -- this

16   graph starts December 8th, 2013, and it ends just the

17   first week of January 2014.  Again, we have a clear

18   decline here.  And there's no argument that this is not

19   objective evidence.  Again, Mr. Vessenes can elaborate --

20        THE COURT:  I want to ask you about the monthly

21   report that was filed and how it lists the equipment.

22   The November report listed deployed systems with a

23   value -- or, you know, maybe this is a cost value, but it

24   says $547,176.

25        MS. GLYNN LEVIN:  Yes.  Cost value.

```
 1              THE COURT:  Right.  And then it showed accumulated
 2       depreciation of $364,412.  Well, that's a lot if what
 3       you're telling me is they only just deployed these
 4       systems.  So now the debtor says total fixed assets
 5       182,765.  So I'm still trying to figure out, you sell
 6       these rigs, what do you get?  Do you get 400,000?  Do you
 7       get 1.5 million?
 8              MS. GLYNN LEVIN:  But let --
 9              THE COURT:  Do you get 10 million?
10              MS. GLYNN LEVIN:  So --
11              THE COURT:  How do I compare monthly revenue of
12       $1.8 million to what you're going to get if you sell the
13       equipment?  I mean, I agree with you.  It's difficult to
14       value, but you're asking that the debtor just be able to
15       go out and sell the equipment, and we have no idea what
16       we're going to get for it and --
17              MS. GLYNN LEVIN:  So let's go to that.  And there
18       are --
19              THE COURT:  Then maybe we should provide that if
20       we don't get more than we want, we just say:  Forget it.
21       We're not going to sell it this way.
22              MS. GLYNN LEVIN:  I mean, there could be that
23       contingency.  But let's address those two points.  First
24       of all, shouldn't the debtor just continue to work these?
25       Well, clearly on the record we've got some very -- we've
```

```
 1      got some highly technically trained people.  Not that it
 2      necessarily requires, you know, rocket scientists to
 3      operate these, but we do have very highly technically
 4      trained people who have been working, who have put in
 5      their blood, sweat and tears to make these things
 6      operate, and they are on the record to say they're only
 7      staying until the end of January.  So that --
 8            THE COURT:  So let me understand this clearly,
 9      because according to Ms. Simonyan's pleadings that she
10      put in, Mr. Vessenes paid them 300-and-some-thousand
11      dollars to stay, and that was just for one month?  Or is
12      that --
13            MS. GLYNN LEVIN:  They actually --
14            THE COURT:  Are those facts just completely wrong?
15            MS. GLYNN LEVIN:  The actual bonuses that were
16      paid in December were only a total of $46,000 to two of
17      the three members of the team.  The third member of the
18      team, Hans Olsen, who has -- was projected to receive a
19      $54,000 bonus, did not.  Did not receive that.  Has not
20      been paid that bonus.  So two of the underlying --
21            THE COURT:  So I'm trying figure out --
22            MS. GLYNN LEVIN:  Yes.
23            THE COURT:  -- how in a Chapter 11 proceeding the
24      debtor pays random bonuses without any court approval at
25      all and without demonstrating that there's a contract in
```

1     place.

2            MS. GLYNN LEVIN:  Well, they --

3            THE COURT:  How does that happen?

4            MS. GLYNN LEVIN:  They --

5            THE COURT:  I haven't read the bankruptcy code

6     provision, but there is even a provision in the

7     bankruptcy code for the payment of incentive

8     compensation.

9            MS. GLYNN LEVIN:  There are, and they are not

10    employees of the debtor.  They are employees of CoinLab.

11           THE COURT:  So that concerns me even more.  Now

12    what you're saying is the debtor agreed to pay

13    significant incentive compensation to employees of an

14    insider without any court approval at all.

15           MS. GLYNN LEVIN:  Well, we can certainly go back,

16    and if the Court thinks this is important we can

17    certainly go back and outline of -- it all and --

18           THE COURT:  I think it's important, because what

19    I'm not understanding is where Mr. Vessenes draws the

20    line between what he can do outside of bankruptcy and

21    what he can do inside of bankruptcy.

22           MS. GLYNN LEVIN:  I'm certainly happy to --

23           THE COURT:  And what he can't do is spend money of

24    the estate outside the ordinary course of business

25    without court approval.

1          MS. GLYNN LEVIN:  I'm certainly happy to put that

2     forward.  But to be clear, these -- this is the team that

3     is operating them, and without any of them, without one

4     of them, the systems don't go.  So it's a little --

5          THE COURT:  In which case we would have had that

6     in a motion --

7          MS. GLYNN LEVIN:  Yes.

8          THE COURT:  -- with declarations.  People could

9     have objected or not and agreed with you that these

10    people were critical, but instead we find out because

11    Ms. Simonyan or somebody else from her firm took the

12    deposition of Mr. Vessenes and he had to say what

13    occurred.  I guess that's --

14         MS. GLYNN LEVIN:  Again --

15         THE COURT:  -- the problem.

16         MS. GLYNN LEVIN:  -- we're talking the total that

17    have actually been paid of bonuses is $46,000 to two

18    people at Christmastime.  So I am certainly happy to put

19    that before the Court and make full disclosure, and the

20    Court can look at that, can look at the basis of the

21    contract.  CoinLab can explain why these are employees --

22    well, two of them are employees of CoinLab and one is an

23    independent contractor.  There were January bonuses

24    projected or allowed for in a budget, but nothing has

25    been paid.  And that's why -- I mean, that's why it's

1    really unfair to have the 2004 excerpts being thrown

2    around without the entire transcript.  We don't even have

3    the entire transcript.  It's not even a formal

4    transcript.  It's a draft.  So those are the facts.  And

5    I'm certainly happy to -- again, to put Mr. Vessenes on

6    the stand, and he can testify as to those facts.  The

7    Court doesn't have to take my word for it.

8          Let's go to the question of what are these things

9    worth.  Again, we don't have an independent valuation.

10   There is no Blue Book.  There is no appraisal standard

11   for these.  This is -- these are, in fact, sort of custom

12   made mining rigs.  So where does one go to get a pulse on

13   what that's worth?  Well, Exhibit B in Mr. Vessenes's

14   supplemental declaration has some graphing on what these

15   things are being sold for.  And this is a very highly --

16         THE COURT:  Well, let's read the graph, then.

17   Read it for me.

18         MS. GLYNN LEVIN:  Okay.

19         THE COURT:  And tell me what it says.  What it

20   says is there's a -- there's 20,000 -- I mean, I have to

21   look at it online.  So what does it actually say is the

22   per-system price that could be received for the systems?

23   Is it $30,000?

24         MS. GLYNN LEVIN:  Can I have my client help

25   interpret this chart?  Because it's pretty technical.

1          THE COURT:  Well, I mean, it's tiny, for one

2     thing.  I can't see it.  If he's the expert, you know,

3     his declaration should just say, "I should be able to

4     sell these for $30,000 a system."

5          MR. VESSENES:  If I -- can I finish --

6          MS. GLYNN LEVIN:  Well, Your Honor, they're not

7     being sold per system.

8          THE COURT:  Okay.

9          MS. GLYNN LEVIN:  They're being sold -- the sale

10    is framed in terms of terra-hash.  And the terra-hash, as

11    I said, is really a measure of power, like horsepower,

12    because that's the way it's measured.  It's not "I'm

13    buying Computer A or Computer B."

14         THE COURT:  So we know how much power we have to

15    sell.

16         MS. GLYNN LEVIN:  Approximately 200,000

17    terra-hash.

18         THE COURT:  Right.

19         MR. VESSENES:  200.  200.

20         THE COURT:  So at what price?

21         MS. GLYNN LEVIN:  Approximately 200,000

22    terra-hash.  But we --

23         THE COURT:  For?

24         MS. GLYNN LEVIN:  In our motion, we have proposed

25    that a minimum bid is $2,000 per terra-hash, and we spent

1      some time looking at what really would be a reasonable

2      minimum bid.  And, again, keeping in mind even at the

3      time that we filed the motion to today we could have had

4      fluctuations in the market for what a terra-hash is being

5      sold for in the open market.  We came up with a minimum

6      bid of $2,000 because in our business judgment, and that

7      has not been challenged, in the debtor's business

8      judgment that is a good entry level point for getting as

9      much interest as possible from perspective purchasers.

10     This auction that we are going to propose -- and I have a

11     supplement to our order -- this auction is actually going

12     to be a worldwide auction, and we're actually proposing

13     to -- and I have actually spoken to the Court's very

14     favorite auctioneer to bring that into -- bring that sort

15     of live.

16             THE COURT:  Murphy's going to auction --

17             MS. GLYNN LEVIN:  Mr. Murphy --

18             THE COURT:  -- mining rigs?

19             MS. GLYNN LEVIN:  I have spoken to Mr. Murphy, and

20     he said he is available and ready to do it.  He is -- I

21     mean, there's nobody else who has any more expertise in

22     auctioning generally than Mr. Murphy, and it seemed to me

23     really -- it seemed to be incumbent on the debtor to

24     ensure that we had sort of a neutral process because --

25             THE COURT:  So there isn't some clearinghouse for

1    these sales?

2         MS. GLYNN LEVIN:  There is no clearinghouse for

3    these sales.  And, really, in order to achieve the best

4    price, we really do need to make sure that it's noticed

5    out worldwide, in addition to having Mr. Murphy as a

6    neutral to help facilitate this auction and to assure

7    that every possible bidder gets the opportunity to come

8    in so we know who they are all, all their requirements

9    for qualified bidders.

10        In addition to that, we have engaged a company out

11   of Florida to help do the PR work, and that contract has

12   been executed today, and we will be asking Your Honor to

13   approve that company to -- as a professional to do the PR

14   and marketing to make sure it gets out there.  And they

15   are used to doing this on a sort of crisis, immediate

16   process to put the news out on the Web, to do interviews,

17   to do press releases, to do whatever it takes to get that

18   information out there.  And this potential purchaser base

19   is -- I mean, these aren't people hanging out in their

20   offices.  They're not venture capitalists.

21        THE COURT:  They're not insiders, as

22   Ms. Simonyan's client believes.

23        MS. GLYNN LEVIN:  And then -- there is not one

24   interest from any insider as far as I know in this.

25   There have been -- I mean, there has been contact for a

1    number of potential purchasers, and the one thing that

2    Mr. -- that is not -- was not put in the record is

3    Mr. Vessenes's testimony from his 2004 exam that said he

4    is not making an offer, CoinLab is making an offer, so

5    the -- and whether XRay makes an offer, I don't know.  It

6    doesn't have counsel.

7         But the whole premise that this is designed

8    somehow to -- because it's some sort of an insider

9    collusion and only people with the special knowledge and

10   the special handshake know how to make a bid, I mean,

11   it's -- to be honest, Your Honor, it's baseless.  This

12   debtor has no other purpose in selling these other than

13   to maximize the return to creditors.  And as I said, the

14   alternative -- and we're on January 10th.  The

15   alternative is that in 21 days, approximately, the staff

16   who are going to continue to operate these and maintain

17   it and run it and track the records and, you know,

18   produce the bitcoin production, they're going to be gone.

19   So at most, if we don't have a sale, we have 21 days left

20   of production.

21        Going back to the numbers.  And this -- these

22   large numbers were sort of thrown around:  "Oh, there's

23   millions of dollars of production."  Again, it's a play

24   on words.  The net is not millions and millions of

25   dollars.  The debtor has significant cost.  Each of the

1     hosting locations is -- are very pricey leases.  They use

2     massive amounts of power.

3           THE COURT:  Well, let's talk about the leases --

4           MS. GLYNN LEVIN:  All right.

5           THE COURT:  -- just for a second.  Because I got

6     the impression when we were here before that the leases

7     were already something that CoinLab had in place, yet

8     when I looked at the declarations filed, your

9     declarations, I see that only the Sabey lease was in

10    place in August.  The Wow -- one Wow lease for 18 rigs

11    was allegedly entered into on the petition date between

12    CoinLab and the lessor, and the second Wow lease was

13    entered into, according to the declaration, on

14    December 19th, so well after the petition was filed.

15    So --

16          MS. GLYNN LEVIN:  So --

17          THE COURT:  -- now we have CoinLab, which

18    supposedly has the right to charge the debtor dollar for

19    dollar for expenses, entering into what appear to be very

20    expensive leases post-petition, and I was just wondering

21    what the lease rates were before the case was filed

22    because these are --

23          MS. GLYNN LEVIN:  The --

24          THE COURT:  -- new leases.  These aren't leases

25    that were in existence as of the petition date.

```
 1            MS. GLYNN LEVIN:  They have all been negotiated
 2     with some hard-fought negotiating, as I understood --
 3            THE COURT:  Well, how do you know that?
 4            MS. GLYNN LEVIN:  I --
 5            THE COURT:  I mean, have you been in --
 6            MS. GLYNN LEVIN:  I have not been --
 7            THE COURT:  Have you been a part of these
 8     negotiations?
 9            MS. GLYNN LEVIN:  I have not been directly.
10            THE COURT:  Because this is -- one of them is
11     $198,000 a month.
12            MS. GLYNN LEVIN:  That is the cost of --
13            THE COURT:  For ten rigs.
14            MS. GLYNN LEVIN:  That is the cost of -- these
15     things don't go in an office building.  These things go
16     in very highly specialized environments that have proper
17     cooling, that have proper temperature control, that have
18     proper security.
19            THE COURT:  Okay.  But if you just stop and think
20     about it, you can see how now I would want to have some
21     background information about what the debtor was paying
22     before so that I know that the debtor and CoinLab haven't
23     significantly trumped up the value.  Because I don't see
24     any of this on the debtor's monthly report for November.
25     Where is the payment --
```

```
 1              MS. GLYNN LEVIN:  That's --

 2              THE COURT:  -- made to CoinLab on the debtor's

 3      November monthly statement?

 4              MS. GLYNN LEVIN:  So the leases are between

 5      CoinLab --

 6              THE COURT:  Right.

 7              MS. GLYNN LEVIN:  -- and these third parties,

 8      Sabey and Wowrack.

 9              THE COURT:  But the debtor pays CoinLab.

10              MS. GLYNN LEVIN:  Yes.

11              THE COURT:  And the debtor did --

12              MS. GLYNN LEVIN:  They are --

13              THE COURT:  -- pay CoinLab.

14              MS. GLYNN LEVIN:  They are passed through.  The

15      leases -- there may be some new leases, but they -- there

16      weren't --

17              THE COURT:  Right.

18              MS. GLYNN LEVIN:  There weren't earlier leases for

19      the same space that were then changed or modified.  These

20      are new leases.  Remember, these are things that are

21      being launched over time.  So there may have been one

22      lease on a month.  Then one --

23              THE COURT:  So it's amazing because on the

24      petition date the debtor had only six rigs that were

25      operating -- well, plus 18, because that happened right
```

1    on the petition date, and then ten new rigs were placed

2    into service in the middle of December.  That's what --

3    how this works?

4          MS. GLYNN LEVIN:  Yes.

5          THE COURT:  Okay.  So then going back to the

6    November monthly statement, I was still looking for a

7    line item for the invoiced payments that the debtor makes

8    to CoinLab for those past due expenses, and I don't know

9    which line item it's on.  That's all I'm saying.

10         MS. GLYNN LEVIN:  Would Your Honor like me to look

11   for that now?

12         THE COURT:  Well, somebody should tell me, yeah,

13   because I'm trying to figure out -- I was, like you,

14   trying to figure out, okay, I assume $1.8 million isn't

15   the net monthly income.  I assume there were some

16   expenses that need to be deducted from that.  And then

17   when I looked at the expenses, I didn't really see -- I

18   see an officer salary of $20,000.  I mean, is that one

19   person?

20         MS. GLYNN LEVIN:  That's Mr. Vessenes' salary,

21   which was not paid.

22         THE COURT:  And he makes $20,000 a month?

23         MS. GLYNN LEVIN:  As I said, that's Mr. Vessenes's

24   salary, which was not paid.  He is not paid.  He has not

25   received a dime since the --

1          THE COURT:  So rent I see 3,058.  General and

2     administrative, 43,000.

3          MR. VESSENES:  Here's, like -- so here, example,

4     these are the Wowrack.  Like, there's Vessenes A and E.

5     That's a Wowrack bill.  And then here -- and this is what

6     we gave to the trustee -- here are the budget estimates

7     for hosting.

8          MS. GLYNN LEVIN:  Okay.  So I'm --

9          THE COURT:  So there's a loss of $66,913, but only

10     because there was no profit shown on the original

11     November statement, and then depreciation is the other

12     big number on here.

13          MS. GLYNN LEVIN:  Right.

14          THE COURT:  So where's CoinLab?

15          MS. GLYNN LEVIN:  So the -- I think what I'd like

16     to do, Your Honor, is turn over a document that has

17     actually already been produced in the 2004 exam.  It's

18     actually Bates stamped here at the bottom, and it's a

19     budget that was produced to the U.S. trustee, who is here

20     today, by the way, and he has told me he's not objecting

21     today 's motion.  I think he can vouch for the fact that

22     we turned out -- we turned over this budget.  May I pass

23     up a copy to Your Honor?

24          THE COURT:  Go ahead.

25          MS. GLYNN LEVIN:  So --

```
 1              THE COURT:  So it's one I haven't seen, right?

 2              MS. GLYNN LEVIN:  I think that this is not -- I

 3    don't believe this is part of the -- of the U.S. -- of a

 4    monthly operating report.  It may have been.  We were

 5    asked to turn it over.  I just can't recall.  So this is

 6    Bates stamped.

 7              THE COURT:  So Ms. Simonyan has seen it?

 8              MS. GLYNN LEVIN:  Yeah.  It's Bates stamped 11 --

 9    CLI Chapter 11, and it's numbered starting at 115 through

10    136.  And this is probably a -- well, it's about 30 or --

11    let's say 20 or so pages of probably well over 2-, maybe

12    3,000 pages that were produced under the 2004 exam.

13              THE COURT:  So this shows what the actual payments

14    are supposed to be.

15              MS. GLYNN LEVIN:  This were the operating

16    expenses, yes.

17              THE COURT:  So it's hosting expense.  That's the

18    line item.  Contractors.

19              MS. GLYNN LEVIN:  Yes.  Hosting expense.

20              THE COURT:  Hosting expense.

21              MS. GLYNN LEVIN:  It's the fifth line down.

22              THE COURT:  Wow, severance of $105,000 in December

23    and January?

24              MS. GLYNN LEVIN:  Again, as I articulated before,

25    the only severance that was paid was the 40- -- I think I
```

```
 1    said $46,000.  That was budgeted.  It was set aside.
 2    It's still sitting there.  It's been untouched.  Ensuring
 3    that the key staff people stay on is a pretty
 4    important --
 5          THE COURT:  Okay.  Well, I want to keep arguing
 6    that one because --
 7          MS. GLYNN LEVIN:  Right.
 8          THE COURT:  -- what I think is it violates the
 9    bankruptcy code to pay severance and bonuses without a
10    motion and court approval.  So we're going to have to
11    get -- I'm going to have to get past that --
12          MS. GLYNN LEVIN:  I will certainly make sure --
13          THE COURT:  -- with this debtor or the case is not
14    long for debtor in possession or we'll have to have some
15    kind of trustee, but there have to be some limits on what
16    the debtor can do with the money that follows the
17    bankruptcy code.  That's all.  I mean, I see it on here
18    on this budget.  This was not a budget that --
19          MS. GLYNN LEVIN:  It's on --
20          THE COURT:  -- I saw or ever approved, so...
21          MS. GLYNN LEVIN:  It's on a budget.  It is not --
22    as I said, the only -- I mean, they were basically
23    Christmas bonuses to two staff employee people in
24    December.  Nothing has been paid in January.  Nothing.
25          THE COURT:  Okay.
```

```
 1          MS. GLYNN LEVIN:  Mr. Vessenes has been paid
 2     nothing.
 3          So you were -- the Court was concerned about the
 4     hosting and exactly how that works?
 5          THE COURT:  Well, is that the -- so the CoinLab
 6     line items are contractors, right?  Is that one?  59,750.
 7          MS. GLYNN LEVIN:  CoinLab line items.
 8          THE COURT:  Contractors.  I assume those are
 9     the -- well, I'm trying to figure out what are the --
10     which line items show the pass-through expenses, and I'm
11     guessing contractors would be.
12          MS. GLYNN LEVIN:  All of them.
13          THE COURT:  Right.
14          MS. GLYNN LEVIN:  All of them.
15          THE COURT:  So hosting expense, contractors.
16     What's NRE?
17          MR. VESSENES:  Nonrecurring engineering costs for
18     installation of systems.
19          MS. GLYNN LEVIN:  There we go.  Nonrecurring
20     engineering costs for installation of systems.
21          THE COURT:  And administrative services?
22          MS. GLYNN LEVIN:  It's explained in the column on
23     the right-hand side.
24          THE COURT:  Oh, okay.  And administrative
25     services.  Travel?
```

1          MS. GLYNN LEVIN:  There are -- members of the team

2     work in various places, and the systems are hosted in

3     various places.  They're not all in one place.  They're

4     in Eastern Washington.  They're in Western Washington.

5     There are offices in Portland.  So it requires travel and

6     it requires people to be on site to take care of this

7     and --

8          THE COURT:  And then small office rent.

9          MS. GLYNN LEVIN:  Very small office rent.

10          THE COURT:  All right.

11          MS. GLYNN LEVIN:  I mean, I really want to make

12     sure that the Court is satisfied that there isn't some

13     hiding of information.  I mean, this is as transparent

14     as --

15          THE COURT:  Well, I'm not satisfied that there

16     isn't some hiding of information, but I'm willing to -- I

17     mean, what we're here today is -- what we're doing is

18     we're here today to talk about whether or not the

19     debtor's equipment should be sold versus continuing to

20     operate the business.

21          MS. GLYNN LEVIN:  Yes.

22          THE COURT:  I know full well that our -- one of

23     our panel trustees is likely not going to be able to

24     operate this business, so we need to find a way to get

25     some money to creditors that makes sense.  But if you're

1    asking me am I satisfied with the credibility of

2    Mr. Vessenes?  No, I am not.  And so what I need is to

3    get to a believable scenario for selling the equipment

4    and realizing more income than the debtor can realize by

5    operating even for a couple of months.  And that's why

6    the income and expenses are important to me, because, I

7    mean, Ms. Simonyan is going to get up, and she's going to

8    argue that this debtor can make more money by operating,

9    and I still can't get to November, because the way

10    November worked was there was an amended report filed

11    that only had income on it.  So am I just supposed to

12    substitute that number --

13           MS. GLYNN LEVIN:  There --

14           THE COURT:  -- gross sales, and then do the math,

15    and that's what the net -- what is the debtor's net

16    profit for November?

17           MS. GLYNN LEVIN:  That's because there were

18    invoices issued from CoinLab to the debtor in the month

19    of November, but they were not paid.  So the expenses

20    that were actually paid, disbursed dollars or coins

21    actually paid out in the month of November 1 through 30?

22    The answer was zero.  They have been paid out in

23    December.

24           THE COURT:  So they --

25           MS. GLYNN LEVIN:  That report's not due yet.

```
 1          THE COURT:  I see.  So I don't -- you don't know

 2     or nobody's figured out yet what the net profit for

 3     November and what the net profit for December is?

 4          MS. GLYNN LEVIN:  We will -- we can certainly give

 5     estimates.  And, again, Mr. Vessenes is here.  I

 6     understand the Court's concerns, Your Honor, but to do --

 7     I mean, we were operating -- I mean, this is as close to

 8     rotting fish as you get.  And any case where a lawyer,

 9     where a counsel comes in and says, "My client has rotting

10     fish, can we please sell it," yes, everybody's

11     credibilities gets scrutinized because of the heightened

12     time and the urgency of it all.  But if there is any

13     concern about Mr. -- about there not being sufficient

14     documentation in the record, well, I will take that upon

15     myself.  I would certainly hate to have my own client's

16     credibility be questioned when it -- if it was my fault.

17          THE COURT:  I mean, my preference would certainly

18     be that CoinLab shouldn't be paid anything except by a

19     motion and order of the Court, or somebody needs to be

20     looking at the invoices.  Because this is a lot of money

21     being transferred to what is clearly an insider.

22          MS. GLYNN LEVIN:  Yes.

23          THE COURT:  Before and after bankruptcy with

24     virtually no oversight by anyone, and that concerns me.

25          MS. GLYNN LEVIN:  I understand, Your Honor.
```

1          THE COURT:  I don't know how legitimate these

2     expenses really are because what I see is a debtor that

3     has absolutely zero existence, zero -- the debtor is

4     nothing.  The debtor has -- doesn't have -- I can't tell

5     whether the debtor has the assets.  Mr. Stehlik raised an

6     issue about who owns the -- you know, who owns the

7     technology.  I don't know what it takes to prove what the

8     debtor owns.  The debtor has no employees.  The debtor

9     has no office.  The debtor has nothing.  And so I want to

10    make sure that when we do this worldwide advertising we

11    are not misrepresenting to the world what we have to

12    sell, because the integrity of the bankruptcy process is

13    at stake.

14          MS. GLYNN LEVIN:  Clearly, Your Honor, and --

15          THE COURT:  So that's -- and then I want to

16    compare apples to apples.  In other words, how much did

17    this debtor make in November and December, and how much

18    can the debtor make by selling rigs?  If you tell me the

19    minimum price is 2,000 per terra-hash, all right, I've

20    got $400,000.

21          MS. GLYNN LEVIN:  That's right.  That's going to

22    be the minimum if all of the terra-hashes are sold.

23          THE COURT:  Maybe that's all we get, 400,000.

24          MS. GLYNN LEVIN:  Our estimates is that is a

25    really good entry level.  That's a floor.  But we

1    anticipate that we're going to have purchasers -- more

2    than one purchaser, because as I said, the

3    terra-hashes -- the systems are divided among more than

4    one hosting place, and a -- one purchaser might say, "I

5    want, you know, a given number of terra-hashes, and I

6    want to operate them in -- you know, at, say, these --

7    location in, you know, this place," and so on and so

8    forth.

9         To the extent that we were talking about what can

10   the debtor -- what could the debtor mine if all systems

11   continue to go ahead as is, no changes?  I really would

12   like to put Mr. Vessenes on the stand because I can't

13   testify.  These are projections that an expert needs to

14   make, and we are --

15          THE COURT:  Well, you have the profit and loss

16   statement that you just handed me.  You have a budget.

17   But I guess that doesn't have a -- it has 2013 and it has

18   2012.  It goes to January '13, right?  But if you take

19   out the things that aren't appropriate at all, like

20   $105,000 in severance pay, that changes.  Capital

21   expenditures.  Inventory write-offs.  I mean, this

22   doesn't sound like the budget that I would expect for a

23   Chapter 11 debtor, I guess.  I don't understand the

24   budget, but -- operating expenses.

25          MS. GLYNN LEVIN:  I want to address the Court's

1    question, because it's a good one and it's a sensitive

2    one because, as we said, this is really an industry and

3    this is a company that is as transparent as you possibly

4    could get because even its accounts are out there

5    available for the world to see.

6         One of the exhibits that came up in the

7    declaration was a set of records that Bitvestment had

8    created showing transfers and so on.  I mean, it's pretty

9    available for most -- for any kind of savvy user to

10   figure out what is mined and what are being held in

11   various accounts.  The concern and the sensitivity part

12   has to do with -- is connection with the sale, in that

13   the sale, as we propose, that these rigs will be on an

14   "as is/where is" basis, and there are going to be -- are

15   not -- while we have records as to what mining production

16   has been, we don't want to be making representations as

17   to what mining production will be.  In this industry, no

18   one could make such predictions.  It's not like you're

19   selling a, like a -- you know, you're selling a -- car

20   sales.

21        THE COURT:  Okay.  But I understand that.  So

22   there are no reps and warranties about how well these

23   machines will do.

24        MS. GLYNN LEVIN:  Correct.  And in the same way --

25        THE COURT:  We just know how much power they have.

1          MS. GLYNN LEVIN:  We need to know how much power

2     they have, and any -- we are anticipating that the buyers

3     of -- the prospective buyers are going to have that level

4     of understanding.  They will probably be individuals and

5     companies who are already in the bitcoin mining industry

6     and who are already operating, but want to expand their

7     capacity.  So that's what we're anticipating.  I -- we're

8     not going to be selling to someone who can't decide

9     whether they want to buy a 7-Eleven or a mining rig.  I

10    mean, these are going to be people from all over the

11    world who are already in this industry.  And it's a

12    finite industry, although it is growing, which is part of

13    the whole premise for how the business model is changing.

14         I'd like to make sure I address the elements of

15    the sale.  Really, we have been talking for the last hour

16    or so about whether a sound business reason exists for

17    the proposed transaction.  And in the record, between

18    Mr. Vessenes's declaration, supplemental declaration, and

19    Hans Olsen's declaration, the net conclusion that the

20    debtor has come to is that these mining rigs need to be

21    sold.

22         And I want to address the objection because --

23    both the source of the objection and sort of the merits

24    of the objection.

25         Why is it that we have one of many creditors --

1      well, two, but basically one substantial objection of

2      many creditors that is objecting and none of the others

3      are?  We have one and why is that?  We have a very, very

4      litigious plaintiff in New York, who did not get their --

5      who did not get what they want.  They did not get the

6      specific performance, which is what they've been asking

7      for, and that's what's underlying this.  They believe,

8      and I will let Counsel speak to that, but my

9      understanding is that Bitvestment believes that it has an

10     inherent right under its contract to specific

11     performance, and if it were -- if it received the rights

12     it was asking for that it felt were its remedy, it would

13     demolish the claims of every other creditor here.  Its

14     claim, which has absolutely no support, I might add, is

15     for $8 million, which is just such a beautiful round

16     number it's sort of hard to believe that it has any

17     legitimacy to it.

18         All of the other claims -- we have a claim for

19     loans, a large one, 3 million, and we have claims in

20     various amounts, some based on the exchange rate of the

21     bitcoins as of November 1st, others I can't really tell.

22     I mean, we just -- we have a -- sort of a range of

23     claims.

24         But if we sort of step back and say:  Wait a

25     second.  Why is Bitvestment objecting here?  I mean, yes,

1    they want the debtor to continue to pump out those

2    bitcoins as much as possible.  The part that they do

3    not -- that they are missing or the deceit here is that

4    there is a huge cost to be able to do that, and we have a

5    finite timeline here in that the actual service people,

6    the software engineers who are on their -- on the ground

7    to do this say they're going to stop doing it as of the

8    end of January.  So I do want to look at that, these

9    objections in that context.

10       The -- we addressed the sale price, and I think

11   we've been addressing the good faith of the process

12   throughout, and I can address my concerns or my prospects

13   later as to how we would envision an auction.

14       As to the element of reasonable and accurate

15   notice, everyone always complains that notice is too

16   short.  I mean, it's sort of the complaint number one.

17   Well, actually, there has been pretty -- this has been

18   pretty good notice considering the rapid pace of this

19   industry.  The word of mouth has gone out already.  Our

20   pleadings and shortened time was approved on

21   December 24th.  Everything went out to all creditors that

22   day.  That was three weeks ago.  We have a prospective

23   date for an auction bid of January 22nd, so that will be

24   approximately four weeks from the date the service and

25   notice went out.  We have --

1          THE COURT:  But no advertising has been done yet.

2          MS. GLYNN LEVIN:  No.  But as I said, we -- there

3     has been a company retained to blasts --

4          THE COURT:  Right.  But we don't get to go from

5     the original date.  We get to go from, you know, today,

6     which is the 10th.  So there is basically 12 days between

7     now and when you'd want to have the auction.

8          MR. VESSENES:  No.

9          MS. GLYNN LEVIN:  So the auction -- let me go back

10    to our dates.  From today is the 10th.  We would propose

11    to have bids in by noon on the 22nd, deposits for any

12    qualified bidders due on the 24th, and then an auction

13    to -- an auction at 9:00 in the morning on the 27th of

14    January.  And I have checked with Mr. Murphy, and he is

15    available on the 27th as well.

16         MR. VESSENES:  I have that number, Deirdre.  I

17    have our price estimates for the rigs if the judge would

18    like to hear it.

19         MS. GLYNN LEVIN:  Okay.  Hold on to that.

20         I want to deal with a couple of -- well, deal

21    quickly with the objections of Soule, and then I am going

22    to go to look at Bitvestment's objections.  Soule's

23    concerns was what are the assets being sold.  I think we

24    are clear on that.  There was some concern that there

25    was -- the quote was "an unfamiliar nature of the assets

1       being sold."  And I guess familiarity really is in the

2       context of the person who is looking at this, because

3       those who are interested in these assets, this is not

4       unfamiliar at all to them.  These are -- even the

5       investors, who are part of the -- who invested in the

6       debtor early on, they're not unfamiliar at all with

7       bitcoin.  Everybody understands what bitcoin is.

8            THE COURT:  Well, does the proposed order actually

9       describe the assets in detail?  I mean, that's what I'm

10      going to be concerned about is what is the order --

11           MS. GLYNN LEVIN:  I will ensure that we have an

12      exhibit that describes those assets in detail, yes.

13           We addressed the concern about is $2,000 per

14      terra-hash the, quote, market value.  And, again, you

15      know, market value is sort of an amorphous concept.  It

16      is the floor price for an opening bid.  It's not

17      necessarily the market value.  And I say that in

18      quotation.  We do anticipate that bringing in this floor

19      will generate a lot of interest, and the true market

20      value ultimately will be in the bidding process.  This is

21      sort of truly capitalism at its best.

22           I want to turn to the objection of Bitvestment.  I

23      think I've addressed Soule's concerns.  Again, what is

24      Bitvestment?  Where does it stand in this case?  We don't

25      have any -- we only have one -- well, we have

1    administrative creditors and we have unsecured creditors.

2    Bitvestment is an unsecured creditor, no more, no less.

3    The value of its claim, proof of claim, $8 million,

4    highly skeptical.  The amount, the dollar amount that it

5    invested, I'm going to say this really slowly.  $75,000.

6    That is all it invested, and for all of that $75,000 it

7    has created all this litigation, all this production, all

8    this objection, and is trying to basically squeeze the

9    debtor into forcing to continue to produce for it so

10   that -- to the jeopardy of the other creditors.

11            Thousands and thousands of pages of 2004 documents

12   were produced.  Your Honor said it was onerous.  It was

13   onerous.  The timeline was onerous.  And I really have to

14   add that it's pretty distressing to have taken the time

15   to have put together a 2004 motion so that we could find

16   out what's the basis of Bitvestment's claim.  How does it

17   value it?  We got a court order under 2004.  Immediately

18   they turned around and said, "No.  We're asking for

19   reconsideration."  Your Honor denied that immediately.

20   We went ahead and said, "Great.  There's no

21   reconsideration allowed.  We want -- where are our

22   documents under 2004?"  They were due under -- on

23   January 6th.  We have not received one, and neither

24   counsel is willing to accept service of the subpoena.  So

25   I think that might give Your Honor a flavor of the kind

1     of approach here.  We're not dealing with a professional

2     approach here.  In almost every other case that I've been

3     dealt with Counsel will willingly accept the service of

4     the subpoena.

5           Mr. Gallancy has refused to -- will not come to

6     Seattle for a 2004 exam.  He's forcing us to expend the

7     debtor's resources to go to New York to the extent that

8     we -- and we will decide if that's necessary or not, to

9     have him deposed under 2004.  But he won't -- no one will

10    accept the subpoena.  I think that really does give a

11    flavor of what's gone on.

12           I think the Bitvestment objection, Your Honor,

13    really sort of has two parts.  It's got the legitimate

14    parts.  It's got the legs where it's really talking about

15    the sale, and I respectfully -- we've dealt with those,

16    but I respect those objections.  I respect the fact that

17    they wanted us to continue to mine.  I respect the fact

18    that they are looking out for their own client's best

19    interests.  I mean, those are legitimate bases for

20    objections.  You know, is it being sold?  Is it being

21    sold to insiders?  And I think we've dealt with them.  We

22    don't even have insiders bidding.  If they'd like to come

23    and stand and watch the bidding or if they'd like to come

24    bid, they are certainly welcome to do so.

25           The other part of the objection is really kind of

```
 1    more a personal attack, and some of it is legitimate.  I
 2    can -- I understand their concerns about the
 3    transparency.  We have done our best to provide them all
 4    the financial information that we believe that they're
 5    entitled to.  We have not held anything back.  Some of it
 6    was confidential.  We wanted to ensure it was kept
 7    confidential and not spread around the Internet like
 8    trash.  This is a court proceeding, and we did want to
 9    maintain the integrity of that.
10         As to -- I want to mention also a couple of
11    things.  As to the timelines, again, we can't really
12    stress enough that the timeline is really critical here.
13    We wouldn't have been working on the eve of the holidays,
14    Christmas and New Years, and asked Your Honor to deal
15    with this on either of those holidays if the timeline was
16    not critical.  Moving this forward apace is in the best
17    interests of the estate.  It is the way to maximize the
18    estate.  And the debtor is really going to be at a loss
19    to figure out what to do after -- I mean, ultimately it's
20    going to have to turn the keys off if the staff people
21    walk away.  It would not --
22         THE COURT:  But the debtor could easily mine
23    bitcoin until the end of January and then do just that,
24    turn it off and auction the equipment.
25         MS. GLYNN LEVIN:  The concern at that point is
```

1    we're going to have equipment that is going to have

2    nominal value.  We'd be essentially selling it for scrap

3    so --

4              THE COURT:  Why?

5              MR. VESSENES:  But that's our schedule.  The

6    schedule of the judge to --

7              MS. GLYNN LEVIN:  Well --

8              MR. VESSENES:  It is the schedule.

9              MS. GLYNN LEVIN:  Well, it is --

10             MR. VESSENES:  To turn it over on Feb 1 to the new

11   owner.

12             MS. GLYNN LEVIN:  To sell it -- well, are you

13   proposing that we --

14             THE COURT:  I mean, why does it become scrap --

15             MS. GLYNN LEVIN:  Are you proposing that we --

16             THE COURT:  -- if it stops operating?

17             MS. GLYNN LEVIN:  Our schedule is -- well, I want

18   to make sure we're not dealing with semantics here.  Our

19   schedule --

20             THE COURT:  It is not scrap.

21             MS. GLYNN LEVIN:  Our schedule is to allow a new

22   owner to take it over and actually have a sale close

23   exactly as Your Honor has proposed.

24             THE COURT:  Okay.

25             MS. GLYNN LEVIN:  The end of January.  I thought

1    Your Honor was suggesting that we stop this process and

2    start the process of a sale after that time.

3        THE COURT:  I guess what I'm suggesting is based

4    upon the way you've described this equipment to me, it

5    doesn't sound like it becomes scrap unless the market

6    completely collapses.  That whether you stop today or the

7    end of January or the end of February, you still have a

8    system which can operate.

9        MS. GLYNN LEVIN:  Right.  And it --

10       THE COURT:  In other words, it's not scrap --

11       MS. GLYNN LEVIN:  But it's --

12       THE COURT:  -- at any time.

13       MS. GLYNN LEVIN:  It's a --

14       THE COURT:  It's just about the market and whether

15   the cost of that equipment is -- the value of that

16   equipment is going to go up or down.  But in other words,

17   it's not like -- well, okay.  Let me give you a better

18   example.  It is not like a retail store which loses value

19   immensely as soon as it closes.

20       MS. GLYNN LEVIN:  Well, as soon as it stops

21   operating --

22       THE COURT:  Right.

23       MS. GLYNN LEVIN:  -- it does lose value because --

24       THE COURT:  Whereas if you stop operating this

25   system, there is no evidence in the record that indicates

1     that somehow it loses all of its value just because the

2     switch is turned off, right?  You can still sell it to

3     someone who can turn the switch on.

4          MS. GLYNN LEVIN:  The buyers, in my

5     understanding -- and, again, I have to refer to my client

6     because this is a -- such a technical industry.  And I

7     have learned as much as I possibly can, but buyers are

8     going to want to be able to walk in and have an operating

9     system in a hosted environment.  That is what they are

10    looking for, and to be able to say, "Here is your cold,

11    dark stuff in a warehouse," is not going to generate the

12    kind of sale proceeds that we are looking for.

13         THE COURT:  So when they walk in, they're going to

14    want to do business with CoinLab.  They're going to want

15    to hire Mr. Vessenes, and they're going to want to hire

16    these other three people because this is the kind of

17    business where you've got to buy it in operating form?

18         MS. GLYNN LEVIN:  They --

19         THE COURT:  Is that what you're saying?

20         MS. GLYNN LEVIN:  I'm not necessarily saying

21    anything about the Human Resources that are going to be

22    attached, no.  If a buyer wants --

23         THE COURT:  And they're going to need to take over

24    these leases --

25         MS. GLYNN LEVIN:  Yes.

```
 1            THE COURT:  -- that CoinLab has executed.

 2            MS. GLYNN LEVIN:  If a buyer wants to negotiate a

 3       separate contract to have the individuals who are

 4       familiar with the equipment do so, that is up to the

 5       buyer and that is up to -- that is not part of our sale.

 6            THE COURT:  Well, I mean, I want to make sure I

 7       understand what you're saying.  Because you're either

 8       saying this is equipment that cannot be moved and it must

 9       be operated where it is located, or it's equipment that

10       you bring in a big truck and you can ship it to Australia

11       if you want.  Which is it?

12            MS. GLYNN LEVIN:  It may be moved, but "may" is

13       the operative word.  The reality is that the buyers will

14       not want to move it.  It's highly sensitive.  It's very

15       expensive.  It needs to be maintained under special

16       conditions.  There are already places where it is set up.

17       So it would be like picking up, you know, an auto parts

18       factory.  Yeah, you could have it in Seattle or you could

19       have it in Gainesville, Florida, but do you want to?  No.

20       You want to have it exactly where it is.  You don't want

21       to move --

22            THE COURT:  Okay.

23            MS. GLYNN LEVIN:  -- the -- you don't necessarily

24       want to move it.

25            MR. VESSENES:  It's lost revenue too.
```

1           MS. GLYNN LEVIN:  The cost it would -- the buyer

2    would incur that cost, so it would make no economic sense

3    for a buyer to pick it up and want to move it.  Besides,

4    the production of it creates virtual -- a virtual product

5    which can be used anywhere.  It's not like it's

6    producing -- you know, pumping out a concrete product

7    that has to then be picked up and shipped and sold.  So

8    these buyers, who will be coming in from all over the

9    world, probably don't -- may not care where it is, but

10   are -- probably would be very happy to know that there

11   are existing contracts that they can consider stepping

12   into, and if they're qualified can go ahead and negotiate

13   with those hosting providers to continue to operate the

14   rigs in those locations.

15           And Ms. Pearson can address that a little bit

16   more, as she -- I know she's taken a little bit of time

17   to -- although she's only been recently retained in this

18   case, she's taken a little bit of time to try to

19   understand those leases.

20           Before the hearing today, I provided copies to

21   Mr. Stehlik and counsel for Bitvestment on a proposed

22   appendix, which has -- appendix to the order, which has

23   an outline of sort of sale procedures.  And I'm happy to

24   turn to those, but I think maybe it's time to allow my

25   opposing counsel to speak or my cocounsel.

```
 1            THE COURT:  Well, let me ask -- I want to ask one
 2     more.  I have a couple -- I want to make sure I asked all
 3     my questions.  I guess I don't understand how the mining
 4     works such that when the November monthly report was
 5     filed on December 17th, it showed no revenue, and it
 6     wasn't until the day after Mr. Vessenes's deposition that
 7     it was amended to show $1.8 million.
 8            MS. GLYNN LEVIN:  Well, the fact that the
 9     deposition intervened was really kind of a coincidence.
10     Actually asking to -- asking us to clarify the statement
11     of financial affairs had nothing to do with Bitvestment
12     at all.  It had to do with the U.S. trustee, who said,
13     "Can you help us clarify this so" -- and we did, and we
14     amended it.  And we amended it, I think, just to --
15            THE COURT:  Okay.  You missed my question.  My
16     question is about bitcoins --
17            MS. GLYNN LEVIN:  Yes.
18            THE COURT:  -- and how you know when you've
19     actually mined them.
20            MS. GLYNN LEVIN:  Yes.  So --
21            THE COURT:  Okay?  So let me finish.
22            MS. GLYNN LEVIN:  Yes.
23            THE COURT:  On December 17 when this report is
24     filed, you either know or you do not know how many
25     bitcoins have been mined.  And I don't know how the
```

1      process works.  Is it a surprise?  You don't find out

2      until 30 days later how much you've mined or --

3              MS. GLYNN LEVIN:  No.  No.

4              THE COURT:  -- you can't calculate it?

5              MS. GLYNN LEVIN:  No.

6              THE COURT:  Well, how do you do it?

7              MS. GLYNN LEVIN:  So there really -- there are two

8      questions here.  There's no surprise.  It's not like

9      opening up your stocking Christmas day and wondering

10     what's in there.

11             THE COURT:  But it is an algorithm.

12             MS. GLYNN LEVIN:  No.

13             THE COURT:  So you don't know exactly when you're

14     going to get one?

15             MS. GLYNN LEVIN:  You -- well, yes.  In fact,

16     there is some predictability --

17             THE COURT:  All right.

18             MS. GLYNN LEVIN:  -- in that extent.  You know

19     when you've earned it.  You don't know when you're going

20     to earn it, but you know -- when you have earned it, it's

21     clear.  It's in your account.

22             THE COURT:  Okay.

23             MS. GLYNN LEVIN:  And I want to make one point

24     because this trumped me a couple of times, and that is

25     the -- these accounts, the deposits in the accounts

1    under -- for bitcoin are timed as of Greenwich Mean Time

2    because this is an international system.  So there may

3    have been -- there may be a deposit in the account, let's

4    say, on -- you know, on a Tuesday.  Now, Greenwich Mean

5    Time, it's already Wednesday.  In Seattle, it may be

6    still Tuesday depending on the time of day.

7         THE COURT:  I get all of that, but you filed a

8    monthly report in the middle of December which said, "We

9    earned no income."  Zero.  Meaning nothing.

10        MR. VESSENES:  It's Moss Adams' recommendation.

11        MS. GLYNN LEVIN:  So I'll get to that.

12        MS. SIMONYAN:  Your Honor, I object to

13   Mr. Vessenes' testifying.

14        MS. GLYNN LEVIN:  Okay.

15        THE COURT:  Well, he's not testifying.  I mean,

16   here's the problem.  I am being left with the impression

17   that Mr. Vessenes got caught at his deposition when

18   confronted with these numbers and had to disclose them --

19        MS. GLYNN LEVIN:  No.

20        THE COURT:  -- that, in fact, the company had

21   earned $1.8 million.  And the debtor needs to do

22   something to dispel that impression.

23        MS. GLYNN LEVIN:  No.  That really is not the case

24   at all, and I do need to clarify this.  And we have

25   counsel for the U.S. trustee here.  Why is he here?

1     Because he's been talking to me about these reports.

2     That's one reason.  And he and I have had a long -- a

3     fairly long -- at least two discussions, plus I had

4     discussions with Mr. Smith, who actually took the 340 --

5     the 341 meeting.  And everybody said, you know,

6     "Interesting industry.  How do we account for these

7     bitcoins?  What is it?"  And I said, "You know, that is

8     right now a little bit of a question, but my client's

9     advice that it has received from Moss Adams is that when

10    it receives bitcoins in accounts that isn't income.  It's

11    not income until it's sold."  So that has been the --

12    that's been the operating procedure that it's been

13    working from, and we are about --

14         THE COURT:  So they got sold, all of these got

15    sold on January --

16         MS. GLYNN LEVIN:  Well --

17         THE COURT:  -- 8th, the day after Mr. Vessenes got

18    deposed?

19         MS. GLYNN LEVIN:  No.  No.  Let's go back to the

20    amended UST 14.  We were operating under this Moss

21    Adams -- well, I won't say directive.  We'll call it

22    their opinion that that's how it should operate.  And

23    there's been many months, I understand, and maybe even

24    years of discussion as to the accounting principles as to

25    how to account for that.  We are about to get Moss Adams'

1        receipt to have them retained as tax counsel to do the

2        income tax returns.  So the original US 14, UST 14 that

3        was filed basically presented the facts, the accounting,

4        as we had been -- as the opinion had been given to us by

5        Moss Adams.  That is, as of the date that even if you're

6        mining there's -- there aren't any deposits like --

7        because it's bitcoins that are sitting in a bitcoin

8        account, but it's not -- they're not being sold.  So

9        after a long discussion with counsel for the

10       U.S. trustee, we decided, well, it's really fair for a

11       number of reasons.  It's fair to creditors.  It's fair

12       for full disclosure.  It's fair for -- well, it's

13       actually also fair for -- in terms of figuring out what

14       the --

15              THE COURT:  Well, whether it's fair or not, just

16       tell me what you agreed to do.

17              MS. GLYNN LEVIN:  Well, what we agreed to do is

18       right here on -- does Your Honor have the amended UST 14?

19              THE COURT:  I do.

20              MS. GLYNN LEVIN:  Yes?

21              THE COURT:  I do.

22              MS. GLYNN LEVIN:  Okay.  So on the amended UST 14,

23       the first line -- I mean, it's a simple form with

24       complicated answers.  The amended UST 14 says:  Deposits

25       from -- deposits are for the month of November.  So

1    November 1 through 30, as of November 30 --

2           THE COURT:  Now I can't find it.

3           MS. GLYNN LEVIN:  Oh.  I'll give Your Honor a

4    copy.

5           THE COURT:  But it's one page basically, right?

6           MS. GLYNN LEVIN:  Deposits for that month --

7           THE COURT:  Okay.  Right.  I have this.

8           MS. GLYNN LEVIN:  -- 1,650.061 bitcoin.  And I

9    think we dropped off the other smaller digits after the

10   decimal point.  At the rate of 1,132.  That was a -- it's

11   a complicated averaging weight system, and I will let my

12   client who is the math whiz explain that.

13          THE COURT:  I saw it.  It's on the Internet.  It

14   was 848 when I walked out here.  Anywhere between 847 and

15   848 today.

16          MS. GLYNN LEVIN:  It fluctuates.

17          THE COURT:  Right.

18          MS. GLYNN LEVIN:  So having --

19          THE COURT:  So this is the --

20          MS. GLYNN LEVIN:  So that was the rate --

21          THE COURT:  This is the rate as of when the report

22   was filed?

23          MS. GLYNN LEVIN:  No.  As of the date -- as of

24   December -- as of November 30th.  So it's reflecting --

25          THE COURT:  Okay.

```
 1            MS. GLYNN LEVIN:  -- the November 30th figures,
 2       and that's what we were directed to do by the
 3       U.S. trustee.  So we were coming up with the total
 4       deposits of $1,891,377.  That's the dollar equivalent.
 5       And then we've already discussed the disbursements and
 6       why there were no disbursements that month.  There were
 7       invoices, but they were not paid in the month of
 8       November.  So the net cash flow --
 9            THE COURT:  Well, there weren't exactly zero,
10       because I assume there were still the expenses from the
11       original November report that was filed.  The way I was
12       reading this was that you had already -- you had already
13       disclosed the disbursements, and so the receipts were --
14            MS. GLYNN LEVIN:  I don't --
15            THE COURT:  -- to be substituted there.
16            MS. GLYNN LEVIN:  I don't think so.  I don't think
17       that that part changed at all.
18            THE COURT:  So I should ignore the expenses that
19       were shown for rent, general administrative.  You say the
20       $20,000 officer was -- officer expense wasn't paid.  So
21       these expenses were not paid?
22            MS. GLYNN LEVIN:  Budgeted but not paid.
23            THE COURT:  No.  I'm looking at your income --
24       this is the income statement for the original November
25       report, and it shows officer salaries, 20,000.
```

1          MS. GLYNN LEVIN:  Correct.

2          THE COURT:  Rent, 3,000.  General and

3     administrative, $43,855.  I assumed I had to take those

4     expenses from this number.

5          MS. GLYNN LEVIN:  No.  There were -- all of the

6     debtor's expenses are -- in some ways it's very simple,

7     because they are all incapsulated in an invoice which is

8     line by line item detailed and for which we do have the

9     backup.  Your Honor asked about that back in December.

10         THE COURT:  So but --

11         MS. GLYNN LEVIN:  Yes.

12         THE COURT:  -- total disbursements is not zero.

13    Are you saying it's just because they didn't pay any

14    in --

15         MS. GLYNN LEVIN:  They were paid.

16         THE COURT:  Okay.

17         MS. GLYNN LEVIN:  Those invoices were not paid in

18    the month of November.

19         THE COURT:  So I'm sure, then, that Mr. Buford

20    understands that there were $1.8 million in revenue,

21    potential revenue that hasn't been turned into cash yet,

22    and zero expenses for November.

23         MS. GLYNN LEVIN:  But the expenses for November

24    will actually get -- become incurred in December.  I

25    mean, November was an odd month.  So the end of the month

1    when I think invoices would normally be paid, it was

2    Thanksgiving.

3           THE COURT:  All right.  I got you.

4           MS. GLYNN LEVIN:  And so on and so forth.  So that

5    was a concern of Your Honor on --

6           THE COURT:  All right.  Let me --

7           MS. GLYNN LEVIN:  I really want to make --

8           THE COURT:  -- make sure -- let me look at just

9    one more.  I want to make sure I asked all my questions.

10   Okay.  That's it.

11          So why don't we have Mr. Stehlik make his argument

12   first because I think his seems a little simpler to me.

13          MR. STEHLIK:  It's probably due to a simple mind,

14   probably, Your Honor.

15          THE COURT:  Well, I mean, it seems to me,

16   Mr. Stehlik, and probably to you, that there should be

17   some exhibit attached to the order that describes this

18   property that's for sale in detail, whatever detail it

19   can be described.

20          MR. STEHLIK:  Yeah.  Just let me make it clear,

21   though.  My clients are just interested in maximizing the

22   value of the assets --

23          THE COURT:  Right.

24          MR. STEHLIK:  -- of this estate, whatever they may

25   be.  And so we don't have an ax to grind to that extent,

1    and I really don't think anybody else does that's on the

2    creditors' side of this.  The problem really lies in

3    believing what we're told and getting the information

4    that backs up what we're told.  And, frankly, this whole

5    thing is kind of a big mess.  It's just difficult to

6    understand any of this stuff.

7          And then some of the things that are being said

8    don't make sense to me.  Why were there -- why were they

9    asking for investment money in August if they realized

10   that these things were on the way out, rapidly becoming

11   obsolete?  Why did they enter into leases in November

12   post-petition if they thought this was all going to go by

13   the wayside; again, immediate obsolescence in two months?

14   Why were they putting rigs into place in December if they

15   thought these were going to be obsolete in a month or two

16   later?  I don't understand any of this stuff.  It doesn't

17   make fundamental rational sense to me.

18         All of a sudden we are being told after this

19   activity of building up this business that it's going to

20   be obsolete and they have to sell everything.  This

21   happened in a very short period of time.  Either there

22   was a huge miscalculation to begin with, which raises

23   other issues about responsibility at some of these

24   creditors and my client, or things have changed so

25   dramatically that what made sense two months ago doesn't

1    make any sense anymore, and I don't understand why.  It

2    just doesn't make a lot of sense to me, and I really

3    haven't been, I guess, educated sufficiently to

4    understand how that can happen.

5         The people are leaving?  Why are they leaving?

6    They just decided that they're going to move to Florida?

7    How do we know this isn't a manufactured crisis now, all

8    of this stuff, to justify resolving a sale that's coming

9    up for assets we don't really understand?  I mean, the

10   Court is doing a marvelous job trying to understand it,

11   and I'm trying to understand it, as you are too, but I

12   don't think that creditors and the Court should have to

13   do that much work to figure out the economics of this

14   proposed sale.  We're getting information as it's being

15   dribble out or being allowed to be given to us.

16        And I haven't gotten this thing I was supposed

17   to -- I supposedly got.  I came up here a little bit

18   early.

19        THE COURT:  What thing?

20        MR. STEHLIK:  This --

21        THE COURT:  The budget?

22        MR. STEHLIK:  -- appendix or something or a

23   proposed order.

24        MS. GLYNN LEVIN:  Just, I just handed --

25        MR. STEHLIK:  Well, I'm in a hearing.  I can't

1     read all this stuff today.  I'm here to make my arguments

2     and listen to the Court.  And, you know, I should have --

3     if this is important to the process, we should have all

4     had it.

5          And we know Mr. Murphy is going to be auctioneer.

6     Well, I found out that today.  We know they're going to

7     hire a PR firm.  I found that out today.  Who is that?

8     What are they going to do?  Who is going to pay them?

9     How much are they going to get paid?  All this stuff is

10    being done on the fly.  And I understand that there are

11    circumstances that may justify quick action and emergency

12    types of proceedings, but it seems to me a lot of this is

13    manufactured and/or being made up as they go along.  And

14    I just think that they're asking a lot of the Court and

15    creditors on faith to go along with this as based on what

16    we know so far.  I just think there needs to be a little

17    more time and a little more deliberation as to what is

18    going to happen here.

19         And I am concerned that there are significant

20    insider connections that are problematic.  The one thing

21    that disturbs me greatly, this CoinLab relationship.

22    When the schedules were filed, the payments in bitcoin

23    were laid out according to the dates of invoices.  Well,

24    the statement of financial affairs clearly says the date

25    of the transfer, not the date of the invoices.  And now

1    we find out all of this was transferred to CoinLab right

2    before the filing.  And that's not an ordinary course

3    payment, and Your Honor put her thumb on that

4    immediately.  That's a preference.  And who's going to be

5    dealing with all of these things?  And this is just one

6    of the few things that I've seen that's disturbing.

7          And, you know, if at the end of the day this is

8    the right thing to do, then we should do it, but how do

9    we know that?  I am very suspicious because of some of

10   the things I've seen.  I can't really have a lot of faith

11   in what we're being told and what Mr. Vessenes says.

12   There's insider connections.  There are insider

13   transfers.  There are deals being made.  CoinLab has

14   unfettered discretion to charge whatever it wants to this

15   debtor.  We haven't seen anything that tells us what

16   they're charging or that that's reasonable.  I haven't

17   seen anything.  Maybe it's there, but the reports don't

18   seem to suggest really what's there.  And it's just

19   somewhat of a grand illusion to me.  I just don't see,

20   really, what the reality of the situation is.

21         And, again, I don't want to just be up here

22   saying:  Don't sell it, don't sell it, don't sell it.  It

23   may very well be the best thing to do, but I don't know

24   how we can tell based upon what we've been told.

25         THE COURT:  All right.

1          Ms. Simonyan?  Presumably you are the only one who

2     has seen the invoices, or have you seen the invoices?

3          MS. SIMONYAN:  We have seen the invoices,

4     Your Honor, but we have only seen the invoices from --

5     that were billed to the debtor.  We haven't seen any of

6     the underlying invoices, and that's a significant concern

7     to us and should be to all the other creditors because --

8     and I will get to this in a little more detail.  But to

9     answer the Court's question, I would ask that the Court

10    turn to the operations agreement, the post-petition

11    operations agreement, where -- which, by the way, is

12    signed on behalf of both CoinLab and the debtor by

13    Mr. Vessenes giving CoinLab the unbridled power to bill

14    whatever it finds appropriate.  So, yes, there are some

15    invoices that have been generated and have been produced,

16    but we don't know the basis of these invoices, so unless

17    we do further discovery -- and I understand that during

18    the hearing for the motion to compel the Court had some

19    procedural constraints as to what was allowed to be

20    produced.

21          THE COURT:  Right.

22          MS. SIMONYAN:  However, the Court also noted

23    that -- the debtor's continued efforts to hide behind

24    CoinLab to produce information that is critical for the

25    administration of this case and for the relief that it

1     seeks.

2            Your Honor, this is a profitable debtor.  There's

3     no question about it.  We're not making this up.  The

4     information we've gathered is from the record established

5     in this case by the debtor.  Now, they have been not very

6     forthcoming with the production of information, to say

7     the least; however, what has been produced and what we

8     have been able to review shows a highly profitable

9     company.

10           So let's address the timing of this sale that the

11    debtor has proposed.  You know, there was a lot of

12    beating around the bush about the price that will be

13    generated if we move forward with the sale auction

14    pursuant to the procedures that are before the Court

15    right now.  Like Mr. Stehlik, I haven't had a chance --

16    the new procedures motion or order was handed to me

17    moments before the hearing, so --

18           THE COURT:  Okay.  But I got the impression from

19    Ms. Glynn Levin that it's just -- it just shows a chart

20    about what the procedures are.  Does it have substantive

21    changes from what was in the motion?  I mean, some of it

22    had to change based upon the date that I set, right?

23           MS. GLYNN LEVIN:  The date.  Some of the dates

24    changed, and I articulated to what those were.  The

25    January 22nd to be the deadline for bids, the 24th for

1     deadline for deposits, and 27th for an auction.  I

2     mean --

3          THE COURT:  Well, but they make it sound like

4     whatever you gave them today is completely different than

5     what the proposed order was before.

6          MS. GLYNN LEVIN:  It --

7          THE COURT:  Is that --

8          MS. GLYNN LEVIN:  It's not.  I mean, we could do

9     literally a line-by-line comparison.  It's not.

10          THE COURT:  All right.  Well, I --

11          MS. GLYNN LEVIN:  What we --

12          THE COURT:  I don't want to do a line-by-line --

13          MS. SIMONYAN:  Your Honor --

14          MS. GLYNN LEVIN:  What we've added was something

15     to explain what directive, what procedures would be given

16     to an auctioneer.

17          THE COURT:  Oh, okay.  Well, do I --

18          MS. GLYNN LEVIN:  This was specifically --

19          THE COURT:  -- actually have -- that order hasn't

20     been filed, right, so I don't have it.

21          MS. GLYNN LEVIN:  No.  No.  And this --

22          THE COURT:  All right.

23          MS. GLYNN LEVIN:  This is proposed, and we wanted

24     to make -- I mean, this is to respond to the objection.

25          THE COURT:  Okay.  Well, let me --

1          MS. GLYNN LEVIN:  We wanted to make sure the

2     process is fair.

3          THE COURT:  -- have Ms. Simonyan go on, then.

4          MS. SIMONYAN:  Your Honor, like, we don't know

5     what we don't know.  It was handed to us.  I was under

6     the impression that it actually addresses some of the

7     concerns that were raised to the procedures of this

8     auction.  If it doesn't address those concerns, then I

9     think that's even worse for the debtor; however, that's

10    irrelevant.  The point that I was making is that we --

11    according to the debtor's schedules and the reports that

12    they have filed, the projections they have made,

13    everything points to a highly profitable company.  Now,

14    the timing of the sale, they want to do this on an

15    extremely expedited basis, but it's very clear that there

16    is no need for such an expedited sale because every day

17    that these rigs are not sold the company is bringing in

18    value into the estate like it should.

19         THE COURT:  Okay.  But without seeing the

20    expenses, the way they teed it up, if all the expenses

21    hit in December, and I don't know when that report is

22    due, then we determine whether they're profitable and we

23    have to get behind whether the expenses are legitimate,

24    right?  I mean, how can -- you're saying they were

25    profitable because now what they have is a November

1    report that says $1.8 million in revenue and zero

2    expenses.  I agree with you.  I'd rather go with that

3    every month than pretty much anything else.

4        MS. SIMONYAN:  Well, Your Honor, the testimony and

5    the record that the debtor produces changes so often it's

6    actually really hard to keep up with what the actual

7    revenue and what the actual expenses of the company are.

8    At the time that we were filing our response, and at the

9    time -- you know, at every stage of this case when we

10   investigate the financial condition of the company, yes,

11   it's a little different, but all the information gathered

12   together still points to a profitable company.  And I'm

13   looking for this information.  I'm relying on the

14   testimony of Mr. Vessenes at the Rule 2004 exam.  I'm

15   relying on their Schedules I and J that are on the

16   record.  I'm relying on their monthly financial reports.

17       And, Your Honor, I understand that these reports

18   keep changing to whatever is convenient for the debtor at

19   the time.  So, for example, one moment we hear that there

20   are some operating expenses that include severance pays

21   and payments to the officers of the company and some

22   other invoices, and when they're -- when it's pointed out

23   to the debtor that these are in violation of the

24   bankruptcy code and should have been done pursuant to a

25   court order, then it turns out that none of these

1      payments are actually made.  So when it's necessary to

2      show that the company does not -- is not profitable, all

3      the operating expenses are listed.  When it's convenient

4      that the debtor not have made these payments, then these

5      payments have not been paid.  So --

6           THE COURT:  Well, let's go -- so what you're

7      saying is if we go to his deposition testimony we're

8      going to see that he said -- that he said -- that these

9      payments had been made.

10          MS. SIMONYAN:  What we are going to -- that the

11     payments?  No, I'm not saying that, Your Honor.  What

12     I'm --

13          THE COURT:  No.  The incentive compensation.  Are

14     you saying that he said that this money had actually been

15     paid?

16          MS. SIMONYAN:  He said that -- during the

17     Rule 2004 examination, Mr. Vessenes said that some of the

18     incentive compensation was made and it was justified

19     because the company needed to continue operating, and

20     although it was an exorbitant amount it was still better

21     than having the rigs shut down.  This was his testimony.

22          And, Your Honor, it's actually a little difficult

23     for me to represent Mr. Vessenes's testimony here because

24     all the answers -- almost all the answers that we

25     received were in the -- were prefaced by "I don't know."

1          "I'm not sure."  "I have to talk to my accountant."  "I

2     don't know."  "I'm not sure what these transfers are."

3     "I don't know exactly how many addresses the debtor

4     utilizes."  All of this information were conjectures,

5     leaving the door open for the debtor to come back at a

6     later date and again change the testimony to match

7     whatever is convenient for --

8          THE COURT:  Okay.  Well, I see what you're talking

9     about, but here it says -- finally, at the end of all

10    this questioning -- I'm on page -- I can't tell which

11    page this is, but it says --

12         The question:  "So you paid them a retention bonus

13    on top of their salaries, and now they're going to get

14    another retention bonus?"

15         "Yes."  Answer:  "Yes.  They wanted some to stay

16    to the end of the year and more to the stay -- more to

17    stay to the end of January."

18         So I guess from that --

19         And then it says:  "I understand that.  But you

20    are now paid $355,000 for three people for two months of

21    retention bonuses or planning to pay?"

22         Answer:  "Yes.  In my judgment, that's much better

23    than having them leave tomorrow and all the rigs turning

24    off since that's just six or seven days of downtime."

25         So I'm like you.  When I read that, I read that to

1     say that the debtor has paid $355,000 to three people for

2     two months of retention bonuses.  So that's kind of, I

3     guess, where I'm coming from.

4          MS. SIMONYAN:  And the testimony -- my

5     understanding walking out of the Rule 2004 exam was that

6     some of it was paid and some of it was to be paid.  Like

7     I said, we weren't getting clear answers to our

8     questions, but Your Honor has the transcript before it.

9     It's on the record.

10         So we are -- there is some level of speculating we

11    have to do, because even though we did have Mr. Vessenes

12    at the Rule 2004 exam he was not able to answer with

13    certainty a lot of the questions that were asked, a lot

14    of some basic questions.  Payments that were paid in very

15    large amounts, not very recently, he was not able to

16    remember, and he had to -- and he resorted to his

17    accountant making the payment, effectuating the payment,

18    and preparing the bankruptcy schedules.

19         But what we do know, Your Honor, with certainty is

20    that the debtor continues to mine bitcoins, bitcoins have

21    high value.  As of today, I believe, as I was walking out

22    of the office, they were at about 8- -- between 820 to

23    850 per bitcoin.  As of today, just in January the debtor

24    has probably mined approximately $600,000 worth of

25    bitcoins.

1           THE COURT:  Why do you say probably?

2           MS. SIMONYAN:  Well, because the debtor could not

3    tell us with certainty exactly how many bitcoins it

4    mines.  It said -- because the debtor testified that --

5    Mr. Vessenes testified that the debtor mines between 65

6    to 75 bitcoins per day.  So he wasn't able to tell us

7    with certainty exactly how many bitcoins the debtor had

8    mined in November, how many it had mined in December, how

9    many it had mined as of the date of the Rule 2004 exam.

10   So I do have to say "probably" because we are relying to

11   some extent on the testimony of Mr. Vessenes.

12           But so the point is, Your Honor, that every day

13   that we wait and these assets are not sold, more value is

14   coming into the estate.  Based on the projections and the

15   testimony of Mr. Vessenes regarding the operating

16   expenses of the company and looking at the history of the

17   operating expenses of the company, it appears that even

18   if we just wait one extra week we're going to generate

19   more value for the estate than if the rigs are sold

20   today.  If we wait just one extra week, there will be

21   more value in the estate even if we have to completely

22   abandon the rigs at the end of the week than if we were

23   to sell the rigs today.

24           Again, there was some -- a lot of back and forth.

25   The Court wanted a simple answer to a simple question of

1    what is the proposed minimum bid amount, and the

2    answer -- and I don't know why it was so difficult to

3    answer because this was in Mr. Vessenes's testimony at

4    the 2004.  It's on the record in the form of

5    Mr. Vessenes's declaration in support of the sale motion.

6    The answer is very simple.  It's $400,000.  So just in

7    one week the debtor is able to produce more value, more

8    dollar value than it proposes to sell the rigs.

9         Second of all, it's important to note that

10   throughout this whole proceeding the debtor has made --

11   has misled the Court by trying to shift the focus from

12   the fact that it is able to generate extraordinary value

13   to the fact that it's become a little more difficult --

14   increasingly difficult to mine bitcoins.  That is

15   intuitively true.  It's obvious.  Yes, the bitcoins are

16   worth more so there's more competition.  There are more

17   people who want to earn some bitcoins and do mining

18   operations.  That's no secret.  But what the debtor

19   repeatedly avoids producing is the fact that these

20   bitcoins just in one year since the debtor -- just in one

21   year have increased in value 80 times, and that's the

22   true test of the profitability of this company.  We have

23   this incredibly successful, uniquely positioned

24   enterprise that is able to produce this product.  While

25   it's operating expenses can be paid -- are in dollar

1      amounts, it's able to continue to produce a product that

2      it can sell 80 times the price of the product a year --

3      only a year ago.

4           So, Your Honor, it's very simple.  This is a

5      highly profitable enterprise.  It doesn't need this

6      bankruptcy.  It has no business filing a bankruptcy

7      petition, and the sale motion that is a big piece of this

8      puzzle should be denied.

9           I really don't have too much to add to the flaws

10     in the procedures that the debtor has proposed for the

11     sale of these assets.  You know, it's -- what's important

12     to note is that they clearly favor an insider purchase.

13     You know, again, we can't rely on what's in the -- it's

14     in the revised order that was handed to us moments ago.

15     We must look at what was sent out to creditors, what's

16     before the Court, and what's before the Court is -- are

17     procedures that clearly favor only an insider purchasing,

18     and it's evidenced by the fact that the debtor has set an

19     extremely short time frame of five days between the time

20     that the Court enters the order approving the procedures

21     and the deadline to submit the bids.  And within those

22     five days, those five days the debtor finds sufficient to

23     do marketing, to solicit bids, to have the credit -- to

24     have any potential purchasers do due diligence, get the

25     information necessary to determine what the bids should

1      be, to -- and to formulate and submit their bids after

2      having understood the true value of the assets.

3      Your Honor, the absurdity of the time frame that the

4      debtor had initially proposed is evident on its face, and

5      it exposes clearly the debtor's intent to sell the mining

6      rigs to the -- to an insider and shed all these

7      contractual responsibilities that it has to its

8      creditors.

9              Some of the other concerns are that there are no

10     clear procedures for any due diligence to be conducted by

11     any potential purchasers.

12             THE COURT:  I'm not sure we know -- we even know

13     what the due diligence would be.  I assume somebody has

14     to look at the equipment or know exactly what its

15     components are so that they can verify its terra-hashing

16     capabilities.

17             MS. SIMONYAN:  It's terra-hashing capabilities.

18     Whether they work properly.  And these are uniquely

19     engineered rigs, Your Honor.  I don't know exactly the --

20     all the technical details of the due diligence that would

21     by required to make an informed decision about the

22     purchase; however, there is no question that there needs

23     to be some extensive due diligence to understand the

24     mechanism in which they operate, to understand their true

25     value and their -- to understand their revenue-producing

1    capacity.

2         The debtor has testified that it has made no

3    marketing efforts to date.  In fact, the debtor testified

4    at the Rule 2004 exam that the only party that it could

5    identify that had expressed any interest to purchase the

6    assets was an insider, Mr. Joel Yarmon.  So up until

7    today, the only parties that have been consulted about

8    the sale of these mining rigs were only insiders.  Well,

9    I shouldn't say as -- I should say as of the date of the

10   Rule 2004 exam.

11        So the procedures, Your Honor, are extremely

12   flawed, and for that reason alone this -- the motion

13   should be denied.

14        But I next want to turn to what was extensively

15   discussed moments ago, and that's whether or not the

16   debtor may be trusted to make sound business decisions in

17   the best interests of the estate and its creditors, and

18   the debtor's conduct up to this date demonstrate that the

19   answer is absolutely no.  We have a monthly operating

20   report that shows that no bitcoins were mined, that there

21   was no bitcoin value --

22        THE COURT:  So you don't buy the Moss Adams

23   opinion?

24        MS. SIMONYAN:  Your Honor, the Moss -- absolutely

25   not.  The Moss Adams opinion is completely irrelevant

1     here.  We have a monthly operating report that requires

2     the debtor to show what -- to show its assets.  If the

3     debtor is saying that it cannot disclose the mined

4     bitcoins in the form of revenue because it has to be as

5     of the date that the bitcoins are sold, if that, in fact,

6     is the Moss Adams advice, then that value needs to be

7     disclosed elsewhere on the report.  It needs to be

8     disclosed either as assets, inventory.  You can't just

9     ignore on a balance sheet --

10          THE COURT:  Well, there is some inventory listed

11     on here.  It says "Accounts Receivable, Net Bitcoins."  I

12     don't know what that is.

13          MR. VESSENES:  There's an explanation on the

14     second page, Your Honor.

15          MS. SIMONYAN:  I can explain, Your Honor.  The

16     explanation is that because there was no specific line

17     item for bitcoins they have inserted it in accounts

18     receivable, and they value --

19          THE COURT:  So that would be given, wouldn't it?

20          MS. SIMONYAN:  Yes, except it's valued at $129,000

21     when the true value is, in fact, 1.8 million.

22          THE COURT:  Well, I see what you're saying.  Okay.

23          MS. SIMONYAN:  And we went -- at the Rule 2004

24     exam, we actually explored the monthly operating report

25     quite in detail.  We spent a lot of time on it going line

1    item by line item, and, not surprisingly, the monthly

2    operating report was amended the next day to show what

3    the actual revenue for the company was in the form of

4    bitcoins.

5        THE COURT:  So just so I'm clear, if I multiplied

6    129,168 by $848, I get about a million -- 4,085,000 --

7    no, that's not right.  So there's no scenario under which

8    that's the number of bitcoins?

9        MS. SIMONYAN:  Oh, no.  The number --

10       THE COURT:  Yeah.  There's no way.

11       MS. SIMONYAN:  -- of bitcoins that it's --

12       MS. GLYNN LEVIN:  Right.

13       MS. SIMONYAN:  There's no way that --

14       THE COURT:  Right.  There's no way.

15       MS. SIMONYAN:  No mathematical formula --

16       THE COURT:  That had to be a dollar valuation

17   inserted into that line item?

18       MS. SIMONYAN:  Yes.  Absolutely.

19       THE COURT:  Okay.

20       MS. SIMONYAN:  And the debtor has actually

21   testified to that.  But if Your Honor turns to the

22   amended report, the actual number of bitcoins that were

23   mined was 1,650.061, and at a rate -- at the rate as of

24   that date of $1,132 per bitcoin, it would render

25   $1.89 million, approximately.

1            But, Your Honor, that's only one example of the

2     multiple lies that have been put in front of this court

3     and have been produced in this case.  We have an

4     operations agreement that was entered post-petition, as I

5     said, giving CoinLab the unbridled power to bill

6     Alydian -- to bill the debtor whatever it found

7     appropriate, and the debtor has adamantly refused to

8     produce any underlying invoices to -- as evidence that

9     there was no bad faith and the actual expenses were

10    accurate and reasonable.

11            There were payments to insiders two days before,

12    and as of the date -- only a couple of hours before the

13    bankruptcy petition was filed, the debtor transferred as

14    of today's value over $12 million worth of bitcoins.  The

15    debtor repeatedly lied about it in his schedules, on

16    Schedule 3B at the 341 meeting of creditors, and only

17    amended SOFA No. 3 the day after the Rule 2004 exam,

18    during which time it was confronted with evidence that

19    these payments were actually made immediately before the

20    bankruptcy petition.  We have multiple other

21    misstatements in the schedules, including Schedule D,

22    which states that the debtor had no bitcoins as of the

23    date of the filing of the petition.

24            And we have continued discovery violations that

25    are still ongoing in this case, Your Honor, and that's

1           what I would like to turn to next.

2                 Oh, and before I move on, I want to answer a

3           couple of questions that the Court asked earlier, and I

4           don't believe the questions were adequately answered.

5                 So one of the questions was whether the debtor is

6           immediately notified of the amount of bitcoins that its

7           mined and how many bitcoins that it has, and the answer

8           is, yes, it almost immediately knows.  Once the bitcoins

9           are mined, they are in an Alydian address.  They appear

10          in an Alydian address that are used for mining bitcoins,

11          so there is no chance that the debtor at the time of

12          filing the monthly operating -- the original monthly

13          operating report could have miscalculated the value of

14          bitcoins it had.

15                And now, turning to the discovery violations,

16          Your Honor, I want to go back to the hearing on the

17          motion to compel, which was actually a quite extensive

18          hearing, and a lot of -- my client has spent a lot of

19          time on these discovery motions and a lot of attorneys'

20          fees on discovery motions and the Court spent almost a

21          full day entering the order.  And the debtor was

22          specifically required to produce all of the bitcoin

23          addresses that it had -- it used or had previously used

24          to mine, transfer, hold, control bitcoins.  The Court set

25          a specific deadline for that production of 24 hours,

```
 1        given that that was a key piece in the puzzle of
 2        determining what the transfers of bitcoins out of the
 3        estate were.  The deadline was set at 24 hours, and
 4        within the 24 hours, after some struggle, I might add,
 5        we -- the debtor produced a 20-page -- 27-page document
 6        which is subject to a confidentiality agreement.  So I
 7        haven't printed that document, but I would like to -- I
 8        have a copy with me, and I'd like to pass it to the
 9        Court, if I may.
10             THE COURT:  All right.  I'm sure I don't want to
11        keep it, but I'll look at it.
12             MS. SIMONYAN:  Your Honor, this --
13             THE COURT:  Yeah.  It's worthless.
14             MS. SIMONYAN:  Not only is it worthless --
15             THE COURT:  Okay.  But this watermark --
16             MS. GLYNN LEVIN:  That's not the form.  It's been
17        photocopied in a way --
18             THE COURT:  Well, that's what I was about to
19        ask --
20             MS. GLYNN LEVIN:  That is not the way we had it.
21             THE COURT:  Let me ask the question.  I mean, this
22        happens with a watermark when it's photographed.  So the
23        question is, did you receive one with a watermark through
24        which you could see?
25             MS. SIMONYAN:  I received one through a watermark
```

1       through which I can see, but the content of this

2       information is so highly technical that I am not the one

3       that analyzes the data.  I need some people with the

4       technical knowledge to analyze the data and --

5               THE COURT:  So your client doesn't have that

6       knowledge?  Mr. Gallancy can't look at this and know

7       whether these are, in fact, addresses?

8               MS. SIMONYAN:  Well, so there -- the answer to

9       that is twofold, Your Honor.

10              THE COURT:  Okay.  Ms. Glynn Levin, I can tell

11      you, because I sit up here, that Ms. Simonyan didn't make

12      any noises or anything like that when she heard you say

13      things that she didn't like, so you need to give her the

14      same respect.

15              So you're telling me your client can't read this?

16              MS. SIMONYAN:  What my client can read is in the

17      version that Your Honor has in front of her at the

18      moment.  He can read with the darkened watermark, and he

19      can only make out some of the information that is on

20      there that is not obscured by the watermark.  That's --

21              THE COURT:  Okay.  But why can't you give your

22      client the one that doesn't obscure --

23              MS. SIMONYAN:  The original?

24              THE COURT:  Yeah.  That isn't obscured by the

25      watermark.

1          MS. SIMONYAN:  Because my client is in New York,

2     Your Honor, so that would require me to take the only

3     original copy and forward it to my client and have no

4     other copies.  And, Your Honor, I want to remind the

5     Court of the importance of the time frame in which they

6     were supposed to produce these documents.

7          THE COURT:  Right.

8          MS. SIMONYAN:  We needed to this information going

9     into the Rule 2004 examination.  But, you know, the

10    watermark is simply indicative --

11         THE COURT:  But I could just order the debtor to

12    provide you with a copy that does not have a watermark on

13    it and instead on the first page says all of these pages

14    are confidential, and that's it.  No watermark.  Just

15    something on the first page.

16         MS. SIMONYAN:  Exactly, Your Honor.

17         THE COURT:  Okay.

18         MS. SIMONYAN:  And we would ask that the Court

19    make that order.  However, this shows the -- this is only

20    indicative of what the debtors have produced and how

21    forthcoming they have been with the production that were

22    subject to several court orders.

23         In addition to watermark which is absolutely

24    unnecessary, Your Honor, the production does not contain

25    a single full bitcoin address.  The -- Mr. -- I have

1   attached the excerpt from the Rule 2004 exam where

2   Mr. Vessenes testifies that the 27-page production does

3   not contain a single full bitcoin address.  All it

4   contains are short form addresses that are listed at the

5   top of the document, and there are only five of those,

6   and we know now that the debtor has at least six bitcoin

7   addresses.  Again, to this date the only testimony that

8   we have -- we still don't know with certainty how many

9   addresses the debtor has.  Mr. Vessenes came to the

10  Rule 2004 exam and testified that there are probably six,

11  but "probably" is not good enough.  We should have had

12  that information with certainty.  If there are six

13  addresses, those six addresses should have been typed

14  into an email and forwarded to us in response to the

15  court order, something that could have been done within

16  five minutes.

17       But this is not the end of the story, Your Honor.

18  We notified -- instead of filing a motion for sanctions

19  or another motion to compel, we notified debtor's counsel

20  that they had entirely failed to respond to our

21  production request, and we asked that debtor's counsel

22  produce the actual addresses that were used that would be

23  responsive to our request.  And in response, we get a

24  thousand-page document that contains -- over a

25  thousand-page document, that contains probably over

1     100,000 addresses, also covered with a watermark.  If I

2     may, even even a more obnoxious watermark.  If I may pass

3     that to the Court.  And this, Your Honor, constitutes

4     only probably one-tenth of what was produced to us in

5     response to the -- to our RFP No. 1.  And when we

6     actually were able to verify these addresses, we

7     discovered that most of these addresses are addresses

8     that were generated by the debtor but were never used.

9     So, again, Your Honor, we are buried -- the debtor buried

10    us in response to the court order compelling discovery.

11    Four days later, buried us with a production consisting

12    of 1,200 pages and over 100,000 addresses that were

13    completely useless.

14         That was the evening before the Rule 2004 exam,

15    and at the Rule 2004 exam Mr. Vessenes came unprepared to

16    even answer with certainty the very simple question, "How

17    many addresses has the debtor used to mine bitcoins?"

18    Mr. Vessenes testified that there are probably six, and

19    if that's the case, well, then that clearly indicates the

20    bad faith in which they have complied with any discovery

21    requests.

22         And one final item with regard to discovery,

23    Your Honor.  We had asked the debtor to produce some

24    emails and some correspondence that accompany some of

25    our -- some of the agreements that were entered pre- and

1     post-petition by the debtor, and I want to give the Court

2     a little glimpse of what was produced there.

3           THE COURT:  Morgan you can give these back.

4           MS. GLYNN LEVIN:  I'm sorry.  What is this?  Are

5     there Bates stamps?

6           MS. SIMONYAN:  This is the production that was

7     made to us on January 6th, in the evening of January 6th,

8     the day before the Rule 2004 exam was scheduled.  And so

9     let me just explain to the Court -- and, you know, we

10    didn't have, obviously, the opportunity to review this as

11    of -- before the Rule 2004 exam, and it appears -- it's

12    hard to read, but it appears that from what we can tell

13    there is some important information that needs to be

14    explored further.  But let me tell the Court some of the

15    problems there are -- that there are with this discovery.

16          First of all, as the Court can see, many of these

17    emails are gibberish.  There are characters that are

18    completely unreadable.  Some of the font sizes are so

19    small that it's impossible to even read the parts that

20    are in actual English.  Most importantly, these emails

21    are not produced in their original format, and we are

22    entitled to see the emails in their original format

23    because we need to be able to analyze the metadata of the

24    emails and to ensure that the content of the emails and

25    the various information accompanying the emails has not

1    been altered.  There are no attachments to the emails

2    that were included, and there were -- some of the emails

3    were produced in sideways so the watermark that's on them

4    actually obscured them even more than it would otherwise.

5    And the production contains numerous duplicates, so we

6    had to go through approximately 300 pages of the same

7    five emails, Your Honor.

8         These are some of the problems with the production

9    that we've dealt with.  And, you know, I would ask that

10   the Court today make a ruling requiring the debtors to

11   produce this information without the watermark or putting

12   some sort of a confidentiality notice somewhere at the

13   top of the document, which would be perfectly sufficient

14   under the circumstances.  But we know what's covered

15   under the confidentiality agreement.  We have no

16   intention to violate the confidentiality agreement --

17   which, by the way, Your Honor, this confidentiality issue

18   is also -- was another excuse to delay production of

19   documents because all the bitcoin addresses, that's

20   public information.  People can go on publicly available

21   websites and see all the bitcoin addresses that are out

22   there that are transaction --

23        THE COURT:  But can you tell when you go out there

24   and look who they belong to?

25        MS. SIMONYAN:  You can't tell who they belong to,

1   but the point is that --

2           THE COURT:  So then it's not public information.

3           MS. SIMONYAN:  The actual addresses are public

4   information.  It's not public information who they belong

5   to, but the point is that there is no intellectual

6   property that needs to be protected to this

7   confidentiality agreement, although I --

8           THE COURT:  Well, if somebody knew your bitcoin

9   addresses, could they hack into that account?

10          MS. SIMONYAN:  There is absolute -- there have

11  been no incidents of hacking into Alydian addresses.

12  There's nothing on the record to indicate one way or

13  another, and --

14          THE COURT:  Okay.

15          MS. SIMONYAN:  -- this concern was never raised

16  with us.  Just at some point, in order to delay

17  production -- for the apparent reason of delaying

18  production, the debtor raised the confidentiality issue.

19          So, Your Honor, I think I've gone through most of

20  the arguments as to why the motion today should be

21  dismissed.  There were some issues raised about

22  Bitvestment's good faith in this case that I would like

23  to address before I sit down.

24          So, first of all, debtor's counsel calls for the

25  Court to reprimand Bitvestment for taking upon itself the

```
 1       labor of ensuring that the debtor has complied with the
 2       bankruptcy code; has not looted the estate; has disclosed
 3       the insider transfers prepetition, post-petition; has
 4       disclosed the various agreements it has entered into; has
 5       disclosed that it has unilaterally decided to award
 6       Mr. Vessenes a $20,000 monthly salary that, by the way,
 7       started only post-petition; and basically taken upon
 8       itself the labor and the cost of ensuring that the
 9       integrity of the bankruptcy process is preserved.
10              Second of all, Bitvestment -- it's completely
11       irrelevant how many creditors are objecting to the sale
12       motion and to the various other reliefs that have been
13       submitted to this -- have been requested.  However, it
14       must be noted that Bitvestment is a uniquely positioned
15       creditor in this case.  Its contract has a provision that
16       is significantly different from the -- all the other
17       presale contracts of all the other creditors, and the key
18       difference is that Bitvestment's contract does not
19       contain a provision which says that upon a certain date
20       the contract expires.  So all the other contracts expire
21       on a certain date, mostly around December of 2013.  These
22       contracts state that upon a certain date if the debtor
23       has not submitted the -- to the creditors the bitcoins
24       that it's required to submit under the contract the
25       contract expires and these creditors are entitled to a
```

1    refund of their original investment.  So these contracts

2    expire at some point, and the debtor has an option to

3    repay those contracts in dollar value.  Bitvestment

4    contract does not have that provision, making Bitvestment

5    a unique creditor in this case.

6         And, finally, I need to address the subpoena

7    issue, Your Honor.

8         THE COURT:  Their subpoena to your client?

9         MS. SIMONYAN:  Subpoena to my client.

10        There have been allegations made that we have not

11   complied with the subpoena.  Well, it's a little

12   difficult to comply with a subpoena that has never been

13   served.  My client has not given me express authority to

14   accept service on his behalf.  My firm has a very strict

15   policy to comply with the client's permission whether or

16   not to accept service.  It's my understanding that

17   Mr. Reyhani, who is Mr. -- who is Bitvestment's counsel

18   in New York, is also admitted here pro hac vice, he also

19   does not have the authority to accept service.  However,

20   Your Honor, this is a very simple -- there's a very

21   simple solution to this purported problem.  All the

22   debtor needs to do is serve the registered agent, which

23   is publicly available information.  I don't understand

24   how this creates any difficulty or demonstrate any sort

25   of bad faith upon Bitvestment.

1              Oh, and one more thing I want to address,

2    Your Honor.  The debtor has repeatedly stated that the

3    debtor's core team is unwilling to stay after a certain

4    day.  The testimony that's been submitted is highly

5    dubious.  It only comes from Mr. Vessenes, and in very

6    ambiguous terms, if I may add.  Mr. Vessenes testified

7    that they may or they likely will not stay.  Again, we

8    see no certainty.  At the Rule 2004 exam, it was

9    discovered that this team will stay on only if they're

10   paid a retention bonus of $250,000.  Upon further

11   exploration, it was discovered that the team had already

12   received a large sum only a month ago, and that is on top

13   of their $200,000 monthly salary.  These are --

14              THE COURT:  200,000 -- you mean total?

15              MS. SIMONYAN:  No, not --

16              THE COURT:  Not just for one person.

17              MS. SIMONYAN:  No, each.  Each.  Each person has a

18   $200,000 monthly salary.

19              THE COURT:  Monthly salary?

20              MS. SIMONYAN:  I'm sorry.

21              MS. GLYNN LEVIN:  What?

22              MS. SIMONYAN:  I'm sorry.  Yearly salary.

23              THE COURT:  Okay.

24              MS. SIMONYAN:  I'm sorry.  I made -- it was my

25   mistake.  They have a $200,000 yearly salary.  They got a

1    retention bonus of -- or at least they were promised --

2    it's possible that it was never delivered.  We still

3    don't know after the debtor has been questioned so many

4    times, but it's been represented in the debtor's reports

5    that $105,000 at least, as of today, has been paid.  And

6    these people -- Mr. Vessenes was unable to testify

7    whether these people have other jobs, whether they have

8    other commitments or whether they've just threatened to

9    leave and just sit at home and collect Unemployment.  So,

10   Your Honor, the contention that the debtor is unable to

11   operate after a certain day because its team is -- has

12   expressed unwillingness to stay on under very favorable

13   circumstances and having received some significant sums,

14   it's incredulous.  And also, Mr. Vessenes has made no

15   showing that his team is -- cannot be easily replaced.

16        That's all for now, Your Honor, if the Court has

17   no more questions.

18        THE COURT:  I don't.

19        So, Ms. Glynn Levin, do you want to respond?  I'll

20   just give you an opportunity to briefly respond.

21        MS. PEARSON:  Your Honor, can I be heard briefly?

22        THE COURT:  Oh, okay, Ms. Pearson.  Go ahead.

23        MS. PEARSON:  Jane Pearson for CoinLab.

24        I just wanted to make a couple of broad points,

25   and one of them is, you know, the thing that strikes

1      me -- I'm new to the case, but is that if the company is

2      so highly profitable, I mean, certainly CoinLab would be

3      interested as the majority shareholder in the continued

4      operations of the company.  So I think that the action of

5      being supportive of the auction demonstrates the

6      fundamental conviction that the company cannot -- if it

7      is profitable now, and I'm not -- I don't think that's

8      been established, but that it's not anticipated because

9      of the market forces that are at work --

10          THE COURT:  So let's talk --

11          MS. PEARSON:  -- that it will continue to be

12     profitable.

13          THE COURT:  -- about, though, who you think -- who

14     else from CoinLab would have had authority to sign this

15     post-petition operations agreement.  Because so far I've

16     only seen one person associated with CoinLab, and that's

17     Mr. Vessenes.  So I think these companies do whatever he

18     wants to do, so how can I find -- I guess what I'm asking

19     you, and you're new, but I mean, how do I find any

20     separate existence at all so far with regard to

21     CoinLab --

22          MS. PEARSON:  Well, I --

23          THE COURT:  -- from the debtor?

24          MS. PEARSON:  Your Honor, I think, you know,

25     common management doesn't necessarily mean that there

1      isn't separate existence.

2           THE COURT:  So I asked you, who else in the

3      company, then, in CoinLab would have the authority to

4      sign this contract?

5           MS. PEARSON:  I believe that the general -- well,

6      the general counsel, Ms. Wallace, would have authority to

7      sign a contract.  A CFO would have authority to sign a

8      contract.  I'm not sure who the current CFO is.  Those

9      are people that strike me as having that kind of

10     authority.

11          THE COURT:  So hopefully they know about this.

12          MS. PEARSON:  Well, I think they --

13          THE COURT:  Or participated in some way.

14          MS. PEARSON:  Well, I'm not sure when Ms. Wallace

15     came on board.  I don't know if she participated with

16     respect to that contract.  I'm not sure who was on board,

17     if there was a CFO on board at that time.

18          But I also wanted to point out with respect to

19     that contract, that it doesn't provide for unbridled

20     discretion on CoinLab's part in terms of payment of

21     invoices.  In fact, it authorizes the payment of direct

22     costs plus an administrative fee of ten percent.  So it

23     appears on the face, and I understand that it was -- this

24     was drafted by highly competent outside counsel, that on

25     the face of this agreement it appears to be a typical

1       kind of agreement.  And, in fact, the arrange -- I think

2       one of the unfortunate pieces with respect to the debtor

3       right now is that all of us who aren't involved in

4       bitcoins are -- I think are struggling a little bit just

5       to understand --

6               THE COURT:  We are.

7               MS. PEARSON:  -- the industry.  And that makes it,

8       I think, maybe appear somewhat differently from how, in

9       fact, it might be.  There are terms that we're used to

10      dealing with that I think don't accommodate themselves

11      easily to this industry, and I think we're all trying to

12      figure that out, and so I think that there have perhaps

13      been some representations which were intended in good

14      faith, but perhaps because they don't fit into certain

15      forms or ways in which we're used to hearing the

16      information might not seem as clear as maybe they could

17      have been in retrospect.

18              So I also -- I would also just generally comment

19      that it wouldn't be that unusual for a parent to be

20      involved in the bankruptcy case of an affiliate and for

21      there to be common management.

22              I also want to comment with respect to the concern

23      about an expedited sale.  You know, it appears to me that

24      the actual assets that are going to be sold are quite

25      discreet, and I think a good point has been made that

1    they should be able to be described on an exhibit to an

2    order that's clear, that interested purchasers could look

3    into.  I think that this -- it appears that this -- the

4    market for this sale is highly specialized, but that it's

5    a known group that can be marketed to, and they aren't --

6    you know, with respect to Mr. Stehlik and I guess to

7    myself, they aren't necessarily aging lawyers sitting

8    around at their desks.

9            THE COURT:  They're not us.

10           MS. PEARSON:  Yeah, they're -- it's not me.  And

11   so there are places that these people look and -- pretty

12   continuously and become -- and are aware of and can act

13   quickly.  And so I don't think that -- and the debtor is

14   also going to seek to hire a particular PR firm to be

15   directed to those people.  So I think the communication

16   is not going to be the same as selling bricks-and-mortar

17   types of assets.

18           I don't see how the proposed procedure favors

19   insider purchasers.  CoinLab is not going to be a bidder.

20   Mr. Vessenes says that he's not going to be a bidder.

21   Certainly, the nature of any bidder's relationship to the

22   debtor would need to be disclosed subject -- you know,

23   for the Court's final approval of any order approving the

24   sale.

25           THE COURT:  I mean, it's only a concern if some of

1    the common owners end up in a brand new corporation

2    formed in order to buy the assets.

3         MS. PEARSON:  I understand that, Your Honor.  And

4    that's certainly a legitimate concern.

5         And then, finally, I mean, and if it is such a

6    fantastic asset, guaranteed -- you know, that people are

7    so confident is going to make so much money, then there

8    should be lots of bidders --

9         THE COURT:  Yeah.  I think it's the opposite.

10        MS. PEARSON:   -- and the objecting parties should

11   bid.

12        THE COURT:  I think from my perspective it's the

13   opposite.  Mr. Vessenes is saying that it's not.  That

14   these are assets that are devaluing rapidly.

15        MS. PEARSON:  That's certainly --

16        THE COURT:  And Ms. Glynn Levin described them

17   basically as scrap by February.

18        MS. PEARSON:  Well --

19        THE COURT:  So I think they're not -- I guess I

20   thought the debtor's argument was they're not going to be

21   worth anything unless we unload them quickly.

22        MS. PEARSON:  That's what I think the debtor's

23   argument is also.  But I'm saying the objecting parties I

24   think are challenging that representation, and if --

25        THE COURT:  Well, I'm not so sure.  I think

1    Ms. Simonyan basically said we can make more money by

2    operating with this equipment for a couple of months and

3    then just trashing it.  I mean, I guess that's what we're

4    trying to get at.  What are --

5           MS. PEARSON:  Well, but it --

6           THE COURT:  -- these things really worth?

7           MS. PEARSON:  But it appears -- well, it appears

8    that it's extremely difficult to establish a value at any

9    particular in time.

10          THE COURT:  Right.

11          MR. VESSENES:  I have estimates, actually.  I just

12   haven't wanted to put them on the record in case we would

13   prejudice bidders from going over that.

14          THE COURT:  Okay.  And you don't -- you can't

15   talk.

16          MS. PEARSON:  No.  No.  That makes sense.

17          And it also appears that, I mean, the value --

18   it's a highly volatile market, not just for the mining

19   equipment, but also for the bitcoin, and I think -- I

20   believe -- I can't speak for the debtor, but I believe

21   the debtor's intention is to continue operating until the

22   sale takes place.  So if the Court did approve the sale,

23   until the equipment, the mining equipment changes hands,

24   it would continue to mine.  It wouldn't just, like, today

25   be shut down.  Subject, of course, to the availability of

1          the employees.

2                   So those are all the comments that I have,

3          Your Honor.

4                   THE COURT:  All right.

5                   Ms. Glynn Levin, now do you want to respond

6          briefly?

7                   MS. GLYNN LEVIN:  I'll try to make it brief,

8          Your Honor.  I know Your Honor has heard a lot already

9          today.

10                  I think the point has been made that just because

11         you have a complicated and perhaps complex industry where

12         there are a lot of questions about how things work and

13         there are a lot of questions about what the technology

14         is, that doesn't defeat our right to be able to be in

15         bankruptcy.  That doesn't defeat a debtor's right to be

16         able to reorganize and sell.  It's not required that we

17         have a simple, well understood, well established, common,

18         conventional industry in order to be in bankruptcy court.

19                  This is new, and the fact that it is new does --

20         is perplexing to a lot of people, and we have done our

21         very best in trying to simplify it and making it as clear

22         as possible to everyone so that it is patently obvious

23         what is going on, how the accounting works, what the

24         assets are.  We know who's involved.  And it does take --

25         I mean, it has taken some time to get our collective

1    hands around this so that we can sort of convert the

2    information and the data into a form that is sort of

3    readily usable for all of the constituent parts of the

4    bankruptcy system.  You know, I definitely get that.

5         So when Mr. Stehlik comes up and says, you know,

6    "What is this stuff?  Gee, I don't get it."  Well, you

7    know, he's a newcomer to the case.  That's how I felt

8    when I first started off.  I mean, I couldn't spell

9    "bitcoin."  So it does take some time to start to get

10    there and understanding.  That is not a reason, that's

11    not a ground to defeat our motion.  And maybe the

12    contrary is true.  Maybe the fact that we have something

13    that is so unique, we are bringing this, doing our best

14    to explain in sort of layman terms as well as possible

15    what we are doing, is the -- really the essence of this

16    motion.

17         I kind of have to object with the long discussion

18    about discovery.  While I know the Court has been

19    concerned about disclosure and making sure that all of

20    the discovery is turned over, I mean, this is not a

21    discovery motion, and I wasn't -- didn't stand here

22    prepared to be addressing this.

23         Let's turn quickly to the operating agreement.  I

24    think Ms. Pearson correctly identified the -- you know,

25    the pros and cons of that agreement, that it's not a

1    carte blanche to do whatever is -- whatever CoinLab

2    wants.

3         Your Honor specifically addressed the question of

4    should we under a 2004 proceeding be required to turn

5    over all of the underlying invoices, and I said that

6    would be burdensome, but we could do it.  And Your Honor

7    said, no, that would by overly burdensome, so we did not

8    do it.  It was not part of the court order, and I object

9    to the insinuation now that we withheld something that we

10    were supposed to turn over.  It was expressly asked for

11    and not turned over because it was not part of the court

12    order.

13         In terms of the timing of the 2004, that was

14    strictly up to Bitvestment.  The Court agreed to allow us

15    basically one week, a very short week to turn over a

16    volume, and I think the Court described it as overly

17    broad when we were in here a day or two before New Years,

18    and a volume was turned over on the 6th of January.

19         Now, there's been some sort of insinuation that

20    information was buried, and I resent that, because

21    Bitvestment has been asking time and time again, "Turn

22    over all the addresses.  Turn over all the addresses."

23    And we have been saying, and I said in court, "Really?

24    You really want these?  There are a hundred thousand

25    addresses out there that are essentially set aside as

1    sort of like empty vessels, and they are not being used."

2    And they said, "Yes.  Turn over all the addresses."  So

3    we did.

4         Now, the form of the addresses, the watermark, as

5    it got copied, does appear much darker than when it left

6    my office.  I will say that, and I -- and the day the

7    initial production was supposed to be turned over, that

8    27 pages, Lane Powell did not tell me their office was

9    closed, so literally there was a court order requiring us

10   to turn over documents to an office that was closed on

11   New Years, and only through the efforts of a messenger

12   who managed to find his way up through the security

13   system and beg to deliver these things was it actually --

14   were we able to finally meet the terms of the court

15   order.  And so with 24 hours, it would have -- I think it

16   would have been nice had we been told that Lane Powell

17   was going to be closed on the time that -- at the time

18   that we were required to turn them over.

19        I'll also point out that at the deposition of

20   Mr. Vessenes, which lasted a good eight hours so every

21   opportunity was there to ask any question of him, one

22   exhibit was turned over, and it's Exhibit 9.  It is a

23   16-page document, and I'm happy to turn it over just like

24   Counsel has done, although they didn't put -- they didn't

25   Bates stamp it, so it just appears as a printout.  And

1        what it is is a printout of exactly as Your Honor was

2        saying.  It's all the addresses and all the activity on

3        CoinLab's active using accounts.

4               MR. VESSENES:  Alydian.

5               MS. GLYNN LEVIN:  Excuse me.  Debtor's.  The

6        debtor's accounts.  All of the activity.  So when they

7        came up after hours of saying, "Why didn't you turn these

8        things over," and then walked up and said, "Well, here's

9        Exhibit 9.  Are these all your accounts?"  They had them

10       all along.

11              THE COURT:  So you're saying this Exhibit 9 was

12       produced by them?

13              MS. GLYNN LEVIN:  This Exhibit 9 was produced by

14       them, Your Honor.  They had had them --

15              THE COURT:  Oh, okay.  I guess I should --

16              MS. GLYNN LEVIN:  They had them --

17              THE COURT:  You can take this one back and give it

18       to --

19              MS. GLYNN LEVIN:  -- all along, and the way to

20       match up that they are owned by the debtor is that the

21       first five or so -- five or six characters or so which

22       appeared on the spreadsheets that we produced match

23       exactly the account or the address numbers on there.  So

24       they had them all along.  The whole thing was a great big

25       subterfuge to really force the debtor to go through an

1    incredible amount of work, expend enormous resources, and

2    make a very large fuss, really, out of nothing.  They

3    have all the information about the accounts.  These

4    accounts are available now that they have the full

5    address, literally the full address with all 27 or 30

6    characters or whatever it is.  I mean, literally now that

7    they know that those belong to the debtor, they can

8    actually go and see in real time the activity on them.

9    So it's a little hard to accept the objection that we

10   didn't turn over, that there's some information that's

11   being hidden.  There were transfers between, among those

12   accounts.  Those were all accounts held by the debtor.

13   They were not being sent out to third parties and

14   certainly not to CoinLab.  Again, it's all very

15   transparent and very able to be determined.

16        I think the one thing that I did hear from Counsel

17   for Bitvestment is that she said it was intuitively true

18   and it is no secret that it's out there and -- that it is

19   increasingly difficult to mine.  That was a big

20   concession, and I'm very pleased with her forthrightness

21   on that part.  A big concession.  It is intuitively true

22   it is becoming increasingly difficult to mine.

23        Now, I do ask this.  Where is the declaration of

24   her client?  Where is the declaration of Mr. Gallancy,

25   who is supposedly a financial -- a certified financial

1    analyst and some other kind of an expert in this

2    industry?  There's no evidence from him.  Zero.  So

3    everything that has been done on this objection is just

4    to say, "You've not done your work, debtor.  You've not

5    done your work."  They have not shown one thing.  They

6    have not produced one expert report.  They have not even

7    produced one sentence of Mr. Gallancy's declaration to

8    say:  You know, I don't think this is a good idea.  It's

9    all argument.

10         In terms of the calculation, the value increased

11   80 times, you know, it's just -- it's statistics, and

12   it's really immaterial as to what exactly the value of a

13   bitcoin is at -- over the history of one year.  To this

14   motion --

15         THE COURT:  Okay.  But just trying to be true to

16   the industry, and demonstrating maybe that I've learned

17   something from when we've started, we know, we all know,

18   that at present the total number of bitcoins that are

19   going to be issued is limited.  So as bitcoins are mined,

20   that means there are fewer left available, so doesn't

21   that mean just as a matter of supply and demand that the

22   value of bitcoins is going to go up, setting aside things

23   like the Chinese and Overstock?  But the fact is, the

24   fewer there are, just in that vacuum, the more valuable

25   they will be?

1          MS. GLYNN LEVIN:  In that vacuum?

2          THE COURT:  Right.

3          MS. GLYNN LEVIN:  Yes.

4          THE COURT:  In that vacuum.

5          MS. GLYNN LEVIN:  But we don't operate in a

6     vacuum.  We are operating in an international sphere with

7     multiple variable factors.  I mean, this is an

8     economist's dream analysis to figure out all the factors,

9     I mean, and they could change daily, what factors

10    influence the price of bitcoin.  I mean, I'll bet you you

11    could put that into a Google search and come up with lots

12    of different hits and lots of different analysis, and

13    market supply and demand is only one.  Ability to use

14    them is another.  What's going on in the field of

15    regulation by governments is another.  I mean, there are

16    multiple factors here, and the debtor cannot control the

17    value of the -- the exchange value of the bitcoin.  And

18    that isn't actually before the Court today.  The debtor

19    can say, "Here's the history from the" -- it was high, it

20    was low, it's gone up again, it's gone up and down and up

21    and down.  We can't control that.  The only thing right

22    now we have a limited bit of control over is getting our

23    rigs out there to mine, and that, as we've shown, has

24    got -- and I -- what was the percentage increase?  Some

25    thousands and thousands of percentage increase of

1    difficulty, going straight up.

2          I guess I also want to turn to now -- because I

3    don't want to beg the Court's patience for too, too long.

4          THE COURT:  Okay.  Well, I'm going to give you

5    four minutes.

6          MS. GLYNN LEVIN:  I have four minutes.

7          In terms of the amount of time, it's not five

8    days.  We're really talking from today 12 days.  And the

9    news has already hit the press.  We already have a PR

10   firm out there.  Why didn't we start --

11         THE COURT:  We do?

12         MS. GLYNN LEVIN:  Well, we've negotiated a

13   contract with one.  One has not been employed by the

14   Court.

15         THE COURT:  So they've started advertising?

16         MS. GLYNN LEVIN:  They have --

17         THE COURT:  Okay.  I stopped you.  I don't want to

18   use your four minutes.

19         MS. GLYNN LEVIN:  They have used -- they have --

20   this is -- this was a -- this is a tricky decision,

21   Your Honor.  Do we leak the information out and get it

22   out there so that the time we actually sell it the news

23   is stale, or do we hold on to it and then make a big

24   splash?  "Debtor is selling these things."  Get out

25   there, get the excitement, figure out right at the right

1      time.  How could we go out and start marketing something

2      where we had no idea where the Court was going to be in

3      terms of setting a floor?

4           THE COURT:  Okay.  That's why I asked you because

5      you said we already have a PR firm out there, and that's

6      why I asked you because we don't yet.  Haven't hired

7      them.  They haven't done anything yet.

8           MS. GLYNN LEVIN:  They have been retained and they

9      are ready to go.  I mean --

10          THE COURT:  All right.

11          MS. GLYNN LEVIN:  -- literally ready.  We have

12     telephone calls set up this afternoon, and they are ready

13     to hit the button and set the ground running, and I would

14     like to set their application for appointment on

15     immediately.  I mean literally this afternoon.

16          Can the debtor be trusted to make sound business

17     decisions?  It's a -- this is a very -- this is a

18     judgment call, Your Honor.  This is not an objective

19     standard.  We have done our absolute best to put

20     everything out there.  Where we had forms and reports

21     that didn't suit our industry, we modified them.  We

22     supplemented.  We amended our -- we amended -- we have

23     had no complaints from the U.S. trustee.  Not one.  He is

24     sitting there quietly listening and enjoying the story

25     here.  Not one complaint from the U.S. trustee.  Zero.

1          And ultimately --

2               THE COURT:  Okay.  Before you keep beating that

3     dead horse --

4               MS. GLYNN LEVIN:  Yes.

5               THE COURT:  -- let me just remind you, I am the

6     one who makes the decisions --

7               MS. GLYNN LEVIN:  Yes.

8               THE COURT:  -- not Mr. Buford.

9               MS. GLYNN LEVIN:  I understand, but --

10              THE COURT:  So I don't really care whether he

11    stands up or sits down.

12              MS. GLYNN LEVIN:  I understand, Your Honor.

13              THE COURT:  If he stood up, that would be of great

14    concern to me.

15              MS. GLYNN LEVIN:  Okay.

16              THE COURT:  And probably to you too, because that

17    would mean that all of a sudden maybe Mr. Buford does

18    have concerns.  So fortunately for you, you're only

19    dealing with mine, Mr. Stehlik, and Ms. Simonyan.

20              MS. GLYNN LEVIN:  What this does is it

21    characterizes the dynamic of this dispute.  This is

22    really two private parties who have had litigation going

23    on in New York and who are now transferring and trying to

24    convert and sway this court to take their side in

25    litigation that doesn't even in some ways really belong

1    here, except to the extent that we are dealing with an

2    objection to claim.

3           Again, I'm certainly happy and -- you know, when I

4    look at that -- those watermarks too, I mean, I -- they

5    do look dark to me, and I am absolutely happy to

6    reproduce that production without the watermark or with

7    just something at the bottom.  But there was some concern

8    that these would be used and circulated, and we -- and

9    unfortunately, the way it got photocopied, it looks very

10   dark.  But the information below was not obscured, so

11   ultimately I'm not sure what the practical complaint is,

12   but if the Court would like us to reproduce those without

13   the watermark on top, I'm certainly willing to do that,

14   as I offered at the 2004 exam multiple times.

15          Again, a full audit of all of the addresses were

16   provided to the U.S. trustee.

17          Turning to the emails --

18          THE COURT:  Okay.  I want you to wrap up.

19          MS. GLYNN LEVIN:  I will wrap --

20          THE COURT:  I don't want to discuss the discovery

21   dispute.  If they file a motion to compel, I'll respond

22   to it.  I'm not making an order with regard to that

23   today.

24          MS. GLYNN LEVIN:  I don't have too much else,

25   Your Honor.  Your Honor has been very patient with this

1   process, and I appreciate -- my client appreciates the

2   time that the Court has spent in trying to learn where

3   this industry is.  We have confidence that with Tim

4   Murphy in charge of an auction that that will be the best

5   way to ensure the -- sort of the neutrality of the

6   process.  He could certainly file his auctioneer's

7   report.  We will have our expert to go out and get the PR

8   out there and get the sale, to generate the excitement,

9   set that minimum bid of $2,000 per terra-hash and see

10   where this goes.  And we're willing to consider -- or

11   we'll consider what other contingencies there could be in

12   terms of a sale.

13     But the reality is, Your Honor, that we -- that

14   the systems need to get sold.  No Chapter 7 trustee is

15   going to sell them.  Your Honor said that.  And to -- we

16   will continue to operate them up until, you know, the

17   moment that they're turned over to a new purchaser or

18   purchasers and sold.  We ask the Court to grant the

19   motion and allow us to go ahead on that, on a sale.

20     Thank you.

21     THE COURT:  Okay.  I am not going to grant the

22   motion.  I'm not saying never, and I'm going to give you

23   my conditions today for what I need before I'm going to

24   be prepared to do this.

25     I want to start with one of the last points

1        Ms. Glynn Levin just made, and that is the point that
2    this is in reality a two-party dispute, and I agree with
3    that, and I am very close to sua sponte dismissing this
4    case and letting the parties just fight it out in state
5    court or in federal court in New York, where perhaps they
6    ought to be.  And so let me just lay what I think the
7    motivations are of the parties that are troubling to me
8    and their motivations on both sides that I am obviously
9    going to be watching.
10        On the debtor's side, I don't know as much about
11    this industry as I should, but I've learned enough so far
12    to be convinced that these machines, these so-called
13    systems, could be a lot like the Harleys I see from my
14    consumer debtors, and that means they're Mr. Vessenes's
15    and his colleagues' babies and that it will be a cold day
16    before they're willing to give them up.  And I know that
17    the only place the debtor can get out of these contracts,
18    which I have held are not executory, is here.  And I know
19    that I will therefore be very concerned about whether
20    insiders or related parties are the ones bidding at an
21    auction.
22        And Mr. Stehlik and others have kind of --
23    Mr. Stehlik hit it on the head when he said what we are
24    to believe is that all this effort by the debtor and
25    CoinLab has occurred over the last few months, all

1    culminating in equipment that is worth a couple

2    hundred -- $400,000.  And Mr. Vessenes is shaking his

3    head, which is why I'm going to give his my conditions

4    for going forward.

5         MR. VESSENES:  Yeah.

6         THE COURT:  Maybe they are worth $10 million, and

7    if somebody -- if that's true, somebody is going to have

8    to tell me that, but today that's not in the record.

9    What I know, however, is the debtor has great

10   incentive -- I think the debtor's principals will have

11   great incentive to find a way into continuing this

12   business, given the personal and financial investment

13   they have obviously made in it in the last few weeks.

14        On the flip side, I know that Bitvestment has a

15   contract and a legal argument that it can force specific

16   performance on the debtor, and that if it is successful

17   in doing that, then none of the other creditors get paid.

18   That bitcoin continues to go up in value.  I understand

19   the volatility, but the basic premise of bitcoin right

20   now is that people are betting that its value is going to

21   go up.  The more of it that is mined, the less of it is

22   that is there.  And Mr. Gallancy and those on his side

23   are interested in turning their investment into their own

24   bitcoin gold mine, if you will.

25        So I start with the proposition that I think that

1      the parties' motivations are on the table.  We know what
2      they are.
3           My biggest concern is I do not believe this
4      evidentiary record convinces me that the debtor is better
5      off to sell this equipment.  And before I am willing to
6      consider that, I need accurate monthly financial reports.
7      Maybe it's not true that the debtor didn't just make
8      $1.8 million in November and have no costs, but I don't
9      have December's report.  I don't have any breakdown of
10     what the actual expenses incurred were.  Therefore, I
11     have no idea whether this debtor is profitable or not.
12     All I have in the record shows me that the debtor is
13     wildly profitable, and that if this debtor could make
14     $1.8 million a month and not incur any expenses, it would
15     be one of the most successful debtors I have ever had,
16     and we would just stay at that for a few months and
17     everybody would be more than paid, and the debtor could
18     go off on its merry way and do its thing.  But I think
19     that is not the case.  I think there are expenses here.
20     Before I am willing to go forward, I need to have
21     financial reports that honestly show me what the revenue
22     is and what the expenses are.
23          With regard to CoinLab, I am not satisfied with
24     these huge payments to CoinLab without any court
25     approval.  We have post-petition agreements and payments;

1       prepetition, possibly; very large preference

2       transactions.  And I agree with Ms. Simonyan that we will

3       ultimately have to get to the underlying cost that has

4       been incurred by CoinLab and passed on to the debtor.  If

5       it is, in fact, a direct cost, as argued by Ms. Pearson

6       and as stated in the contract, so it's just a

7       pass-through of costs that we can verify, fine.  But

8       Mr. Stehlik points out that here we have these huge costs

9       being incurred relative to equipment that the debtor is

10      now telling us is going to be worthless if we don't get

11      rid of it immediately, and that is, frankly, hard for me

12      to believe.

13          So I am concerned about post-petition contracts in

14      which CoinLab has entered which involve huge monthly

15      lease obligations.  Those are obligations of CoinLab.

16      The debtor can't control those.  CoinLab doesn't have to

17      get any approval from me as to whether or not those

18      leases can be signed.  However, when CoinLab comes in

19      here to seek reimbursement from the debtor for what is, I

20      believe, $198,350 per month in lease obligations, CoinLab

21      had better have some evidence that these are market

22      leases.  Otherwise, I have concerns that these expenses

23      are being trumped up in order to draw money out of this

24      debtor and away from the creditors here.

25          Mr. Vessenes is reluctant to tell me how much he

1    thinks these systems are worth because, like all

2    Chapter 11 debtors, he is concerned that if he takes any

3    kind of stand in public that will telegraph to others

4    what they can bid.  That is the case in all auctions in

5    Chapter 11.  That's just how we do it.  That's just a

6    fact.  And the way you deal with that is at a minimum

7    you've got to give me an estimate of what the universe

8    might be.  It can be anywhere from a minimum of $400,000

9    to $25 million.  What I need is for someone -- and maybe

10   the expert is Mr. Vessenes.  If it is, time for you to

11   tell me because I'm not going into a sale where the

12   debtor shows $1.8 million in revenue after only one month

13   and I am going to get $400,000 for equipment.  That's

14   just not going to happen.

15        MR. VESSENES:  I'd be happy --

16        THE COURT:  I need more certainty that there will

17   actually be competitive bidding that could generate a

18   significant amount of money.  Otherwise, it may very well

19   be that that same return can be generated by operating

20   this business and trashing the equipment at the end, just

21   giving it up.

22        I know what I will hear in responses:  "But you

23   haven't considered the fact that the employees have

24   threatened to leave."  I frankly don't care.  This is a

25   common theme in Chapter 11.  In almost every corporate

1      Chapter 11 all of a sudden employees want to leave and

2      they want to be paid big dollars at the expense of

3      everybody else in the case so that we can all beg them

4      and get down on our knees and be thankful that they're

5      going to save us.  From what?  That which they wrought

6      upon the creditors.  So we can't let the demands of a few

7      people drive the entire case.  If they want to leave,

8      they should leave.  I suspect that they don't.  And if

9      they do want to leave and there aren't people to come in

10     and operate this business, then we're left where we are

11     today, which is we need to sell the equipment.

12         And I haven't heard anything to convince me that

13     this is a kind of sale like a store where you've got, you

14     know, 150 employees who come in every day and stack

15     shelves and man cash registers and do accounting and do

16     all that's necessary to run a business, that it really

17     does generate more money upon sale if all that is in

18     place.  I'm not seeing that evidence.  If that's the

19     case, then I think the debtor needs to put that into some

20     form of evidence that I can understand:  Hey, the fact

21     that it's in a place with people who can operate it will

22     actually generate more money versus scrap, turn it off,

23     unplug it.

24         I don't know what the terms of these leases are at

25     all with regard to this equipment.  If it's the kind of

1    thing that really is hard to move, then it really

2    surprises me that on December 19, 2013, the debtor and

3    CoinLab installed ten rigs in this Wow lease headquarters.

4         Post-petition transactions cannot continue.  In

5    the first place, the monthly report, that's going to be

6    prepared for December.  And if there are some correction

7    that needs to be made for November, then it better be

8    made.  Incentive compensation does not get paid in a

9    Chapter 11 unless there is a motion for authority to pay

10   on notice to creditors and an order signed by me.

11        Post-petition contracts.  I suppose the debtor

12   could argue this was in the ordinary course of business,

13   but I'm going to say it's not.  A contract signed between

14   the debtor and a related entity which is signed by the

15   person that I am counting on to be in charge of the

16   debtor in possession, Mr. Vessenes, when he signs with

17   both hats on, I have to have all of my systems on high

18   alert.  And with a contract like this, it says a number

19   of things that are interesting in the proprietary

20   materials section.  We actually have, "CoinLab hereby

21   assigns and transfers to Alydian, without separate

22   consideration, all right, title, and interest that

23   CoinLab may have in the proprietary materials."  I don't

24   know what that means or why that's in here, but things

25   like that concern me when the person who is supposedly

1    the business person interacting with Ms. Glynn Levin has

2    signed on behalf of both companies.  This is not valid

3    until there is a motion to approve it, notice to

4    creditors, and an order signed by me.

5          Let me go back to see if there are any other

6    things that I need.

7          I do want you to reproduce, Ms. Glynn Levin.  The

8    only thing I'll say about the production today is that

9    you need to reproduce those documents without the

10   watermark.  And I am assuming when Bitvestment starts

11   making its disclosures it will not put a watermark all

12   over the front of its documents.

13         Let's review the major conditions that I have

14   before I will reconsider this motion to sell:

15         I need accurate and honest income and expense

16   information for November and December.

17         I need a clear description of the property.  I

18   don't want there to be reliance on the fact that

19   everybody knows what it is.  I think it is very unclear

20   from this operations agreement and the way it says that

21   CoinLab essentially owns all this stuff.  So there must

22   be an exhibit that actually describes what the system

23   includes and how many there are.  I understand that we

24   don't want to make representations about what that system

25   can accomplish, but I think there must be a way to

1    describe it so that the estate is making an accurate and

2    honest representation to the public about what's for

3    sale.

4          I need a declaration from Mr. Vessenes which

5    addresses the value of this equipment in more detail for

6    me so that I know more than just what the minimum bid is

7    going to be.

8          Every time we do an auction in bankruptcy court we

9    don't know what we're going to get, but over the years

10   I've learned that I can be surprised.  If you had told me

11   that Tully's would sell for what it did for, I would have

12   said no way.  I had another case where everybody got paid

13   in full, and nobody saw it coming.  And it involved

14   technology.  So all I need to know is that there's

15   something more here than $400,000, and if there isn't, if

16   it is $400,000, then I can compare that to the income and

17   the expenses and the net income and make a decision about

18   whether or not that is actually in the best interest of

19   creditors.  In this record, I can't see that this is in

20   the best interest of the creditors.

21         And I am concerned about the debtor's business

22   judgment, which I think may be clouded by the debtor's

23   own interests, the interests of its affiliates, and the

24   animosity toward what I agree is a bitter enemy.  But

25   that doesn't change the fact, as Ms. Simonyan says, that

1    Bitvestment has every right to exercise the legal rights

2    that it has, and it's clear that that will continue in

3    the case, and I am worried about the expenses.

4         With regard to the PR firm, I haven't seen that

5    application, but, again, that's part of the economics of

6    the sale.  In order to determine whether the sale makes

7    any sense, we need to know what the expenses of the sale

8    are going to be.  Presumably, Murphy is going to take a

9    cut.  We need to know what that is.  Presumably, the PR

10    firm is going to have to be paid.  We need to know

11    what -- if Murphy takes 20 percent and the PR firm takes

12    50, you know, and we're down to 200,000, then that makes

13    it a totally different case.

14         So, Ms. Glynn Levin, I'm going to leave it to you.

15    Tee it up however you want, but you're going to need to

16    re-file the motion.  I am not persuaded that there is an

17    emergency here that requires me to unload this equipment

18    without taking the time to actually analyze what's at

19    stake here, and I have concerns about what's been going

20    on in the case.

21         And so, Mr. Buford, I hope that you are perfectly

22    satisfied, and if you are, that's great, and I won't see

23    a motion to dismiss or convert.

24         But if he's not, then I expect somebody to request

25    relief that they think is appropriate if there are

```
1       problems with the management of the company.

2               With that, we will be at recess.  Thank you.

3               MR. STEHLIK:  Thank you.

4               MS. SIMONYAN:  Thank you.

5               THE CLERK:  Please rise.

6               (Hearing concluded.)

7                       C E R T I F I C A T E

8       STATE OF WASHINGTON        )

9                                  )

10      COUNTY OF KING             )

11          I, the undersigned, under my commission as a Notary

12      Public in and for the State of Washington, do hereby

13      certify that the foregoing digitally recorded proceedings

14      were transcribed under my direction as a certified

15      transcriptionist; and that the transcript is true and

16      accurate to the best of my knowledge and ability; that I

17      am not a relative or employee of any attorney or counsel

18      employed by the parties hereto, nor financially

19      interested in its outcome.

20

21          Signed and dated this 14th day of January, 2014

22

23

24              by [s] Shanna Barr

25              SHANNA BARR, CETD
```